# GALLAUDET UNIVERSITY KELLOGG CONFERENCE CENTER
## MANAGEMENT AGREEMENT

TABLE OF CONTENTS

| ARTICLE I | DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
|---|---|---|
| ARTICLE II | TERM OF AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | 2.1 Commencement Date . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | 2.2 Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| | 2.3 Initial Opening Period . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| ARTICLE III | ENGAGEMENT OF OPERATOR . . . . . . . . . . . . . . . . . . . . | 6 |
| | 3.1 Operational Services . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| | 3.2 Property Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| | 3.3 Limitations on Authority . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| | 3.4 Operation at Owner's Expense . . . . . . . . . . . . . . . . . . . | 9 |
| ARTICLE IV | ACCOUNTING AND BUDGETING SERVICES . . . . . . . . . . | 9 |
| | 4.1 Annual Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| | 4.2 Approval of Annual Plan . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| | 4.3 Approval of Capital Budget . . . . . . . . . . . . . . . . . . . . . | 10 |
| | 4.4 Implementation of Annual Plan . . . . . . . . . . . . . . . . . | 10 |
| | 4.5 Budgetary Limitations . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| | 4.6 Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| | 4.7 Financial Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| ARTICLE V | MANAGEMENT FEES . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| ARTICLE VI | DISBURSEMENTS AND REIMBURSEMENTS . . . . . . . . . . | 12 |
| | 6.1 Accounting Period Billings and Reimbursements . . . . | 12 |
| | 6.2 Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| ARTICLE VII | REPAIRS, MAINTENANCE AND REPLACEMENTS . . . . . . | 12 |
| | 7.1 Routine Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| | 7.2 Owner's Capital Expenditure Obligations . . . . . . . . . . | 13 |
| ARTICLE VIII | PROPRIETARY MARKS . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | 8.1 Property Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | 8.2 Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | 8.3 Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | 8.4 Confidential Information . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| ARTICLE IX | TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| | 9.1 Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| | 9.2 Termination Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| | 9.3 Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| | 9.4 Operator's Duties Upon Termination . . . . . . . . . . . . . | 15 |
| | 9.5 Owner's Obligations Upon Termination . . . . . . . . . . . | 16 |
| ARTICLE X | CASUALTY LOSS AND CONDEMNATION . . . . . . . . . . . . | 16 |
| | 10.1 Damage or Destruction . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| | 10.2 Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| | 10.3 Discontinued Operations . . . . . . . . . . . . . . . . . . . . . . . | 16 |

ARTICLE XI  INSURANCE ....................................... 16
    11.1  Property Insurance ........................... 16
    11.2  Owner's Insurance ........................... 16
    11.3  Operator's Insurance ......................... 17
    11.4  Policy Standards ............................. 17
    11.5  Additional Coverages ........................ 17
    11.6  Deductibles ................................. 17
    11.7  Requirements ................................ 17

ARTICLE XII  INDEMNIFICATION ............................... 18
    12.1  Indemnification of Owner by Operator ........... 18
    12.2  Contracts and Future Bookings .................. 18
    12.3  Survival ................................... 18

ARTICLE XIII  OWNER'S COVENANTS ............................ 18
    13.1  Right to Operate and Use Property .............. 18
    13.2  Property Taxes .............................. 18

ARTICLE XIV  TRANSFER AND ASSIGNMENT ...................... 19

ARTICLE XV  ENVIRONMENTAL MATTERS ....................... 19
    15.1  Obligations of Operator ...................... 19
    15.2  Indemnification of Owner by Operator ........... 20

ARTICLE XVI  NOTICES ....................................... 20

ARTICLE XVII  MISCELLANEOUS ................................ 21
    17.1  Consent by Owner ........................... 21
    17.2  Further Agreements .......................... 21
    17.3  Waiver ..................................... 21
    17.4  Successors and Assigns ........................ 21
    17.5  Governing Law: Venue ........................ 21
    17.6  Amendments ................................ 21
    17.7  Estoppel Certificate .......................... 22
    17.8  Partial Invalidity ............................ 22
    17.9  No Representation Regarding Projections .......... 22
    17.10  Relationship ................................ 22
    17.11  Entire Agreement ............................ 22
    17.12  Right to Make Agreement ...................... 22
    17.13  Interpretation ............................... 22
    17.14  Counterparts ................................ 23
    17.15  Captions ................................... 23
    17.16  Pronouns ................................... 23
    17.17  Waiver of Right to Assume Agreement ............ 23

# MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** ("this Agreement") is made and entered into as of this 11th day of February, 2000 by and between **GUEST SERVICES, INC.,** a non-stock, non-profit distributing Corporation, with its principal place of business located at 3055 Prosperity Avenue, Fairfax, Virginia 22031-2290 (hereinafter referred to as "Operator") and **GALLAUDET UNIVERSITY,** a federally chartered corporation located at 800 Florida Avenue, N.E., Washington, D.C. 20002 (hereinafter referred to as "Owner").

**WHEREAS,** Owner is the owner of a conference center commonly known as the "Gallaudet University Kellogg Conference Center" which is located at 800 Florida Avenue, N.E., Washington, D.C. 20002;

**WHEREAS,** it is Owner's desire that the Gallaudet University Kellogg Conference Center be managed and operated in harmony with the unique culture of Gallaudet University and its mission to provide the appropriate environment for adult learning of continuing personal and professional education and training for the deaf and hard of hearing community;

**WHEREAS,** Operator is experienced in the management and operation of conference centers;

**WHEREAS,** Operator is aware of the unique culture of Gallaudet University and is committed to take the necessary steps to assist Owner in its mission, as the same may relate to the operation and management of the Gallaudet University Kellogg Conference Center; and

**WHEREAS,** Owner desires to engage Operator to provide operational and management services for the Gallaudet University Kellogg Conference Center in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the covenants and agreements herein contained Operator and Owner agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement (and in the exhibits attached hereto) the following terms shall have the meanings as set forth below:

"**Accounting Periods**" means the twelve (12) calendar months of the fiscal year.

"**Affiliate**" means, with respect to any party to this Agreement, (a) any other person or legal entity directly or indirectly "controlled by", "controlling" or "under common control with" such party, or (b) any other person or legal entity in which such party, or any person or legal entity owing directly or indirectly a material beneficial interest in such party, holds directly or indirectly a material beneficial interest. For purposes of this Agreement the terms "controlled by", "controlling" or "under the common control with" shall mean the possession (whether direct or indirect) of the power to direct or cause the direction of the management or policies of a person or entity whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Management Agreement as it may be amended, extended or supplemented from time to time.

"**Annual Plan**" has the meaning set forth in section 4.1 hereof.

"**Management Fee**" has the meaning set forth in Article V hereof.

"**Buildings and Improvements**" means the existing eighty-seven (87) double occupancy guest rooms, six (6) suites together with the ballroom, the lecture hall and all banquet, meeting and conference rooms, the dining area, the lounge, all storage and service areas, along with all of the other existing and future real property structures and improvements located on the Site (hereinafter defined).

"**Capital Budget**" shall have the meaning set forth in section 4.1 (b) hereof.

"**Client Locations**" means the Property and all other conference centers, hospitals, hotels and other properties to which Operator or its Affiliates provide management, operational and other related centralized services.

"**Commencement Date**" means the date on which Operator shall commence to management and operate the business of the Property in accordance with the terms of this Agreement.

"**Direct Costs**" means those costs incurred by Operator (other than Management Fees) that are directly attributable to services provided and expenses incurred under this Agreement.

"**Event of Default**" has the meaning set forth in section 9.1 hereof.

"**Fiscal Year**" means the annual accounting period beginning on October 1 and ending on September 30 of each year during the terms of this Agreement, except that the "Initial Fiscal Year" shall commence on the Commencement Date and end on September 30, 2000, and the final Fiscal Year shall end on the effective date of termination of this Agreement. A "full" Fiscal Year means a fiscal Year containing 365 days, and a "partial" Fiscal Year means a Fiscal Year of lesser duration.

"**Furnishings and Equipment**" means all furniture, wall and floor coverings, fixtures and equipment (other than Major Equipment Systems) located at or used in connection with the Property, including (without limitation): (a) all furniture, furnishings, built-in serving or service furniture, carpeting, decorative millwork, decorative lighting, television receivers and other electronic equipment, interior plantings, interior water features, artifacts and artwork, and interior and exterior graphics; (b) office furniture; (c) chinaware, glassware, linens, silverware uniforms and menus; (d) all fixtures and specialized hotel or conference center equipment used in the operation of kitchens, laundries, lounges and dining areas; (e) telephone and call accounting systems; (f) room management systems, point-of-sale accounting equipment, front and back office accounting systems and office equipment; (g) cleaning and engineering equipment, tools, utensils and all other similar items; (h) vehicles; (i) recreational equipment; and (j) all other similar items which are used in the operation of the Property.

"**Gross Operating Expenses**" means, for any period, all costs and expenses directly incurred by Operator and Owner during such period in relation to the operation of the Property, determined on an accrual basis, including, Direct Costs, a reasonable bad debt allowance as determined mutually by Owner and Operator, the Management Fees (hereinafter defined), and all other costs and expenses which are specifically designated as "Gross Operating Expenses" under the terms of this Agreement or Operator's Uniform System (hereinafter defined). Gross Operating Expenses shall also include costs and expenses directly incurred in relation to the operation of any business the revenue from which is included in the in the

definition of Gross Revenue. Notwithstanding the foregoing, "Gross Operating Expenses" shall not include any of the following:

(a)    costs of purchases, design, installation, construction or other acquisition of the Buildings and Improvements, Major Equipment Systems, and Furnishings and Equipment, to the extent such costs are capitalized under Operator's Uniform System;

(b)    depreciation, amortization or other method of cost recovery for capital assets, the amount of any casualty loss (whether insured or uninsured), the amount of any deductible (or the self-insured retention) under any policy of property insurance described in section 11.1 hereof, and any loss upon the sale or other disposition of a capital asset;

(c)    Taxes and Property Insurance (hereinafter defined);

(d)    payments of principal and interest and other financing costs with respect to any indebtedness incurred by Owner, and all rental and other lease payments under any ground lease or any capital lease under generally accepted accounting principles and the Uniform System;

(e)    excise, sales or use taxes paid to any governmental authority if and to the extent that the collection of such amounts from Property patrons is excluded from gross Revenue;

(f)    gratuities and service charges paid to Property Employees (hereinafter defined) if and to the extent that the collection of such amounts from Property patrons is excluded from Gross Revenue;

(g)    all costs related to the training program described in 3.1 (a) hereof; and

(h)    any other items which is specifically excluded from "Gross Operating Expenses" under the terms of this Agreement.

"**Gross Operating Profit**" means, for any Fiscal Year, the excess (if any) of Gross Revenue for such period over the total of Gross Operating Expenses for the same period.

"**Gross Revenue**" means, for any period, all revenue, proceeds of sales, or income of any kind derived directly or indirectly during such period from any source at the Property for such period over which Operator has any direct or indirect responsibility under this Agreement, determined on an accrual basis in accordance with Operator's Uniform System (after deducting all allowances for rebates and adjustments as provided for under the Uniform System), whether cash or credit, including (without limitation) rental of rooms, food and beverage sales, sales from Bistro and other facilities managed directly by Operator, telephone and telefax revenues, commissions and other incentive payments attributable to Property operations, and all net revenue received from any third party concessionaries operating any concession at the Property under any agreement with Owner or Operator, and from other persons rendering services to guests. Notwithstanding the foregoing, Gross Revenue shall not include:

(a)    gratuities or service charges added to guests' bills or statements which are paid over to Property Employees;

(b)    federal, state and local excise, use or rent taxes collected directly from patrons or guests as part of or as an addition to the sales price of any goods or services;

(c)     any proceeds from the sale or disposition of the Property or any of the Major Equipment Systems, Furnishings and Equipment or other capital assets used in connection with the operation or management of the Property;

(d)     the proceeds from any insured casualty, condemnation award, or any other such loss of a capital asset (other than proceeds of business interruption insurance);

(e)     any proceeds or other economic benefit of any borrowings of Owner whether or not secured by the Property or any Furnishings and Equipment;

(f)     amounts representing the value or cost of room occupancy, meals or other services provided as compensation to Property Employees or as complimentary benefits to any other persons;

(g)     discounts, allowances, and refunds or credits to patrons or guests;

(h)     proceeds of collection of accounts receivable to the extent the amount of any receivable was previously included in Gross Revenue;

(i)     payments made under warranties and guaranties from providers of goods or service to the Property, whether received by Owner or by Operator on Owner's behalf;

(j)     all payments, proceeds and receipts of gifts, donations, grants and other monetary pledges made, given or committed to Gallaudet University or the Gallaudet University Conference Center;

(k)     all revenues and receipts related to all soda, juice and snack vending machines located on the Property; and

(l)     all salaries and benefits paid by Gallaudet University to any Gallaudet University employees;

"**Hazardous Materials**" means, at any time, any substance that is then defined or listed in, or otherwise regulated pursuant to, any of the Environmental Laws.

"**Inventories and Operating Supplies**" means all inventories of merchandize held for sale, including food and beverage items, and all stocks of expendable supplies necessary for the operation of the Property, including without limitation, all office supplies, cleaning supplies, guest supplies, paper supplies, laundry supplies, recreational supplies, repair and maintenance supplies, fuel and miscellaneous expendables.

"**Major Equipment Systems**" means the major mechanical and electrical systems which are required for the operation of the Property and incorporated into the Site or the structure of the Buildings and Improvements, including the equipment systems for heating, plumbing, ventilating, air conditioning, elevators, escalators, electrical and water distribution within the Property.

"**Operating Budget**" has the meaning set forth in section 4.1 (a) hereof.

"**Operator Proprietary Materials**" shall mean the service marks, trademarks, trade names, insignias and logos that are owned by Operator or its Affiliates along with all computer software programs, marketing and promotional literature developed by Operator and used in the operation of the Property.

4

"**Operator's Home Office Management Employees**" shall mean those employees of Operator and its Affiliates whose personal offices are located at Operator's headquarters located at the address set forth hereinabove or at other locations where such Management Employees maintain their personal offices.

"**Operator's Uniform System**" or "**Uniform System**" means the system of accounts described in Operator's standard accounting procedures, which conform substantially to the Uniform System of Accounts for Hotels (8th Revised Edition, 1986) published by the Hotel Association of New York City, Inc., together with any changes to such manual adopted by Operator from time to time with Owner's approval.

"**Owner Proprietary Materials**" shall mean the service marks, trademarks, trade names, insignias, logos and materials that are owned or otherwise developed by Owner for use at the Property.

"**Owner's Profit**" means, for any monthly operating period, the excess (if any) of operating revenue over operating expenses.

"**Property**" means the Site, the Building and Improvements, the Major Equipment Systems, the Inventories and Operating Supplies, and the Furnishings and Equipment.

"**Property Employees**" has the meaning set forth in Section 3.2 hereof.

"**Reimbursable Costs**" shall mean all Direct and Indirect Costs and any other cost or expense reimbursed by Owner to Operator under the specific terms of this Agreement or otherwise approved in advance in writing by Owner for reimbursement. Reimbursable Costs shall not include any corporate, administrative or employee-related expenses or general overhead of Operator or its Affiliates.

"**Site**" means the real property described on Exhibit A attached hereto and made a part hereof.

"**Salaried Employees**" means those employees of Operator who directly or indirectly perform management, professional or supervisory services at the Property and whose compensation is based upon a salary rather than an hourly wage. All "Salaried Employees" shall be considered Property Employees to the extent and for the time actually employed at the Property. "Salaried Employees" shall include the Property's Managing Director, general manager, food and beverage manager, hospitality manager, front desk manager, housekeeping supervisor along with those other managerial, professional and supervisory employees identified in each proposed Annual Plan.

"**Taxes and Property Insurance**" means, for any period, the cost accruing during such period under generally accepted accounting principles for (a) ad valorem real estate and personal property taxes and assessments and other governmental charges or levies upon the Property (or payments in lieu of said taxes), and (b) premiums payable on all property insurance policies described n section 11.1 hereof.

