# EXHIBIT "A"



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

**COZEN**
**O'CONNOR**
ATTORNEYS

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

**David J. Groth**
Direct Phone   215.665.2056
Direct Fax      215.701.2056
dgroth@cozen.com

July 20, 2005

Freda Pepper
Integrated Risk Management
961 Pottstown Pike
Chester Springs, PA  19425

|     | Re:  | Our Insured:    | Gallaudet University |
|-----|------|-----------------|----------------------|
|     |      | IRM File No.:   | 463L100251-8         |
|     |      | Our File No.:   | 134164               |

Dear Ms. Pepper:

This will confirm our recent telephone conversation concerning the status of the above-captioned subrogation claim.  As promised, I am enclosing for your review damage documentation supporting the building claim which has been paid by St. Paul totaling $709,822.82.  There are other aspects of the claim, including damage to the contents of the building, which have not yet been completely adjusted.  It is expected that another $100,000.00 – $150,000.00 will be paid to Gallaudet by St. Paul in order to completely settle Gallaudet's insurance claims.

Also, as I informed you, there is pending litigation between Gallaudet and Avedon/Pro Clean regarding the charges for the work performed by Avedon and Pro Clean in response to the water leak incident.  The invoices of Avedon/Pro Clean show charges totaling in excess of $700,000.00 for their services.  However, St. Paul has concluded that the reasonable cost of that work was only $300,000.00 so it has issued a payment to Gallaudet for only $300,000.00 relating to the Avedon/Pro Clean work.  The other repair work which was completed by Belfor cost a total of $409,822.82.

Please let me know the position of your client with regard to the resolution of this claim as soon as possible.  Even though the claim has not been fully adjusted, I would expect to be in a position to pursue St. Paul's subrogation, through litigation, if

necessary, within the next sixty days.  If we could do anything to avoid that, I would like to determine that sooner rather than later.

       Awaiting your advice, I am

                        Very truly yours,

                        COZEN O'CONNOR

                        BY:     DAVID J. GROTH

DJG/slw
enclosure

PHILA1\2306370\1 134164.000

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University | : : : | CASE NUMBER: 1:05-cv-02115 |
| Plaintiff | : | |
| vs. | : : | |
| CAPITOL SPRINKLER INSPECTION, INC | : : | |
| Defendant | : : | |

PLAINTIFF ST. PAUL MERCURY INSURANCE COMPANY
A/S/O GALLAUDET UNIVERSITY'S
INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), plaintiff, St. Paul Mercury

Insurance Company a/s/o Gallaudet University makes the following initial disclosures. These

disclosures are being made without waiver of and subject to all objections as to attorney-client

privilege, work product and relevance.

A.     **Individuals Likely to have Discoverable Information That Plaintiff
       May Use to Support Its Claims**

Gary B. Aller
Director of Business Operations
Gallaudet University
800 Florida Avenue, NE
Washington, DC  20002-3695
       Liability/Damages

Stephen Logue
Managing Director
Guest Services
Gallaudet University
Kellogg Conference Center
800 Florida Ave., N.E.
Washington, DC  20002-3695
       Liability

Representatives of
Capitol Sprinkler Inspection, Inc.
6550 Dobbin Road
Columbia, MD  21045
        Liability

Kenneth R. McLauchlan, P.E.
Sr. Mechanical Engineer
McLauchlan & Associates, Inc.
474 Fawns Walk
Annapolis, Maryland  21401-5657
        Liability

William Tillett
BelforUSA
10850 Hanna Street, Suite L
Beltsville, MD  20705
        Damages

Jonathan P. Dunn
Adjuster
Vanguard Adjusters Group, Inc.
P. O. Box 835
Woodbury, NJ  08096
        Damages

Carville C. Evering, Jr.
Corporate Operations Manager
Nardone & Company, Inc.
838 Ritchie Highway, Suite #2
Severna Park, MD  21146
        Damages

Lee E. Gaskins, MA, CHS-III
Manager, Risk Management & Insurance
Gallaudet University
800 Florida Ave., N.E.
Washington, DC  20002-3695
        Damages

James Dunaway
St. Paul Travelers Insurance Co.
P. O. Box 15366
Pensacola, FL  32514
        Damages

P-002

    **B.**   **Documents, Data, Compilations and Tangible
Things in the Possession, Custody or Control
of Plaintiff That Plaintiff May Use to
Support Its Claims**

1. Capitol Sprinkler Inspection, Inc. Contract for Automatic Sprinkler Equipment Inspection Service dated 4/22/02 between Capitol Sprinkler Inspection, Inc. and Guest Services c/o Gallaudet Conference Center

2. Gallaudet University Department of Safety and Security  Incident Report dated 1/25/03

3. Weather data for January 2003 observed at Washington, DC – Ronald Reagan National Airport

4. Capitol Sprinkler Inspection, Inc. report dated 1/9/03

5. Capitol Sprinkler Inspection, Inc. report dated 7/2/02

6. Dry Valves Location Checklist

7. Capitol Sprinkler Contracting, Inc. invoice dated 1/29/03

8. Plaintiff's Summary of Damages and supporting documentation

9. Physical evidence

    **C.**   **Computation of Damages Claimed.**

| | |
|---|---|
| **Real Property** | $709,822.82 |
| **Business Personal Property** | 90,200.03 |
| | $800,022.85 |

P-003

D.    **The Existence of Any Insurance Agreements Under Which Any Person or Entity Carrying on an Insurance Business may be Liable to Satisfy Part or all of the Judgment that may be Entered in this Case.**

Not applicable to plaintiff.

COZEN O'CONNOR

BY: _David J. Groth_ _____

DAVID J. GROTH, ESQUIRE (phv)
DANIEL J. LUCCARO, ESQUIRE (phv)
The Atrium - Third Floor
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

and

MESIROW & STRAVITZ
Eric Stravitz, Esquire
2000 Massachusetts Avenue
Suite 200
Washington, DC 20036
(202) 463-0303

ATTORNEYS FOR PLAINTIFF,
ST. PAUL MERCURY INSURANCE COMPANY

P-004

# EXHIBIT "C"

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University     :     CASE NUMBER: 1:05-cv-02115
                                         :
     Plaintiff                   :
                                         :
       vs.                    :
                                         :
CAPITOL SPRINKLER INSPECTION, INC    :
                                         :
     Defendant               :
                                         :

---

## PLAINTIFF ST. PAUL MERCURY INSURANCE COMPANY A/S/O GALLAUDET UNIVERSITY'S
## SUMMARY OF DAMAGES

**I.**    **REAL PROPERTY**

- Statement of Loss
- Check screens for real property payments
- Vanguard Adjusters Group, Inc. report dated 1/31/03 and photographs
- \* Avedon Contracting, Inc. invoice and repair estimate dated 2/20/03
- \* Pro Clean Inc. invoice and estimate for emergency services dated 2/13/03
- Belfor USA repair estimate dated 2/20/03    **$230,950.84**
- Agreement between Gallaudet University and Belfor USA dated 3/3/03
- Belfor invoice dated 4/2/03
- Belfor letter dated 4/10/03 to St. Paul Insurance
- Belfor invoice dated 6/16/03
- Belfor supplemental carpet estimate dated 7/03
- Certificate of Satisfaction and Belfor consultation invoice (Expense item)
- Belfor USA carpet replacement estimate dated 8/11/03
- Belfor invoice dated 10/22/03
- Consulting Agreement Amendment #1 between Gallaudet University and Belfor USA for second phase of repairs; Belfor estimate dated 6/10/03; and Belfor invoice dated 11/20/03
- E-mail dated 2/13/04 summarizing real property payments to date and Belfor carpet and wallpaper supplemental estimate **$178,870.98**

See supporting documentation attached at Exhibit "A"

**\***    **Payment by St. Paul for these invoices totaled only $300,000.00.**

**II.    BUSINESS PERSONAL PROPERTY**

- Payment screen for personal property payments
- Statement of Loss
- Nardone & Company, Inc. reports, inventory and invoice
- Invoices for property replacement and reimbursable expenses        **$90,200.03**

See supporting documentation attached at Exhibit "B"

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## RECAP

**REAL PROPERTY**...................................................**$709,822.82**
**BUSINESS PERSONAL PROPERTY**............................**$ 90,200.03**

      **TOTAL CLAIMED DAMAGES**..................**$800,022.85**

2

# EXHIBIT "D"

STATEMENT OF LOSS - GALLAUDETTE UNIVERSITY

| | | |
|---|---|---|
| Emergency services | $ 300,000.00 | Payment to cover services by Avidon |
| Rebuild per estimate by Belfor | $ 230,951.84 | Work completed by Belfor after emergency services |
| Supplement on carpet and additional wallpaper | $ 178,870.98 | Supplement to cover carpet replacement and additional wallpaper not in original scope |
| **TOTAL BUILDING CLAIM** | **$ 709,822.82** | |

P-024

# EXHIBIT "E"

B.P.P

| Revised | 11/8/2005 | FOR REVIEW AND DISCUSSION PURPOSES ONLY | | | | | | |
|---|---|---|---|---|---|---|---|---|
| INSURED: | GALLAUDET UNIVERSITY | | | | | | | |
| POL. # | CK03800837 | | | REPLACEMENT COST VALUE CALCULATIONS | | | | |
| CLAIM # | CK03800837 22H001 | | | ALL ITEMS REPLACED BY GALLAUDET | | | | |
| TRACKING # | VY 01719 | | | | | | | |
| COVERAGE: | | | | | | | | |
| BLANKET BUILDING & BUSINESS PERSONAL | $ 354,318,222.00 | | | | | | | |
| | FOR THIS ADJUSTMENT | | | STATEMENT | OF | LOSS | | |
| | | | | VALUE | LOSS | CLAIM | | |
| VALUE AS DETERMINED: | | | | | | | | |
| FOR THIS ADJUSTMENT ONLY | $ 354,318,222.00 | | $ | 354,318,222.00 | | | | |
| | | TOTAL REPAIRS | DEPRECIATION | A.C.V. LOSS | | | | |
| LOSS AS DETERMINED: | | | | | | | | |
| | NARDONE INVENTORY-PAGE 1 | $ 4,937.95 | $ - | $ 4,937.95 | | | | |
| | NARDONE INVENTORY-PAGE 2 | $ 1,538.00 | $ - | $ 1,538.00 | | | | |
| | NARDONE INVENTORY-PAGE 3 | $ 102.00 | $ - | $ 102.00 | | | | |
| | NARDONE INVENTORY-PAGE 4 | $ 390.00 | $ - | $ 390.00 | | | | |
| | SHREDDER | $ 1,719.20 | $ - | $ 1,719.20 | | | | |
| | BOOK CASE | $ 362.00 | $ - | $ 362.00 | | | | |
| | LASER FAX MACHINE | $ 399.99 | $ - | $ 399.99 | | | | |
| | EMERGENCY SYS.UNIT KITS | $ 105.35 | $ - | $ 105.35 | | | | |
| | CANNON IMAGE RUNNER | $ 7,738.12 | $ - | $ 7,738.12 | | | | |
| | CONTENTS MANIPULATION | $ 1,170.00 | $ - | $ 1,170.00 | | | | |
| | USB PRINTER CABLE | $ 252.64 | $ - | $ 252.64 | | | | |
| | TRS KEYBOARD TRAY | $ 103.60 | $ - | $ 103.60 | | | | |
| | COMPUTERS AND MONITORS | $ 27,734.00 | $ - | $ 27,734.00 | | | | |
| | RONDO SOFA'S | $ 1,493.00 | $ - | $ 1,493.00 | | | | |
| | HP COMPAQ MP1200 | $ 2,299.00 | $ - | $ 2,299.00 | | | | |
| | CHAIR, PRINTER, QUASAR TV | $ 3,319.78 | $ - | $ 3,319.78 | | | | |
| | VISIPLEX PAGING SYSTEM | $ 1,787.00 | $ - | $ 1,787.00 | | | | |
| | APOLLO OVERHEAD PROJECT | $ 299.99 | $ - | $ 299.99 | | | | |
| | FURNITURE | $ 1,182.40 | $ - | $ 1,182.40 | | | | |
| | FURNITURE, LIGHT TACKBOARD | $ 1,311.00 | $ - | $ 1,311.00 | | | | |
| | CREDENZE, FURNITURE, ETC | $ 1,385.60 | $ - | $ 1,385.60 | | | | |
| | FURNITURE | $ 1,686.90 | $ - | $ 1,686.90 | | | | |
| | FURNITURE | $ 1,482.20 | $ - | $ 1,482.20 | | | | |
| | COMPUTER, AUDIO, VIDEO, ETC | $ 23,884.00 | $ - | $ 23,884.00 | | | | |
| | FORMS, MENTAL HEALTH | $ 236.00 | $ - | $ 236.00 | | | | |
| | CHAIR | $ 189.96 | $ - | $ 189.96 | | | | |
| | HAND TRUCK | $ 238.45 | $ - | $ 238.45 | | | | |
| | GATEWAY COMPUTER | $ 2,782.00 | $ - | $ 2,782.00 | | | | |
| | | $ - | $ - | $ - | | | | |
| | | $ - | $ - | $ - | | | | |
| | | $ - | $ - | $ - | | | | |
| TOTAL VALUE & LOSS AT REPL. COST | | $ 90,200.03 | $ - | $ 90,200.03 | $ 90,200.03 | | | |
| | | | | | | | | |
| | | | | | | | | |
| CLAIM AS DETERMINED: | | | | | | | | |
| REPLACEMENT COST VALUE LOSS | | $ 90,200.03 | | | | | | |
| LESS DEDUCTIBLE- APPLIED TO BLDG. | | $ - | | | | | | |
| ACTUAL CASH VALUE CLAIM | | $ 90,200.03 | | | | $ 90,200.03 | | |
| | | | | | | | | |
| | | | | | | | | |
| AGREED SOUND VALUE, LOSS & CLAIM | | | | $ 354,318,222.00 | $ 90,200.03 | $ 90,200.03 | | |
| | $2,500 DEDUCTIBLE APPLIED TO BUILDING LOSS | | | | | | | |

P-274

# EXHIBIT "F"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, : as Subrogee of Gallaudet University Plaintiff : vs. : | CASE NUMBER: 1:05CV02115 |

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University
    Plaintiff               :      CASE NUMBER: 1:05CV02115
       vs.           :

CAPITOL SPRINKLER INSPECTION, INC  :
    Defendant         :

       vs.           :

GUEST SERVICES, INC.       :
    Third-Party Defendant    :

## PLAINTIFF'S DISCLOSURE OF EXPERT TESTIMONY UNDER RULE 26(a)(2)(B)

    Plaintiff, by and through its attorneys, hereby submits its disclosure of anticipated expert testimony as follows:

## I.    LIABILITY EXPERT

    Kenneth R. McLauchlan, P.E., CFEI
    Senior Mechanical Engineer
    McLauchlan & Associates, Inc.
    474 Fawns Walk
    Annapolis, MD 21409

    Mr. McLauchlan's signed report is attached hereto and incorporated by reference herein in its entirety. His compensation rate is $170.00 per hour.

