# EXHIBIT A

# Capitol Sprinkler Inspection, Inc.

DEPOSITION
EXHIBIT
_I Vane_
_KB 8-14-06_

6550 DOBBIN ROAD
COLUMBIA, MD 21045

Telephone

Maryland: (301) 982-1023
Baltimore: (410) 730-4711
Fax: (410) 740-2428
Emergency: (410) 494-5015

### Contract For Automatic Sprinkler Equipment Inspection Service

AGREEMENT made this ___22___ day of ___April___, 20 _02_ between the Capitol Sprinkler Inspection, Inc., hereinafter called the CONTRACTOR, and ___Guest Services c/o Galludet Conferenced Center 800 Florida Ave. NE___

___Washington, D.C.  20002-3695  Attn:  David Ham___ hereinafter called the SUBSCRIBER, for AUTOMATIC SPRINKLER EQUIPMENT INSPECTION SERVICE.

WITNESSETH, that:

Subscriber owns and or occupies the building(s) located on the premises known as ___Conference Center___

wherein there is now installed certain automatic fire extinguishing equipment, to wit: ___Perform Annual Trip Test on 2-4" Dry Pipe Valves___

The contractor shall inspect said installation ___Semi-Annually___.

The Subscriber shall pay to Contractor after first inspection has been made, and annually thereafter, the sum of ___Six Hundred Seventy Five Dollars, ($675.00)___

Such inspection Service shall cover the items specified on the reverse hereof and shall include supplying minor service type adjustments and replacements parts, provided that this shall not include extensions or alteration of the sprinkler system or the furnishing of replacement sprinkler heads or devices or any other major work.

If any equipment shall have been installed in addition to that existing at the date of this contract the annual inspection service charge above provided shall be increased in accordance with prevailing rates effective as of the first inspection of such additional equipment.

Notice of this agreement and copies of all inspection reports will be forwarded by the contractor to the insurance authority having jurisdiction _____.

The term of this agreement shall be one year from date hereof and thereafter until the same shall be terminated by either party on at least sixty (60) days advance written notice to the other. Notice of termination or change in number of inspections shall be given to the fire insurance authority by the Contractor.

It is understood that the Contractor by providing such inspection service and by making such adjustments as may be required does not warrant the condition or operation of the system inspected.

SUBSCRIBER:                    CAPITOL SPRINKLER INSPECTION, INC.

By _____    By _____

Date ___4/30/02___             Date ___April 22y 2002___

(over)                                        EF-20

## SCOPE OF SERVICES

- Inspect, test and service the fixed fire protection equipment                in a workmanlike manner in accordance with this contract, and the requirements of the National Fire Protection Association (NFPA) Care and Maintenance of Sprinkler Systems (No. 13-A) and American Insurance Association publication Recommended Method for Reporting Dry Pipe Valve Tests (No. 13-C). The service shall be performed                 and meet the requirements of the Insurance Rating Association. To guide in completing an inspection of the apparatus as installed, the Standard Sprinkler Equipment Report Form, as recommended by the Advisory Engineering Council of the American Insurance Association shall be followed in conjunction with the manufacturer's instructions for testing and servicing the equipment.

**Wet Systems - Alarm Valves**

Test alarms by opening the inspector's test connection when available. Otherwise, these may be made through by-pass test connection in conjunction with making a water flow test when facilities and conditions permit.

- Check cold weather valves and exposed piping to assure their proper conditions for winter and summer operation.

Test the solution in anti-freeze systems for satisfactory condition, as required in the Standard for the Installation of Sprinkler Systems (NFPA No. 13).

**Dry Systems - Dry Valves, Accelerators, Exhausters**

Test the alarms, both water flow and air if provided, and perform a water flow test through the drain connection when facilities and conditions permit.

Check air pressure, priming water level, latching arrangements, automatic drip connections when provided, and the general condition of the dry pipe valves, accelerators or exhausters, and their environment, including dry pipe valve rooms or enclosures.

- trip test dry pipe valves together with accelerators and exhauster if provided in accordance with standard testing and reporting procedures required by this Association.

- After testing, restore the system and the dry pipe valve to operation according to the manufacturer's instructions.

- Open condensation drains on drum drip connections and drain low points during fall and winter inspection.

**Special Systems - Water Deluge, Foam, CO-2, Dry Powder**

Test alarms when facilities and conditions permit according to the procedures suggested by the manufacturer(s) and/or as requested by the insurance authority having jurisdiction.

Test the detection or actuating system and accessory equipment according to the manufacturer's instruction and the requirements of the insurance authority having jurisdiction.

**Replacement Parts and Field Service Adjustments**

Provide and replace, when necessary, renewable rubber gaskets, rubber clapper facings, and renewable valve discs for control valves. Perform field service adjustments for all control and alarm devices.

**Reports:**

- A report of inspection, test results, services performed, and desirable improvements shall be completed on a Standard National Automatic Sprinkler and Fire Control Association Inspection Report Form, which shall be sent to the Subscriber; a copy shall be sent direct to the office of this Association having jurisdiction.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
(Civil Division)

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University<br>385 Washington Street,<br>St. Paul, MN 55102 | : : : : : | CASE NUMBER: |
| Plaintiff | : : | |
| vs. | : : | **JURY TRIAL DEMANDED** |
| CAPITOL SPRINKLER INSPECTION, INC.<br>6550 Dobbin Road<br>Columbia, MD 21045 | : : : : | |
| Defendant | : : | |

## COMPLAINT

Plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, by and through its undersigned counsel, hereby demands judgment against defendant, Capitol Sprinkler Inspection, Inc., and, upon information and belief, complains against defendant as follows:

## THE PARTIES

1.     Plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), is a corporation duly organized and existing under the laws of Minnesota with its principal place of business located at 385 Washington Street, St. Paul, Minnesota, and at all times material hereto was authorized to issue insurance policies in the State of Maryland.

2.     St. Paul's insured, Gallaudet University ("Gallaudet"), was at all times material hereto the owner of the Kellog Conference Center located at 800 Florida Avenue, N.E. Washington, D.C. ("the Conference Center").

3.     At all times material hereto, St. Paul insured Gallaudet for its real and personal property located at the Conference Center as well as for business interruption.

4.     Defendant, Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler"), is a corporation duly organized and existing under the laws of Maryland with a principal address of 6550 Dobbin Road, Columbia, Maryland, and at all times material hereto, was engaged in the business of, among other things, inspecting, testing and maintaining fire protection systems.

## JURISDICTION AND VENUE

5.  Jurisdiction of this Court is invoked under 28 U.S.C. §1332 in view of the parties' diverse citizenship and the amount in controversy which exceeds Seventy-Five Thousand Dollars ($75,000.00) excluding interest and costs of this action.

6.  Venue is properly laid in this judicial district because the events giving rise to plaintiff's claim occurred in it.

## FACTS

7.     At all times material hereto, there was a dry fire protection sprinkler system at the Conference Center ("the System").

8.     On or about April 22, 2002, Gallaudet contracted with defendant Capitol Sprinkler to do a semi-annual inspection of the System.

9.     On or about January 9, 2003, Capitol Sprinkler inspected the System.

10.     On or about January 9, 2003, Capitol Sprinkler certified that it had drained the valves and sprinkler lines in the System.

2

11.     On or about January 25, 2003, a pipe fitting in the System froze, thawed and ruptured allowing water to discharge throughout the interior of the Conference Center and causing substantial damage ("the Incident").

12.     It was later determined that the pipe froze because the drain valves in the System were not completely drained by defendant Capitol during its recent inspection.

13.     In accordance with the terms of the above referenced insurance policy, plaintiff, St. Paul, paid its insured, Gallaudet University, an amount in excess of Seven Hundred Thousand Dollars ($700,000), representing the fair and reasonable cost of repairing and replacing its damaged property at the Conference Center and compensating it for its business interruption.

14.     In accordance with the common law principles of legal and equitable subrogation, St. Paul is subrogated to the rights of its insured, Gallaudet University, regarding its claims against Capitol Sprinkler.

## COUNT I:    NEGLIGENCE

15.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though each were set forth fully herein at length.

16.     The Incident was caused by the negligence, carelessness, gross negligence and/or reckless disregard for Gallaudet's property by defendant Capitol Sprinkler and/or its agents, workmen and/or employees acting within the scope of their employment. This negligence, carelessness, gross negligence and/or reckless disregard for the property of others consisted of, among other things, the following:

3

a)    failing to act in a safe and proper manner with due regard for the safety and welfare of plaintiff's insured's property;

b)    failing to take all necessary precautions to prevent damage to plaintiff's insured's property;

c)    failing to properly inspect, test and maintain the System in accordance with applicable industry standards;

d)    failing to hire competent agents, workmen and/or employees to inspect, test and maintain the System;

e)    failing to properly and adequately drain the System after testing;

f)    violating applicable standards, codes and/or industry customs and practices, including but not limited to NFPA 25; and

g)    such other and further negligent acts and omissions which may be revealed through discovery.

