**Exhibit D**

Case 1:05-cv-02115-CKK    Document 51-6    Filed 01/21/2008    Page 1 of 8

**MCLAUCHLAN & ASSOCIATES, INC.**

CONSULTING MECHANICAL ENGINEERS

474 FAWNS WALK
ANNAPOLIS, MD 21409-5657
TELEPHONE (410) 269-4025
FAX (410) 757-2221
Email:kenmclauchlan@mclauchlan-engineers.com

September 11, 2006

Mr. David J. Groth, Esquire
Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103

Reference: Gallaudet University Water Damage Analysis
St. Paul Insurance Tracking No. VY01719
Date of Loss: January 25, 2003
Your File No. 134164

Dear Mr. Groth,

McLauchlan & Associates, Inc. (MAI) was asked to investigate a water damage incident that occurred on January 25, 2003, at the Kellogg Conference Center facility on the campus of Gallaudet University, 800 Florida Avenue, NE, Washington, DC 20002. MAI was asked to determine the cause of the water damage incident.

Background information was obtained through two site inspections (on February 3, 2003 and February 12, 2003), review of the following documents and interview:

- Deposition transcript of Mr. Vernon Vane, taken August 14, 2006

- Deposition transcript of Mr. Craig Parham, taken August 14, 2006

- Deposition transcript of Mr. Michael Bowlin, taken August 14, 2006

- As-Built Fire Protection System Drawings prepared by Capitol Sprinkler Contracting, Inc., dated 5/30/95

- Interview with Mr. David Ham

Mr. Vane testified as follows:

He was employed by Capitol Sprinkler ("Capitol") for 23 years, and had been Supervisor of Inspections for the previous 15 to 16 years. Employee Mike Bowlin had just started with inspections in 2003. Employees Tom Scott and Tim Francis

Mr. David J. Groth, Esquire
September 11, 2006
Page 2

were helpers in inspections. The employees received all of their training as "on the-job-training. Mike Bowlin was the least experienced inspector. Capitol did not provide any written materials to its inspectors. Capitol did not train its employees that it was acceptable to let non-employees do testing or inspection of the systems. Capitol did tell its customers about draining drum drips. Capitol had a contract to perform inspections for Aramark from 1996 to 1999, and then with Guest Services, Inc. ("GSI") beginning in 2002. The first inspection performed by Capitol in 2002 was on July 2, 2002. Mr. David Ham of GSI scheduled the inspection and arranged for someone to go with the Capitol inspector to gain access to the building. This person was a tall, slender, black man, who Mr. Vane was unable to identify by name. Capitol performed a trip test for Systems 1 and 2 on July 2, 2002. It was necessary for the inspectors to drain the drum drips during the January 9, 2003 inspection to make sure there is no water in them. This includes condensation and water left in the system from the July, 2002 trip test. He assigned Mr. Bowlin and Mr. Scott to do the inspection on January 9, 2003. He believes that Mr. Ham did not have any specialized knowledge of sprinkler systems. Capitol never trained any GSI personnel specifically how to drain a drum drip, and never provided any written explanations of the draining procedure. Capitol identified Terrence Hubbard as the GSI employee who accompanied Mr. Bowlin and Mr. Scott on January 9, 2003 based only on the fact that Mr. Hubbard later signed for the evidence. Capitol strictly adopted the NFPA Standard No. 25 guidelines for the work at Gallaudet. The systems at Gallaudet were hydrostatically tested at the time of installation.

Mr. Parham testified as follows:

He has been employed by Capitol for 28 years and holds the position of Vice President. He works in installations. Capitol originally installed the systems at the Kellogg Conference Center. When he arrived at the building after the water damage incident, he found that the valves were in the closed position. After the incident, Capitol replaced a ruptured tee fitting. The system leaked compressed air after the tee was replaced. Capitol found 3 sprinkler heads that were "distressed by ice" and were leaking air. These heads were replaced by Capitol. The employee had been trying to call the DC Water Department to shut off the water, because he did not know how to shut off the sprinkler system water supply. He concluded that the tee ruptured and the sprinkler heads leaked as a result of freezing. He also concluded that the drum drips that drain that part of the sprinkler system had not been drained on January 9, 2003. NFPA Standard No. 25 "does not drive what [Capitol does]". It is the building owner's responsibility to drain the drum drips once a month, but this was not indicated in the contract between Capitol and GSI. There is a plastic cap that encloses the valves on the drum drips. The cap is held in place with a lock.

