**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University | : <br> : <br> : <br> : |
| Plaintiff | : <br> : |
| vs. | : <br> : |
| CAPITOL SPRINKLER INSPECTION, INC | :    CASE NUMBER:  1:05CV02115 (CKK) <br> : |
| Defendant | : <br> : |
| vs. | : <br> : |
| GUEST SERVICES, INC. | : <br> : |
| Third-Party Defendant | : <br> : |

**DEFENDANT'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**I.   <u>INTRODUCTION</u>**

In the mid-to-late 1990's, Gallaudet University ("Gallaudet") engaged Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler") to install a dry-pipe fire protection system at its Kellogg Conference Center, and to subsequently perform semi-annual inspections and trip tests on the system. Upon completion of the installation, Capitol Sprinkler showed Gallaudett's building engineer how to perform said inspections and trip tests (See Exhibit B). Capitol Sprinkler's first inspection contracts were executed with Gallaudet through its property management agent at the time, ARAMARK (See Exhibit B). As a result of the combined efforts of ARAMARK and Capitol Sprinkler, no freeze failures occurred at the Conference Center while ARAMARK acted as Gallaudet's property management agent.

{DE101073.2}

On April 22, 2002, Guest Services, Inc. ("Guest Services"), acting as Gallaudet's property management agent, secured Capitol Sprinkler's services to perform semi-annual inspections and trip tests on the system (See Exhibit G). Capitol Sprinkler's inspectors had no independent access to the Kellogg Conference Center. Instead, during each inspection, an employee of Guest Services, Terrence Hubbard, accompanied the Capitol Sprinkler inspector, Michael Bowlin, through the building (See Exhibit A). Mr. Hubbard was there to unlock the applicable valves and open the appropriate rooms so that Mr. Bowlin could successfully complete his inspection. During Mr. Bowlin's inspection on January 9, 2003, when Mr. Hubbard and Mr. Bowlin reached conference room 5200, where Mr. Bowlin was to drain a drum drip located in the ceiling of that room, Mr. Hubbard stated that he did not have the card key for this room (See Exhibit A). Mr. Hubbard made no effort to go get the card key in order to gain access to the room, offering instead to take care of draining the drum drip himself (See Exhibit A). Building personnel had assisted Capitol Sprinkler in draining drum drips in the past, so it was not unusual for Mr. Hubbard to make such an offer (See Exhibit A).

On or about January 25, 2003, a pipe "tee" fitting failed in the section of the sprinkler system that was on the same branch line as the drum drip that Mr. Hubbard had offered to take care of draining himself. The failure was the result of a "freeze event", meaning that water in the pipe had frozen and expanded, bursting the fitting, and subsequently melted, allowing air and then water to escape the system through the failed fitting and discharge into the interior of the Conference Center. This subrogation action ensued.

Plaintiff asks the Court to grant it summary judgment and find, as a matter of law, that Capitol Sprinkler Inspection, Inc., breached its sprinkler inspection contract with its insured. For

{DE101073.2}

the reasons stated herein, Capitol Sprinkler submits that Plaintiff has failed to carry its burden and that the Court should DENY the Motion accordingly

## II.     SUMMARY OF THE APPLICABLE LAW

### A.     STANDARD OF REVIEW

Plaintiff's opening Memorandum of Points and Authorities clouds the standard applicable to motions for summary judgment in this Court. In fact, summary judgment shall only be entered where "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cobell v. Norton*, 260 F.Supp. 110, 116 (D.D.C. 2003); see also *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Through this analysis, the Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In other words, the Court is trying to determine whether trial is necessary. *Id.* This standard essentially "mirrors" the standard used when considering a motion for a Directed Verdict. *Celotex* at 323.

"[T]he substantive law will identify which facts are material." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006). "To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party." *Communications Workers Of America, AFL-CIO, v. Verizon Services, Inc.*, 404 F. Supp. 2d 62, 66 (D.D.C. 2005); (citations omitted). At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Arrington* at 333; citing *Liberty Lobby* at 249. Even if a jury might

ultimately choose not to believe the version of events presented by a non-movant, this is not the basis on which the Court's decision may rest. *Arrington* at 333, citing *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005).

