EXHIBIT "A"

**Capital Reporting Company**

Page 1

```
 1            UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2    - - - - - - - - - - - - - - - X

 3    ST. PAUL MERCURY INSURANCE     :

 4    COMPANY, as Subrogee of        :

 5    Gallaudet University,          :

 6              Plaintiff,           :

 7        v.                         : Case No.:

 8                                   : 1:05-cv-02115

 9    CAPITOL SPRINKLER              :

10    INSPECTION, INC.,              :

11              Defendant.           :

12    - - - - - - - - - - - - - - - X

13                        Washington, DC
                          Monday, August 14, 2006
14    Deposition of:

15            MICHAEL BOWLIN

16    called for oral examination by counsel for

17    Plaintiff, pursuant to Notice, at the Law Office

18    of Mesirow and Stravitz, 2000 Massachusetts

19    Avenue, NW, Washington, DC, before Kim Brantley of

20    Capital Reporting, a Notary Public in and for the

21    District of Columbia, beginning at 1:45 p.m., when

22    were present on behalf of the respective parties:
```

# Capital Reporting Company

Page 30

1   there once between '96 and '99?
2       A.  Prior.
3       Q.  Correct?
4       A.  Between what?
5       Q.  '96 and '99, as an inspector.
6       A.  I can't say it was from '99.  It might
7   have been '99 and 2000.
8       Q.  Well according to Mr. Vane, they didn't
9   have the account in 2000 --
10          MR. BROOKS:  Don't argue with him.
11  Just wait for the question.
12  BY MR. GROTH:
13      Q.  According to Mr. Vane they didn't have
14  the account in 2000?
15          MR. BROOKS:  That's not a question.
16  BY MR. GROTH:
17      Q.  My question is were you out there
18  before 2000 as an inspector or a helper?
19      A.  No.
20      Q.  So it's likely then that the first time
21  you were out there was in July of 2002, correct?
22      A.  Correct.

Page 31

1       Q.  And the second time that you were out
2   there was January of 2003.  Is that correct?
3       A.  Yes.
4       Q.  And were you there in any other
5   capacity, not to do an inspection or testing, but
6   for any reason other than those two times in
7   2002 or 2003?
8       A.  No.
9       Q.  Were you there for any reason, were you
10  at the building for any reason after the loss
11  incident occurred on January 25th, 2003?
12      A.  No.
13      Q.  Did you have any contact, telephone
14  contact, correspondence contact, any type of
15  contact with any representatives or employees of
16  Gallaudet or Guest Services after the water leak
17  incident took place?
18      A.  No.
19      Q.  You weren't involved in the repairs of
20  the system after the leak occurred?
21      A.  No.
22      Q.  During the July 2002 inspection, what

Page 32

1   was the reason why Mr. Vane was out there?
2       A.  Mr. Ham had asked if we would show him
3   where these -- where things were, because he was
4   just taking over the maintenance and he was there
5   to show him where drum drips were, where the
6   inspector's tests were, where dry valves were and
7   what was involved.
8       Q.  And how did Mr. Vane determine where
9   all these things were?
10      A.  We have a folder that has everything
11  listed on as far as where locations are and then
12  Mr. Ham also had a blueprint of the construction
13  of the building as far as the sprinkler is
14  concerned.
15      Q.  And would it be correct to say that the
16  folder would have been the same folder that
17  Capitol used between '96 and '99 to inspect the
18  same systems?
19      A.  Yes, yes.
20      Q.  So, on that occasion, in July of 2002,
21  you and Mr. Vane and -- there was a third person,
22  Mr. --

Page 33

1       A.  Francis.
2       Q.  Francis, did the trip test and all the
3   other testing that needs to be done for the dry
4   pipe systems, correct?
5       A.  Yes.
6       Q.  Other than Mr. Ham, did any building
7   maintenance people accompany you during that
8   period of work?
9       A.  I don't recall.
10      Q.  Do you know whether or not somebody had
11  to unlock certain locks or doors or whatever to
12  give you access to all of the points that had to
13  be drained and valves that had to be turned, that
14  type of thing?
15      A.  Yes.
16      Q.  Do you know who that person was?
17      A.  I don't recall.
18      Q.  Mr. Ham did not do that?
19      A.  No.
20      Q.  Somebody else was assigned to let you
21  get access to these areas?
22      A.  Yes.

9 (Pages 30 to 33)

## Capital Reporting Company

Page 38

1  at that location? For example, if there was
2  construction in an area and you couldn't get to a
3  drain or a valve or something like that, where you
4  couldn't finish all of your work, would you
5  normally note that type of field condition on that
6  report in that section?
7      A.  Sometimes.
8      Q.  Does anybody review those reports back
9  at the office, to your knowledge?
10     A.  Mr. Vane does.
11     Q.  Do you know if he does it on a daily
12  basis?
13     A.  Usually when we the folders back, if
14  there are any deficiencies or any problems that we
15  have, we show him that folder, so he's aware of it
16  so he can contact the customer.
17     Q.  So, if there is nothing written in that
18  deficiency section, is that meant to denote that
19  there were no problems and that all the work that
20  needed to be done was done?
21     A.  Yes.
22     Q.  On those two reports that you have in

Page 39

1  front of you for July of 2002 and January 2003, is
2  that your printing and handwriting?
3      A.  Yes.
4      Q.  On both of them?
5      A.  Yes.
6      Q.  Were there any problems that you recall
7  performing the work, the inspection work and
8  testing work that had to be done in July of 2002?
9      A.  No.
10     Q.  Did Mr. Vane actually assist in doing
11  that work, and by "assist" I mean hands-on that he
12  did some of the work with you and Mr. --
13     A.  Francis.
14     Q.  Francis?
15     A.  Yes.
16     Q.  He wasn't there just saying "You guys
17  do the work. I'll talk to Mr. Ham or I'll do
18  something else"?
19     A.  No.
20     Q.  And as I understand your testimony, you
21  were not back to the building at all between July
22  of 2002 and January 9th, 2003, correct?

Page 40

1      A.  No.
2      Q.  Other than learning Mr. Ham's name
3  during the July visit, did you learn the name of
4  any other employee at the building during that
5  visit?
6      A.  The gentleman that met us at the desk
7  probably introduced himself, but I can't recall
8  what his name was.
9      Q.  Okay. And you didn't make a note of
10  that? It's not written in any record there or
11  anything?
12     A.  No, no.
13     Q.  What about at the time of the January
14  9th inspection? Did you see Mr. Ham at that
15  inspection?
16     A.  No.
17     Q.  Do you know the name of anybody that
18  accompanied you, anybody employed at the building
19  who accompanied you during that inspection?
20     A.  Like I said that gentleman I met and we
21  shook hands and he probably mentioned his name and
22  it probably went in one ear and out the other.

Page 41

1      Q.  I know it's more than three years after
2  that inspection took place now. Did you know that
3  person's name two weeks after the inspection took
4  place?
5      A.  No.
6      Q.  So you really never learned his name.
7  He may have said it, but the day after you didn't
8  remember what it was?
9      A.  Exactly.
10     Q.  You're like me. I'm not good with
11  names, and in and out right away?
12     A.  Exactly.
13     Q.  So basically other than Mr. Ham, based
14  on your two inspection visits to this building,
15  you didn't know of anyone else who worked in the
16  building?
17     A.  Correct.
18     Q.  Can you describe the person that
19  accompanied you and Mr. Scott to give you access
20  to the various areas to do your work during the
21  January 9th visit?
22     A.  It was the same gentleman that

11 (Pages 38 to 41)

# Capital Reporting Company

Page 42

1  accompanied us in July.
2      Q.  So you would give the same description
3  of the gentleman, yes?
4      A.  Yes.
5      Q.  Only six months older?
6      A.  Yes.
7      Q.  In terms of the testing of the system,
8  the dry pipe systems, you didn't do the trip test
9  at that time, correct?
10     A.  In --
11     Q.  January.
12     A.  No.
13     Q.  But you do have to drain the drum drips
14 for other reasons.
15     A.  Correct, correct.
16     Q.  And how many drain areas are there in
17 the system that you had to drain?
18     A.  Approximately seven I think.  There
19 is -- in my folder I had it listed down, but I
20 think the fourth floor there is two -- one in each
21 stairway, and there is another one there, and I
22 can't recall at the time; and then on the fifth

Page 43

1  floor there is stairways there plus the vending
2  area and the room that we didn't have access to.
3      Q.  In Capitol's interrogatory answers to
4  some questions that -- written questions that we
5  gave to Capitol, in answer to number nine they
6  describe the areas where these drains were
7  located.  Have you seen these answers before?
8      A.  Um-hum.
9      Q.  Yes?
10     A.  Yes.
11     Q.  Does that accurately reflect that
12 answer, number nine, and you can just read it to
13 yourself, does that accurately reflect where all
14 the drain areas are to the system?
15         (Brief pause while witness peruses
16 document.)
17     A.  Yes.
18     Q.  A moment ago you gave an answer in
19 which you refer to my folder.  Is the folder that
20 you are referring to the same folder that Mr. Vane
21 was talking about, the customer folder?
22     A.  Yes.

