UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY,<br>as Subrogee of Gallaudet University<br><br>    Plaintiff<br><br>    vs.<br><br>CAPITOL SPRINKLER INSPECTION, INC<br><br>    Defendant<br><br>    vs.<br><br>GUEST SERVICES, INC.<br><br>    Third-Party Defendant | CASE NUMBER: 1:05CV02115 (CKK) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST THIRD-PARTY DEFENDANT**

Pursuant to Rules 7(h) and 56.1 of Local Rules of the United States District Court for the District of Columbia, Defendant Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler"), hereby submits the following Statement of Material Facts in Support of its Motion for Summary Judgment:

1.    Plaintiff's insured, Gallaudet University ("Gallaudet"), is the owner of the Conference Center located at 800 Florida Avenue, N.E., Washington, D.C. (See Exhibit A, Contract for Automatic Sprinkler Equipment Inspection Service).

2.    The Conference Center was constructed during the period 1996-1998. Capitol installed the sprinkler system. (See Exhibit B, Parham Deposition; P.14, L.14-15 & L.19-21). Craig Parham, the current Vice President of Capitol Sprinkler Contracting, was the outside

{DE102644.2}

superintendent for Capitol's work on the project. (See Exhibit B, Parham Deposition; P.8, L.8-10; P.14, L.22 - P.15, L.3).

3.  The Kellogg Conference Center is a five-story building situated on the grounds of Gallaudet University. It can be fairly described as a hotel, which consists of a standard lobby area as one enters through the front door and a front desk area, which contains a long, front desk having three computer terminals, a "card keying machine" and safety deposit boxes. (See Exhibit C, Aller Deposition; P.49, L.15-22; P.63, L.20 - P.64, L.7; P. 68, L.11-16). The fire alarm annunciator panel is located directly across from the front desk. (See Exhibit C, Aller Deposition; P.68, L.17 - P.69, L.8). Guest Services' staff monitored the annunciator panel in January of 2003. (See Exhibit C, Aller Deposition; P.70, L.21 - P.71, L. 9)

4.  In addition, the facility housed meeting rooms, an auditorium, a ballroom and guest rooms, among other things. (See Exhibit C, Aller Deposition; P.49, L.15-22; P. 68, L. 11-16). During the relevant period, 2002 & 2003, it contained 93 guest rooms. (See Exhibit C, Aller Deposition; P.55, L.2-7). The hotel guest rooms are situated on the top two floors, the fourth and fifth floors. (See Exhibit C, Aller Deposition; P.52, L.3-10; P.53, L.9-13).

5.  The facility is open to the general public. (See Exhibit C, Aller Deposition; P.52-53). Members of the general public, having no affiliation with the school, may stay as guests at the hotel even though they have no business with the school. (See Exhibit C, Aller Deposition; P.52, L.14-17; P.53, L.1-6).

6.  In January, 2003, Gary Aller served as the Director of Business Operations at Gallaudet University. As such, he had oversight for the Kellogg Conference Center. (See Exhibit C, Aller Deposition; P.24, L.7-15).

7. Prior to January, 2003, Mr. Aller had no formal education or training in facilities maintenance. (See Exhibit C, Aller Deposition; P. 28, L. 18-20). Moreover, he had no experience in facilities maintenance, no familiarity with fire sprinkler systems, and no experience with the NFPA. (See Exhibit C, Aller Deposition; P. 28, L. 21 - P.29, L1; P.29, L.15-21).

8. Even so, Mr. Aller was responsible for overseeing the contract management company that managed the facility, Guest Services, Inc. (See Exhibit C, Aller Deposition P.29, L.2-14).

9. Mr. Aller is well able to describe how access to the various areas throughout the hotel is controlled: Access to the guest rooms on the 4th and 5th floors was through the use of a key card, described as "card access" or "swipe access". (See Exhibit C, Aller Deposition; P.132, L.18-22; P. 133, L. 8-12). Access to some of the rooms on the third floor was by key access, and access to others was by card access. (See Exhibit C, Aller Deposition; P.133, L.4-8).

