# Exhibit D

**Capital Reporting Company**

Page 1

```
1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2     - - - - - - - - - - - - - - X

3     ST. PAUL MERCURY INSURANCE     :

4     COMPANY, as Subrogee of        :

5     Gallaudet University,          :

6              Plaintiff,            :

7        v.                          : Case No.:

8                                    : 1:05-cv-02115

9     CAPITOL SPRINKLER              :

10    INSPECTION, INC.,              :

11              Defendant.           :

12    - - - - - - - - - - - - - - X

13                    Washington, DC
                      Monday, August 14, 2006
14    Deposition of:
                      VERNON VANE
15    called for oral examination by counsel for

16    Plaintiff, pursuant to Notice, at the Law Office

17    of Mesirow and Stravitz, 2000 Massachusetts

18    Avenue, NW, Washington, DC, before Kim Brantley of

19    Capital Reporting, a Notary Public in and for the

20    District of Columbia, beginning at 10:08 a.m.,

21    when were present on behalf of the respective

22    parties:
```

Page 29

1    the work that Capitol had contracted to do for a

2    customer?

3        A.    I don't understand what you mean by any

4    of the work.

5        Q.    Well, we just talked about inspections

6    and what they I entail.

7        A.    Right.

8        Q.    Let's use the example of the dry

9    system, operating it, charging it with water,

10   draining it and then certifying it.

11       A.    Right.

12       Q.    As an example, just as an example, did

13   you ever train or instruct any of your inspectors

14   or helpers that it was okay for them to permit or

15   authorize some non-employee of Capitol, I don't

16   care who it is, any non-employee of Capitol to do

17   any part of the work they were supposed to be

18   doing?

19       A.    We always instructed them to, and

20   showed them how to do the draining, which is what

21   they had to do.  I mean, we were only there

22   initially, and then in a six-month frame, so we

## Capital Reporting Company

Page 33

1    during that period of time, ever permitted one of

2    your customers or asked one of your customers to

3    do any part of the work that Capitol Sprinkler was

4    contracted to do?

5        A.    Not that I can recall.

6        Q.    Why not?   Why would you not do that?

7        A.    Why would I?  I mean, if I'm there to

8    do a job, we're going to do the job, and that's

9    it, but we do -- we do it while we're there.   I

10    mean --

11        Q.    And when you say "the job," do you mean

12    the whole job, that means --

13        A.    Well, whether it be dry system, wet

14    system, fire pump, whatever.

15        Q.    But I'm talking about the job from

16    beginning to end.  So for example if you have a

17    dry system.

18        A.    Right.

19        Q.    You start out by testing the system,

20    you let the air leak out, you fill the pipes with

21    water and you take your measurements, whatever you

22    have to do, and then you have to drain the system

**Capital Reporting Company**

1    completely?

2         A.    Right.

3         Q.    And then you have to set it back up so

4    it can operate again and then you certify that you

5    did the test, correct?

6         A.    Correct.

7         Q.    So you have not ever in your history as

8    a supervisor asked one of your customers or one of

9    their employees to do part of that job for you,

10   any part of that job?

11        A.    No.

12        Q.    And just so we're clear on this,

13   because one of the prior answers you gave I think

14   referred specifically to the Galaudet situation.

15   You were talking about discussions you had with

16   some people about drain points and that kind of

17   stuff?

18        A.    Right.

19        Q.    Let's talk about the Gallaudet

20   situation for a moment and we will get to some of

21   these documents a little bit later, but in

22   general, this was a new account for Capitol in

**Capital Reporting Company**

Page 35

1    terms of the inspections, relatively new?

2         A.    No, we had done it from '96 to '99 and

3    then I think that's when the -- another company

4    took over.

5         Q.    Who was that?

6         A.    I guess it would be David Ham.  What is

7    it?  Whose name --

8         Q.    Are you talking about --

9         A.    Aramark was I believe the first

10   building maintenance people.

11        Q.    And Capitol had a contract with Aramark

12   to do these inspections?

13        A.    Yes, Aramark from -- according to my

14   record '96 to '99.

15        Q.    And then Guest Services after that?

16        A.    And then Guest Services.

17        Q.    And then you had a contract with Guest

18   Services?

19        A.    Right, we signed that in --

20        Q.    I think it was 2002?

21        A.    Right, 2002.

22        Q.    What happened between 1999 and 2002?

**Capital Reporting Company**

1  A. I have no idea.

2  Q. But you weren't working there?

3  A. I wasn't there.

4  Q. Were you actually doing these

5 inspections yourself out in the field between '96

6 and '99?

7  A. Yes.

8  Q. So you had some familiarity with the

9 system?

10  A. Yes.

11  Q. And then you started up with Guest

12 Services again in 2002, correct?

13  A. Correct.

14  Q. And the first inspection that Capitol

15 did after that contract was signed was in July of

16 2002, correct?

17  A. Correct.

18  Q. And you participated in that inspection

19 yourself?

20  A. I was down there, yes.

21  Q. And who were you with?

22  A. It was Mike and Tim Francis.

Capital Reporting Company

Page 48

1      Q.    I was going to ask you that.   The

2   second page, which is the separate second page, is

3   actually the reverse side of the first page.   Is

4   that correct?

5      A.    That's correct.

6      Q.    And you signed this contract on behalf

7   of Capitol Sprinkler?

8      A.    I did.

9      Q.    Is that one of your functions also, to

10  go out and actually sell jobs or get customers?

11     A.    I serve them, yes, yes.

12     Q.    You see an opportunity you follow up on

13  it?

14     A.    Yes.

15     Q.    Do you know who signed on behalf of the

16  subscriber?

17     A.    I don't know who that gentleman is.   I

18  have done certain -- it doesn't appear to be David

19  Ham's.

20     Q.    That's why I asked.

21     A.    I don't know.   I looked at that this

22  morning.

## Capital Reporting Company

1      Q.    Okay.  But in any event, over your

2    three years doing inspections you knew where

3    everything was.  You really didn't need any sketch

4    or anything?

5      A.    Basically.

6      Q.    So you took Mike Bowlin around and Tim

7    Francis and you showed them what to do, correct?

8      A.    Yes.

9      Q.    I'm sorry, we're back to July of 2002?

10     A.    Three.

11     Q.    2002.

12     A.    Yes, right.

13     Q.    At that time, were you aware that Guest

14   Services  was a managing agent for the building

15   for Gallaudet University?

16     A.    Yes.

17     Q.    The contract was signed with Guest

18   Services basically, wasn't it?

19     A.    Yes.  We -- yes.  That's true.

20     Q.    And you made your arrangements to

21   inspect the building in terms of scheduling and

22   making sure somebody was there to give you access

**Capital Reporting Company**

Page 39

1    and whatever through Guest Services?

2         A.    Through David Ham.

3         Q.    Who was he?

4         A.    He was the chief, I guess you would

5    call it.

6         Q.    Of --

7         A.    Head of maintenance.

8         Q.    Of?  Is he a Guest Services employee?

9         A.    Guest Services.

10        Q.    I want to know what you thought at that

11   time.

12        A.    Guest Services.

13        Q.    Did you do this type of work for any

14   other buildings on the Gallaudet campus other than

15   the Kellogg Conference Center?

16        A.    No, sir, just that building.

17        Q.    And back in July of 2002, did you make

18   arrangements with David Ham of Guest Services to

19   do this inspection?

20        A.    Yes.

21        Q.    And who if anybody was present for that

22   inspection from Guest Services?

## Capital Reporting Company

Page 40

1      A.    We typically started outside with the

2   pump.  Nobody was there for that, and then once we

3   moved inside, then we would go to the desk and

4   tell them that we were ready to do inside, or go

5   down to David's office, either way, and they would

6   be -- send somebody or he would assign somebody to

7   go with us.

8      Q.    Ham did not go with you, himself?

9      A.    No.

10          MR. BROOKS:  Are we talking July?

11          MR. GROTH:  Yes, we're talking July

12   '02.

13   BY MR. GROTH:

14      Q.    Why did you need somebody from Guest

15   Services to accompany you?

16      A.    For access, keys, things of that

17   nature.

18      Q.    What were you getting access to that

19   needed a key?

20      A.    Well there were locks on the valves

21   that had to be unlocked and rooms, things of that

22   nature.

**Capital Reporting Company**

1      Q.    Okay.  And do you know who Mr. Ham

2    assigned to you to do that?

3      A.    No.

4      Q.    Can you describe the person physically?

5      A.    As I recall.

6      Q.    Yes.

7      A.    A tall, slender black man.

8      Q.    Age, approximately?

9      A.    Thirties.

10     Q.    Did he wear any kind of uniform, like a

11   shirt with "maintenance" like a name on it or a

12   company name or anything like that?

13     A.    I don't recall, I don't recall.

14     Q.    Even if he did and he had his name

15   stitched on the shirt, you wouldn't recall that

16   one way or the other?

17     A.    No, no.

18     Q.    Is this the first time you ever saw

19   this person?

20     A.    Yes.

21     Q.    In other words he had not been there

22   between 1996 and 1999?

**Capital Reporting Company**

Page 42

1       A.    No.

2       Q.    Now, is he the only person who

3   accompanied you to unlock these areas that needed

4   to be unlocked in July?

5       A.    As I recall, yes.

6       Q.    And were you given access to all the

7   areas that you needed to be given access to to do

8   the completed testings and inspection?

9       A.    Yes.

10      Q.    And how many of those areas or valves

11  or whatever require a key?

12      A.    Just the ones that are sort of in the

13  public area, like the stairways and things.

14      Q.    By count, can you give me a number

15  approximately how many there are?

16      A.    Two on the fifth floor and one on the

17  fourth floor, I believe it is.

18      Q.    Now does that include those valves that

19  are locked that you need a key for also?

