## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University<br><br>    Plaintiff<br><br>    vs.<br><br>CAPITOL SPRINKLER INSPECTION, INC<br><br>    Defendant<br><br>    vs.<br><br>GUEST SERVICES, INC.<br><br>    Third-Party Defendant | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  CASE NUMBER:  1:05CV02115 (CKK)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

### DEFENDANT CAPITOL SPRINKLER INSPECTION, INC'S
### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
### MOTION FOR SUMMARY JUDGMENT AGAINST THIRD-PARTY DEFENDANT

Pursuant to Rules 7(h) and 56.1 of Local Rules of the United States District Court for the District of Columbia, Defendant Capitol Sprinkler Inspection, Inc. hereby submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment against Third-Party Defendant Guest Services, Inc.

## I.    INTRODUCTION

In the mid-to-late 1990's, Gallaudet University ("Gallaudet") engaged Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler") to install a dry-pipe fire protection system at its Kellogg Conference Center, and to perform subsequent semi-annual inspections and trip tests on the system.  Capitol Sprinkler's first inspection contracts were executed with Gallaudet through its property management agent at the time, Aramark (See Exhibit D).  The record is devoid of any

suggestion of problems with access for Capitol Sprinkler's inspectors to perform their work, or freeze-related failures during this period.

On April 22, 2002, Guest Services, Inc. ("Guest Services"), acting as Gallaudet's new property management agent, secured Capitol Sprinkler's services to perform semi-annual inspections and trip tests on the system. (See Gen'ly Exhibits E, F, & G). Capitol Sprinkler's inspectors had no independent access to the Kellogg Conference Center. Instead, an employee of Guest Services escorted the Capitol Sprinkler inspectors through the building while inspections were performed. (See Gen'ly Exhibits D, H, & I). This escort's role was to unlock the applicable valves and open the appropriate rooms so Mr. Bowlin could successfully complete his inspection. (See Gen'ly Exhibits D, H, & I).

During the inspection on January 9, 2003, in addition to other areas, Mr. Bowlin was to drain a drum drip located in the ceiling of conference room 5200. When Mr. Bowlin reached conference room 5200, his Guest Services escort said that he did not have the card key for this room and could not grant Mr. Bowlin access to the room or the drum drip within. (See Gen'ly Exhibits H & I). The escort made no effort to get the card key to access to the room, instead offering to take care of draining the drum drip himself. (See Exhibit H). Mr. Bowlin asked if the escort would take care of that particular drum drip, and the escort said he would do so. (See Exhibit H). It was not unusual for this employee to make such an offer since the building engineer's responsibility is to keep the drum drips or low points drained (see Exhibit B), building maintenance personnel are required to know how to perform this function, and, in the past, employees of property management agents had assisted Capitol Sprinkler in draining drum drips while acting at the direction or with the knowledge of the inspector. (See Exhibit H). It appears

{DE101496.1}

that the Guest Services escort was Terrance Hubbard, although his name was not known at the time of the inspection.

On or about January 25, 2003, a pipe fitting failed as the result of a "freeze event," meaning that water in the pipe froze and expanded, bursting the fitting, and subsequently melted, which allowed air and then water to escape the system through the failed fitting. The water discharged into the interior of the Conference Center. This subrogation action ensued.

For the reasons stated herein, Capitol Sprinkler submits that Guest Services is liable for the damages sustained by Plaintiff in this case, that Guest Services owes Capitol Sprinkler indemnification and contribution for the damages Plaintiff suffered, and accordingly, that the Court should GRANT Capitol Sprinkler's Motion.

## II.    SUMMARY OF THE APPLICABLE LAW

### A.    STANDARD OF REVIEW

Summary judgment shall be entered where "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cobell v. Norton*, 260 F.Supp. 110, 116 (D.D.C. 2003); see also *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Through this analysis, the Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In other words, the Court is trying to determine whether trial is necessary. *Id.* This standard essentially "mirrors" the standard used when considering a motion for a Directed Verdict. *Celotex,* 477 U.S. at 323.

