# Exhibit E

**Capital Reporting Company**

Page 1

```
 1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2    - - - - - - - - - - - - - - - X

 3    ST. PAUL MERCURY INSURANCE     :

 4    COMPANY, as Subrogee of        :       AUG 2 1 2006

 5    Gallaudet University,          :

 6              Plaintiff,           :

 7       v.                          : Case No.:

 8                                   : 1:05-cv-02115

 9    CAPITOL SPRINKLER              :

10    INSPECTION, INC.,              :

11              Defendant.           :

12    - - - - - - - - - - - - - - - X

13                        Washington, DC
                          Monday, August 14, 2006
14    Deposition of:

15              MICHAEL BOWLIN

16    called for oral examination by counsel for

17    Plaintiff, pursuant to Notice, at the Law Office

18    of Mesirow and Stravitz, 2000 Massachusetts

19    Avenue, NW, Washington, DC, before Kim Brantley of

20    Capital Reporting, a Notary Public in and for the

21    District of Columbia, beginning at 1:45 p.m., when

22    were present on behalf of the respective parties:
```



Page 2

```
 1    On behalf of Plaintiff:

 2        DAVID GROTH, ESQUIRE
          Cozen & O'Connor
 3        1900 Market Street
          Philadelphia, PA 19103
 4        (215) 665-2000
          E-mail: dgroth@cozen.com
 5

 6    On behalf of Defendant Capitol Sprinkler:

 7        NORMAN H. BROOKS, ESQUIRE
          Marks, O'Neill, O'Brien & Country
 8        913 Market Street -Suite 800
          Wilmington, DE 19801
 9        (302) 658-6538

10

11    On behalf of Defendant Guest Services:

12        MICHAEL D. FOSTER, ESQUIRE
          Trichilo, Bancroft, McGavin, Horvath & Judkins, PC
13        3920 University Drive
          Fairfax, Virginia 22030
14        (703) 385-1000

15

16    ALSO PRESENT:  Vernon Vane, Capitol Sprinkler

17

18

19

20

21

22
```

**Capital Reporting Company**

Page 3

```
 1              C O N T E N T S
 2   EXAMINATION BY:              PAGE
 3   Mr. Groth                    5, 114
 4   Mr. Foster                   78
 5   Mr. Brooks                   112
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22   (*Exhibits retained by Counsel)
```

**Capital Reporting Company**

1      A.   Most of the time, no.

2      Q.   When you say most of the time not, does

3  that mean in some occasions you would actually

4  enlist people to do work that Capitol had

5  contracted with a customer to do?

6      A.   If like we had to be in too many places

7  at one time?

8      Q.   Right.

9      A.   They might assist us as far as in the

10  control room as far as seeing the alarms going off

11  or even sometimes help us with the draining drum

12  drips or cleaning up after we have drained them in

13  some instances.

14      Q.   And how would some customer

15  representative or employee help you drain a drum

16  drip?

17      A.   They would just go with us and -- or

18  they would see how we would do it, if there was

19  multi drum drips, like in a garage, then they

20  would go do a few and we would do some.

21      Q.   So, you would ask a building owner's

22  representative to go and do some of the work?

**Capital Reporting Company**

1        A.    No, sometimes we didn't ask.

2    Sometimes they were just there.   They were

3    assigned to us to stay with us.

4        Q.    Right.

5        A.    And then they would go with us and help

6    us, instead of standing there watching us, they

7    would participate.

8        Q.    But I'm talking about specifically when

9    you say they might go and drain a drum drip on

10    their own.

11        MR. BROOKS:   That's been asked and

12    answered.

13    BY MR. GROTH:

14        Q.    I'm asking you whether or not there

15    were occasions when you would permit a building

16    owner's representative to go to a drum drip

17    somewhere in the building and actually do the

18    draining by him or herself?

19        A.    I was always supervising that drainage

20    or -- they wouldn't go off on their own without me

21    knowing about it.

22        Q.    And in those situations, what would you

## Capital Reporting Company

1    do to determine whether or not the person who was

2    going to do that work had sufficient training,

3    experience, background and specialized knowledge

4    in order to permit them to do the work?

5        A.    Well, the people that run these places,

6    as far as maintenance, they are supposed to take

7    care of that when we're not there, so that's part

8    of their responsibilities when we're not onsite.

9        Q.    I'm asking you with regard to

10   particular individuals, who you would run across

11   in these buildings.  How would you know what their

12   training --

13       A.    I'm sorry.

14       Q.    How would you know what their training,

15   experience, background or specialized knowledge

16   was, if any, to properly permit them to do this

17   work?

18       A.    I don't.

19       Q.    You wouldn't question them or ask for a

20   resume or anything like that, would you?

21       A.    No.

22       Q.    Do you know whether or not your

1    was the reason why Mr. Vane was out there?

2        A.    Mr. Ham had asked if we would show him

3    where these -- where things were, because he was

4    just taking over the maintenance and he was there

5    to show him where drum drips were, where the

6    inspector's tests were, where dry valves were and

7    what was involved.

8        Q.    And how did Mr. Vane determine where

9    all these things were?

10        A.    We have a folder that has everything

11    listed on as far as where locations are and then

12    Mr. Ham also had a blueprint of the construction

13    of the building as far as the sprinkler is

14    concerned.

15        Q.    And would it be correct to say that the

16    folder would have been the same folder that

17    Capitol used between '96 and '99 to inspect the

18    same systems?

19        A.    Yes, yes.

20        Q.    So, on that occasion, in July of 2002,

21    you and Mr. Vane and -- there was a third person,

22    Mr. --

## Capital Reporting Company

1       A.    Francis.

2       Q.    Francis, did the trip test and all the

3    other testing that needs to be done for the dry

4    pipe systems, correct?

5       A.    Yes.

6       Q.    Other than Mr. Ham, did any building

7    maintenance people accompany you during that

8    period of work?

9       A.    I don't recall.

10       Q.    Do you know whether or not somebody had

11    to unlock certain locks or doors or whatever to

12    give you access to all of the points that had to

13    be drained and valves that had to be turned, that

14    type of thing?

15       A.    Yes.

16       Q.    Do you know who that person was?

17       A.    I don't recall.

18       Q.    Mr. Ham did not do that?

19       A.    No.

20       Q.    Somebody else was assigned to let you

21    get access to these areas?

22       A.    Yes.

Page 34

1      Q.    Can you describe the person that gave

2   you access to those areas in July of 2002?

3      A.    He was a colored gentleman, probably my

4   height.

5      Q.    Which is?

6      A.    Five ten.

7      Q.    Okay.

8      A.    Around I'm guessing like thirty years

9   old or could be younger, could be older, but

10  around that.