### ARTICLE II
### TERM OF AGREEMENT

2.1    **Commencement Date**. Operator shall commence to manage and operate the Property in accordance with the terms of this Agreement on **February 11, 2000** (the "Commencement Date"). From and after the Commencement Date until the term of this Agreement expires or is terminated in accordance with the terms set forth herein. Operator shall have possession of all keys, locks and safe combinations, reservation lists, ledgers, accounting books and records, insurance policies, and other agreements and documents related to the operation of the Property. Prior to the Commencement Date, and from time to time thereafter as may be necessary, Operator (with Owner's assistance) shall take all appropriate steps and

execute all appropriate applications and documents to obtain all licenses and permits (including food and liquor licenses) required for the operation of the Property.

2.2    **Term**. The term of this Agreement shall commence on the Commencement Date hereof and shall continue for a period of sixty-seven (67) months with two (2) one (1) year renewal options. Each such one (1) year renewal option shall be granted at the sole discretion of Owner.

2.3    **Initial Opening Periods**. No later than April 15, 2000, Operator agrees to prepare and submit to Owner an initial opening plan ("Initial Opening Plan") for the period beginning on the proposed opening date of February 11, 2000 and ending on September 30, 2000 (the "Initial Opening Period"). Such Initial Opening Plan shall conform substantially to the requirements of an Annual Plan as set forth in section 4.1 hereinbelow (with the understanding of Owner and Operator that the Initial Opening Plan covers only seven months). Owner agrees to provide information to and participate with Operator in the preparation of the Initial Opening Plans. Owner agrees to compensate Operator during the Initial Opening Period in accordance with Article V hereinbelow.

<div align="center">

**ARTICLE III**
**ENGAGEMENT OF OPERATOR**

</div>

3.1    **Operational Services**. Owner hereby appoints, authorizes and engages Operator to act as the operator and manager of the Property during the term of this Agreement, with responsibility, control and discretion in the operation, management and supervision of the Property subject to the limitations set forth in this Agreement. Operator agrees to operate and manage the Property for Owner in a commercially reasonable, prudent and professional manner, in substantial conformity with the then-current approved Annual Plan and in accordance with the procedures, practices and management techniques employed by Operator in the operation of other conference center properties having similar styles, characters, facilities and amenities as the Property all in harmony with the unique culture of the Gallaudet University campus. As such, Operator agrees to consult with Owner on a regular basis to assure that the Property is being marketed and operated in accordance with the policies, goals and objectives of Owner. Owner and Operator agree that neither the concept or quality level for the Property will be changed without their mutual consent. Subject to the limitations set forth herein and in section 3.4 below, and without limiting the generality of the foregoing, Operator's engagement under this Agreement shall include the responsibility and authority, on behalf of Owner, to:

(a)    Employ (in accordance with section 3.2 hereof), train (which training shall include the provision of a level of proficiency in sign language equal to that required of other Gallaudet University personnel in equivalent or similar positions, as well as an appropriate understanding of deaf culture; provided further, that Operator agrees it shall engage Gallaudet University as the sole provider of such sign language training program and Operator agrees to pay, at Operator's expense, fifty percent (50%) of all training expenses herein and to reimburse at one hundred percent (100%) all training expenses of employees transferred or moved at the Operator's request from the Gallaudet University Kellogg Conference Center) supervise, discharge and determine and pay the compensation, fringe benefits, retirement benefits and other policies and terms of employment of all Property Employees as may be reasonably required to provide proper operation, supervision, and management of the Property in a professional manner suitable to the unique character of the Property;

(b)    Create, implement and supervise (with participation of Owner) an on-the-job training program that will be made available to Gallaudet University students interested in careers in the hospitality industry (the details of such training program to be provided in each proposed Annual Plan);

<div align="center">6</div>

(c)     Recruit, hire and train qualified deaf and hard of hearing employees for the operation and management of the Property (the details of such efforts to be provided in each proposed Annual Plan);

(d)     Cooperate with Owner with respect to any and all legal actions or proceedings which Owner and Operator shall mutually deem reasonably necessary or proper in connection with the routine operation of the Property, including actions or proceedings to collect accounts receivable or to oust or dispossess guests, or other persons in possession of any part of the Property, to enforce claims relating to employees employed at the Property, or to cancel or terminate any license or concession agreement for the breach thereof or default thereunder by any licensee or concessionaire, and take appropriate steps to protest and/or litigate to final decision in any appropriate court or other forum, any violation, order, rule or regulation directly related to the operation of the Property.

(e)     Negotiate and enter into service contracts necessary or desirable in the ordinary course of business in operating the Property, including, without limitation, contracts for provision of telephone and other utility services, cleaning services, vermin extermination, trash removal, elevator and boiler maintenance, air conditioning maintenance, master television service, laundry and dry cleaning, entertainment, satellite systems and other services which Operator deems advisable;

(f)     Immediately upon its receipt of any and all notices, bills or statements pertaining to Taxes, and Property Insurance in connection with the Property, Operator shall deliver the same to Owner. Owner shall be solely responsible for the payment of any and all Taxes and Property Insurance.

(g)     Plan, prepare, arrange and contract for advertising, publicity and promotional activities of the Property;

(h)     Establish, supervise and implement a sales and marketing program for the Property generally consistent with the sales and marketing programs of other similar properties managed by Operator, taking into consideration local market conditions and variations in facilities, as Owner and Operator deem to be generally beneficial to the economic performance of the Property;

(i)     Purchase (or arrange for the purchase of) and install (or arrange for the installation of) those remaining Furnishings and Equipment, Inventories and Operating Supplies, if any, necessary for the operation and management of the Property;

(j)     Perform and supervise (or cause to be performed and supervised) such maintenance and repairs to the Property as shall be required by applicable law, or as shall be necessary to operate and maintain the Property in a professional manner suitable to the character of the Property;

(k)     Pay all Direct Costs and comply with all laws, rules, regulations, requirements, orders, notices, determinations and ordinances of any federal, state or local authority which are applicable to the operation and management of the Property;

(l)     Determine all terms for guest admittance to the Property and establish all prices, price schedules, rates and rate schedules for rooms, and other amenities and services provided at or in connection with the Property;

(m)     Develop, revise, and implement food and beverage concepts (including the service and sale of alcoholic beverages) and entertainment activities, together with related policies and procedures;

(n)     Apply for, negotiate, arrange and maintain in the name of Owner or Operator (as required by law), all licenses, permits and concession agreements required to manage and operate the Property;

(o)     Establish all credit policies, and enter into agreements with credit card companies, in connection with the Property;

(p)     Obtain and grant concessions and privileges including, without limitation, newsstands, taxicabs and automobile parking as Owner and Operator may deem reasonably necessary or desirable in connection with the operation of the Property;

(q)     Engage independent accountants selected by Owner and reasonably acceptable to Operator as Owner and Operator may deem necessary to provide advice or perform services of a specialized nature related to matters within Operator's responsibility under this Agreement;

(r)     Be responsible for the purchase and maintenance of all internal plants and related decorations (Owner shall be responsible for all external landscaping and related maintenance);

(s)     Assist Gallaudet University's Grounds Personnel with the removal of all snow, ice and other debris from the sidewalks, loading docks and all other entrances to the Property;

(t)     Conduct a recycling program (including paper, glass, aluminum and plastic products) for the Property in accordance with Owner's recycling policy and not allow styrofoam products to be used at the Property;

(u)     Purchase and pay for, as Direct Costs, all food, supplies and services including all Inventories and Operating Supplies utilized in the performance of its obligations hereunder (all local trade discounts related to the purchase of such food, supplies and services shall be credited to Owner's account); and

(v)     Perform any and all other acts as Owner and Operator may reasonably deem necessary or appropriate for the operation and management of the Property.

**3.2    Property Employees.** All persons employed on-site at the Property during the terms of this Agreement (including all Salaried Employees) shall be "Property Employees." Operator shall have the sole responsibility for and shall use reasonable care in the hiring, promotion, discharge and supervision of all Property Employees, provided that the number and compensation of the Property Employees are in conformity with each approved Annual Plan and with industry standards for the staffing of conference center properties comparable to the Property in the same market area taking into account local market conditions. Operator affirms that it is an equal opportunity and affirmative action employer and agrees to comply with all applicable federal, state and District of Columbia laws and regulations related thereto. Owner shall have the right to approve the hiring of the person Operator selects to be the Property's general manager which approval shall not be unreasonably withheld or denied. If Operator incurs any costs, including legal fees, retroactive wages and damages, as a result of any personnel action taken by Owner or by Operator at the direction of Owner against any Property Employee, which action Operator would not have taken but for Owner's direction, Operator shall charge Owner for such costs as Direct Costs. Operator agrees to indemnify Owner with respect to any personnel action taken by Operator on Operator's own accord without Owner direction or approval against any Property Employee and all liability, costs and expenses related to such Operator action including legal fees, retroactive wages or damages shall be the sole responsibility of Operator.

**3.3**    <u>Limitations on Authority</u>. Operator shall have no authority on behalf of Owner to do any of the following without Owner's prior written approval in each instance, unless the specific transaction is described in an approved Annual Plan, Operating Budget or Capital Budget:

(a)    Enter into any collective bargaining agreements with respect to Property Employees; or

(b)    Institute or defend legal proceedings other than those described in subsection (d) of section 3.1 hereof; or

(c)    Borrow money, guaranty the debts of any third person, or mortgage, pledge, grant a security interest in or otherwise encumber all or any part of the Property; or

(d)    Incur any liabilities or obligations to third parties which are unrelated to the management, operation, maintenance and security of the Property or to the performance of Operator's responsibilities under this Agreement; or

(e)    Incur any single expense of Two Thousand Five Hundred And No/100 Dollars ($2,500.00) for any item not provided for in an approved annual Plan (except in the case of an emergency); or

(f)    Enter into any contract, agreement or commitment or incur any other obligation with respect to the operation or management of the Property the duration of which would exceed one (1) year.

**3.4**    <u>Operation at Owner's Expense</u>. Subject to the express limitation upon Operator's authority set forth in this Agreement (3.4 hereof and the Budgetary Limitations in section 4.5 below), Operator shall act as agent for Owner in the performance of its responsibilities under this Agreement, and all costs, expenses and liabilities incurred by Operator to third parties in connection with such performance shall be borne exclusively by Owner. Except as otherwise expressly provided for herein, Operator shall not become liable for any such costs, expenses and liabilities by reason of its management and operational responsibilities hereunder, and Operator may inform third parties of its agency for Owner in connection with any action taken on behalf of Owner in accordance with Operator's authority under the terms in this Agreement.

<div align="center">

**ARTICLE IV**
**ACCOUNTING AND BUDGETING SERVICES**

</div>

**4.1**    <u>Annual Plan</u>. In addition to the Initial Opening Plans required under Article II hereinabove with respect to the Initial Fiscal Year, Operator shall prepare and submit to Owner a proposed annual plan for each full Fiscal Year for the operation of the Property ("Annual Plan"). Prior to July 1, 2000, Operator shall prepare and submit to Owner a proposed Annual Plan for the full Fiscal Year beginning October 1, 2000 and ending on September 30, 20001. Prior to or on each succeeding July 1 during the term of this Agreement, Operator shall prepare and submit to Owner a proposed Annual Plan for the next succeeding Fiscal Year. Each Annual Plan shall include:

(a)    Operator's reasonable estimate (on an Accounting Period basis) of Gross Revenue, Gross Operating Expenses, and Taxes and Property Insurance for the Fiscal Year, itemized in a reasonable manner consistent with Operator's Uniform System of Procedures (the "Operating Budget"), together with the assumptions (in narrative form) utilized in preparing the Operating Budget;

(b)    A budget of Operator's recommended renewals, revisions, rebuilding, replacements, substitutions or improvements to the Property for the Fiscal Year which are of a capital nature under Operator's Uniform System of Procedures ("Capital Budget"), including Operator's reasonable estimates

<div align="center">9</div>

for the cost of designs, plans and specifications, material, labor (including installation), storage, consultants, travel, overhead, sales tax and freight related to such capital improvements;

      (c)    A description of the marketing strategy Operator intends to implement during the Fiscal Year to optimize both short and long-term profitability of the Property; together with a marketing plan that includes a positioning statement, competition analysis, group sales quotas, sales action plans, media schedule, and public relations plan;

      (d)    A description of the plan Operator intends to implement during the Fiscal Year to accomplish the requirements for recruiting, hiring and training of Property employees set forth in Article III above;

      (e)    Operator's estimate of any amounts Owner will be required to provide to fund expenditures contemplated by the Capital Budget during the Fiscal Year; and

      (f)    Any other matter deemed appropriate by Operator or requested by Owner; provided, however, any such matter requested by Owner shall be as to a matter which is customarily included in such annual plans within the conference center industry.

      **4.2**    **Approval of Annual Plan.**    The Annual Plan for each Fiscal Year must be approved by Owner. Owner shall not unreasonably withhold its approval of each Annual Plan (or any portion hereof) submitted by Operator, and Owner shall be deemed to have approved each Annual Plan submitted by Operator except as to those portions to which Owner specifically objects by written notice given to Operator within sixty (60) days after delivery of the Capital Budget to Owner. If no Capital Budget for the next Fiscal Year has been agreed to by the end of the then current Fiscal Year the previous Fiscal Year's Capital Budget will be used.

      **4.3**    **Approval of Capital Budget.** The Capital Budget for each Fiscal Year must be approved by Owner. Owner shall not unreasonably withhold its approval of each Capital Budget (or any portion thereof) submitted by Operator, and Owner shall be deemed to have approved each Capital Budget submitted by Operator except as to those portions which Owner specifically objects by written notice given to Operator within sixty (60) days after delivery of the Capital Budget to Owner. If no Capital Budget for the next Fiscal Year has been agreed to by the end of the then current Fiscal Year the previous Fiscal Year's Capital Budget will be used.    The determination of whether specific costs are capital expenditures (includable in the Capital Budget) or operating expenses (includable in the Operating Budget) shall be made in accordance with Operator's Uniform System.

      **4.4**    **Implementation of Annual Plan.** Operator shall act diligently to operate the Property in accordance with the then current approved Annual Plan, to achieve the results projected in the approved Operating Budget for each Fiscal Year, and to arrange for the capital improvements, repairs, replacements, revisions and rebuilding contemplated under the approved Capital Budget. Owner acknowledges that actual results of operation of the Property may vary from the Operating Budget because of assumptions that may not occur and changed conditions (including changes in weather, occupancy, average daily room rates, and food and beverage sales).    The budgeted amounts will represent Operator's reasonable estimates, and Operator makes no representation or warranty that the revenue and expenditures set forth in the Operating Budget and the Capital Budget will be achieved.

**4.5    Budgetary Limitations.**  Operator agrees that Operator will not enter into any agreement or transaction on behalf of Owner, without Owner's written consent or approval, if the reasonable foreseeable costs and liabilities chargeable to Owner by reason of such transaction or agreement will cause capital expenditures for the then current Fiscal Year to exceed five percent (5%), in the aggregate, of the amount budgeted therefor in the Capital Budget approved by Owner for such Fiscal Year.

**4.6    Books and Records.**  Operator shall, for the account of Owner, supervise and maintain full and adequate books of account and other records reflecting the results of operation of the Property including accounts receivable, accounts payable, and general ledger, all on an accrual basis in accordance with Operator's Uniform System. Operator shall maintain and properly store all such books and records for a period of not less than five (5) years after the Fiscal Year in which such books and records relate. Operator may perform accounting services at Operator's centralized office or at the Property. Except for such books and records as Operator may elect to keep in a centralized office pursuant to the operation of centralized accounting services, Operator shall keep and maintain at the Property the books of account and all other records relating to the operation of the Property. All such books and records for both current and prior years (including any centralized books and records) shall be available to Owner and its representatives at all reasonable times for examination, audit, inspection and transcription, provided such representatives shall provide Operator with suitable identification and reasonable notice prior to being afforded access. For a period of three (3) years after Operator's delivery of such books and records upon any termination of this Agreement, Operator shall retain the right to inspect, audit, copy, and transcribe all such books of account and records relating to periods prior to such termination. On behalf of Owner, Operator shall be responsible for the processing of all credit card accounts and other accounts receivable, the preparation and maintenance of all forms and records related thereto and for all sales and use taxes related to Property operations; and the establishment and maintenance of payroll systems and related employee records for all Property Employees.