## II.    DAMAGE EXPERTS

    James Dunaway
    St. Paul Travelers Insurance Co.
    P.O. Box 15366
    Pensacola, FL 32514

Jonathan Dunn
Adjuster
Vanguard Adjusters Group, Inc.
P.O. Box 835
Woodbury, NJ 08096

Carvelle C. Everling, Jr.
Corporate Operations Manager
Nardone & Company, Inc.
838 Ritchie Highway, Suite #2
Severna Park, MD 21146

William Tillett
Belfor USA
10850 Hanna Street, Suite L
Beltsville, MD 20705

The damage reports and estimates of these individuals, containing their observations,

measurements, calculations and analysis of the cost to repair the property damage caused by the

subject water leakage incident, are set forth in Plaintiff's Initial Disclosures, Bates Nos. P-022

through P-410, which are incorporated by reference herein as though fully set forth at length.

Plaintiff's damage witnesses will testify consistent with the facts and information contained in

their reports and estimates that the fair, reasonable and necessary cost to repair the property

damaged by the subject water leakage incident was $800,022.85. See specifically Plaintiff's

Summary of Damages, Bates Nos. P-022 – 023.

COZEN O'CONNOR


BY: _____
DAVID J. GROTH, ESQUIRE (phv)
DANIEL J. LUCCARO, ESQUIRE (phv)
The Atrium - Third Floor
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

and

2

MESIROW & STRAVITZ
Eric Stravitz, Esquire
2000 Massachusetts Avenue
Suite 200
Washington, DC 20036
(202) 463-0303

ATTORNEYS FOR PLAINTIFF,
ST. PAUL MERCURY INSURANCE COMPANY

## MCLAUCHLAN & ASSOCIATES, INC.

CONSULTING MECHANICAL ENGINEERS

474 FAWNS WALK
ANNAPOLIS, MD 21409-5657
TELEPHONE (410) 269-4025
FAX (410) 757-2221
Email:kenmclauchlan@mclauchlan-engineers.com

September 11, 2006

Mr. David J. Groth, Esquire
Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103

Reference:    Gallaudet University Water Damage Analysis
              St. Paul Insurance Tracking No. VY01719
              Date of Loss: January 25, 2003
              Your File No. 134164

Dear Mr. Groth,

McLauchlan & Associates, Inc. (MAI) was asked to investigate a water damage incident that occurred on January 25, 2003, at the Kellogg Conference Center facility on the campus of Gallaudet University, 800 Florida Avenue, NE, Washington, DC 20002. MAI was asked to determine the cause of the water damage incident.

Background information was obtained through two site inspections (on February 3, 2003 and February 12, 2003), review of the following documents and interview:

- Deposition transcript of Mr. Vernon Vane, taken August 14, 2006

- Deposition transcript of Mr. Craig Parham, taken August 14, 2006

- Deposition transcript of Mr. Michael Bowlin, taken August 14, 2006

- As-Built Fire Protection System Drawings prepared by Capitol Sprinkler Contracting, Inc., dated 5/30/95

- Interview with Mr. David Ham

Mr. Vane testified as follows:

He was employed by Capitol Sprinkler ("Capitol") for 23 years, and had been Supervisor of Inspections for the previous 15 to 16 years. Employee Mike Bowlin had just started with inspections in 2003. Employees Tom Scott and Tim Francis

Mr. David J. Groth, Esquire
September 11, 2006
Page 2

were helpers in inspections. The employees received all of their training as "on the-job-training. Mike Bowlin was the least experienced inspector. Capitol did not provide any written materials to its inspectors. Capitol did not train its employees that it was acceptable to let non-employees do testing or inspection of the systems. Capitol did tell its customers about draining drum drips. Capitol had a contract to perform inspections for Aramark from 1996 to 1999, and then with Guest Services, Inc. ("GSI") beginning in 2002. The first inspection performed by Capitol in 2002 was on July 2, 2002. Mr. David Ham of GSI scheduled the inspection and arranged for someone to go with the Capitol inspector to gain access to the building. This person was a tall, slender, black man, who Mr. Vane was unable to identify by name. Capitol performed a trip test for Systems 1 and 2 on July 2, 2002. It was necessary for the inspectors to drain the drum drips during the January 9, 2003 inspection to make sure there is no water in them. This includes condensation and water left in the system from the July, 2002 trip test. He assigned Mr. Bowlin and Mr. Scott to do the inspection on January 9, 2003. He believes that Mr. Ham did not have any specialized knowledge of sprinkler systems. Capitol never trained any GSI personnel specifically how to drain a drum drip, and never provided any written explanations of the draining procedure. Capitol identified Terrence Hubbard as the GSI employee who accompanied Mr. Bowlin and Mr. Scott on January 9, 2003 based only on the fact that Mr. Hubbard later signed for the evidence. Capitol strictly adopted the NFPA Standard No. 25 guidelines for the work at Gallaudet. The systems at Gallaudet were hydrostatically tested at the time of installation.

Mr. Parham testified as follows:

He has been employed by Capitol for 28 years and holds the position of Vice President. He works in installations. Capitol originally installed the systems at the Kellogg Conference Center. When he arrived at the building after the water damage incident, he found that the valves were in the closed position. After the incident, Capitol replaced a ruptured tee fitting. The system leaked compressed air after the tee was replaced. Capitol found 3 sprinkler heads that were "distressed by ice" and were leaking air. These heads were replaced by Capitol. The employee had been trying to call the DC Water Department to shut off the water, because he did not know how to shut off the sprinkler system water supply. He concluded that the tee ruptured and the sprinkler heads leaked as a result of freezing. He also concluded that the drum drips that drain that part of the sprinkler system had not been drained on January 9, 2003. NFPA Standard No. 25 "does not drive what [Capitol does]". It is the building owner's responsibility to drain the drum drips once a month, but this was not indicated in the contract between Capitol and GSI. There is a plastic cap that encloses the valves on the drum drips. The cap is held in place with a lock.

Mr. Bowlin testified as follows:

Mr. David J. Groth, Esquire
September 11, 2006
Page 3

He started to work at Capitol in 1985. He started as an apprentice doing installations of sprinkler systems. He did installations until 1999, when he sustained a back injury. Beginning in 1999 or 2000, he began to do sprinkler system inspections for Capitol. He was given on-the-job training by his supervisors in performing inspections. He reviewed NFPA 13 and 25, but was not given any written materials regarding how inspections should be performed. He was never tested for the inspection job. He was never told by anyone at Capitol that it was permitted for persons other than a Capitol employees to perform the work he was sent to perform. He would permit a building owner's representative to drain a drum drip while he was on site because he was "supervising that drainage". He did not know the level of experience, background or specialized knowledge that people in the buildings who were doing this work had. There was no occasion when he told a building maintenance person to drain a drum drip without his checking to see that it was done properly. The first time that he was at the Kellogg Conference Center was in July, 2002, and the second time was on January 9, 2003. In July, 2002, he did a trip test of the dry pipe system, working with Capitol employees Mr. Vernon Vane and Mr. Tim Francis. The drum drip that drains the lines that leaked in the January 2003 incident was located behind an access panel inside the door to Conference Room 5200. The door could only be opened with a hotel card key. On January 9, 2003, he and Capitol employee Mr. Tom Scott drained all of the drum drips except the one located above the ceiling in Conference Room 5200. He was supposed to drain that drum drip but did not do so because the building owner's representative escort that was with him did not have a hotel card key to enter the room. The building owner's representative stated "I don't have a card. I have to go downstairs and get the card for access." The building owner's representative did not offer to get the key, but did not refuse to get the key. The building owner's representative said he "would take care of the drum drip". Mr. Bowlin did not ask the building owner's representative to get the hotel card key. He never asked Mr. Scott to get the key. He did not know anything about the background, experience, training, reliability or competency of the building owner's representative with regard to draining the drum drip. He did find water in the other 4 drum drips that he drained on January 9, 2003. He assumed there would be water in the drum drip that he did not drain. He never checked to determine if the building owner's representative drained the drum drip above the ceiling in Conference Room 5200. No problems were found with any other components in the dry pipe systems during the January 9, 2003 inspection. He did not know whether the building owner's representative was an employee of Gallaudet University or GSI. Because the drum drips are hard piped to drain, the person draining must listen until they can't hear a "gurgling" sound to know when there is no more water in the system.

Mr. Ham reported that on January 25, 2003, at approximately 3:30 PM, a major water release occurred in the building. The incident began when the fire alarm went off, with strobes and audio warnings being activated. GSI personnel checked all of the floors for fire. They then heard water discharging from above the 5th floor of the building. It was

Mr. David J. Groth, Esquire
September 11, 2006
Page 4

subsequently determined there was no fire in the building. The water was turned off at the Penthouse sprinkler room. It was reported that water was found to be discharging from a fractured black cast/malleable iron tee fitting in the dry pipe system. Four sprinkler heads in the dry pipe system (in the portion of the system where the tee fractured) were also found to have been damaged by ice, to the point that they were leaking air pressure when the system was repaired and pressurized with compressed air.

MAI inspected the Kellogg Conference Center on February 3, 2003 and February 12, 2003. The damaged fire protection system tee fitting and sprinkler heads had been removed and replaced prior to MAI's inspection.

The subject Kellogg Conference Center building was a five story residential structure. The building was protected by several water based fire protection systems, including two dry pipe systems. The building was initially opened in 1995. The 4th and 5th story of the building contained areas that had dry pipe fire protection systems, where the main and branch piping was routed through unheated ceiling (attic) plenums between the finished ceilings of the rooms below and the metal roof deck.

The dry pipe system involved in the water damage incident was generally comprised of a Dry Pipe Valve and trim, black steel threaded pipe, threaded cast and/or malleable iron fittings, and upright closed sprinkler heads with thermo-sensitive elements and drains. A dry pipe system is installed where a wet pipe (water-filled) system cannot be installed because of the potential of the water in the piping being exposed to freezing conditions. Water freezing in fire protection piping creates conditions which could damage the piping and fittings, resulting in uncontrolled release of water into the building, and also creates conditions where ice in the piping could initially prevent flow of water to a sprinkler head under actual fire conditions. Dry pipe systems use air compressors to fill the sections of piping subject to freezing conditions with compressed air. A Dry Pipe Valve is the interface between the compressed air in the piping system and the water supply. In the event that a fire occurs, the heat of the fire causes the integral thermo-sensitive element to open the sprinkler head(s) nearest the heat source. Compressed air in the piping then discharges from the sprinkler head. The drop in air pressure causes the Dry Pipe Valve to open, charging the piping system with water, and allowing water to flow out of the open sprinkler head(s).

Dry pipe sprinkler systems are tested at intervals specified in National Fire Protection Association (NFPA) Standard 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems". Testing includes full and partial "trip tests". A trip test is a simulation of the opening of a sprinkler head in a fire. A manual valve is opened to provide a release of compressed air pressure from the system, and the performance of the system components is observed and timed. At the conclusion of the testing, water is in the dry piping system. This water must be removed from the system to prevent freezing. Drum drips are provided throughout the system to drain, by gravity, any residual water out of the dry pipe system. A drum drip is a simple device consisting

Mr. David J. Groth, Esquire
September 11, 2006
Page 5

of two manual shutoff valves, and a section of larger diameter piping (the "barrel" section). The drum drip is connected through permanent piping to the low point of the dry pipe system which is to be drained. The upper valve in the drum drip is left open to allow any residual water to fill the "barrel" section. The lower valve is kept closed. To drain the drum drip, the upper valve is closed, to prevent a loss of compressed air pressure in the system, and the lower valve is opened, to allow the accumulated water to discharge. The lower valve is then closed and the upper valve is opened slowly so that the air compressor can keep the system pressure high enough to prevent false tripping. This process is repeated until all of the residual water is removed from the system.