17.    As a direct and proximate result of the aforesaid negligence, carelessness, gross negligence and/or reckless disregard for the property of others, plaintiff's insured suffered substantial water damage to its property and business interruption, for which plaintiff has reimbursed its insured.

WHEREFORE, plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, demands judgment against defendant, Capitol Sprinkler Inspection, Inc., in an amount in excess of Seven Hundred Thousand Dollars ($700,000), together with interest, costs, and other relief that this court deems just and equitable.

4

## COUNT II:    BREACH OF CONTRACT

18.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though each were set forth fully herein at length.

19.    On or about April 22, 2002, Gallaudet contracted with defendant Capitol Sprinkler to do a semi-annual inspection of the System.

20.    Under the terms of the aforementioned contract, Capitol Sprinkler agreed to "inspect, test and service the fixed fire protection equipment in a workmanlike manner in accordance with this contract, and the requirements of the National Fire Protection Association (NFPA) Care and Maintenance of Sprinkler System (No. 13-A) and American Insurance Association publication "Recommended Method for Reporting Dry Pipe Valve Tests (No. 13-C)."

21.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in a workmanlike manner.

22.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in accordance with the requirements of the contract.

23.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in accordance with the requirements of NFPA 13.

24.    As a direct and proximate result of the aforesaid breaches of contract, the Incident occurred resulting in substantial damage to plaintiff's insured's property and business interruption, for which plaintiff has reimbursed its insured.

WHEREFORE, plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, demands judgment against defendant, Capitol Sprinkler Inspection, Inc., in an amount in excess of Seven Hundred Thousand Dollars ($700,000), together with interest, costs, and other relief that this court deems just and equitable.

> Respectfully submitted,
>
> MESIROW & STRAVITZ, PLLC
>
> By: _____
> Eric N. Stravitz  (D.C. Bar #438093)
> 2000 Massachusetts Avenue
> Suite 200
> Washington, DC 20036
> (202) 463-0303
> (202) 861-8858 Fax
> strav@erols.com

Of Counsel
Cozen O'Connor
David J. Groth, Esquire
Daniel J. Luccaro, Esquire
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000
Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff hereby requests a jury trial.

_____
Eric N. Stravitz  (D.C. Bar #438093)

6

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(Civil Division)

ST. PAUL MERCURY INSURANCE :
COMPANY, as subrogee of Gallaudet :
University, 385 Washington Street, :
St. Paul, MN 55102 :
 :
   Plaintiff, :
 : Case No. 1:05CV02115
   v. :
 : **Trial by Jury Demanded**
 :
CAPITOL SPRINKLER INSPECTION, INC., :
6550 Dobbin Road, Columbia, MD 21045 :
 :
   Defendant. :

## ANSWER

   Defendant, Capitol Sprinkler Inspection, Inc., by and through the undersigned counsel, hereby opposes Plaintiff's Complaint for money damages and in support, states the following:

### THE PARTIES

   1.  Upon information and belief, admitted.

   2.  Capitol Sprinkler Inspection, Inc., (hereinafter referred to as "Capitol Sprinkler"), lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

   3.  Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

   4.  Capitol Sprinkler admits the averments set forth in this paragraph.

### JURISDICTION AND VENUE

   5.  Upon information and belief, admitted.

   6.  Upon information and belief, admitted.

DE050009.1

## FACTS

7.    Whereas Plaintiff has not defined "all times material hereto", Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

8.    Admitted.

9.    Upon information and belief, admitted.

10.    Whereas Plaintiff has not identified with specificity "the valves and sprinkler lines in the System," Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

11.    Admitted that on or about January 25, 2003, a pipe fitting failed, allowing water to discharge into the interior of the conference center.  Subject to the foregoing, denied.

12.    Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

13.    Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

14.    The averments of Paragraph 14 state a conclusion of law to which no response is required.

## COUNT I:  NEGLIGENCE

15.    Answering Defendant incorporates by reference as if fully rewritten herein, all of the admissions, denials and further answers contained in the foregoing paragraphs 1 through 14.

16.    Capitol Sprinkler denies the allegations in Paragraph 16 of Plaintiff's Complaint in full and as to each subpart.

17.    Capitol Sprinkler denies the allegations in Paragraph 17 of Plaintiff's Complaint.

DE050009.1

## COUNT II: BREACH OF CONTRACT

18.     Answering Defendant incorporates by reference as if fully rewritten herein, all of the admissions, denials and further answers contained in the foregoing paragraphs 1 through 17.

19.     Admitted.

20.     Admitted that Defendant Capitol Sprinkler agreed to *inter alia*, inspect, test and service the fire protection equipment in a workman-like manner in accordance with the contract and the requirements of the applicable NFPA and American Insurance Association Publication. Subject to the foregoing, denied.

21.     Capitol Sprinkler denies the allegations in Paragraph 21 of Plaintiff's Complaint.

22.     Capitol Sprinkler denies the allegations in Paragraph 22 of Plaintiff's Complaint.

23.     Capitol Sprinkler denies the allegations in Paragraph 23 of Plaintiff's Complaint.

24.     Capitol Sprinkler denies the allegations in Paragraph 24 of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

1.     Plaintiff's Complaint fails to state a claim upon which relief may be granted.

2.     Plaintiff knowingly and voluntarily assumed any and all risk associated with the matters alleged in the Complaint. Pursuant to the doctrines of assumption of the risk or informed consent, this conduct bars, in whole or in part, the damages that Plaintiff seeks to recover herein.

3.     Plaintiff's claims are barred because the damages alleged by Plaintiff were not proximately caused by any act or omission of Capitol Sprinkler Inspection, Inc.

4.     Plaintiff's claims are barred by the economic loss doctrine.

5.     Plaintiff's recovery, if any, is barred or reduced pursuant to the comparative negligence, fault, responsibility or causation of others, including, but not limited to, Plaintiff.

DE050009.1

6.    Plaintiff was negligent in that:

a)    It was unable to provide Defendant access to that part of the sprinkler system that failed;

b)    It's employee or agent failed to return to the fifth floor to complete the draining process on a particular drum drip to which Defendant was not given access; and

c)    It failed to reasonably monitor the system while impaired in violation of NFPA 25.

7.    Plaintiff was negligent in that it permitted the ambient temperature surrounding the subject system to drop to such levels as to permit liquids to freeze.

8.    Plaintiff's damages, if any, were caused in whole or in part by the acts and omissions of other entities over whom Capitol Sprinkler Inspection, Inc. had no authority or control.

9.    Plaintiff's claims are barred because any damages allegedly sustained by Plaintiff were the result of pre-existing or subsequent conditions that are unrelated to Capitol Sprinkler Inspection, Inc.'s performance.

10.    Plaintiff's claims are barred because any damages allegedly sustained by Plaintiff were the direct and proximate result of an independent, unforeseeable superseding or intervening cause.

11.    Plaintiff's claims are barred by reason of Plaintiff's failure to mitigate the alleged damages or losses.

12.    Should Capitol Sprinkler Inspection, Inc. be held liable to Plaintiff, which liability is specifically denied, Capitol Sprinkler Inspection, Inc. would be entitled to a set-off for the total of all amounts paid to Plaintiff from all collateral sources.

DE050009.1

13.    Plaintiff St. Paul Mercury Insurance Company lacks standing to pursue the subject cause.

14.    Plaintiff's claims are barred or reduced due to plaintiff's insured's failure to mitigate its damages.

15.    Defendant Capitol Sprinkler Inspection, Inc. requests that Plaintiff be denied the relief sought in its Complaint at law, and that Capitol Sprinkler Inspection, Inc. be dismissed from this action and awarded costs together with any additional relief that the Court deems just and proper.  Capitol Sprinkler Inspection, Inc. reserves the right to supplement its Answer and affirmative defenses with additional defenses that may become available or apparent during the course of investigation, preparation or discovery, and to amend its Answer accordingly.

**WHEREFORE,** Capitol Sprinkler Inspection, Inc. prays for relief and judgment against Plaintiff as follows:

A.    that Plaintiff takes nothing by reason of Plaintiff's Complaint;

B.    that this action be dismissed with prejudice;

C.    that Capitol Sprinkler Inspection, Inc. recover its fees, costs and attorney fees incurred herein; and such further and other relief as the Court deems proper.