Mr. Bowlin testified as follows:

Mr. David J. Groth, Esquire
September 11, 2006
Page 3

    He started to work at Capitol in 1985. He started as an apprentice doing installations of sprinkler systems. He did installations until 1999, when he sustained a back injury. Beginning in 1999 or 2000, he began to do sprinkler system inspections for Capitol. He was given on-the-job training by his supervisors in performing inspections. He reviewed NFPA 13 and 25, but was not given any written materials regarding how inspections should be performed. He was never tested for the inspection job. He was never told by anyone at Capitol that it was permitted for persons other than a Capitol employees to perform the work he was sent to perform. He would permit a building owner's representative to drain a drum drip while he was on site because he was "supervising that drainage". He did not know the level of experience, background or specialized knowledge that people in the buildings who were doing this work had. There was no occasion when he told a building maintenance person to drain a drum drip without his checking to see that it was done properly. The first time that he was at the Kellogg Conference Center was in July, 2002, and the second time was on January 9, 2003. In July, 2002, he did a trip test of the dry pipe system, working with Capitol employees Mr. Vernon Vane and Mr. Tim Francis. The drum drip that drains the lines that leaked in the January 2003 incident was located behind an access panel inside the door to Conference Room 5200. The door could only be opened with a hotel card key. On January 9, 2003, he and Capitol employee Mr. Tom Scott drained all of the drum drips except the one located above the ceiling in Conference Room 5200. He was supposed to drain that drum drip but did not do so because the building owner's representative escort that was with him did not have a hotel card key to enter the room. The building owner's representative stated "I don't have a card. I have to go downstairs and get the card for access." The building owner's representative did not offer to get the key, but did not refuse to get the key. The building owner's representative said he "would take care of the drum drip". Mr. Bowlin did not ask the building owner's representative to get the hotel card key. He never asked Mr. Scott to get the key. He did not know anything about the background, experience, training, reliability or competency of the building owner's representative with regard to draining the drum drip. He did find water in the other 4 drum drips that he drained on January 9, 2003. He assumed there would be water in the drum drip that he did not drain. He never checked to determine if the building owner's representative drained the drum drip above the ceiling in Conference Room 5200. No problems were found with any other components in the dry pipe systems during the January 9, 2003 inspection. He did not know whether the building owner's representative was an employee of Gallaudet University or GSI. Because the drum drips are hard piped to drain, the person draining must listen until they can't hear a "gurgling" sound to know when there is no more water in the system.

Mr. Ham reported that on January 25, 2003, at approximately 3:30 PM, a major water release occurred in the building. The incident began when the fire alarm went off, with strobes and audio warnings being activated. GSI personnel checked all of the floors for fire. They then heard water discharging from above the 5th floor of the building. It was

Mr. David J. Groth, Esquire
September 11, 2006
Page 4

subsequently determined there was no fire in the building. The water was turned off at the Penthouse sprinkler room. It was reported that water was found to be discharging from a fractured black cast/malleable iron tee fitting in the dry pipe system. Four sprinkler heads in the dry pipe system (in the portion of the system where the tee fractured) were also found to have been damaged by ice, to the point that they were leaking air pressure when the system was repaired and pressurized with compressed air.

MAI inspected the Kellogg Conference Center on February 3, 2003 and February 12, 2003. The damaged fire protection system tee fitting and sprinkler heads had been removed and replaced prior to MAI's inspection.

The subject Kellogg Conference Center building was a five story residential structure. The building was protected by several water based fire protection systems, including two dry pipe systems. The building was initially opened in 1995. The 4th and 5th story of the building contained areas that had dry pipe fire protection systems, where the main and branch piping was routed through unheated ceiling (attic) plenums between the finished ceilings of the rooms below and the metal roof deck.