The moving party bears the initial burden of establishing that no "genuine issue of material fact" exists and that judgment in its favor should be entered by citing to credible evidence of the type discussed in Rule 56. *Celotex* at 322-24. Should the moving party carry its burden, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); See also *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "[This does not] mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex* at 324. Rather, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make [its showing]". *Id.*

"In deciding whether there is a disputed issue of material fact, the Court must draw all justifiable inferences in favor of the non-moving party." *Sidibe v. Traveler's Insurance Company*, 468 F. Supp. 2d 97, 100 (D.D.C. 2006); (citations omitted). In fact, "the court must assess the factual record by assuming the truth of the non-movant's evidence and drawing all justifiable inferences in that party's favor." *Stanwood v. Welch*, 922 F. Supp. 635, 639 (D.D.C. 1995) (citations omitted). Where, as here, "material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994); citing *Alyeska Pipeline Service Co. v. United States Environmental*

*Protection Agency*, 856 F.2d 309, 314 (D.C. Cir. 1988). Neither is summary judgment available where, as here, the evidence in support of Plaintiff's motion is not "so one-sided that [Plaintiff] must prevail as a matter of law." *Liberty Lobby* at 259.

In the end, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id*. If the Court determines that there exists "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves," which, when considered in the light most favorable to the non-moving party and with all reasonable inference resolved in favor of the non-moving party, demonstrates the existence of a question of material fact, it must deny a motion for summary judgment on that basis. See *Celotex* at 324; see also *Sidibe* at 100.

**B.   CHOICE OF LAWS**

"In a diversity case a federal court follows the choice-of-law rules of the jurisdiction in which it sits." *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193 (D.C. Cir. 1999); (citations omitted). In the absence of a contractual choice-of-law provision, this Court "uses 'a constructive blending' of the 'governmental interest analysis' and the 'most significant relationship test,' the latter as expressed in the Restatement (Second) of Conflict of Laws § 188 (1988)." *Id.* at 194; (citations omitted). Where, as here, there is no choice of laws provision in the subject contract, the contract itself was partially negotiated and performed in the District of Columbia, no other jurisdiction appears to have an obvious interest in determining the issues arising under the contract, and the Plaintiff and all other parties have chosen this venue to adjudicate the matter, the Court should properly apply the laws of the District of Columbia to determine whether a breach of contract occurred. *Id*.

### C.  D.C. LAW OF CONTRACTS AND AGENCY

#### 1.  Court must look to the face of the contract first.

"This jurisdiction adheres to an 'objective' law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties unless the written language is not susceptible of a clear and definite undertaking." *Island Development Corporation v. District of Columbia*, 933 A.2d 340, 347 (D.C. App 2007); quoting *Sobelsohn v. American Rental Management Co.*, 926 A.2d 713, 718 (D.C. 2007). "The law requires contracts to be read as a whole, with meaning given to every provision contained therein." *KiSKA Construction Corporation-USA v. Washington Metropolitan Area Transit Authority*, 321 F.3d 1151, 1163 (D.C. Cir. 2003); cert denied at 540 U.S. 939 (2003). "When the meaning of a contract provision is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at discerning the intent of the parties." *Farmland Industries, Inc. v. Grain Board of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990); citing *Sundown, Inc. v. Canal Square Associates*, 390 A.2d 421, 432 (D.C. 1978). "[I]f extrinsic evidence supports more than one reasonable interpretation of the contract, local law calls for the trier of fact to resolve the dispute." *Id.* (citations omitted).

#### 2.  Oral modifications

In the District of Columbia, "it is well-established that a written contract may be modified or rescinded by a subsequent oral agreement . . . but the oral modification must be established by a preponderance of the evidence." *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C. App. 2000) citing *Nickel v. Scott,* 59 A.2d 206, 207 (D.C. 1948); see also *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C. 1964). Because such statements are inherently against the pecuniary interests of the party making them at the time they are made, "[i]t is direct evidence, not hearsay,

when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party" *Id.* at 876; citing *Hydrite Chemical Company v. Calumet Lubricants Company*, 47 F.3d 887, 892 (7th Cir. 1995). "Accordingly, [a party's] recitation of [another's] out-of-court offer is admissible for consideration on summary judgment and as mentioned, raises a genuine issue of material fact." *Id.* Further, such oral modifications will be enforced where the party charged with performance or non-performance of an orally modified term changes his position so materially that fraud would result were the modified term *not* enforced. See e.g. *Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310 (D.C. App. 1982).

### 3. Performance excused in light of material breach.

The Restatement (Second) of Contracts § 237 states that a "party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render any such performance due at an earlier time.' " *Ashcraft & Gerel v. Coady*, 244 F. 3d 948, 950 (D.C. Cir. 2001); citing *Restatement (Second) of Contracts* § 237 (1981). "'[O]ne party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties … even though the other party does not know of the failure.' " *Id*. This is true whether there is defective performance or a complete absence of performance by the breaching party and operates to discharge "the [other party's corresponding] duty when the condition can no longer occur." *Steele v. Isikoff*, 130 F. Supp. 2d 23, 25 (2000); (citations omitted).