Page 44

1      Q.  You didn't keep your own records or
2  anything for each customer?
3      A.  No, no.
4      Q.  And if we looked at that folder and
5  requested a copy of -- I don't know if I did
6  request a copy, but I'll request it now, a copy of
7  the folder cover, whatever has the information
8  about all these drains and locations are, we would
9  see a listing of these drains as described in this
10 interrogatory answer?
11     A.  Yes.
12     Q.  Did you have out at the scene when you
13 did the January inspection of 2003 any plans,
14 diagrams, sketches of the sprinkler system to look
15 at to tell you where all these things were, or
16 were you strictly going by what was on the folder?
17     A.  Strictly by what was on the folder and
18 my knowledge.
19     Q.  In your memory of what happened six
20 months earlier?
21     A.  Yes.
22     Q.  On the inspection sheet, itself, there

Page 45

1  is no line to check, there is no column to check
2  for, to confirm that you drained all the drain
3  areas, is there?
4      A.  No.
5      Q.  But there are certain things on there
6  that in order to do those items you have to have
7  drained the drum drips.  Is that correct?
8      A.  As far as -- I don't understand what
9  you are saying.
10     Q.  Of any of the sixteen listed items, in
11 order to -- in order to check off that you have
12 actually done that, don't you have to have already
13 drained the drum drips in order to check some of
14 those boxes off?
15     MR. BROOKS:  I'm going to object to the
16 question.  You're assuming facts about a dry out
17 trip test, and you have given him a July '02
18 document in connection with a question of January
19 of '03.
20     MR. GROTH:  I'm sorry.
21 BY MR. GROTH:
22     Q.  Let me show you the January document.

12 (Pages 42 to 45)

## Capital Reporting Company

Page 50

1  valve, and then close the end valve and drain it
2  so you can maintain air pressure?
3      A.  Yes.
4      Q.  Is that the way you normally did it,
5  the winter check?
6      A.  Yes.
7      Q.  Do you recall doing it that way on
8  January 9th, 2003?
9      A.  Yes.
10     Q.  Now did you drain, you and Mr. Scott,
11 drain all of the drain points during the January
12 9th 2003 inspection?
13     A.  All but the one in that room.
14     Q.  The one above conference room 5200?
15     A.  Correct.
16     Q.  As is listed in this interrogatory
17 answer.  It says "One drum drip is located in the
18 ceiling of conference room 5200."  That's the one
19 that you did not drain.
20     A.  Correct.
21     Q.  Were you supposed to drain that drain?
22     A.  Yes.

Page 51

1      Q.  Why were you supposed to drain that
2  drain?
3      A.  Because it's part of the dry system and
4  has a drum drip above it.
5      Q.  And you drained that drain in July of
6  2002?
7      A.  Yes.
8      Q.  Why didn't you drain the drain in
9  January of 2003?
10     A.  Because I did not have access to the
11 room.
12     Q.  Why did you have access?
13     A.  The gentleman that was with us did not
14 have a card access to let us into the room.
15     Q.  This is the same gentlemen that had the
16 card in July of 2002?
17     A.  Correct.
18     Q.  Describe to me the conversation you had
19 with this gentleman regarding getting access to
20 that room.  Tell me what you said.  Tell me what
21 he said.
22     A.  We were going to the room and when we

Page 52

1  got to the room he says, "I don't have a card.  I
2  have to go down stairs and get the card for the
3  access."
4      Q.  And how far is is downstairs from where
5  you were?
6      A.  We're on the fifth floor.
7      Q.  What did you do?  Take the elevator
8  down?
9      A.  You have to take the elevator down and
10 go to the front desk.
11     Q.  And how long would you suppose it would
12 have taken him to go down, get the elevator and
13 get the card and come back up?
14     A.  Five minutes, ten minutes.
15     Q.  Five, ten minutes?
16     A.  Um-hum.
17     Q.  What kind of distance are we talking
18 about?
19     A.  However long it takes him to get to the
20 elevator, go downstairs to the front desk, or
21 however fast the elevator runs.
22     Q.  Did he say why he didn't have the card

Page 53

1  with him?
2      A.  He hadn't checked out a card -- no, he
3  didn't say why he didn't have a card.
4      Q.  Did he offer to go down and get the
5  key -- get the card?
6      A.  No.
7      Q.  Was this drum drip that had to be
8  drained above this conference room the first, last
9  or one of the middle drains that you were doing?
10     A.  The last.
11     Q.  It was the very last drain?
12     A.  The very last drain.
13     Q.  Was this the last drain that you had to
14 do in order to complete this drum?
15     A.  Right.
16     Q.  Did you have to go back to the control
17 room or turn any other valves or do any other work
18 in order to get the system reset?
19     A.  I would have to go back to the account
20 room to leave my paperwork.
21     Q.  That was it?
22     A.  That was it.

14 (Pages 50 to 53)

## Capital Reporting Company

Page 54

1    Q.  Where is the mechanical room?
2    A.  Above the fifth floor, in the middle of
3    the building.
4    Q.  How do you get there, by elevator or
5    walking space?
6    A.  You have to go up steps.
7    Q.  So, you get to the point where he says
8    he doesn't have a card to get in this doorway.
9    What happens next?
10   A.  We asked if he was going to get a card
11   and he just kind of looked at us like, you know,
12   he really didn't want to -- he would take care of
13   it.  He said he would take care of the drum drip,
14   and I asked him, I said "Are you going to take
15   care of this" -- I said, "You know what?  I can't
16   get in the room.  Are you going to take care of
17   this drum drip?"
18   Q.  Well did you ask him to go get the
19   card?
20   A.  No, I didn't ask him to go get the
21   card.
22   Q.  Why didn't you ask him to go get the

Page 55

1    card?
2    A.  He should have had the card.
3    Q.  Why did you not ask him specifically to
4    go get the card, even if he didn't have the card
5    with him at the time?
6    MR. BROOKS:  It's been asked and
7    answered.  Can I have the last question read back.
8    THE REPORTER:  "Question: Why did you
9    not ask him specifically to go get the card, even
10   if he didn't have the card with him at the time?"
11   MR. BROOKS:  Asked and answered.
12   MR. GROTH:  No, it's not.  I asked him
13   before why he didn't ask him to go get the card
14   and he said the guy should have had the card with
15   him.  He didn't answer the question the first
16   time.  If you want to go back and read that, we
17   can do that, too.
18   MR. BROOKS:  You can answer to the best
19   of your recollection.  You can answer.
20   THE WITNESS:  Can you ask the question
21   again.
22

Page 56

1    BY MR. GROTH:
2    Q.  Sure.  Why didn't you ask this person,
3    whose name you didn't have and still don't have --
4    correct?
5    A.  Yes.
6    Q.  Why didn't you ask him to go get the
7    card so you could have access to drain the last
8    drain you had left?
9    A.  I asked him to get the card but I don't
10   remember him going to get the card.
11   Q.  So you don't remember him saying "I
12   refuse to get the card" or anything like that?
13   A.  He didn't refuse to get the card.  It
14   wasn't said that he would get the card.  It was
15   just he would take care of the drum.
16   Q.  Let me ask you about that.  Did you ask
17   him, since you don't have a card, "Will you take
18   care of the drum drip?"
19   A.  I asked him if he would take care of
20   the drum drip.
21   Q.  So you made a request?
22   A.  I made a request.