10. Key cards for access to the guest rooms were controlled by employees of Guest Services as they were responsible for the security of hotel guests. (See Exhibit C, Aller Deposition; P.133, L.22-12). Guest Services employees would activate the access card by inserting it into a machine, punching a code and encoding the cards with appropriate information so that the card would open the appropriate room. The card was then given to a guest. (See Exhibit C, Aller Deposition; P.133, L.22 - P.134, L.6).

11. Access to the subject guest room, number 5200, is controlled by a card swipe on the outer door. (See Exhibit C, Aller Deposition; P.134, L.20 - P.135, L.8).

12. Upon installation of the sprinkler system and the owner's acceptance of the building, Capitol Sprinkler performed the maintenance and inspections required by NFPA 25 from the time of acceptance until 1999. Those services were performed for the owner through a

3

{DE102644.2}

contract with Aramark services. (See Exhibit D, Vane Deposition; P. 34, L. 19 - P. 36, L. 3). The record is devoid of any suggestion of problems with access to perform the work, or freeze-related failures during this period.

13.     On or about February 11, 2002, Gallaudet contracted with Guest Services, Inc. to provide operational and management services for the Kellogg Conference Center. (See Exhibit A, Gallaudet University Kellogg Conference Center Management Agreement).

14.     On April 22, 2002, Gallaudet University contracted with Capitol Sprinkler Inspection, Inc. to do a semi-annual inspection of the sprinkler system in the subject conference center/hotel. (See Exhibit E, Complaint, Par. 1, D.I. #1; Exhibit F, Answer to Complaint, Par. 1, D.I. #1; and Exhibit G, Contract). This service was contracted through Guest Services. Capitol Sprinkler thereafter resumed its inspection services at the facility for Gallaudet. (See Exhibit D, Vane Deposition: P.35, L.15 - P.36, L.17). Mr. Vane signed the contract on behalf of Capitol Sprinkler. (See Exhibit D, Vane Deposition; P.48, L. 6-8). NFPA 25 is the standard by which Defendant does inspections and routine maintenance. (See Exhibit B, Parham Deposition; P.11, L.13 - P.12, L.9; Exhibit N; Affidavit of V. Vane, dated January 17, 2008)

15.     In order to perform the July '02 service, Capitol Sprinkler made arrangements, in terms of scheduling and access, through David Ham, Guest Services, Inc.'s Chief of Maintenance. (See Exhibit D, Vane Deposition ; P.38, L.20 - P.39, L.9; P.29, L.12; P.39, L.17-20).

16.     Mr. Vane was at the July '02 inspection with Mike Bowlin and Tim Francis. Upon being ready to inspect the interior, they identified themselves and Mr. Ham assigned someone to escort them throughout the building. An escort from Guest Services was required in order to provide access. (See Exhibit D, Vane Deposition; P.40, L.1-22). This escort provided

Capitol Sprinkler's representatives access to all of the areas necessary to perform their work, including draining the drum drips so that all of the drum drips were drained that day. (See Exhibit D, Vane Deposition; P.40, L.1 - P.42, L.9). That included the subject drum drip on the 5th floor, in room 5200. (See Exhibit D, Vane Deposition; P.42, L.10-17).

17.   During the July '02 inspection, Mr. Ham asked if they would show him where the drum drips were because he was just taking over the maintenance and so they showed them where the drum drips, inspectors tests and dry valves were. (See Exhibit H, Bowlin Deposition; P.31, L.22 - P.32, L.7). It was not unusual for a property management agent to accompany an inspector to see how drum drips were drained, and actually drain some themselves. (See Exhibit H, Bowlin Deposition; P.20, L.14-20). Generally, property management maintenance personnel that maintain buildings are supposed to drain drum drips themselves when Capitol Sprinkler is not on site. (See Exhibit H, Bowlin Deposition; P.21, L.14- P.22, L.8). The building engineer's responsibility is to keep the drum drips or low points drained. (See Exhibit B, Parham Deposition; P.53, L.16 - P.54, L.3).