20      A.    I believe the control valves on the

21  drive point valves had a chain on them also.  I

22  believe they did. I don't recall exactly, but.

# Exhibit E

10/31/05

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(Civil Division)

ST. PAUL MERCURY INSURANCE COMPANY,
as Subrogee of Gallaudet University
385 Washington Street,
St. Paul, MN 55102

      Plaintiff

      vs.

CAPITOL SPRINKLER INSPECTION, INC.
6550 Dobbin Road
Columbia, MD 21045

      Defendant

CASE NUMBER:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, by and through its undersigned counsel, hereby demands judgment against defendant, Capitol Sprinkler Inspection, Inc., and, upon information and belief, complains against defendant as follows:

## THE PARTIES

1.      Plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), is a corporation duly organized and existing under the laws of Minnesota with its principal place of business located at 385 Washington Street, St. Paul, Minnesota, and at all times material hereto was authorized to issue insurance policies in the State of Maryland.

2.      St. Paul's insured, Gallaudet University ("Gallaudet"), was at all times material hereto the owner of the Kellog Conference Center located at 800 Florida Avenue, N.E. Washington, D.C. ("the Conference Center").

3.    At all times material hereto, St. Paul insured Gallaudet for its real a   personal property located at the Conference Center as well as for business interruption.

4.    Defendant, Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler")   a corporation duly organized and existing under the laws of Maryland with a princi address of 6550 Dobbin Road, Columbia, Maryland, and at all times material hereto, was en ed in the business of, among other things, inspecting, testing and maintaining fire protectio /stems.

## JURISDICTION AND VENUE

5.    Jurisdiction of this Court is invoked under 28 U.S.C. §1332 in view of parties' diverse citizenship and the amount in controversy which exceeds Seventy-Five T sand Dollars ($75,000.00) excluding interest and costs of this action.

6.    Venue is properly laid in this judicial district because the events givin e to plaintiff's claim occurred in it.

## FACTS

7.    At all times material hereto, there was a dry fire protection sprink stem at the Conference Center ("the System").

8.    On or about April 22, 2002, Gallaudet contracted with defendant ol Sprinkler to do a semi-annual inspection of the System.

9.    On or about January 9, 2003, Capitol Sprinkler inspected the Sys

10.    On or about January 9, 2003, Capitol Sprinkler certified that it h ned the valves and sprinkler lines in the System.

2

11.    On or about January 25, 2003, a pipe fitting in the System froze, thawed and ruptured allowing water to discharge throughout the interior of the Conference Center and causing substantial damage ("the Incident").

12.    It was later determined that the pipe froze because the drain valves in the System were not completely drained by defendant Capitol during its recent inspection.

13.    In accordance with the terms of the above referenced insurance policy, plaintiff, St. Paul, paid its insured, Gallaudet University, an amount in excess of Seven Hundred Thousand Dollars ($700,000), representing the fair and reasonable cost of repairing and replacing its damaged property at the Conference Center and compensating it for its business interruption.

14.    In accordance with the common law principles of legal and equitable subrogation, St. Paul is subrogated to the rights of its insured, Gallaudet University, regarding its claims against Capitol Sprinkler.

## COUNT I:   NEGLIGENCE

15.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though each were set forth fully herein at length.

16.    The Incident was caused by the negligence, carelessness, gross negligence and/or reckless disregard for Gallaudet's property by defendant Capitol Sprinkler and/or its agents, workmen and/or employees acting within the scope of their employment. This negligence, carelessness, gross negligence and/or reckless disregard for the property of others consisted of, among other things, the following:

3

a)   failing to act in a safe and proper manner with due regard for the safety and welfare of plaintiff's insured's property;

b)   failing to take all necessary precautions to prevent damage to plaintiff's insured's property;

c)   failing to properly inspect, test and maintain the System in accordance with applicable industry standards;

d)   failing to hire competent agents, workmen and/or employees to inspect, test and maintain the System;

e)   failing to properly and adequately drain the System after testing;

f)   violating applicable standards, codes and/or industry customs and practices, including but not limited to NFPA 25; and

g)   such other and further negligent acts and omissions which may be revealed through discovery.

17.   As a direct and proximate result of the aforesaid negligence, carelessness, gross negligence and/or reckless disregard for the property of others, plaintiff's insured suffered substantial water damage to its property and business interruption, for which plaintiff has reimbursed its insured.

WHEREFORE, plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, demands judgment against defendant, Capitol Sprinkler Inspection, Inc., in an amount in excess of Seven Hundred Thousand Dollars ($700,000), together with interest, costs, and other relief that this court deems just and equitable.

4

## COUNT II:  BREACH OF CONTRACT

18.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though each were set forth fully herein at length.

19.    On or about April 22, 2002, Gallaudet contracted with defendant Capitol Sprinkler to do a semi-annual inspection of the System.

20.    Under the terms of the aforementioned contract, Capitol Sprinkler agreed to "inspect, test and service the fixed fire protection equipment in a workmanlike manner in accordance with this contract, and the requirements of the National Fire Protection Association (NFPA) Care and Maintenance of Sprinkler System (No. 13-A) and American Insurance Association publication "Recommended Method for Reporting Dry Pipe Valve Tests (No. 13-C)."

21.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in a workmanlike manner.

22.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in accordance with the requirements of the contract.

23.    Defendant Capitol Sprinkler breached its contractual obligations by failing to inspect, test, and service the System in accordance with the requirements of NFPA 13.

24.    As a direct and proximate result of the aforesaid breaches of contract, the Incident occurred resulting in substantial damage to plaintiff's insured's property and business interruption, for which plaintiff has reimbursed its insured.

5

WHEREFORE, plaintiff, St. Paul Mercury Insurance Company, as Subrogee of Gallaudet University, demands judgment against defendant, Capitol Sprinkler Inspection, Inc., in an amount in excess of Seven Hundred Thousand Dollars ($700,000), together with interest, costs, and other relief that this court deems just and equitable.

Respectfully submitted,

MESIROW & STRAVITZ, PLLC

By: 
Eric N. Stravitz (D.C. Bar #438093)
2000 Massachusetts Avenue
Suite 200
Washington, DC 20036
(202) 463-0303
(202) 861-8858 Fax
strav@erols.com

Of Counsel
Cozen O'Connor
David J. Groth, Esquire
Daniel J. Luccaro, Esquire
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000
Attorneys for Plaintiff

## JURY DEMAND

Plaintiff hereby requests a jury trial.

Eric N. Stravitz (D.C. Bar #438093)

6

**Exhibit F**

1-16-06

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(Civil Division)

ST. PAUL MERCURY INSURANCE                  :
COMPANY, as subrogee of Gallaudet           :
University, 385 Washington Street,          :
St. Paul, MN 55102                          :
                                            :
           Plaintiff,                       :
                                            :        Case No. 1:05CV02115
       v.                                   :
                                            :        **Trial by Jury Demanded**
CAPITOL SPRINKLER INSPECTION, INC.,         :
6550 Dobbin Road, Columbia, MD 21045        :
                                            :
           Defendant.                       :

## ANSWER

       Defendant, Capitol Sprinkler Inspection, Inc., by and through the undersigned counsel,

hereby opposes Plaintiff's Complaint for money damages and in support, states the following:

## THE PARTIES

       1.      Upon information and belief, admitted.

       2.      Capitol Sprinkler Inspection, Inc., (hereinafter referred to as "Capitol Sprinkler"),

lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this

paragraph and therefore, denies the allegations.

       3.      Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to

the truth of the allegations of this paragraph and therefore, denies the allegations.

       4.      Capitol Sprinkler admits the averments set forth in this paragraph.

## JURISDICTION AND VENUE

       5.      Upon information and belief, admitted.

       6.      Upon information and belief, admitted.

DE050009.1

## FACTS

7.     Whereas Plaintiff has not defined "all times material hereto", Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

8.     Admitted.

9.     Upon information and belief, admitted.

10.     Whereas Plaintiff has not identified with specificity "the valves and sprinkler lines in the System," Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

11.     Admitted that on or about January 25, 2003, a pipe fitting failed, allowing water to discharge into the interior of the conference center.  Subject to the foregoing, denied.

12.     Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

13.     Capitol Sprinkler lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore, denies the allegations.

14.     The averments of Paragraph 14 state a conclusion of law to which no response is required.

## COUNT I:  NEGLIGENCE

15.     Answering Defendant incorporates by reference as if fully rewritten herein, all of the admissions, denials and further answers contained in the foregoing paragraphs 1 through 14.

16.     Capitol Sprinkler denies the allegations in Paragraph 16 of Plaintiff's Complaint in full and as to each subpart.

17.     Capitol Sprinkler denies the allegations in Paragraph 17 of Plaintiff's Complaint.

DE050009.1

## COUNT II: BREACH OF CONTRACT

18.    Answering Defendant incorporates by reference as if fully rewritten herein, all of the admissions, denials and further answers contained in the foregoing paragraphs 1 through 17.

19.    Admitted.

20.    Admitted that Defendant Capitol Sprinkler agreed to *inter alia*, inspect, test and service the fire protection equipment in a workman-like manner in accordance with the contract and the requirements of the applicable NFPA and American Insurance Association Publication. Subject to the foregoing, denied.

21.    Capitol Sprinkler denies the allegations in Paragraph 21 of Plaintiff's Complaint.

22.    Capitol Sprinkler denies the allegations in Paragraph 22 of Plaintiff's Complaint.

23.    Capitol Sprinkler denies the allegations in Paragraph 23 of Plaintiff's Complaint.

24.    Capitol Sprinkler denies the allegations in Paragraph 24 of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiff knowingly and voluntarily assumed any and all risk associated with the matters alleged in the Complaint. Pursuant to the doctrines of assumption of the risk or informed consent, this conduct bars, in whole or in part, the damages that Plaintiff seeks to recover herein.