"[T]he substantive law will identify which facts are material." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006). "To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party." *Communications Workers Of America, AFL-CIO, v. Verizon Services, Inc.*, 404 F. Supp. 2d 62, 66 (D.D.C. 2005) (citations omitted). At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Arrington,* 473 F.3d at 333 (citing *Liberty Lobby,* 477 U.S. at 249).

The moving party bears the initial burden of establishing that no "genuine issue of material fact" exists and that judgment in its favor should be entered by citing to credible evidence of the type discussed in Rule 56. *Celotex,* 477 U.S. at 322-24. Should the moving party carry its burden, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); See also *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Summary judgment is available where, as here, the evidence in support of the Third-Party Plaintiff's motion is "so one-sided that [it] must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 259.

## B.    CHOICE OF LAW

"In a diversity case a federal court follows the choice-of-law rules of the jurisdiction in which it sits." *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193 (D.C. Cir. 1999) (citations omitted). In the absence of a contractual choice-of-law provision, this Court "uses 'a constructive blending' of the 'governmental interest analysis' and the 'most significant

{DE101496.1}

relationship test,' the latter as expressed in the *Restatement (Second) of Conflict of Laws* § 188 (1988)." *Id.* at 194 (citations omitted). Where, as here, there is no choice of laws provision in the subject contract, the contract itself was partially negotiated and performed in the District of Columbia, no other jurisdiction appears to have an obvious interest in determining the issues arising under the contract, and the Plaintiff and all other parties have chosen this venue to adjudicate the matter, the Court should properly apply the laws of the District of Columbia to determine whether a breach of contract occurred. *Id.*

C.    **D.C. LAW OF CONTRACTS AND AGENCY**

1.    **The Court must look to the face of the contract first.**

"This jurisdiction adheres to an 'objective' law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties unless the written language is not susceptible of a clear and definite undertaking." *Island Development Corporation v. District of Columbia*, 933 A.2d 340, 347 (D.C. App 2007) (quoting *Sobelsohn v. American Rental Management Co.*, 926 A.2d 713, 718 (D.C. 2007)). "The law requires contracts to be read as a whole, with meaning given to every provision contained therein." *KiSKA Construction Corporation-USA v. Washington Metropolitan Area Transit Authority*, 321 F.3d 1151, 1163 (D.C. Cir. 2003) (cert denied at 540 U.S. 939 (2003)). "When the meaning of a contract provision is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at discerning the intent of the parties." *Farmland Industries, Inc. v. Grain Board of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990) (citing *Sundown, Inc. v. Canal Square Associates*, 390 A.2d 421, 432 (D.C. 1978)).

{DE101496.1}

**2.     Oral modifications to contracts are allowed.**

In the District of Columbia, "it is well-established that a written contract may be modified or rescinded by a subsequent oral agreement . . . but the oral modification must be established by a preponderance of the evidence." *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C. App. 2000) (citing *Nickel v. Scott,* 59 A.2d 206, 207 (D.C. 1948)); see also *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C. 1964). Because such statements are inherently against the pecuniary interests of the party making them at the time they are made, "[i]t is direct evidence, not hearsay, when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party" *Id.* at 876 (citing *Hydrite Chemical Company v. Calumet Lubricants Company*, 47 F.3d 887, 892 (7th Cir. 1995)). "Accordingly, [a party's] recitation of [another's] out-of-court offer is admissible for consideration on summary judgment . . . ." *Id.* Further, such oral modifications will be enforced where the party charged with performance or non-performance of an orally modified term changes his position so materially that fraud would result were the modified term *not* enforced. See e.g. *Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310 (D.C. App. 1982).

**3.     One party's performance of a contract is excused in light of material breach by the other party to the contract.**

The *Restatement (Second) of Contracts* § 237 states that a "party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render any such performance due at an earlier time.'" *Ashcraft & Gerel v. Coady*, 244 F. 3d 948, 950 (D.C. Cir. 2001) (citing *Restatement (Second) of Contracts* § 237 (1981)). "'[O]ne party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties … even though the party does not know of the failure.' " *Id.* This is true whether there is defective performance or a complete absence of performance by the

{DE101496.1}

breaching party and operates to discharge "the [other party's corresponding] duty when the condition can no longer occur." *Steele v. Isikoff*, 130 F. Supp. 2d 23, 25 (2000) (citations omitted).