11     Q.    Did he have any other distinguishing

12  marks?  Did he have an accent?  Did he have

13  anything else that you can recall?

14     A.    No.

15     Q.    Did he have on a uniform of any type

16  that gave his name or affiliation of the company,

17  anything like that?

18     A.    I can't recall.

19     Q.    And what did that person do during the

20  July inspection?

21     A.    All he did was go and open up rooms

22  that we needed open and took the locks of the drum

**Capital Reporting Company**

Page 35

1    drips off and gave us access to all these things.

2        Q.    He was not asked to help physically do

3    any of the work, correct?

4        A.    No.

5        Q.    Nor did you know if he was competent or

6    trained or had knowledge to be able to do this

7    work.  Is that correct?

8        A.    No.

9        Q.    For the drum drip that was I think

10   above conference room 5200, do you know what drum

11   drip we're talking about that actually leaked?

12       A.    Yes.

13       Q.    I'm sorry, misstated.

14             The drum drip that drains the lines

15   that actually leak.

16       A.    Right.

17       Q.    Do you know where that is located?

18       A.    Yes.

19       Q.    Is that over and above a conference

20   room?

21       A.    It's a room -- a suite room, and you

22   open the door and it's right, as soon as you walk

## Capital Reporting Company

Page 36

1    in the room.

2         Q.    There is an access hatch?

3         A.    There is an access hatch.

4         Q.    And what kind of unlocking device do

5    you need to get into that room?

6         A.    The room itself is a card access.

7         Q.    Just like a hotel room?

8         A.    Yes.

9         Q.    Computerized card.

10        A.    Once you get in there, then it's just

11   screwdrivers to open up an access panel.

12        Q.    So it's not a key that allows you to

13   get in?

14        A.    Right.

15        Q.    Were there any other rooms that you

16   needed to get access to that used these types of

17   cards to allow you access, other than that one?

18        A.    No.

19        Q.    All the rest of the devices had some

20   kind of locking mechanism on them instead of a

21   key?

22        A.    Right, or a master key to the building

**Capital Reporting Company**

1    to get inside of the mechanical rooms.

2        Q.    Now do you know whether or not the card

3    that the building person had to allow you access

4    into that suite room was a card that would allow

5    him access into any room in the building, that you

6    needed a card to?

7        A.    I don't know.

8        Q.    On the inspection reports, Exhibit 2

9    and 3, there are -- there is a space at the bottom

10   with some lines, empty lines, blank lines, that

11   has the word "deficiencies" there?

12       A.    Um-hum.

13       Q.    Yes.

14       A.    Yes.

15       Q.    What is that space supposed to be used

16   for according to your training at Capitol?

17       A.    Any problems that I would find in the

18   system or recommendations that I would make to

19   improve the system or to repair the system.

20       Q.    What if there were some conditions in

21   the field that you found that would not permit you

22   to do all of the work that you were needing to do

**Capital Reporting Company**

1    front of you for July of 2002 and January 2003, is

2    that your printing and handwriting?

3        A.    Yes.

4        Q.    On both of them?

5        A.    Yes.

6        Q.    Were there any problems that you recall

7    performing the work, the inspection work and

8    testing work that had to be done in July of 2002?

9        A.    No.

10       Q.    Did Mr. Vane actually assist in doing

11   that work, and by "assist" I mean hands-on that he

12   did some of the work with you and Mr. --

13       A.    Francis.

14       Q.    Francis?

15       A.    Yes.

16       Q.    He wasn't there just saying "You guys

17   do the work.  I'll talk to Mr. Ham or I'll do

18   something else"?

19       A.    No.

20       Q.    And as I understand your testimony, you

21   were not back to the building at all between July

22   of 2002 and January 9th, 2003, correct?

Page 40

1      A.    No.

2      Q.    Other than learning Mr. Ham's name

3    during the July visit, did you learn the name of

4    any other employee at the building during that

5    visit?

6      A.    The gentleman that met us at the desk

7    probably introduced himself, but I can't recall

8    what his name was.

9      Q.    Okay.  And you didn't make a note of

10   that?  It's not written in any record there or

11   anything?

12     A.    No, no.

13     Q.    What about at the time of the January

14   9th inspection?  Did you see Mr. Ham at that

15   inspection?

16     A.    No.

17     Q.    Do you know the name of anybody that

18   accompanied you, anybody employed at the building

19   who accompanied you during that inspection?

20     A.    Like I said that gentleman I met and we

21   shook hands and he probably mentioned his name and

22   it probably went in one ear and out the other.

**Capital Reporting Company**

1      Q.    I know it's more than three years after

2  that inspection took place now.  Did you know that

3  person's name two weeks after the inspection took

4  place?

5      A.    No.

6      Q.    So you really never learned his name.

7  He may have said it, but the day after you didn't

8  remember what it was?

9      A.    Exactly.

10     Q.    You're like me.  I'm not good with

11 names, and in and out right away?

12     A.    Exactly.

13     Q.    So basically other than Mr. Ham, based

14 on your two inspection visits to this building,

15 you didn't know of anyone else who worked in the

16 building?

17     A.    Correct.

18     Q.    Can you describe the person that

19 accompanied you and Mr. Scott to give you access

20 to the various areas to do your work during the

21 January 9th visit?

22     A.    It was the same gentleman that

Page 42

1    accompanied us in July.

2         Q.   So you would give the same description

3    of the gentleman, yes?

4         A.   Yes.

5         Q.   Only six months older?

6         A.   Yes.

7         Q.   In terms of the testing of the system,

8    the dry pipe systems, you didn't do the trip test

9    at that time, correct?

10        A.   In --

11        Q.   January.

12        A.   No.

13        Q.   But you do have to drain the drum drips

14   for other reasons.

15        A.   Correct, correct.

16        Q.   And how many drain areas are there in

17   the system that you had to drain?

18        A.   Approximately seven I think.  There

19   is -- in my folder I had it listed down, but I

20   think the fourth floor there is two -- one in each

21   stairway, and there is another one there, and I

22   can't recall at the time; and then on the fifth

Page 50

1    valve, and then close the end valve and drain it

2    so you can maintain air pressure?

3        A.    Yes.

4        Q.    Is that the way you normally did it,

5    the winter check?

6        A.    Yes.

7        Q.    Do you recall doing it that way on

8    January 9th, 2003?

9        A.    Yes.

10       Q.    Now did you drain, you and Mr. Scott,

11   drain all of the drain points during the January

12   9th 2003 inspection?

13       A.    All but the one in that room.

14       Q.    The one above conference room 5200?

15       A.    Correct.

16       Q.    As is listed in this interrogatory

17   answer.  It says "One drum drip is located in the

18   ceiling of conference room 5200."  That's the one

19   that you did not drain.