**4.7    Financial Reports.**  As soon as possible, but in no event later than fifteen (15) business days after the end of each Accounting Period, Operator shall deliver to Owner unaudited financial reports for the Property for such Account Period which shall include (a) a profit and loss statement comparing actual results to both budget and the previous year's actual results, for both the current Accounting Period and Fiscal Year to date, and (b) a summary of Gross Operating Expenses, and Taxes and Property Insurance listed by department under Operator's Uniform System. As soon as possible, but in no event later than forty-five (45) days after the end of each Fiscal Year, Operator shall deliver to Owner an unaudited profit and loss statement for the Property for such Fiscal Year, setting forth all Gross Revenue, Gross Operating Expenses, and Taxes and Property Insurance. The financial reports required hereunder shall be manually signed by the person who prepared such reports or by another authorized managerial representative of Operator and shall be in Operator's customary form and in the same detail as generally prepared by Operator for other conference centers managed by it, and shall be taken from the books and records maintained by Operator in the manner hereinabove specified. Operator's reporting responsibilities hereunder shall include balance sheet, general ledger and subledger accounting for fixed assets, other long-term assets and long term liabilities pertaining to the Property.

## ARTICLE V
## MANAGEMENT FEES

During the term of this Agreement Owner shall pay to Operator for each of the five (5) Fiscal Years set forth below an all inclusive Management Fee structured as follows:

| Fiscal Year | Gross Revenue | Owner's Profit |
|---|---|---|
| 1 | 4% | 5% |
| 2 | 3.75% | 10% |
| 3 | 3.50% | 11% |
| 4 | 3.25% | 12% |
| 5 | 3% | 12% |

Owner and Operator agree that each of Fiscal Years 1-5 shall begin on October 1 and end on the following September 30 (the Fiscal Year calendar of both Owner and Operator) (i.e. Fiscal Year 1 begins on October 1, 2000 and ends on September 30, 2001; Fiscal Year 2 begins October 1, 2001 and ends on September 30, 2002, etc...). Owner and Operator further agree that, notwithstanding the above structure, the Management Fee for the Initial Fiscal Year shall consist solely of a monthly flat fee to be agreed upon.

## ARTICLE VI
## DISBURSEMENTS AND REIMBURSEMENTS

**6.1    Accounting Period Billings and Reimbursements.** In addition to the Management Fees required to be paid by Owner to Operator under this Agreement, Owner shall reimburse Operator all Reimbursable Costs. Within fifteen (15) business days after the end of each Accounting Period, Operator will submit to Owner (along with the financial information required under section 4.7 hereof)  (a) an invoice for the amount, if any, by which the sum of Reimbursable Costs and Management Fees for such Accounting Period exceed Gross Revenues for such Accounting Period, or (b) a check made payable to Owner for the amount, if any, by which Gross Revenues for such Accounting Period exceed the sum of Reimbursable Costs and Management Fees for such Accounting Period. No later than December 31 following the Owner's fiscal year ending on September 30, the Operator and Owner shall make the calculation for the cumulative twelve months of the recently ended fiscal year to determine if any year end adjustment is required for the profit sharing program as set forth in Article V above.

**6.2    Payment Terms.** All invoices submitted by Operator to Owner pursuant to section 5.1 (a) above shall be paid within ten (10) days after Owner's receipt thereof. In the event any such invoice is not paid within thirty (30) days of the invoice date, interest shall be charged at the rate of one percent (1%) per month on the unpaid balance computed from the invoice date until the date paid. Amounts due Owner section 5.1(b), if any, shall be submitted to Owner along with the financial information required to be provided by Operator to Owner under section 4.7 hereof.

## ARTICLE VII
## REPAIRS, MAINTENANCE AND REPLACEMENTS

**7.1    Routine Maintenance.** Operator, at Owner's cost and expense, shall maintain the Property in good repair and condition and shall make or cause to be made all ordinary and necessary maintenance, routine repairs and minor alterations the costs of which are not normally capitalized under Operator's Uniform System. All such costs shall constitute Gross Operating Expenses. Operator shall obtain Owner's

prior written approval for any repair, maintenance or replacement the cost of which exceeds Two Thousand Five Hundred and No/100 Dollars ($2,500.00). Non-routine maintenance and repair, the costs of which are normally capitalized under Operator's Uniform System, shall be made and paid for in accordance with the following provisions set forth in section 7.2 below.

    **7.2**    **Owner's Capital Expenditure Obligations.**   Operator shall from time to time inform Owner of such alterations, additions, improvements, repairs and replacements in or to the Property (including Building and Improvements, Major Equipment Systems and Furnishings and Equipment) as may be necessary to avoid the risk of criminal or civil sanctions under federal, state or local laws, regulations, ordinances, rules or building codes, or to maintain and operate the Property consistent with existing standards of quality. The cost and expense of such alterations, additions, improvements, repairs and replacements shall be the sole responsibility of Owner. As and when necessary, the same shall be made with as little hindrance or disruption as reasonably possible to the operation of the Property.

## ARTICLE VIII
## PROPRIETARY MARKS

    **8.1**    **Property Name.** During the term of this Agreement, the Property shall at all times be designated and known as "**GALLAUDET UNIVERSITY KELLOGG CONFERENCE CENTER**" (which name designation shall be an Owner Proprietary Material). Notwithstanding the preceding sentence, Owner shall have the right to change the name of the Property in its sole and absolute discretion; however, Owner agrees to consult with Operator prior to implementing any such decision. The Property shall be known and marketed with such additional identification as Owner and Operator jointly deem appropriate to incorporate the fact that the Property is managed by Operator utilizing the Operator Proprietary Materials.

    **8.2**    **Disclaimer.** Owner and Operator acknowledge and will not contest the other's unrestricted and exclusive right, title and interest to the Operator Proprietary Materials and Owner Proprietary Materials, respectively, and all licenses thereof. Owner and Operator hereby disclaim any right or interest in the Operator Proprietary Materials and Owner Proprietary Materials, respectively, or the goodwill derived therefrom. All present and future service marks, trademarks and copyrights now owned or hereafter applied for or granted in connection with the Operator Proprietary Materials shall be the property of Operator (or its Affiliates) and inure to its (or their) benefit, and Owner shall not use or permit others to use any of the same without Operator's written approval. All present and future service marks, trademarks, and copyrights now owned or hereafter applied for or granted in connection with the Owner Proprietary Materials or the Property shall be the property of Owner (or its Affiliates) and inure to its (or their) benefit, and Operator shall not use or permit others to use any of the same without Owner's written approval.

    **8.3**    **Remedy.** Owner and Operator agree that each party shall be entitled to injunctive and equitable relief for any violation of the foregoing provisions of this Article VIII. The non-prevailing party agrees to pay to the prevailing party all damages, costs and expenses, including reasonable attorneys' fees and court costs, which may be incurred by such party or its Affiliates arising from any violation of the foregoing provisions of this Article VIII.

    **8.4**    **Confidential Information.** All manuals, recipes, menus, computer programs, personnel materials and other related materials of Operator utilized by Operator in the management and operation of the Property shall be the property of Operator and shall be treated as confidential information. Owner shall keep such information confidential and shall so instruct its agents, employees and independent contractors. The use of such information by Owner in any manner shall not affect Operator's ownership thereof or the confidential nature of such information.

**ARTICLE IX**
**TERMINATION**

9.1    <u>Events of Default.</u>  Any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)    the failure of either party to pay any sum of money to the other party when due and payable under the terms of this Agreement if such failure is not cured within ten (10) days after the non-defaulting party gives written notice thereof to the defaulting party;

(b)    the failure of either party to perform, keep or fulfill any of the other covenants, undertakings or obligations in this Agreement, or the breach by either party of any of its warranties under this Agreement, if such failure or breach (i) has or could have a material adverse effect on the operation of the Property or the rights or duties of the non-defaulting party hereunder and (ii) such failure or breach is not cured within thirty (30) days after the non-defaulting party gives written notice thereof to the defaulting party; provided, however, that if such failure or breach is not capable of being cured within such thirty (30) day period and the defaulting party commences in good faith to cure such default during such period and thereafter prosecutes such cure to completion with all due diligence, then no Event to Default shall exist unless such default remains uncured one hundred twenty (120) days after such written notice was given;

(c)    the filing by either party of a voluntary petition in bankruptcy under Title 11 of the United States Code or of any petition or answer in any other legal proceeding wherein either party seeks or acquiesces in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or District of Columbia law relating to bankruptcy, insolvency or other relief for debtors;

(d)    the entry of any judicial order, judgment or decree approving an involuntary petition filed against either party of a type described in section 9.1(c) above if such order, judgment or decree remains unvacated for an aggregate of sixty (60) days (whether or not consecutive) after the date of entry thereof; or

(e)    the filing of any petition or answer by Owner in any legal proceeding seeking or acquiescing in the appointment of any custodian, trustee, conservator, liquidator or receiver of all or any part of the property or the rent, issues, revenues, or profits thereof, or the appointment of any such custodian, trustee, conservator, liquidator or receiver without Owner's acquiescence if such appointment remains unvacated for an aggregate of sixty (60) days (whether or not consecutive) after the date of filing thereof.

(f)    the entry of any judicial order or judgment, the granting of a writ of attachment, or the occurrence of any other event the result of which would prevent Operator access to or the use of the bank account or accounts into which the revenues, receipts or other monies generated by or otherwise related to the Property including any monies provided by Owner to Operator for use in the operation or management of the Property as deposited.

9.2    <u>Termination Rights.</u>  This Agreement may be terminated prior to the expiration of its term upon the occurrence of any one or more of the following events;

(a)    Upon an Event of Default, at the option of the non-defaulting party exercised by written notice of termination given to the defaulting party prior to the cure of such Event of Default;

(b)     At the option of Operator, exercised by written notice of termination to Owner, upon any suspension for a period of thirty (30) days or more or any withdrawal or revocation of any material governmental license or permit required for the operation of the Property in accordance with the terms of this Agreement, but only if such suspension, withdrawal or revocation is due to circumstances beyond Operator's reasonable control;

(c)     At the option of Owner, exercised by written notice of termination to Operator, which, notwithstanding the provisions of section 9.3 below, shall be effective immediately upon the receipt by Operator of such notice of termination, upon any transfer by Operator of its rights or duties under this Agreement.

(d)     Upon any material and substantial loss of, damage to or destruction of all or any part of the Property by condemnation or other taking, fire or other casualty or cause, which Owner elects not to repair or restore, at the option of either party by written notice of termination to the other party at any time after the occurrence of any such event.

(e)     At the option of Owner, exercised by written notice of termination to Operator, upon the occurrence of a twenty percent (20%) or greater shortfall in the projected Gross Operating Profit for Fiscal Year 2001 or thereafter (as set forth in an approved Annual Plan).

(f)     At the option of Owner, notwithstanding the provisions of section 9.3 below, exercised by ninety (90) days written notice of termination to Operator.

(g)     At the option of Operator, notwithstanding the provisions of section 9.3 below, exercised by ninety (90) days written notice of termination to Owner.

**9.3     Effective Date.**  The effective date of termination of this Agreement shall be thirty (30) days after a notice of termination is given under section 9.2 above, unless a later date is specified by the terminating party in such notice.

**9.4     Operator's Duties Upon Termination.**  Upon the expiration of the term of this Agreement, or upon the effective date of termination of this Agreement, Operator shall:

(a)     As expeditiously as possible and to the extent permitted by law, surrender and assign to Owner or its designee any and all licenses, permits, or other governmental authorizations required for the operation and management of the Property;

(b)     Deliver to Owner any and all of Owner's properties and assets within the possession of Operator, including keys, locks and safe combinations, reservation lists, ledgers, accounting books and records, and other documents, agreements, leases, and licenses required for or related to the operation and management of the Property (including all insurance policies and bonds exclusively related to the operation and management of the Property); provided, however, Operator shall have no obligation to deliver to Owner any of Operator's Proprietary Materials; and

(c)     Within ninety (90) days of termination, prepare and deliver to Owner the financial reports required under this Agreement through the date of termination and remit to Owner the amount, if any, by which Gross Revenues collected by Operator exceed the sum of Reimbursable Costs plus any Management Fees.

**9.5    Owner's Obligations Upon Termination.**  Within twenty (20) days of Operator's performance and completion of all of its duties pursuant to section 9.4 above, Owner shall pay to Operator any and all accrued and unpaid Reimbursable Costs and Management Fees due Operator pursuant to terms of this Agreement. Operator's remittance to Owner of any funds pursuant to section 9.4 (c) above shall not constitute a waiver of or otherwise affect Operator's rights to be paid any and all amounts owing to Operator pursuant to this Agreement.

## ARTICLE X
## CASUALTY LOSS AND CONDEMNATION

**10.1    Damage or Destruction.**    If the Property or any portion thereof is damaged or destroyed during the term of this Agreement by fire, other casualty, or act of God, Owner may at its election, repair, rebuild or replace the Property.

**10.2    Condemnation.**  If only a part of the Property shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority, Owner may, at its election and without expense to Operator, repair, restore and alter the Property so as to make it a satisfactory architectural unit of similar type, class and size as the Buildings and Improvements were prior to the taking or condemnation.  In connection with any such proceeding, Operator shall not have or assert any compensable property interest in the Property or any of its component parts.

**10.3    Discontinued Operations.**  If at any time during the term hereof it becomes necessary to close or cease operation of the Property (or any portion thereof) in order to protect the health, safety or welfare of the guests of the Property or Property Employees, or if required by law, Owner and Operator may close and cease operation of all or part of the Property. With approval of Owner, Operator shall reopen and commence operation when Owner and Operator deem that such may be done without jeopardy to the Property, the Property Employees, or any guests of the Property. In the event of any occurrence described in this Article X, Owner and Operator shall determine the extent, if any, to which such event requires the discontinuance of the operation of the Property or a reduction in the scope of the operation of the Property.

## ARTICLE XI
## INSURANCE

**11.1    Property Insurance.**  From the Commencement Date and thereafter at all times during the term of this Agreement, Owner shall provide and maintain insurance on all real and personal property located upon or comprising the Property.

**11.2    Owner's Insurance.**  From the Commencement Date and thereafter at all times during the term of this Agreement, Owner shall provide and maintain the following insurance with respect to the Property:

        (a)    Commercial general liability insurance or equivalent coverage with primary policy limits of 1,000,000 combined single limit per occurrence and 2,000,000 annual aggregate for the Property. Such insurance shall include coverage for, among other things, lessors' risk insurance. Such coverage shall also contain a separation of insureds clause causing it to apply as if each named insured were the only named insured and separately to each insured against whom claim is made or suit is brought.

        (b)    Excess liability insurance with limits of at least 25,000,000. Owner may increase the primary limits of liability set forth in subsection (a) above as necessary to eliminate any gaps between such primary coverage and the excess liability insurance described in this subsection.

(c)    Other insurance that Owner shall from time to time deem advisable or appropriate.

**11.3    Operator's Insurance.**  From the Commencement Date and thereafter at all times during this Agreement, Operator shall provide and maintain insurance on operations of the Property as follows:

(a)    Commercial general liability insurance or equivalent coverage with primary policy limits of $1,000,000 combined single limit per occurrence and $2,000,000 annual aggregate for the Property. Such insurance shall include coverage for innkeeper's liability, hotel safe deposit box liability, liquor liability, products liability, completed operations liability, contractual liability and personal injury liability.

(b)    Commercial crime insurance for the Property including coverage for Property Employees and any of Operator's Home Office Management Employees who may, from time to time, have responsibilities that include activities at or related to the management or operation of the Property, dishonesty, loss inside the premises, loss outside the premises, money orders, counterfeit currency and depositor's forgery. The limit for each of these coverages shall not be less than $500,000. Notwithstanding Section 11.4 below, Operator shall not be required to include Owner as a named insured on the commercial crime insurance; however, Operator shall include a joint loss payable endorsement (Form CR 1047) on its policy that will cause any loss payment arising out of the operations at the Property to be paid to both Operator and Owner.

(c)    Worker's compensation insurance providing statutory workers' compensation coverage and employer's liability insurance with limits of not less than $500,000/$500,000/$500,000 for all Property Employees, Operator's Home Office Management Employees, and all other persons directly or indirectly employed by Operator.