In addition to residual water from trip tests, condensation of moisture from the compressed air occurs when the air in the dry piping system is cooled below dewpoint. This moisture must also be removed from the piping system to prevent freezing.

NFPA Standard No. 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems" was reviewed. This Standard contains the following requirement:

> "12.4.4.3.3* Low points in dry pipe sprinkler systems shall be drained after each operation and before the onset of freezing weather conditions."

Review of the Contract For Automatic Sprinkler Equipment Inspection Service dated April 22, 2002, between Capitol and GSI (Exhibit 1 to the deposition of Mr. Vane) indicates that Capitol is required to inspect the fire protection systems semi-annually, to perform an Annual Trip Test of the two 4" Dry Pipe Valves, and, among other requirements, to "Open condensation drains on drum drip connections and drain low points during fall and winter inspection." This is consistent with the requirement in NFPA Standard No. 25.

Review of the Capitol Sprinkler Inspection, Inc. form dated January 9, 2003 (Exhibit 3 to the deposition of Mr. Vane) indicates, on line 15, "Note below any other conditions or deficiencies needing correction". This line is checked "Yes". Under the section of the form identified as "Deficiencies", there are no conditions indicated. All applicable aspects of the Attic Area system referenced on the form were marked as normal.

Review of METAR weather records for the KDCA Ronald Reagan National Airport (the reporting facility closest to the Kellogg Conference Center) indicates that the following weather conditions were experienced in the Washington, DC area during the period prior to the water damage incident:

| Date | High Temperature, degrees F | Low Temperature, degrees F |
|---|---|---|
| January 1, 2003 | 51 | 42 |
| January 2, 2003 | 42 | 39 |

Mr. David J. Groth, Esquire
September 11, 2006
Page 6

| | | |
|---|---|---|
| January 3, 2003 | 39 | 35 |
| January 4, 2003 | 39 | 30 |
| January 5, 2003 | 33 | 28 |
| January 6, 2003 | 37 | 32 |
| January 7, 2003 | 37 | 25 |
| January 8, 2003 | 53 | 35 |
| January 9, 2003 | 62 | 39 |
| January 10, 2003 | 48 | 33 |
| January 11, 2003 | 36 | 27 |
| January 12, 2003 | 33 | 23 |
| January 13, 2003 | 46 | 24 |
| January 14, 2003 | 33 | 26 |
| January 15, 2003 | 33 | 19 |
| January 16, 2003 | 30 | 19 |
| January 17, 2003 | 30 | 19 |
| January 18, 2003 | 24 | 12 |
| January 19, 2003 | 32 | 19 |
| January 20, 2003 | 41 | 26 |
| January 21, 2003 | 31 | 19 |
| January 22, 2003 | 28 | 16 |
| January 23, 2003 | 21 | 14 |
| January 24, 2003 | 34 | 15 |
| January 25, 2003 | 35 | 17 |

The weather data indicate that in the four day period before the water damage incident, the temperature never exceeded freezing (32 F), and was as low as 14 degrees F.

The damage to the tee fitting and the sprinkler heads is consistent with excessive stress to these components during the expansion associated with phase change of liquid water to ice. Review of the elevation of piping and fittings in this area indicates that the area where the tee fitting fractured was a low point in the pitched fire protection piping system, and any water in the system (whether it was residual water from a prior trip test or water condensed from compressed air) would flow by gravity to this area of the piping system. Mr. Parham of Capitol also concluded that these components were damaged by formation of ice in the piping. The weather data support a conclusion that unheated areas in the building, such as the area where the subject tee fitting and sprinkler heads were located, were exposed to sub freezing conditions for a prolonged period of time prior to the incident.

Review of the testimony of Capitol employees indicates the following:

- Capitol advised GSI in the Contract dated April 22, 2002, that Capitol would drain all drum drips as part of the Winter Service.

Mr. David J. Groth, Esquire
September 11, 2006
Page 7

- Mr. Michael Bowlin, Capitol's employee performing the Winter Service on January 9, 2003, drained all of the drum drips *except* the drum drip (located above Conference Room 5200) that drains water from the portion of the dry pipe fire protection system where the tee fitting fractured.

- Mr. Bowlin's reason for not draining the drum drip above Conference Room 5200 was that his escort through the building (who he could not identify by either name or employer) did not have a hotel card key to access the drum drip.

- Mr. Bowlin never asked his Capitol co-worker (Mr. Tom Scott) to get the card key from the Front Desk of the hotel, five floors below. He never asked or told his escort to get the card key.

- Mr. Bowlin testified that he relied on his escort through the building to drain the drum drip above Conference Room 5200, even though he did not know what understanding, training, experience, background, reliability or competency his escort had, if any, in fire protection systems in general, or draining of drum drips specifically.

- Mr. Bowlin testified that he had never been told by Capitol that persons other than Capitol employees were permitted to do the work that Capitol was sent to perform. Mr. Bowlin then testified that he always "supervised" persons other than Capitol employees when they drained drum drips while he was on site. Mr. Bowlin testified that he never saw his escort drain the subject drum drip, and never checked later to see if the draining was properly performed.

- Mr. Bowlin testified that he knew there was accumulated water in the piping systems in the four drum drips that he actually did drain on January 9, 2003.

- Mr. Bowlin testified that at the time of his inspection of the dry pipe systems on January 9, 2003 there were no defects or problems with the Dry Pipe Valve, air compressor or other components that would have resulted in water entering the dry pipe system (in the absence of a fire).

The following conclusions are based on information reviewed to date, the author's education and experience. The conclusions are subject to change in the event that additional information is obtained. Based on the above investigation and analysis, MAI concludes the following, to a reasonable degree of engineering certainty:

1. The water damage incident that occurred on January 25, 2003 at the Kellogg Conference Center at Gallaudet University was caused by freezing of water in a dry pipe fire protection system located above the 5th story of the building. The freezing water caused expansion that overstressed a cast/malleable iron tee fitting in the dry pipe system, resulting in fracture of the fitting. The fracture allowed

Mr. David J. Groth, Esquire
September 11, 2006
Page 8

compressed air in the dry pipe system to leak out, which caused the Dry Pipe Valve to trip and open. The Dry Pipe Valve supplied water to the dry pipe fire protection system piping. Water then leaked out of the fractured tee fitting, resulting in substantial water damage to the building.

2. Water was in the dry pipe fire protection system as a result of the failure of Capitol Sprinkler Inspection, Inc. to properly perform the inspection and maintenance service that was required under the Contract For Automatic Sprinkler Equipment Inspection Service between Capitol and Guest Services, Inc. dated April 22, 2002. Specifically, Capitol was required to drain all drum drips in the fire protection system at the time of the Winter Service. The Winter Service was performed by Capitol on January 9, 2003. The Capitol inspector (Mr. Michael Bowlin) who was supposed to drain the drum drips as part of the Winter Service admitted that he did not drain the drum drip that removes water from the section of the dry pipe system where the tee fitting fractured.

3. The Capitol inspector knew, or should have known, that there was water in the piping system served by the drum drip that he failed to drain on January 9, 2003, based on his observation that there was water in the other four drum drip systems in the building that he did drain on that date. He knew, or should have known, that this accumulated water in the dry pipe system could freeze, damage piping and fittings, and result in an uncontrolled water discharge from the fire protection system.

4. The water damage incident would not have occurred if Capitol had properly drained all of the drum drips during the Winter Service performed on January 9, 2003, as required in the contract between Capitol and Guest Services, Inc.

Respectfully Submitted,

*Kenneth R. McLauchlan*

Kenneth R. McLauchlan, P.E., CFEI
Senior Mechanical Engineer

# EXHIBIT "G"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University         :

                    Plaintiff      :

       vs.                 :

CAPITOL SPRINKLER INSPECTION, INC   :

                  Defendant   :

       vs.                 :

GUEST SERVICES, INC.              :

              Third-Party Defendant   :

CASE NUMBER:  1:05CV02115

---

**PLAINTIFF'S SUPPLEMENTAL DISCLOSURE OF EXPERT**
**TESTIMONY UNDER RULE 26(a)(2)(B)**

     Plaintiff, by and through its attorneys, hereby submits this supplemental disclosure of

anticipated expert testimony as follows:

     Plaintiff is substituting Charles H. Murray, Jr., RPA., LPCS, an Executive General

Adjuster for St. Paul Travelers Insurance Company, for the previously named St. Paul Travelers

Insurance Company representative, James Dunaway.  Mr. Dunaway has retired, moved to

Florida and is reportedly in failing health.  Mr. Murray's contact information is as follows:

               Charles H. Murray, Jr.., RPA, LPCS
               Executive General Adjuster
               St. Paul Travelers Insurance Company
               111 Shilling Road
               Hunt Valley, MD  21031

     Mr. Murray directly participated in the adjustment of this claim.  All of the documents

which support the claim were previously forwarded to all counsel in Plaintiff's Initial

Disclosures, Bates Nos. P-022 through P-410, which are incorporated by reference herein as

though fully set forth at length. Mr. Murray will testify, consistent with the facts and information contained in those reports and estimates, that the fair, reasonable and necessary cost to repair the property damaged by the subject water leakage incident was $800,022.85. In addition, attached hereto are two additional documents which were prepared by Mr. Murray which state the building replacement cost value and actual cash value, as well as the business personal property replacement cost value and actual cash value.

COZEN O'CONNOR

BY: _____
DAVID J. GROTH, ESQUIRE (phv)
DANIEL J. LUCCARO, ESQUIRE (phv)
The Atrium - Third Floor
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

and

MESIROW & STRAVITZ
Eric Stravitz, Esquire
2000 Massachusetts Avenue
Suite 200
Washington, DC 20036
(202) 463-0303

ATTORNEYS FOR PLAINTIFF,
ST. PAUL MERCURY INSURANCE COMPANY

Dated:  January 2, 2007

## CERTIFICATE OF SERVICE

I, David J. Groth, hereby certify that a true and correct copy of Plaintiff's Supplemental

Disclosure of Expert Testimony Under Rule 26(a)(2)(B) was mailed this 2nd day of January,

2007, via U.S. mail, postage prepaid to the following counsel of record:

Norman H. Brooks, Esquire
Marks, O'Neill, O'Brien & Courtney
913 North Market Street, #800
Wilmington, DE 19805


Stephen Horvath, Esquire
Trichilo, Bancroft, McGavin , Horvath & Judkins, P.C.
3920 University Drive, P.O. Box 22
Fairfax, VA 22030


DAVID J. GROTH

Building SOL Template

| Insured: | GALLAUDET UNIVERSITY | | | | | |
|---|---|---|---|---|---|---|
| POL..#: | CK03800837 | | | | | |
| CLAIM#: | CK03800837 22H001 | | | | | |
| TRACING # | VY 01719 | | BUILDING @ RCV & ACV | | | |
| COVERAGE: | | | | | | |
| BLANKET BUS.REAL & PERSONAL PROPERTY | | | | | | |

| | FOR THIS ADJUSTMENT ONLY | $ 354,318,222.00 | | $ 354,318,222.00 | | |
|---|---|---|---|---|---|---|
| | | | | STATEMENT | OF | LOSS |
| | | | | VALUE | LOSS | CLAIM |
| VALUE AS DETERMINED: | | | | | | |
| | FOR THIS ADJUSTMENT ONLY | $ 354,318,222.00 | | $ 354,318,222.00 | | |

| | | TOTAL REPAIRS | DEPRECIATION | A.C.V. LOSS | | |
|---|---|---|---|---|---|---|
| LOSS AS DETERMINED: BUSINESS REAL PROPERTY | | | | | | |
| | ACOUSTIC TREATMENTS | $ 2,570.40 | $ | $ 2,570.40 | | |
| | CLEANING | $ 8,652.00 | $ | $ 8,652.00 | | |
| | CONTENTS MANIPULATION | $ 275.00 | $ 27.50 | $ 247.50 | | |
| | GENERAL DEMOLITION | $ 15,068.31 | $ | $ 15,068.31 | | |
| | DRYWALL | $ 21,834.32 | $ | $ 21,834.32 | | |
| | ELECTRICAL | $ 2,002.67 | $ | $ 2,002.67 | | |
| | FLOOR COVERING CARPET | $ 95,565.06 | $ 14,334.76 | $ 81,230.30 | | |
| | FLOOR COVERING VINYL | $ 17,989.88 | $ 2,698.48 | $ 15,291.40 | | |
| | INSULATION | $ 5,488.12 | $ | $ 5,488.12 | | |
| | LABOR ONLY | $ 26,335.72 | $ | $ 26,335.72 | | |
| | PAINTING | $ 33,378.91 | $ 6,675.78 | $ 26,703.13 | | |
| | JOB SITE SUPERVISION | $ 4,625.00 | $ | $ 4,625.00 | | |
| | WALLPAPER | $ 79,380.00 | $ 15,876.00 | $ 63,504.00 | | |
| | WATER EXTRACTION SERVICES | $ 5,624.30 | $ | $ 5,624.30 | | |
| | TAX ON MATERIALS | $ 1,339.06 | $ | $ 1,339.06 | | |
| | | $ | $ | $ | | |
| TOTAL VALUE & LOSS AT REPL. COST | | $ 320,128.75 | $ 39,612.52 | $ 280,516.23 | | |
| GENERAL CONDITIONS---10% | | $ 32,012.88 | $ 3,961.25 | $ 28,051.62 | | |
| SUBTOTAL | | $ 352,141.63 | $ 43,573.78 | $ 308,567.85 | | |
| GENERAL CONTRACTORS FEE--15% | | $ 52,821.24 | $ 6,536.07 | $ 46,285.18 | | |
| TOTAL CONSTRUCTION COST | | $ 404,962.87 | $ 50,109.84 | $ 354,853.03 | | |
| OTHER TAX ON MATERIALS | | $ 4,859.95 | $ | $ 4,859.95 | | |
| TOTAL PROJECT COST | | $ 409,822.82 | $ 50,109.84 | $ 359,712.98 | | |