Respectfully submitted,

*/s/ Donald R. Kinsley*
Donald R. Kinsley, Esquire, D.C. Bar No.432998
Marks, O'Neill, O'Brien & Courtney, P.C.
913 North Market Street, #800
Wilmington, DE 19801
(302) 658-6538
*Attorney for Defendant*

DATED:  January 16, 2006

DE050009.1

# EXHIBIT D

## Capital Reporting Company

Page 1

```
 1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - X

 3   ST. PAUL MERCURY INSURANCE      :

 4   COMPANY, as Subrogee of         :

 5   Gallaudet University,           :

 6            Plaintiff,             :

 7      v.                           : Case No.:

 8                                   : 1:05-cv-02115

 9   CAPITOL SPRINKLER               :

10   INSPECTION, INC.,               :

11            Defendant.             :

12      - - - - - - - - - - - - - - X

13                        Washington, DC
                         Monday, August 14, 2006
14   Deposition of:
                         VERNON VANE
15   called for oral examination by counsel for

16   Plaintiff, pursuant to Notice, at the Law Office

17   of Mesirow and Stravitz, 2000 Massachusetts

18   Avenue, NW, Washington, DC, before Kim Brantley of

19   Capital Reporting, a Notary Public in and for the

20   District of Columbia, beginning at 10:08 a.m.,

21   when were present on behalf of the respective

22   parties:
```

Page 6

1  you cannot use hand gestures or anything else to
2  respond to a question, because the answers have to
3  be written up in a transcript of this deposition,
4  and the court reporter can only take down what you
5  say.  So no uh-huh's , uh-uh's or anything like
6  that, which don't come across in a transcript.  A
7  yes, no or narrative answer to a question, please.
8        Please allow me to complete the
9  question before you begin your answer for two
10  reasons: Number one, so that you know exactly what
11  it is I'm asking you before you begin your answer,
12  even if you think you may know where I'm going to,
13  and number two, so that the court reporter only
14  has to take down one of us speaking at a time.
15        Again there is going to be a typed
16  transcript of everything that is said in the
17  deposition and she can't make an accurate
18  transcript if we are talking over each other.  So
19  I will attempt to allow you to answer the question
20  fully before I begin my next question and you
21  again wait till I'm done asking the question
22  before you begin your answer.  Please don't guess

Page 7

1  or speculate or assume anything in response to a
2  question.  I don't know what you know and what you
3  don't know.  I may ask you about things of which
4  you have no knowledge.  If that's a case, just
5  tell me that and that will be a sufficient answer.
6  You're here as a fact witness.  You are supposed
7  to tell us what you have seen or heard or have
8  been told, but you do not have to guess or
9  speculate in response to an answer.  Nobody
10  expects you to know the answer to every question
11  that you are asked.  If there is an objection to a
12  question that I ask you, from your counsel, allow
13  him to state the objection or Guest Services'
14  counsel.  Allow them to state the objection for
15  the record and then proceed to answer the question
16  unless your counsel, your counsel, specifically
17  instructs you not to answer the question.  I may
18  ask you for things such as dates, time of day,
19  distance between two objects and maybe you can't
20  give me an exact answer, but you can estimate or
21  approximate distance between certain objects or
22  time of day or something like that.  If you are

Page 8

1  going to estimate or approximate in an answer,
2  just tell us that, that you are doing it, because
3  any information you give may be helpful, even if
4  it's not an exact measurement or time or thing or
5  something like that, but it could be helpful.  So
6  just tell us when you are doing it and it will be
7  sufficient.  If you need to take a break for any
8  reason or would like to discuss something with
9  your counsel during the deposition, just let me
10  know and we will stop the deposition and we will
11  take a break or you can have a discussion with
12  your counsel off the record.  Do you have any
13  questions so far?
14     A.  No.
15        MR. GROTH:  Have we agreed to reserve
16  all objections for trial except for --
17        MR. FOSTER:  One more time.
18        MR. GROTH:  Reserve all objections for
19  questions except as to form, reserve all
20  objections for relevancy and form of question and
21  whatever.
22        MR. FOSTER:  I'll object to form,

Page 9

1  that's fine.
2        MR. BROOKS:  That's fine.
3        MR. GROTH:  Reading and signing; do you
4  want the witness to read and sign?
5        MR. BROOKS:  We will want to read.
6  BY MR. GROTH:
7     Q.  That just means at the end of the
8  deposition you will be provided with a copy of the
9  transcript, which you will be able to review and
10  make notes on.  It's called an errata sheet, based
11  upon line and page whether or not you think the
12  court reporter got your answer correctly and not
13  to correct the transcript if there is something
14  wrong with it.  All right?
15     A.  Very well.
16     Q.  Mr. Vane, where do you live?
17     A.  Sparks, Maryland.
18     Q.  What's the address?
19     A.  15616 Chilcoat Lane.
20     Q.  By whom are you employed?
21     A.  Capitol Sprinkler.
22     Q.  What is your position?

3 (Pages 6 to 9)

## Capital Reporting Company

Page 10

1    A.   Supervisor of inspections.
2    Q.   What office do you work out of?
3    A.   Columbia.  We only have one.
4    Q.   How long have you worked for Capitol?
5    A.   Twenty-three years I think.  It's a
6  little vague.
7    Q.   Close enough.  How long have you been
8  supervisor of inspections?
9    A.   Probably about fifteen years, sixteen
10  years.
11    Q.   What did you do for Capitol before
12  that?
13    A.   I was a pipe fitter, journeyman, pipe
14  fitter, installer, job foreman.
15    Q.   In 2002, 2003, how many employees did
16  Capitol have?
17    A.   Capitol Sprinkler?
18    Q.   Yes, approximately.
19    A.   Oh, approximately probably sixty to
20  seventy, somewhere in that range.
21    Q.   Are there different departments in
22  terms of installations and repairs and

Page 11

1  inspections?
2    A.   No, just inspections and then
3  installations.
4    Q.   Installations.
5    A.   Right.
6    Q.   And would it be correct that the
7  installers are not generally the people who do the
8  inspections, but a separate group of people?
9    A.   That's true, yes.
10    Q.   And back in 2002, 2003, approximately
11  how many people were there who did inspections,
12  testing?
13    A.   Myself and -- in 2003?  Two other guys.
14    Q.   Who were the others?
15    A.   Virgil Poplin.
16    Q.   Can you spell the last name?
17    A.   P-o-p-l-i-n and Rudy Cooper.
18    Q.   What are these people called who do
19  inspections?  Is there a name that the company
20  uses to identify them?
21    A.   No.
22    Q.   Mechanics, technicians, inspectors?

Page 12

1    A.   Yes, inspectors would be a general
2  term, yes.
3    Q.   And were all the rest of the employees,
4  field employees, installers?
5    A.   Basically, yes.
6    Q.   Is there an employee named Mike Bowlin?
7    A.   Yes.
8    Q.   Working for Capitol back in 2003?
9    A.   Yes.
10    Q.   What position was he in?
11    A.   At that time he was just starting
12  inspections.
13    Q.   What do you mean just starting
14  inspections?
15    A.   Well, I mean he had been doing it --
16  I'm trying to think, when did he start?  Mike came
17  out of the field and came to work in inspections,
18  and so he was making the transformation.
19    Q.   The transition?
20    A.   The transition, right.
21    Q.   So he was a former installer?
22    A.   Yes.

Page 13

1    Q.   What about Tom Scott?
2    A.   Tom was just a hiree.  I worked with
3  Tom who was just a hiree that worked with Mike.
4    Q.   What is a "hiree"?
5    A.   Just, let's say a helper.
6    Q.   You mean a laborer?
7    A.   No, a helper, who did labor and
8  assisted.
9    Q.   He wasn't a former installer?
10    A.   No.
11    Q.   How new was he to the company?  How
12  long had he worked there as of January of 2003?
13    A.   He had probably been there about a
14  year.  I'm not real sure.
15    Q.   What do helpers do?
16    A.   They assist with the inspections and
17  testing.
18    Q.   And what kind of work do they actually
19  do?
20    A.   Well, like Mike would be at the panel,
21  because you have to verify that things work.
22    Q.   Right.

4 (Pages 10 to 13)

# Capital Reporting Company

Page 46

A. When they do the billing they send the white copy.

Q. And do you send a copy of that to any other entity?

A. Some of them I send to insurance companies, but they -- when they request it.

Q. What about any code enforcement people?

A. No.

Q. I think there's something in some contract that I read somewhere about sending a copy of this stuff to authority having jurisdiction? Do you remember that term?

A. Oh, yeah.

Q. Who is the authority having jurisdiction for this particular location?

A. I don't know.

Q. Did Capitol ever send a copy of the inspection reports to any authority having jurisdiction?

A. No, just to the ones --

Q. The customer?

A. The ones that I named, yes.

Page 47

Q. The customer and perhaps the insurance company?

A. No, no insurance company.

Q. Not for this customer?

A. Not for this one.

Q. Okay.

MR. GROTH: Let's just mark a couple of these documents while we're talking about them.

BY MR. GROTH:

Q. I'm going to show you a document which I'll mark Vane Exhibit 1.

(Vane Exhibit 1 was marked for identification.)

BY MR. GROTH:

Q. At the top it says Capitol Sprinkler Inspections, Inc. It's a two-page document. Have you ever seen that document before?