The dry pipe system involved in the water damage incident was generally comprised of a Dry Pipe Valve and trim, black steel threaded pipe, threaded cast and/or malleable iron fittings, and upright closed sprinkler heads with thermo-sensitive elements and drains. A dry pipe system is installed where a wet pipe (water-filled) system cannot be installed because of the potential of the water in the piping being exposed to freezing conditions. Water freezing in fire protection piping creates conditions which could damage the piping and fittings, resulting in uncontrolled release of water into the building, and also creates conditions where ice in the piping could initially prevent flow of water to a sprinkler head under actual fire conditions. Dry pipe systems use air compressors to fill the sections of piping subject to freezing conditions with compressed air. A Dry Pipe Valve is the interface between the compressed air in the piping system and the water supply. In the event that a fire occurs, the heat of the fire causes the integral thermo-sensitive element to open the sprinkler head(s) nearest the heat source. Compressed air in the piping then discharges from the sprinkler head. The drop in air pressure causes the Dry Pipe Valve to open, charging the piping system with water, and allowing water to flow out of the open sprinkler head(s).

Dry pipe sprinkler systems are tested at intervals specified in National Fire Protection Association (NFPA) Standard 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems". Testing includes full and partial "trip tests". A trip test is a simulation of the opening of a sprinkler head in a fire. A manual valve is opened to provide a release of compressed air pressure from the system, and the performance of the system components is observed and timed. At the conclusion of the testing, water is in the dry piping system. This water must be removed from the system to prevent freezing. Drum drips are provided throughout the system to drain, by gravity, any residual water out of the dry pipe system. A drum drip is a simple device consisting

Mr. David J. Groth, Esquire
September 11, 2006
Page 5

of two manual shutoff valves, and a section of larger diameter piping (the "barrel" section). The drum drip is connected through permanent piping to the low point of the dry pipe system which is to be drained. The upper valve in the drum drip is left open to allow any residual water to fill the "barrel" section. The lower valve is kept closed. To drain the drum drip, the upper valve is closed, to prevent a loss of compressed air pressure in the system, and the lower valve is opened, to allow the accumulated water to discharge. The lower valve is then closed and the upper valve is opened slowly so that the air compressor can keep the system pressure high enough to prevent false tripping. This process is repeated until all of the residual water is removed from the system.

In addition to residual water from trip tests, condensation of moisture from the compressed air occurs when the air in the dry piping system is cooled below dewpoint. This moisture must also be removed from the piping system to prevent freezing.

NFPA Standard No. 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems" was reviewed. This Standard contains the following requirement:

> "12.4.4.3.3* Low points in dry pipe sprinkler systems shall be drained after each operation and before the onset of freezing weather conditions."

Review of the Contract For Automatic Sprinkler Equipment Inspection Service dated April 22, 2002, between Capitol and GSI (Exhibit 1 to the deposition of Mr. Vane) indicates that Capitol is required to inspect the fire protection systems semi-annually, to perform an Annual Trip Test of the two 4" Dry Pipe Valves, and, among other requirements, to "Open condensation drains on drum drip connections and drain low points during fall and winter inspection." This is consistent with the requirement in NFPA Standard No. 25.

Review of the Capitol Sprinkler Inspection, Inc. form dated January 9, 2003 (Exhibit 3 to the deposition of Mr. Vane) indicates, on line 15, "Note below any other conditions or deficiencies needing correction". This line is checked "Yes". Under the section of the form identified as "Deficiencies", there are no conditions indicated. All applicable aspects of the Attic Area system referenced on the form were marked as normal.