### 4. Performance excused by impossibility, commercial impracticability, or frustration of purpose.

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are

{DE101073.2}

discharged, unless the language or the circumstances indicate the contrary." *Island Development Corporation* at 349; quoting *Restatement (Second) Of Contracts: Discharge By Supervening Frustration* § 265 (1981). "[W]hen, due to circumstances beyond the control of the parties the performance of a contract is rendered impossible [or commercially impracticable], the party failing to perform is exonerated. *Island Development Corporation* at 348-349; citing *Whelan v. Griffith Consumers Company*, 170 A.2d 229, 230 (D.C. 1961). "Under frustration analysis the court is concerned with the impact of the event upon the failure of consideration, while under impracticability, the concern is more with the nature of the event and its effect upon performance." *Island Development Corporation* at 349; citing *Seaboard Lumber Company v. United States*, 308 F.3d 1283, 1296 (Fed. Cir. 2002).

### 5. Agency

It is well settled that a principal is responsible for the acts of its agent who, acting within the scope of its authority, performs or withholds performance of the principal's legal or contractual responsibilities. However, "[w]hether an agency relationship exists in a given situation depends on the particular facts of each case." *Judah v. Burton, Reinder & Morris Management, Inc.,* 744 A.2d 1037, 1040 (DC App. 2000); citing *District of Columbia v. Hampton,* 666 A.2d 30, 38 (D.C. 1995). "Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Id.* "In deciding this question, courts will look both to the terms of any contract that may exist and to the actual course of dealings between the parties . . . [noting that] . . the parties' actual relationship, in spite of contractual language, may be the conclusive factor" *Id.* "With the authority to manage this property, to care for it, to protect it, and to maintain it, goes the incidental and reasonably necessary authority to contract for repairs and upkeep which in

{DE101073.2}

themselves are reasonable and necessary." *Medico v. Simkowitz,* 158 A.2d 681, 682 (D.C. App. 1960); citing 2 Am. Jur., Agency §195 (1936).

### D. D.C. CONSTRUCTION CODES AND NFPA STANDARDS

Although the District of Columbia has expressly adopted certain provisions of the NFPA Standards in particular situations (e.g. installation of fire pumps in accordance with NFPA 20 (*CDCR 12A -913* (2007)), they have not expressly adopted NFPA 25, relying instead on the ICC's internal references to NFPA 25. The District of Columbia has adopted the ICC International Plumbing Code. See *D.C. Code § 6-1403.01; CDCR § 12A-101.4.4*. The Code of D.C. Municipal Regulations states that "the ICC International Plumbing Code/2000 amended by the D.C. Plumbing Code Supplement/2003 shall constitute the D.C. Plumbing Code/2003 hereinafter referred to as the "Plumbing Code". *CDCR 12A-101.4.4.* Similarly, the District of Columbia has also adopted the ICC International Fire Code. See *D.C. Code § 6-1403.01; CDCR § 12A-101.4.6*. The Code of D.C. Municipal Regulations states that "the ICC International Fire Code/2000 as amended by the D.C. Fire Prevention Code Supplement/2003 shall constitute the D.C. Fire Prevention Code/2003 hereinafter referred to as the "Fire Prevention Code". *CDCR 12A-101.4.6.* The ICC Codes in their turn reference the most recently adopted editions of the NFPA as the standard to be employed under their provisions. Because the 1998 edition of NFPA Standard 25 is the most recent edition to precede either of the 2000 editions of the ICC Codes adopted by the District of Columbia, its standards would apply to inspections of dry pipe fire protection systems in D.C.

The 1998 edition of NFPA 25 provides as follows:

> "The responsibility for properly maintaining a water-based fire protection system shall be that of the owner(s) of the property. By means of periodic inspections, tests, and maintenance, the equipment shall be shown to be in good operating condition, or any defects or impairments shall be revealed.

> Inspection, testing, and maintenance shall be implemented in accordance with procedures meeting or exceeding those established in this document and in accordance with the manufacturer's instructions. These tasks shall be performed by personnel who have developed competence through training and experience.
> *Exception: Where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract.*"

*NFPA 25, § 1-4.2* (1998)(emphasis in original) (See Exhibit I).