Page 57

1    Q.  And when you asked him that question,
2    did you know at that time anything about his
3    background, experience, reliability, competency to
4    do the work that you were requesting that he do?
5    A.  No.
6    Q.  Did you ask him for any information
7    that would allow you to access that, whether he
8    was competent, qualified, trained in order to do
9    this job?
10   A.  No.
11   Q.  Did you have any reason to believe that
12   he had those kind of qualifications or training?
13   A.  Excuse me?
14   Q.  Did you have any reason to believe, did
15   you have any facts that told you that this guy
16   could do what needed to be done with this drum
17   drip?
18   A.  He was assigned to us by the
19   maintenance, so I assume that he was going -- he
20   was able to do that.
21   Q.  You made an assumption?
22   A.  Yes.

15 (Pages 54 to 57)

## Capital Reporting Company

Page 66

1    Q.  Did he tell you that was a bad decision
2  on your part?
3    A.  Yes, he did.
4    Q.  Were you reprimanded in any way?
5    A.  No.
6    Q.  Did Mr. Vane tell you that if this ever
7  happens again where you face a situation where you
8  can't do all the work, that you should note that
9  on your report?
10    A.  That I should note that?
11    Q.  Yes.
12    A.  Yes.
13    Q.  Did he tell you or give you any
14  instructions telling you that you should not allow
15  or permit or authorize any building personnel from
16  doing -- you should not allow any building
17  personnel to do work that you were supposed to be
18  out there doing?
19    A.  No, he didn't say that.
20    Q.  Have you ever had a situation arise
21  since the date of this loss where you've
22  authorized some building person to do some of the

Page 67

1  work that you went out there and were supposed to
2  be doing?
3    A.  No.
4    Q.  Did you ever write down or give a
5  statement to anybody regarding what you did during
6  your inspection on January 9th, 2003?  I mean
7  write out by hand a statement of what you and your
8  partner did out there during that inspection.
9    A.  I don't recall writing any statements
10  other than the questions that have been asked by
11  attorneys.
12    Q.  Okay.  What about giving a taped
13  statement where somebody asks you questions on a
14  tape recorder, taped the conversation?
15    A.  No.
16    Q.  Did Mr. Vane, during that conversation
17  you had with him, the day after the leak took
18  place, did he ask you who this person was that you
19  were going to permit to do this --
20    A.  Yes.
21    Q.  -- work.  What did you tell him?
22    A.  I told him I didn't know the

Page 68

1  gentleman's name.
2    Q.  Did you describe him?
3    A.  Yes, I did.
4    Q.  Did you tell him it was the same person
5  that you had both seen there in July?
6    A.  Yes.
7    Q.  Was there any discussion of contacting
8  Guest Services or Gallaudet, either you or Mr.
9  Vane or somebody else, to contact them to try to
10  find out the name of that person and try and find
11  out who they were?
12    A.  There was no conversation brought to
13  my, no.
14    Q.  Did you ever have a discussion about
15  your inspection in January or this incident with
16  anybody else at Capitol other than Mr. Vane?
17    A.  Yes, with Mr. Parham.
18    Q.  When was that?
19    A.  I can't remember if it was the same day
20  or a day after.  It was within that week.
21    Q.  Who was present for that?
22    A.  Mr. Vane was present and Mr. Parham was

Page 69

1  present.  I don't recall if anybody else was
2  there.
3    Q.  What about Mr. Scott?
4    A.  I don't recall if Mr. Scott was there.
5    Q.  And where was that discussion?
6    A.  In Mr Vane's office.
7    Q.  And what was the purpose of that
8  meeting?
9    A.  To try to find out what happened as far
10  as the circumstances and how not to let it happen
11  again.
12    Q.  Okay.  So basically you were having the
13  same discussion with Mr. Parham that you had with
14  Mr. Vane a day or two before?
15    A.  Yes.
16    Q.  Did you give him any additional
17  information that you had not given Mr. Vane when
18  you talked to him first?
19    A.  No.
20    Q.  And what did Mr. Parham say about the
21  way that you conducted the inspection on January
22  9th?

18 (Pages 66 to 69)

## Capital Reporting Company

Page 74

1 whether or not that was okay with them?
2     A.  No.
3     Q.  In these interrogatory answers, again
4 these are answers to written questions that were
5 put to Capitol that Capitol answered, they
6 identified the person that accompanied you during
7 the January 9th inspection as Terrence Hubbard,
8 H-u-b-b-a-r-d.  Do you know where Capitol got that
9 name from?
10    A.  No, I don't.
11    Q.  They didn't get it from you?
12    A.  No.
13    Q.  Do you know if they got it from Mr.
14 Scott?
15    A.  I don't think so.
16    Q.  During the January 9th inspection, did
17 you find any other problem with the dry pipe
18 system of the parts that you had access doing work
19 on?
20    A.  No.
21    Q.  No problem with the dry pipe valve?
22    A.  No.

Page 75

1     Q.  No problem with the compressor?
2     A.  No.
3     Q.  No problem draining any of the other
4 drains?
5     A.  No.
6     Q.  In the interrogatory answers from
7 Capitol in response to question number three, it
8 states in part, and I will let you read this whole
9 answer if you like, it states in part, "Upon
10 learning that Mr. Hubbard would not provide Mike
11 Bowling, a Capitol employee" -- actually it's
12 written out wrong, but I'm reading it exactly the
13 way it is, "Upon reading that Mr. Hubbard would
14 not provide Mike Bowling, the Capitol employee," I
15 think it refers to, "with a key to open the door,
16 requested that Mr. Hubbard obtain the key and
17 provide access to the drum drip.  Mr. Hubbard was
18 unwilling to obtain necessary key, such that
19 Capitol was denied access to the drum drip."
20    You can read all of that answer to
21 number three to yourself and then I will ask you a
22 question about it.

Page 76

1     (Brief pause while witness peruses
2 document.)
3     Q.  Okay, have you had a chance to read
4 that?
5     A.  Yes.
6     Q.  Was the individual, whoever it was,
7 that you -- that accompanied you during the
8 January inspection unwilling, which is the term
9 they use in that answer, unwilling to go get the
10 key?
11    A.  He didn't come out and say no.
12    Q.  As I recall your testimony from a
13 couple of minutes ago, I think you said that you
14 never requested that he didn't get the key.  Is
15 that correct?
16    A.  Right.
17    Q.  So to say that in that answer that he
18 is unwilling to go get the key, did he ever refuse
19 to go get the key?
20    A.  No.
21    Q.  You did this inspection on January 9th,
22 2003.  Did you find any freezing of any pipes or

Page 77

1 valves in the system when you did the work that
2 you did do?
3     A.  No.
4     Q.  Even in terms of the draining of the
5 drum drips that you did drain, there was no frozen
6 water or anything in those drains?
7     A.  No.
8     MR. GROTH:  I have no other questions.
9 This other counsel may have some other questions
10 for you also.
11    EXAMINATION BY COUNSEL FOR DEFENDANT:
12 BY MR. FOSTER:
13    Q.  Mr. Bowlin, my name is Matt Foster.
14 I'm here on behalf of Steve Horvath, the lead
15 counsel for Guest Services.  I'm just going to ask
16 you a couple of follow-up questions.  You'll have
17 to forgive me if I duplicate a few things.  I'll
18 try not to, though.
19    What did you do today to prepare for
20 your deposition?
21    MR. BROOKS:  I'm going to object,
22 direct the witness not to answer to the extent it

20 (Pages 74 to 77)