18.   The July '02 inspection was performed by Capitol Sprinkler employees, Michael Bowlin and Tim Francis. (See Exhibit H, Bowlin Deposition; P. 32, L.20 - P. 33, L. 1). The escort accompanied them throughout the building, providing access to certain locks and doors, vis., access to all points necessary to drain all of the drum drips. (See Exhibit H, Bowlin Deposition; P.32, L.20 - P.33, L. 15).

19.   Mr. Bowlin does not know the name of the escort, but it was not Mr. Ham. (See Exhibit H, Bowlin Deposition; P.33, L.16-19). The escort provided all of the access necessary to perform the inspection in July '02, by removing locks from the drum drips and providing room access. (See Exhibit H, Bowlin Deposition; P.34, L.19 - P.35, L.1). And, they encountered no

problems while performing the inspection and service work in July, 2002. (See Exhibit H, Bowlin Deposition; P. 39, L.6-9).

20.     Mr. Bowlin returned to the facility on January 9, 2003. Upon returning, he again reported to the front desk and identified himself as being from Capitol Sprinkler. (See Exhibit H, Bowlin Deposition; P.91, L.11-21). He was accompanied by Capitol Sprinkler employee, Thomas Scott. (See Exhibit H, Bowlin Deposition; P. 50, L. 7 - 13; and Exhibit I, Affidavit of Mr. Scott).

21.     Upon arrival, they were met by a gentleman at the front desk, whose name they can not recall. (See Exhibit H, Bowlin Deposition, P.40, L.2-8; and Exhibit I, Affidavit of Mr. Scott.). During the January '03 service, they were escorted throughout the building by an agent of Guest Services, who had an assortment of keys, which provided access to the secure areas within the building except to one guest room on the fifth floor. (Affidavit of Thomas Scott). This was the very same agent who escorted Mr. Bowlin and Mr. Francis throughout the building during the July '02 inspection. (See Exhibit H, Bowlin Deposition; P.41, L.18 - P.42, L.4).

22.     Mr. Bowlin recalls the agent appearing during his July '02 and January '03 inspections as a "colored gentleman", approximately 5'10" in height and 30 years old, plus or minus a few years. (See Exhibit H, Bowlin Deposition; P.34, L.1-10).

23.     Mr. Scott recalls the agent appearing as an African American with an average-color complexion, about 5'10" or 5'11" tall, in his 30's or 40's. (See Exhibit I; Affidavit of Mr. Scott).

24.     Normally, Mr. Scott and Mr. Bowlin would have split up in order to accomplish the work. However, in this instance, the pair was unable to work separately because of the access issue. (See Exhibit H, Bowlin Deposition; P.94, L.3-19).

25. The subject drum drip is located behind the door to suite room number 5200. (See Exhibit H, Bowlin Deposition; P.35, L. 9 - P.36, L.1). That room requires computerized card or swipe access, just like a hotel room. (See Exhibit H, Bowlin Deposition P.36, L.4-14). This was the only drum drip situated in a guest room, which required card access. (See Exhibit H, Bowlin Deposition; P.36, L.15-18). The rest of the drum drips could be accessed by means of physically unlocking a locking mechanism on the component itself, or by means of a building master key that provided access to the mechanical rooms. (See Exhibit H, Bowlin Deposition; P.36, L.19 - P.37, L.1).

26. During the January '03 inspection, Mr. Bowlin and Mr. Scott drained all of the drum drips except the one in room 5200. (See Exhibit H, Bowlin Deposition; P.50, L.10-14). Access to this room is controlled by card swipe on the outer door. (See Exhibit C, Aller Deposition; P.134, L.20 - P.135, L.8).

27. Mr. Bowlin was able to drain that particular drum drip during the July '02. (See Exhibit H, Bowlin Deposition; P.51, L.5-6). However, he was unable to drain it in January '03, because he was not given access to the room. (See Exhibit H, Bowlin Deposition; P.51, L.8-11). They had no access to the room because the agent who was escorting them throughout the building did not have card access. (See Exhibit H, Bowlin Deposition; P.51, L.12-17).