3.    Plaintiff's claims are barred because the damages alleged by Plaintiff were not proximately caused by any act or omission of Capitol Sprinkler Inspection, Inc.

4.    Plaintiff's claims are barred by the economic loss doctrine.

5.    Plaintiff's recovery, if any, is barred or reduced pursuant to the comparative negligence, fault, responsibility or causation of others, including, but not limited to, Plaintiff.

DE050009.1

Plaintiff was negligent in that:

a)     It was unable to provide Defendant access to that part of the sprinkler system that failed;

b)     It's employee or agent failed to return to the fifth floor to complete the draining process on a particular drum drip to which Defendant was not given access; and

c)     It failed to reasonably monitor the system while impaired in violation of NFPA 25.

7.     Plaintiff was negligent in that it permitted the ambient temperature surrounding the subject system to drop to such levels as to permit liquids to freeze.

8.     Plaintiff's damages, if any, were caused in whole or in part by the acts and omissions of other entities over whom Capitol Sprinkler Inspection, Inc. had no authority or control.

9.     Plaintiff's claims are barred because any damages allegedly sustained by Plaintiff were the result of pre-existing or subsequent conditions that are unrelated to Capitol Sprinkler Inspection, Inc.'s performance.

10.     Plaintiff's claims are barred because any damages allegedly sustained by Plaintiff were the direct and proximate result of an independent, unforeseeable superseding or intervening cause.

11.     Plaintiff's claims are barred by reason of Plaintiff's failure to mitigate the alleged damages or losses.

12.     Should Capitol Sprinkler Inspection, Inc. be held liable to Plaintiff, which liability is specifically denied, Capitol Sprinkler Inspection, Inc. would be entitled to a set-off for the total of all amounts paid to Plaintiff from all collateral sources.

DE050009.1

13.     Plaintiff St. Paul Mercury Insurance Company lacks standing to pursue the subject cause.

14.     Plaintiff's claims are barred or reduced due to plaintiff's insured's failure to mitigate its damages.

15.     Defendant Capitol Sprinkler Inspection, Inc. requests that Plaintiff be denied the relief sought in its Complaint at law, and that Capitol Sprinkler Inspection, Inc. be dismissed from this action and awarded costs together with any additional relief that the Court deems just and proper.  Capitol Sprinkler Inspection, Inc. reserves the right to supplement its Answer and affirmative defenses with additional defenses that may become available or apparent during the course of investigation, preparation or discovery, and to amend its Answer accordingly.

**WHEREFORE,** Capitol Sprinkler Inspection, Inc. prays for relief and judgment against Plaintiff as follows:

A.     that Plaintiff takes nothing by reason of Plaintiff's Complaint;

B.     that this action be dismissed with prejudice;

C.     that Capitol Sprinkler Inspection, Inc. recover its fees, costs and attorney fees incurred herein; and such further and other relief as the Court deems proper.

Respectfully submitted,

*/s/ Donald R. Kinsley*
Donald R. Kinsley, Esquire, D.C. Bar No.432998
Marks, O'Neill, O'Brien & Courtney, P.C.
913 North Market Street, #800
Wilmington, DE 19801
(302) 658-6538
*Attorney for Defendant*

DATED:  January 16, 2006

DE050009.1

# Exhibit G

# Capitol Sprinkler Inspection, Inc.

6550 DOBBIN ROAD
COLUMBIA, MD 21045

Telephone
Maryland: (301) 982-1023
Baltimore: (410) 730-4711
Fax: (410) 740-2428
Emergency: (410) 494-5015

### Contract For Automatic Sprinkler Equipment Inspection Service

AGREEMENT made this __22__ day of __April__ 20 __02__ between the Capitol Sprinkler Inspection, Inc., hereinafter called the CONTRACTOR, and __Guest Services c/o Galludet Conferenced Center 800 Florida Ave. NE__ __Washington, D.C. 20002-3695 Attn: David Ham__ hereinafter called the SUBSCRIBER, for AUTOMATIC SPRINKLER EQUIPMENT INSPECTION SERVICE.

WITNESSETH, that:

Subscriber owns and or occupies the building(s) located on the premises known as _____
__Conference Center__

wherein there is now installed certain automatic fire extinguishing equipment, to wit:
__Perform Annual Trip Test on 2-4" Dry Pipe Valves__

The contractor shall inspect said installation __Semi-Annually__

The Subscriber shall pay to Contractor after first inspection has been made, and annually thereafter, the sum of __Six Hundred Seventy Five Dollars, ($675.00)__

Such inspection Service shall cover the items specified on the reverse hereof and shall include supplying minor service type adjustments and replacements parts, provided that this shall not include extensions or alteration of the sprinkler system or the furnishing of replacement sprinkler heads or devices or any other major work.

If any equipment shall have been installed in addition to that existing at the date of this contract the annual inspection service charge above provided shall be increased in accordance with prevailing rates effective as of the first inspection of such additional equipment.

Notice of this agreement and copies of all inspection reports will be forwarded by the contractor to the insurance authority having jurisdiction _____

The term of this agreement shall be one year from date hereof and thereafter until the same shall be terminated by either party on at least sixty (60) days advance written notice to the other. Notice of termination or change in number of inspections shall be given to the fire insurance authority by the Contractor.

It is understood that the Contractor by providing such inspection service and by making such adjustments as may be required does not warrant the condition or operation of the system inspected.

SUBSCRIBER:                         CAPITOL SPRINKLER INSPECTION, INC.

By _____       By _____
Date ____4/30/02____             Date __April 22, 2002__

(over)

EF-20

# Exhibit H

**Capital Reporting Company**

Page 1

1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - X

3    ST. PAUL MERCURY INSURANCE      :

4    COMPANY, as Subrogee of         :        AUG 2 1 2006

5    Gallaudet University,           :

6              Plaintiff,            :

7         v.                         : Case No.:

8                                    : 1:05-cv-02115

9    CAPITOL SPRINKLER               :

10   INSPECTION, INC.,               :

11             Defendant.            :

12   - - - - - - - - - - - - - - - X

13                      Washington, DC
                        Monday, August 14, 2006
14   Deposition of:

15            MICHAEL BOWLIN

16   called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Law Office

18   of Mesirow and Stravitz, 2000 Massachusetts

19   Avenue, NW, Washington, DC, before Kim Brantley of

20   Capital Reporting, a Notary Public in and for the

21   District of Columbia, beginning at 1:45 p.m., when

22   were present on behalf of the respective parties:

## Capital Reporting Company

Page 2

```
 1    On behalf of Plaintiff:

 2         DAVID GROTH, ESQUIRE
           Cozen & O'Connor
 3         1900 Market Street
           Philadelphia, PA  19103
 4         (215) 665-2000
           E-mail: dgroth@cozen.com
 5


 6    On behalf of Defendant Capitol Sprinkler:

 7         NORMAN H. BROOKS, ESQUIRE
           Marks, O'Neill, O'Brien & Country
 8         913 Market Street -Suite 800
           Wilmington, DE  19801
 9         (302) 658-6538

10


11    On behalf of Defendant Guest Services:

12         MICHAEL D. FOSTER, ESQUIRE
           Trichilo, Bancroft, McGavin, Horvath & Judkins, PC
13         3920 University Drive
           Fairfax, Virginia  22030
14         (703) 385-1000

15


16    ALSO PRESENT:  Vernon Vane, Capitol Sprinkler

17

18

19

20

21

22
```

**Capital Reporting Company**

Page 3

1              C O N T E N T S

2    EXAMINATION BY:                    PAGE

3    Mr. Groth                       5, 114

4    Mr. Foster                         78

5    Mr. Brooks                        112

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    (*Exhibits retained by Counsel)

**Capital Reporting Company**

Page 20

```
1        A.    Most of the time, no.

2        Q.    When you say most of the time not, does

3   that mean in some occasions you would actually

4   enlist people to do work that Capitol had

5   contracted with a customer to do?

6        A.    If like we had to be in too many places

7   at one time?

8        Q.    Right.

9        A.    They might assist us as far as in the

10  control room as far as seeing the alarms going off

11  or even sometimes help us with the draining drum

12  drips or cleaning up after we have drained them in

13  some instances.

14       Q.    And how would some customer

15  representative or employee help you drain a drum

16  drip?

17       A.    They would just go with us and -- or

18  they would see how we would do it, if there was

19  multi drum drips, like in a garage, then they

20  would go do a few and we would do some.

21       Q.    So, you would ask a building owner's

22  representative to go and do some of the work?
```

**Capital Reporting Company**

1        A.    No, sometimes we didn't ask.

2    Sometimes they were just there.   They were

3    assigned to us to stay with us.

4        Q.    Right.

5        A.    And then they would go with us and help

6    us, instead of standing there watching us, they

7    would participate.

8        Q.    But I'm talking about specifically when

9    you say they might go and drain a drum drip on

10   their own.

11        MR. BROOKS:   That's been asked and

12   answered.

13   BY MR. GROTH:

14        Q.    I'm asking you whether or not there

15   were occasions when you would permit a building

16   owner's representative to go to a drum drip

17   somewhere in the building and actually do the

18   draining by him or herself?

19        A.    I was always supervising that drainage

20   or -- they wouldn't go off on their own without me

21   knowing about it.

22        Q.    And in those situations, what would you

Page 22

1    do to determine whether or not the person who was

2    going to do that work had sufficient training,

3    experience, background and specialized knowledge

4    in order to permit them to do the work?

5        A.    Well, the people that run these places,

6    as far as maintenance, they are supposed to take

7    care of that when we're not there, so that's part

8    of their responsibilities when we're not onsite.

9        Q.    I'm asking you with regard to

10   particular individuals, who you would run across

11   in these buildings.  How would you know what their

12   training --

13       A.    I'm sorry.

14       Q.    How would you know what their training,

15   experience, background or specialized knowledge

16   was, if any, to properly permit them to do this

17   work?