4.    **Performance under a contract is excused by impossibility, commercial impracticability, or frustration of purpose.**

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." *Island Development Corporation,* 933 A.2d at 349 (quoting *Restatement (Second) Of Contracts: Discharge By Supervening Frustration* § 265 (1981)). "[W]hen, due to circumstances beyond the control of the parties the performance of a contract is rendered impossible [or commercially impracticable], the party failing to perform is exonerated. *Id.* at 348-349 (citing *Whelan v. Griffith Consumers Company*, 170 A.2d 229, 230 (D.C. 1961)). "Under frustration analysis the court is concerned with the impact of the event upon the failure of consideration, while under impracticability, the concern is more with the nature of the event and its effect upon performance." *Id.* at 349 (citing *Seaboard Lumber Company v. United States*, 308 F.3d 1283, 1296 (Fed. Cir. 2002)).

5.    **Under agency theory, a principal is liable for the acts of its agent.**

It is well settled that a principal is responsible for the acts of its agent who, acting within the scope of its authority, performs or withholds performance of the principal's legal or contractual responsibilities.    "Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Judah v. Burton, Reinder & Morris Management, Inc.,* 744 A.2d 1037, 1040 (D.C. App. 2000) (citing *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982)). "In deciding this question, courts will

look both to the terms of any contract that may exist and to the actual course of dealings between the parties . . . [noting that] . . the parties' actual relationship, in spite of contractual language, may be the conclusive factor" *Id.* "With the authority to manage [a] property, to care for it, to protect it, and to maintain it, goes the incidental and reasonably necessary authority to contract for repairs and upkeep which in themselves are reasonable and necessary." *Medico v. Simkowitz,* 158 A.2d 681, 682 (D.C. App. 1960) (citing 2 Am. Jur. *Agency* § 195 (1936)).

### D.    D.C. LAW OF NEGLIGENCE

In the District of Columbia, "[t]o establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). "[T]he plaintiff has the burden of establishing a standard of care and that defendant's deviation from that standard proximately caused plaintiff's injuries." *Id.* at 90 (citing *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988)) (other citation omitted). A Plaintiff may establish the duty owed him by demonstrating a duty imposed on the defendant by statute or law and that "plaintiff's interests are entitled to legal protection against the defendant's conduct." *District of Columbia v. Beretta, USA Corporation*, 872 A.2d 633, n.3 (D.C. App. 2005). "Proximate cause is 'that cause, which in natural and continued sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.' " *Harris*, 770 A.2d at 92 (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 320 (D.C. 1980)). "The 'defendant need not have foreseen the precise injury, nor should [he] have had notice of the particular method in which a harm would occur, if the possibility of harm was clear to the ordinary prudent eye.'" *Harris*, 770 A.2d at 92 (quoting *Spar v. Obwoya*, 369 A.2d 173, 177 (D.C. 1977)).

### E.    D.C. CONSTRUCTION CODES AND NFPA STANDARDS

NFPA Standard 25 ("NFPA 25") governs inspections, testing and maintenance of the fire protection systems in Washington D.C.  The District of Columbia has expressly adopted the ICC International Fire Code.  See *D.C. Code § 6-1403.01; CDCR § 12A-101.4.6*.  The Code of D.C. Municipal Regulations states that "the ICC International Fire Code/2000 as amended by the D.C. Fire Prevention Code Supplement/2003 shall constitute the D.C. Fire Prevention Code/2003 ... ." *CDCR 12A-101.4.6*.  The ICC International Fire Code in turn, adopts NFPA 25 as the required standard for inspections, testing and maintenance of water based fire protection systems.  See *ICC IFC, Chap. 5, (2000)* ("Fire Protection Systems").  NFPA 25 therefore carries the force of law in Washington D.C. and governs inspections, testing and maintenance of the system present in the Kellogg Conference Center.