20       A.    Correct.

21       Q.    Were you supposed to drain that drain?

22       A.    Yes.

## Capital Reporting Company

```
1        Q.    Why were you supposed to drain that

2   drain?

3        A.    Because it's part of the dry system and

4   has a drum drip above it.

5        Q.    And you drained that drain in July of

6   2002?

7        A.    Yes.

8        Q.    Why didn't you drain the drain in

9   January of 2003?

10        A.    Because I did not have access to the

11   room.

12        Q.    Why did you have access?

13        A.    The gentleman that was with us did not

14   have a card access to let us into the room.

15        Q.    This is the same gentlemen that had the

16   card in July of 2002?

17        A.    Correct.

18        Q.    Describe to me the conversation you had

19   with this gentleman regarding getting access to

20   that room.  Tell me what you said.  Tell me what

21   he said.

22        A.    We were going to the room and when we
```

Page 52

1    got to the room he says, "I don't have a card.   I

2    have to go down stairs and get the card for the

3    access."

4         Q.    And how far is is downstairs from where

5    you were?

6         A.    We're on the fifth floor.

7         Q.    What did you do?  Take the elevator

8    down?

9         A.    You have to take the elevator down and

10   go to the front desk.

11        Q.    And how long would you suppose it would

12   have taken him to go down, get the elevator and

13   get the card and come back up?

14        A.    Five minutes, ten minutes.

15        Q.    Five, ten minutes?

16        A.    Um-hum.

17        Q.    What kind of distance are we talking

18   about?

19        A.    However long it takes him to get to the

20   elevator, go downstairs to the front desk, or

21   however fast the elevator runs.

22        Q.    Did he say why he didn't have the card

## Capital Reporting Company

Page 53

1  with him?

2      A.   He hadn't checked out a card -- no, he

3  didn't say why he didn't have a card.

4      Q.   Did he offer to go down and get the

5  key -- get the card?

6      A.   No.

7      Q.   Was this drum drip that had to be

8  drained above this conference room the first, last

9  or one of the middle drains that you were doing?

10     A.   The last.

11     Q.   It was the very last drain?

12     A.   The very last drain.

13     Q.   Was this the last drain that you had to

14  do in order to complete this drum?

15     A.   Right.

16     Q.   Did you have to go back to the control

17  room or turn any other valves or do any other work

18  in order to get the system reset?

19     A.   I would have to go back to the account

20  room to leave my paperwork.

21     Q.   That was it?

22     A.   That was it.

Page 54

1      Q.    Where is the mechanical room?

2      A.    Above the fifth floor, in the middle of

3    the building.

4      Q.    How do you get there, by elevator or

5    walking space?

6      A.    You have to go up steps.

7      Q.    So, you get to the point where he says

8    he doesn't have a card to get in this doorway.

9    What happens next?

10      A.    We asked if he was going to get a card

11    and he just kind of looked at us like, you know,

12    he really didn't want to -- he would take care of

13    it.  He said he would take care of the drum drip,

14    and I asked him, I said "Are you going to take

15    care of this" -- I said, "You know what?  I can't

16    get in the room.  Are you going to take care of

17    this drum drip?"

18      Q.    Well did you ask him to go get the

19    card?

20      A.    No, I didn't ask him to go get the

21    card.

22      Q.    Why didn't you ask him to go get the

Page 56

1    BY MR. GROTH:

2        Q.    Sure.  Why didn't you ask this person,

3    whose name you didn't have and still don't have --

4    correct?

5        A.    Yes.

6        Q.    Why didn't you ask him to go get the

7    card so you could have access to drain the last

8    drain you had left?

9        A.    I asked him to get the card but I don't

10   remember him going to get the card.

11       Q.    So you don't remember him saying "I

12   refuse to get the card" or anything like that?

13       A.    He didn't refuse to get the card.  It

14   wasn't said that he would get the card.  It was

15   just he would take care of the drum.

16       Q.    Let me ask you about that.  Did you ask

17   him, since you don't have a card, "Will you take

18   care of the drum drip?"

19       A.    I asked him if he would take care of

20   the drum drip.

21       Q.    So you made a request?

22       A.    I made a request.

Page 58

1      Q.    Correct?

2      A.    Correct.

3      Q.    Now when you requested this person to

4   do this draining of the drum drip, what

5   specifically did he say back to you?

6      A.    He said that he would take care of it.

7      Q.    And after that, I think you said you

8   only had to drop off some paperwork at the control

9   room and then you left the building, correct?

10     A.    Yes, sir.

11     Q.    When do you normally fill out your

12  inspection reports?  Contemporaneously, same time

13  or do you wait till the next day?

14     A.    Same time.

15     Q.    Same time?  Even before you leave the

16  building?

17     A.    Yes, because I have to leave a copy.

18     Q.    Where do you leave a copy in the

19  building?

20     A.    At the dry valves there is a folder

21  there that we slip the pink copy of it into the

22  folder, so if the fire marshal comes he can

## Capital Reporting Company

1    the slack for him?

2        A.    No.

3        Q.    Boy, he was a good helper?

4        A.    He was.

5        Q.    Were you on any drugs or any medication

6    at that time?

7        A.    No.

8        Q.    You don't take a Lipitor or anything

9    like that?

10        A.    No.

11        Q.    You're referring to the January 9, 2003

12    inspection.  Did you go to Galaudet University and

13    request to have a Guest Services employee come

14    meet you again, as you did in the January -- or

15    July inspection?

16        A.    I reported into the front desk.

17        Q.    Is that like a hotel?

18        A.    It's like a hotel front desk, and I'd

19    go up and introduce myself that "I'm Mike Bowlin,

20    from Capitol Sprinkler and I need to see a

21    maintenance key," or whoever they would send.

22        Q.    Okay.

Page 94

1    paperwork?

2        A.    Exactly.

3        Q.    And at no time did you ever ask this

4    mystery employee to assist you in doing what you

5    had to do?

6        A.    He had no need, because there was two

7    of us.  Mr. Scott had to stay with me because of

8    him having access to the drum drips and we

9    couldn't split up to do like we normally do.  So

10   he had to be there with us.  There was no reason

11   for him to assist us.

12       Q.    Why couldn't you split up to do, as you

13   say, what you normally do?

14       A.    Because Terrence -- the gentleman

15   couldn't be in two places at one time, and a

16   winter inspection goes faster than a normal trip

17   test.  So basically we were just draining the drum

18   drip; we move on to the next one.  It only takes

19   an hour at the most.

20       Q.    Did you ever ask him, "Hey, why don't

21   you just go ahead ahead of us, unlock the next one

22   and we will get out of here sooner"?