**11.4    Policy Standards.**  All insurance required to be provided by Operator hereunder shall include Owner as additional insured. All insurance policies shall contain an express waiver of subrogation against Owner or Operator to the extent they are not an insured thereunder. Any insurance required to be provided by Operator or Owner hereunder may be provided under blanket policies of insurance. Each party shall provide the other with certificates of insurance as to those policies they purchase or maintain pursuant to this Agreement. Any insurance agreed to be provided hereunder by Owner or Operator shall be primary and without the right of contribution from any similar type of insurance purchased by the other with regard to Property.

**11.5    Additional Coverages.**  Owner acknowledges that the insurance coverage requirements set forth in this Article XI, in terms of both forms of insurance and limits of coverage represent the minimum protection currently acceptable to Owner and Operator. Owner shall have the option to broaden such coverage, increase the limits or carry additional insurance provided that all premiums for such changes are paid for by Owner at its expense.

**11.6    Deductibles.**  Owner and Operator shall be responsible for any payment of any deductible or self-insured retention carried on any insurance required by either party under this Article XI.

**11.7    Requirements.**  All policies of insurance shall be written on an "occurrence" basis, if possible, and if any policy is written on a "claims made" basis, then such policy must, if possible, be continued in effect for a period of two (2) years following the expiration or early termination of this Agreement. In addition, all policies of insurance must be written by a company or companies licensed to do business in the District of Columbia and with a company or companies satisfactory to Owner. Each policy of insurance shall provide that such policy may not be surrendered, cancelled or modified, including,

without limitation, cancellation for non-payment of premiums, without at least thirty (30) days' prior written notice to all parties named as insured therein, including Owner.

## ARTICLE XII
### INDEMNIFICATION

12.1    **Indemnification of Owner by Operator.** To the fullest extent permitted by law, Operator shall indemnify, defend and hold harmless Owner and its Affiliates, and the officers, directors, trustees, employees and agents of Owner and its Affiliates (individually, an "Indemnified Person") from and against any and all liability, claim, loss, damage or expense, including but not limited to reasonable attorney's fees sustained by, arising out of, resulting from or asserted against an Indemnified Person if such liability, claim, loss damage or expense, results from negligent acts or willful misconduct of any Property Employee, or any of Operator's Home Office Management Employees, or any other person directly or indirectly employed by Operator or any one for whose acts or omissions Operator may be liable.

12.2    **Contracts and Future Bookings.** In the event of a termination of this Agreement, Owner shall indemnify Operator against and hold Operator harmless from any and all losses, costs, liabilities, and claims arising or resulting from the failure of Owner to perform any contractual obligations undertaken by Operator with respect to the Property within Operator's authority under this Agreement, including the provision of any services contracted for by Operator in connection with future business booked at the Property prior to such termination.

12.3    **Survival.** All rights, obligations and indemnification under this Article XII shall survive the expiration of the term or termination of this Agreement.

## ARTICLE XIII
### OWNER'S COVENANTS

13.1    **Right to Operate and Use Property.** Owner agrees that Operator, until the termination of this Agreement, may occupy and use the Property for all purposes and activities related to Operator's rights and responsibilities under the terms of this Agreement. Owner further agrees to assist in the execution and delivery of all applications, certificates and other documents as may be necessary or appropriate to obtain and maintain all licenses and permits required in connection with the operation of the Property, and to cooperate with Operator to the fullest extent possible to obtain and maintain such licenses and permits.

13.2    **Property Taxes.** All real property taxes, personal property taxes and assessments, or other governmental charges or levies, against the Property or any of its component parts shall be paid prior to delinquency by Owner. Upon receipt of any and all notices of assessments, property valuations and similar documents by either party hereto, such party shall promptly deliver the same or copies thereof to other party. Owner shall have the right, at its sole cost and expense, to contest the validity or amount of any such taxes or assessments provided that such contest does not materially jeopardize Operator's rights under this Agreement. Operator shall cooperate with Owner in the contest of any such taxes or assessments, but Owner shall promptly reimburse Operator for any out-of-pocket costs incurred by Operator in connection therewith.

## ARTICLE XIV
## TRANSFER AND ASSIGNMENT

Operator acknowledges that this Agreement is a personal services agreement and that the Property's managing director shall be responsible for overseeing the management of Operator's obligations under this Agreement and shall be the person to whom Owner shall look as the contact person for Operator. Operator shall have the right to change the Property's managing director; however, if Operator does so, Operator shall notify Owner in writing in advance of such change. Operator shall not assign or transfer any of its rights or obligations under this Agreement without the prior written approval of Owner in its sole and absolute discretion.

## ARTICLE XV
## ENVIRONMENTAL MATTERS

### 15.1    Obligations of Operator.

(a)    During the term of this Agreement, Operator shall be responsible, as detailed herein, for the safe and legal use and disposal of all Hazardous Materials used by Operator or any Property Employee in the management and operations of the Property. In order to fulfill this obligation, Operator shall:

(i)    arrange for the proper training of all Property Employees in the requirements for the safe and legal use and disposal of all Hazardous Materials;

(ii)    implement a program of disciplinary action for Property Employees who fail to adhere to such requirements;

(iii)    use only trained Property Employees or licensed and bonded contractors, acceptable to both Owner and Operator, for the use and disposal of any Hazardous Materials at the Property;

(iv)    promptly, upon receiving any information regarding an improper use, release or disposal (or suspected improper use, release or disposal) of Hazardous Materials at the Property, notify Owner and take all reasonable and lawful actions necessary to mitigate immediate threats to human health and the environment from such improper use, release or disposal; and

(v)    maintain proper documentation regarding all of the foregoing, which documentation shall be available to Owner immediately upon request.

(b)    All expenses and costs arising out of performance of the obligations imposed in subsection (a) hereof (including consulting and reasonable legal expenses) shall constitute Direct Costs. Notwithstanding the foregoing, Operator shall be responsible for all expenses and costs caused by the negligent acts or willful misconduct of any Property Employee, including Operator's Home Office Management Employees.

(c)    Owner reserves the right upon giving written notice to Operator, to assume responsibility for any and all matters identified in subsection (a) above if, in the sole opinion of Owner, such action is appropriate to protect and preserve the Property.

**15.2    Indemnification of Owner by Operator.**  Operator agrees to indemnify, defend and hold harmless Owner and its Affiliates, and the officers, directors, trustees, employees and agents of Owner and its Affiliates, from and against any and all liability, claim, loss, expense, penalty or damage including third-party claims, arising from the use, release, disposal or presence of Hazardous Materials or the violation of any Environmental Laws, which use, release, disposal, presence or violation (a) occurs during the term of this Agreement and (b) is caused by the negligent acts or willful misconduct of any Property Employee, including Operator's Home Office Management Employees.  All obligations of Operator to indemnify, defend and hold harmless Owner and its Affiliates under this Article XV shall survive the expiration of the term or termination of this Agreement.


<div align="center">

**ARTICLE XVI**
**NOTICES**

</div>

All notices, demands, consents, reports or other communications required or permitted to be given to Owner or Operator under this Agreement shall be in writing and shall be given by personal delivery or by facsimile or overnight courier or United States registered or certified mail (postage prepaid, return receipt requested) addressed as hereinafter provided. Except as otherwise specified herein, the time period in which a response to any notice or other communication must be made, if any, shall commence to run on the earliest to occur of (a) if by personal delivery, the date of receipt, or attempted delivery if such communication is refused; (b) if given by facsimile, the date on which such facsimile notice must be followed by notice in accordance with subparagraphs (a) or (c) herein within twenty-four (24) hours of such facsimile notice; (c) if sent by overnight courier, the date of receipt, or attempted delivery if such delivery is refused; and (d) if sent by mail (as aforesaid), the date of receipt, or attempted delivery if such certified mail is refused.  Any party listed below may change its address under this Article XII by notice to the other parties listed below. Until further notice, notices and other communications under this Agreement shall be addressed to the parties listed below as follows:

(a)    If to Operator, then to

Guest Services, Inc.
3055 Prosperity Avenue
Fairfax, Virginia  22031-2290
Attention:  Gerard T. Gabrys
President, Chief Operating Officer

Telephone:  (703) 849-9304
Telecopier:  (703) 560-1263

With copy to:

Guest Services, Inc.
3055 Prosperity Avenue
Fairfax, Virginia  22031-2290
Attention:  Nicholas DiMeglio
Vice President, Hotel Operations and Marketing

Telephone:  (703) 849-9309
Telecopier:  (703) 641-4690

(b)    If to Owner, then to:

Gallaudet University Conference Center
800 Florida Avenue, N.E.
Washington, DC 20002-3695
Attention:  Fred L. Kendrick
          Director, Business Services

Telephone:  (202) 651-5353
Telecopier:  (202) 651 5284

With a copy to:

Gallaudet University
800 Florida Avenue, N.E.
Washington, DC 20002-3695
Attention:  Paul Kelly, Esq.
          Vice President of Administration and Business

Telephone:  (202) 651-5075
Telecopier:  (202) 651-5742

## ARTICLE XVII
### MISCELLANEOUS

**17.1    Consent by Owner.** Except where a different time period is provided to the contrary within this Agreement, whenever Owner is required or asked to provide its consent to a matter submitted to it, Owner shall affirmatively consent to or reject the matter submitted to it within ten (10) business days of its receipt of such request.  Unless Owner notifies Operator in writing to the contrary, Owner's representatives for purpose of obtaining any and all consents shall be the persons identified to receive notices pursuant to Article XVI hereof.

**17.2    Further Agreements.** Owner and Operator shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

**17.3    Waiver.** The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

**17.4    Successors and Assigns.** The terms, covenants and conditions of this Agreement shall be binding upon and inure to the benefit of Owner, its successors and assigns, and shall be binding upon and inure to the benefit of Operator, its successors and permitted assigns.

**17.5    Governing Law: Venue.** This Agreement shall be governed by the laws of the District of Columbia. If any legal action shall be brought by the parties in connection with this Agreement, such action shall be filed in the District of Columbia.

**17.6    Amendments.** This Agreement may not be modified, amended, substituted, replaced, surrendered or changed, except by a written instrument executed by Owner and Operator.

**17.7    Estoppel Certificate.** Operator agrees at any time and from time to time, as requested by Owner upon not less than ten (10) days prior written notice, to execute and deliver to Owner a statement certifying that this Agreement is unmodified and is full force and effect (or if there have been modifications, that this Agreement is in full force and effect as modified as evidenced by the attached modifications) certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the Operator, whether Owner is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which Operator may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by others with whom Owner may be dealing.

**17.8    Partial Invalidity.** In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by a final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

**17.9    No Representation Regarding Projections.** In entering into this Agreement, Operator and Owner acknowledge that neither Owner nor Operator have made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Property, and that Operator and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Operator or Owner or as to the future financial success of the Property.

**17.10    Relationship.** In the performance of its responsibilities and the exercise of its authority under this Agreement, Operator shall act as agent for and on behalf of Owner. Neither this Agreement nor any agreements, instruments, documents or transactions contemplated hereby shall in any respect by interpreted, deemed or construed as making one party a partner of joint venturer with the other party or as creating any similar relationship or entity, and each of Operator and Owner agrees that it will not make any contrary assertion, contention, claim or counterclaim in any action, suit or other legal proceedings involving Operator and Owner.

**17.11    Entire Agreement.** This Agreement and Guest Services proposal dated December 10, 1999 which is included herein by reference as if it were physically attached to this agreement constitutes the entire understanding of the parties relative to the topic hereof, and may not be altered or amended except in writing, signed by all of the parties hereto. Should any portion hereof be held to be invalid or unenforceable, such holding shall not affect the remainder hereof, which shall remain enforceable in accordance with its terms.

**17.12    Right to Make Agreement.** Each party warrants, with respect to itself, that neither the execution and delivery of this Agreement nor the finalization of the transactions contemplated hereby shall violate any provision of its respective organizational documents, violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, agreement, other commitment or restriction to which it is a party or by which it is bound; or require any consent, vote or approval which has not been given or taken. Each party covenants that it has and will continue to have throughout the term of this Agreement and any extensions hereof, if any, the full right to enter into, extend or modify this Agreement and perform its obligations hereunder.

**17.13    Interpretation.** No provisions of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision. The use of the words

22

"hereof", "hereunder" and other similar compounds of the word "here" shall refer to this Agreement in its entirety and not to any particular section or subsection.

17.14  **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which shall constitute one and the same Agreement.

17.15  **Captions.** Headings or titles of sections and Articles are inserted solely for convenience or reference and shall not constitute a part of this Agreement, or affect is meaning, construction or interpretation.

17.16  **Pronouns.** All personal pronouns used in this Agreement shall include the other gender, whether used in the masculine, feminine or neuter gender, and the singular shall include the plural wherever and as often as may be appropriate.

17.17  **Waiver of Right to Assume Agreement.** Operator and Owner acknowledge that this is a personal service contract and is not assumable under Section 365(2)(A) of the Bankruptcy Code. In the event this Agreement is, for any reason deemed to be assumable, however, Operator, having been duly represented by counsel and having been duly advised, hereby waived any rights it may have under Section 365 of the Bankruptcy Code to assume this Agreement in the event of filing by Operator of a voluntary petition in bankruptcy under Title 11 of the United States Code or of any petition or answer in any other legal proceeding wherein Operator seeks or acquiesces in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or District of Columbia law relating to bankruptcy, insolvency or other relief for debtors. Operator hereby represents that such waiver is a knowing and voluntary waiver for which it has received due consideration.

**IN WITNESS WHEREOF,** Operator and Owner have duly executed and delivered this Management Agreement under seal as of the date first herein written.

ATTEST:

GUEST SERVICES, INC.

By: _____ (SEAL)

(Corporate Seal)

ATTEST:

GALLAUDET UNIVERSITY

_____
Paul Kelly
Vice President and Treasurer

By: _____ (SEAL)
Paul Kelly
Vice President and Treasurer

(Corporate Seal)

23

24

GALLAUDET UNIVERSITY KELLOGG CONFERENCE CENTER
MANAGEMENT AGREEMENT

TABLE OF CONTENTS

ARTICLE I      DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ARTICLE II      TERM OF AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
2.1    Commencement Date . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
2.2    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
2.3    Initial Opening Period . . . . . . . . . . . . . . . . . . . . . . . . . .   6
  6

ARTICLE III      ENGAGEMENT OF OPERATOR . . . . . . . . . . . . . . . . . . . . . . .   6
3.1    Operational Services . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
3.2    Property Employees . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
3.3    Limitations on Authority . . . . . . . . . . . . . . . . . . . . . . . .   9
3.4    Operation at Owner's Expense . . . . . . . . . . . . . . . . . . . .   9

ARTICLE IV      ACCOUNTING AND BUDGETING SERVICES . . . . . . . . . . .   9
4.1    Annual Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
4.2    Approval of Annual Plan . . . . . . . . . . . . . . . . . . . . . . . .   10
4.3    Approval of Capital Budget . . . . . . . . . . . . . . . . . . . . . .   10
4.4    Implementation of Annual Plan . . . . . . . . . . . . . . . . .   10
4.5    Budgetary Limitations . . . . . . . . . . . . . . . . . . . . . . . . .   11
4.6    Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
4.7    Financial Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARTICLE V      MANAGEMENT FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

ARTICLE VI      DISBURSEMENTS AND REIMBURSEMENTS . . . . . . . . . . .   12
6.1    Accounting Period Billings and Reimbursements . . . .   12
6.2    Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

ARTICLE VII      REPAIRS, MAINTENANCE AND REPLACEMENTS . . . . . .   12
7.1    Routine Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
7.2    Owner's Capital Expenditure Obligations . . . . . . . . . .   13

ARTICLE VIII      PROPRIETARY MARKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
8.1    Property Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
8.2    Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
8.3    Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
8.4    Confidential Information . . . . . . . . . . . . . . . . . . . . . . . .   13

ARTICLE IX      TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
9.1    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
9.2    Termination Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
9.3    Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
9.4    Operator's Duties Upon Termination . . . . . . . . . . . . .   15
9.5    Owner's Obligations Upon Termination . . . . . . . . . . .   16

ARTICLE X      CASUALTY LOSS AND CONDEMNATION . . . . . . . . . . . . .   16
10.1    Damage or Destruction . . . . . . . . . . . . . . . . . . . . . . . . .   16
10.2    Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
10.3    Discontinued Operations . . . . . . . . . . . . . . . . . . . . . . . .   16