| EXTENDED COVERAGES: | | | | | | |
|---|---|---|---|---|---|---|
| WATER REMEDIATION - AVIDON | | $ 300,000.00 | $ | $ 300,000.00 | | |
| LOSS DATA PREPARATIONS | | | | | | |
| ORDINANCE & LAW | | | | | | |
| FIRE DEPARTMENT SERVICE CHARGE | | | $ | $ | | |
| DEBRIS REMOVAL-BLDG & B.P.P. | | | $ | $ | | |
| | TOTALS ALL COLUMNS | $ 709,822.82 | $ 50,109.84 | $ 659,712.98 | | |

| CLAIM AS DETERMINED: | | | | | | |
|---|---|---|---|---|---|---|
| ACTUAL CASH VALUE LOSS | | $ 659,712.98 | | | $ 659,712.98 | |
| LESS DEDUCTIBLE | | $ (1,000.00) | | | | |
| ACTUAL CASH VALUE CLAIM | | $ 658,712.98 | | | | $ 658,712.98 |

| AGREED SOUND VALUE, LOSS & CLAIM | | | | $ 354,318,222.00 | $ 659,712.98 | $ 658,712.98 |
|---|---|---|---|---|---|---|

BPP

| INSURED: | GALLAUDET UNIVERSITY |
|---|---|
| POL. # | CK03800837 |
| CLAIM # | CK03800837 22H001 |
| TRACKING # | VY 01719 |
| COVERAGE: | |

RCV & ACV VALUE CALCULATIONS
ALL ITEMS REPLACED BY GALLAUDET

| BLANKET BUILDING & BUSINESS PERSONAL | $ | 354,318,222.00 |
| FOR THIS ADJUSTMENT | | |

|  | | STATEMENT | OF | LOSS |
|---|---|---|---|---|
|  | | VALUE | LOSS | CLAIM |
| VALUE AS DETERMINED: | | | | |
| FOR THIS ADJUSTMENT ONLY | $  354,318,222.00 | $   354,318,222.00 | | |

| LOSS AS DETERMINED: BUSINESS PERSONAL PROPERTY | TOTAL REPAIRS | DEPRECIATION | A.C.V. LOSS | | |
|---|---|---|---|---|---|
| NARDONE INVENTORY-PAGE 1 | $ 4,937.95 | $ 740.69 | $ 4,197.26 | | |
| NARDONE INVENTORY-PAGE 2 | $ 1,538.00 | $ 230.70 | $ 1,307.30 | | |
| NARDONE INVENTORY-PAGE 3 | $ 192.00 | $ 28.80 | $ 163.20 | | |
| NARDONE INVENTORY-PAGE 4 | $ 390.00 | $ 58.50 | $ 331.50 | | |
| SHREDDER | $ 1,719.20 | $ 257.88 | $ 1,461.32 | | |
| BOOK CASE | $ 362.00 | $ 54.30 | $ 307.70 | | |
| LASER FAX MACHINE | $ 399.99 | $ 60.00 | $ 339.99 | | |
| EMERGENCY SYS.UNIT KITS | $ 105.35 | $ 15.80 | $ 89.55 | | |
| CANNON IMAGE RUNNER | $ 7,738.12 | $ 1,160.72 | $ 6,577.40 | | |
| CONTENTS MANIPULATION | $ 1,170.00 | $ 175.50 | $ 994.50 | | |
| USB PRINTER CABLE | $ 252.64 | $ 37.90 | $ 214.74 | | |
| TRS KEYBOARD TRAY | $ 103.50 | $ 15.53 | $ 87.98 | | |
| COMPUTERS AND MONITORS | $ 27,734.00 | $ 5,546.80 | $ 22,187.20 | | |
| RONDO SOFA'S | $ 1,493.00 | $ 223.95 | $ 1,269.05 | | |
| HP COMPAQ MP1200 | $ 2,299.00 | $ 344.85 | $ 1,954.15 | | |
| CHAIR, PRINTER, QUASAR TV | $ 3,319.78 | $ 497.97 | $ 2,821.81 | | |
| VISIPLEX PAGING SYSTEM | $ 1,767.00 | $ 265.05 | $ 1,501.95 | | |
| APOLLO OVERHEAD PROJECT | $ 299.99 | $ 45.00 | $ 254.99 | | |
| FURNITURE | $ 1,182.40 | $ 177.36 | $ 1,005.04 | | |
| FURNITURE, LIGHT TACKBOARD | $ 1,311.00 | $ 196.65 | $ 1,114.35 | | |
| CREDENZE, FURNITURE, ETC | $ 1,385.60 | $ 207.84 | $ 1,177.76 | | |
| FURNITURE | $ 1,686.90 | $ 253.04 | $ 1,433.87 | | |
| FURNITURE | $ 1,482.20 | $ 222.33 | $ 1,259.87 | | |
| COMPUTER, AUDIO, VIDEO, ETC | $ 23,884.00 | $ 4,776.80 | $ 19,107.20 | | |
| FORMS, MENTAL HEALTH | $ 236.00 | $ 35.40 | $ 200.60 | | |
| CHAIR | $ 189.96 | $ 28.49 | $ 161.47 | | |
| HAND TRUCK | $ 238.45 | $ 35.77 | $ 202.68 | | |
| GATEWAY COMPUTER | $ 2,782.00 | $ 417.30 | $ 2,364.70 | | |
|  | $      . | $      . | $      . | | |
|  | $      . | $      . | $      . | | |
|  | $      . | $      . | $      . | | |
| TOTAL VALUE & LOSS AT REPL. COST | $ 90,200.03 | $ 13,530.00 | $ 74,089.13 | $ 90,200.03 | |

| CLAIM AS DETERMINED: | | |
|---|---|---|
| VALUE LOSS | $ 74,089.13 | |
| LESS DEDUCTIBLE- APPLIED TO BLDG. | $     . | |
| ACTUAL CASH VALUE CLAIM | $ 74,089.13 | $ 74,089.13 |

| AGREED SOUND VALUE, LOSS & CLAIM | | $ 354,318,222.00 | $ 90,200.03 | $ 74,089.13 |
|---|---|---|---|---|

$2,500 DEDUCTIBLE APPLIED TO BUILDING LOSS

# EXHIBIT "H"

IN THE UNITED STATE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(Civil Division)

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as subrogee of Gallaudet University, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :    Case No. 1:05CV02115 <br> : |
| | : <br> : |
| CAPITOL SPRINKLER INSPECTION, INC. | : <br> : |
| Defendant/Third-Party Plaintiff, | : <br> : |
| v. | : <br> : |
| GUEST SERVICES, INC., | : <br> : |
| Third-Party Defendant. | : <br> : |

## CERTIFICATION OF COUNSEL TO CONFER ON NON-DISPOSITIVE MOTIONS

As provided by LCvR 7(m), the undersigned attorney for the Defendant/Third-Party Plaintiff, Capitol Sprinkler Inspection, Inc. certifies that Counsel for Capitol has, in good faith, attempted to confer with opposing counsel in order to resolve this discovery dispute without judicial intervention, but has been unable to reach a compromise. Counsel for Capitol Sprinkler Inspection, Inc. believes that the Plaintiff will oppose this motion.

MARKS, O'NEILL,
O'BRIEN & COURTNEY, P.C.

_\s\ Norman H. Brooks, Jr._
Donald R. Kinsley, Esquire (Bar ID No. 432998)
Michael T. Hamilton, Esquire (Bar ID No. 474233)
Norman H. Brooks, Jr., Esquire (PHV)
913 N. Market Street, Ste. 800
Wilmington, DE 19801
_Attorneys for Defendant/Third-Party Plaintiff_

DATE: February 26, 2007

DE077262.1

# EXHIBIT "I"



# COZEN
# O'CONNOR
## ATTORNEYS

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

**DAVID J. GROTH**
Direct Phone  215.665.2056
Direct Fax      215.701.2056
dgroth@cozen.com

February 23, 2007

**VIA EMAIL**

Norman H. Brooks, Jr., Esquire
Marks, O'Neill, O'Brien & Courtney
913 North Market Street, #800
Wilmington, DE  19805

Re:    St. Paul Mercury Insurance Company, as Subrogee of Gallaudet
       University v. Capitol Sprinkler Inspection, Inc., et al.
       Case No. 1:05CV02115
       Our File No.:  134164

Dear Mr. Brooks:

I just received your electronic filing of a *Motion In Limine* (Document 32 filed February 23, 2007) regarding plaintiff's damage witnesses. Attached to that motion is a Certification of Counsel under LCvR7(m) in which you certify to the court that you made the required good faith attempt to "confer with opposing counsel in order to resolve this discovery dispute without judicial intervention." As you and I both know, contrary to your Certification to the Court, you have never made any attempt to discuss the subject matter of this motion with me before filing it with the Court. Consequently, not only did you violate LCvR7(m), you also intentionally misrepresented to the Court that you had complied with the Rule.

Consequently, I would like you to send to me as soon as possible, in written form, the date and substance of any communication between us which you contend constituted the required good faith attempt to resolve the subject discovery dispute without judicial intervention. Please include in your letter or e-mail to me the date of any alleged communications between us on this issue; the type of communications (i.e., e-mail, letter, telephone conversation); and the substance of any such communications, including any statements on the issue which you attribute to me.

February 23, 2007
Page 2

If you choose not to respond to this letter before plaintiff's answer to your *Motion In Limine* is due, I will assume for purposes of my response that, as stated above, it is because there was, in fact, no communication of any type between us on this issue. If that is the case, I would request that you immediately contact the Court and withdraw your Certification of Counsel to Confer on Non-dispositive Motions, and inform the Court that you failed to comply with the Rule before filing the motion.

Awaiting your advice, I am

Very truly yours,

COZEN O'CONNOR

BY:   DAVID J. GROTH

DJG/pak

cc:   Stephen A. Horvath, Esquire
Eric Stravitz, Esquire

PHILADELPHIA\2995140\1  134164.000

# EXHIBIT "J"

W.
.R.D. 497                                                         Page 1
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

C

**Motions, Pleadings and Filings**

United States District Court,
D. Maryland.
Lisa SULLIVAN
v.
GLOCK, INC.
No. CIV. A. WMN-95-2652.

Sept. 29, 1997.

Former police officer brought action against manufacturer of semiautomatic pistol, alleging that she sustained serious injuries as a result of defective design of carrying case for pistol. Manufacturer moved to exclude testimony of officer's expert witnesses. The District Court, Grimm, United States Magistrate Judge, held that to extent that source of facts which formed basis for treating physicians' opinions derived from information learned during actual treatment of officer, no comprehensive written report from physicians was required.

Motion to exclude testimony denied.

West Headnotes

**[1] Federal Civil Procedure** 〰1274
170Ak1274 Most Cited Cases
To extent that source of facts which form basis for treating physician's opinions derive from information learned during actual treatment of patient, as opposed to being subsequently supplied by attorney involved in litigating case involving condition or injury, no comprehensive written report signed by witness is required. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[2] Federal Civil Procedure** 〰1274
170Ak1274 Most Cited Cases
Party does not waive its entitlement to disclosure of report prepared by expert witness merely by filing interrogatories or deposing expert. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

**[3] Federal Civil Procedure** 〰1278
170Ak1278 Most Cited Cases
If failure to comply with required disclosure involves

material aspect of expert's testimony, and if opposing party can show prejudice in connection with lack of disclosure, then opinion of expert should be excluded, in whole or in part, at trial. Fed.Rules Civ.Proc.Rules 26(a)(2)(B), 37(c)(1), 28 U.S.C.A.

**[4] Federal Civil Procedure** 〰1278
170Ak1278 Most Cited Cases
Trial court has enormous discretion in deciding whether party's violation of expert report rules is justified or harmless, and result will be determined by facts peculiar to each. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[5] Federal Civil Procedure** 〰1274
170Ak1274 Most Cited Cases

**[5] Federal Civil Procedure** 〰1278
170Ak1278 Most Cited Cases

**[5] Federal Civil Procedure** 〰1532.1
170Ak1532.1 Most Cited Cases
It is incumbent upon counsel to make full and timely disclosures of information regarding their retained experts, supplement them promptly when required, responsively answer interrogatories directed towards experts, and supplement these answers if warranted; failure to do so may well result in exclusion of testimony of expert at trial, in whole or in part. Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

**[6] Federal Civil Procedure** 〰1278
170Ak1278 Most Cited Cases
Counsel's failure to pursue interrogatories and/or depositions to discover expected opinion testimony of "hybrid" fact/expert witnesses is not a basis for excluding that testimony at trial. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[7] Federal Civil Procedure** 〰1278
170Ak1278 Most Cited Cases
In determining whether or not automatic exclusion provisions of rule governing discovery sanctions should be applied to exclude expert testimony, court should consider four factors in assessing whether there was substantial justification for failure to disclose or harmlessness to opposing party: importance of excluded testimony, explanation of party for its failure to comply with required disclosure, potential prejudice that would arise from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 2

allowing testimony, and availability of a continuance to cure such prejudice. Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

*498 Marlon Steve Charles, Washington, DC, for plaintiff.