A. Yes.

Q. What is it?

A. It's our standard form contract. Actually this is the back page (indicating).

Page 48

Q. I was going to ask you that. The second page, which is the separate second page, is actually the reverse side of the first page. Is that correct?

A. That's correct.

Q. And you signed this contract on behalf of Capitol Sprinkler?

A. I did.

Q. Is that one of your functions also, to go out and actually sell jobs or get customers?

A. I serve them, yes, yes.

Q. You see an opportunity you follow up on it?

A. Yes.

Q. Do you know who signed on behalf of the subscriber?

A. I don't know who that gentleman is. I have done certain -- it doesn't appear to be David Ham's.

Q. That's why I asked.

A. I don't know. I looked at that this morning.

Page 49

Q. On the second page, Scope of Services, it says, "As part of the contract, after testing, restore the system and the dry pipe valve to operation according to the manufacturer's instructions."

Is that correct?

A. That's correct.

Q. You have seen this before, right?

A. Yes.

Q. And you know what I am talking about. And under that it says "Open compensation drains on drum trip connections and drain low points during fall and winter inspection." That right?

A. That's correct.

Q. That is the work that's supposed to be done by Capitol Sprinkler's people when they are at the job site. Is that correct?

A. That's correct.

Q. It doesn't say anybody else is supposed to do this work. Is that correct?

A. No.

Q. That is correct? It does not say that?

13 (Pages 46 to 49)

## Capital Reporting Company

Page 50

1     A. That's correct, yes.

2     Q. This is what I was asking you about,

3 where these reports go. It says, "Report of

4 inspection, test results, services performed and

5 so on shall be completed on a standard National

6 Automatic Sprinkler and Fire Control Association

7 inspection report form which shall be sent to the

8 subscriber. A copy shall be sent direct to the

9 office of this association having jurisdiction."

10     What does that mean?

11     A. I don't know.

12     Q. Okay. And when you say you provided it

13 to the subscriber, are you talking about to Guest

14 Services?

15     A. Whoever we contract with, yes.

16     MR. GROTH: I'm going to mark another

17 document as Vane Exhibit 2.

18     (Vane Exhibit 2 was

19     marked for

20     identification.)

21 BY MR. GROTH:

22     Q. At the top it says Capitol Sprinkler

Page 51

1 inspection, Inc., it has no other identifying

2 information except a date, July 2nd, 2002.

3     What is that document, Mr. Vane?

4     A. That's the trip test for systems one

5 and two.

6     Q. What are systems one and two?

7     A. The two dry systems on the fifth floor

8     Q. Do those systems each have their own

9 dry pipe valve --

10     A. Yes.

11     Q. And drum drips?

12     A. Yes.

13     Q. But you only do one report for both --

14 oh, I see both are listed --

15     A. System one and system two.

16     Q. Okay, I got it. You're familiar with

17 the incident in question, are you not?

18     A. Yes, I am.

19     Q. The water leak situation, in January of

20 2003. Which system was it where the leak

21 occurred? One or two?

22     A. I don't know.

Page 52

1     Q. You can't tell from the document?

2     A. No.

3     Q. In the checklist of items here, is

4 there any item of the sixteen that are listed here

5 that refers specifically to draining the drum

6 drips after the test is done?

7     A. No.

8     Q. Is there anyone of those sixteen items

9 that would include, even though not referenced by

10 name, include the draining of the drum drips?

11     A. No.

12     Q. Isn't that something that has to be

13 done, by the inspector?

14     A. Drain the drum drips?

15     Q. Yes?

16     A. Yes.

17     Q. Why is there no check line for that?

18 Let me rephrase that. Why is there no number for

19 that item that has to be done?

20     A. We just do it and if we have a problem

21 with it, we note it on the problem.

22     Q. Let's talk about that for a second.

Page 53

1 If for some reason you cannot do the work --

2     A. Right.

3     Q. In general, not just Gallaudet, in

4 general if you cannot do the work that you are

5 contracted for to do, some part of the system is

6 inaccessible, maybe there is some construction

7 work or something that would impede you from doing

8 the work, but you did go out and do some of the

9 work, would you generally put some kind of

10 notation in this area of the bottom of the form

11 that says "deficiencies" and says what you did do

12 and what you didn't do and why you wouldn't do it?

13     A. Yes.

14     Q. That would be your practice, right?

15     A. Yes.

16     Q. Is that what you instruct your helpers

17 to do also?

18     A. Yes.

19     Q. And obviously for this visit on July

20 2nd, 2002, on Vane Exhibit 2, there were no

21 deficiencies. Everything was done as it was

22 supposed to be done. Is that correct?

14 (Pages 50 to 53)

# Capital Reporting Company

Page 54

1     A.  Yes.
2     Q.  This number eleven on this sheet says
3  "Air compression operates improper pressure."
4       Is that something that's tested after
5  the system is drained and recharged with air?
6     A.  Well, once you trip the system, then
7  after you reset the valve and close all the
8  drains, then you start the air compressor up and
9  refill the air in the system.
10    Q.  Do you start the air compressor up
11 after you drain the drum drips?
12    A.  Yes.
13    Q.  So basically you have to drain the drum
14 drips before you put the air compressor on,
15 otherwise the pipes are all still filled with
16 water?
17    A.  Exactly.
18    Q.  So even though draining the drum drips
19 isn't specifically listed on the sixteen, it has
20 to be done --
21    A.  It's procedure.
22    Q.  It has to be done in order to allow you

Page 55

1  to do some of these other things?
2     A.  Yes.
3     Q.  I'm going to mark as Vane Exhibit 3
4  another document dated January 9th, 2003.  It
5  looks like another inspection report.
6          (Vane Exhibit 3 was
7            marked for
8            identification.)
9  BY MR. GROTH:
10    Q.  Can you tell me what that is?
11    A.  Right.  That's just the winter check.
12 They came in, checked the air pressure.
13    Q.  Is the winter check any different from
14 the summer check?
15    A.  There is no tripping of the valves.
16    Q.  The dry pipe valves?
17    A.  Right.  You just do them in the warmer
18 weather.  This is basically to make sure that the
19 water's turned on.  I mean, and the compressor
20 runs and so forth.
21    Q.  Are you saying then that in January of
22 2003 for that inspection that the sprinkler pipes

Page 56

1  are not charged with water?
2     A.  No.
3     Q.  In the dry pipe system?
4     A.  No, they're not tripped, no.
5     Q.  They are not?
6     A.  No.
7     Q.  So the last time these system -- the
8  dry pipe systems, the two dry pipe systems?
9     A.  Right, just dry.
10    Q.  Would have been tripped and tested
11 after filling them with water where the drum drips
12 would have had to have been drained would have
13 been in July of 2002.  Is that correct?
14    A.  That's correct.
15    Q.  And would it also be correct that in
16 January of 2003 it would not be necessary for the
17 inspector or the helper to drain the drum drips
18 because they're not charging the system with
19 water?
20    A.  It is necessary.
21    Q.  Why is that?
22    A.  To make sure there is no water in them.

Page 57

1     Q.  Why should there be any water in them
2  if you drained them -- hold on a second.
3          Why should there be any water in the
4  system if you drained the system properly in July
5  of 2002?
6     A.  One problem is condensation.
7     Q.  What causes that?
8     A.  Hot and cold in the attics, all those
9  pipes up there.
10    Q.  Right.
11    A.  It's a hundred and twenty in the
12 summer, and whatever in the winter.
13    Q.  Right.
14    A.  And then also any residual water that's
15 left in the system from the drain in July.
16    Q.  Is there some mathematical computation
17 that can be done to calculate how much
18 condensation you would normally get in a system
19 like this over a period of time?
20    A.  None that I'm aware of.
21    Q.  What do you drain the water into, if
22 you find something?

15 (Pages 54 to 57)

## Capital Reporting Company

Page 58

1   A.  In this particular case, the drains are
2   all connected to -- because of their location,
3   they're all piped out and into a central drain
4   somewhere in the building.
5       Q.  So you open the drum drip and it goes
6   right into a drain?
7       A.  Exactly.
8       Q.  Can you see the water moving?
9       A.  No.
10      Q.  It goes right through the pipes?
11      A.  Right through the pipes.
12      Q.  How do you know when it's completely
13  drained?
14      A.  You'll hear a change -- say you listen
15  for it, and it's just -- and when it's full of
16  water.  You'll hear the gurgling and the water
17  running and so forth, and then as you get to the
18  end you'll hear a lot of hissing and at that point
19  we typically -- I do, and everybody else did, we
20  shut the top valve.  I mean, close the bottom
21  valve and open the top valve after that and just
22  then try it two or three times, just letting it up

Page 59

1   and down.  In other words, the top valve, if there
2   is any more water coming, it will collect in the
3   cylinder.
4       Q.  Right?
5       A.  And you close that and open the bottom.
6   And we used to do that two or three times, till we
7   get a blow of air and the blow, you could hear it,
8   it's obvious.
9       Q.  Okay.  So, even though you don't do the
10  trip test in the winter, you still have to drain
11  the drum drips for the reasons you mentioned,
12  condensation and maybe some left over residual
13  water from the last inspection, correct?
14      A.  Yes.
15      Q.  Were there any problems that were
16  detected in the July of 2002 in that inspection
17  where the dry pipe valve or the compressor?
18      A.  No.
19      Q.  Do you know whether or not in the
20  January 9, 2003 inspection there were any problems
21  detected with the drum pipe valve or compressor?
22      A.  None that -- no.  I don't know.