Review of METAR weather records for the KDCA Ronald Reagan National Airport (the reporting facility closest to the Kellogg Conference Center) indicates that the following weather conditions were experienced in the Washington, DC area during the period prior to the water damage incident:

| Date | High Temperature, degrees F | Low Temperature, degrees F |
|---|---|---|
| January 1, 2003 | 51 | 42 |
| January 2, 2003 | 42 | 39 |

Mr. David J. Groth, Esquire
September 11, 2006
Page 7

- Mr. Michael Bowlin, Capitol's employee performing the Winter Service on January 9, 2003, drained all of the drum drips *except* the drum drip (located above Conference Room 5200) that drains water from the portion of the dry pipe fire protection system where the tee fitting fractured.

- Mr. Bowlin's reason for not draining the drum drip above Conference Room 5200 was that his escort through the building (who he could not identify by either name or employer) did not have a hotel card key to access the drum drip.

- Mr. Bowlin never asked his Capitol co-worker (Mr. Tom Scott) to get the card key from the Front Desk of the hotel, five floors below. He never asked or told his escort to get the card key.

- Mr. Bowlin testified that he relied on his escort through the building to drain the drum drip above Conference Room 5200, even though he did not know what understanding, training, experience, background, reliability or competency his escort had, if any, in fire protection systems in general, or draining of drum drips specifically.

- Mr. Bowlin testified that he had never been told by Capitol that persons other than Capitol employees were permitted to do the work that Capitol was sent to perform. Mr. Bowlin then testified that he always "supervised" persons other than Capitol employees when they drained drum drips while he was on site. Mr. Bowlin testified that he never saw his escort drain the subject drum drip, and never checked later to see if the draining was properly performed.

- Mr. Bowlin testified that he knew there was accumulated water in the piping systems in the four drum drips that he actually did drain on January 9, 2003.

- Mr. Bowlin testified that at the time of his inspection of the dry pipe systems on January 9, 2003 there were no defects or problems with the Dry Pipe Valve, air compressor or other components that would have resulted in water entering the dry pipe system (in the absence of a fire).

The following conclusions are based on information reviewed to date, the author's education and experience. The conclusions are subject to change in the event that additional information is obtained. Based on the above investigation and analysis, MAI concludes the following, to a reasonable degree of engineering certainty:

1. The water damage incident that occurred on January 25, 2003 at the Kellogg Conference Center at Gallaudet University was caused by freezing of water in a dry pipe fire protection system located above the 5th story of the building. The freezing water caused expansion that overstressed a cast/malleable iron tee fitting in the dry pipe system, resulting in fracture of the fitting. The fracture allowed

Mr. David J. Groth, Esquire
September 11, 2006
Page 8

compressed air in the dry pipe system to leak out, which caused the Dry Pipe Valve to trip and open. The Dry Pipe Valve supplied water to the dry pipe fire protection system piping. Water then leaked out of the fractured tee fitting, resulting in substantial water damage to the building.

2. Water was in the dry pipe fire protection system as a result of the failure of Capitol Sprinkler Inspection, Inc. to properly perform the inspection and maintenance service that was required under the Contract For Automatic Sprinkler Equipment Inspection Service between Capitol and Guest Services, Inc. dated April 22, 2002. Specifically, Capitol was required to drain all drum drips in the fire protection system at the time of the Winter Service. The Winter Service was performed by Capitol on January 9, 2003. The Capitol inspector (Mr. Michael Bowlin) who was supposed to drain the drum drips as part of the Winter Service admitted that he did not drain the drum drip that removes water from the section of the dry pipe system where the tee fitting fractured.

3. The Capitol inspector knew, or should have known, that there was water in the piping system served by the drum drip that he failed to drain on January 9, 2003, based on his observation that there was water in the other four drum drip systems in the building that he did drain on that date. He knew, or should have known, that this accumulated water in the dry pipe system could freeze, damage piping and fittings, and result in an uncontrolled water discharge from the fire protection system.

4. The water damage incident would not have occurred if Capitol had properly drained all of the drum drips during the Winter Service performed on January 9, 2003, as required in the contract between Capitol and Guest Services, Inc.

Respectfully Submitted,

*Kenneth R. McLauchlan*

Kenneth R. McLauchlan, P.E., CFEI
Senior Mechanical Engineer