Likewise, where the Owner or Occupant contracts out for said inspections, "[t]he owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance." *NFPA 25, § 1-4.1* (1998). These "Owner Obligations" have carried forward into the 2002 edition of NFPA 25 cited by Plaintiff's expert. See *NFPA 25, § 4.1, et seq.* (See Exhibit H-2)

### III. ARGUMENT

#### A. PLAINTIFF'S FACTS DO NOT EVIDENCE A BREACH OF CONTRACT.

Despite Plaintiff's contentions to the contrary, the facts that Plaintiff's sets forth in its opening Memorandum of Point and Authorities, failed to disclose facts necessary to carry its burden on the issue of whether Capitol Sprinkler breached its inspection contract with Gallaudet. Plaintiff's Statements of Fact mischaracterized the testimonies of Capitol employees, failed to note contrary testimony by its own insured's corporate designee, and failed to establish as a matter of law that Capitol Sprinkler either had an affirmative duty to drain the subject drum drip or other wise failed to fulfill each and every obligation it had under its contract.

For instance, Capitol Sprinkler employee, Mr. Parham, concluded that "*somebody* didn't drain the drum drip that drains this branch of the sprinkler system back on January 9, 2003". (See Exhibit C, P. 44)  Clearly, Mr. Parham acknowledged the necessity of draining the drum

{DE101073.2}

drip, (Id.) while he never indicated that the final responsibility to do so fell to Capitol Sprinkler given the representations made by Guest Services employee, Terrance Hubbard. As noted in Parhams' testimony, the testimony of Vernon Bain, and the testimony of the inspector himself, Michael Bowlin, Terrance Hubbard, as the Guest Services employee who was both the prime contact for the inspector and the person who controlled access to the subject drum drip agreed, in his role as such, to ensure that the drum drip was drained when he could not provide Mr. Bowlin, with access to the same. (See gen'ly Exhibits A, B, and C). While it may be true that Capitol Sprinkler employees did not drain the subject drum drip, it is also true that they were relieved of that obligation by the actions and representations of an employee of Guest Services, the property management agent at Gallaudet University. Moreover, the failure to provide access to the subsect drum drip was itself a violation of the Owner's Obligations under NFPA 25, and relieved Mr. Bowlin of any obligation to inspect the same. (See Exhibit I).

  **B. CAPITAL SPRINKLER'S CONDUCT DOES NOT CONSTITUTE BREECH OF CONTRACT**

    **1. Guest Services Modified the Contract**

The inspection contract between Capitol Sprinkler and Gallaudet states that the contract is to be performed in a workmanlike manner in accordance with the requirements of the National Fire Protection Association (NFPA) (see Contract for Automatic Sprinkler Equipment Inspection Service, attached to Plaintiff's Motion as Exhibit A). As noted, pursuant to the applicable provisions of NFPA Standard 25, it is first and fundamentally the owner's obligation to inspect and test a dry pipe fire protection system installed in a building owned by the owner. (Exhibit I) In this case, the owner engaged Guest Services Inc., by way of a property management contract, dated February 2000, to insure that the same was properly performed. Thus, it became Guest Services' duty to fulfill the Owner's Obligations under NFPA 25. (*NFPA 25, § 1-4.2* (1998);

{DE101073.2}

Exhibit I). It is undisputed, that Guest Services negotiated a contract on Gallaudet's behalf with Capitol Sprinkler for the performance of said sprinkler inspections. Plaintiff admits, and Capitol Sprinkler accepts, that Guest Services had full authority to bind Gallaudet University (the owner) in the performance of its contract with Capitol Sprinkler. Neither Plaintiff nor Guest Services has produced affirmative evidence tending to support a conclusion that Guest Services employee, Terrance Hubbard, did not agree to ensure that the subject drum drip was drained within a reasonable time after Capitol Sprinklers inspector was not given access to the same.

  As agent of the owner, with full authority to negotiate a contract with Capitol Sprinkler, Guest Services had both the duty and authority to either perform Gallaudet's obligations, as owner of the Kellog Conference Center, or to contract with a third-party for the performance of the same. Where Guest Services chose to contract with a third-party, in this case, Capitol Sprinkler, for the performance of sprinkler inspections, Guest Services likewise had the right to modify any such contract whether in writing, orally, or through the course of its dealings with Capitol Sprinkler. In this case, the individual appointed by Guest Services to control Capitol Sprinkler access to the subject sprinkler system, including its component parts (and drum drips), agreed to undertake the performance of a specific aspect of the Guest Services/Capitol Sprinkler Contact. In reliance on that representation, Capitol Sprinkler's inspector left the building, under the reasonable impression that his work there was complete and that the subject drum drip would be properly drained. Guest Services cannot now be heard to dispute this modification and, notwithstanding Plaintiff's contention to the contrary, such an oral modification of the Guest Services/Capitol Sprinkler written contract is enforceable under District of Columbia *juris prudence*. (See genl'y *Puma v. Sullivan,* supra.)