## Capital Reporting Company

Page 106

1    Q.  How do you know he did that?
2    A.  Because he took us to some of the
3  stairways and I wasn't sure about like the
4  locations, like I was sure of the location at the
5  panel was in the vending room, but he had to show
6  me on the floor where the vending room was.
7    Q.  So how do you know he knew there was a
8  valve located behind this door that would not
9  open?
10    A.  Well I showed him on my list, on my
11  folder that there was an -- inside this room which
12  I had marked as a room number that there was a
13  drum drain.
14    Q.  So you told him, "We need to get access
15  to this door"?
16    A.  Correct.
17    Q.  You stated earlier that Scott was a
18  good assistant.  Did you ever ask Scott to run
19  down to the front office to get a key?
20    A.  It wasn't his responsibility.
21    Q.  That's not what I asked you.  Did you
22  ever ask Scott to run down to the office to get a

Page 107

1  key?
2    A.  No, no.
3    Q.  Did you ever say, "I will go down to
4  the office to get the key"?
5    A.  No.
6    Q.  Did you ever ask him to make contact,
7  when I say "him," the unnamed employee.  Did you
8  ever ask him to make contact with Mr. Hubbard --
9  not Mr. Hubbard -- with Mr. Ham to get access to
10  this room?
11    A.  No.
12    Q.  You stated earlier that you found out
13  about the incident the Monday following, you know,
14  January 25th, 2003?
15    A.  And Mr. Vane told you there was an
16  incident at Gallaudet?
17    A.  Yes.
18    Q.  At that time did you say, "Hey, I told
19  somebody to cover this.  It's not my fault"?
20    A.  No, I didn't say it that way.
21    Q.  What did you say to him?
22    A.  I said that the gentleman that was

Page 108

1  there would take care of it.  He said he would
2  take care of it and we didn't have access.
3    Q.  Did Mr. Vane ever indicate to you that
4  you were going to be in trouble for this?
5    A.  No.
6    Q.  Did Mr. Vane ever indicate to you that
7  Mr. Scott was going to be in trouble for this?
8    A.  No.
9    Q.  Did Mr. Vane ever ask you, "Let's get
10  in my truck right now and go over to Gallaudet and
11  you point to me which employee said that they
12  would release the pressure from the drip drain"?
13    A.  No.
14    Q.  Did you ever suggest to Mr. Vane that
15  we should go to Gallaudet and find out who this
16  mystery employee is?
17    A.  No.
18    Q.  Did Mr. Scott ever ask you, "Hey, let's
19  drive over right now and go find out who this
20  person is"?
21    A.  No.
22    Q.  Did you ever talk to Mr. Scott after

Page 109

1  January 25th, 2003 about the incident?
2    A.  Yes.
3    Q.  How often did you talk to him about it?
4    A.  We talked about it as far as what not
5  to do as far as putting it on our inspections
6  sheet if somebody tells us that, that we need to
7  start logging it down.
8    Q.  I didn't ask you what you talked about.
9  How often do you think you talked about it?
10    A.  I don't know.
11    Q.  Would you say that you talked about it
12  at least two times a week?
13    A.  No.
14    Q.  It was just maybe a one or two time
15  incident that you talked about?
16    A.  Correct.
17    Q.  Did you ever think you were at fault
18  for this?
19    A.  No.
20    Q.  Were you ever afraid of losing your job
21  over this incident?
22    A.  No.

28 (Pages 106 to 109)

EXHIBIT "B"

**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2       - - - - - - - - - - - - - - - X

 3    ST. PAUL MERCURY INSURANCE      :

 4    COMPANY, as Subrogee of         :

 5    Gallaudet University,           :

 6              Plaintiff,            :

 7       v.                           : Case No.:

 8                                    : 1:05-cv-02115

 9    CAPITOL SPRINKLER               :

10    INSPECTION, INC.,               :

11              Defendant.            :

12       - - - - - - - - - - - - - - X

13                        Washington, DC
                          Monday, August 14, 2006
14    Deposition of:
                       VERNON VANE
15    called for oral examination by counsel for