28. The drum drip in room 5200 was the last one to be drained that day. (See Exhibit H, Bowlin Deposition; P.53, L.7-15). Upon arriving at the door to the room, the escort said he didn't have a card to the room. (See Exhibit H, Bowlin Deposition; P. 51, L. 22, - P. 52, L. 3).

29. Mr. Bowlin asked the escort whether he was going to get an access card and the escort responded with a look as if he really did not want to. (See Exhibit H, Bowlin Deposition; P.54, L.7-13). The agent never offered to go to the front desk to get an access card. (See Exhibit

H, Bowlin Deposition; P.53, L.4-6). Mr. Bowlin asked him whether he would take care of that particular drum drip. (See Exhibit H, Bowlin Deposition; P.54, L.7-13). And, the escort said he would "take care of the drum". (P.56, L.13-15; P.58, L.3-6).

30. As of the date of the January 25, 2003 incident alleged in Plaintiff's Complaint, David Ham was Guest Services Inc.'s building engineer for the facility (See Exhibit C, Aller Deposition; P.98, L.10-13). He is the one who actually shut off the water that day. (See Exhibit C, Aller Deposition; P.99, L.14-17; P. 115, L. 9-13). Guest Services' employee, Terrance Hubbard, was not at the facility when water started flowing, but he arrived at about 3:30 that afternoon. (See Exhibit C, Aller Deposition; P.86, L.20 - P.87, L.7).

31. Following the incident of January 25, 2003, representatives of Capitol Sprinkler Contracting, Inc. performed certain repairs to the subject fire protection system and restored it to service. As part of that process, they replaced certain components. Vernon Vane returned the original components to an agent of Guest Services, Inc., at the Kellogg Conference Center, who identified himself as Terrance Hubbard. He appeared about 5'10" tall and had a medium build. He appeared in his 30's or 40's. The color of his skin was dark for a Caucasian, and light for an African American such that Mr. Vane would describe him being of mixed race. (See Exhibit J; Affidavit of V. Vane, dated February 7, 2008).

32. The depositions of Mr. Hubbard and Mr. Ham were twice noticed in this litigation; once by counsel for plaintiff, and once by counsel for defendant. Counsel for Guest Services produced neither witness for either deposition. (See Exhibit M; Transcript of Court Status Conference of 1/31/07, pp. 3, 5 & 6).

33. Upon information and belief, Terrance Hubbard died on September 10, 2005. (See Exhibit K; Affidavit of Lou Dempsey, dated January 17, 2008).

{DE102644.2}

34.   Counsel for Capitol Sprinkler has made reasonable efforts to depose Terrance Hubbard and David Ham. Counsel noticed the depositions of both gentleman, as well as Third-Party Defendant's 30(b)(6) witness "concerning access to the conference center provided to Defendant by Third-Party Defendant on January 9, 2003". (See Exhibit L; Notice of Deposition).

35.   Counsel for Guest Services, Mr. Horvath, was initially in contact with Mr. Ham. However, his office lost contact with him and he was unavailable for deposition. (See Exhibit M; Transcript of Court Status Conference of 1/31/07, pp. 3, 5 & 6). As of the close of discovery, Mr. Ham remains unavailable for deposition. (See Exhibit M; Transcript of Court Status Conference of 1/31/07, pp. 3, 5 & 6). At no time has Guest Services ever produced Mr. Hubbard or Mr. Ham, or any Fed. R. Civ. P. 30(B)(6) witness in defense of this litigation.

Respectfully submitted,

MARKS, O'NEILL,
O'BRIEN & COURTNEY, P.C.

/s/Donald R. Kinsley
Michael T. Hamilton, Esquire (Bar ID No. 474233)
Donald R. Kinsley, Esquire (Bar ID No. 432998)
Norman H. Brooks, Jr., Esquire (PHV)
913 N. Market Street, Ste. 800
Wilmington, DE 19801
*Attorney for Defendant/Third-Party Plaintiff
Capitol Sprinkler Inspection, Inc.*

DATE: February 8, 2008