18       A.    I don't.

19       Q.    You wouldn't question them or ask for a

20   resume or anything like that, would you?

21       A.    No.

22       Q.    Do you know whether or not your

## Capital Reporting Company

Page 32

1  was the reason why Mr. Vane was out there?

2       A.   Mr. Ham had asked if we would show him

3  where these -- where things were, because he was

4  just taking over the maintenance and he was there

5  to show him where drum drips were, where the

6  inspector's tests were, where dry valves were and

7  what was involved.

8       Q.   And how did Mr. Vane determine where

9  all these things were?

10      A.   We have a folder that has everything

11  listed on as far as where locations are and then

12  Mr. Ham also had a blueprint of the construction

13  of the building as far as the sprinkler is

14  concerned.

15      Q.   And would it be correct to say that the

16  folder would have been the same folder that

17  Capitol used between '96 and '99 to inspect the

18  same systems?

19      A.   Yes, yes.

20      Q.   So, on that occasion, in July of 2002,

21  you and Mr. Vane and -- there was a third person,

22  Mr. --

**Capital Reporting Company**

Page 33

1       A.    Francis.

2       Q.    Francis, did the trip test and all the

3    other testing that needs to be done for the dry

4    pipe systems, correct?

5       A.    Yes.

6       Q.    Other than Mr. Ham, did any building

7    maintenance people accompany you during that

8    period of work?

9       A.    I don't recall.

10      Q.    Do you know whether or not somebody had

11   to unlock certain locks or doors or whatever to

12   give you access to all of the points that had to

13   be drained and valves that had to be turned, that

14   type of thing?

15      A.    Yes.

16      Q.    Do you know who that person was?

17      A.    I don't recall.

18      Q.    Mr. Ham did not do that?

19      A.    No.

20      Q.    Somebody else was assigned to let you

21   get access to these areas?

22      A.    Yes.

Page 34

1        Q.    Can you describe the person that gave

2    you access to those areas in July of 2002?

3        A.    He was a colored gentleman, probably my

4    height.

5        Q.    Which is?

6        A.    Five ten.

7        Q.    Okay.

8        A.    Around I'm guessing like thirty years

9    old or could be younger, could be older, but

10   around that.

11       Q.    Did he have any other distinguishing

12   marks?  Did he have an accent?  Did he have

13   anything else that you can recall?

14       A.    No.

15       Q.    Did he have on a uniform of any type

16   that gave his name or affiliation of the company,

17   anything like that?

18       A.    I can't recall.

19       Q.    And what did that person do during the

20   July inspection?

21       A.    All he did was go and open up rooms

22   that we needed open and took the locks of the drum

**Capital Reporting Company**

Page 35

1   drips off and gave us access to all these things.

2       Q.    He was not asked to help physically do

3   any of the work, correct?

4       A.    No.

5       Q.    Nor did you know if he was competent or

6   trained or had knowledge to be able to do this

7   work.  Is that correct?

8       A.    No.

9       Q.    For the drum drip that was I think

10  above conference room 5200, do you know what drum

11  drip we're talking about that actually leaked?

12      A.    Yes.

13      Q.    I'm sorry, misstated.

14            The drum drip that drains the lines

15  that actually leak.

16      A.    Right.

17      Q.    Do you know where that is located?

18      A.    Yes.

19      Q.    Is that over and above a conference

20  room?

21      A.    It's a room -- a suite room, and you

22  open the door and it's right, as soon as you walk

Page 36

1    in the room.

2        Q.    There is an access hatch?

3        A.    There is an access hatch.

4        Q.    And what kind of unlocking device do

5    you need to get into that room?

6        A.    The room itself is a card access.

7        Q.    Just like a hotel room?

8        A.    Yes.

9        Q.    Computerized card.

10        A.    Once you get in there, then it's just

11    screwdrivers to open up an access panel.

12        Q.    So it's not a key that allows you to

13    get in?

14        A.    Right.

15        Q.    Were there any other rooms that you

16    needed to get access to that used these types of

17    cards to allow you access, other than that one?

18        A.    No.

19        Q.    All the rest of the devices had some

20    kind of locking mechanism on them instead of a

21    key?

22        A.    Right, or a master key to the building

## Capital Reporting Company

1    to get inside of the mechanical rooms.

2        Q.    Now do you know whether or not the card

3    that the building person had to allow you access

4    into that suite room was a card that would allow

5    him access into any room in the building, that you

6    needed a card to?

7        A.    I don't know.

8        Q.    On the inspection reports, Exhibit 2

9    and 3, there are -- there is a space at the bottom

10   with some lines, empty lines, blank lines, that

11   has the word "deficiencies" there?

12       A.    Um-hum.

13       Q.    Yes.

14       A.    Yes.

15       Q.    What is that space supposed to be used

16   for according to your training at Capitol?

17       A.    Any problems that I would find in the

18   system or recommendations that I would make to

19   improve the system or to repair the system.

20       Q.    What if there were some conditions in

21   the field that you found that would not permit you

22   to do all of the work that you were needing to do

**Capital Reporting Company**

1      front of you for July of 2002 and January 2003, is

2      that your printing and handwriting?

3          A.    Yes.

4          Q.    On both of them?

5          A.    Yes.

6          Q.    Were there any problems that you recall

7      performing the work, the inspection work and

8      testing work that had to be done in July of 2002?

9          A.    No.

10         Q.    Did Mr. Vane actually assist in doing

11     that work, and by "assist" I mean hands-on that he

12     did some of the work with you and Mr. --

13         A.    Francis.

14         Q.    Francis?

15         A.    Yes.

16         Q.    He wasn't there just saying "You guys

17     do the work.  I'll talk to Mr. Ham or I'll do

18     something else"?

19         A.    No.

20         Q.    And as I understand your testimony, you

21     were not back to the building at all between July

22     of 2002 and January 9th, 2003, correct?

**Capital Reporting Company**

Page 40

1      A.    No.

2      Q.    Other than learning Mr. Ham's name

3    during the July visit, did you learn the name of

4    any other employee at the building during that

5    visit?

6      A.    The gentleman that met us at the desk

7    probably introduced himself, but I can't recall

8    what his name was.

9      Q.    Okay.  And you didn't make a note of

10   that?  It's not written in any record there or

11   anything?

12     A.    No, no.

13     Q.    What about at the time of the January

14   9th inspection?  Did you see Mr. Ham at that

15   inspection?

16     A.    No.

17     Q.    Do you know the name of anybody that

18   accompanied you, anybody employed at the building

19   who accompanied you during that inspection?

20     A.    Like I said that gentleman I met and we

21   shook hands and he probably mentioned his name and

22   it probably went in one ear and out the other.

Page 41

1        Q.    I know it's more than three years after

2    that inspection took place now.  Did you know that

3    person's name two weeks after the inspection took

4    place?

5        A.    No.

6        Q.    So you really never learned his name.

7    He may have said it, but the day after you didn't

8    remember what it was?

9        A.    Exactly.

10        Q.    You're like me.  I'm not good with

11    names, and in and out right away?

12        A.    Exactly.

13        Q.    So basically other than Mr. Ham, based

14    on your two inspection visits to this building,

15    you didn't know of anyone else who worked in the

16    building?

17        A.    Correct.

18        Q.    Can you describe the person that

19    accompanied you and Mr. Scott to give you access

20    to the various areas to do your work during the

21    January 9th visit?

22        A.    It was the same gentleman that

**Capital Reporting Company**

Page 42

1    accompanied us in July.

2        Q.    So you would give the same description

3    of the gentleman, yes?

4        A.    Yes.

5        Q.    Only six months older?

6        A.    Yes.

7        Q.    In terms of the testing of the system,

8    the dry pipe systems, you didn't do the trip test

9    at that time, correct?

10       A.    In --

11       Q.    January.

12       A.    No.

13       Q.    But you do have to drain the drum drips

14   for other reasons.

15       A.    Correct, correct.

16       Q.    And how many drain areas are there in

17   the system that you had to drain?

18       A.    Approximately seven I think.  There

19   is -- in my folder I had it listed down, but I

20   think the fourth floor there is two -- one in each

21   stairway, and there is another one there, and I

22   can't recall at the time; and then on the fifth

Page 50

1    valve, and then close the end valve and drain it

2    so you can maintain air pressure?

3        A.   Yes.

4        Q.   Is that the way you normally did it,

5    the winter check?

6        A.   Yes.

7        Q.   Do you recall doing it that way on

8    January 9th, 2003?

9        A.   Yes.

10       Q.   Now did you drain, you and Mr. Scott,

11   drain all of the drain points during the January

12   9th 2003 inspection?

13       A.   All but the one in that room.

14       Q.   The one above conference room 5200?

15       A.   Correct.

16       Q.   As is listed in this interrogatory

17   answer.  It says "One drum drip is located in the

18   ceiling of conference room 5200."  That's the one

19   that you did not drain.

20       A.   Correct.

21       Q.   Were you supposed to drain that drain?

22       A.   Yes.

**Capital Reporting Company**

Page 51

1      Q.    Why were you supposed to drain that

2   drain?

3      A.    Because it's part of the dry system and

4   has a drum drip above it.

5      Q.    And you drained that drain in July of

6   2002?

7      A.    Yes.

8      Q.    Why didn't you drain the drain in

9   January of 2003?

10      A.    Because I did not have access to the

11   room.

12      Q.    Why did you have access?

13      A.    The gentleman that was with us did not

14   have a card access to let us into the room.

15      Q.    This is the same gentlemen that had the

16   card in July of 2002?

17      A.    Correct.

18      Q.    Describe to me the conversation you had

19   with this gentleman regarding getting access to

20   that room.  Tell me what you said.  Tell me what

21   he said.