Under NFPA 25, as the Owner of the Kellogg Conference Center, Gallaudet had a continuing obligation to provide access to the fire protection system in the building, and to ensure that all inspections, tests, and maintenance were performed on the system since it was first installed.  This is true under all editions of NFPA 25.  The 1998 edition of NFPA 25 was the most recent edition preceding the 2000 edition of the ICC International Fire Code.  The 1998 edition of NFPA 25 provides that:

> The responsibility for properly maintaining a water-based fire protection system shall be that of the owner(s) of the property. By means of periodic inspections, tests, and maintenance, the equipment shall be shown to be in good operating condition, or any defects or impairments shall be revealed.
>
> .    .    .
>
> *Exception:  Where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract.*

{DE101496.1}

*NFPA 25, § 1-4.2* (1998) (emphasis in original). "The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance." *NFPA 25, § 1-4.1* (1998).

The 2002 edition of NFPA 25 was used for the inspections, testing and maintenance of the system in the Kellogg Conference Center and imposes substantially the same obligation on the owner as the 1998 edition. (See gen'ly Exhibit B; see also Exhibit N). The 2002 edition of NFPA 25 provides that:

> The responsibility for properly maintaining a water-based fire protection system shall be that of the owner of the property. *NFPA 25, § 4.1.2* (2002).

> The property owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance. *NFPA 25, § 4.1.1* (2002).

> Where the property owner is not the occupant, the property owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract. *NFPA 25 § 4.1.2.3* (2002).

> Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance, the occupant, management firm, or managing individual shall comply with the requirements identified for the owner or occupant throughout this standard. *NFPA 25 § 4.1.2.4* (2002).

Thus, the Owner's obligations under NFPA 25 remained substantively unchanged from the period when Aramark acted as Gallaudet's property management agent through the period when Guest Services acted in the same capacity. As such, there can be no doubt that Guest Services, as the Owner's property management agent, was legally responsible for carrying out the Owner's obligations under NFPA 25. Concurrently, Gallaudet, as the Owner, retained the responsibility for ensuring that its obligations were carried out in their entirety.

{DE101496.1}

### III.    ARGUMENT

Guest Services breached the contract and negligently failed to perform its statutory duties under NFPA 25.  The inspection contract provides that Capitol Sprinkler would conduct its inspections and tests pursuant to the applicable provisions of NFPA, which requires that the inspectors be provided with access to the necessary components of the sprinkler system.  Further, as the Owner's property management agent, Guest Services had a statutory obligation to provide Capitol Sprinkler inspectors with access to all portions of the subject sprinkler system necessary for them to complete their NFPA 25 inspection.

Guest Services failed to provide the required access, agreed to drain the subject drum drip, and subsequently failed to drain it.  As shown below, these acts constitute a breach of contract, a frustration of the principal purpose of the contract, an oral modification of the contract, and a subsequent breach of the orally modified contract by Guest Services. Capitol Sprinkler employees, thus, were relieved of their contractual obligation to drain the subject drum drip and resulting damages from Guest Services' failure to do so.  Furthermore, Guest Services had an independent statutory duty to comply with NFPA 25, which it negligently breached.

### A.    GUEST SERVICES WAS GALLAUDET'S PROPERTY MANAGEMENT AGENT

It is Plaintiff's position that, pursuant to its property management contract, Guest Services had complete authority to contract with Capitol Sprinkler on behalf of Gallaudet University to inspect and test the subject sprinkler system.  However, Guest Services was also required to report to Gallaudet's Executive Director of Business and Support Services, Gary Aller, on the operation and maintenance of the Conference Center and Mr. Aller exercised sufficient control over Guest Services to recommend and control its termination following this

{DE101496.1}

incident.  Given this, there can be no question that Guest Services operated as Gallaudet's Property Management Agent for the purposes of the Capitol Sprinkler contract.

**B.     GUEST SERVICES HAD A CONTRACTUAL DUTY TO PROVIDE READY ACCESS TO THE SPRINKLER SYSTEM**

The inspection contract as executed by Capitol Sprinkler and Guest Services states that the contract is to be performed in a workmanlike manner in accordance with the requirements of the National Fire Protection Association (NFPA).  (See Gen'ly Exhibits B, D, & N).  NFPA 25 applies to the inspections, testing and maintenance of the subject sprinkler system.  Thus, Gallaudet, Guest Services, and Capitol Sprinkler were all bound by the applicable provisions of NFPA 25.