**Exhibit F**

**Capital Reporting Company**

Page 1

```
 1    UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2    - - - - - - - - - - - - - - X

 3    ST. PAUL MERCURY INSURANCE      :

 4    COMPANY, as Subrogee of         :

 5    Gallaudet University,           :

 6            Plaintiff,              :

 7        v.                          : Case No.:

 8                                    : 1:05-cv-02115

 9    Capitol Sprinkler               :

10    INSPECTION, INC.,               :

11            Defendant.             :

12    - - - - - - - - - - - - - - X

13                        Washington, DC
                          Monday, August 14, 2006
14    Deposition of:

15            CRAIG PARHAM

16    called for oral examination by counsel for

17    Plaintiff, pursuant to Notice, at the Law Office

18    of Mesirow and Stravitz, 2000 Massachusetts

19    Avenue, NW, Washington, DC, before Kim Brantley of

20    Capital Reporting, a Notary Public in and for the

21    District of Columbia, beginning at 3:45 p.m., when

22    were present on behalf of the respective parties:
```

AUG 24 2006

# Capital Reporting Company

Page 8

1        A.    I'm president of Capitol Franklin

2   inspection, Inc., but they operate as two separate

3   entities and I'm not on Inspection's payroll.

4        Q.    What do the two entities do separate

5   from each other?

6        A.    One does inspection; one does

7   installation.

8        Q.    What is your position with Capitol

9   Sprinkler Contracting?

10       A.    I'm vice president.

11       Q.    Okay.  How long have you been working

12   with Capitol Sprinkler?

13       A.    For about twenty-eight years.

14       Q.    Do you own any stock in the

15   corporations?

16       A.    I do.

17       Q.    How much in each?

18       A.    Ten percent.

19       Q.    In each?

20       A.    It's the Subchapter S is not set up

21   that way.

22       Q.    Is there a majority stock holder?

Page 11

1     Q.   What about at Capitol.  Have you ever

2  performed inspections while working for Capitol?

3     A.   That has not been my job, no.

4     Q.   So for the last twenty-eight years or

5  so you haven't done inspections?

6     A.   No, not as my job.  Not to say I

7  haven't reset a dry pipe valve, but that has not

8  been my daily work.

9     Q.   Have you ever taken any formal training

10  given by the NFPA or any other industry or trade

11  groups regarding NFPA 25?

12     A.   No.

13     Q.   Are you familiar with NFPA 25?

14     A.   I am, yes, sir.

15     Q.   How are you familiar with it?

16     A.   Well it is a standard by which we do --

17  it is a standard that is set up to do sprinkler

18  inspections and routine maintenance.

19     Q.   Are there any other industry or trade

20  standards that are published to take -- to address

21  sprinkler system inspections and testing other

22  than NFPA 25?

Page 12

1      A.   NFPA 13 and NFPA 20.   Thirteen is

2  installation of sprinkler systems; twenty is fire

3  pumps, and I believe -- and fourteen, and I will

4  have to qualify that, which is stand pipes and

5  water supplies.  There is discussions about

6  maintenance and requirements and how it is to be

7  done.  They are lumped together into twenty-five,

8  so there would be one appendix that was basically

9  for inspections only.

10      Q.   Do you know what the Insurance Rating

11  Association is?

12      A.   ISO, yes.

13      Q.   What is it?

14      A.   Basically --

15      Q.   Not ISO, Insurance Rating Association.

16      A.   I mean -- no, I don't.  I assume what

17  it is, but I don't know what it is.

18      Q.   You're talking about the insurance

19  services office, right?

20      A.   Well, basically it sets the rate for

21  buildings, basically whether it's sprinkler or not

22  sprinkler.

## Capital Reporting Company

Page 14

1      Q.    So you let him basically run the

2   inspection site?

3      A.    Um-hum.

4      Q.    Prior to the date of this incident at

5   Gallaudet University on January 25th, 2003, had

6   you ever been to this building?

7      A.    Yes.

8      Q.    On what occasion?

9      A.    When it was being constructed.

10     Q.    The building was about six years old at

11  the time of the incident?

12     A.    We walked it.  I think that's about

13  right.

14     Q.    So it was built in somewhere around

15  '97, '96?

16     A.    Right.

17     Q.    '98, something in there?

18     A.    Yes.

19     Q.    Did Capitol install the sprinkler

20  system?

21     A.    We did.

22     Q.    And what was your connection to that

Page 15

1   job?

2       A.   I was outside superintendent, which is

3   basically the position I hold now.

4       Q.   And what generally were your duties and

5   responsibilities as superintendent on a project?

6       A.   My portion of the business is providing

7   the material and labor to the jobs and providing

8   the progress as the job moves along, i.e. moving

9   people in and out to keep pace with the flow of

10  the job, material and labor.

11      Q.   Because you have to coordinate your

12  work with other trades?

13      A.   Exactly.  In the beginning we might

14  need two guys, in the end we might need six, and

15  that's basically the flow.

16      Q.   Do you have any engineering background

17  at all?

18      A.   No.

19      Q.   Do you design these systems?

20      A.   No.

21      Q.   Did Capitol in its own business

22  records, Capitol Contracting, because it did this

**Capital Reporting Company**

Page 43

1      A.   We have a contract that doesn't say

2    it's ours.

3      Q.   Do you know if there is a separate

4    charge for both the trip test inspection and the

5    winter check?

6      A.   It's all rolled into one.

7      Q.   So if the contract says you pay

8    annually six hundred seventy-five dollars, that's

9    a one-time payment for both inspections?

10     A.   Right, yes.

11     Q.   Is that correct?

12     A.   We have some places that require four.

13     Q.   Okay.  So that's built into the price,

14   I assume, that you are going to be out there

15   twice?

16     A.   Um-hum.

17     Q.   When you got out there, was there any

18   question in your mind that what you saw in terms

19   of this T that had fractured, and we have pictures

20   of it here, Vane Exhibits 9 and 10, these are

21   pictures also that you took, so I assume you saw

22   what's depicted in these photographs, correct?

Page 44

1       A.    Yes.

2       Q.    Was there any question in your mind

3    that this fitting failed because it had frozen and

4    eventually thawed and ruptured?

5       A.    No, it was not.

6       Q.    That's what you --

7       A.    Yes, I was sure that it had frozen.

8       Q.    And when you found out that these heads

9    were also leaking air, you also concluded that was

10   from the freezing of the water and the head.  Is

11   that correct?

12      A.    Yes.  Yes.

13      Q.    And when you saw that, did you conclude

14   your self that somebody didn't drain the drum drip

15   that drains this branch of the sprinkler system,

16   back on January 9th, 2003?