ARTICLE XI          INSURANCE ................................................. 16
                    11.1    Property Insurance .............................. 16
                    11.2    Owner's Insurance .............................. 16
                    11.3    Operator's Insurance ........................... 16
                    11.4    Policy Standards ............................... 17
                    11.5    Additional Coverages .......................... 17
                    11.6    Deductibles ................................... 17
                    11.7    Requirements .................................. 17

ARTICLE XII         INDEMNIFICATION ....................................... 18
                    12.1    Indemnification of Owner by Operator ........... 18
                    12.2    Contracts and Future Bookings ................. 18
                    12.3    Survival ...................................... 18

ARTICLE XIII        OWNER'S COVENANTS .................................... 18
                    13.1    Right to Operate and Use Property ............. 18
                    13.2    Property Taxes ................................ 18

ARTICLE XIV         TRANSFER AND ASSIGNMENT ........................... 19

ARTICLE XV          ENVIRONMENTAL MATTERS ............................. 19
                    15.1    Obligations of Operator ....................... 19
                    15.2    Indemnification of Owner by Operator .......... 20

ARTICLE XVI         NOTICES ................................................. 20

ARTICLE XVII        MISCELLANEOUS ...................................... 21
                    17.1    Consent by Owner ............................. 21
                    17.2    Further Agreements ........................... 21
                    17.3    Waiver ....................................... 21
                    17.4    Successors and Assigns ....................... 21
                    17.5    Governing Law; Venue ......................... 21
                    17.6    Amendments ................................... 21
                    17.7    Estoppel Certificate ......................... 21
                    17.8    Partial Invalidity ........................... 22
                    17.9    No Representation Regarding Projections ....... 22
                    17.10   Relationship ................................. 22
                    17.11   Entire Agreement ............................. 22
                    17.12   Right to Make Agreement ...................... 22
                    17.13   Interpretation ............................... 22
                    17.14   Counterparts ................................. 22
                    17.15   Captions ..................................... 23
                    17.16   Pronouns ..................................... 23
                    17.17   Waiver of Right to Assume Agreement .......... 23

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("this Agreement") is made and entered into as of this 11th day of February, 2000 by and between GUEST SERVICES, INC., a non-stock, non-profit distributing Corporation, with its principal place of business located at 3055 Prosperity Avenue, Fairfax, Virginia 22031-2290 (hereinafter referred to as "Operator") and GALLAUDET UNIVERSITY, a federally chartered corporation located at 800 Florida Avenue, N.E., Washington, D.C. 20002 (hereinafter referred to as "Owner").

WHEREAS, Owner is the owner of a conference center commonly known as the "Gallaudet University Kellogg Conference Center" which is located at 800 Florida Avenue, N.E., Washington, D.C. 20002;

WHEREAS, it is Owner's desire that the Gallaudet University Kellogg Conference Center be managed and operated in harmony with the unique culture of Gallaudet University and its mission to provide the appropriate environment for adult learning of continuing personal and professional education and training for the deaf and hard of hearing community;

WHEREAS, Operator is experienced in the management and operation of conference centers;

WHEREAS, Operator is aware of the unique culture of Gallaudet University and is committed to take the necessary steps to assist Owner in its mission, as the same may relate to the operation and management of the Gallaudet University Kellogg Conference Center; and

WHEREAS, Owner desires to engage Operator to provide operational and management services for the Gallaudet University Kellogg Conference Center in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements herein contained Operator and Owner agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement (and in the exhibits attached hereto) the following terms shall have the meanings as set forth below:

"Accounting Periods" means the twelve (12) calendar months of the fiscal year.

"Affiliate" means, with respect to any party to this Agreement, (a) any other person or legal entity directly or indirectly "controlled by", "controlling" or "under common control with" such party, or (b) any other person or legal entity in which such party, or any person or legal entity owing directly or indirectly a material beneficial interest in such party, holds directly or indirectly a material beneficial interest. For purposes of this Agreement the terms "controlled by", "controlling" or "under the common control with" shall mean the possession (whether direct or indirect) of the power to direct or cause the direction of the management or policies of a person or entity whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Management Agreement as it may be amended, extended or supplemented from time to time.

"**Annual Plan**" has the meaning set forth in section 4.1 hereof.

"**Management Fee**" has the meaning set forth in Article V hereof.

"**Buildings and Improvements**" means the existing eighty-seven (87) double occupancy guest rooms, six (6) suites together with the ballroom, the lecture hall and all banquet, meeting and conference rooms, the dining area, the lounge, all storage and service areas, along with all of the other existing and future real property structures and improvements located on the Site (hereinafter defined).

"**Capital Budget**" shall have the meaning set forth in section 4.1 (b) hereof.

"**Client Locations**" means the Property and all other conference centers, hospitals, hotels and other properties to which Operator or its Affiliates provide management, operational and other related centralized services.

"**Commencement Date**" means the date on which Operator shall commence to management and operate the business of the Property in accordance with the terms of this Agreement.

"**Direct Costs**" means those costs incurred by Operator (other than Management Fees) that are directly attributable to services provided and expenses incurred under this Agreement.

"**Event of Default**" has the meaning set forth in section 9.1 hereof.

"**Fiscal Year**" means the annual accounting period beginning on October 1 and ending on September 30 of each year during the terms of this Agreement, except that the "Initial Fiscal Year" shall commence on the Commencement Date and end on September 30, 2000, and the final Fiscal Year shall end on the effective date of termination of this Agreement. A "full" Fiscal Year means a fiscal Year containing 365 days, and a "partial" Fiscal Year means a Fiscal Year of lesser duration.

"**Furnishings and Equipment**" means all furniture, wall and floor coverings, fixtures and equipment (other than Major Equipment Systems) located at or used in connection with the Property, including (without limitation): (a) all furniture, furnishings, built-in serving or service furniture, carpeting, decorative millwork, decorative lighting, television receivers and other electronic equipment, interior plantings, interior water features, artifacts and artwork, and interior and exterior graphics; (b) office furniture; (c) chinaware, glassware, linens, silverware uniforms and menus; (d) all fixtures and specialized hotel or conference center equipment used in the operation of kitchens, laundries, lounges and dining areas; (e) telephone and call accounting systems; (f) room management systems, point-of-sale accounting equipment, front and back office accounting systems and office equipment; (g) cleaning and engineering equipment, tools, utensils and all other similar items; (h) vehicles; (i) recreational equipment; and (j) all other similar items which are used in the operation of the Property.

"**Gross Operating Expenses**" means, for any period, all costs and expenses directly incurred by Operator and Owner during such period in relation to the operation of the Property, determined on an accrual basis, including, Direct Costs, a reasonable bad debt allowance as determined mutually by Owner and Operator, the Management Fees (hereinafter defined), and all other costs and expenses which are specifically designated as "Gross Operating Expenses" under the terms of this Agreement or Operator's Uniform System (hereinafter defined). Gross Operating Expenses shall also include costs and expenses directly incurred in relation to the operation of any business the revenue from which is included in the in the

definition of Gross Revenue. Notwithstanding the foregoing, "Gross Operating Expenses" shall not include any of the following:

(a)     costs of purchases, design, installation, construction or other acquisition of the Buildings and Improvements, Major Equipment Systems, and Furnishings and Equipment, to the extent such costs are capitalized under Operator's Uniform System;

(b)     depreciation, amortization or other method of cost recovery for capital assets, the amount of any casualty loss (whether insured or uninsured), the amount of any deductible (or the self-insured retention) under any policy of property insurance described in section 11.1 hereof, and any loss upon the sale or other disposition of a capital asset;

(c)     Taxes and Property Insurance (hereinafter defined);

(d)     payments of principal and interest and other financing costs with respect to any indebtedness incurred by Owner, and all rental and other lease payments under any ground lease or any capital lease under generally accepted accounting principles and the Uniform System;

(e)     excise, sales or use taxes paid to any governmental authority if and to the extent that the collection of such amounts from Property patrons is excluded from gross Revenue;

(f)     gratuities and service charges paid to Property Employees (hereinafter defined) if and to the extent that the collection of such amounts from Property patrons is excluded from Gross Revenue;

(g)     all costs related to the training program described in 3.1 (a) hereof; and

(h)     any other items which is specifically excluded from "Gross Operating Expenses" under the terms of this Agreement.

"**Gross Operating Profit**" means, for any Fiscal Year, the excess (if any) of Gross Revenue for such period over the total of Gross Operating Expenses for the same period.

"**Gross Revenue**" means, for any period, all revenue, proceeds of sales, or income of any kind derived directly or indirectly during such period from any source at the Property for such period over which Operator has any direct or indirect responsibility under this Agreement, determined on an accrual basis in accordance with Operator's Uniform System (after deducting all allowances for rebates and adjustments as provided for under the Uniform System), whether cash or credit, including (without limitation) rental of rooms, food and beverage sales, sales from Bistro and other facilities managed directly by Operator, telephone and telefax revenues, commissions and other incentive payments attributable to Property operations, and all net revenue received from any third party concessionaries operating any concession at the Property under any agreement with Owner or Operator, and from other persons rendering services to guests. Notwithstanding the foregoing, Gross Revenue shall not include:

(a)     gratuities or service charges added to guests' bills or statements which are paid over to Property Employees;

(b)     federal, state and local excise, use or rent taxes collected directly from patrons or guests as part of or as an addition to the sales price of any goods or services;

3

(c)     any proceeds from the sale or disposition of the Property or any of the Major Equipment Systems, Furnishings and Equipment or other capital assets used in connection with the operation or management of the Property;

(d)     the proceeds from any insured casualty, condemnation award, or any other such loss of a capital asset (other than proceeds of business interruption insurance);

(e)     any proceeds or other economic benefit of any borrowings of Owner whether or not secured by the Property or any Furnishings and Equipment;

(f)     amounts representing the value or cost of room occupancy, meals or other services provided as compensation to Property Employees or as complimentary benefits to any other persons;

(g)     discounts, allowances, and refunds or credits to patrons or guests;

(h)     proceeds of collection of accounts receivable to the extent the amount of any receivable was previously included in Gross Revenue;

(i)     payments made under warranties and guaranties from providers of goods or service to the Property, whether received by Owner or by Operator on Owner's behalf;

(j)     all payments, proceeds and receipts of gifts, donations, grants and other monetary pledges made, given or committed to Gallaudet University or the Gallaudet University Conference Center;

(k)     all revenues and receipts related to all soda, juice and snack vending machines located on the Property; and

(l)     all salaries and benefits paid by Gallaudet University to any Gallaudet University employees;

"**Hazardous Materials**" means, at any time, any substance that is then defined or listed in, or otherwise regulated pursuant to, any of the Environmental Laws.

"**Inventories and Operating Supplies**" means all inventories of merchandize held for sale, including food and beverage items, and all stocks of expendable supplies necessary for the operation of the Property, including without limitation, all office supplies, cleaning supplies, guest supplies, paper supplies, laundry supplies, recreational supplies, repair and maintenance supplies, fuel and miscellaneous expendables.

"**Major Equipment Systems**" means the major mechanical and electrical systems which are required for the operation of the Property and incorporated into the Site or the structure of the Buildings and Improvements, including the equipment systems for heating, plumbing, ventilating, air conditioning, elevators, escalators, electrical and water distribution within the Property.

"**Operating Budget**" has the meaning set forth in section 4.1 (a) hereof.

"**Operator Proprietary Materials**" shall mean the service marks, trademarks, trade names, insignias and logos that are owned by Operator or its Affiliates along with all computer software programs, marketing and promotional literature developed by Operator and used in the operation of the Property.

4

"**Operator's Home Office Management Employees**" shall mean those employees of Operator and its Affiliates whose personal offices are located at Operator's headquarters located at the address set forth hereinabove or at other locations where such Management Employees maintain their personal offices.

"**Operator's Uniform System**" or "**Uniform System**" means the system of accounts described in Operator's standard accounting procedures, which conform substantially to the Uniform System of Accounts for Hotels (8th Revised Edition, 1986) published by the Hotel Association of New York City, Inc., together with any changes to such manual adopted by Operator from time to time with Owner's approval.

"**Owner Proprietary Materials**" shall mean the service marks, trademarks, trade names, insignias, logos and materials that are owned or otherwise developed by Owner for use at the Property.

"**Owner's Profit**" means, for any monthly operating period, the excess (if any) of operating revenue over operating expenses.

"**Property**" means the Site, the Building and Improvements, the Major Equipment Systems, the Inventories and Operating Supplies, and the Furnishings and Equipment.

"**Property Employees**" has the meaning set forth in Section 3.2 hereof.

"**Reimbursable Costs**" shall mean all Direct and Indirect Costs and any other cost or expense reimbursed by Owner to Operator under the specific terms of this Agreement or otherwise approved in advance in writing by Owner for reimbursement. Reimbursable Costs shall not include any corporate, administrative or employee-related expenses or general overhead of Operator or its Affiliates.

"**Site**" means the real property described on Exhibit A attached hereto and made a part hereof.

"**Salaried Employees**" means those employees of Operator who directly or indirectly perform management, professional or supervisory services at the Property and whose compensation is based upon a salary rather than an hourly wage. All "Salaried Employees" shall be considered Property Employees to the extent and for the time actually employed at the Property. "Salaried Employees" shall include the Property's Managing Director, general manager, food and beverage manager, hospitality manager, front desk manager, housekeeping supervisor along with those other managerial, professional and supervisory employees identified in each proposed Annual Plan.

"**Taxes and Property Insurance**" means, for any period, the cost accruing during such period under generally accepted accounting principles for (a) ad valorem real estate and personal property taxes and assessments and other governmental charges or levies upon the Property (or payments in lieu of said taxes), and (b) premiums payable on all property insurance policies described n section 11.1 hereof.

## ARTICLE II
## TERM OF AGREEMENT

**2.1    Commencement Date.** Operator shall commence to manage and operate the Property in accordance with the terms of this Agreement on **February 11, 2000** (the "Commencement Date"). From and after the Commencement Date until the term of this Agreement expires or is terminated in accordance with the terms set forth herein. Operator shall have possession of all keys, locks and safe combinations, reservation lists, ledgers, accounting books and records, insurance policies, and other agreements and documents related to the operation of the Property. Prior to the Commencement Date, and from time to time thereafter as may be necessary, Operator (with Owner's assistance) shall take all appropriate steps and

execute all appropriate applications and documents to obtain all licenses and permits (including food and liquor licenses) required for the operation of the Property.

2.2    **Term.** The term of this Agreement shall commence on the Commencement Date hereof and shall continue for a period of sixty-seven (67) months with two (2) one (1) year renewal options. Each such one (1) year renewal option shall be granted at the sole discretion of Owner.

2.3    **Initial Opening Periods.** No later than April 15, 2000, Operator agrees to prepare and submit to Owner an initial opening plan ("Initial Opening Plan") for the period beginning on the proposed opening date of February 11, 2000 and ending on September 30, 2000 (the "Initial Opening Period"). Such Initial Opening Plan shall conform substantially to the requirements of an Annual Plan as set forth in section 4.1 hereinbelow (with the understanding of Owner and Operator that the Initial Opening Plan covers only seven months). Owner agrees to provide information to and participate with Operator in the preparation of the Initial Opening Plans. Owner agrees to compensate Operator during the Initial Opening Period in accordance with Article V hereinbelow.