John P. Sweeney, Gregory L. Lockwood, Susan Durbin Kinter and Miles & Stockbridge, Baltimore, MD, and John F. Renzulli, Christopher P. Orlando and Renzulli, Gainey & Rutherford, New York City, for defendant.

## MEMORANDUM AND ORDER

GRIMM, United States Magistrate Judge.

This case has been assigned to me for the resolution of discovery disputes pursuant to 28 U.S.C. § 636(c) (1993) and Local Rule 301 (D.Md.1997). The plaintiff, a former police officer, has sued Glock, Inc., the manufacturer of the Glock 9mm semiautomatic pistol. The plaintiff alleges that she sustained serious injuries as a result of the defective design of a carrying case for the Glock pistol which, it is claimed, caused the pistol to discharge while the plaintiff was attempting to put it in its carrying case following a training session.

Presently pending is the defendant's motion to exclude testimony of plaintiff's expert witnesses, the plaintiff's opposition and the defendant's reply. Paper Nos. 41, 42 and 43. [FN1] The essence of the defendant's motion is that the plaintiff failed to provide complete expert disclosures as required by Fed.R.Civ.P. 26(a)(2) with respect to all experts except Mr. Roane (hereinafter the "health care experts") and, therefore, pursuant to Fed.R.Civ.P. 37(c)(1), those experts should not be permitted to testify at trial, which counsel advises is presently scheduled for early 1998. For the reasons set forth below, the defendant's motion is denied, but the defendant will be permitted to pursue discovery of these experts, and to designate rebuttal experts.

> FN1. The defendant also has sought to exclude the trial testimony of another of the plaintiff's experts, Mr. Roane, as part of the relief requested in its motion for summary judgment. Paper No. 38. This issue will be addressed in a separate Order.

## BACKGROUND

In its motion to exclude the plaintiff's expert testimony, the defendant concedes that the plaintiff disclosed the identity of her health care experts, but asserts that these disclosures were inadequate. The disclosure identified the following health care experts: Yomi Fakunle, M.D.; Lesley Wong, M.D.; Jerome F. Kowaleski, Ph.D., a psychologist; Lois Bethea-Thompson, a physical therapist; and Diane Doyle, an occupational therapist. During a telephone conference with counsel for the plaintiff on September 17, 1997, counsel for the plaintiff stated that each of these health care experts provided services for, and treatment of, the plaintiff. According to plaintiff's counsel, none of the health care experts were retained for the purpose of providing testimony at trial.

The Rule 26(a)(2) disclosure statement filed by the plaintiff, [FN2] contains a very brief description of the role of each of the foregoing health care providers in connection with *499 their treatment and/or evaluation of the plaintiff. Unquestionably, these descriptions fall far short of the detailed information required by Rule 26(a)(2)(B). As will be discussed more fully, however, each of the health care experts disclosed by the plaintiff falls into the category of expert witnesses commonly described as "hybrid witnesses," for whom no Fed.R.Civ.P. 26(a)(2)(B) disclosures are required. Accordingly, I will deny the defendant's motion to exclude the testimony of these witnesses at trial. However, because there continues to be substantial uncertainty regarding the nature of the disclosures required by Rule 26(a)(2) with respect to hybrid witnesses--as displayed by the practice of counsel in this case--I also decline to penalize the defendant in resolving the pending motion. I therefore will also order that the defendant be permitted to discover the opinions of the health care experts who are expected to offer testimony at trial, and if requested, to designate rebuttal experts.

> FN2. The disclosure statement is attached as Exhibit A to the defendant's motion. Paper No. 41.

## DISCUSSION

Since the adoption of the Federal Rules of Evidence in 1975, the use of expert witnesses in civil and criminal trials has exploded. One commentator has observed:

> In modern trials, the expert is as common as the lawyer. Case after case, civil or criminal, state or federal, turns on the testimony of one or more of many kinds of experts. Expert inflation is on the rise. The causes are many. The growth of complex litigation, the explosion of technology and science, the increasing creativity of advocates--all play a role. But the main reason is the liberality with which modern evidence doctrine embraces

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L 75 F.R.D. 497
1 75 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

courtroom experts.

Faust F. Rossi, *Modern Evidence and the Expert Witness*, in *The Litigation Manual: A Primer for Trial Lawyers* 254 (2d ed.1989).

The Federal Rules of Civil Procedure regarding discovery of expert witness opinions have had to change to keep pace with the increasing use of expert testimony. Prior to the 1993 amendments to the Rules, there was no right to take the deposition of an expert retained to testify at trial, without leave of the court. [FN3] Expert opinions were to be discovered through interrogatories--a practice which proved to be almost useless in terms of obtaining meaningful disclosure of opinions and supporting factual bases. Indeed, the commentary to the 1993 changes to Fed.R.Civ.P. 26(a) specifically noted this problem, stating "[t]he information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness." Commentary to Fed.R.Civ.P. 26(a) (1993), 146 F.R.D. 401, 634 (1993).

> FN3. Prior to the 1993 amendments, Rule 26(b)(4) limited discovery of testifying experts to interrogatories, but provided that, upon motion, "the court may order further discovery by other means...." Fed.R.Civ.P. 26(b)(4)(A)(i) (superseded). In practice, this was one of the most ignored rules of civil procedure. Recognizing the hardship that strict adherence to the rule would impose upon efficient pretrial preparation, this Court accordingly adopted a Local Rule stating that it was "[t]he general practice in this District to permit experts designated by one party to be deposed by an opposing party." Local Rule 104.10 (D.Md.1989) (superseded).

In recognition of the need for lawyers to have an effective means of discovering expert testimony, the 1993 changes to the Rules of Civil Procedure adopted a carefully considered series of procedures designed to facilitate meaningful, and less expensive, discovery of expert opinions. The "expert disclosures" required by Fed.R.Civ.P. 26(a)(2) are the cornerstone of these changes. The Rule provides, relevantly:

(2) Disclosure of Expert Testimony.
(A) In addition to the disclosures required by paragraph (1), a party will disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.
(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as *500 an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.
Fed.R.Civ.P. 26(a)(2).

It is noteworthy that Rule 26(a)(2) creates two distinct types of disclosures: (1) disclosure of the identity of *any* witness who may provide opinion testimony at trial in accordance with Fed. R. Evid. 702, 703, and 705; and (2) the far more comprehensive written and signed report which Rule 26(a)(2)(B) requires for "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony" (hereinafter, "retained experts"). This distinction, often overlooked in practice, is of critical importance. Rule 26(a)(2)(A) is colloquially said to apply to "hybrid" fact/expert witnesses, the most frequent example being a treating physician in a personal injury case. [FN4] As to these witnesses, the comprehensive disclosures of the written report set forth in Fed.R.Civ.P. 26(a)(2)(B) are not required. The commentary to Rule 26 provides in pertinent part:

> FN4. See Local Rule 104.10.b (D.Md.1997) (indicating that "hybrid fact/expert witnesses" include treating physicians).

The requirement of a written report in paragraph [26(a) ](2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

example, can be deposed or called to testify at trial without any requirement for a written report.

Commentary to Fed.R.Civ.P. 26(a) (1993), 146 F.R.D. 401, 635 (1993). *See also* Local Rule 104.10.b (D.Md.1997) (stating that Rule 26(a)(2)(B) disclosures "need not be provided as to hybrid fact/expert witnesses such as treating physicians," and that "an adverse party may obtain the opinions of such witnesses, through interrogatories, document production requests and depositions"). [FN5]

> FN5. Although the treating physician is the most frequent example of a hybrid witness, it is clear from a review of Fed.R.Evid. 702 that any witness with expertise in an area of scientific, technical or specialized knowledge which would be helpful to the fact finder would fit into this category as well. It is very common in modern litigation to find fact witnesses who also possess the requisite expertise required by Fed.R.Evid. 702 to permit them to give expert opinion testimony. While Rule 26(a)(2)(A) does not require disclosure of anything more than their identity, lawyers still need to discover their opinions in order to effectively prepare for trial.

[1] Although it is clear that a treating physician is the quintessential example of a hybrid witness for whom no Rule 26(a)(2)(B) disclosures are required, it is a mistake to focus solely on the status of the expert, instead of the nature of the testimony which will be offered at trial. A witness can be a hybrid witness as to certain opinions, but a retained expert as to others, and with regard to treating physicians, there is a debate over where the line should be drawn. *Compare Shapardon v. West Beach Estates, 172 F.R.D. 415, 416-17 (D.Haw. 1997)* ("[T]reating physicians commonly consider the cause of any medical condition presented in a patient, the diagnosis, the prognosis and the extent of disability, if any, caused by the condition or injury. Opinions as to these matters are encompassed in the ordinary care of a patient and do not subject the treating physician to the report requirement of Rule 26(a)(2)(B)."); *Lauria v. National R.R. Passenger Corp.*, No. Civ. A. 95-1561, 1997 WL 138906, at *2 (E.D.Pa. March 24, 1997) ("[A] court must inquire whether the treating physician acquired his opinion as to the cause of the plaintiff's injuries directly through his treatment of the plaintiff.... If *501 so, then even though the treating physician may be deposed, he is not required to file the written report required by Rule 26(a)(2)(B). In this situation, testimony as to

whether the injuries for which the physician treated the patient are causally related to the accident are within the scope of the patient's care and treatment."); *Hall v. Sykes, 164 F.R.D. 46, 48 (E.D.Va.1995)* ("If a treating physician forms an opinion of the causation of an injury to a patient and the prognosis of the patient's condition during the treatment then such opinion may be expressed by the treating physician without the necessity of a report under Fed.R.Civ.P. 26(a)(2)(B).... However, if a physician, even though he may be a treating physician, is specially retained or employed to render a medical opinion based upon factors that were not learned in the course of the treatment of the patient, then such a doctor would be required to present an expert written report."); *Piper v. Harnischfeger Corp., 170 F.R.D. 173 (D.Nev.1997)* (same); and *Garza v. Abbott Lab., No. 95 C 3560, 1996 WL 494266 (N.D.Ill. Aug. 27, 1996)* (same) *with Thomas v. Consolidated Rail Corp., 169 F.R.D. 1, 2 (D.Mass.1996)* ("Many courts, however, have recognized the unfairness of permitting a party to employ a physician who treated an injured party to provide testimony beyond simply the care of the plaintiff to classic expert opinion regarding causation and prognosis."); and *Brown v. Best Foods, 169 F.R.D. 385, 388 (N.D.Ala.1996)* ("To the extent the treating physician testifies only as to care and treatment of his/her patient, the physician is not considered a specially retained expert [for whom Rule 26(a)(2)(B) disclosures are required].").
In my opinion, the approach taken by the court in *Shapardon, supra*, is most helpful, and most consistent with the stated purpose of Rule 26(a)(2)(A). To the extent that the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient--as opposed to being subsequently supplied by an attorney involved in litigating a case involving the condition or injury--then no Rule 26(a)(2)(B) statement should be required.

The failure to appreciate the distinction between a hybrid witness and retained expert can be a trap for the unwary. In this case, for example, the plaintiff disclosed the identity of a number of experts who were also her treating health care providers, and hence, hybrid witnesses, but did not provide--and was not required to provide--the detailed disclosures mandated by Fed.R.Civ.P. 26(a)(2)(B). Not appreciating the distinction between hybrid witnesses and retained experts, defendant's counsel repeatedly demanded complete Rule 26(a)(2)(B) disclosures, when she was not entitled to receive them. [FN6] Apparently operating under the misconception that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 5

the failure to provide these more detailed responses would result in automatic exclusion under Rule 37(c)(1), discussed below, defendant's counsel did not depose the hybrid witnesses. Instead, after the expiration of the discovery cutoff, she filed the instant motion in limine in an effort to exclude the testimony of these witnesses at trial.

> FN6. From a review of the papers submitted in connection with this dispute it does not appear that counsel for the plaintiff was aware of the distinction between hybrid witnesses and retained experts either. His failure to provide more detailed information about his experts in response to counsel for the defendant's many demands appears to be more a function of inattention to her requests, rather than an understanding of the rules of procedure.

As noted above, however, the plaintiff was not required to disclose any more than the identity of the hybrid witnesses under Rule 26(a)(2)(A), which she did. Thus, the automatic exclusion provision of Rule 37(c)(1) is inapplicable. Under an overly rigid reading of the rules of procedure, which I decline to do, the trap for the defendant would be that it would now be required to go to trial without any knowledge of the plaintiff's hybrid witnesses' opinions, because the discovery deadline has passed, and, without leave of the Court, the defendant would be unable to depose them. [FN7] In addition to the confusion *502 regarding what disclosures are required for hybrid witnesses and retained experts, there is also confusion associated with other methods of discovering expert opinion testimony, as will next be seen.