Page 60

1       Q.  If there was some problem, should that
2   have been noticed?
3       A.  That would have been on there, yes.
4       Q.  Should it have been noted on the
5   deficiency part of the form?
6       A.  Yes, it would.
7       Q.  And you don't see anything there?
8       A.  Correct?
9       A.  Correct.
10      Q.  Have you ever been told by anybody
11  there was some problem with the compressor or dry
12  pipe valve?
13      A.  No.
14      Q.  So you have no facts or reason to
15  believe there was a problem with that in January
16  of 2003, correct?
17      A.  Correct.
18      Q.  Who assigned Mr. Bowlin and Mr. Scott
19  to do this inspection in January of 2003?
20      A.  I did.
21      Q.  Did you have any discussion with them
22  about this particular job before they went out and

Page 61

1   did it?
2       A.  No.
3       Q.  Did Mr. Bowlin or Mr. -- I'm sorry, Mr.
4   Scott wasn't there in July, did Mr. Bowlin ask you
5   any questions about the job?  He had only been
6   there one time previously, correct, in July?
7       A.  Yes.
8       Q.  Did he ask you any questions before he
9   went out there?
10      A.  No.
11      Q.  During the inspection, during the
12  course of the inspection, did Mr. Bowlin or Mr.
13  Scott in January of 2003, call back to the office
14  for any instructions, advice, guidance?
15      A.  No.
16      Q.  Did you have any discussion with Mr.
17  Bowlin or Mr. Scott about this job after they
18  completed it in January of 2003, before the leak
19  occurred?
20      A.  No.
21      Q.  About how long does it take to do this
22  job at Gallaudet, I'm just talking about the dry

16 (Pages 58 to 61)

Page 82

A.   Terminated it.

Q.   Now, after that visit, your visit a few days after the loss to Gallaudet, did you speak to Bowlin or Scott concerning their last inspection?

A.   No, I don't think I did.  I don't recall.

Q.   Did you have any reason to believe during your visit to the building after the leak took place that it might have been related somehow to the last inspection that was done by Capitol a couple of weeks before?

A.   Well Craig had said that they hadn't -- you know, being what it was, a freeze-up and a break, that apparently, you know, it wasn't drained, and then, of course, we at that point -- that's what it was.

Q.   Did Craig Parham speak to Bowlin or Scott about their last inspection?

A.   I believe he did, yes.

Q.   Did you speak to Parham about that conversation, what he was told by Bowlin and Scott?

Page 83

A.   I think I was there when we had a little discussion about it.

Q.   You brought him into the office to talk about it?

A.   Yes.

Q.   And was this short in time after you visited the building, after the leak took place?

A.   Yes, it was within the next week to ten days, I would say.

Q.   And why did you call him in?  Why did you call Bowlin and Scott in?

A.   Well, we just happened to be in that morning and Craig came in, as I recall that situation, and we just talked about it that morning.  We didn't bring him in specifically for that.

Q.   Well, I know they didn't come in to work that day just to meet with you guys, but you called them in for a reason to talk with them about their inspection, correct?

A.   Whether we all talked about it?

Q.   Yes.

Page 84

A.   No, it was the regular workday and it was early in the morning and we were all in there.

Q.   But there is a topic that you wanted to address with these guys directly?

A.   Oh, yes.

Q.   And was anybody there besides you, Parham, Bowlin and Scott?

A.   That was all.

Q.   And tell me about the conversation.  What questions were they asked and what answers did they give you?

A.   Well, we just -- I'm sure it was Craig asked that, you know, why it didn't get done, and that made the remark that had one notation been made on that paper over there.  So it's important that we write down things, make notations.

Q.   Well, let's go through this a little bit more in detail.  First of all, you and Mr. Parham spoke with Bowlin and Scott together, right, not separately?

A.   As far as I recall they were the only ones there.

Page 85

Q.   Is that the first knowledge that Bowlin and Scott had that the incident occurred?

A.   I don't recall.

Q.   Did Bowlin and Scott know before this meeting that somebody was questioning why this area wasn't drained?

A.   I'm sure that they did know that.  I mean, I didn't say anything to them, but I'm sure that once they heard about it that, you know, and knew where it was --

Q.   It may have also crossed their minds?

A.   Yes.

Q.   Did somebody ask them if they drained all of the drain points after they did the testing?

A.   Yes, we did.

Q.   And what did they say?

A.   That the fellow that was with them did not have the key to get into that location and something to the effect that he would take care of it later when he got the key.

Q.   Do you know who gave that information?

22 (Pages 82 to 85)

# Capital Reporting Company

Page 94

1    A.  Well, we discussed that and nobody
2  could come up with a name.  I mean, we just didn't
3  know.
4    Q.  Well, eventually somebody came up with
5  a name.  Isn't that correct?
6    A.  Yes.
7    Q.  In your Answers to Interrogatories,
8  there is a name?
9    A.  Right.
10    Q.  Where did the name come from?
11    A.  That's the guy that signed off on
12  the -- that signed off on the receipt.  When I
13  brought -- I can't remember we brought it down or
14  sent it down, but anyway the broken fittings in
15  the sprinkler head they wanted.
16    Q.  Yes.
17    A.  Was given to him and he signed off for
18  that.
19    Q.  That's Mr. Hubbard?
20    A.  Hubbard, yes, and we're not -- we're
21  surmising that possibly he was the gentleman that
22  was --

Page 95

1    Q.  What's the basis of that surmise?
2    A.  Just somebody that -- he seemed to fit
3  the general description that we both -- or we all
4  had.
5    Q.  So Mr. Bowlin and Mr. Scott didn't
6  point this guy out to somebody and say he's the
7  guy that was there that day?
8    A.  No.
9    Q.  Did they ever go back there for any
10  reason that you know of to the Gallaudet building
11  after the leakage?
12    A.  No.
13    Q.  And as I understand it, at some point
14  after this incident, when the repairs were done,
15  Capitol took with it the ruptured fitting?
16    A.  Yes.  Craig left -- he had brought them
17  with him.
18    Q.  Right.
19    A.  That night, and left them with me.
20    Q.  Right.
21    A.  And just -- I just said, well, we'll
22  hang on to these.

Page 96

1    Q.  Right.
2    A.  And then somebody requested them, so I
3  took them -- I believe I brought them down and
4  dropped them off to them.
5    Q.  But that was some time later?
6    A.  Within the next week or so I think.
7    Q.  Okay.
8    A.  I got a sheet with a date on it, yeah,
9  a transmittal.
10    Q.  Do you have it with you?
11    A.  No, I didn't bring it with me.
12    Q.  Do you know what the approximate date
13  was?
14    A.  No, I don't recall.
15    Q.  This was the end of January.  Was it
16  some time in the beginning of February?
17    A.  I don't recall.
18    Q.  And why did somebody, to your
19  understanding, why did somebody request that you
20  give them the fitting that broke?
21    A.  I assume that their insurance company
22  or someone asked for it.

Page 97

1    Q.  Okay.  Was there any doubt in anybody's
2  mind at Capitol that this fracture took place
3  because of freezing of water in the line that
4  should not have been there?
5    A.  No, it's obvious.
6    Q.  Everybody knew it, right, correct?
7    A.  Correct.
8    Q.  There was no attempt to find out any
9  other cause for this fracture, other than what had
10  appeared just by looking at it, that it froze and
11  broke?
12    A.  Just by looking at it.
13    Q.  You saw other frozen fittings and
14  broke?
15    A.  Oh, yes.
16    Q.  Years as an installer, you know what
17  they look like, right?
18    A.  Exactly.
19    Q.  Are you aware of any facts or
20  information to indicate that Gallaudet University
21  did anything to cause or contribute to cause this
22  pipe rupture?