**2.      Capitol Sprinkler's performance was excused.**

In the alternative, Gallaudet, through its management agent Guest Services, materially breached its contract with Capitol Sprinkler by failing to provide Capitol Sprinkler with access to all components of the subject sprinkler system, including the subject drum drip, as required by NFPA Standard 25. Plaintiff admits that its insured, Guest Services, and Capitol Sprinkler were each and all bound by the applicable provisions of NFPA Standard 25. As noted above, the applicable standard requires the Owner to provide "ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance." *NFPA 25, § 1-4.1* (1998). When, as here, the performance obligations of one party to a contract can only feasibly be fulfilled upon successful performance by another party to the contract, failure of that party's performance constitutes a material breach that forgives the other's performance. (See gen'ly *Restatement (Second) of Contracts* § 237; See also *Ashcraft and Gerel v. Coady*, 244 F.3d 948 (D.C. Cir. 2001).

Further, when Capitol Sprinkler's inspector left the Conference Center, he was under the reasonable understanding that Guest Services would ensure that the subject drum drip was properly drained in a reasonable time following his inspection. As a party to the underlying contract, it was within Guest Services' authority to do so. As the Owner's property management agent, it was Guest Services' legal responsibility to do so. Clearly the drum drip was never subsequently drained. The subsequent failure by the Guest Services employee to ensure that the drum drip was properly drained, constitutes a material breach of the Guest Services/Capitol Sprinkler, is clearly inconsistent with Guest Services' obligations as the Owner's property management agent under NFPA 25, and provides Capitol Sprinkler with a complete defense to Plaintiffs allegations of breach of contract. *Id.*; see also *Steele v. Isikoff*, supra.

Finally, Guest Services' failure to provide Capitol Sprinkler's inspector appropriate access to the subject drum drip made it impossible, or at the very least commercially impracticable, for Capitol Sprinkler to perform the inspection in question. It is undisputed that Guest Services exclusively controlled access to those areas the Kellogg Conference Center that Capitol Sprinkler's inspector in the performance of his inspection. It is likewise undisputed that Capitol Sprinkler's inspector inspected all portions of the subject sprinkler system to which he was given access on January 9, 2003. Capitol Sprinkler's employees have consistently and repeatedly testified as to Terrance Hubbard's inability to provide access to the subject drum drip. Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and it does not appear that Mr. Hubbard will be able to do so himself. As neither Plaintiff nor Guest Services has presented affirmative testimony or other offers of proof to contradict this position, they cannot now be heard to dispute it. On the representations of Guest Services employee, Capitol Sprinkler's inspector reasonably believed that access to the subject drum drip was unavailable. As such, an inspection of the same was impossible, relieving the inspector of any obligation to inspect it. See gen'ly *Island Development Corporation v. District of Columbia*, 933 A.2d 340 (D.C. App 2007)

## IV.  CONCLUSION

Despite plaintiff's contentions to the contrary, there are genuine issues of material facts in dispute in this case. Initially, Plaintiff's motion fails to demonstrate the lack of any genuine issue of material fact by failing to disclose facts of record which are themselves material to a breach of contract action. The record reflects a factual dispute as to whether Capitol Sprinkler's inspection failed to comply with its inspection contract. The record also demonstrates that Terrence Hubbard agreed to perform Guest Services' NFPA 25 obligations on behalf of

{DE101073.2}

Plaintiff's insured, thereby modifying the underlying inspection contract and relieving Capitol Sprinkler of any obligation to inspect the subject drum drip. Finally, the record is clear that, as an agent of Plaintiff's insured, Guest Services failed to perform its NFPA 25 obligations on behalf of Plaintiff's insured and thus breached the inspection contract to which it was a party.

**WHEREFORE,** because there exist genuine issues of material fact as to whether Defendant Capitol Sprinkler Inspection, Inc. breached its inspection contract with Plaintiff's insured, Capitol Sprinkler respectfully requests that this Honorable Court DENY Plaintiff's Motion for Partial Summary Judgment and enter Judgment in its favor.

Respectfully submitted,

**MARKS, O'NEILL,
O'BRIEN & COURTNEY, P.C.**

　　　/s/Donald R. Kinsley
Michael T. Hamilton, Esquire (Bar ID No. 474233)
Donald R. Kinsley, Esquire (Bar ID No. 432998)
Norman H. Brooks, Jr., Esquire (PHV)
913 N. Market Street, Ste. 800
Wilmington, DE  19801
*Attorney for Defendant
Capitol Sprinkler Inspection, Inc.*

DATE: January 21, 2008

{DE101073.2}