16    Plaintiff, pursuant to Notice, at the Law Office

17    of Mesirow and Stravitz, 2000 Massachusetts

18    Avenue, NW, Washington, DC, before Kim Brantley of

19    Capital Reporting, a Notary Public in and for the

20    District of Columbia, beginning at 10:08 a.m.,

21    when were present on behalf of the respective

22    parties:
```

# Capital Reporting Company

Page 18

1    A.  Yes.
2    Q.  Who was Poplin's helper?
3    A.  Rudy.
4    Q.  Rudy Cooper was Poplin's helper?
5    A.  Well Virgil worked with -- Virgil was
6  with me and actually when we were going then Mike
7  and Rudy were together.
8    Q.  I'm sorry, you lost me there for a
9  second.  Poplin worked with you as a helper for a
10  while?
11    A.  Yes.
12    Q.  And Rudy worked with Mike Bowlin?
13    A.  Yes.
14    Q.  As a helper?
15    A.  As a helper, yes.
16    Q.  Even though he was more experienced
17  than Mike Bowlin?
18    A.  Well, I wouldn't say he was more
19  experienced.
20    Q.  On the inspection side?
21    A.  On the inspection side, yes, yes.  I
22  mean, you say "helper."  I mean, I just -- they

Page 19

1  worked together.
2    Q.  A team?
3    A.  Teamwork, yes.
4    Q.  But as of January of 2003, Mike Bowlin
5  was your least experienced inspector?
6    A.  No.
7    Q.  Who was your least experienced
8  inspector?
9    A.  Tim Francis.
10    Q.  I thought he was a helper?
11    A.  Okay.  Inspector.  Yes, Mike was the
12  least.
13    Q.  And he had only started doing
14  inspections when, Mike Bowlin?
15    A.  Maybe a year or two before that.
16    Q.  And in terms of his on-the-job training
17  for inspections, not for installing, he had been
18  installing for some years, correct?
19    A.  Correct.
20    Q.  Who gave him his OJT for inspections?
21    A.  I did and -- well, as a team, they went
22  out together and then if they had any problems I

Page 20

1  oversaw whatever they did.
2    Q.  Who is "they"?
3    A.  If he and Rudy went together, then.
4    Q.  But in terms of training, both Mike and
5  Rudy could do this inspection job.  That would be
6  one of your functions as supervisor?
7    A.  Right.
8    Q.  Can you give me a brief description of
9  your educational background, please?
10    A.  High school graduate.
11    Q.  What year?  Well you must go to
12  reunions once in a while?
13    A.  No, I don't.  '60 I think, somewhere
14  around there.
15    Q.  Any formal education after that?
16    A.  No, just went in the union.  I was in
17  the United Association of Pipe Fitters.
18    Q.  Pipe fitters?
19    A.  Yes, and sprinkler fitters and did the
20  five years and finished that.
21    Q.  Was that right after high school?
22    A.  No, it was -- it was after my first

Page 21

1  marriage.  So that would have been around '64 I
2  think I started.
3    Q.  So you started working for Capitol
4  around 1990?
5    A.  No, it was eighty -- I'm trying to
6  think -- my oldest is twenty-five.
7    Q.  Oh, you said twenty-three years.  I'm
8  sorry.
9    A.  I think it was '80, '80 or '81
10  somewhere in there.  I'm not real sure.
11    Q.  And between the time you finished your
12  apprenticeship in the union and '81, did -- '80,
13  '81 when you went to Capitol, did you have any
14  other jobs in the sprinkler industry?
15    A.  No.  After I -- well I worked for
16  Grinnel Company.  I was there for almost ten
17  years.
18    Q.  What did you do for them?
19    A.  Same thing, in the field.
20    Q.  Inspections?
21    A.  No, no, job foreman and installer.
22    Q.  Why did you leave there?

6 (Pages 18 to 21)

## Capital Reporting Company

Page 30

1  always told them about drum drips and low point
2  drains and so forth and that they had to be taken
3  care of.
4      Q.  Who is the "they" you're referring to?
5      A.  Okay, any maintenance people or anyone
6  that is in charge in the building.
7      Q.  You were answering my question
8  specifically with regard to this situation at
9  Gallaudet and it was not meant to be for this
10  situation.  I meant in general.  As in general?
11      MR. BROOKS:  Can I have the original
12  question read back, because I thought it did ask
13  about non-employees of Gallaudet University.
14      THE REPORTER:  "Question: As an
15  example, just as an example, did you ever train or
16  instruct any of your inspectors or helpers that it
17  was okay for them to permit or authorize some
18  non-employee of Capitol, I don't care who it is,
19  any non-employee of Capitol to do any part of the
20  work they were supposed to be doing?
21      "Answer: We always instructed them to,
22  and showed them how to do the draining, which is

Page 31

1  is what they had to do.  I mean we were only there
2  initially and then in a six month frame, so we
3  always told them about drum drips and low point
4  drains and so forth and that they had to be taken
5  care of.
6      "Question: Who is the 'they' you're
7  referring to?
8      "Answer: Okay, any maintenance people
9  or anyone that is in charge in the building.
10      "Question: You were answering my
11  question specifically with regard to this
12  situation at Gallaudet and it was not meant to be
13  for this situation.  I meant in general.  As in
14  general."
15      MR. BROOKS:  A non-employee of Capitol,
16  thank you.
17  BY MR. GROTH:
18      Q.  We're going to go over that question
19  again.  I'll try to rephrase it a little
20  differently.
21      Did you ever train your employees that
22  it was okay for them not to do all the work that

Page 32

1  had to be done to test the system but that they
2  could allow other people who were not employees of
3  Capitol to do some of the work?
4      A.  During the testing?
5      Q.  Yes.  During the testing or inspection
6  of these sprinkler systems.
7      A.  No.
8      Q.  Is there anything in the NFPA 25 that
9  authorizes or permits people who are not familiar
10  with or trained in the -- to do the type of
11  inspections that we just talked about to do the
12  procedures that are outlined in NFPA 25 to test
13  and inspect these systems?
14      A.  I don't know.  I couldn't state -- I
15  don't know what the book says regarding that.
16      Q.  Do you know if there are any provisions
17  in NFPA 25 which talk about experience -- the
18  experience or training that someone should have in
19  order to do this type of work?
20      A.  Not that I'm aware of.
21      Q.  Have you, in your fifteen years as a
22  supervisor of inspections in doing field work

Page 33

1  during that period of time, ever permitted one of
2  your customers or asked one of your customers to
3  do any part of the work that Capitol Sprinkler was
4  contracted to do?
5      A.  Not that I can recall.
6      Q.  Why not?  Why would you not do that?
7      A.  Why would I?  I mean, if I'm there to
8  do a job, we're going to do the job, and that's
9  it, but we do -- we do it while we're there.  I
10  mean --
11      Q.  And when you say "the job," do you mean
12  the whole job, that means --
13      A.  Well, whether it be dry system, wet
14  system, fire pump, whatever.
15      Q.  But I'm talking about the job from
16  beginning to end.  So for example if you have a
17  dry system.
18      A.  Right.
19      Q.  You start out by testing the system,
20  you let the air leak out, you fill the pipes with
21  water and you take your measurements, whatever you
22  have to do, and then you have to drain the system

9 (Pages 30 to 33)

## Capital Reporting Company

Page 38

1    Q.  Okay.  But in any event, over your
2  three years doing inspections you knew where
3  everything was.  You really didn't need any sketch
4  or anything?
5    A.  Basically.
6    Q.  So you took Mike Bowlin around and Tim
7  Francis and you showed them what to do, correct?
8    A.  Yes.
9    Q.  I'm sorry, we're back to July of 2002?
10    A.  Three.
11    Q.  2002.
12    A.  Yes, right.
13    Q.  At that time, were you aware that Guest
14  Services was a managing agent for the building
15  for Gallaudet University?
16    A.  Yes.
17    Q.  The contract was signed with Guest
18  Services basically, wasn't it?
19    A.  Yes.  We -- yes.  That's true.
20    Q.  And you made your arrangements to
21  inspect the building in terms of scheduling and
22  making sure somebody was there to give you access

Page 39

1  and whatever through Guest Services?
2    A.  Through David Ham.
3    Q.  Who was he?
4    A.  He was the chief, I guess you would
5  call it.
6    Q.  Of --
7    A.  Head of maintenance.
8    Q.  Of?  Is he a Guest Services employee?
9    A.  Guest Services.
10    Q.  I want to know what you thought at that
11  time.
12    A.  Guest Services.
13    Q.  Did you do this type of work for any
14  other buildings on the Gallaudet campus other than
15  the Kellogg Conference Center?
16    A.  No, sir, just that building.
17    Q.  And back in July of 2002, did you make
18  arrangements with David Ham of Guest Services to
19  do this inspection?
20    A.  Yes.
21    Q.  And who if anybody was present for that
22  inspection from Guest Services?

Page 40

1    A.  We typically started outside with the
2  pump.  Nobody was there for that, and then once we
3  moved inside, then we would go to the desk and
4  tell them that we were ready to do inside, or go
5  down to David's office, either way, and they would
6  be -- send somebody or he would assign somebody to
7  go with us.
8    Q.  Ham did not go with you, himself?
9    A.  No.
10    MR. BROOKS:  Are we talking July?
11    MR. GROTH:  Yes, we're talking July
12  '02.