22      A.    We were going to the room and when we

Page 52

1    got to the room he says, "I don't have a card.  I

2    have to go down stairs and get the card for the

3    access."

4         Q.    And how far is is downstairs from where

5    you were?

6         A.    We're on the fifth floor.

7         Q.    What did you do?  Take the elevator

8    down?

9         A.    You have to take the elevator down and

10   go to the front desk.

11        Q.    And how long would you suppose it would

12   have taken him to go down, get the elevator and

13   get the card and come back up?

14        A.    Five minutes, ten minutes.

15        Q.    Five, ten minutes?

16        A.    Um-hum.

17        Q.    What kind of distance are we talking

18   about?

19        A.    However long it takes him to get to the

20   elevator, go downstairs to the front desk, or

21   however fast the elevator runs.

22        Q.    Did he say why he didn't have the card

**Capital Reporting Company**

Page 53

1   with him?

2       A.   He hadn't checked out a card -- no, he

3   didn't say why he didn't have a card.

4       Q.   Did he offer to go down and get the

5   key -- get the card?

6       A.   No.

7       Q.   Was this drum drip that had to be

8   drained above this conference room the first, last

9   or one of the middle drains that you were doing?

10      A.   The last.

11      Q.   It was the very last drain?

12      A.   The very last drain.

13      Q.   Was this the last drain that you had to

14  do in order to complete this drum?

15      A.   Right.

16      Q.   Did you have to go back to the control

17  room or turn any other valves or do any other work

18  in order to get the system reset?

19      A.   I would have to go back to the account

20  room to leave my paperwork.

21      Q.   That was it?

22      A.   That was it.

Page 54

1        Q.    Where is the mechanical room?

2        A.    Above the fifth floor, in the middle of

3    the building.

4        Q.    How do you get there, by elevator or

5    walking space?

6        A.    You have to go up steps.

7        Q.    So, you get to the point where he says

8    he doesn't have a card to get in this doorway.

9    What happens next?

10        A.    We asked if he was going to get a card

11    and he just kind of looked at us like, you know,

12    he really didn't want to -- he would take care of

13    it.  He said he would take care of the drum drip,

14    and I asked him, I said "Are you going to take

15    care of this" -- I said, "You know what?  I can't

16    get in the room.  Are you going to take care of

17    this drum drip?"

18        Q.    Well did you ask him to go get the

19    card?

20        A.    No, I didn't ask him to go get the

21    card.

22        Q.    Why didn't you ask him to go get the

Page 56

1    BY MR. GROTH:

2         Q.    Sure.   Why didn't you ask this person,

3    whose name you didn't have and still don't have --

4    correct?

5         A.    Yes.

6         Q.    Why didn't you ask him to go get the

7    card so you could have access to drain the last

8    drain you had left?

9         A.    I asked him to get the card but I don't

10   remember him going to get the card.

11        Q.    So you don't remember him saying "I

12   refuse to get the card" or anything like that?

13        A.    He didn't refuse to get the card.   It

14   wasn't said that he would get the card.   It was

15   just he would take care of the drum.

16        Q.    Let me ask you about that.   Did you ask

17   him, since you don't have a card, "Will you take

18   care of the drum drip?"

19        A.    I asked him if he would take care of

20   the drum drip.

21        Q.    So you made a request?

22        A.    I made a request.

Page 58

1       Q.    Correct?

2       A.    Correct.

3       Q.    Now when you requested this person to

4    do this draining of the drum drip, what

5    specifically did he say back to you?

6       A.    He said that he would take care of it.

7       Q.    And after that, I think you said you

8    only had to drop off some paperwork at the control

9    room and then you left the building, correct?

10      A.    Yes, sir.

11      Q.    When do you normally fill out your

12   inspection reports?  Contemporaneously, same time

13   or do you wait till the next day?

14      A.    Same time.

15      Q.    Same time?  Even before you leave the

16   building?

17      A.    Yes, because I have to leave a copy.

18      Q.    Where do you leave a copy in the

19   building?

20      A.    At the dry valves there is a folder

21   there that we slip the pink copy of it into the

22   folder, so if the fire marshal comes he can

Page 91

1    the slack for him?

2        A.    No.

3        Q.    Boy, he was a good helper?

4        A.    He was.

5        Q.    Were you on any drugs or any medication

6    at that time?

7        A.    No.

8        Q.    You don't take a Lipitor or anything

9    like that?

10        A.    No.

11        Q.    You're referring to the January 9, 2003

12    inspection.  Did you go to Galaudet University and

13    request to have a Guest Services employee come

14    meet you again, as you did in the January -- or

15    July inspection?

16        A.    I reported into the front desk.

17        Q.    Is that like a hotel?

18        A.    It's like a hotel front desk, and I'd

19    go up and introduce myself that "I'm Mike Bowlin,

20    from Capitol Sprinkler and I need to see a

21    maintenance key," or whoever they would send.

22        Q.    Okay.

Page 94

1    paperwork?

2         A.    Exactly.

3         Q.    And at no time did you ever ask this

4    mystery employee to assist you in doing what you

5    had to do?

6         A.    He had no need, because there was two

7    of us.  Mr. Scott had to stay with me because of

8    him having access to the drum drips and we

9    couldn't split up to do like we normally do.  So

10   he had to be there with us.  There was no reason

11   for him to assist us.

12        Q.    Why couldn't you split up to do, as you

13   say, what you normally do?

14        A.    Because Terrence -- the gentleman

15   couldn't be in two places at one time, and a

16   winter inspection goes faster than a normal trip

17   test.  So basically we were just draining the drum

18   drip; we move on to the next one.  It only takes

19   an hour at the most.

20        Q.    Did you ever ask him, "Hey, why don't

21   you just go ahead ahead of us, unlock the next one

22   and we will get out of here sooner"?

# Exhibit I

## <u>AFFIDAVIT OF THOMAS SCOTT</u>

STATE OF MARYLAND               :

                                       :

COUNTY OF ANNE ARUNDEL       :

BE IT REMEMBERED that on this 6th day of February, 2008, personally appeared before me, the Subscriber, a notarial officer authorized to administer oaths in the State and County aforesaid, THOMAS SCOTT, personally known to me as such, and being duly sworn, did depose and attest to the following:

I, *Thomas Scott*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, am competent to testify in court, am not under any legal disability, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my knowledge and belief:

1.      On January 9, 2003, I was employed by Capitol Sprinkler Inspection, Inc.

2.      On that date, I accompanied Michael Bowlin to the Kellogg Conference Center, located on the campus of Gallaudet University, in order to perform an inspection and service the automatic sprinkler system.

3.      Upon arrival at the conference center, we were met by an agent of Guest Services, Inc., who escorted us throughout the building as we performed our work.

4.      I do not recall the name of the gentleman who escorted us, but can describe him. I am 6'1" tall. He was 2 or 3 inches shorter than me. I was 29 years old at the time. He was older than me; probably in his 30s or 40s. He had what I would describe as an average-colored complexion for an African American gentleman.

5.      This same gentleman had in his possession an assortment of keys, which provided access to secure areas within the building, including portions of the sprinkler

{DE102626.1}

system. He unlocked the various locking devices on the sprinkler system equipment so as to enable us to drain all of the drip drums, except the one in the guest room on the fifth floor.

6.    This gentleman was unable to provide us access to that guest room because he had no metal key or plastic key card for the room. He indicated that he would return later and drain that particular drum drip.

_____
THOMAS SCOTT

SWORN TO and SUBSCRIBED before me the day and year first above written.

_____
Notary Public   MARY L ESCALANTE

My Commission Expires: NOV 1, 2010

MARY L. ESCALANTE
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Nov. 1, 2010

{DE102626.1}

# Exhibit J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University

      Plaintiff                  :

         vs.                  :

CAPITOL SPRINKLER INSPECTION, INC   :     CASE NO. 1:05CV02115 (CKK)

      Defendant            :

         vs.                  :

GUEST SERVICES, INC.             :

      Third-Party Defendant    :

**AFFIDAVIT OF VERNON VANE**

STATE OF MARYLAND          :

COUNTY OF HOWARD        :

BE IT REMEMBERED that on this 7th day of February, 2008, personally appeared before me, the Subscriber, a notarial officer authorized to administer oaths in the State and County aforesaid, VERNON VANE, personally known to me as such, and being duly sworn, did depose and attest to the following:

I, *Vernon Vane*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my knowledge and belief:

1.    I am currently employed as the Supervisor of Inspection for Defendant Capitol Sprinkler Inspection, Inc.

2.    I was deposed in this litigation on Monday, August 14, 2006.

3.    Following the incident of January 25, 2003, representatives of Capitol Sprinkler Contracting, Inc. performed certain repairs to the subject fire protection system and restored it to service.  As part of that process, Capitol Sprinkler Contracting replaced four sprinkler heads and one "Tee" fitting.

4.    I then returned the original components to an agent of Guest Services, Inc., at the Kellogg Conference Center.  The components are identified on the receipt/letter of transmittal, attached as Exhibit 1.

5.    When I returned the components to Guest Services, Inc., I met its agent at the Kellogg Conference Center.  He identified himself as Terrance F. Hubbard.

6.    He appeared about 5'10" tall and had a medium build.  He appeared in his 30's or 40's.

7.    The color of his skin was dark for a Caucasian, and light for an African American:  I would describe his race as being mixed.

8.    Mr. Hubbard took possession of the original components, vis., the one "Tee" fitting and 4 sprinkler heads that had been removed from the system.  At that time, I requested Mr. Hubbard to sign the transmittal, attached as Exhibit 1, in an effort to acknowledge receipt, and he complied.

{DE102611.1}

_____
VERNON VANE

SWORN TO and SUBSCRIBED before me the day and year first above written.