Pursuant to the applicable provisions of NFPA 25, as the Owner, Gallaudet bore primary responsibility for inspections, testing and maintenance of the subject fire protection system. *NFPA 25, § 1-4.2* (1998); *NFPA 25, § 4.1.2* (2002).  The Owner must also provide "ready accessibility to [all] components of water-based fire protection systems that require inspection, testing, or maintenance." *NFPA 25, § 1-4.1* (1998); *NFPA 25, 4.1.1* (2002).  Where, as here, the Owner contracts with a property management company to fulfill these obligations, then the property management company stands in the shoes of the Owner with respect to the Owner's NFPA 25 obligations. *NFPA 25 § 1-4.1* (1998); *NFPA 25 § 4.1.2.4* (2002).  Thus, Guest Services had the duty to provide such 'ready accessibility' to Capitol Services' inspector. *Id.*

**C.     GUEST SERVICES MATERIALLY BREACHED THE CONTRACT.**

It is undisputed that Guest Services exclusively controlled access to those areas of the Kellogg Conference Center for which Capitol Sprinkler's inspector required access to perform his inspection.  It is likewise undisputed that Capitol Sprinkler's inspector inspected all portions of the subject sprinkler system to which he was given access on January 9, 2003.  Capitol

12

Sprinkler's employees have consistently and repeatedly testified as to Guest Services' inability to provide access to the subject drum drip on that date.

It appears that the Guest Services employee was Terrance Hubbard, although his name wasn't known at the time of the inspection. Mr. Hubbard was also the prime contact for Capitol Sprinkler inspectors while performing their inspections. As an employee of Guest Services, particularly the one who controlled access to the sprinkler system, Mr. Hubbard had the contractual duty and the apparent authority to provide access to the subject drum drip, or to drain it when he couldn't provide access to it. *NFPA 25 §§ 4.1.1 and 4.1.2.4* (2002).

Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and Terrance Hubbard, now deceased, will not be able to do so himself. As neither Plaintiff nor Guest Services has presented affirmative testimony, or any other offer of proof, to contradict what has been Capitol Sprinkler's position since this action ensued, they cannot now dispute it. Guest Services failed to fulfill its NFPA 25 obligation because its employee did not grant the Capitol Sprinkler inspector access to all drum drips that required inspection. Such failure constitutes a material breach of the contract.

## D. CAPITOL SPRINKLER'S PERFORMANCE IS EXCUSED BY GUEST SERVICES' MATERIAL BREACH OF CONTRACT.

Where, as here, the performance obligations of one party to a contract can only feasibly be fulfilled upon successful performance by another party to the contract, failure of that party's performance constitutes a material breach that forgives the other's performance. (See gen'ly *Restatement (Second) of Contracts* § 237; See also *Ashcraft and Gerel v. Coady*, 244 F.3d 948 (D.C. Cir. 2001).

It is undisputed that Guest Services exclusively controlled access to those areas of the Kellogg Conference Center for which Capitol Sprinkler's inspector required access to perform

his inspection. It is likewise undisputed that Capitol Sprinkler's inspector inspected all portions of the subject sprinkler system to which he was given access on January 9, 2003. Capitol Sprinkler's employees have consistently and repeatedly testified as to Guest Services' inability to provide access to the subject drum drip on that date and the Guest Services' employee's agreement to drain it himself. Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and Terrance Hubbard, now deceased, will not be able to do so himself. As neither Plaintiff nor Guest Services has presented affirmative testimony, or any other offer of proof, to contradict what has been Capitol Sprinkler's position since this action ensued, they cannot now dispute it.

Because Guest Services failed to provide Capitol Sprinkler's inspector with access to the subject drum drip, the inspector could not feasibly inspect the drum drip. This is precisely the kind of material breach that forgives Capitol Sprinkler's performance under that contract.