17      A.    Yes.  That was the logical conclusion.

18      Q.    What did you do after that trip out on

19   the day of the loss?  What did you do to find out

20   what Capitoll's inspectors had done during the

21   January 9, 2003 inspection?

22      A.    That Monday morning Mike and I

1        Q.    Did you have any conversation with Mr.

2   Bowlin regarding documenting this conversation

3   that he had with this gentleman who he requested

4   to do the drum drip draining?

5        A.    No.

6        Q.    There is a spot at the bottom of the

7   inspection reports for deficiencies, and you can

8   note certain things in there, if there is a

9   problem or an area or something that should be

10  addressed or whatever.  Was there ever a

11  discussion at that meeting regarding whether or

12  not Mr. Bowlin noted in the deficiency areas that

13  "I did not drain this drip drain and I could not

14  get access and somebody in the building said they

15  would do it"?

16       A.    No, because it wasn't -- I explain

17  again, the building engineer's responsibility is

18  to keep these places drained.  We go back and try

19  to work with -- I mean, we want to keep these

20  people, everybody we work with, as good customers.

21  So we try as best we can to make sure that they

22  are cognizant of what they need to do.  But many

Page 54

1    of these staffs change over -- change multiple

2    times.  New players coming on board.  But, no, I

3    did not ask that question.

4         Q.    During that meeting was Mr. Bowlin ever

5    told by either you or Mr. Vane that if this ever

6    happens again he should make a written notation on

7    the inspection sheet that he did not drain all the

8    drains and that somebody else either offered or he

9    requested somebody else to do that?

10        A.    We concurred that in unique spots that

11   would be an extremely good idea, not on every job

12   we do, but on unique areas.

13        Q.    Was there any discussion at that

14   meeting regarding going back to the building and

15   having Mr. Scott or Mr. Bowlin try to find and

16   identify the person at the building who said he

17   was going to do this drum drip draining?

18        A.    No.

19        Q.    Did you ever have any reason to go back

20   to the building after the 27th?

21        A.    Well, I was wrong about the 27th, but,

22   no.

# Exhibit G

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ST. PAUL MERCURY INSURANCE COMPANY,: 
as Subrogee of Gallaudet University

      Plaintiff                :

      vs.                 :

CAPITOL SPRINKLER INSPECTION, INC   :     CASE NO. 1:05CV02115 (CKK)

      Defendant            :

      vs.                 :

GUEST SERVICES, INC.           :

      Third-Party Defendant    :

---

### AFFIDAVIT OF VERNON VANE

STATE OF MARYLAND           :

COUNTY OF HOWARD         :

BE IT REMEMBERED that on this 17th day of January, 2008, personally appeared before me, the Subscriber, a notarial officer authorized to administer oaths in the State and County aforesaid, VERNON VANE, personally known to me as such, and being duly sworn, did depose and attest to the following:

I, *Vernon Vane*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my knowledge and belief:

1.    I am currently employed as the Supervisor of Inspection for Defendant Capitol Sprinkler Inspection, Inc.

2.    I have been employed at Capitol Sprinkler Inspection, Inc. in various capacities for approximately 24 years.  I have been the Supervisor of Inspection for approximately sixteen years.  Prior to that, I worked as a pipe fitter, journeyman, installer and job foreman.

3.    I was deposed in this litigation on Monday, August 14, 2006.

4.    This Affidavit will explain the apparent inconsistency presented by the fact that although the subject contract refers to NFPA 13A, the subject inspection was performed under the standards identified as NFPA 25.

5.    NFPA 25 is a standard produced by the National Fire Protection Association, titled, *Standard for the Inspection, Testing & Maintenance of Water-Based Fire Protection Systems*.  The history of NFPA 25 is set forth in the section titled, *Origin & Development of NFPA 25*, attached hereto as Exhibit 1.  It provides that the first edition of NFPA 25 was a collection of inspection, testing and maintenance provisions that helped to ensure the successful operation of water-based fire protection systems.  It was developed as an extension of existing documents such as NFPA 13A, titled *Recommended Practice for the Inspection, Testing & Maintenance of Sprinkler Systems*, and NFPA 14A, *Recommended Practice for the Inspection, Testing & Maintenance of Standpipe & Hose Systems*.  The portion of those documents that pertained to the inspection, testing and maintenance of those systems was withdrawn from those publications, and became the framework of the first edition of NFPA 25, which pertains to only the inspection, testing and maintenance of water-based systems.

{DE101204.1}

6.    The current version of NFPA 13 is titled, *Standard for the Installation of Sprinkler Systems*. That standard now applies to *installation* issues in various fire protection systems, including water-based systems.

7.    It appears that the language of our form contract, which is the subject of this litigation, did not evolve at the same time that portions of NFPA 13A evolved into NFPA 25.

8.    Despite the fact that the contract refers to NFPA 13A, the inspection at issue in this litigation was performed pursuant to NFPA 25.

9.    The responsibilities of the owner or occupant of a building protected by a water-based fire protection system, including the subject conference center, are set out in NFPA 25, Paragraph 25-5.

10.    I agree that the 2002 edition of NFPA 25 controlled our responsibilities in performing the subject contract. Similarly, NFPA 25 controlled the responsibilities of the owner and manager, Gallaudet University and Guest Services, Inc., in performing the subject contract.

11.    The general responsibilities of the owner or occupant of a building are set forth in NFPA 25, Chapter 4, attached as Exhibit 2. Paragraph 4.1.1 therein specifically provides that "The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing or maintenance".

12.    NFPA 25 further provides that where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing and maintaining the fire protection systems to the occupant or management firm or managing individual through specific provisions in a lease or management contract. When Capitol Sprinkler Inspection, Inc. contracted with Gallaudet University, through its agent, Guest Services, Inc., we expected that Gallaudet University, through its agent, Guest Services, Inc., would comply

{DE101204.1}

with the requirements of NFPA 25, Chapter 4, by, among other things, providing our technicians with access to all parts of the system requiring inspection or maintenance.

13. When Capitol Sprinkler performed the same inspection and maintenance services at the subject conference center during the period 1996 through 1999, during which time the building was being managed by Guest Services' predecessor, Aramark Services, Aramark provided us all necessary access to completely perform the contract. As such, we were able to drain all of the drum drips' low points, including the subject low point or drum, to which we were not given access during our inspection/maintenance visit on January 9, 2003.

VERNON VANE

SWORN TO and SUBSCRIBED before me the day and year first above written.

Ann Golden, Notary Public

My Commission Expires: _12-1-08_

{DE101204.1}

**Exhibit G-1**

# NFPA 25

Standard for the

## Inspection, Testing, and Maintenance of Water-Based Fire Protection

Systems

### 2002 Edition

Copyright © 2002, National Fire Protection Association, All Rights Reserved

This edition of NFPA 25, *Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems*, was prepared by the Technical Committee on Inspection, Testing, and Maintenance of Water-Based Systems and acted on by NFPA at its November Association Technical Meeting held November 10–14, 2001, in Dallas, TX. It was issued by the Standards Council on January 11, 2002, with an effective date of January 31, 2002, and supersedes all previous editions.