## ARTICLE III.
## ENGAGEMENT OF OPERATOR

3.1    **Operational Services.** Owner hereby appoints, authorizes and engages Operator to act as the operator and manager of the Property during the term of this Agreement, with responsibility, control and discretion in the operation, management and supervision of the Property subject to the limitations set forth in this Agreement. Operator agrees to operate and manage the Property for Owner in a commercially reasonable, prudent and professional manner, in substantial conformity with the then-current approved Annual Plan and in accordance with the procedures, practices and management techniques employed by Operator in the operation of other conference center properties having similar styles, characters, facilities and amenities as the Property all in harmony with the unique culture of the Gallaudet University campus. As such, Operator agrees to consult with Owner on a regular basis to assure that the Property is being marketed and operated in accordance with the policies, goals and objectives of Owner. Owner and Operator agree that neither the concept or quality level for the Property will be changed without their mutual consent. Subject to the limitations set forth herein and in section 3.4 below, and without limiting the generality of the foregoing, Operator's engagement under this Agreement shall include the responsibility and authority, on behalf of Owner, to:

(a)    Employ (in accordance with section 3.2 hereof), train (which training shall include the provision of a level of proficiency in sign language equal to that required of other Gallaudet University personnel in equivalent or similar positions, as well as an appropriate understanding of deaf culture; provided further, that Operator agrees it shall engage Gallaudet University as the sole provider of such sign language training program and Operator agrees to pay, at Operator's expense, fifty percent (50%) of all training expenses herein and to reimburse at one hundred percent (100%) all training expenses of employees transferred or moved at the Operator's request from the Gallaudet University Kellogg Conference Center) supervise, discharge and determine and pay the compensation, fringe benefits, retirement benefits and other policies and terms of employment of all Property Employees as may be reasonably required to provide proper operation, supervision, and management of the Property in a professional manner suitable to the unique character of the Property;

(b)    Create, implement and supervise (with participation of Owner) an on-the-job training program that will be made available to Gallaudet University students interested in careers in the hospitality industry (the details of such training program to be provided in each proposed Annual Plan);

6

(c)    Recruit, hire and train qualified deaf and hard of hearing employees for the operation and management of the Property (the details of such efforts to be provided in each proposed Annual Plan);

(d)    Cooperate with Owner with respect to any and all legal actions or proceedings which Owner and Operator shall mutually deem reasonably necessary or proper in connection with the routine operation of the Property, including actions or proceedings to collect accounts receivable or to oust or dispossess guests, or other persons in possession of any part of the Property, to enforce claims relating to employees employed at the Property, or to cancel or terminate any license or concession agreement for the breach thereof or default thereunder by any licensee or concessionaire, and take appropriate steps to protest and/or litigate to final decision in any appropriate court or other forum, any violation, order, rule or regulation directly related to the operation of the Property.

(e)    Negotiate and enter into service contracts necessary or desirable in the ordinary course of business in operating the Property, including, without limitation, contracts for provision of telephone and other utility services, cleaning services, vermin extermination, trash removal, elevator and boiler maintenance, air conditioning maintenance, master television service, laundry and dry cleaning, entertainment, satellite systems and other services which Operator deems advisable;

(f)    Immediately upon its receipt of any and all notices, bills or statements pertaining to Taxes, and Property Insurance in connection with the Property, Operator shall deliver the same to Owner. Owner shall be solely responsible for the payment of any and all Taxes and Property Insurance.

(g)    Plan, prepare, arrange and contract for advertising, publicity and promotional activities of the Property;

(h)    Establish, supervise and implement a sales and marketing program for the Property generally consistent with the sales and marketing programs of other similar properties managed by Operator, taking into consideration local market conditions and variations in facilities, as Owner and Operator deem to be generally beneficial to the economic performance of the Property;

(i)    Purchase (or arrange for the purchase of) and install (or arrange for the installation of) those remaining Furnishings and Equipment, Inventories and Operating Supplies, if any, necessary for the operation and management of the Property;

(j)    Perform and supervise (or cause to be performed and supervised) such maintenance and repairs to the Property as shall be required by applicable law, or as shall be necessary to operate and maintain the Property in a professional manner suitable to the character of the Property;

(k)    Pay all Direct Costs and comply with all laws, rules, regulations, requirements, orders, notices, determinations and ordinances of any federal, state or local authority which are applicable to the operation and management of the Property;

(l)    Determine all terms for guest admittance to the Property and establish all prices, price schedules, rates and rate schedules for rooms, and other amenities and services provided at or in connection with the Property;

(m)    Develop, revise, and implement food and beverage concepts (including the service and sale of alcoholic beverages) and entertainment activities, together with related policies and procedures;

(n)    Apply for, negotiate, arrange and maintain in the name of Owner or Operator (as required by law), all licenses, permits and concession agreements required to manage and operate the Property;

7

(o)     Establish all credit policies, and enter into agreements with credit card companies, in connection with the Property;

(p)     Obtain and grant concessions and privileges including, without limitation, newsstands, taxicabs and automobile parking as Owner and Operator may deem reasonably necessary or desirable in connection with the operation of the Property;

(q)     Engage independent accountants selected by Owner and reasonably acceptable to Operator as Owner and Operator may deem necessary to provide advice or perform services of a specialized nature related to matters within Operator's responsibility under this Agreement;

(r)     Be responsible for the purchase and maintenance of all internal plants and related decorations (Owner shall be responsible for all external landscaping and related maintenance);

(s)     Assist Gallaudet University's Grounds Personnel with the removal of all snow, ice and other debris from the sidewalks, loading docks and all other entrances to the Property;

(t)     Conduct a recycling program (including paper, glass, aluminum and plastic products) for the Property in accordance with Owner's recycling policy and not allow styrofoam products to be used at the Property;

(u)     Purchase and pay for, as Direct Costs, all food, supplies and services including all Inventories and Operating Supplies utilized in the performance of its obligations hereunder (all local trade discounts related to the purchase of such food, supplies and services shall be credited to Owner's account); and

(v)     Perform any and all other acts as Owner and Operator may reasonably deem necessary or appropriate for the operation and management of the Property.

**3.2     Property Employees.** All persons employed on-site at the Property during the terms of this Agreement (including all Salaried Employees) shall be "Property Employees." Operator shall have the sole responsibility for and shall use reasonable care in the hiring, promotion, discharge and supervision of all Property Employees, provided that the number and compensation of the Property Employees are in conformity with each approved Annual Plan and with industry standards for the staffing of conference center properties comparable to the Property in the same market area taking into account local market conditions. Operator affirms that it is an equal opportunity and affirmative action employer and agrees to comply with all applicable federal, state and District of Columbia laws and regulations related thereto. Owner shall have the right to approve the hiring of the person Operator selects to be the Property's general manager which approval shall not be unreasonably withheld or denied. If Operator incurs any costs, including legal fees, retroactive wages and damages, as a result of any personnel action taken by Owner or by Operator at the direction of Owner against any Property Employee, which action Operator would not have taken but for Owner's direction, Operator shall charge Owner for such costs as Direct Costs. Operator agrees to indemnify Owner with respect to any personnel action taken by Operator on Operator's own accord without Owner direction or approval against any Property Employee and all liability, costs and expenses related to such Operator action including legal fees, retroactive wages or damages shall be the sole responsibility of Operator.

8

3.3     <u>Limitations on Authority</u>. Operator shall have no authority on behalf of Owner to do any of the following without Owner's prior written approval in each instance, unless the specific transaction is described in an approved Annual Plan, Operating Budget or Capital Budget:

(a)     Enter into any collective bargaining agreements with respect to Property Employees; or

(b)     Institute or defend legal proceedings other than those described in subsection (d) of section 3.1 hereof; or

(c)     Borrow money, guaranty the debts of any third person, or mortgage, pledge, grant a security interest in or otherwise encumber all or any part of the Property; or

(d)     Incur any liabilities or obligations to third parties which are unrelated to the management, operation, maintenance and security of the Property or to the performance of Operator's responsibilities under this Agreement; or

(e)     Incur any single expense of Two Thousand Five Hundred And No/100 Dollars ($2,500.00) for any item not provided for in an approved annual Plan (except in the case of an emergency); or

(f)     Enter into any contract, agreement or commitment or incur any other obligation with respect to the operation or management of the Property the duration of which would exceed one (1) year.

3.4     <u>Operation at Owner's Expense</u>. Subject to the express limitation upon Operator's authority set forth in this Agreement (3.4 hereof and the Budgetary Limitations in section 4.5 below), Operator shall act as agent for Owner in the performance of its responsibilities under this Agreement, and all costs, expenses and liabilities incurred by Operator to third parties in connection with such performance shall be borne exclusively by Owner. Except as otherwise expressly provided for herein, Operator shall not become liable for any such costs, expenses and liabilities by reason of its management and operational responsibilities hereunder, and Operator may inform third parties of its agency for Owner in connection with any action taken on behalf of Owner in accordance with Operator's authority under the terms in this Agreement.

<div align="center">

**ARTICLE IV**
**ACCOUNTING AND BUDGETING SERVICES**

</div>

4.1     <u>Annual Plan</u>. In addition to the Initial Opening Plans required under Article II hereinabove, with respect to the Initial Fiscal Year, Operator shall prepare and submit to Owner a proposed annual plan for each full Fiscal Year for the operation of the Property ("Annual Plan"). Prior to July 1, 2000, Operator shall prepare and submit to Owner a proposed Annual Plan for the full Fiscal Year beginning October 1, 2000 and ending on September 30, 20001. Prior to or on each succeeding July 1 during the term of this Agreement, Operator shall prepare and submit to Owner a proposed Annual Plan for the next succeeding Fiscal Year. Each Annual Plan shall include:

(a)     Operator's reasonable estimate (on an Accounting Period basis) of Gross Revenue, Gross Operating Expenses, and Taxes and Property Insurance for the Fiscal Year, itemized in a reasonable manner consistent with Operator's Uniform System of Procedures (the "Operating Budget"), together with the assumptions (in narrative form) utilized in preparing the Operating Budget;

(b)     A budget of Operator's recommended renewals, revisions, rebuilding, replacements, substitutions or improvements to the Property for the Fiscal Year which are of a capital nature under Operator's Uniform System of Procedures ("Capital Budget"), including Operator's reasonable estimates

<div align="center">9</div>

for the cost of designs, plans and specifications, material, labor (including installation), storage, consultants, travel, overhead, sales tax and freight related to such capital improvements;

(c)    A description of the marketing strategy Operator intends to implement during the Fiscal Year to optimize both short and long-term profitability of the Property; together with a marketing plan that includes a positioning statement, competition analysis, group sales quotas, sales action plans, media schedule, and public relations plan;

(d)    A description of the plan Operator intends to implement during the Fiscal Year to accomplish the requirements for recruiting, hiring and training of Property employees set forth in Article III above;

(e)    Operator's estimate of any amounts Owner will be required to provide to fund expenditures contemplated by the Capital Budget during the Fiscal Year; and

(f)    Any other matter deemed appropriate by Operator or requested by Owner; provided, however, any such matter requested by Owner shall be as to a matter which is customarily included in such annual plans within the conference center industry.

4.2    **Approval of Annual Plan.**    The Annual Plan for each Fiscal Year must be approved by Owner. Owner shall not unreasonably withhold its approval of each Annual Plan (or any portion hereof) submitted by Operator, and Owner shall be deemed to have approved each Annual Plan submitted by Operator except as to those portions to which Owner specifically objects by written notice given to Operator within sixty (60) days after delivery of the Capital Budget to Owner. If no Capital Budget for the next Fiscal Year has been agreed to by the end of the then current Fiscal Year the previous Fiscal Year's Capital Budget will be used.

4.3    **Approval of Capital Budget.**    The Capital Budget for each Fiscal Year must be approved by Owner. Owner shall not unreasonably withhold its approval of each Capital Budget (or any portion thereof) submitted by Operator, and Owner shall be deemed to have approved each Capital Budget submitted by Operator except as to those portions which Owner specifically objects by written notice given to Operator within sixty (60) days after delivery of the Capital Budget to Owner. If no Capital Budget for the next Fiscal Year has been agreed to by the end of the then current Fiscal Year the previous Fiscal Year's Capital Budget will be used.    The determination of whether specific costs are capital expenditures (includable in the Capital Budget) or operating expenses (includable in the Operating Budget) shall be made in accordance with Operator's Uniform System.

4.4    **Implementation of Annual Plan.**    Operator shall act diligently to operate the Property in accordance with the then current approved Annual Plan, to achieve the results projected in the approved Operating Budget for each Fiscal Year, and to arrange for the capital improvements, repairs, replacements, revisions and rebuilding contemplated under the approved Capital Budget. Owner acknowledges that actual results of operation of the Property may vary from the Operating Budget because of assumptions that may not occur and changed conditions (including changes in weather, occupancy, average daily room rates, and food and beverage sales). The budgeted amounts will represent Operator's reasonable estimates, and Operator makes no representation or warranty that the revenue and expenditures set forth in the Operating Budget and the Capital Budget will be achieved.

4.5     **Budgetary Limitations.**  Operator agrees that Operator will not enter into any agreement or transaction on behalf of Owner, without Owner's written consent or approval, if the reasonable foreseeable costs and liabilities chargeable to Owner by reason of such transaction or agreement will cause capital expenditures for the then current Fiscal Year to exceed five percent (5%), in the aggregate, of the amount budgeted therefor in the Capital Budget approved by Owner for such Fiscal Year.

4.6     **Books and Records.**  Operator shall, for the account of Owner, supervise and maintain full and adequate books of account and other records reflecting the results of operation of the Property including accounts receivable, accounts payable, and general ledger, all on an accrual basis in accordance with Operator's Uniform System. Operator shall maintain and properly store all such books and records for a period of not less than five (5) years after the Fiscal Year in which such books and records relate. Operator may perform accounting services at Operator's centralized office or at the Property. Except for such books and records as Operator may elect to keep in a centralized office pursuant to the operation of centralized accounting services, Operator shall keep and maintain at the Property the books of account and all other records relating to the operation of the Property. All such books and records for both current and prior years (including any centralized books and records) shall be available to Owner and its representatives at all reasonable times for examination, audit, inspection and transcription, provided such representatives shall provide Operator with suitable identification and reasonable notice prior to being afforded access. For a period of three (3) years after Operator's delivery of such books and records upon any termination of this Agreement, Operator shall retain the right to inspect, audit, copy, and transcribe all such books of account and records relating to periods prior to such termination. On behalf of Owner, Operator shall be responsible for the processing of all credit card accounts and other accounts receivable, the preparation and maintenance of all forms and records related thereto and for all sales and use taxes related to Property operations; and the establishment and maintenance of payroll systems and related employee records for all Property Employees.

4.7     **Financial Reports.**  As soon as possible, but in no event later than fifteen (15) business days after the end of each Accounting Period, Operator shall deliver to Owner unaudited financial reports for the Property for such Account Period which shall include (a) a profit and loss statement comparing actual results to both budget and the previous year's actual results, for both the current Accounting Period and Fiscal Year to date, and (b) a summary of Gross Operating Expenses, and Taxes and Property Insurance listed by department under Operator's Uniform System. As soon as possible, but in no event later than forty-five (45) days after the end of each Fiscal Year, Operator shall deliver to Owner an unaudited profit and loss statement for the Property for such Fiscal Year, setting forth all Gross Revenue, Gross Operating Expenses, and Taxes and Property Insurance. The financial reports required hereunder shall be manually signed by the person who prepared such reports or by another authorized managerial representative of Operator and shall be in Operator's customary form and in the same detail as generally prepared by Operator for other conference centers managed by it, and shall be taken from the books and records maintained by Operator in the manner hereinabove specified. Operator's reporting responsibilities hereunder shall include balance sheet, general ledger and subledger accounting for fixed assets, other long-term assets and long term liabilities pertaining to the Property.

# ARTICLE V
## MANAGEMENT FEES

During the term of this Agreement Owner shall pay to Operator for each of the five (5) Fiscal Years set forth below an all inclusive Management Fee structured as follows:

| Fiscal Year | Gross Revenue | Owner's Profit |
|---|---|---|
| 1 | | |
| 2 | 4% | 5% |
| 3 | 3.75% | 10% |
| 4 | 3.50% | 11% |
| 5 | 3.25% | 12% |
| | 3% | 12% |

Owner and Operator agree that each of Fiscal Years 1-5 shall begin on October 1 and end on the following September 30 (the Fiscal Year calendar of both Owner and Operator) (i.e. Fiscal Year 1 begins on October 1, 2000 and ends on September 30, 2001; Fiscal Year 2 begins October 1, 2001 and ends on September 30, 2002, etc...). Owner and Operator further agree that, notwithstanding the above structure, the Management Fee for the Initial Fiscal Year shall consist solely of a monthly flat fee to be agreed upon.