> FN7. From the papers filed in connection with this dispute, I do not know whether counsel for the defendant propounded an interrogatory question to the plaintiff asking for the opinions and factual bases of all witnesses who would provide opinion testimony pursuant to Fed.R.Evid. 702, 703 and 705. This would be an independent method of requiring the plaintiff to disclose this information in hybrid witnesses, and the failure to answer such an interrogatory may be separate grounds to support a motion to exclude the opinion testimony of a hybrid witness. Accordingly, prudent counsel would be wise to include in their interrogatories two separate "expert" interrogatories. The first should solicit the

opinions of hybrid witnesses. For example, "for each witness identified by you in connection with the disclosures required by Fed.R.Civ.P. 26(a)(2)(A), provide a complete statement of the opinions to be expressed and basis and reasons therefor." The second should request disclosure of the opinions of retained experts covered by Rule 26(a)(2)(B). For example, "for each witness which you have retained or specially employed to provide expert testimony in this case, or employed by you whose duties regularly involve giving expert testimony and who you expect to testify at trial, provide a complete statement of the opinions to be expressed and the basis and reasons therefor."

[2] Discovery of expert opinion testimony may also be obtained by interrogatories under Rule 26(b)(4)(B), and by deposition under Rules 26(b)(4)(A) and 26(b)(4)(B). [FN8] Rule 26(e)(1), moreover, imposes a duty on a party to supplement disclosures required by Rule 26(a). Similarly, Rule 26(e)(2) states that a party is "under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect." Supplementation, however, is not required if the corrective information already has been made known to the other parties during the discovery process or in writing. Fed.R.Civ.P. 26(e). This scheme is often confusing as reasonable minds can disagree about whether supplementing information has been provided "during the discovery process," which includes document production, written discovery responses and deposition testimony. Significant "corrective" information relating to an expert's opinion could, for example, be buried within a mass of documents produced to, but overlooked by, the receiving attorney.

> FN8. A party does not waive its entitlement to Rule 26(a)(2)(B) disclosures merely by filing interrogatories or deposing an expert. _Brand v. Mazda Motor Inc._, No. 95-4139-SAC, 1996 WL 707018, at *2 (D.Kan. Nov. 18, 1996); _St. Paul Fire & Marine Insurance Co. v. Heath Fielding Insurance Broking, Ltd._, No. 91 CIV. 0748, 1996 WL 19028, at *12 (S.D.N.Y. Jan. 17, 1996). Indeed, the deposition of an expert for whom a report is required by Rule 26(a)(2)(B) may not be taken until after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 6

those disclosures have been made. Fed.R.Civ.P. 26(b)(4)(A).

Another reason for potential confusion regarding the sufficiency of disclosure of expert opinion testimony is that Rule 26(e)(1) requires that, with respect to the retained expert, there is a duty to supplement the expert's opinion if there is a material change in the opinion. This obligation extends to both the report required by Rule 26(a)(2)(B), as well as the expert's deposition testimony. This supplementation must occur not later than the date of the pretrial disclosures required by Rule 26(a)(3). [FN9] Part of the potential confusion here stems from the fact that the supplementation of deposition testimony is not required for hybrid witnesses, for whom no Rule 26(a)(2)(B) disclosures are required. Once again, the failure to appreciate the distinction between hybrid witnesses and retained experts can either lead to sanctionable violations of the rules of civil procedure, or a failure to obtain sufficient discovery of the opinions of hybrid witnesses through other discovery devices.

> FN9. Rule 26(a)(3) requires that pretrial disclosures be made not later than 30 days before trial, unless otherwise required by the court. Local Rule 106.4, which governs pretrial orders, provides that disclosure of the information required by the pretrial order satisfies the requirements of Rule 26(a)(3). Thus, in this jurisdiction, if supplementation of an expert's deposition testimony is required by Rule 26(e)(1), it must be done not later that the time designated in the scheduling order for filing the joint pretrial order.

Another issue which frequently arises in connection with discovery of expert opinions is the sufficiency of the disclosures required by Rule 26(a)(2)(B). *See, e.g., 1st Source Bank v. First Resource Federal Credit Union,* 167 F.R.D. 61, 66-67 (N.D.Ind.1996) (noting that "courts and counsel are still learning the specificity required of expert reports under Rule 26(a)(2)(B)," and that "no *503 mechanism exists for a disclosing party to test the sufficiency of its disclosure," prior to the opposing party filing of a motion in limine or objecting at trial); *see also Reed v. Binder,* 165 F.R.D. 424, 429 (D.N.J.1996) (noting that "[t]he test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced"). The Rule itself is quite detailed, and,

when coupled with Rule 37(a)(3), [FN10] would seem to require exact compliance in all particulars with the disclosures required by Rule 26(a)(2)(B), even though this is often very difficult to do. Moreover, a literal reading of Rules 37(a)(3) and 37(c)(1) would result in the application of the automatic exclusion of an expert's trial testimony if there was not complete compliance with the requirements of Rule 26(a)(2)(B), unless the court finds that there was substantial justification for the failure to make complete disclosure or that the failure to disclose is harmless. *Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir.1996).

> FN10. "[A]n *evasive or incomplete disclosure,* answer, or response is to be treated as a *failure to disclose,* answer or respond." Fed.R.Civ.P. 37(a)(3) (emphasis added).

[3] Thus, given the severity of the automatic exclusion sanction of Rule 37(c)(1), prudence dictates that counsel be as complete and thorough as possible in making and supplementing Rule 26(a)(2)(B) disclosures. *Accord 1st Source Bank,* 167 F.R.D. at 67 (suggesting that until Rule 26(a)(2)(b) is modified to include a safe harbor provision or a meet and confer provision as a prerequisite to exclusion for an inadequate disclosure, "counsel would seem well advised to err on the side of overinclusiveness"). As a rule of thumb, if the failure to comply with the required disclosure involves a material aspect of the expert's testimony, [FN11] and if the opposing party can show prejudice in connection with the lack of disclosure, then the opinion of the expert should be excluded, in whole or in part, at trial.

> FN11. When one understands the purpose of the Rule 26(a)(2)(B) disclosures, it is easier to appreciate why complete disclosures are required. The purpose of these disclosures is to provide "information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective *cross examination* and perhaps arrange for expert testimony from other witnesses." Commentary to Rule 26(a), 146 F.R.D. 401, 633 (1993) (emphasis added). Cross examination of an expert generally involves three components. During the court's preliminary assessment of whether the expert will be permitted to offer opinion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 7

testimony, pursuant to Fed.R.Evid. 104(a), the focus is whether the expert meets the requirements of evidence rule 702 to give such testimony. If so qualified, then, pursuant to Fed.R.Evid. 611(b), the focus shifts to the opinions expressed and the support therefor, as well as matters affecting the credibility of the expert. When one keeps these three functions of cross examination of experts in mind it is easier to appreciate why all of the information required by the Rule 26(a)(2)(B) disclosure is important. All too often lawyers focus almost exclusively on disclosing the expert's opinions, the supporting facts, data, and bases, and neglect their additional obligation to disclose the witness's qualifications, publications, compensation, and listing of prior testimony. This information, however, bears directly on whether the expert is qualified under Fed.R.Evid. 702, and commonly provides a factual basis to attack the credibility of the expert. Thus, a Rule 26(a)(2)(B) disclosure which does not completely address each of these elements may be lacking in a material respect.

Pursuant to Fed.R.Civ.P. 37(a)(2), a party who is not provided a Rule 26(a)(2)(B) disclosure, or receives one which he or she thinks is incomplete, may file a "motion to compel disclosure and for appropriate sanctions." [FN12] When deciding whether or not to file such a motion, however, a party must make an important tactical decision, as the facts in this case illustrate. Central to this decision is the automatic exclusion provision of Fed.R.Civ.P. 37(c)(1), which provides "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing or on a motion any witness or information not so disclosed." Rule 37(c)(1) is "a self executing sanction for failure to make a disclosure required by Rule 26(a), without further need for a motion under ... **\*504** [37](a)(2)(A)." Commentary to Fed.R.Civ.P. 37, 146 F.R.D. 401, 691 (1993). The commentary further provides that "[p]ursuant to new subdivision [37](a)(2)(A), a party dissatisfied with the disclosure made by an opposing party *may* under this rule move for an order to compel disclosure," but that "[u]nder revised paragraph [37](3), evasive or incomplete disclosures and responses to interrogatories and production requests are treated as *failures* to disclose or respond." *Id.* at 690.

FN12. Of course, counsel must first make a good faith attempt to confer with opposing counsel to obtain the disclosures before filing a motion to compel. Fed.R.Civ.P. 37(a)(2)(A); Local Rule 104.7 (D.Md.1997).

A party who receives incomplete or evasive Rule 26(a)(2) disclosures consequently faces a dilemma of sorts. Because the failure to completely and nonevasively respond operates as a refusal to answer, the "self-executing" exclusion of the expert's opinion is mandated, without further motion by the party, unless the court determines that the defective disclosure was substantially justified or harmless. Attorneys who wish to exclude the expert's testimony at trial, then, may be disinclined to file the motion to compel, because, if granted, the party which supplied the defective disclosures may be given another opportunity to get them right, and the expert will then be permitted to testify at trial. Furthermore, as a practical matter, filing a motion to compel can have the effect of educating an opponent as to what corrective measures must be taken in order to secure admission at trial of some of the potentially most damaging evidence which can be offered. On the other side of the coin, if the attorney does not file a motion to compel, he or she does so at the risk of the judge permitting the expert to testify, finding that the failure to properly provide the Rule 26(a)(2) disclosures was substantially justified or harmless. *See, e.g., Marek v. Moore,* 171 F.R.D. 298, 299-300 (D.Kan.1997) (finding that party was not prejudiced by expert's failure to sign Rule 26(a)(2)(B) report). The stakes are high, for if the expert's opinion is allowed, the result is one of the worst imaginable--an expert testifying as to opinions about which opposing counsel has no notice or knowledge. The conundrum, therefore, is whether to file a motion to compel and obtain the information prior to trial, or, alternately, not file the motion to compel and hope that the court will exclude the testimony under Rule 37(c)(1) at trial. The answer to this dilemma often depends, to borrow from Inspector "Dirty Harry" Callahan, on whether or not counsel feels lucky. [FN13]

FN13. *See* Inspector "Dirty Harry" Callahan, *Dirty Harry* (Warner Bros. Co./ Malpaso Co.1971) "There's just one question you've got to ask yourself--'Do I feel lucky?' ".

When counsel foregoes filing a motion to compel, anticipating that the trial judge will exclude the expert testimony on the basis of inadequate 26(a)(2)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 8

disclosures, and files a motion in limine to block the testimony at trial, the court must decide whether to impose what has traditionally been considered a severe sanction, appropriate only for willful and substantial abuse of the discovery process. *See McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 586 (W.D.N.Y.1995)* (noting that "[p]recluding testimony from an expert under [Rule 37(c)(1) ] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard of the federal rules"); *see also Reed v. Binder, 165 F.R.D. 424, 431 (D.N.J.1996)* (finding that barring expert's testimony as sanction for inadequate Rule 26(a)(2)(B) disclosure was unduly harsh where expert testimony will dominate the proceedings); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* No. 95 CIV. 2144, 1996 WL 337289, at *2 (S.D.N.Y. June 18, 1996)* (same). This decision is commonly made at trial or on the eve of trial, when there is little opportunity for appropriate briefing and deliberation. Often the court is faced with conflicting representations and a mixture of information with respect to the status of discovery of the opinions and bases of the expert which is the subject of the motion in limine. An incomplete Rule 26(a)(2)(B) disclosure may have been made providing some, but not all, of the required information. Counsel opposing exclusion may argue that the incomplete or untimely disclosure was harmless as other discovery provided the requisite 26(a)(2)(B) information. Conversely, the party challenging the testimony may not have deposed the proposed expert, arguing that it relied upon the court enforcing the automatic exclusion provisions of Rule 37(c)(1).

**\*505** If the court determines that substantial justification exists for the incomplete expert disclosures, or that the opposing party will not be prejudiced by allowing the expert to testify as to hitherto undisclosed opinions, then it is difficult to not also rule that the party opposing the expert will be permitted to depose the expert, so as not to be unfairly surprised. This is usually the case because, as already noted, a party is not required to file a motion to compel complete disclosures under Rule 37(a)(2), [FN14] and is well within its rights to rely on the automatic exclusion provision contained in Rule 37(c)(1). If the court allows the deposition, however, it tacitly condones last minute discovery and undermines compliance with the rules of procedure. Moreover, when the court determines that a challenged expert may testify, it may then have to allow the challenging party to counter-designate a rebuttal expert, also immediately before trial, who

must also be deposed. This undercuts the very purpose of the pretrial scheduling order--including the important goal of setting a specific and limited period for discovery--and rewards dilatory practices by the party which failed to make proper Rule 26(a)(2) disclosures.

> FN14. That rule states, relevantly, "[i]f a party fails to make a disclosure required by Rule 26(a), any other party *may* move to compel disclosure and for appropriate sanctions" (emphasis added).