25 (Pages 94 to 97)

# EXHIBIT E

# *Capitol Sprinkler Inspection, Inc.*

6550 DOBBIN RD.
COLUMBIA, MD. 21045

**TELEPHONE**
Maryland: (301) 982-1023    Fax: (410) 740-2428
Baltimore: (410) 730-4711    Emergency: (410) 494-5015

Building Name _Gallaudet Conf. Center_    Type of Occupancy _Attic Area_

Address _____

Central Station Supervision By _____    Type of System: Wet _____ Dry ✓

Supervision Phone No. _____

*Winter Check*

| | YES | N.A.* | NO** |
|---|---|---|---|
| 1. Are all areas completely sprinkled | ✓ | | |
| 2. Is system in good condition and in service | ✓ | | |
| 3. Are additions or building changes properly protected | ✓ | | |
| 4. Are all areas and valves protected from freezing | ✓ | | |
| 5. Are all control valves open, tagged and sealed   *Tamp Sw* | ✓ | | |
| 6. Are cold weather valves open | ✓ | ✓ | |
| 7. Are extra heads and wrench provided | ✓ | | |
| 8. Are sprinklers blocked by stock, partitions or other obstructions | | | ✓ |
| 9. Is fire pump operational, tested periodically and maintained | ✓ | | |
| 10. Are alarm valves, flow switches, motor gong operational   *Pre Sw.* | ✓ | | |
| 11. Air compressor operates and proper air pressure | ✓ | | |
| 12. Quick opening devices in service and operational | ✓ | ✓ | |
| 13. Dry valves protected from freezing | ✓ | | |
| 14. Fire Department Connections, couplings, caps, balldrip | ✓ | | |
| 15. Note below other conditions or deficiencies needing correction | ✓ | | |
| 16. Operate Inspectors Test and 2" drain valves. Enter results below. | | | |

| System # | Static | Residual | Bell Time | Air Pressure | Air Pressure At Trip | Time of Trip At Valve | Time of Water At Test Pipe | With Q.O.D. | Without Q.O.D. |
|---|---|---|---|---|---|---|---|---|---|
| System #1 | | | | 45 psi | | | | | |
| | 150 psi jockey pump | | | | | | | | |
| System # | Fire pump | | | 44 psi | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Deficiencies: _____
_____

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
3 Vane
KB 8-14-06

Date: _Jan. 9 2003_    Inspected and Tested By: _M. Bowlin_
                                                   _T. Scott_

*   Not Applicable
**  Explain any "No" answers above (except No. 8)

# EXHIBIT F

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - - X

 3   ST. PAUL MERCURY INSURANCE      :

 4   COMPANY, as Subrogee of         :

 5   Gallaudet University,           :

 6            Plaintiff,             :

 7       v.                          :  Case No.:

 8                                   :  1:05-cv-02115

 9   CAPITOL SPRINKLER               :

10   INSPECTION, INC.,               :

11            Defendant.             :

12      - - - - - - - - - - - - - - - - X

13                        Washington, DC
                          Monday, August 14, 2006
14   Deposition of:

15            MICHAEL BOWLIN

16   called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Law Office

18   of Mesirow and Stravitz, 2000 Massachusetts

19   Avenue, NW, Washington, DC, before Kim Brantley of

20   Capital Reporting, a Notary Public in and for the

21   District of Columbia, beginning at 1:45 p.m., when

22   were present on behalf of the respective parties:
```

## Capital Reporting Company

Page 50

```
      valve, and then close the end valve and drain it
      so you can maintain air pressure?
   3      A.  Yes.
   4      Q.  Is that the way you normally did it,
   5  the winter check?
   6      A.  Yes.
   7      Q.  Do you recall doing it that way on
   8  January 9th, 2003?
   9      A.  Yes.
  10      Q.  Now did you drain, you and Mr. Scott,
  11  drain all of the drain points during the January
  12  9th 2003 inspection?
  13      A.  All but the one in that room.
  14      Q.  The one above conference room 5200?
  15      A.  Correct.
  16      Q.  As is listed in this interrogatory
  17  answer.  It says "One drum drip is located in the
  18  ceiling of conference room 5200."  That's the one
  19  that you did not drain.
  20      A.  Correct.
  21      Q.  Were you supposed to drain that drain?
  22      A.  Yes.
```

Page 51

```
   1      Q.  Why were you supposed to drain that
   2  drain?
   3      A.  Because it's part of the dry system and
   4  has a drum drip above it.
   5      Q.  And you drained that drain in July of
   6  2002?
   7      A.  Yes.
   8      Q.  Why didn't you drain the drain in
   9  January of 2003?
  10      A.  Because I did not have access to the
  11  room.
  12      Q.  Why did you have access?
  13      A.  The gentleman that was with us did not
  14  have a card access to let us into the room.
  15      Q.  This is the same gentlemen that had the
  16  card in July of 2002?
  17      A.  Correct.
  18      Q.  Describe to me the conversation you had
  19  with this gentleman regarding getting access to
  20  that room.  Tell me what you said.  Tell me what
  21  he said.
  22      A.  We were going to the room and when we
```

Page 52

```
   1  got to the room he says, "I don't have a card.  I
   2  have to go down stairs and get the card for the
   3  access."
   4      Q.  And how far is is downstairs from where
   5  you were?
   6      A.  We're on the fifth floor.
   7      Q.  What did you do?  Take the elevator
   8  down?
   9      A.  You have to take the elevator down and
  10  go to the front desk.
  11      Q.  And how long would you suppose it would
  12  have taken him to go down, get the elevator and
  13  get the card and come back up?
  14      A.  Five minutes, ten minutes.
  15      Q.  Five, ten minutes?
  16      A.  Um-hum.
  17      Q.  What kind of distance are we talking
  18  about?
  19      A.  However long it takes him to get to the
  20  elevator, go downstairs to the front desk, or
  21  however fast the elevator runs.
  22      Q.  Did he say why he didn't have the card
```

Page 53