13  BY MR. GROTH:
14    Q.  Why did you need somebody from Guest
15  Services to accompany you?
16    A.  For access, keys, things of that
17  nature.
18    Q.  What were you getting access to that
19  needed a key?
20    A.  Well there were locks on the valves
21  that had to be unlocked and rooms, things of that
22  nature.

Page 41

1    Q.  Okay.  And do you know who Mr. Ham
2  assigned to you to do that?
3    A.  No.
4    Q.  Can you describe the person physically?
5    A.  As I recall.
6    Q.  Yes.
7    A.  A tall, slender black man.
8    Q.  Age, approximately?
9    A.  Thirties.
10    Q.  Did he wear any kind of uniform, like a
11  shirt with "maintenance" like a name on it or a
12  company name or anything like that?
13    A.  I don't recall, I don't recall.
14    Q.  Even if he did and he had his name
15  stitched on the shirt, you wouldn't recall that
16  one way or the other?
17    A.  No, no.
18    Q.  Is this the first time you ever saw
19  this person?
20    A.  Yes.
21    Q.  In other words he had not been there
22  between 1996 and 1999?

11 (Pages 38 to 41)

# Capital Reporting Company

Page 42

1    A. No.
2    Q. Now, is he the only person who
3 accompanied you to unlock these areas that needed
4 to be unlocked in July?
5    A. As I recall, yes.
6    Q. And were you given access to all the
7 areas that you needed to be given access to to do
8 the completed testings and inspection?
9    A. Yes.
10    Q. And how many of those areas or valves
11 or whatever require a key?
12    A. Just the ones that are sort of in the
13 public area, like the stairways and things.
14    Q. By count, can you give me a number
15 approximately how many there are?
16    A. Two on the fifth floor and one on the
17 fourth floor, I believe it is.
18    Q. Now does that include those valves that
19 are locked that you need a key for also?
20    A. I believe the control valves on the
21 drive point valves had a chain on them also. I
22 believe they did. I don't recall exactly, but.

Page 43

1    Q. And would need a key for that?
2    A. And would need a key for that.
3    Q. So that's a total of about four
4 different keys that have to be used to give you
5 access --
6    A. More than likely they were all keyed
7 alike. That's typical.
8    Q. So you generally used the same key?
9    A. More or less.
10    Q. But basically four or five different
11 areas where you have to have access to where you
12 need a key to do your work?
13    A. Basically.
14    Q. And this one person who was with you is
15 the one who went around and gave you access to do
16 all that, correct?
17    A. Yes.
18    Q. Did any direct employee of Gallaudet
19 accompany you on that inspection of the tour.
20    A. No.
21    Q. Now, getting a roundabout way back to
22 that earlier answer about you trying to tell your

Page 44

1 customers certain information about their system,
2 correct?
3    A. Right.
4    Q. The person that you told about this
5 system or that you talked to about this system,
6 the only person that you are talking about is this
7 tall, slender black man in his thirties from July
8 of 2002, correct?
9    A. No. He just assisted us, I mean,
10 walked with us and unlocked things. That's all he
11 did.
12    Q. Let me rephrase the question. Did you
13 have any discussion with that man concerning how
14 this system operates?
15    A. None that I can remember.
16    Q. Did you have any discussion with him
17 about the procedure you need to follow to drain a
18 drum drip?
19    A. No.
20    Q. Did you know anything about the history
21 or competency or reliability of the person that
22 accompanied you in July of 2002?

Page 45

1    A. No.
2    Q. From your recollection, do you recall
3 if this person did anything to indicate to you
4 that he knew something about sprinkler systems and
5 how to test them and inspect them and do the type
6 of work that Capitol Sprinkler is doing?
7    A. No.
8    Q. When Capitol finished doing that work
9 in July of 2002, does it require some sign off by
10 some representative of the building? In other
11 words, a sheet to be signed or anything like that?
12    A. No.
13    Q. Is that customarily the case with all
14 customers?
15    A. That's basically the way we do. We
16 have a triple part sheet and once we're finished,
17 you sign it, date it and fill it all in, and we
18 leave one hanging in the folder, one for the pump,
19 one for the dry systems and one for the wet
20 systems, in that case.
21    Q. And do you send Guest Services or
22 Gallaudet a copy of those?

12 (Pages 42 to 45)

# Capital Reporting Company

1  Capitol Sprinkler?
2      A.  Yes.
3      Q.  Is there any type of employee log or
4  daily diary or any other type of paperwork that
5  the employees have to fill out to show where they
6  were on any given day?
7      A.  No.
8      Q.  How about in their time cards?  Does it
9  list places where they went, the jobs that they
10  did, how much time they spent there?
11      A.  No.
12      Q.  Was there anything unusual or unique
13  about the testing and inspection of the dry pipe
14  systems at Gallaudet?
15      A.  No.
16      Q.  Nothing out of the ordinary that
17  presented any particular problem for the
18  inspectors to handle?
19      A.  No.
20      MR. BROOKS:  Are we talking July '02?
21      MR. GROTH:  Yes, in July or January of
22  '02?

1      A.  She's our office manager, accountant.
2      Q.  Does she send out the bills?
3      A.  Yes.
4      Q.  Who is Bill Treece, T-r-e-e-c-e?
5      A.  He's the owner.
6      Q.  Who is Charles Otis?
7      A.  Oh, he's an outside mechanic,
8  installer.
9      Q.  Do you know if he did some of the
10  repairs after the leak?
11      A.  Yes, I believe Craig called him and
12  they have a service truck.
13      Q.  Okay.  With materials on, tools, that
14  kind of stuff?
15      A.  Exactly.
16      Q.  How about Andrew Nichols,
17  N-i-c-h-o-l-s?
18      A.  Andrew Nichols?  Yes, he used to work
19  for us.
20      Q.  What did he do?
21      A.  He was never a volunteer.
22      Q.  What did he do?

1      THE WITNESS:  No.
2  BY MR. GROTH:
3      Q.  Does Capitol Sprinkler have any
4  documents, written documents with any type of
5  writing or notation indicating that somebody else
6  at the building agreed to drain one of the drum
7  drips during that January 9th, 2003 inspection?
8      A.  No.
9      Q.  Does Capitol Sprinkler have any
10  documents, any written documents to indicate that
11  it provided any explanations or instructions or
12  training to anybody at the building in July '02 or
13  January of '03 as to how to properly drain a drum
14  drip?
15      A.  No.
16      Q.  Does Capitol Sprinkler have any
17  documents in its business records to indicate that
18  it was not provided access to all drain areas of
19  the Gallaudet dry pipe system during the January
20  9th, 2003 inspection?
21      A.  No.
22      Q.  Who is Ann Golden?

1      A.  Just a helper.
2      Q.  Did he ever go to Gallaudet for any
3  reason that you know?
4      A.  Well, not that I can recall.
5      Q.  He's listed on Rule 26A disclosures by
6  Capitol as somebody having knowledge about the
7  circumstances surrounding the day of the loss.
8      A.  Andrew Nichols.
9      Q.  I'm sorry, wrong name.  I was looking
10  at Charles Otis.  He's listed by Capitol Sprinkler,
11  somebody having information regarding the
12  circumstances surrounding inspections of the
13  subject property.
14      A.  If he does, I mean, it's -- he was
15  just a helper.  He was down there with somebody,
16  maybe me.
17      Q.  In July or January of 2002, 2003, or
18  maybe in 1996 to '99?
19      A.  I'd say prior to all that, yes.
20      Q.  I asked you to sign a contract and you
21  couldn't make out the name.  Does the name Mike
22  Mahoney ring a bell?

18 (Pages 66 to 69)

# Capital Reporting Company

Page 86

1  Was it Bowlin or Scott?
2      A.  Probably Mike.
3      Q.  Did he describe the guy?
4      A.  No.
5      Q.  Did he say whether or not it was the
6  same guy that you and he had accompanied you
7  during the July inspection?
8      A.  No.
9      Q.  Did they tell you whether or not they
10  knew the guy's name?
11      A.  No.  Because we all asked that and
12  nobody seemed to recall names.
13      Q.  The drum drip that was not drained, was
14  that one of the drain points that you needed a key
15  to get to to open a door to get in a room to get
16  to the hatch?
17      A.  Yes.
18      Q.  I thought before you said that the guy
19  who had the key generally could open all the locks
20  with one key.  Is that correct?
21      A.  Yes, my understanding is that is in the
22  hotel and it's operated not by a key, but by a

Page 87

1  card.
2      Q.  The door?
3      A.  The door.
4      Q.  So was it your understanding from what
5  Mr. Bowlin was saying that this guy didn't have
6  the card on him?
7      A.  Exactly.
8      Q.  In interrogatory answers, which we will
9  get to in a second, I think the terminology used
10  in one of the answers was this person from the
11  building was "unwilling" to get the key.  Do you
12  recall that being in the interrogatory answers?
13      A.  I do recall that, yes.
14      Q.  In what sense did you understand from
15  the information you were getting from Mr. Bowlin
16  why this guy would be unwilling to get them the
17  key to do this work?
18      A.  I don't have a feel for that.  I mean,
19  Mike was there, you know.  I didn't have any -- I
20  don't know what the conversation was exactly.