_____
Ann Golden, Notary Public

My Commission Expires: ___12 - 1 - 08___

{DE10261l.1}

# Exhibit J - 1

**CAPITOL SPRINKLER CONTRACTING, INC.**
6550 Dobbin Road
COLUMBIA, MARYLAND 21045

Baltimore (410) 730-4711
Maryland (301) 982-1023

## LETTER OF TRANSMITTAL

| DATE *January 30, 2003* | JOB NO. |
|---|---|
| ATTENTION *David Ham* | |
| RE: *Return of Fittings & Sprinkler Heads* | |

TO *Guest Services*
*% Gallaudet Conference Center*
*800 Florida Ave NE. Wash DC 20002*

WE ARE SENDING YOU    ☐ Attached    ☐ Under separate cover via _____ the following items:

☐ Shop drawings    ☐ Prints    ☐ Plans    ☑ Samples    ☐ Specifications

☐ Copy of letter    ☐ Change order    _____

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| | | 4 | *Viking Mod M 1994 - Glass Bulb 200°F Brass Upright Sprinklers* |
| | | 1 | *1X1X½ Blk C.I. Tee* |
| | | | |
| | | | |
| | | | |

THESE ARE TRANSMITTED as checked below:

☐ For approval          ☐ Approved as submitted          ☐ Resubmit _____ copies for approval

☐ For your use          ☐ Approved as noted          ☐ Submit _____ copies for distribution

☑ As requested          ☐ Returned for corrections          ☐ Return _____ corrected prints

☐ For review and comment          ☐ _____

☐ FOR BIDS DUE _____          ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS _____

COPY TO _____

SIGNED: _____ *Terrence F. Hubbard*

If enclosures are not as noted, kindly notify us at once.

# Exhibit K

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University

     Plaintiff

       vs.

CAPITOL SPRINKLER INSPECTION, INC     :     CASE NO. 1:05CV02115 (CKK)

     Defendant

       vs.

GUEST SERVICES, INC.

     Third-Party Defendant

---

## AFFIDAVIT OF LOUIS R. DEMPSEY

STATE OF DELAWARE          :

COUNTY OF NEW CASTLE      :

BE IT REMEMBERED that on this 17th day of January, 2008, personally appeared before me, the Subscriber, an attorney licensed to practice law in the State and County aforesaid, and authorized to perform notarial acts pursuant to 29 Del. C. §4323(a)(3), LOUIS R. DEMPSEY, a private investigator, licensed by the State of Delaware and personally known to me as such, and being duly sworn according to law, did depose and attest to the following:

I, *Louis R. Dempsey*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my

knowledge and belief:

1.      At the request of Counsel for Defendant Capitol Sprinkler Inspection, Inc., I attempted to locate a subject known only as Terrance Hubbard. I was provided only the name of his employer: Guest Services, Inc. -- 3055 Prosperity Avenue, Fairfax, Virginia 22031.

2.      In October, 2006, I queried five separate data bases for a total of thirteen (13) queries. Computer research revealed four possible subjects located in Virginia. However, I was unable to relate any to Guest Services, Inc., without additional identifying information.

3.      Following the Court's 1/31/07 Status Conference with Counsel, I received additional information from Counsel from Capitol Sprinkler Inspection, vis., 1) the subject's complete name (Terrance Edwin Hubbard); 2) his last known home address (901 6th Street, NW -- Apartment 507 -- Washington, DC 20024); 3) his date of birth (7/27/1954); and his social security number (intentionally blank).

4.      I subsequently performed a Cyber-TRACE. The Cyber-TRACE investigation revealed that an individual identified as Terrance Edwin Hubbard, having the same last known address, date of birth and social security number as those provided to me by counsel and set our in Paragraph 3 above, was listed in the Social Security Administration Death Masterfile as having died in September, 2005.

5.      On January 15, 2008, i.e., following the filing of Plaintiff's Motion for Summary Judgment, I spoke with an individual identified as Edwin Hubbard, of Sodus, New York. He said that Terrence Edwin Hubbard committed suicide in Washington, DC in September, 2005. He directed me to the obituary that appeared in the Newark, New York Courier Gazette on October 5, 2005, a copy of which is attached hereto as Exhibit

1. The obituary identifies the surviving parents of Terrance E. Hubbard as being Beverly & Edwin Hubbard.

6. On January 17, 2008, I spoke with Mr. Hubbard again by telephone.

7. Edwin Hubbard confirmed that his son, Terrance Edwin Hubbard, was at one time employed by Guest Services at the Gallaudet University. Mr. Hubbard specifically recalled on incident wherein his son told him that he was required to work many hours one week to clean up water damage resulting from a sprinkler incident.


LOUIS R. DEMPSEY

SWORN TO and SUBSCRIBED before me the day and year first above written.


Norman H. Brooks, Jr., Esquire, Notary Officer
Notarial Officer pursuant to 29 Del.C. §4323(a)(3)
My commission expires: Indefinite

# Exhibit K - 1

Deaths – Courier-Gazette Digital Edition Newark NY 14513                    Page 1 of 1

# Death Notices
## July – September 2005

**October 4, 2005**

**Overacre, Thelma** - Thelma Overacre, 76, of Ladue Avenue, Clifton Springs died September 28, 2005 at Strong Memorial Hospital in Rochester. Her loving family was by her side. Thelma was born June 22, 1929 in Canandaigua and was the daughter of the late William and Florence Potter. She had lived in the area all her life and retired from Mobil Chemical in Bushnell's Basin. Thelma was a former member of the Order of Eastern Star. She loved history, especially about World War II. She was a family woman, devoting her time raising her family with love. She was happiest spending time with her children, grandchildren and great-grandson. Thelma will be sadly missed by all her loving family and friends. Arrangement entrusted to R. A. Patrick Funeral Home, 26 W. Main St. Clifton Springs. Funeral services are this morning at the funeral home. Burial will be at the convenience of the family in Pioneer Cemetery. Friends may contribute to Clifton Springs Fire Department. She is survived by her children, Bradley G. Overacre of Lyons and Michelle (Donald) Overacre-Post, Deborah Taylor and Suzanne Giordano, all of Clifton Springs; grandchildren, a great-grandson; sister, Florence Miles of Shortsville; several nieces and nephews. She was predeceased by her husband, Earl Overacre; brothers, George and Kenneth Potter; and sister, Virginia Wiley.

**Hubbard, Terrance E.** - Terrance E. 'Terry' Hubbard, 51, of Sodus/Washington, D.C., died suddenly on September 10, 2005. Terry served 12 years in the U.S. Navy. He is predeceased by his grandfather and grandmother, Fred and Marge Hubbard, and grandfather, Ralph Rawden. Terry is survived by his parents, Beverly and Edwin Hubbard; sister, Debra Cudney and Penny (Steve) Billington; brother, Barry (Laurie) Hubbard; grandmother, Edith Rawden; aunts, uncles, niece, and nephews. Arrangements by Norton Funeral Home. Funeral Services will be held at the convenience of the family.

top of page

# Exhibit L

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University | : | CASE NUMBER: 1: 05-CV-02115 |
| Plaintiff | : | |
| vs. | : | |
| CAPITOL SPRINKLER INSPECTION, INC | : | |
| Defendant | : | |
| vs. | : | |
| GUEST SERVICES, INC. | : | |
| Third-Party Defendant | : | |

## NOTICE OF ORAL DEPOSITION

TO:  Stephen Horvath, Esquire
     Trichilo, Bancroft, McGavin , Horvath & Judkins, P.C.
     3920 University Drive, P.O. Box 22
     Fairfax, VA  22030

     David J. Groth, Esquire (phv)
     Daniel J. Luccaro, Esquire (phv)
     1900 Market Street
     Philadelphia, PA 19103
     (215) 665-2000 (p)
     (215) 701-2368 (f)

     PLEASE TAKE NOTICE that plaintiff will take the depositions of the following
individuals at the offices of Mesirow & Stravitz, 2000 Massachusetts Avenue, Suite 200,
Washington, DC upon oral examination pursuant to the Federal Rules of Civil Procedure,
before a Notary Public, or before some other officer authorized by law to administer
oaths.

{DE067099.1}

**Monday, October 16, 2006**

| Deponent | Time |
|---|---|
| Terrance Hubbard | 10:00 a.m. |
| Plaintiff's 30(b)(6) witness concerning access to the Conference Center provided by Gallaudet University on January 9, 2003. | 11:00 a.m. |
| David Hamm | 1:00 p.m. |
| Third Party Defendant's 30(b)(6) witness concerning access to the Conference Center provided to Defendant by Third Party Defendant on January 9, 2003. | 3:00 p.m. |

You are asked to notify the deponents to be present at the time and place aforesaid and you are privileged to attend and participate in the examination. Said depositions will continue from day to day until completed.