E.    **CAPITOL SPRINKLER'S PERFORMANCE IS EXCUSED BECAUSE GUEST SERVICES FRUSTRATED THE PRINCIPAL PURPOSE OF THE CONTRACT**

Guest Services' failure to provide Capitol Sprinkler's inspector appropriate access to the subject drum drip frustrated the principal purpose of the contract. It is undisputed that Guest Services exclusively controlled access to those areas of the Kellogg Conference Center for which Capitol Sprinkler's inspector required access to perform his inspection. It is likewise undisputed that Capitol Sprinkler's inspector inspected all portions of the subject sprinkler system to which he was given access on January 9, 2003. Capitol Sprinkler's employees have consistently and repeatedly testified as to Guest Services' inability to provide access to the subject drum drip on that date and the Guest Services' employee's agreement to drain it himself. Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and Terrance Hubbard,

now deceased, will not be able to do so himself.  As neither Plaintiff nor Guest Services has presented affirmative testimony, or any other offer of proof, to contradict what has been Capitol Sprinkler's position since this action ensued, they cannot now dispute it.

On the representations of Guest Services' employee, Capitol Sprinkler's inspector reasonably believed that access to the subject drum drip was unavailable.  As such, an inspection of the same was impossible, relieving the inspector of any obligation to inspect it and relieving Capitol Sprinkler for performance of the contract regarding the subject drum drip.  *Island Development Corporation,* 933 A.2d at 349.

F.    **GUEST SERVICES MODIFIED ITS CONTRACT WITH CAPITOL SPRINKLER**

Notwithstanding the fact that Guest Services material breaches of contract frustrated and forgave Capitol Sprinkler's performance, following his failure to provide Capitol Sprinkler's inspector with access to the subject drum drip, the Guest Services' employee who controlled such access orally agreed to drain the drum drip himself.  It is undisputed that Guest Services, on Gallaudet's behalf, had full authority to negotiate the terms of the contract with Capitol Sprinkler for the performance of the required sprinkler inspections.  Because it had the authority to contract for these services, Guest Services also had the authority to modify any such contract whether in writing, orally, or through the course of its dealings with Capitol Sprinkler.  That is what happened in this case.

Capitol Sprinkler's employees have consistently and repeatedly testified as to Guest Services' inability to provide access to the subject drum drip on that date and the Guest Services' employee's agreement to drain it himself.  Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and Terrance Hubbard, now deceased, will not be able to do so himself.  As neither Plaintiff nor Guest Services has presented affirmative testimony, or

{DE101496.1}

any other offer of proof, to contradict what has been Capitol Sprinkler's position since this action ensued, they cannot now dispute it.

The individual appointed by Guest Services to control Capitol Sprinkler's access to the subject sprinkler system, including the subject drum drip, agreed to drain the subject drum drip in this case.  In reliance on that representation, Capitol Sprinkler's inspector left the building under the reasonable impression that his work there was complete and that the subject drum drip would be properly drained.  Such an oral modification of the Guest Services/Capitol Sprinkler written contract, under the circumstances present here, is enforceable under District of Columbia. Therefore, as a matter of law, this modification is effective and at the time Capitol Sprinklers' inspector left the Conference Center, Guest Services had the duty to drain the subject drum drip.

## G.     GUEST SERVICES BREACHED THE MODIFIED CONTRACT

When Capitol Sprinkler's inspector left the Conference Center, he was under the reasonable understanding that Guest Services would ensure that the subject drum drip was properly drained in a reasonable time following his inspection, per the now modified contract. Guest Services had the actual and apparent authority to drain the drum drip and could assume a duty the performance of which it had at one point contracted away.  Clearly, the Guest Services employee never drained the subject drum drip, nor did he ensure that the drum drip was properly drained by another.  This failure constitutes a material breach of the modified contract and is clearly inconsistent with Guest Services' obligations as the Owner's property management agent under NFPA 25.  As a direct result of Guest Services' failure to ensure that the drum drip was properly drained, the water in the related pipes froze, causing the damages suffered by Plaintiff.

**H.   GUEST SERVICES NEGLIGENTLY FAILED TO PERFORM ITS DUTIES UNDER NFPA 25, CAUSING THE PLAINTIFF'S DAMAGES.**

Washington D.C. adopted by reference NFPA 25 as its standard for the inspection, testing and maintenance of fire protections systems through its use of the ICC International Fire Code. Pursuant to NFPA 25, Guest Services as the Owner's property management agent, had an affirmative duty to either maintain the sprinkler system or provide a third party contractor, in this case Capitol Sprinkler, with the necessary access to the system to do so.  These duties exist independent of any duties under Capitol Sprinkler's contract.