This edition of NFPA 25 was approved as an American National Standard on January 31, 2002.

### Origin and Development of NFPA 25

The first edition of NFPA 25 was a collection of inspection, testing, and maintenance provisions that helped ensure the successful operation of water-based fire protection systems. NFPA 25 was developed as an extension of existing documents such as NFPA 13A, *Recommended Practice for the Inspection, Testing, and Maintenance of Sprinkler Systems*, and NFPA 14A, *Recommended Practice for the Inspection, Testing, and Maintenance of Standpipe and Hose Systems*, which have successfully assisted authorities having jurisdiction and building owners with routine inspections of sprinkler systems and standpipes. These documents have since been withdrawn from the NFPA standards system. NFPA 25 became the main document governing sprinkler systems as well as related systems, including underground piping, fire pumps, storage tanks, water spray systems, and foam-water sprinkler systems.

This document provides instruction on how to conduct inspection, testing, and maintenance activities. It also stipulates how often such activities are required to be completed. Requirements are provided for impairment procedures, notification processes, and system restoration. This type of information, where incorporated into a building maintenance program, enhances the demonstrated favorable experience of all water-based fire protection systems.

The second edition incorporated several improvements that reflected the initial experience with the standard. A new chapter was added that addresses obstructions in pipe as well as appropriate corrective actions.

The third edition refined testing requirements and frequencies and provided additional guidance for preplanned impairment programs. The document scope was expanded to include marine systems.

This fourth edition continues to refine testing frequencies for water-flow devices and evaluation of the annual fire pump test data. This edition also includes additional information regarding evaluation and test methods for microbiologically influenced corrosion (MIC).

### Technical Committee on Inspection, Testing, and Maintenance of Water-Based Systems

**Kenneth W. Linder,** *Chair*

**Exhibit G-2**

## Chapter 4 General Requirements

**4.1 Responsibility of the Owner or Occupant.**

**4.1.1\*** The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance.

**4.1.2\*** The responsibility for properly maintaining a water-based fire protection system shall be that of the owner of the property.

**4.1.2.1** By means of periodic inspections, tests, and maintenance, the equipment shall be shown to be in good operating condition, or any defects or impairments shall be revealed.

**4.1.2.2** Inspection, testing, and maintenance shall be implemented in accordance with procedures meeting or exceeding those established in this document and in accordance with the manufacturer's instructions.

**4.1.2.3** These tasks shall be performed by personnel who have developed competence through training and experience.

**4.1.2.4** Where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract.

**4.1.3** The owner or occupant shall notify the authority having jurisdiction, the fire department, if required, and the alarm-receiving facility before testing or shutting down a system or its supply.

**4.1.3.1** The notification shall include the purpose for the shutdown, the system or component involved, and the estimated time of shutdown.

**4.1.3.2** The authority having jurisdiction, the fire department, and the alarm-receiving facility shall be notified when the system, supply, or component is returned to service.

**4.1.3.3** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.3.

**4.1.4\*** The owner or occupant shall promptly correct or repair deficiencies, damaged parts, or impairments found while performing the inspection, test, and maintenance requirements of this standard.

**4.1.4.1** Corrections and repairs shall be performed by qualified maintenance personnel or a qualified contractor.

**4.1.4.2** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.4.

**4.1.5\*** The building owner or occupant shall not make changes in the occupancy, the use or process, or the materials used or stored in the building without evaluation of the fire protection systems for their capability to protect the new occupancy, use, or materials.

**4.1.5.1** The evaluation shall consider factors that include, but are not limited to, the following:

(1)  Occupancy changes such as converting office or production space into warehousing

(2)  Process or material changes such as metal stamping of molded plastics

(3)  Building revisions such as relocated walls, added mezzanines, and ceilings added below sprinklers

(4)  Removal of heating systems in spaces with piping subject to freezing

**4.1.5.2** Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with 4.1.2.4, the occupant, management firm, or managing individual shall comply with 4.1.5.

**4.1.6** Where changes in the occupancy, hazard, water supply, storage commodity, storage arrangement,

# Exhibit H

## MCLAUCHLAN & ASSOCIATES, INC.

CONSULTING MECHANICAL ENGINEERS

474 FAWNS WALK
ANNAPOLIS, MD 21409-5657
TELEPHONE (410) 269-4025
FAX (410) 757-2221
Email:kenmclauchlan@mclauchlan-engineers.com

September 11, 2006

Mr. David J. Groth, Esquire
Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103

Reference:    Gallaudet University Water Damage Analysis
              St. Paul Insurance Tracking No. VY01719
              Date of Loss: January 25, 2003
              Your File No. 134164

Dear Mr. Groth,

McLauchlan & Associates, Inc. (MAI) was asked to investigate a water damage incident that occurred on January 25, 2003, at the Kellogg Conference Center facility on the campus of Gallaudet University, 800 Florida Avenue, NE, Washington, DC 20002. MAI was asked to determine the cause of the water damage incident.

Background information was obtained through two site inspections (on February 3, 2003 and February 12, 2003), review of the following documents and interview:

- Deposition transcript of Mr. Vernon Vane, taken August 14, 2006

- Deposition transcript of Mr. Craig Parham, taken August 14, 2006

- Deposition transcript of Mr. Michael Bowlin, taken August 14, 2006

- As-Built Fire Protection System Drawings prepared by Capitol Sprinkler Contracting, Inc., dated 5/30/95

- Interview with Mr. David Ham

Mr. Vane testified as follows:

He was employed by Capitol Sprinkler ("Capitol") for 23 years, and had been Supervisor of Inspections for the previous 15 to 16 years. Employee Mike Bowlin had just started with inspections in 2003. Employees Tom Scott and Tim Francis

Mr. David J. Groth, Esquire
September 11, 2006
Page 2

were helpers in inspections. The employees received all of their training as "on the-job-training. Mike Bowlin was the least experienced inspector. Capitol did not provide any written materials to its inspectors. Capitol did not train its employees that it was acceptable to let non-employees do testing or inspection of the systems. Capitol did tell its customers about draining drum drips. Capitol had a contract to perform inspections for Aramark from 1996 to 1999, and then with Guest Services, Inc. ("GSI") beginning in 2002. The first inspection performed by Capitol in 2002 was on July 2, 2002. Mr. David Ham of GSI scheduled the inspection and arranged for someone to go with the Capitol inspector to gain access to the building. This person was a tall, slender, black man, who Mr. Vane was unable to identify by name. Capitol performed a trip test for Systems 1 and 2 on July 2, 2002. It was necessary for the inspectors to drain the drum drips during the January 9, 2003 inspection to make sure there is no water in them. This includes condensation and water left in the system from the July, 2002 trip test. He assigned Mr. Bowlin and Mr. Scott to do the inspection on January 9, 2003. He believes that Mr. Ham did not have any specialized knowledge of sprinkler systems. Capitol never trained any GSI personnel specifically how to drain a drum drip, and never provided any written explanations of the draining procedure. Capitol identified Terrence Hubbard as the GSI employee who accompanied Mr. Bowlin and Mr. Scott on January 9, 2003 based only on the fact that Mr. Hubbard later signed for the evidence. Capitol strictly adopted the NFPA Standard No. 25 guidelines for the work at Gallaudet. The systems at Gallaudet were hydrostatically tested at the time of installation.