# ARTICLE VI
## DISBURSEMENTS AND REIMBURSEMENTS

**6.1    Accounting Period Billings and Reimbursements.** In addition to the Management Fees required to be paid by Owner to Operator under this Agreement, Owner shall reimburse Operator all Reimbursable Costs. Within fifteen (15) business days after the end of each Accounting Period, Operator will submit to Owner (along with the financial information required under section 4.7 hereof) (a) an invoice for the amount, if any, of such Reimbursable Costs and Management Fees for such Accounting Period exceed Gross Revenues for such Accounting Period, or (b) a check made payable to Owner for the amount, if any, by which Gross Revenues for such Accounting Period exceed the sum of Reimbursable Costs and Management Fees for such Accounting Period. No later than December 31 following the Owner's fiscal year ending on September 30, the Operator and Owner shall make the calculation for the cumulative twelve months of the recently ended fiscal year to determine if any year end adjustment is required for the profit sharing program as set forth in Article V above.

**6.2    Payment Terms.** All invoices submitted by Operator to Owner pursuant to section 5.1 (a) above shall be paid within ten (10) days after Owner's receipt thereof. In the event any such invoice is not paid within thirty (30) days of the invoice date, interest shall be charged at the rate of one percent (1%) per month on the unpaid balance computed from the invoice date until the date paid. Amounts due Owner section 5.1(b), if any, shall be submitted to Owner along with the financial information required to be provided by Operator to Owner under section 4.7 hereof.

# ARTICLE VII
## REPAIRS, MAINTENANCE AND REPLACEMENTS

**7.1    Routine Maintenance.** Operator, at Owner's cost and expense, shall maintain the Property in good repair and condition and shall make or cause to be made all ordinary and necessary maintenance, routine repairs and minor alterations the costs of which are not normally capitalized under Operator's Uniform System. All such costs shall constitute Gross Operating Expenses. Operator shall obtain Owner's

12

prior written approval for any repair, maintenance or replacement the cost of which exceeds Two Thousand Five Hundred and No/100 Dollars ($2,500.00). Non-routine maintenance and repair, the costs of which are normally capitalized under Operator's Uniform System, shall be made and paid for in accordance with the following provisions set forth in section 7.2 below.

7.2    **Owner's Capital Expenditure Obligations.**  Operator shall from time to time inform Owner of such alterations, additions, improvements, repairs and replacements in or to the Property (including Building and Improvements, Major Equipment Systems and Furnishings and Equipment) as may be necessary to avoid the risk of criminal or civil sanctions under federal, state or local laws, regulations, ordinances, rules or building codes, or to maintain and operate the Property consistent with existing standards of quality. The cost and expense of such alterations, additions, improvements, repairs and replacements shall be the sole responsibility of Owner. As and when necessary, the same shall be made with as little hindrance or disruption as reasonably possible to the operation of the Property.

## ARTICLE VIII
## PROPRIETARY MARKS

8.1    **Property Name.**  During the term of this Agreement, the Property shall at all times be designated and known as "**GALLAUDET UNIVERSITY KELLOGG CONFERENCE CENTER**" (which name designation shall be an Owner Proprietary Material). Notwithstanding the preceding sentence, Owner shall have the right to change the name of the Property in its sole and absolute discretion; however, Owner agrees to consult with Operator prior to implementing any such decision. The Property shall be known and marketed with such additional identification as Owner and Operator jointly deem appropriate to incorporate the fact that the Property is managed by Operator utilizing the Operator Proprietary Materials.

8.2    **Disclaimer.**  Owner and Operator acknowledge and will not contest the other's unrestricted and exclusive right, title and interest to the Operator Proprietary Materials and Owner Proprietary Materials, respectively, and all licenses thereof. Owner and Operator hereby disclaim any right or interest in the Operator Proprietary Materials and Owner Proprietary Materials, respectively, or the goodwill derived therefrom. All present and future service marks, trademarks and copyrights now owned or hereafter applied for or granted in connection with the Operator Proprietary Materials shall be the property of Operator (or its Affiliates) and inure to its (or their) benefit, and Owner shall not use or permit others to use any of the same without Operator's written approval. All present and future service marks, trademarks, and copyrights now owned or hereafter applied for or granted in connection with the Owner Proprietary Materials or the Property shall be the property of Owner (or its Affiliates) and inure to its (or their) benefit, and Operator shall not use or permit others to use any of the same without Owner's written approval.

8.3    **Remedy.**  Owner and Operator agree that each party shall be entitled to injunctive and equitable relief for any violation of the foregoing provisions of this Article VIII. The non-prevailing party agrees to pay to the prevailing party all damages, costs and expenses, including reasonable attorneys' fees and court costs, which may be incurred by such party or its Affiliates arising from any violation of the foregoing provisions of this Article VIII.

8.4    **Confidential Information.**  All manuals, recipes, menus, computer programs, personnel materials and other related materials of Operator utilized by Operator in the management and operation of the Property shall be the property of Operator and shall be treated as confidential information. Owner shall keep such information confidential and shall so instruct its agents, employees and independent contractors. The use of such information by Owner in any manner shall not affect Operator's ownership thereof or the confidential nature of such information.

13

## ARTICLE IX
## TERMINATION

**9.1    Events of Default.** Any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)    the failure of either party to pay any sum of money to the other party when due and payable under the terms of this Agreement if such failure is not cured within ten (10) days after the non-defaulting party gives written notice thereof to the defaulting party;

(b)    the failure of either party to perform, keep or fulfill any of the other covenants, undertakings or obligations in this Agreement, or the breach by either party of any of its warranties under this Agreement, if such failure or breach (i) has or could have a material adverse effect on the operation of the Property or the rights or duties of the non-defaulting party hereunder and (ii) such failure or breach is not cured within thirty (30) days after the non-defaulting party gives written notice thereof to the defaulting party; provided, however, that if such failure or breach is not capable of being cured within such thirty (30) day period and the defaulting party commences in good faith to cure such default during such period and thereafter prosecutes such cure to completion with all due diligence, then no Event to Default shall exist unless such default remains uncured one hundred twenty (120) days after such written notice was given;

(c)    the filing by either party of a voluntary petition in bankruptcy under Title 11 of the United States Code or of any petition or answer in any other legal proceeding wherein either party seeks or acquiesces in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or District of Columbia law relating to bankruptcy, insolvency or other relief for debtors;

(d)    the entry of any judicial order, judgment or decree approving an involuntary petition filed against either party of a type described in section 9.1(c) above if such order, judgment or decree remains unvacated for an aggregate of sixty (60) days (whether or not consecutive) after the date of entry thereof; or

(e)    the filing of any petition or answer by Owner in any legal proceeding seeking or acquiescing in the appointment of any custodian, trustee, conservator, liquidator or receiver of all or any part of the property or the rent, issues, revenues, or profits thereof, or the appointment of any such custodian, trustee, conservator, liquidator or receiver without Owner's acquiescence if such appointment remains unvacated for an aggregate of sixty (60) days (whether or not consecutive) after the date of filing thereof.

(f)    the entry of any judicial order or judgment, the granting of a writ of attachment, or the occurrence of any other event the result of which would prevent Operator access to or the use of the bank account or accounts into which the revenues, receipts or other monies generated by or otherwise related to the Property including any monies provided by Owner to Operator for use in the operation or management of the Property as deposited.

**9.2    Termination Rights.** This Agreement may be terminated prior to the expiration of its term upon the occurrence of any one or more of the following events;

(a)    Upon an Event of Default, at the option of the non-defaulting party exercised by written notice of termination given to the defaulting party prior to the cure of such Event of Default;

14

(b)    At the option of Operator, exercised by written notice of termination to Owner, upon any suspension for a period of thirty (30) days or more or any withdrawal or revocation of any material governmental license or permit required for the operation of the Property in accordance with the terms of this Agreement, but only if such suspension, withdrawal or revocation is due to circumstances beyond Operator's reasonable control;

(c)    At the option of Owner, exercised by written notice of termination to Operator, which, notwithstanding the provisions of section 9.3 below, shall be effective immediately upon the receipt by Operator of such notice of termination, upon any transfer by Operator of its rights or duties under this Agreement.

(d)    Upon any material and substantial loss of, damage to or destruction of all or any part of the Property by condemnation or other taking, fire or other casualty or cause, which Owner elects not to repair or restore, at the option of either party by written notice of termination to the other party at any time after the occurrence of any such event.

(e)    At the option of Owner, exercised by written notice of termination to Operator, upon the occurrence of a twenty percent (20%) or greater shortfall in the projected Gross Operating Profit for Fiscal Year 2001 or thereafter (as set forth in an approved Annual Plan).

(f)    At the option of Owner, notwithstanding the provisions of section 9.3 below, exercised by ninety (90) days written notice of termination to Operator.

(g)    At the option of Operator, notwithstanding the provisions of section 9.3 below, exercised by ninety (90) days written notice of termination to Owner.

9.3    **Effective Date.**  The effective date of termination of this Agreement shall be thirty (30) days after a notice of termination is given under section 9.2 above, unless a later date is specified by the terminating party in such notice.

9.4    **Operator's Duties Upon Termination.**  Upon the expiration of the term of this Agreement, or upon the effective date of termination of this Agreement, Operator shall:

(a)    As expeditiously as possible and to the extent permitted by law, surrender and assign to Owner or its designee any and all licenses, permits, or other governmental authorizations required for the operation and management of the Property;

(b)    Deliver to Owner any and all of Owner's properties and assets within the possession of Operator, including keys, locks and safe combinations, reservation lists, ledgers, accounting books and records, and other documents, agreements, leases, and licenses required for or related to the operation and management of the Property (including all insurance policies and bonds exclusively related to the operation and management of the Property); provided, however, Operator shall have no obligation to deliver to Owner any of Operator's Proprietary Materials; and

(c)    Within ninety (90) days of termination, prepare and deliver to Owner the financial reports required under this Agreement through the date of termination and remit to Owner the amount, if any, by which Gross Revenues collected by Operator exceed the sum of Reimbursable Costs plus any Management Fees.

9.5 **Owner's Obligations Upon Termination.** Within twenty (20) days of Operator's performance and completion of all of its duties pursuant to section 9.4 above, Owner shall pay to Operator any and all accrued and unpaid Reimbursable Costs and Management Fees due Operator pursuant to terms of this Agreement. Operator's remittance to Owner of any funds pursuant to section 9.4 (c) above shall not constitute a waiver of or otherwise affect Operator's rights to be paid any and all amounts owing to Operator pursuant to this Agreement.

## ARTICLE X
## CASUALTY LOSS AND CONDEMNATION

10.1 **Damage or Destruction.** If the Property or any portion thereof is damaged or destroyed during the term of this Agreement by fire, other casualty, or act of God, Owner may at its election, repair, rebuild or replace the Property.

10.2 **Condemnation.** If only a part of the Property shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority, Owner may, at its election and without expense to Operator, repair, restore and alter the Property so as to make it a satisfactory architectural unit of similar type, class and size as the Buildings and Improvements were prior to the taking or condemnation. In connection with any such proceeding, Operator shall not have or assert any compensable property interest in the Property or any of its component parts.

10.3 **Discontinued Operations.** If at any time during the term hereof it becomes necessary to close or cease operation of the Property (or any portion thereof) in order to protect the health, safety or welfare of the guests of the Property or Property Employees, or if required by law, Owner and Operator may close and cease operation of all or part of the Property. With approval of Owner, Operator shall reopen and commence operation when Owner and Operator deem that such may be done without jeopardy to the Property, the Property Employees, or any guests of the Property. In the event of any occurrence described in this Article X, Owner and Operator shall determine the extent, if any, to which such event requires the discontinuance of the operation of the Property or a reduction in the scope of the operation of the Property.

## ARTICLE XI
## INSURANCE

11.1 **Property Insurance.** From the Commencement Date and thereafter at all times during the term of this Agreement, Owner shall provide and maintain insurance on all real and personal property located upon or comprising the Property.

11.2 **Owner's Insurance.** From the Commencement Date and thereafter at all times during the term of this Agreement, Owner shall provide and maintain the following insurance with respect to the Property:

(a) Commercial general liability insurance or equivalent coverage with primary policy limits of 1,000,000 combined single limit per occurrence and 2,000,000 annual aggregate for the Property. Such insurance shall include coverage for, among other things, lessors' risk insurance. Such coverage shall also contain a separation of insureds clause causing it to apply as if each named insured were the only named insured and separately to each insured against whom claim is made or suit is brought.

(b) Excess liability insurance with limits of at least 25,000,000. Owner may increase the primary limits of liability set forth in subsection (a) above as necessary to eliminate any gaps between such primary coverage and the excess liability insurance described in this subsection.

(c)     Other insurance that Owner shall from time to time deem advisable or appropriate.

11.3     **Operator's Insurance.**  From the Commencement Date and thereafter at all times during this Agreement, Operator shall provide and maintain insurance on operations of the Property as follows:

(a)     Commercial general liability insurance or equivalent coverage with primary policy limits of $1,000,000 combined single limit per occurrence and $2,000,000 annual aggregate for the Property. Such insurance shall include coverage for innkeeper's liability, hotel safe deposit box liability, liquor liability, products liability, completed operations liability, contractual liability and personal injury liability.

(b)     Commercial crime insurance for the Property including coverage for Property Employees and any of Operator's Home Office Management Employees who may, from time to time, have responsibilities that include activities at or related to the management or operation of the Property, dishonesty, loss inside the premises, loss outside the premises, money orders, counterfeit currency and depositor's forgery. The limit for each of these coverages shall not be less than $500,000. Notwithstanding Section 11.4 below, Operator shall not be required to include Owner as a named insured on the commercial crime insurance; however, Operator shall include a joint loss payable endorsement (Form CR 1047) on its policy that will cause any loss payment arising out of the operations at the Property to be paid to both Operator and Owner.

(c)     Worker's compensation insurance providing statutory workers' compensation coverage and employer's liability insurance with limits of not less than $500,000/$500,000/$500,000 for all Property Employees, Operator's Home Office Management Employees, and all other persons directly or indirectly employed by Operator.

11.4     **Policy Standards.**  All insurance required to be provided by Operator hereunder shall include Owner as additional insured. All insurance policies shall contain an express waiver of subrogation against Owner or Operator to the extent they are not an insured thereunder. Any insurance required to be provided by Operator or Owner hereunder may be provided under blanket policies of insurance. Each party shall provide the other with certificates of insurance as to those policies they purchase or maintain pursuant to this Agreement. Any insurance agreed to be provided hereunder by Owner or Operator shall be primary and without the right of contribution from any similar type of insurance purchased by the other with regard to Property.

11.5     **Additional Coverages.**  Owner acknowledges that the insurance coverage requirements set forth in this Article XI, in terms of both forms of insurance and limits of coverage represent the minimum protection currently acceptable to Owner and Operator. Owner shall have the option to broaden such coverage, increase the limits or carry additional insurance provided that all premiums for such changes are paid for by Owner at its expense.

11.6     **Deductibles.**  Owner and Operator shall be responsible for any payment of any deductible or self-insured retention carried on any insurance required by either party under this Article XI.

11.7     **Requirements.**  All policies of insurance shall be written on an "occurrence" basis, if possible, and if any policy is written on a "claims made" basis, then such policy must, if possible, be continued in effect for a period of two (2) years following the expiration or early termination of this Agreement. In addition, all policies of insurance must be written by a company or companies licensed to do business in the District of Columbia and with a company or companies satisfactory to Owner. Each policy of insurance shall provide that such policy may not be surrendered, cancelled or modified, including,

17

without limitation, cancellation for non-payment of premiums, without at least thirty (30) days' prior written notice to all parties named as insured therein, including Owner.

# ARTICLE XII
## INDEMNIFICATION

**12.1    Indemnification of Owner by Operator.** To the fullest extent permitted by law, Operator shall indemnify, defend and hold harmless Owner and its Affiliates, and the officers, directors, trustees, employees and agents of Owner and its Affiliates (individually, an "Indemnified Person") from and against any and all liability, claim, loss, damage or expense, including but not limited to reasonable attorney's fees sustained by, arising out of, resulting from or asserted against an Indemnified Person if such liability, claim, loss damage or expense, results from negligent acts or willful misconduct of any Property Employee, or any of Operator's Home Office Management Employees, or any other person directly or indirectly employed by Operator or any one for whose acts or omissions Operator may be liable.

**12.2    Contracts and Future Bookings.** In the event of a termination of this Agreement, Owner shall indemnify Operator against and hold Operator harmless from any and all losses, costs, liabilities, and claims arising or resulting from the failure of Owner to perform any contractual obligations undertaken by Operator with respect to the Property within Operator's authority under this Agreement, including the provision of any services contracted for by Operator in connection with future business booked at the Property prior to such termination.