Contrastingly, if the court decides to grant the motion in limine and exclude the challenged expert's testimony as to undisclosed opinions, it may seriously weaken the case of the party sponsoring the witness under circumstances where the opposing party had actual knowledge before the discovery cutoff that the expert would be offered at trial, yet received incomplete disclosures about the full nature of the opinions. It is tempting, under such circumstances, to wonder why the opposing party didn't file a motion to compel adequate disclosure under Rule 37(a)(2)(a), or simply take the deposition of the expert, even though that party was well within its rights not to do so, and to elect to take the position that Rule 37(c)(1) bars the testimony at trial.

[4] In attempting to decide whether or not the court can, in the exercise of its discretion, allow the challenged expert to testify at trial despite incomplete disclosures under Rule 26(a)(2), the court may look for guidance to the many reported decisions on this issue. However, when it does so, it will quickly discover that, as at "Alice's Restaurant," one can find what one wants. [FN15] *See, e.g., Metal Processing Co., Inc. v. Amoco Oil Co., 173 F.R.D. 244, 248 (E.D.Wis.1997)* (refusing to exclude experts disclosed 20 days before trial, where court extends discovery deadline to permit party to depose experts who did not file timely reports); *Hester v. CSX Transportation, Inc.,* 61 F.3d 382, 388 n. 11 (5th Cir.1995)* (trial court's decision refusing to exclude expert's rebuttal testimony was not an abuse of discretion even though opinion was not disclosed until day of trial where court finds no intent to withhold opinion in effort to obtain unfair advantage); *Starforth v. Western Resources, Inc.,* 96-2049-EEO, 1996 WL 677084 (D.Kan. Oct. 29, 1996)* (refusing to strike expert for missing Rule 26(a)(2)(B) disclosure deadline where several months remained before trial); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir.1996)* (exclusion of expert testimony was not an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

abuse of discretion where experts' identities were disclosed three days before trial); *Fund Commission Service, II, Inc. v. Westpac Banking Co., No. 93 Civ. 8298, 1996 WL 469660, at \*4 (S.D.N.Y. Aug. 16, 1996)* (excluding party from using "any expert evidence at any stage in [the case]" where the party's "dilatory tactics have flouted the [Rule 26(a) ] Advisory Committee's policy of promoting full pretrial disclosure of expert information."). The net result of the analysis of these cases is that the trial court has enormous discretion in deciding whether a party's violation of the expert report rules is justified or harmless, and the result will be determined by the facts peculiar to each *506 case. *Metal Processing Co., Inc., 173 F.R.D. at 248*. It is possible, however, to identify rules of reason which should be applied in analyzing this issue.

> FN15. See Arlo Guthrie, "Alice's Restaurant" (Reprise Records, 1967) ("You can get anything you want at Alice's Restaurant."). To date, however, neither the Fourth Circuit nor this Court appears to have interpreted in a published opinion the appropriateness of excluding expert testimony for the failure to comply with Rule 26(a)(2).

The first rule of reason is that the entire structure of the rules of procedure governing pretrial preparation, expert disclosures under Rule 26(a)(2) and discovery in general, underscore the need for a fixed period of discovery which ends at a date certain well before trial. Thus, last minute discovery should be strongly discouraged, absent truly exigent circumstances.

[5] Second, there is an important interrelationship between the expert disclosures required by Rule 26(a)(2) and the other forms of discovery which must be recognized by counsel, who are obligated to comply with all of the requirements for each component, or risk the adverse consequences of failing to do so. Therefore, it is incumbent upon counsel to make full and timely disclosures of information regarding their retained experts, supplement them promptly when required, [FN16] responsively answer interrogatories directed towards experts, and supplement these answers if warranted. Failure to do so may well result in the exclusion of the testimony of the expert at trial, in whole or in part. The days when counsel may "hide the ball" regarding expert disclosure, and intentionally provide a little, but by no means complete, information about the expected expert testimony are over, and those who continue to do this should not be rewarded for

doing so. Moreover, it is no longer acceptable to wait until the last minute to retain and prepare experts. Counsel must be prepared to provide full and meaningful disclosure and discovery at the times required by the rules of procedure and the pretrial scheduling order.

> FN16. To avoid disputes about whether Rule 26(a)(2) disclosures were supplemented as required, this should be done in a writing which clearly reflects that the disclosures are being supplemented.

[6] Third, counsel must be familiar with the distinction between hybrid witnesses and expert witnesses, and the significance of this difference with respect to the required disclosures of Rule 26(a)(2). The written report required by Rule 26(a)(2)(B) is inapplicable to hybrid witnesses, and counsel must be prepared to obtain information about the opinions and bases of their testimony by interrogatories and/or depositions. The failure to pursue these alternative means of discovering the expected opinion testimony of hybrid witnesses is not a basis for excluding that testimony at trial.

Fourth, when faced with a situation where no required expert disclosures have been made, or materially incomplete disclosures have been made, counsel must make a tactical decision. If the most important goal is to avoid surprise at trial or last minute discovery about expert testimony on the eve of trial, then counsel should consider filing a motion to compel adequate disclosures or in the alternative to exclude expert testimony as soon as possible following the discovery cutoff, so that if the court declines to exclude the expert's testimony, the opinions of that expert may be discovered, and a rebuttal expert engaged as far as possible ahead of trial. Alternatively, if the most important goal of the attorney is to preclude the expert from testifying at trial by evoking the automatic exclusion provisions of Rule 37(c)(1), he or she should remember that this course is not risk free, and that the exclusion of evidence is a severe sanction which the party moving for exclusion may be reluctant to impose despite Rule 37(c)(1). At least one court, for example, has recently refused to strike an expert's testimony for failing to comply with Rule 26(a)(2)(B) disclosures where the party moving for exclusion waited until the day before the discovery cut-off to challenge the adequacy of the report. *See Harvey v. District of Columbia, 949 F.Supp. 874, 877 (D.D.C.1996)* (noting that had the moving party "promptly communicated with the plaintiff, they could have met and conferred about the report and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497
175 F.R.D. 497, 39 Fed.R.Serv.3d 1351
(Cite as: 175 F.R.D. 497)

Page 10

still would have had time to file a motion to compel production of a supplemental report.").

[7] Fifth, in determining whether or not the automatic exclusion provisions of Rule 37(c)(1) should be applied to exclude expert testimony, the court should consider four factors in assessing whether there was substantial justification for the failure to disclose or harmlessness to the opposing party: (1) *507 the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 744 (Fed.Cir.1997). With respect to the first factor, the court should evaluate whether the expert whose testimony would be excluded is central to the sponsoring party's case, or merely one of several experts who will testify to the same point. If exclusion of the testimony would be fatal to the sponsoring party's case, there is authority which suggests that it would be abuse of discretion to exclude the evidence. *Orjias v. Stevenson,* 31 F.3d 995, 1005 (10th Cir.1994) ("Notwithstanding Rule 37(c), the district court may be found to have abused its discretion if the exclusion of testimony results in fundamental unfairness in the trial of the case"); *Newman v. GHS Osteopathic Inc.,* 60 F.3d 153, 157 (3rd Cir.1995) (same).

With respect to the second factor, the court should take into consideration the reason for the failure to make the disclosure. The court may consider, for example, the experience of counsel, and whether the failure to provide appropriate disclosures was willful or in bad faith as opposed to inadvertent or the result of inexperience. The court might consider whether any of the confusing circumstances discussed above were involved; whether opposing counsel wrote to request the required disclosure or protest the adequacy of the disclosure given; whether the failure was total as opposed to an incomplete disclosure or failure to timely supplement; and whether the information required by the disclosure was provided to opposing counsel by some other discovery method. In this regard, at least one court has recently also taken into consideration the fact that Rule 26(a)(2) disclosures are relatively new. *See Reed v. Binder,* 165 F.R.D. 424, 431 (D.N.J.1996) (declining to bar expert's testimony as sanction for inadequate Rule 26(b)(2)(B) disclosure in part because voluntary disclosure has not been the rule, and "the court

perceives that attorneys practicing before this court have not become completely accustomed to the substantial changes in practice caused by the 1993 amendments to the rules"). In any event, when making its determination, the court should not overlook the fact that Rule 37(c)(1) requires that the reason for nondisclosure constitute *substantial* justification. *See Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 678-82 (D.Kan.1995) ("Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact."). *See, e.g., Salgado v. General Motors Co.,* No. 93 C 1427, 1996 WL 535333, at *2 (N.D.Ill. Sept. 19, 1996) (finding that experts' busy trial and travel schedules did not provide substantial justification for party's failure to comply with Rule 26(a)(2)(B)).

The third factor requires the court to consider the potential prejudice to the opposing party if the expert is allowed to testify. Perhaps the most important consideration in this regard is the amount of time remaining before trial. If the issue surfaces months before trial, the court has great latitude to require the disclosure, permit the opposing party to take additional discovery and designate rebuttal experts, and to balance the scales by imposing a lesser sanction, such as awarding costs. *See McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 586 (W.D.N.Y.1995) ("Now that plaintiff has submitted most of the components of the required report, any prejudice to defendant can be remedied by granting leave to defendant to depose the expert outside the discovery period [and costs] associated with obtaining compliance with that rule."). Where, however, the issue surfaces on the eve of trial, or worse yet, during the trial, the court's options are far more restricted. In this regard, it must be acknowledged that injecting expert discovery into the final stages of pretrial preparation, or during trial itself, is extremely disruptive as well as expensive. Whether the court is willing to allow this to happen may well be influenced by whether the dispute centers around a complete failure to provide disclosure of the identity or opinions of an expert, as opposed to a claim that the *508 disclosures were incomplete, or that disclosures which were once complete were not supplemented to cover an additional opinion the expert is now being asked to give. Another factor which should be considered is whether the proposed expert testimony will be the subject of a *Daubert* challenge. [FN17] *See Reed,* 165 F.R.D. at 429 n. 9 (noting that "[t]he disclosure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requirements of the Rules are also particularly helpful to the court in making rulings limiting or restricting expert testimony pursuant to Evidence Rules 104(a) and 702 and *Daubert* "). If so, then the court will have to consider the disruptive impact which this may have on the trial, because it may have to conduct evidentiary hearings outside the presence of the jury pursuant to Fed.R.Evid. 104(a) to determine whether the proposed expert testimony may be presented to the jury.

> FN17.    *Daubert    v.    Merrell    Dow Pharmaceuticals,    509    U.S.    579,    113    S.Ct. 2786, 125 L.Ed.2d 469 (1993).*

The final factor the court should consider is whether a continuance may be granted to cure the effects of prejudice caused by a failure to disclose, or a late disclosure.    Needless to say, if the issue arises months before a scheduled trial date, this remedy is far more palatable than if it arises on the eve of trial. Courts should be mindful that granting a continuance just before a scheduled trial inconveniences not only the attorneys and parties, but also non-party witnesses.    Additionally, a court must be careful not to reward the party who failed to make proper disclosures by granting a continuance, a practice which invites abuse.

## CONCLUSION

In light of the above discussion, it is apparent that, to the extent that the health care experts identified by the plaintiff in her Rule 26(a)(2)(A) disclosures are intended to testify at trial regarding their treatment of the plaintiff, any opinions regarding the existence of her medical condition, its causation, her treatment and prognosis, then they are hybrid witnesses and the plaintiff was not obliged to provide the defendant with the comprehensive disclosures required under Rule 26(a)(2)(B).    Accordingly, the disclosure of their identities complies with the federal rules.    For this reason, the defendant's motion is DENIED. However, to the extent that the plaintiff intends for these witnesses to offer opinion testimony based on facts not obtained from their actual treatment of the plaintiff, they may not do so unless complete Rule 26(a)(2)(B) disclosures have been made.    Because trial is some months away, there remains time to permit the reopening of discovery for the limited purpose of permitting the defendant to depose the plaintiff's health care experts.    To insure that this is accomplished effectively, the following schedule will apply:    Within 30 days of this Order, the defendant shall take the deposition of the plaintiff's health care experts.    Within 21 days thereafter, the defendant

shall designate any rebuttal experts.    Within 30 days thereafter, the plaintiff may take the deposition of such rebuttal experts.

SO ORDERED.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv02652 (Docket) (Sep. 08, 1995)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "K"

LEXSEE

**ELISABETH KIRKHAM, Plaintiff, v. SOCIETE AIR FRANCE T/A AIR FRANCE, Defendant.**

Civil Action No. 03-1083 (JDB)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*236 F.R.D. 9; 2006 U.S. Dist. LEXIS 18998*

**April 13, 2006, Decided**

**SUBSEQUENT HISTORY:** Summary judgment denied by *Kirkham v. Societe Air Fr., 2007 U.S. Dist. LEXIS 8113 (D.D.C., Jan. 10, 2007)*

**PRIOR HISTORY:** *Kirkham v. Societe Air Fr., 368 U.S. App. D.C. 291, 429 F.3d 288, 2005 U.S. App. LEXIS 25115 (2005)*

**COUNSEL:** [**1] For ELISABETH KIRKHAM, Plaintiff: Athan Theodore Tsimpedes, LAW OFFICES OF ATHAN T. TSIMPEDES, Washington, DC.