```
   1  with him?
   2      A.  He hadn't checked out a card -- no, he
   3  didn't say why he didn't have a card.
   4      Q.  Did he offer to go down and get the
   5  key -- get the card?
   6      A.  No.
   7      Q.  Was this drum drip that had to be
   8  drained above this conference room the first, last
   9  or one of the middle drains that you were doing?
  10      A.  The last.
  11      Q.  It was the very last drain?
  12      A.  The very last drain.
  13      Q.  Was this the last drain that you had to
  14  do in order to complete this drum?
  15      A.  Right.
  16      Q.  Did you have to go back to the control
  17  room or turn any other valves or do any other work
  18  in order to get the system reset?
  19      A.  I would have to go back to the account
  20  room to leave my paperwork.
  21      Q.  That was it?
  22      A.  That was it.
```

14 (Pages 50 to 53)

# EXHIBIT G

Page 1

1    UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - X

3    ST. PAUL MERCURY INSURANCE        :

4    COMPANY, as Subrogee of           :

5    Gallaudet University,             :

6              Plaintiff,              :

7         v.                           : Case No.:

8                                      : 1:05-cv-02115

9    Capitol Sprinkler                 :

10   INSPECTION, INC.,                 :

11             Defendant.              :

12   - - - - - - - - - - - - - - - X

13                      Washington, DC
                       Monday, August 14, 2006
14   Deposition of:

15              CRAIG PARHAM

16   called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Law Office

18   of Mesirow and Stravitz, 2000 Massachusetts

19   Avenue, NW, Washington, DC, before Kim Brantley of

20   Capital Reporting, a Notary Public in and for the

21   District of Columbia, beginning at 3:45 p.m., when

22   were present on behalf of the respective parties:

Page 42

1 the building people to do that, yes.
2     Q.  That's part of the winter service, to
3 drain the drum drains?
4     A.  We provide a service to all our people
5 to go back in the winter and check the systems.
6 That is not necessarily draining drum drains.
7 That is preliminarily going to that dry system,
8 making sure that the air compressor is working
9 properly, making sure that the pressures are
10 correct, and in many instances, not here, making
11 sure that there is even a note about heat the
12 areas, making sure that the air compressor and the
13 dry system on a condition space, of course quite
14 often I use a strip mall entrance. It's a
15 separate room and I will go in and the heater will
16 be burned up and then the drum drain is not part
17 of what I would check.
18     Q.  Of the dry system?
19     A.  That's the people who run the
20 building's responsibility to do that.
21     Q.  Do you have a contract that says it's
22 their responsibility to do that.

Page 43

1     A.  We have a contract that doesn't say
2 it's ours.
3     Q.  Do you know if there is a separate
4 charge for both the trip test inspection and the
5 winter check?
6     A.  It's all rolled into one.
7     Q.  So if the contract says you pay
8 annually six hundred seventy-five dollars, that's
9 a one-time payment for both inspections?
10     A.  Right, yes.
11     Q.  Is that correct?
12     A.  We have some places that require four.
13     Q.  Okay.  So that's built into the price,
14 I assume, that you are going to be out there
15 twice?
16     A.  Um-hum.
17     Q.  When you got out there, was there any
18 question in your mind that what you saw in terms
19 of this T that had fractured, and we have pictures
20 of it here, Vane Exhibits 9 and 10, these are
21 pictures also that you took, so I assume you saw
22 what's depicted in these photographs, correct?

Page 44

1     A.  Yes.
2     Q.  Was there any question in your mind
3 that this fitting failed because it had frozen and
4 eventually thawed and ruptured?
5     A.  No, it was not.
6     Q.  That's what you --
7     A.  Yes, I was sure that it had frozen.
8     Q.  And when you found out that these heads
9 were also leaking air, you also concluded that was
10 from the freezing of the water and the head.  Is
11 that correct?
12     A.  Yes.  Yes.
13     Q.  And when you saw that, did you conclude
14 your self that somebody didn't drain the drum drip
15 that drains this branch of the sprinkler system,
16 back on January 9th, 2003?
17     A.  Yes.  That was the logical conclusion.
18     Q.  What did you do after that trip out on
19 the day of the loss?  What did you do to find out
20 what Capitoll's inspectors had done during the
21 January 9, 2003 inspection?
22     A.  That Monday morning Mike and I

Page 45

1 discussed what I had found and what had
2 transpired.
3     Q.  What was in the conversation?  Tell me
4 what you said, what he said.
5     A.  Well, you know, I guess you haven't
6 seen him, but Vernon actually puts on the back of
7 all of his folders, particularly that jobs that
8 have idiosyncracies like that, what the inspectors
9 have to look for.  So number one they can train
10 the people on the job, because usually somebody
11 will go with them, but secondly if there is one
12 behind the column and you can't readily see, you
13 know it's there.
14     Q.  Right.
15     A.  So we talked about it and of course I
16 do not know which inspector went -- which one of
17 the field people went with Mike, but everything
18 there is locked.  Somebody has to have a key to
19 open the valves.  Somebody has to get a key to get
20 in the cable room, and someone has to have a card
21 reader key to get to the panel above the ceiling.
22 Mike told me that the gentleman who went with him

**12 (Pages 42 to 45)**

# EXHIBIT H

## MCLAUCHLAN & ASSOCIATES, INC.

CONSULTING MECHANICAL ENGINEERS

474 FAWNS WALK
ANNAPOLIS, MD 21409-5657
TELEPHONE (410) 269-4025
FAX (410) 757-2221
Email:kenmclauchlan@mclauchlan-engineers.com

September 11, 2006

Mr. David J. Groth, Esquire
Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103

Reference:    Gallaudet University Water Damage Analysis
              St. Paul Insurance Tracking No. VY01719
              Date of Loss: January 25, 2003
              Your File No. 134164

Dear Mr. Groth,

McLauchlan & Associates, Inc. (MAI) was asked to investigate a water damage incident that occurred on January 25, 2003, at the Kellogg Conference Center facility on the campus of Gallaudet University, 800 Florida Avenue, NE, Washington, DC 20002. MAI was asked to determine the cause of the water damage incident.

Background information was obtained through two site inspections (on February 3, 2003 and February 12, 2003), review of the following documents and interview:

- Deposition transcript of Mr. Vernon Vane, taken August 14, 2006

- Deposition transcript of Mr. Craig Parham, taken August 14, 2006

- Deposition transcript of Mr. Michael Bowlin, taken August 14, 2006

- As-Built Fire Protection System Drawings prepared by Capitol Sprinkler Contracting, Inc., dated 5/30/95

- Interview with Mr. David Ham

Mr. Vane testified as follows:

He was employed by Capitol Sprinkler ("Capitol") for 23 years, and had been Supervisor of Inspections for the previous 15 to 16 years. Employee Mike Bowlin had just started with inspections in 2003. Employees Tom Scott and Tim Francis

Mr. David J. Groth, Esquire
September 11, 2006
Page 2

were helpers in inspections. The employees received all of their training as "on the-job-training. Mike Bowlin was the least experienced inspector. Capitol did not provide any written materials to its inspectors. Capitol did not train its employees that it was acceptable to let non-employees do testing or inspection of the systems. Capitol did tell its customers about draining drum drips. Capitol had a contract to perform inspections for Aramark from 1996 to 1999, and then with Guest Services, Inc. ("GSI") beginning in 2002. The first inspection performed by Capitol in 2002 was on July 2, 2002. Mr. David Ham of GSI scheduled the inspection and arranged for someone to go with the Capitol inspector to gain access to the building. This person was a tall, slender, black man, who Mr. Vane was unable to identify by name. Capitol performed a trip test for Systems 1 and 2 on July 2, 2002. It was necessary for the inspectors to drain the drum drips during the January 9, 2003 inspection to make sure there is no water in them. This includes condensation and water left in the system from the July, 2002 trip test. He assigned Mr. Bowlin and Mr. Scott to do the inspection on January 9, 2003. He believes that Mr. Ham did not have any specialized knowledge of sprinkler systems. Capitol never trained any GSI personnel specifically how to drain a drum drip, and never provided any written explanations of the draining procedure. Capitol identified Terrence Hubbard as the GSI employee who accompanied Mr. Bowlin and Mr. Scott on January 9, 2003 based only on the fact that Mr. Hubbard later signed for the evidence. Capitol strictly adopted the NFPA Standard No. 25 guidelines for the work at Gallaudet. The systems at Gallaudet were hydrostatically tested at the time of installation.

Mr. Parham testified as follows:

He has been employed by Capitol for 28 years and holds the position of Vice President. He works in installations. Capitol originally installed the systems at the Kellogg Conference Center. When he arrived at the building after the water damage incident, he found that the valves were in the closed position. After the incident, Capitol replaced a ruptured tee fitting. The system leaked compressed air after the tee was replaced. Capitol found 3 sprinkler heads that were "distressed by ice" and were leaking air. These heads were replaced by Capitol. The employee had been trying to call the DC Water Department to shut off the water, because he did not know how to shut off the sprinkler system water supply. He concluded that the tee ruptured and the sprinkler heads leaked as a result of freezing. He also concluded that the drum drips that drain that part of the sprinkler system had not been drained on January 9, 2003. NFPA Standard No. 25 "does not drive what [Capitol does]". It is the building owner's responsibility to drain the drum drips once a month, but this was not indicated in the contract between Capitol and GSI. There is a plastic cap that encloses the valves on the drum drips. The cap is held in place with a lock.

Mr. Bowlin testified as follows:

Mr. David J. Groth, Esquire
September 11, 2006
Page 3

He started to work at Capitol in 1985. He started as an apprentice doing installations of sprinkler systems. He did installations until 1999, when he sustained a back injury. Beginning in 1999 or 2000, he began to do sprinkler system inspections for Capitol. He was given on-the-job training by his supervisors in performing inspections. He reviewed NFPA 13 and 25, but was not given any written materials regarding how inspections should be performed. He was never tested for the inspection job. He was never told by anyone at Capitol that it was permitted for persons other than a Capitol employees to perform the work he was sent to perform. He would permit a building owner's representative to drain a drum drip while he was on site because he was "supervising that drainage". He did not know the level of experience, background or specialized knowledge that people in the buildings who were doing this work had. There was no occasion when he told a building maintenance person to drain a drum drip without his checking to see that it was done properly. The first time that he was at the Kellogg Conference Center was in July, 2002, and the second time was on January 9, 2003. In July, 2002, he did a trip test of the dry pipe system, working with Capitol employees Mr. Vernon Vane and Mr. Tim Francis. The drum drip that drains the lines that leaked in the January 2003 incident was located behind an access panel inside the door to Conference Room 5200. The door could only be opened with a hotel card key. On January 9, 2003, he and Capitol employee Mr. Tom Scott drained all of the drum drips except the one located above the ceiling in Conference Room 5200. He was supposed to drain that drum drip but did not do so because the building owner's representative escort that was with him did not have a hotel card key to enter the room. The building owner's representative stated "I don't have a card. I have to go downstairs and get the card for access." The building owner's representative did not offer to get the key, but did not refuse to get the key. The building owner's representative said he "would take care of the drum drip". Mr. Bowlin did not ask the building owner's representative to get the hotel card key. He never asked Mr. Scott to get the key. He did not know anything about the background, experience, training, reliability or competency of the building owner's representative with regard to draining the drum drip. He did find water in the other 4 drum drips that he drained on January 9, 2003. He assumed there would be water in the drum drip that he did not drain. He never checked to determine if the building owner's representative drained the drum drip above the ceiling in Conference Room 5200. No problems were found with any other components in the dry pipe systems during the January 9, 2003 inspection. He did not know whether the building owner's representative was an employee of Gallaudet University or GSI. Because the drum drips are hard piped to drain, the person draining must listen until they can't hear a "gurgling" sound to know when there is no more water in the system.