21      Q.  Okay.  Did you question Bowlin about
22  that, like ask him the question, "Why didn't you

Page 88

1  tell the guy to go get the key to open the door?"
2      A.  Well, they asked him, it's my
3  understanding that they asked and he said he would
4  take care of it later.  That was it.
5      Q.  Well that wasn't my question.  Did you
6  ask or did Mr. Parham ask Mr. Bowlin, "Why didn't
7  you tell the guy to go get the key to open the
8  door?"
9      A.  I didn't ask that question, no.
10      Q.  Did Mr. Bowlin tell you that he knew
11  anything about this guy who apparently made the --
12  or allegedly made the proposition that he would
13  get the key and come back and drain this himself?
14  Did he know anything about the guy?
15      A.  Anything about work history?
16      A.  No.
17      Q.  Anything about his familiarity with the
18  sprinkler system?
19      A.  No.
20      Q.  Anything about his knowledge and
21  ability to manipulate a drum drip and make sure
22  that this process that you described earlier about

Page 89

1  opening and closing it, making sure all the
2  water's out, any inkling that this guy knew
3  anything about how to do that?
4      A.  Yes -- no, I don't know what Mike knew
5  about the gentleman.
6      Q.  Did Mike Bowlin tell you that he gave
7  this guy any type of instruction on how to do any
8  of this stuff?
9      A.  No.
10      Q.  Did Mike Bowlin tell you whether or not
11  he considered calling back to the office, to you
12  or to somebody else at the office, to see if this
13  procedure would be okay with you guys?
14      A.  No.
15      Q.  Did you suggest he should have done
16  that?
17      A.  No, not that I recall.
18      Q.  Other than telling Mr. Bowlin that he
19  should have noted on the inspection report, under
20  the deficiency section, that they did not drain
21  the one drum drip and that somebody else allegedly
22  volunteered to do that, did you have any other

23 (Pages 86 to 89)

# Capital Reporting Company

Page 90

1  criticisms of Mr. Bowlin's or Mr. Scott's
2  performance in that last inspection during that
3  meeting?
4      A.  None.
5      Q.  You told me earlier that in all your
6  years of doing inspections you had never asked a
7  representative of a customer or a building person,
8  whatever, to do any of the job that Capitol was
9  contracted to do.  Do you recall that testimony?
10     A.  Um-hum -- yes.
11     Q.  Did you tell them that it was not
12  appropriate for them to permit anybody, whether
13  they volunteered or didn't volunteer, to do any of
14  the work that Capitol's people were supposed to be
15  doing?
16     A.  No, I didn't tell them that.
17     Q.  Was there any type of disciplinary
18  action taken with regard to Mr. Bowlin or Mr.
19  Scott?
20     A.  No.
21     Q.  Docked a day's work or --
22     A.  No.

Page 91

1      Q.  Any penalty at all?
2      A.  None.
3      Q.  No reduction in hourly wage, that type
4  of thing?
5      A.  No.
6      Q.  What was Mr. Bowlin getting paid back
7  in January of 2003?
8      A.  I don't know.
9      Q.  Can you give me a range?  He was paid
10  by the hour I assume?
11     A.  By the hour, right.  I don't know, I'm
12  going to guess, twenty to twenty-two dollars an
13  hour.
14     Q.  What about Mr. Scott?
15     A.  Fifteen to seventeen, somewhere in that
16  range.
17     Q.  At that meeting with Mr. Parham, was it
18  discussed that somebody would make some attempt to
19  find out who this person was who allegedly said he
20  would drain the remaining drum drip at that
21  January inspection?
22     A.  Well, -- no, no.

Page 92

1      Q.  Did you make any attempt to find out
2  who that person was?
3      A.  No, I didn't.
4      Q.  You didn't call Mr. Ham up?
5      A.  No, I didn't.
6      Q.  You didn't call anybody else up at the
7  building?
8      A.  I don't recall calling anybody, no.
9      Q.  Find out who was on duty that day?
10     A.  Craig said that the fellow that was on
11  duty at that day was -- that he had trouble
12  understanding the gentleman, that he didn't speak
13  English very well.  So I'm just going by what he
14  said.
15     I forgot about that.  Parham had been
16  out there already, because he was the --
17     A.  Yes, he was the initial responder.
18     Q.  And Parham thinks he actually met the
19  guy that the inspectors say they met with?
20     A.  No.
21     Q.  That was a different guy?
22     A.  Different guy.

Page 93

1      Q.  Okay.  So when Parham -- well when
2  Parham was out there, the two of you had not yet
3  had this conversation with the two inspectors?
4      A.  No.
5      Q.  So you don't think Parham discussed
6  anything at that time when he was doing the
7  repairs out there about that issue, that the issue
8  of some guy saying, "I'll drain this drain for you
9  later"?
10     A.  Oh, no, no.
11     Q.  Was Parham out there after that for any
12  reason, to your knowledge?
13     A.  I don't know.  I think he was here,
14  according to one of those tickets, the 27th.
15     Q.  I'm talking about after your meeting
16  with the two inspectors.
17     A.  Oh, no, I don't know that he ever came
18  back out.
19     Q.  So you didn't do anything to try to
20  find out the name of the guy who supposedly made
21  this offer that he would drain the drains after
22  the September inspection?

24 (Pages 90 to 93)

## Capital Reporting Company

Page 94

1    A.  Well, we discussed that and nobody
2    could come up with a name.  I mean, we just didn't
3    know.
4        Q.  Well, eventually somebody came up with
5    a name.  Isn't that correct?
6        A.  Yes.
7        Q.  In your Answers to Interrogatories,
8    there is a name?
9        A.  Right.
10       Q.  Where did the name come from?
11       A.  That's the guy that signed off on
12   the -- that signed off on the receipt.  When I
13   brought -- I can't remember we brought it down or
14   sent it down, but anyway the broken fittings in
15   the sprinkler head they wanted.
16       Q.  Yes.
17       A.  Was given to him and he signed off for
18   that.
19       Q.  That's Mr. Hubbard?
20       A.  Hubbard, yes, and we're not -- we're
21   surmising that possibly he was the gentleman that
22   was --

Page 95

1        Q.  What's the basis of that surmise?
2        A.  Just somebody that -- he seemed to fit
3    the general description that we both -- or we all
4    had.
5        Q.  So Mr. Bowlin and Mr. Scott didn't
6    point this guy out to somebody and say he's the
7    guy that was there that day?
8        A.  No.
9        Q.  Did they ever go back there for any
10   reason that you know of to the Gallaudet building
11   after the leakage?
12       A.  No.
13       Q.  And as I understand it, at some point
14   after this incident, when the repairs were done,
15   Capitol took with it the ruptured fitting?
16       A.  Yes.  Craig left -- he had brought them
17   with him.
18       Q.  Right.
19       A.  That night, and left them with me.
20       Q.  Right.
21       A.  And just -- I just said, well, we'll
22   hang on to these.

Page 96

1        Q.  Right.
2        A.  And then somebody requested them, so I
3    took them -- I believe I brought them down and
4    dropped them off to them.
5        Q.  But that was some time later?
6        A.  Within the next week or so I think.
7        Q.  Okay.
8        A.  I got a sheet with a date on it, yeah,
9    a transmittal.
10       Q.  Do you have it with you?
11       A.  No, I didn't bring it with me.
12       Q.  Do you know what the approximate date
13   was?
14       A.  No, I don't recall.
15       Q.  This was the end of January.  Was it
16   some time in the beginning of February?
17       A.  I don't recall.
18       Q.  And why did somebody, to your
19   understanding, why did somebody request that you
20   give them the fitting that broke?
21       A.  I assume that their insurance company
22   or someone asked for it.

Page 97

1        Q.  Okay.  Was there any doubt in anybody's
2    mind at Capitol that this fracture took place
3    because of freezing of water in the line that
4    should not have been there?
5        A.  No, it's obvious.
6        Q.  Everybody knew it, right, correct?
7        A.  Correct.
8        Q.  There was no attempt to find out any
9    other cause for this fracture, other than what had
10   appeared just by looking at it, that it froze and
11   broke?
12       A.  Just by looking at it.
13       Q.  You saw other frozen fittings and
14   broke?
15       A.  Oh, yes.
16       Q.  Years as an installer, you know what
17   they look like, right?
18       A.  Exactly.
19       Q.  Are you aware of any facts or
20   information to indicate that Gallaudet University
21   did anything to cause or contribute to cause this
22   pipe rupture?

25 (Pages 94 to 97)

## Capital Reporting Company

Page 110

1    Q.  And you only noted one error that you
2    thought existed in the Answers to Interrogatories,
3    number four, where it says "On January 9th Mike
4    Bowlin and Tom Scott performed a trip test," and
5    winter check and as I understand it, the part
6    that's wrong is the trip test part.  There was no
7    trip test done?
8        A.  None.
9        Q.  But there is a winter check?
10       A.  Winter check, correct.
11       Q.  Other than that all the other
12   information as you understand it is correct and
13   accurate?
14       A.  It appears to be, yes.
15       Q.  With regard to Interrogatory Number 3,
16   it states in part, the answer is during the