Michael T. Hamilton, Esquire
Norman H. Brooks, Esquire
Marks, O'Neill, O'Brien & Courtney
913 North Market Street, #800
Wilmington, DE  19805
(302) 658-6538

{DE067099.1}

# Exhibit M

2007-01-31.txt

```
00001
01   UNITED STATES DISTRICT COURT
02   FOR THE DISTRICT OF COLUMBIA
03
04
05   St. Paul Mercury              Docket No. CA 05-2115 CKK
06     Insurance Company
07
08           Plaintiff
09                                 Washington, D.C.
10       vs.                       Wednesday, January 31, 2007
11                                 9:04 a.m.
12   Capitol Sprinkler Inspection,
13     Inc.
14
15           Defendant
16
17
18   Capitol Sprinkler Inspection,
19     Inc.
20
21           Third-Party Plaintiff
22
23       vs.
24
25   Guest Services, Inc.
26
27           Third-Party Defendant
28
29
30
31
32   Transcript of Status Hearing
33   Before the Honorable Colleen Kollar-Kotelly
34   United States District Judge jury
35
36
37
38
39   APPEARANCES:
40
41   For the Plaintiff:        Eric Stravitz, Esq.
42                             David Groth, Esq.
43
44   For the Defendant:        Norman Brooks, Jr., Esq.
45                             Stephen Horvath, Esq.
46
▯
00002
01
02   Reporter:                 WILLIAM D. MC ALLISTER, CVR-CM
03                             Court Reporter
04                             (301) 520-1000
05
06
07
08
09   Reported by Voice Writing and transcribed using SpeechCAT
10
11
12
13   Pages 1 through 27
14
```

2007-01-31.txt

```
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
```
00003
01    P R O C E E D I N G S
02            THE CLERK:  Civil Case 05-2115.  St. Paul Mercury
03    Insurance Company versus Capitol Sprinkler Inspection, Inc.,
04    and Guest Service, Inc.
05            Counsel, would you please identify yourselves for the
06    record.
07            MR. GROTH:  David Groth, counsel for the plaintiff,
08    Your Honor.
09            MR. STRAVITZ:  Eric Stravitz, counsel for the
10    plaintiff, Your Honor.
11            MR. BROOKS:  Good morning.  Norman Brooks on behalf
12    of Capitol Sprinkler, Inc., defendant.
13            MR. HORVATH:  Good morning, Your Honor.  Steve
14    Horvath on behalf of Guest Services, third-party defendant.
15            THE COURT:  All right.  We are here for a status.
16    Discovery should be done.  It was extended.  I know you've had
17    some ADR with Magistrate Judge Kay.  I guess we're not able to
18    resolve it.
19            So at this point we're ready for either a motions
20    schedule or to set a pretrial.  I'm unsure where everybody is
21    in all of this.
22            Counsel, if you would come forward to the
23    microphone.  It makes it much easier for the court reporter and
24    for me to hear you.
25            MR. BROOKS:  Thank you, Your Honor.  I believe we
```
00004
01    have a couple of issues that would probably merit some
02    discussion concerning completing discovery which would probably

2007-01-31.txt
```
03   take another 30 days.
04            THE COURT:  Discovery is not done?
05            MR. BROOKS:  No, it's not, Your Honor.
06            THE COURT:  How come?  I mean this thing got pushed
07   off.  You got extra time.  Why isn't it done?
08            MR. BROOKS:  That is correct, Your Honor.  We have
09   had two depositions that we wanted to take on the part of the
10   third-party defendant.  We understand that one witness who is a
11   very critical witness, we think he is deceased.  We are trying
12   to get a copy of the certified death certificate.  But our
13   unofficial research on the Internet suggests he is deceased.
14            The second is a former employee, Mr. Ham.  He is an
15   employee of the third-party defendant.  If the third-party
16   defendant is going to call him as a witness, then we would like
17   to depose him.  The plaintiff noticed his deposition early on
18   in the case and then we noticed the deposition towards the end
19   of the case, and neither one went forward.
20            We understand he is a former employee, and that issue
21   needs to be resolved.  I understand that counsel for third-
22   party defendant early in the case was in contact with this
23   gentleman but is no longer in contact with him.  So we need to
24   have a decision about whether or not this fellow is going to
25   testify at trial or not.

00005
01            The second issue deals with two experts.  One is an
02   expert that I identified on the last day for defendant's
03   experts.  I filed a responsive pleading.  I produced, on the
04   last day I produced a summary of the deposition and trial
05   testimony and a statement of his opinions.  I did not actually
06   have an actual report from him.
07            A little out the time I filed actually, served a
08   handwritten report, not handwritten report, but a report from
09   this particular expert which essentially added nothing to his
10   opinions but it was a signed report as required by the rule.
11            After the discovery I also received a letter from
12   plaintiff's attorney wherein he has provided additional
13   documents relied upon by a new damages expert and I would like
14   30 days to take this new damages expert's testimony.
15            Thank you.
16            THE COURT:  So in other words it is going to take you
17   a year to get all of the discovery in the case.  I mean you
18   were in here back in April of 2006.  Why didn't anybody file
19   extensions or anything before the period was over as opposed to
20   coming in after the time period, although it's pretty close?
21            I think when I extended it -- I didn't bring the
22   docket.  I thought frankly you were done or I would have
23   printed out the docket to take a look at it.  But I thought
24   either yesterday was your last day or it was fairly recently.
25   So let's start.

00006
01            Did you add a new expert or is this a new report?
02            MR. GROTH:  No.  There are no new reports at all.
03            THE COURT:  Then what is the damage expert that
04   they're talking about?
05            MR. GROTH:  There was an adjuster for the plaintiff
06   insurance company who retired, is in ill health and has moved
07   to Florida.  There was another adjuster that worked on the same
08   claim.  His name was substituted for the other adjuster.
09   There's no different reports, no different numbers, nothing
10   else has changed except the name of the witness who we would
11   have testify to that damages at trial.
```
Page 3

2007-01-31.txt