Capitol Sprinkler's employees have consistently and repeatedly testified as to Guest Services' inability to provide access to the subject drum drip on that date.  Neither Plaintiff nor Guest Services have sought to elicit testimony to contradict this position and Terrance Hubbard, now deceased, will not be able to do so himself.  As neither Plaintiff nor Guest Services has presented affirmative testimony, or any other offer of proof, to contradict what has been Capitol Sprinkler's position since this action ensued, they cannot now dispute it.

The individual appointed by Guest Services to control Capitol Sprinkler's access to the subject sprinkler system, including the subject drum drip, also agreed to drain the subject drum drip in this case.  In reliance on that representation, Capitol Sprinkler's inspector left the building under the reasonable impression that his work there was complete and that the subject drum drip would be properly drained.

Guest Services failed to give Capitol Sprinkler access to the subject drum drip, and thereafter failed to drain the drum drip itself.  These failures by Guest Services constituted violations of the duties imposed on Guest Services by Washington D.C. for the inspection, testing and maintenance of fire protections systems.  As a result of these failures, Capitol Sprinkler was unable to drain the subject drum drip in the first instance and the drum drip was

{DE101496.1}

not subsequently drained by anyone else, allowing the water remaining in the related sprinkler pipes to freeze, and causing the subsequent sprinkler system failure and the consequential water damage to the conference center.

But for Guest Services' failure to provide access to the subject drum drip, Capitol Sprinklers' inspector could have drained the subject drum drip and prevented the damages that resulted. Further, Guest Services' subsequent failure to drain the subject drum drip itself was the singular act, "which in natural and continued sequence, unbroken by any efficient intervening cause, [produced Plaintiff's] injury and without which the result would not have occurred." *District of Columbia v. Harris*, 770 A.2d 82, 92 (D.C. 2001) (citations omitted).

Although Guest Services may claim not to have appreciated the nature and extent of the damages that resulted, certainly, Guest Services had an understanding that damage could result from a failure to complete the required act of draining the drum drip.

## IV.    CONCLUSION

Guest Services breached its contract with Capitol Sprinkler because it failed to provide Capitol Sprinkler access to all sections of the sprinkler system as required by NFPA 25 and the parties' contract. Furthermore, when Guest Services denied this required access, it frustrated the purpose of the contract, thereby relieving Capitol Sprinkler of the duty to perform under the contract.

The record also demonstrates that Terrence Hubbard agreed to perform Guest Services' NFPA 25 obligations on behalf of Gallaudet, thereby modifying the underlying inspection contract and relieving Capitol Sprinkler of any obligation to inspect the subject drum drip. Further, the record is clear that, as an agent of Gallaudet, Guest Services failed to perform its

{DE101496.1}

NFPA 25 obligations, and thus, breached the modified inspection contract to which it was a party.

Finally, there is clear evidence that Guest Services failed to perform duties imposed on it independent of the Capitol Sprinkler contract when its employee failed to provide Capitol Sprinkler's inspector with access to the subject drum drip and subsequently failed to drain the drum drip himself..  Such breaches resulted in a freeze failure in the sprinkler system and caused the consequential water damage to the conference center.  Accordingly, Guest Services is liable for the damage caused to Gallaudet, must indemnify Capitol Sprinkler for any damages that may be apportioned to Capitol Sprinkler, and must contribute to any amount awarded Plaintiff.

**WHEREFORE,** Capitol Sprinkler respectfully requests that this Honorable Court GRANT its Motion for Summary Judgment against Guest Services and enter Judgment in its favor.

Respectfully submitted,

**MARKS, O'NEILL,**
**O'BRIEN & COURTNEY, P.C.**

_____/s/Donald R. Kinsley_____
Michael T. Hamilton, Esquire (Bar ID No. 474233)
Donald R. Kinsley, Esquire (Bar ID No. 432998)
Norman H. Brooks, Jr., Esquire (PHV)
913 N. Market Street, Ste. 800
Wilmington, DE  19801
*Attorney for Defendant*
*Capitol Sprinkler Inspection, Inc.*

DATE:  February 8, 2008

19