Mr. Parham testified as follows:

He has been employed by Capitol for 28 years and holds the position of Vice President. He works in installations. Capitol originally installed the systems at the Kellogg Conference Center. When he arrived at the building after the water damage incident, he found that the valves were in the closed position. After the incident, Capitol replaced a ruptured tee fitting. The system leaked compressed air after the tee was replaced. Capitol found 3 sprinkler heads that were "distressed by ice" and were leaking air. These heads were replaced by Capitol. The employee had been trying to call the DC Water Department to shut off the water, because he did not know how to shut off the sprinkler system water supply. He concluded that the tee ruptured and the sprinkler heads leaked as a result of freezing. He also concluded that the drum drips that drain that part of the sprinkler system had not been drained on January 9, 2003. NFPA Standard No. 25 "does not drive what [Capitol does]". It is the building owner's responsibility to drain the drum drips once a month, but this was not indicated in the contract between Capitol and GSI. There is a plastic cap that encloses the valves on the drum drips. The cap is held in place with a lock.

Mr. Bowlin testified as follows:

Mr. David J. Groth, Esquire
September 11, 2006
Page 3

He started to work at Capitol in 1985. He started as an apprentice doing installations of sprinkler systems. He did installations until 1999, when he sustained a back injury. Beginning in 1999 or 2000, he began to do sprinkler system inspections for Capitol. He was given on-the-job training by his supervisors in performing inspections. He reviewed NFPA 13 and 25, but was not given any written materials regarding how inspections should be performed. He was never tested for the inspection job. He was never told by anyone at Capitol that it was permitted for persons other than a Capitol employees to perform the work he was sent to perform. He would permit a building owner's representative to drain a drum drip while he was on site because he was "supervising that drainage". He did not know the level of experience, background or specialized knowledge that people in the buildings who were doing this work had. There was no occasion when he told a building maintenance person to drain a drum drip without his checking to see that it was done properly. The first time that he was at the Kellogg Conference Center was in July, 2002, and the second time was on January 9, 2003. In July, 2002, he did a trip test of the dry pipe system, working with Capitol employees Mr. Vernon Vane and Mr. Tim Francis. The drum drip that drains the lines that leaked in the January 2003 incident was located behind an access panel inside the door to Conference Room 5200. The door could only be opened with a hotel card key. On January 9, 2003, he and Capitol employee Mr. Tom Scott drained all of the drum drips except the one located above the ceiling in Conference Room 5200. He was supposed to drain that drum drip but did not do so because the building owner's representative escort that was with him did not have a hotel card key to enter the room. The building owner's representative stated "I don't have a card. I have to go downstairs and get the card for access." The building owner's representative did not offer to get the key, but did not refuse to get the key. The building owner's representative said he "would take care of the drum drip". Mr. Bowlin did not ask the building owner's representative to get the hotel card key. He never asked Mr. Scott to get the key. He did not know anything about the background, experience, training, reliability or competency of the building owner's representative with regard to draining the drum drip. He did find water in the other 4 drum drips that he drained on January 9, 2003. He assumed there would be water in the drum drip that he did not drain. He never checked to determine if the building owner's representative drained the drum drip above the ceiling in Conference Room 5200. No problems were found with any other components in the dry pipe systems during the January 9, 2003 inspection. He did not know whether the building owner's representative was an employee of Gallaudet University or GSI. Because the drum drips are hard piped to drain, the person draining must listen until they can't hear a "gurgling" sound to know when there is no more water in the system.

Mr. Ham reported that on January 25, 2003, at approximately 3:30 PM, a major water release occurred in the building. The incident began when the fire alarm went off, with strobes and audio warnings being activated. GSI personnel checked all of the floors for fire. They then heard water discharging from above the 5th floor of the building. It was

Mr. David J. Groth, Esquire
September 11, 2006
Page 4

subsequently determined there was no fire in the building. The water was turned off at the Penthouse sprinkler room. It was reported that water was found to be discharging from a fractured black cast/malleable iron tee fitting in the dry pipe system. Four sprinkler heads in the dry pipe system (in the portion of the system where the tee fractured) were also found to have been damaged by ice, to the point that they were leaking air pressure when the system was repaired and pressurized with compressed air.

MAI inspected the Kellogg Conference Center on February 3, 2003 and February 12, 2003. The damaged fire protection system tee fitting and sprinkler heads had been removed and replaced prior to MAI's inspection.

The subject Kellogg Conference Center building was a five story residential structure. The building was protected by several water based fire protection systems, including two dry pipe systems. The building was initially opened in 1995. The 4th and 5th story of the building contained areas that had dry pipe fire protection systems, where the main and branch piping was routed through unheated ceiling (attic) plenums between the finished ceilings of the rooms below and the metal roof deck.

The dry pipe system involved in the water damage incident was generally comprised of a Dry Pipe Valve and trim, black steel threaded pipe, threaded cast and/or malleable iron fittings, and upright closed sprinkler heads with thermo-sensitive elements and drains. A dry pipe system is installed where a wet pipe (water-filled) system cannot be installed because of the potential of the water in the piping being exposed to freezing conditions. Water freezing in fire protection piping creates conditions which could damage the piping and fittings, resulting in uncontrolled release of water into the building, and also creates conditions where ice in the piping could initially prevent flow of water to a sprinkler head under actual fire conditions. Dry pipe systems use air compressors to fill the sections of piping subject to freezing conditions with compressed air. A Dry Pipe Valve is the interface between the compressed air in the piping system and the water supply. In the event that a fire occurs, the heat of the fire causes the integral thermo-sensitive element to open the sprinkler head(s) nearest the heat source. Compressed air in the piping then discharges from the sprinkler head. The drop in air pressure causes the Dry Pipe Valve to open, charging the piping system with water, and allowing water to flow out of the open sprinkler head(s).