**12.3    Survival.** All rights, obligations and indemnification under this Article XII shall survive the expiration of the term or termination of this Agreement.

# ARTICLE XIII
## OWNER'S COVENANTS

**13.1    Right to Operate and Use Property.** Owner agrees that Operator, until the termination of this Agreement, may occupy and use the Property for all purposes and activities related to Operator's rights and responsibilities under the terms of this Agreement. Owner further agrees to assist in the execution and delivery of all applications, certificates and other documents as may be necessary or appropriate to obtain and maintain all licenses and permits required in connection with the operation of the Property, and to cooperate with Operator to the fullest extent possible to obtain and maintain such licenses and permits.

**13.2    Property Taxes.** All real property taxes, personal property taxes and assessments, or other governmental charges or levies, against the Property or any of its component parts shall be paid prior to delinquency by Owner. Upon receipt of any and all notices of assessments, property valuations and similar documents by either party hereto, such party shall promptly deliver the same or copies thereof to other party. Owner shall have the right, at its sole cost and expense, to contest the validity or amount of any such taxes or assessments provided that such contest does not materially jeopardize Operator's rights under this Agreement. Operator shall cooperate with Owner in the contest of any such taxes or assessments, but Owner shall promptly reimburse Operator for any out-of-pocket costs incurred by Operator in connection therewith.

18

## ARTICLE XIV
## TRANSFER AND ASSIGNMENT

Operator acknowledges that this Agreement is a personal services agreement and that the Property's managing director shall be responsible for overseeing the management of Operator's obligations under this Agreement and shall be the person to whom Owner shall look as the contact person for Operator. Operator shall have the right to change the Property's managing director; however, if Operator does so, Operator shall notify Owner in writing in advance of such change. Operator shall not assign or transfer any of its rights or obligations under this Agreement without the prior written approval of Owner in its sole and absolute discretion.

## ARTICLE XV
## ENVIRONMENTAL MATTERS

15.1    Obligations of Operator.

(a)    During the term of this Agreement, Operator shall be responsible, as detailed herein, for the safe and legal use and disposal of all Hazardous Materials used by Operator or any Property Employee in the management and operations of the Property.  In order to fulfill this obligation, Operator shall:

(i)    arrange for the proper training of all Property Employees in the requirements for the safe and legal use and disposal of all Hazardous Materials;

(ii)    implement a program of disciplinary action for Property Employees who fail to adhere to such requirements;

(iii)    use only trained Property Employees or licensed and bonded contractors, acceptable to both Owner and Operator, for the use and disposal of any Hazardous Materials at the Property;

(iv)    promptly, upon receiving any information regarding an improper use, release or disposal (or suspected improper use, release or disposal) of Hazardous Materials at the Property, notify Owner and take all reasonable and lawful actions necessary to mitigate immediate threats to human health and the environment from such improper use, release or disposal; and

(v)    maintain proper documentation regarding all of the foregoing, which documentation shall be available to Owner immediately upon request.

(b)    All expenses and costs arising out of performance of the obligations imposed in subsection (a) hereof (including consulting and reasonable legal expenses) shall constitute Direct Costs. Notwithstanding the foregoing, Operator shall be responsible for all expenses and costs caused by the negligent acts or willful misconduct of any Property Employee, including Operator's Home Office Management Employees.

(c)    Owner reserves the right upon giving written notice to Operator, to assume responsibility for any and all matters identified in subsection (a) above if, in the sole opinion of Owner, such action is appropriate to protect and preserve the Property.

19

15.2   <u>Indemnification of Owner by Operator</u>.  Operator agrees to indemnify, defend and hold harmless Owner and its Affiliates, and the officers, directors, trustees, employees and agents of Owner and its Affiliates, from and against any and all liability, claim, loss, expense, penalty or damage including third-party claims, arising from the use, release, disposal or presence of Hazardous Materials or the violation of any Environmental Laws, which use, release, disposal, presence or violation (a) occurs during the term of this Agreement and (b) is caused by the negligent acts or willful misconduct of any Property Employee, including Operator's Home Office Management Employees.  All obligations of Operator to indemnify, defend and hold harmless Owner and its Affiliates under this Article XV shall survive the expiration of the term or termination of this Agreement.

<div align="center">

**ARTICLE XVI**
**NOTICES**

</div>

All notices, demands, consents, reports or other communications required or permitted to be given to Owner or Operator under this Agreement shall be in writing and shall be given by personal delivery or by facsimile or overnight courier or United States registered or certified mail (postage prepaid, return receipt requested) addressed as hereinafter provided. Except as otherwise specified herein, the time period in which a response to any notice or other communication must be made, if any, shall commence to run on the earliest to occur of (a) if by personal delivery, the date of receipt, or attempted delivery if such communication is refused; (b) if given by facsimile, the date on which such facsimile notice must be followed by notice in accordance with subparagraphs (a) or (c) herein within twenty-four (24) hours of such facsimile notice; (c) if sent by overnight courier, the date of receipt, or attempted delivery if such delivery is refused; and (d) if sent by mail (as aforesaid), the date of receipt, or attempted delivery if such certified mail is refused.  Any party listed below may change its address under this Article XII by notice to the other parties listed below. Until further notice, notices and other communications under this Agreement shall be addressed to the parties listed below as follows:

(a)   If to Operator, then to

Guest Services, Inc.
3055 Prosperity Avenue
Fairfax, Virginia 22031-2290
Attention: Gerard T. Gabrys
President, Chief Operating Officer

Telephone: (703) 849-9304
Telecopier: (703) 560-1263

With copy to:

Guest Services, Inc.
3055 Prosperity Avenue
Fairfax, Virginia 22031-2290
Attention: Nicholas DiMeglio
Vice President, Hotel Operations and Marketing

Telephone: (703) 849-9309
Telecopier: (703) 641-4690

<div align="center">20</div>

(b)     If to Owner, then to:

> Gallaudet University Conference Center
> 800 Florida Avenue, N.E.
> Washington, DC 20002-3695
> Attention:  Fred L. Kendrick
>             Director, Business Services

> Telephone:  (202) 651-5353
> Telecopier:  (202) 651 5284

With a copy to:

> Gallaudet University
> 800 Florida Avenue, N.E.
> Washington, DC 20002-3695
> Attention: Paul Kelly, Esq. .
>            Vice President of Administration and Business

> Telephone: (202) 651-5075
> Telecopier: (202) 651-5742

## ARTICLE XVII
### MISCELLANEOUS

**17.1    Consent by Owner.** Except where a different time period is provided to the contrary within this Agreement, whenever Owner is required or asked to provide its consent to a matter submitted to it, Owner shall affirmatively consent to or reject the matter submitted to it within ten (10) business days of its receipt of such request. Unless Owner notifies Operator in writing to the contrary, Owner's representatives for purpose of obtaining any and all consents shall be the persons identified to receive notices pursuant to Article XVI hereof.

**17.2    Further Agreements.** Owner and Operator shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

**17.3    Waiver.** The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

**17.4    Successors and Assigns.** The terms, covenants and conditions of this Agreement shall be binding upon and inure to the benefit of Owner, its successors and assigns, and shall be binding upon and inure to the benefit of Operator, its successors and permitted assigns.

**17.5    Governing Law; Venue.** This Agreement shall be governed by the laws of the District of Columbia. If any legal action shall be brought by the parties in connection with this Agreement, such action shall be filed in the District of Columbia.

**17.6    Amendments.** This Agreement may not be modified, amended, substituted, replaced, surrendered or changed, except by a written instrument executed by Owner and Operator.

21

17.7    **Estoppel Certificate.** Operator agrees at any time and from time to time, as requested by Owner upon not less than ten (10) days prior written notice, to execute and deliver to Owner a statement certifying that this Agreement is unmodified and is full force and effect (or if there have been modifications, that this Agreement is in full force and effect as modified as evidenced by the attached modifications) certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the Operator, whether Owner is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which Operator may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by others with whom Owner may be dealing.

17.8    **Partial Invalidity.** In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by a final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

17.9    **No Representation Regarding Projections.** In entering into this Agreement, Operator and Owner acknowledge that neither Owner nor Operator have made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Property, and that Operator and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Operator or Owner or as to the future financial success of the Property.

17.10    **Relationship.** In the performance of its responsibilities and the exercise of its authority under this Agreement, Operator shall act as agent for and on behalf of Owner. Neither this Agreement nor any agreements, instruments, documents or transactions contemplated hereby shall in any respect by interpreted, deemed or construed as making one party a partner of joint venturer with the other party or as creating any similar relationship or entity, and each of Operator and Owner agrees that it will not make any contrary assertion, contention, claim or counterclaim in any action, suit or other legal proceedings involving Operator and Owner.

17.11    **Entire Agreement.** This Agreement and Guest Services proposal dated December 10, 1999 which is included herein by reference as if it were physically attached to this agreement constitutes the entire understanding of the parties relative to the topic hereof, and may not be altered or amended except in writing, signed by all of the parties hereto. Should any portion hereof be held to be invalid or unenforceable, such holding shall not affect the remainder hereof, which shall remain enforceable in accordance with its terms.

17.12    **Right to Make Agreement.** Each party warrants, with respect to itself, that neither the execution and delivery of this Agreement nor the finalization of the transactions contemplated hereby shall violate any provision of its respective organizational documents, violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, agreement, other commitment or restriction to which it is a party or by which it is bound; or require any consent, vote or approval which has not been given or taken. Each party covenants that it has and will continue to have throughout the term of this Agreement and any extensions hereof, if any, the full right to enter into, extend or modify this Agreement and perform its obligations hereunder.

17.13    **Interpretation.** No provisions of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision. The use of the words

"hereof", "hereunder" and other similar compounds of the word "here" shall refer to this Agreement in its entirety and not to any particular section or subsection.

17.14  **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which shall constitute one and the same Agreement.

17.15  **Captions.** Headings or titles of sections and Articles are inserted solely for convenience or reference and shall not constitute a part of this Agreement, or affect is meaning, construction or interpretation.

17.16  **Pronouns.** All personal pronouns used in this Agreement shall include the other gender, whether used in the masculine, feminine or neuter gender, and the singular shall include the plural wherever and as often as may be appropriate.

17.17  **Waiver of Right to Assume Agreement.** Operator and Owner acknowledge that this is a personal service contract and is not assumable under Section 365(2)(A) of the Bankruptcy Code. In the event this Agreement is, for any reason deemed to be assumable, however, Operator, having been duly represented by counsel and having been duly advised, hereby waived any rights it may have under Section 365 of the Bankruptcy Code to assume this Agreement in the event of filing by Operator of a voluntary petition in bankruptcy under Title 11 of the United States Code or of any petition or answer in any other legal proceeding wherein Operator seeks or acquiesces in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or District of Columbia law relating to bankruptcy, insolvency or other relief for debtors. Operator hereby represents that such waiver is a knowing and voluntary waiver for which it has received due consideration.

**IN WITNESS WHEREOF,** Operator and Owner have duly executed and delivered this Management Agreement under seal as of the date first herein written.

ATTEST:                                         GUEST SERVICES, INC.

_(signature)_                                   By _(signature)_ ___(SEAL)

(Corporate Seal)

ATTEST:                                         GALLAUDET UNIVERSITY

_(signature)_                                   By: _(signature)_ ___(SEAL)
Paul Kelly                                          Paul Kelly
Vice President and Treasurer                        Vice President and Treasurer

(Corporate Seal)

23

# G A L L A U D E T  U N I V E R S I T Y

BUSINESS SERVICES

(202) 651-5353

KENDALL GREEN
800 FLORIDA AVE. NE
WASHINGTON, DC 20002-3695

January 21, 2000

*Org. Corp. Records*
*cc: N. DiMeglio*
*G. Newstedt*
*M. King*
*B. Rogers*
*1-31-00*

Mr. Nicholas R. DiMeglio
Vice President
Guest Services, Inc.
3055 Prosperity Avenue
Fairfax, VA  22031-2290

Dear Mr. DiMeglio:

This letter serves as official notification that Gallaudet University has selected Guest Services, Inc. (GSI) to provide hospitality and guests services for the Gallaudet University Kellogg Conference Center (GUKCC). This letter further acknowledges that GSI has and will continue to provide on-site management personnel effective January 18, 2000 and until the transitional phase with ARAMARK is completed on or about February 11, 2000, where upon GSI will commence to manage the GUKCC.

As we discussed, the timeframe for the transition is a very tight one. Accordingly, I am requesting that GSI assemble the personnel necessary to accept applications, evaluate existing personnel and to make job offers to any and all property employees currently on-site at GUKCC and those other necessary to assume operation of this facility.

I have reviewed your specimen contract and will be developing a first draft for your review within the next few days. I anticipate us being able to complete the contract within a very short time span. However, please utilize this letter as Gallaudet University's official offer until contract terms are finalized.

I recognize there will be costs associated with this transitional phase for which Guest Services will be reimbursed and would like for you to identify those costs as early as you can or as we progress through the change over.

Please let me know if you require additional information or clarification relative to any matters pertaining to the operations of the GUKCC.

Mr. Nicholas R. DiMeglio
January 21, 2000
Page 2


The Gallaudet University community is excited about having you expand your service offering on our campus and all of us are looking forward to a long and productive relationship.

Sincerely,


Fred L. Kendrick, Director
Business Services/Safety and Security


Accepted: _____     _____
                        Guest Services, Inc.                    Date

*R.C; Corp. Records*
*N.D. Meglio*
*WRRT, Maffux*
*G. Newstedt & C. Blair*
*B. Rogero*
*9-03-01*

## AMENDMENT TO
## GALLAUDET UNIVERSITY KELLOGG CONFERENCE CENTER
## MANAGEMENT AGREEMENT

Gallaudet University wishes to receive the monthly operating statements from Guest Services, Inc., on or before the 10th business day after the end of the preceding month, instead of 15th. Therefore, both parties agree to the following modifications of the above-referenced Agreement.

**4.7 Financial Reports:** The phrase, "fifteen (15) business days" in the first sentence is amended to read "ten (10) business days."

**6.1 Accounting Period Billings and Reimbursements:** The "fifteen (15) business days" in the second sentence is amended to read "ten (10) business days."

All other terms and conditions in the Agreement remain unchanged.


ATTEST:                                    GUEST SERVICES, INC.


_____  By: _____

(Corporate Seal)


ATTEST:                                    GALLAUDET UNIVERSITY


_____  By: _____
Paul Kelly
Vice President and Treasurer

(Corporate Seal)

*CC: Corp. Records*
*N.D. Meglio*
*J Marquis/WRI*
*B/Rogers*
*G. Blair*
*7-22-0?*

## SECOND AMENDMENT
## TO
## KELLOGG CONFERENCE CENTER
## MANAGEMENT AGREEMENT

WHEREAS on February 11, 2000 Owner and Operator entered into an Agreement for the Kellogg Conference Center, and

WHEREAS on June 13, 2003 Owner exercised its option to terminate the Agreement upon 90 days' notice, pursuant to section 9.3 (f), and

WHEREAS Owner and Operator have agreed to terminate the Agreement prior to the expiration of the 90-day notice period, if Owner pays Operator for certain expenses Operator will incur as a result of such early termination,

NOW, THEREFORE, Owner and Operator agree to this Second Amendment to the Agreement:

1) Payment by Owner to Operator
As consideration for the early termination of the Agreement, Owner will pay Operator Fifty-Five Thousand, Four Hundred, Nineteen Dollars ($55,419.00), by 5 p.m. Eastern Daylight Time on August 8, 2003.

2) Vacation by Operator
In consideration of the payment referred to in section 1, above, Operator shall vacate the Property on 11:59 p.m. Eastern Daylight Time on August 8, 2003.

3) Termination of Obligations
The Agreement, and all obligations of the parties to each other, shall cease and terminate effective 11:59 p.m. Eastern Daylight Time on August 8, 2003, except for those provisions of the Agreement which by their terms shall remain in effect beyond the termination of the Agreement.

The parties enter into this Second Amendment to Management Agreement this ____ day of ____ , 2003.

Attest:

_Sally A. Ellis_

Attest

_Connie S. All_
7/11/03

Guest Services, Inc. ("Operator")

_Frank T. Cetya_

Gallaudet University ("Owner")

_Paul Kelly_
7/11/03