For SOCIETE AIR FRANCE trading as AIR FRANCE, Defendant: Marc Edmund Miller, Cameron W. Fogle, Lynn Estes Calkins, Ethan Ray Arenson, Leo G. Rydzewski, HOLLAND & KNIGHT, L.L.P., Washington, DC.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINION BY:** JOHN D. BATES

**OPINION:**

### [*10] MEMORANDUM AND ORDER

Defendant Societe Air France ("Air France") has moved to strike the designation of plaintiff's two expert witnesses or, in the alternative, to compel plaintiff to file expert reports pursuant to *Fed. R. Civ. P. 26(a)(2)(B)*. Plaintiff contends that the two expert witnesses are her treating physicians and, as such, are not required to provide expert reports. n1 The Court concludes that the exclusion of expert testimony would not be reasonable in light of the ongoing expert discovery in this case, and the good faith basis for disagreement, and hence only defendant's request to compel the production of expert reports will be considered.

n1 Plaintiff originally designated three expert witnesses, but has dropped one. See Pl.'s Am. Designation of Expert Witnesses (Mar. 22, 2006).

[**2]

The factual background of this negligence action is set forth more fully in *Kirkham v. Societe Air France, 368 U.S. App. D.C. 291, 429 F.3d 288, 291 (D.C. Cir. 2005)*. In relevant part, plaintiff alleges that on or about June 12, 2000, while being guided by an Air France employee through the Orly Airport in France, she was struck in the foot by a person or luggage cart, and spent nine days in the hospital before returning to the United States in a wheelchair. She has since had several foot surgeries and continues to suffer complications from her injury. She has designated Dr. Barry P. Boden and Dr. Gary Feldman, both orthopedic surgeons who have treated her injuries, as expert witnesses pursuant to *Fed. R. Civ. P. 26(a)(2)(A)*. Dr. Boden has been her treating physician since July 2000. Compl. P 15, 18. The timing of Dr. Feldman's relationship to plaintiff is not presently documented. Each is expected to testify "regarding the diagnosis, prognosis, treatment and injuries, including the pain and suffering and causal relationship, if any, of the Plaintiff's injuries, damages and treatment to this occurrence; the reasonableness and necessity of treatment [**3] received by the Plaintiff; and the issue of any permanency and whether it is related to this occurrence." Pl.'s Am. Designation of Expert Witnesses (Mar. 22, 2006).

*Rule 26(a)(2)* requires a party to disclose the identity of all of its expert witnesses, but requires a written report only "with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." *Fed. R. Civ. P. 26(a)(2)(B)*. The 1993 advisory committee note to *Rule 26* reiterates that the requirement of a written expert re-

Case 1:05-cv-02115-CKK     Document 40-3     Filed 03/05/2007     Page 53 of 55

Page 2

236 F.R.D. 9, *; 2006 U.S. Dist. LEXIS 18998, **

port "applies only to those experts who are retained or specially employed" to provide expert testimony, and concludes that "a treating physician, for example, can be deposed [*11] or called to testify at trial without any requirement for a written report." The advisory committee note recognizes the common sense proposition that a treating physician has a relationship with the patient that is typically separate from the case, based on his care and treatment of the patient, and thus he should not be deemed "retained" based solely on that relationship. [**4] See Wreath v. United States, 161 F.R.D. 448, 450 (D. Kan. 1995). It also recognizes that a treating physician will, like a fact witness, have personal knowledge based on his care and treatment, and to the extent fact testimony is being provided, it should not be subject to the requirement of a written report. See Sullivan v. Glock, Inc., 175 F.R.D. 497, 500-501 (D. Md. 1997) (describing treating physician as a "hybrid fact/expert witness").

Although the language of the rule and advisory committee notes would, at first glance, appear straightforward, the applicability of the written report requirement to treating physicians who provide expert testimony is unclear because, in practice, the testimony of treating physicians often departs from its traditional scope -- the physician's personal observations, diagnosis, and treatment of a plaintiff -- and addresses causation and predictions about the permanency of a plaintiff's injuries, matters that cross over into classic expert testimony. See Sowell v. Burlington N. & Santa Fe Ry. Co., 2004 U.S. Dist. LEXIS 24738, 2004 WL 2812090, *2-* 3 (N.D. Ill. 2004). Thus, there are widely divergent views within the federal [**5] courts on whether a treating physician providing expert testimony is required to provide an expert report in advance of testifying under Rule 26(a)(2)(B). See Garcia v. City of Springfield Police Dep't, 230 F.R.D. 247, 247-49 (D. Mass. 2005) (collecting cases, and concluding that requirement of expert report depends on whether treating physician is specially retained in connection with litigation and whether testimony is based on personal observations from providing care and treatment); Sowell, 2004 U.S. Dist. LEXIS 24738, 2004 WL 2812090, at *2-* 3 (collecting cases, and concluding that expert report is always required where treating physician testimony includes opinions on "causation, permanency, and prognosis"); McCloughan v. City of Springfield, 208 F.R.D. 236, 241-42 (C.D. Ill. 2002) (collecting cases, and concluding that expert report is not required where treating physician offers testimony on "causation, diagnosis, and prognosis"); see also Anthony v. Wash. Metro. Area Transit Auth., 2005 U.S. Dist. LEXIS 41560, No. 04-622, slip op. at 5 (D.D.C. Apr. 8, 2005) (" without an expert report, a treating physician may not testify as to issues of causation, foreseeability, prognosis, [**6] and permanency") (Kay, M. J.). n2

n2 Some of the cases referenced above suggest that a treating physician is not even an expert witness subject to disclosure under Rule 26(a)(2)(A) to the extent his testimony relates to his personal observations through interaction with a plaintiff/patient prior to the litigation. See McCloughan, 208 F.R.D. at 241 (citing Patel v. Gayes, 984 F.2d 214, 218 (7th Cir. 1993)). That view has been superceded by the 2000 amendments to Fed. R. Evid. 701 and advisory committee notes which make clear that expert testimony includes opinions based on "' scientific, technical, or other specialized knowledge,' regardless of whether those opinions were formed during the scope of interaction with a party prior to the litigation." Bell v. Gonzales, 2005 U.S. Dist. LEXIS 37879, 2005 WL 3555490, *12 (D.D.C. 2005). Plaintiff agrees that the testimony of Dr. Boden and Dr. Feldman is properly characterized as expert testimony.

The primary area [**7] of disagreement among the decisions cited above is whether a treating physician may offer opinion testimony on causation, prognosis, and permanency, even if she bases her opinions solely on the information she obtained from her treatment of plaintiff (and her own expert training). n3 No [*12] federal court of appeals has resolved the issue, although dictum in one case suggests that the answer depends on the substance of the treating physician's testimony. See Musser v. Gentiva Health Servs., 356 F.3d 751, 758 n. 3 (7th Cir. 2004) (declining to decide whether treating physicians are subject to the report requirement, but observing: "It is clear that there is some expert testimony in the nature of the treating physician's testimony that does not require a report. But some district courts have suggested that if the Rule 26(a)(2)(A) testimony exceeds the scope of treatment, and ventures into more general expert opinion testimony, a report may be necessary.") (citations omitted). n4

n3 There appear to be two schools of thought on this issue. The "majority" view, as it has been characterized, opines that "opinions as to these matters [causation and prognosis] are encompassed in the ordinary care of a patient," and thus do not subject the treating physician to the report requirement of Rule 26(a)(2)(B). See, e.g., Shapardon v. West Beach Estates, 172 F.R.D. 415, 416-17 (D. Haw. 1997); see also Martin v. CSX Transp., Inc., 215 F.R.D. 554, 557 (S.D. Ind. 2003); Riddick v. Washington Hosp. Ctr., 183 F.R.D. 327, 330 (D.D.C. 1998). The contrary

Case 1:05-cv-02115-CKK    Document 40-3    Filed 03/05/2007    Page 54 of 55

Page 3

236 F.R.D. 9, *; 2006 U.S. Dist. LEXIS 18998, **

view points out that a treating physician's primary function is to provide care and treatment, and determining causation is incidental and typically based on whatever information happens to be reported to the physician:

> That conclusion [the majority view] fails to consider the difference between an entry on a medical record as to the reported cause of an injury (often based on the plaintiff's self-reporting) and testimony about causation for the purpose of allocating legal liability for an injury. The plaintiff came to the treating physician for treatment. Any notes or conclusions made during treatment regarding causation are incidental to that treatment. In contrast, in a lawsuit, the issue of causation is often a major, if not the major, contested issue in the case . . . .

*Sowell, 2004 U.S. Dist. LEXIS 24738, 2004 WL 2812090, at *4* (emphasis in original); see also *Zarecki v. National RR Passenger Corp., 914 F. Supp. 1566, 1573 (N.D. Ill. 1996)* (noting that the treating physician's opinions as to "ultimate causation" were "based on some unspecified body of professional knowledge," rather than treatment of the patient or first-hand knowledge of conditions giving rise to the injury).

[**8]

n4 Another court assumed an expert report for such testimony is never required based solely on the 1993 advisory committee note to *Rule 26* and the assumption that a treating physician's testimony is limited to treatment. *Gomez v. Rivera Rodriguez, 344 F.3d 103, 113 (1st Cir. 2003)* (relying on advisory committee note on treating physicians as "illustrating the sort of witness who may have specialized knowledge yet need not be considered an expert for the purpose of submitting a report as part of pretrial discovery," because such testimony is based on personal observations through "consultation with or treatment of a patient").

Despite the disagreement, there is consensus on a few principles. First, whether the expert was "retained or specially employed" in connection with the litigation must be considered, given the plain language of *Rule 26(a)(2)(B)*. See, e.g., *Garcia, 230 F.R.D. at 249*; *Sprague v. Liberty Mutual Ins. Co., 177 F.R.D. 78, 81 (D.N.H. 1998)*. "Retained" ordinarily implies some consideration, a payment or reward of some kind, [**9] for services rendered. *Brown v. Best Foods, 169 F.R.D. 385, 388 n. 3 (N.D. Ala. 1996)*. At the same time, payment alone would not be dispositive, as professional standards in some areas may permit treating physicians to be compensated for time spent as a witness or at a deposition. Id. Moreover, counsel's characterization of whether an expert is "retained" for the litigation (rather than for treatment) is not conclusive. It is entirely possible that a plaintiff may commence a relationship with a physician both for purposes of treatment and to obtain a medical opinion that can be used in litigation. n5 See *Anthony, slip op. at 4-5*. The Court would need to know whether the treating physician developed his relationship with plaintiff -- and his opinions -- close in time to the litigation or at the request of counsel. *Riddick, 183 F.R.D. at 331*; *Anthony, slip op. at 4*. Indeed, it bears noting that plaintiff's complaint, filed approximately three years after her injury, mentions only Dr. Boden, and makes no reference at all to Dr. Feldman. Compl. PP 15, 18 (referencing Dr. Boden as her "treating physician," and further stating that "Ms. Kirkham's [**10] right ankle has been under the treatment and care of Dr. Boden, an orthopedic surgeon, from July 2000 to the present").

> n5 Thus, plaintiff's conclusory statements that Dr. Boden and Dr. Feldman were not "retained or specially employed to provide expert testimony" or "specially retained for purposes of this litigation" (Pl. Opp. at 1-2), standing alone, are not conclusive.

Second, a treating physician who testifies solely as to information learned from his actual treatment of a patient is not subject to the expert report requirement -- the written report requirement would apply, if at all, only to causation, prognosis, and permanency. See, e.g., *Sowell, 2004 U.S. Dist. LEXIS 24738, 2004 WL at *4* (requiring written report for treating physician's causation testimony, but not for testimony as to "observations, diagnosis or treatment"); *Sullivan, 175 F.R.D. at 508* (written report requirement does not apply to causation and prognosis testimony, but only if treating physician's opinion is based on facts [*13] "obtained [**11] from actual treatment"). Conversely, a treating physician who bases his opinion on the medical records of another physician, not just on his own examination of the patient, is

Case 1:05-cv-02115-CKK    Document 40-3    Filed 03/05/2007    Page 55 of 55
Page 4

236 F.R.D. 9, *; 2006 U.S. Dist. LEXIS 18998, **

required to prepare an expert report because such review indicates he is being retained in connection with the litigation. See, e.g., *Riddick, 183 F.R.D. at 331; Wreath, 161 F.R.D. at 450.*

Before deciding whether an expert report is required as to causation, prognosis, and permanency of injuries in this case, the Court needs the more detailed information described in the cases above, which is absent from the present record. This includes, as to each physician:

. Is he receiving compensation, or does he expect to receive compensation, for time spent preparing for testimony and/or providing testimony?

. When did he commence treatment of plaintiff?

. Has he prepared an opinion at the request of counsel or in connection with this litigation?

. Did he review the medical records of another care provider or information supplied by counsel in order to prepare his opinion? n6

. Is his opinion based solely on information learned from his actual treatment [**12] and care of plaintiff?

n6 Plaintiff's counsel states that the expert testimony "is limited to opinions gained in the actual treatment of Kirkham's injuries," citing plaintiff's expert designation in support of that statement. Pl. Opp. at 2. Plaintiff's designation does not contain such a limitation. In any event, this does not directly address the matter of what information was provided to each physician during the course of treatment.

This information is necessary to enable the Court to determine whether either expert has been "retained or specially employed to provide expert testimony in the case" as contemplated by *Fed. R. Civ. P. 26(a)(2)(B)*, and thus is required to file an expert report.

For the foregoing reasons, it is hereby

ORDERED that plaintiff shall submit responses to the foregoing questions by not later than April 20, 2006.

SO ORDERED.

/s/

JOHN D. BATES

United States District Judge

Dated: April 13, 2006