Mr. Ham reported that on January 25, 2003, at approximately 3:30 PM, a major water release occurred in the building. The incident began when the fire alarm went off, with strobes and audio warnings being activated. GSI personnel checked all of the floors for fire. They then heard water discharging from above the 5th floor of the building. It was

Mr. David J. Groth, Esquire
September 11, 2006
Page 4

subsequently determined there was no fire in the building. The water was turned off at
the Penthouse sprinkler room. It was reported that water was found to be discharging
from a fractured black cast/malleable iron tee fitting in the dry pipe system. Four
sprinkler heads in the dry pipe system (in the portion of the system where the tee
fractured) were also found to have been damaged by ice, to the point that they were
leaking air pressure when the system was repaired and pressurized with compressed air.

MAI inspected the Kellogg Conference Center on February 3, 2003 and February 12,
2003. The damaged fire protection system tee fitting and sprinkler heads had been
removed and replaced prior to MAI's inspection.

The subject Kellogg Conference Center building was a five story residential structure.
The building was protected by several water based fire protection systems, including two
dry pipe systems. The building was initially opened in 1995. The 4th and 5th story of the
building contained areas that had dry pipe fire protection systems, where the main and
branch piping was routed through unheated ceiling (attic) plenums between the finished
ceilings of the rooms below and the metal roof deck.

The dry pipe system involved in the water damage incident was generally comprised of a
Dry Pipe Valve and trim, black steel threaded pipe, threaded cast and/or malleable iron
fittings, and upright closed sprinkler heads with thermo-sensitive elements and drains. A
dry pipe system is installed where a wet pipe (water-filled) system cannot be installed
because of the potential of the water in the piping being exposed to freezing conditions.
Water freezing in fire protection piping creates conditions which could damage the piping
and fittings, resulting in uncontrolled release of water into the building, and also creates
conditions where ice in the piping could initially prevent flow of water to a sprinkler head
under actual fire conditions. Dry pipe systems use air compressors to fill the sections of
piping subject to freezing conditions with compressed air. A Dry Pipe Valve is the
interface between the compressed air in the piping system and the water supply. In the
event that a fire occurs, the heat of the fire causes the integral thermo-sensitive element to
open the sprinkler head(s) nearest the heat source. Compressed air in the piping then
discharges from the sprinkler head. The drop in air pressure causes the Dry Pipe Valve to
open, charging the piping system with water, and allowing water to flow out of the open
sprinkler head(s).

Dry pipe sprinkler systems are tested at intervals specified in National Fire Protection
Association (NFPA) Standard 25, entitled "Inspection, Testing, And Maintenance Of
Water-Based Fire Protection Systems". Testing includes full and partial "trip tests". A
trip test is a simulation of the opening of a sprinkler head in a fire. A manual valve is
opened to provide a release of compressed air pressure from the system, and the
performance of the system components is observed and timed. At the conclusion of the
testing, water is in the dry piping system. This water must be removed from the system
to prevent freezing. Drum drips are provided throughout the system to drain, by gravity,
any residual water out of the dry pipe system. A drum drip is a simple device consisting

Mr. David J. Groth, Esquire
September 11, 2006
Page 5

of two manual shutoff valves, and a section of larger diameter piping (the "barrel" section). The drum drip is connected through permanent piping to the low point of the dry pipe system which is to be drained. The upper valve in the drum drip is left open to allow any residual water to fill the "barrel" section. The lower valve is kept closed. To drain the drum drip, the upper valve is closed, to prevent a loss of compressed air pressure in the system, and the lower valve is opened, to allow the accumulated water to discharge. The lower valve is then closed and the upper valve is opened slowly so that the air compressor can keep the system pressure high enough to prevent false tripping. This process is repeated until all of the residual water is removed from the system.

In addition to residual water from trip tests, condensation of moisture from the compressed air occurs when the air in the dry piping system is cooled below dewpoint. This moisture must also be removed from the piping system to prevent freezing.

NFPA Standard No. 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems" was reviewed. This Standard contains the following requirement:

> "12.4.4.3.3* Low points in dry pipe sprinkler systems shall be drained after each operation and before the onset of freezing weather conditions."

Review of the Contract For Automatic Sprinkler Equipment Inspection Service dated April 22, 2002, between Capitol and GSI (Exhibit 1 to the deposition of Mr. Vane) indicates that Capitol is required to inspect the fire protection systems semi-annually, to perform an Annual Trip Test of the two 4" Dry Pipe Valves, and, among other requirements, to "Open condensation drains on drum drip connections and drain low points during fall and winter inspection." This is consistent with the requirement in NFPA Standard No. 25.

Review of the Capitol Sprinkler Inspection, Inc. form dated January 9, 2003 (Exhibit 3 to the deposition of Mr. Vane) indicates, on line 15, "Note below any other conditions or deficiencies needing correction". This line is checked "Yes". Under the section of the form identified as "Deficiencies", there are no conditions indicated. All applicable aspects of the Attic Area system referenced on the form were marked as normal.

Review of METAR weather records for the KDCA Ronald Reagan National Airport (the reporting facility closest to the Kellogg Conference Center) indicates that the following weather conditions were experienced in the Washington, DC area during the period prior to the water damage incident:

| Date | High Temperature, degrees F | Low Temperature, degrees F |
|---|---|---|
| January 1, 2003 | 51 | 42 |
| January 2, 2003 | 42 | 39 |

Mr. David J. Groth, Esquire
September 11, 2006
Page 7

- Mr. Michael Bowlin, Capitol's employee performing the Winter Service on January 9, 2003, drained all of the drum drips *except* the drum drip (located above Conference Room 5200) that drains water from the portion of the dry pipe fire protection system where the tee fitting fractured.

- Mr. Bowlin's reason for not draining the drum drip above Conference Room 5200 was that his escort through the building (who he could not identify by either name or employer) did not have a hotel card key to access the drum drip.

- Mr. Bowlin never asked his Capitol co-worker (Mr. Tom Scott) to get the card key from the Front Desk of the hotel, five floors below. He never asked or told his escort to get the card key.

- Mr. Bowlin testified that he relied on his escort through the building to drain the drum drip above Conference Room 5200, even though he did not know what understanding, training, experience, background, reliability or competency his escort had, if any, in fire protection systems in general, or draining of drum drips specifically.

- Mr. Bowlin testified that he had never been told by Capitol that persons other than Capitol employees were permitted to do the work that Capitol was sent to perform. Mr. Bowlin then testified that he always "supervised" persons other than Capitol employees when they drained drum drips while he was on site. Mr. Bowlin testified that he never saw his escort drain the subject drum drip, and never checked later to see if the draining was properly performed.

- Mr. Bowlin testified that he knew there was accumulated water in the piping systems in the four drum drips that he actually did drain on January 9, 2003.

- Mr. Bowlin testified that at the time of his inspection of the dry pipe systems on January 9, 2003 there were no defects or problems with the Dry Pipe Valve, air compressor or other components that would have resulted in water entering the dry pipe system (in the absence of a fire).

The following conclusions are based on information reviewed to date, the author's education and experience. The conclusions are subject to change in the event that additional information is obtained. Based on the above investigation and analysis, MAI concludes the following, to a reasonable degree of engineering certainty:

1. The water damage incident that occurred on January 25, 2003 at the Kellogg Conference Center at Gallaudet University was caused by freezing of water in a dry pipe fire protection system located above the 5th story of the building. The freezing water caused expansion that overstressed a cast/malleable iron tee fitting in the dry pipe system, resulting in fracture of the fitting. The fracture allowed

Mr. David J. Groth, Esquire
September 11, 2006
Page 8

compressed air in the dry pipe system to leak out, which caused the Dry Pipe
Valve to trip and open. The Dry Pipe Valve supplied water to the dry pipe fire
protection system piping. Water then leaked out of the fractured tee fitting,
resulting in substantial water damage to the building.

2. Water was in the dry pipe fire protection system as a result of the failure of
Capitol Sprinkler Inspection, Inc. to properly perform the inspection and
maintenance service that was required under the Contract For Automatic
Sprinkler Equipment Inspection Service between Capitol and Guest Services, Inc.
dated April 22, 2002. Specifically, Capitol was required to drain all drum drips in
the fire protection system at the time of the Winter Service. The Winter Service
was performed by Capitol on January 9, 2003. The Capitol inspector (Mr.
Michael Bowlin) who was supposed to drain the drum drips as part of the Winter
Service admitted that he did not drain the drum drip that removes water from the
section of the dry pipe system where the tee fitting fractured.

3. The Capitol inspector knew, or should have known, that there was water in the
piping system served by the drum drip that he failed to drain on January 9, 2003,
based on his observation that there was water in the other four drum drip systems
in the building that he did drain on that date. He knew, or should have known,
that this accumulated water in the dry pipe system could freeze, damage piping
and fittings, and result in an uncontrolled water discharge from the fire protection
system.

4. The water damage incident would not have occurred if Capitol had properly
drained all of the drum drips during the Winter Service performed on January 9,
2003, as required in the contract between Capitol and Guest Services, Inc.

Respectfully Submitted,

*Kenneth R. McLauchlan*

Kenneth R. McLauchlan, P.E., CFEI
Senior Mechanical Engineer