17   January 2003 inspection, "Gallaudet/Guest Services
18   failed to provide access to the subject drum drip.
19   Terrence Hubbard, a representative of
20   Gallaudet/Guest Services, who was escorting
21   Capitol employees during inspection, did not have
22   the proper key to access a certain conference

Page 111

1    room."
2        I want to make sure I understand this.
3    The only information that you have that Mr.
4    Hubbard was the person who was accompanying
5    Capitol's inspectors on January 9th, 2003 was the
6    fact that Mr. Hubbard signed for the evidence
7    after -- about a week or so after the incident
8    took place.  Is that correct?
9        A.  Right.
10       Q.  That's it?
11       A.  Well, we didn't have a name, and then
12   it was -- yes, that was it.
13       Q.  Would it be fair to say that other than
14   Mr. Ham, knowing Mr. Ham and meeting Mr. Ham, you
15   didn't know the names of any of the building
16   personnel?
17       A.  No.
18       Q.  And would that be true also for Mr.
19   Bowlin and Mr. Scott?
20       A.  I don't know with them.  They were here
21   more than I was.
22       Q.  Well, just one more time than you were?

Page 112

1        A.  Yes, but, no, I didn't know any of
2    the --
3        Q.  And they knew it was not Mr. Ham that
4    accompanied them?
5        A.  Exactly.
6        Q.  Because they had met Mr. Ham in July?
7        A.  Exactly.
8        Q.  Or Mr. Bowlin had met Mr. Ham in July?
9        A.  Right.
10       Q.  Basically that's the only other name
11   that Capitol had, and that's the name that ends up
12   in this answer, correct?
13       A.  Basically, yes.
14       Q.  In your meeting with Mr. Parham and Mr.
15   Bowlin and Mr. Scott a couple of days after this
16   incident took place, did Mr. Bowlin or Mr. Scott
17   tell you whether or not they did anything after
18   leaving the building after that inspection to
19   check with this person at the building to make
20   sure that they had drained the drum drip?
21       A.  No.
22       Q.  That they went back to the building to

Page 113

1    check themselves or they called the guy to ask him
2    or remind him or just to confirm that he had
3    checked -- he had drained the drum drip?
4        A.  No.
5        Q.  Did they say they had done anything
6    like that?
7        A.  No.
8        Q.  Did you ask them?
9        A.  I didn't ask them, no.
10       Q.  Did you ever make a statement to
11   anybody at Capitol Sprinkler after this incident
12   occurred and this meeting with the two inspectors
13   took place that the inspectors were wrong to
14   permit somebody other than a Capitol Sprinkler
15   person to perform or conduct any of the work that
16   Capitol was supposed to be doing?
17       A.  No.
18       Q.  Did anybody else at Capitol make such a
19   statement to you?
20       A.  No.
21       Q.  Did Mr. Parham say, those guys should
22   not have permitted anybody else outside of Capitol

29 (Pages 110 to 113)

## Capital Reporting Company

Page 150

1    A.   One by one half.
2    Q.   Correct, so it's a straight true run of
3  the one-inch and Ts off of a half inch?
4    A.   Yes.
5    Q.   How familiar are you with the type of
6  pipes used in this system?
7    A.   Plain Schedule 40, black iron pipes.
8    Q.   The same as used in gas lines?
9    A.   Yes.
10   Q.   So it's plain Schedule 40?
11   A.   Black iron pipes, standard issue.
12   Q.   Have you ever seen one with a crack in
13  it prior to installation?
14   A.   A pipe, um-hum.
15   Q.   Is that a yes?
16   A.   Yes, I'm sorry.
17   Q.   You have been here a while, I can
18  understand.  How are you able to spot a crack in a
19  pipe?
20   A.   You don't literally -- well, unless
21  it's very obvious, but most of them show up after
22  you hydrostatically test and you have a problem in

Page 151

1  usually --
2    Q.   How do you hydrostatically test the
3  system?
4    A.   You have a hydrostatic pump.  You hook
5  it up, fill it full of water and pump it up to two
6  hundred and twenty-five or two hundred and fifty.
7  Some jurisdictions it's three hundred and
8  twenty-five.
9    Q.   And that's three hundred and
10  twenty-five PSI?
11   A.   Yes.
12   Q.   Pounds per square inch?
13   A.   Yes.
14   Q.   Which is well above the actual air
15  pressure that would be on those lines?
16   A.   Yes.
17   Q.   Did you ever hydrostatically test the
18  Gallaudet system?
19   A.   All the systems there were tested, yes.
20   Q.   When were they tested?
21   A.   I don't know.  You have to -- that's
22  done by the fire marshal, under construction when

Page 152

1  the building is under construction, and witnessed
2  by them.  I'm sure they have the paperwork.
3    Q.   Prior to you beginning your inspections
4  in 2002, or actually back to your inspection there
5  is 1996 when you first started your inspections
6  there, did you ever separately hydrostatically
7  test the line?
8    A.   No, we never hydro'd ever over there.
9    Q.   So you're not actually aware whether
10  there was a problem with that pipe prior to the
11  incident then?
12   A.   No, I'm not.
13   Q.   You never physically inspected the
14  pipes?
15   A.   No.
16   Q.   With regard to the identification of
17  Terrence Hubbard, at what point in time did you
18  return these broken fittings and have Mr. Hubbard
19  sign them off?
20   A.   I don't recall.  Like I said, we'll
21  provide that document.  I don't recall exactly.
22  It wasn't very long after the incident.

Page 153

1    Q.   Would you say it would be within a
2  month?
3    A.   Oh, I'd say, yes.
4    Q.   Within a two-week period?
5    A.   Possibly, yes.
6    Q.   And how long after the incident did you
7  have your conversation with Mr. Bowlin and Mr.
8  Scott?
9    A.   Oh, it was within the next week or so,
10  week and a half, something like that.
11   Q.   Did you ever ask them to accompany you
12  down to Gallaudet to the actual building to see if
13  they could pick out this individual that allegedly
14  told them he would drain the drip drains himself?
15   A.   No.  I never thought of that.
16   Q.   Did you personally deliver the pipe
17  back to --
18   A.   No, I have no -- I don't know.  I'm not
19  sure about that, whether I brought it down or I
20  sent it down.  I know I had it already in a little
21  plastic bag, but I just don't recall.
22   Q.   And the only reason you assume that

39 (Pages 150 to 153)

## Capital Reporting Company

Page 154

1  this employee is Terrence Hubbard is just because
2  of the fact that he signed the pager?
3      A.  That's correct.
4      Q.  Nobody ever said, "Hey, that's the
5  guy"?
6      A.  No, nobody specifically.
7      Q.  Have you ever seen Mr. Hubbard
8  personally?
9      A.  No, wouldn't know him if I fell on him.
10     Q.  Did Mike or Tom ever give you a
11  description of the gentleman they say that was the
12  mystery employee that wouldn't let them in?
13     A.  None that I can remember, no.
14         MR. FOSTER:  I have no further
15  questions.
16         MR. BROOKS:  I have none.  We will
17  read.
18         MR. GROTH:  I have just a couple of
19  follow-up questions.
20      EXAMINATION BY COUNSEL FOR PLAINTIFF:
21  BY MR. GROTH:
22      Q.  The folder that has the customer

Page 155

1  information that you maintain at the office and
2  that has the location of the various valves and
3  drum drips and whatever.
4      A.  Yes, the list.
5      Q.  Is that sent out with the inspectors on
6  the job?
7      A.  Yes, they have the job folder and it
8  goes with them when they go.
9      Q.  So Mr. Bowlin should have had that
10  folder and known about all the locations to drain
11  just from looking at the folder?
12     A.  Exactly.
13     Q.  Even if he didn't recall back from July
14  where he had been and what he had done?
15     A.  Right.
16     Q.  And with regard to the issue of
17  condensation in these lines, this last inspection
18  took place on January 9th, 2003 and the loss took
19  place on January 25th, 2003.  There are no weather
20  conditions or any other environmental conditions
21  that should have caused that much condensation in
22  the pipes over a sixteen-day period.  Is that

Page 156

1  correct?
2          MR. BROOKS:  I object.
3          THE WITNESS:  I wouldn't say that.
4  Craig, if you ask him, he can better tell but that
5  system, but in those particular systems, typically
6  the dry pipe valve is here and the sprinkler
7  system is here.  In that particular case, the dry
8  pipe valve is on the fifth floor and we're down on
9  a lower level.  Because of the pitch in the roofs
10  so, it's possible.
11  BY MR. GROTH:
12     Q.  What's possible?
13     A.  Condensation of -- and plus what's
14  left -- like I said, what's left in the pipes
15  after you -- you don't always get it all out.  It
16  drains.
17     Q.  Well if you don't drain it there is
18  obviously water left in the branches, correct?
19     A.  Exactly.  It lays about that deep in
20  the bottom of the pipes (indicating).
21     Q.  And here we know that Capitol did not
22  drain this area that is drained by the drum drip

Page 157

1  that we saw in the photographs, correct?
2      A.  Yes.
3      Q.  That's an admission, your own employees
4  are admitting they didn't do it.
5      A.  Exactly.
6          MR. GROTH:  I don't have any other
7  questions.
8
9          (Whereupon the deposition of Vernon
10  Vane was concluded at 12:54 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22

40 (Pages 154 to 157)