```
·21  to get his deposition as far as plaintiff is aware until the
 22  end of the discovery deadline where apparently some effort was
 23  made to find out where he is now.
 24            THE COURT:  If I could just ask, in terms of Mr. Ham,
 25  had you noticed his deposition at some point and then canceled
00009
 01  it?  I thought that's what defense counsel said.
 02            MR. GROTH:  I noticed his deposition very early on in
 03  the case.  I don't have a claim against the third-party
 04  defendant.  Plaintiff doesn't have a claim against the third-
 05  party defendant.  I noticed his deposition because his name was
 06  disclosed by Guest Services, the third-party defendant.
 07            I decided shortly thereafter that I did not need his
 08  deposition.  I never sought his deposition again.  The
 09  information I had was that he was last known to be living in
 10  California or something like that; and since I didn't have a
 11  claim against Guest Services, I had no intention of taking a
 12  deposition.
 13            So I initially noticed the depositions of two Guest
 14  Services employees neither one of whom plaintiff decided it
 15  needed and no attempt was made to get those at any time during
 16  the discovery process.
 17            So in terms of the status of the discovery, I believe
 18  the plaintiff and the third-party defendant are quite content
 19  with the status of discovery right now that it's completed.  We
 20  completed everything we needed to do and it is the defendant
 21  who is seeking to f, or no good reason, to reopen discovery
 22  because the defendant did not do what it was supposed to do
 23  under the extended discovery deadline entered by the court on
 24  October 24, 2006.
 25            THE COURT:  Let me hear from the third-party about at
00010
 01  least, Mr. Ham.
 02            MR. HORVATH:  Thank you, Your Honor.  Steve Horvath
 03  for Guest Services.  Dealing with issue of Mr. Ham, he was
 04  identified early on.
 05            THE COURT:  Can you spell his name?
 06            MR. HORVATH:  Ham like in the pork.
 07            THE COURT:  The meat, okay.
 08            MR. HORVATH:  He was identified early on.  My office
 09  did have a contact with him early on, and since his move, we've
 10  lost contact.  We have no idea where he is.  If we locate him,
 11  of course, we will disclose his new address.  But at this time
 12  I do not have an address for him.  So I do not know of his
 13  whereabouts.
 14            An effort was made to take his deposition during the
 15  last week of discovery by serving a notice on me.  I advised
 16  counsel for the defendant that I don't have access to him.  I
 17  don't have control over him.  He's not our employee anymore.
 18  So, therefore, I cannot produce him.
 19            He agreed.  He tried to serve a subpoena.  He was not
 20  able to serve him with a subpoena and, therefore, the
 21  deposition was canceled.
 22            THE COURT:  So at this point nobody knows his
 23  location, is that correct?
 24            MR. HORVATH:  That is correct.  Frankly I thought we
 25  had a location at one time in the file and I didn't follow up
00011
 01  every month contacting the person to see if he had moved or
 02  whatever but he has disappeared.
```

Page 5

2007-01-31.txt

03          I am sure with modern technology someone will be able
04     to locate him at some time but that doesn't require that we
05     extend the discovery in this case to do anything.  If we locate
06     him, the first thing someone can do is give him a call and
07     interview him, and after that, a decision can be made as to
08     whether or not a deposition is necessary.
09          I anticipate that if he's no longer in the area, we
10     can always do a de bene esse type deposition for the trial of
11     this case, if necessary.
12          THE COURT:  So from your perspective, if he is found
13     at some point, you would not object then to doing some sort of
14     telephone interview and potentially a de bene esse deposition,
15     is that correct?
16          MR. HORVATH:  That is right.
17          THE COURT:  That seems to me to resolve that one.
18          Where are we on experts from your prospective?
19          MR. HORVATH:  On experts, the problem I have with
20     expert witnesses is that initial expert disclosure was made by
21     the defendant, Capitol, and was clearly inadequate.  He
22     admitted it was inadequate.  It didn't provide us with the
23     basis for any opinions or anything which would really implicate
24     my client in this case.
25          He made a motion on October 16 to extend the time so

00012
01     he could properly designate his experts and no expert was ever
02     designated by him.  So as a result, I never designated any
03     experts on behalf of my client.
04          After the close of discovery, after I was repeatedly
05     told that you have the information for this person, I get a
06     two-page document was purports to implicate my client as being
07     responsible for this event.  I'm not sure if Your Honor recalls
08     what the event was --
09          THE COURT:  Yes.  It was frozen pipes that burst at
10     Gallaudet.
11          MR. HORVATH:  Right.  The implication against my
12     client is that my client should have drained the system even
13     though we hired Capitol to drain the system, that my client
14     should have turned off the water system earlier after it
15     started leaking and water coming down and that caused
16     additional damage.
17          Apparently there is some NFPA 72 regulation that we
18     allegedly violated.  I'm not sure what the basis for that or
19     what the issue is there.  But this is all new to me.  And as a
20     result I did not designate any witnesses.
21          If Capitol is allowed to designate this person and
22     call this person, I am going to need time now to get someone to
23     rebut him because, prior to that time, I was sitting very
24     happy.  I had the plaintiff saying I didn't do anything wrong.
25     I had a contract spelling out the responsibilities and I didn't

00013
01     have any experts saying that my client had done anything wrong.
02          I am now in a situation where Capitol is trying to
03     implicate me by saying that an expert in a report that came in
04     after the close of discovery and two months after it was due
05     that implicates my client without an expert.
06          So I'm caught in a terrible bind at this point in
07     time.  So if Capitol is allowed to designate an expert, and we
08     would strenuously object to that, then I'm going to have
09     problems.  I'm going to need to designate someone to come in
10     and rebut him.
11          THE COURT:  All right.  Let me hear back from defense
Page 6

**Exhibit N**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY,: <br> as Subrogee of Gallaudet University | : | |
| Plaintiff | : | |
| vs. | : | |
| CAPITOL SPRINKLER INSPECTION, INC | : | CASE NO. 1:05CV02115 (CKK) |
| Defendant | : | |
| vs. | : | |
| GUEST SERVICES, INC. | : | |
| Third-Party Defendant | : | |

### AFFIDAVIT OF VERNON VANE

STATE OF MARYLAND                          :
                                                                :
COUNTY OF HOWARD                         :

BE IT REMEMBERED that on this 17th day of January, 2008, personally appeared before me, the Subscriber, a notarial officer authorized to administer oaths in the State and County aforesaid, VERNON VANE, personally known to me as such, and being duly sworn, did depose and attest to the following:

I, *Vernon Vane*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my knowledge and belief:

{DE101204.1}

1.      I am currently employed as the Supervisor of Inspection for Defendant Capitol Sprinkler Inspection, Inc.

2.      I have been employed at Capitol Sprinkler Inspection, Inc. in various capacities for approximately 24 years.   I have been the Supervisor of Inspection for approximately sixteen years.  Prior to that, I worked as a pipe fitter, journeyman, installer and job foreman.

3.      I was deposed in this litigation on Monday, August 14, 2006.

4.      This Affidavit will explain the apparent inconsistency presented by the fact that although the subject contract refers to NFPA 13A, the subject inspection was performed under the standards identified as NFPA 25.

5.      NFPA 25 is a standard produced by the National Fire Protection Association, titled, ***Standard for the Inspection, Testing & Maintenance of Water-Based Fire Protection Systems***.  The history of NFPA 25 is set forth in the section titled, ***Origin & Development of NFPA 25***, attached hereto as Exhibit 1.  It provides that the first edition of NFPA 25 was a collection of inspection, testing and maintenance provisions that helped to ensure the successful operation of water-based fire protection systems.  It was developed as an extension of existing documents such as NFPA 13A, titled ***Recommended Practice for the Inspection, Testing & Maintenance of Sprinkler Systems***, and NFPA 14A, ***Recommended Practice for the Inspection, Testing & Maintenance of Standpipe & Hose Systems***.  The portion of those documents that pertained to the inspection, testing and maintenance of those systems was withdrawn from those publications, and became the framework of the first edition of NFPA 25, which pertains to only the inspection, testing and maintenance of water-based systems.

{DE101204.1}

6.    The current version of NFPA 13 is titled, *Standard for the Installation of Sprinkler Systems*. That standard now applies to *installation* issues in various fire protection systems, including water-based systems.

7.    It appears that the language of our form contract, which is the subject of this litigation, did not evolve at the same time that portions of NFPA 13A evolved into NFPA 25.

8.    Despite the fact that the contract refers to NFPA 13A, the inspection at issue in this litigation was performed pursuant to NFPA 25.

9.    The responsibilities of the owner or occupant of a building protected by a water-based fire protection system, including the subject conference center, are set out in NFPA 25, Paragraph 25-5.

10.    I agree that the 2002 edition of NFPA 25 controlled our responsibilities in performing the subject contract. Similarly, NFPA 25 controlled the responsibilities of the owner and manager, Gallaudet University and Guest Services, Inc., in performing the subject contract.

11.    The general responsibilities of the owner or occupant of a building are set forth in NFPA 25, Chapter 4, attached as Exhibit 2. Paragraph 4.1.1 therein specifically provides that "The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing or maintenance".

12.    NFPA 25 further provides that where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing and maintaining the fire protection systems to the occupant or management firm or managing individual through specific provisions in a lease or management contract. When Capitol Sprinkler Inspection, Inc. contracted with Gallaudet University, through its agent, Guest Services, Inc., we expected that Gallaudet University, through its agent, Guest Services, Inc., would comply

{DE101204.1}

with the requirements of NFPA 25, Chapter 4, by, among other things, providing our technicians with access to all parts of the system requiring inspection or maintenance.

13.    When Capitol Sprinkler performed the same inspection and maintenance services at the subject conference center during the period 1996 through 1999, during which time the building was being managed by Guest Services' predecessor, Aramark Services, Aramark provided us all necessary access to completely perform the contract.  As such, we were able to drain all of the drum drips' low points, including the subject low point or drum, to which we were not given access during our inspection/maintenance visit on January 9, 2003.


_____
VERNON VANE

SWORN TO and SUBSCRIBED before me the day and year first above written.

_____
Ann Golden, Notary Public

My Commission Expires:  _12-1-08_____

{DE101204.1}

**Exhibit N - 1**

# NFPA 25

Standard for the

Inspection, Testing, and Maintenance of Water-Based Fire Protection

Systems

2002 Edition

Copyright © 2002, National Fire Protection Association, All Rights Reserved

This edition of NFPA 25, *Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems*, was prepared by the Technical Committee on Inspection, Testing, and Maintenance of Water-Based Systems and acted on by NFPA at its November Association Technical Meeting held November 10–14, 2001, in Dallas, TX. It was issued by the Standards Council on January 11, 2002, with an effective date of January 31, 2002, and supersedes all previous editions.

This edition of NFPA 25 was approved as an American National Standard on January 31, 2002.

## Origin and Development of NFPA 25

The first edition of NFPA 25 was a collection of inspection, testing, and maintenance provisions that helped ensure the successful operation of water-based fire protection systems. NFPA 25 was developed as an extension of existing documents such as NFPA 13A, *Recommended Practice for the Inspection, Testing, and Maintenance of Sprinkler Systems*, and NFPA 14A, *Recommended Practice for the Inspection, Testing, and Maintenance of Standpipe and Hose Systems*, which have successfully assisted authorities having jurisdiction and building owners with routine inspections of sprinkler systems and standpipes. These documents have since been withdrawn from the NFPA standards system. NFPA 25 became the main document governing sprinkler systems as well as related systems, including underground piping, fire pumps, storage tanks, water spray systems, and foam-water sprinkler systems.

This document provides instruction on how to conduct inspection, testing, and maintenance activities. It also stipulates how often such activities are required to be completed. Requirements are provided for impairment procedures, notification processes, and system restoration. This type of information, where incorporated into a building maintenance program, enhances the demonstrated favorable experience of all water-based fire protection systems.

The second edition incorporated several improvements that reflected the initial experience with the standard. A new chapter was added that addresses obstructions in pipe as well as appropriate corrective actions.

The third edition refined testing requirements and frequencies and provided additional guidance for preplanned impairment programs. The document scope was expanded to include marine systems.

This fourth edition continues to refine testing frequencies for water-flow devices and evaluation of the annual fire pump test data. This edition also includes additional information regarding evaluation and test methods for microbiologically influenced corrosion (MIC).

## Technical Committee on Inspection, Testing, and Maintenance of Water-Based Systems

### Kenneth W. Linder, *Chair*

**Exhibit N - 2**

# Chapter 4 General Requirements

**4.1 Responsibility of the Owner or Occupant.**

**4.1.1\*** The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance.

**4.1.2\*** The responsibility for properly maintaining a water-based fire protection system shall be that of the owner of the property.

**4.1.2.1** By means of periodic inspections, tests, and maintenance, the equipment shall be shown to be in good operating condition, or any defects or impairments shall be revealed.

**4.1.2.2** Inspection, testing, and maintenance shall be implemented in accordance with procedures meeting or exceeding those established in this document and in accordance with the manufacturer's instructions.

**4.1.2.3** These tasks shall be performed by personnel who have developed competence through training and experience.

**4.1.2.4** Where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract.

**4.1.3** The owner or occupant shall notify the authority having jurisdiction, the fire department, if required, and the alarm-receiving facility before testing or shutting down a system or its supply.

**4.1.3.1** The notification shall include the purpose for the shutdown, the system or component involved, and the estimated time of shutdown.

**4.1.3.2** The authority having jurisdiction, the fire department, and the alarm-receiving facility shall be notified when the system, supply, or component is returned to service.

**4.1.3.3** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.3.

**4.1.4\*** The owner or occupant shall promptly correct or repair deficiencies, damaged parts, or impairments found while performing the inspection, test, and maintenance requirements of this standard.

**4.1.4.1** Corrections and repairs shall be performed by qualified maintenance personnel or a qualified contractor.

**4.1.4.2** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.4.

**4.1.5\*** The building owner or occupant shall not make changes in the occupancy, the use or process, or the materials used or stored in the building without evaluation of the fire protection systems for their capability to protect the new occupancy, use, or materials.

**4.1.5.1** The evaluation shall consider factors that include, but are not limited to, the following:

(1)     Occupancy changes such as converting office or production space into warehousing

(2)     Process or material changes such as metal stamping of molded plastics

(3)     Building revisions such as relocated walls, added mezzanines, and ceilings added below sprinklers

(4)     Removal of heating systems in spaces with piping subject to freezing

**4.1.5.2** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.5.

**4.1.6** Where changes in the occupancy, hazard, water supply, storage commodity, storage arrangement,