Dry pipe sprinkler systems are tested at intervals specified in National Fire Protection Association (NFPA) Standard 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems". Testing includes full and partial "trip tests". A trip test is a simulation of the opening of a sprinkler head in a fire. A manual valve is opened to provide a release of compressed air pressure from the system, and the performance of the system components is observed and timed. At the conclusion of the testing, water is in the dry piping system. This water must be removed from the system to prevent freezing. Drum drips are provided throughout the system to drain, by gravity, any residual water out of the dry pipe system. A drum drip is a simple device consisting

Mr. David J. Groth, Esquire
September 11, 2006
Page 5

of two manual shutoff valves, and a section of larger diameter piping (the "barrel" section). The drum drip is connected through permanent piping to the low point of the dry pipe system which is to be drained. The upper valve in the drum drip is left open to allow any residual water to fill the "barrel" section. The lower valve is kept closed. To drain the drum drip, the upper valve is closed, to prevent a loss of compressed air pressure in the system, and the lower valve is opened, to allow the accumulated water to discharge. The lower valve is then closed and the upper valve is opened slowly so that the air compressor can keep the system pressure high enough to prevent false tripping. This process is repeated until all of the residual water is removed from the system.

In addition to residual water from trip tests, condensation of moisture from the compressed air occurs when the air in the dry piping system is cooled below dewpoint. This moisture must also be removed from the piping system to prevent freezing.

NFPA Standard No. 25, entitled "Inspection, Testing, And Maintenance Of Water-Based Fire Protection Systems" was reviewed. This Standard contains the following requirement:

"12.4.4.3.3* Low points in dry pipe sprinkler systems shall be drained after each operation and before the onset of freezing weather conditions."

Review of the Contract For Automatic Sprinkler Equipment Inspection Service dated April 22, 2002, between Capitol and GSI (Exhibit 1 to the deposition of Mr. Vane) indicates that Capitol is required to inspect the fire protection systems semi-annually, to perform an Annual Trip Test of the two 4" Dry Pipe Valves, and, among other requirements, to "Open condensation drains on drum drip connections and drain low points during fall and winter inspection." This is consistent with the requirement in NFPA Standard No. 25.

Review of the Capitol Sprinkler Inspection, Inc. form dated January 9, 2003 (Exhibit 3 to the deposition of Mr. Vane) indicates, on line 15, "Note below any other conditions or deficiencies needing correction". This line is checked "Yes". Under the section of the form identified as "Deficiencies", there are no conditions indicated. All applicable aspects of the Attic Area system referenced on the form were marked as normal.

Review of METAR weather records for the KDCA Ronald Reagan National Airport (the reporting facility closest to the Kellogg Conference Center) indicates that the following weather conditions were experienced in the Washington, DC area during the period prior to the water damage incident:

| Date | High Temperature, degrees F | Low Temperature, degrees F |
|------|------|------|
| January 1, 2003 | 51 | 42 |
| January 2, 2003 | 42 | 39 |

Mr. David J. Groth, Esquire
September 11, 2006
Page 7

- Mr. Michael Bowlin, Capitol's employee performing the Winter Service on January 9, 2003, drained all of the drum drips *except* the drum drip (located above Conference Room 5200) that drains water from the portion of the dry pipe fire protection system where the tee fitting fractured.

- Mr. Bowlin's reason for not draining the drum drip above Conference Room 5200 was that his escort through the building (who he could not identify by either name or employer) did not have a hotel card key to access the drum drip.

- Mr. Bowlin never asked his Capitol co-worker (Mr. Tom Scott) to get the card key from the Front Desk of the hotel, five floors below. He never asked or told his escort to get the card key.

- Mr. Bowlin testified that he relied on his escort through the building to drain the drum drip above Conference Room 5200, even though he did not know what understanding, training, experience, background, reliability or competency his escort had, if any, in fire protection systems in general, or draining of drum drips specifically.

- Mr. Bowlin testified that he had never been told by Capitol that persons other than Capitol employees were permitted to do the work that Capitol was sent to perform. Mr. Bowlin then testified that he always "supervised" persons other than Capitol employees when they drained drum drips while he was on site. Mr. Bowlin testified that he never saw his escort drain the subject drum drip, and never checked later to see if the draining was properly performed.

- Mr. Bowlin testified that he knew there was accumulated water in the piping systems in the four drum drips that he actually did drain on January 9, 2003.

- Mr. Bowlin testified that at the time of his inspection of the dry pipe systems on January 9, 2003 there were no defects or problems with the Dry Pipe Valve, air compressor or other components that would have resulted in water entering the dry pipe system (in the absence of a fire).

The following conclusions are based on information reviewed to date, the author's education and experience. The conclusions are subject to change in the event that additional information is obtained. Based on the above investigation and analysis, MAI concludes the following, to a reasonable degree of engineering certainty:

1. The water damage incident that occurred on January 25, 2003 at the Kellogg Conference Center at Gallaudet University was caused by freezing of water in a dry pipe fire protection system located above the 5th story of the building. The freezing water caused expansion that overstressed a cast/malleable iron tee fitting in the dry pipe system, resulting in fracture of the fitting. The fracture allowed


Mr. David J. Groth, Esquire
September 11, 2006
Page 8

compressed air in the dry pipe system to leak out, which caused the Dry Pipe Valve to trip and open. The Dry Pipe Valve supplied water to the dry pipe fire protection system piping. Water then leaked out of the fractured tee fitting, resulting in substantial water damage to the building.

2. Water was in the dry pipe fire protection system as a result of the failure of Capitol Sprinkler Inspection, Inc. to properly perform the inspection and maintenance service that was required under the Contract For Automatic Sprinkler Equipment Inspection Service between Capitol and Guest Services, Inc. dated April 22, 2002. Specifically, Capitol was required to drain all drum drips in the fire protection system at the time of the Winter Service. The Winter Service was performed by Capitol on January 9, 2003. The Capitol inspector (Mr. Michael Bowlin) who was supposed to drain the drum drips as part of the Winter Service admitted that he did not drain the drum drip that removes water from the section of the dry pipe system where the tee fitting fractured.

3. The Capitol inspector knew, or should have known, that there was water in the piping system served by the drum drip that he failed to drain on January 9, 2003, based on his observation that there was water in the other four drum drip systems in the building that he did drain on that date. He knew, or should have known, that this accumulated water in the dry pipe system could freeze, damage piping and fittings, and result in an uncontrolled water discharge from the fire protection system.

4. The water damage incident would not have occurred if Capitol had properly drained all of the drum drips during the Winter Service performed on January 9, 2003, as required in the contract between Capitol and Guest Services, Inc.

Respectfully Submitted,

*Kenneth R. McLauchlan*

Kenneth R. McLauchlan, P.E., CFEI
Senior Mechanical Engineer