**Exhibit I**

1

```
 1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
 2
   ------------------------------:
 3 ST. PAUL MERCURY              :
   INSURANCE COMPANY, as         :
 4 Subrogee of Gallaudet ,       :
   University,                   :
 5                               :
          Plaintiff,             :
 6                               :
          v.                     :   Case No.:
 7                               :   1:05-cv-20115
   CAPITAL SPRINKLER             :
 8 INSPECTION, INC.,             :
                                 :
 9        Defendant              :
                                 :
10           v.                  :
                                 :
11 GUEST SERVICES, INC.,         :
                                 :
12        Third-Party Defendant. :
   ------------------------------:
13
                         Washington, D.C.
14                       October 26th, 2006
15 Deposition of:
16                 GARY ALLER,
17        Called for oral examination by counsel for
18 Defendant, pursuant to notice, at the Gallaudet
19 University, 800 Florida Avenue, College Hall, Suite
20 318, Washington, D.C., beginning at 10:00 a.m,
21 before Teague Gibson of Esquire Legal Services,
22 Inc., a Notary Public.
```

```
 1                 A P P E A R A N C E S
 2   ON BEHALF OF ST. PAUL MERCURY INSURNACE:
 3             DAVID J. GROTH, ESQ.
               Cozen O'connor
 4             1900 Market Street
               Philadelphia, PA 19103
 5             (215) 665-2056
 6   ON BEHALF OF CAPITOL SPRINKLER INSPECTION:
 7             NORMAN BROOKS, ESQ.
               Marks, O'Neill, O'Brien & Courtney, P.C.
 8             913 Market Street, Suite 800
               Wilmington, DE 19801
 9
     ON BEHALF OF THE DEFENDANT:
10
               MICHAEL D. MELLEN, ESQ.
11             Trichilo, Bancroft, McGavin,
               Horvath & Judkins, P.C.
12             3920 University Drive
               Fairfax, VA 22030
13             (703) 385-1000
14
15
16
17
18
19
20
21
22
```

1    services.

2        Q     And when did that change occur?

3        A     October.

4        Q     Did you move from one position to the

5    next or was there an interim position?

6        A     I moved from one position to the next.

7        Q     So in January of '03 you were the

8    director of the business operations?

9        A     Correct.

10       Q     What did your position as director of

11   business operations entail?

12       A     At that time I had oversight over the

13   Kellog Conference Center, the book store, the Post

14   Office, laundry, vending, food service, I believe

15   that's all of them at the time.

16       Q     Is there a formal job description in

17   writing someplace?

18       A     Yes.

19       Q     And where is that?

20       A     With our human resources department.

21       Q     And what document should I ask for when

22   requesting that, is it the job description?

1    review did that document contain your job

2    description somewhere in it?

3        A    No.

4        Q    You mentioned several areas that you

5    oversaw, is it fair to say you were responsible

6    for the Kellog Conference Center, the Post Office,

7    the vending, laundry and food service in that

8    capacity?

9        MR. GROTH:  Book store.

10        Q    And the book store?

11        A    Yes.

12        Q    Any other responsibilities?

13        A    I worked as an internal consultant in

14    the university.

15        Q    Any particular subject matter?

16        A    Mostly financial and operational

17    consulting.

18        Q    What formal education or training have

19    you had in facilities maintenance?

20        A    None.

21        Q    Prior to starting at Gallaudet had you

22    had any experience in facilities maintenance?

1      A     No.

2      Q     When you started in your position at

3   Gallaudet in July of '02 what were your

4   responsibilities in connection with the Kellog

5   Conference Center?

6      A     I oversaw the contract management

7   company that managed the facility.  I was the

8   liaison with the university with them.

9      Q     And who was the contract management

10  company at the time?

11     A     Guest Services, Incorporated.

12     Q     When did Guest Services become the

13  contract manager company?

14     A     I believe in 2000.

15     Q     Prior to joining Gallaudet in July of

16  '02, had you had any familiarity with fire

17  sprinkler systems?

18     A     No.

19     Q     Had you had any experience with the

20  National Fire Protection Association?

21     A     No.

22     Q     Are you familiar at all with the NFPA?

1    at what percentage we can house I'm not sure.

2         Q    Can you give me an idea of the numbers,

3    without regard to percentages, the number of

4    students that the school provides housing for?

5         A    That would be approximately a thousand.

6         Q    Does the school have just one campus so

7    to speak that's contiguous?

8         A    Yes.

9         Q    Does the school have criteria concerning

10   hearing impairments of the student?

11        A    Yes.

12        Q    And what are those?

13        A    I believe that hearing loss has to be 40

14   percent or greater based on the audiology test.

15        Q    Can you describe the Kellog Conference

16   Center for me?

17        A    It is a five-story building.  Basement

18   mechanical room, first floor has ballroom,

19   auditorium, main desk area, several meeting rooms.

20   Second floor has mostly meeting rooms including a

21   boardroom, of course we have bathrooms on all

22   floors.

1    Q    Anything else?

2    A    Two classroom spaces.

3    Q    What was the fourth floor use during

4    your first year on the job?

5    A    Sleeping rooms.

6    Q    What is a sleeping room as opposed to

7    guest room?

8    A    Same thing.

9    Q    These would be guest rooms for whom?

10    A    For people staying at the hotel.

11    Q    And what people would likely be staying

12    at the hotel on a given day?

13    A    All sorts of people.

14    Q    Can anyone who was not affiliated with

15    the school or has no business with the school stay

16    at that hotel?

17    A    Correct.

18    Q    During your first year on the job did

19    either the hotel or Guest Services or the school,

20    did anyone advertise those sleeping rooms to the

21    general public?

22    A    I believe Guest Services did.

53

1      Q    So it's fair to say that out of town

2    guests could come to Washington, D.C. on other

3    business and stay at the Kellog Conference Center

4    even though they had no connection to the school

5    or no business with the school during that trip?

6      A    That's correct.

7      Q    Is that still the case?

8      A    Yes, it is.

9      Q    And during your first year on the job

10    were there just two guest floors?

11      A    Correct.

12      Q    The fourth and fifth floors?

13      A    Correct.

14      Q    When you initially took the position in

15    July of '02 did you make any inquiries about the

16    profitability of opening those guest rooms to the

17    general public or had that already been the

18    practice?

19      A    That had already been the practice.

20      Q    And even though those rooms were open to

21    the public the conference center was still

22    operating at a loss?

1    amenities.

2        Q    And how many guest rooms were on the

3    fourth floor during that period?

4        A    I'm not certain of the breakdown between

5    the fourth and fifth floors.

6        Q    How many overall?

7        A    93.

8        Q    Would a fair approximation be about half

9    on each floor?

10       A    That's fair, I'm not sure -- it would be

11   one or two or three either direction but that

12   would be fair.

13       Q    During July of '02 when you first

14   started did the university have any employees that

15   were primarily assigned to that building or had

16   that building as their primary duty place?

17       A    No.

18       Q    During all of 2002 did the school have

19   any employees whose primary place of work was the

20   Kellog Conference Center?

21       A    Yes.

22       Q    How many?

1      Q      Is the school on a semester or quarter

2    system if you know?

3      A      Semester.

4      Q      And is there a winter break?

5      A      Yes.

6      Q      Do you recall whether the school was in

7    the middle of a break or whether the Spring '03

8    semester had resumed when the water incident on

9    January 25 occurred?

10      A      I believe the school was in session.

11      Q      And what makes you think that?

12      A      In general the Spring semester starts

13    after Martin Luther King Day.

14      Q      And you think that was the case in '03?

15      A      Yes.

16      Q      Does the fact of school either being in

17    session or out of session have any bearing on the

18    activities at the conference center?

19      A      No, not really.

20      Q      You used the word "hotel" previously

21    when describing the center.  I'm not quite sure if

22    the two terms are interchangeable or are you

1   describing a subset of the conference center or is

2   the building in that function generally referred

3   to on campus as the hotel?

4        A    It's referred to as conference center,

5   sometimes as the hotel.

6        Q    The terms are interchangeable?

7        A    Yes.

8        Q    Is it fair to say that the hotel could

9   be booked to it's capacity during a time when

10  school was either out of session either during the

11  winter break or the summer break?

12       A    It's possible.

13       Q    Those two functions are completely

14  independent of one another?

15       A    Correct.

16       Q    Do you have an understanding of about

17  the occupancy rate of the three rooms during your

18  first year on the job?

19       A    Yes.

20       Q    And what was that?

21       A    Approximately 22 percent.

22       Q    And was that figure -- is that during

1   interpreting department in there?

2        A    The number of rooms available to outside

3   clients has remained the same.

4        Q    So what was that space used for, I guess

5   it was used by the school?

6        A    Correct.

7        Q    On the third floor?

8        A    Yes.

9        Q    That was used by another department?

10       A    Used mostly by the mental health center.

11       Q    Can you describe for me the front desk

12   area, the lobby area of the hotel?

13       A    Standard lobby area, you enter through

14   the door, lobby area's on your right, a long desk

15   with I believe three computer terminals, a card

16   key machine, I believe safety deposit boxes.

17       Q    Does the building have an annunciator

18   panel for either security or fire alarms?

19       A    Yes.

20       Q    Are those panels located in that

21   building or are they in a separate security

22   building?

1        A      There is an annunciator panel in the

2    conference center.

3        Q      And where is that located?

4        A      In the main entrance on the left-hand

5    side as you go in.

6        Q      And where in relation to the front desk

7    is that?

8        A      Across from the front desk.

9        Q      Would we be able to see that area this

10   afternoon?

11       A      Yes.

12       Q      I see on the campus map that there is a

13   gatehouse on the street leading to Lincoln Circle

14   and I think West Virginia Avenue.  Is that the

15   area where there are a few tents around this

16   morning?

17       A      Yeah, the front of West Virginia Avenue,

18   yes -- no, it's in front of Florida Avenue is

19   where the tents are.

20       Q      I'll identify this for the record.  This

21   is a Gallaudet University campus map.  I see on

22   the Section A2 at the very left edge there's a

1      Q      Did you set this out in chronological

2   order?

3      A      I don't recall how I did it at the time.

4   I looked at it as a summary of what happened.

5      Q      What was your basis for recording that

6   Terry Hubbard arrived at 1550?

7      A      He told me.

8      Q      Who was the front desk clerk at the time

9   of the fire alarm?

10     A      I'm not sure.

11     Q      Who was Gary Overton?

12     A      He is the audio visual specialist.

13     Q      By whom is he employed?

14     A      At the time he was employed by Guest

15   Services.

16     Q      Did that change?

17     A      Yes.

18     Q      When?

19     A      In September of -- August of 2003.

20     Q      When the contract terminated?

21     A      Correct.

22     Q      What happened at that point?

1     A    He was hired by the new company Flik

2   International.

3     Q    Is that a full-time position the AV

4   specialist?

5     A    I believe so.

6     Q    Did the university have any standard

7   operating procedures or any protocols in effect in

8   January of '03, that is standard operating

9   procedures for fire alarms and what to do in the

10   event of a fire alarm?

11     A    Yes.

12     Q    And where are those protocol or standard

13   operating procedures set out?

14     A    I don't know.

15     Q    When was the first time that you read

16   that protocol or standard operating procedure for

17   a fire alarm?

18     A    I've never read it.

19     Q    Do you know whether Natalie Corey the

20   day manager on duty at the time of the incident

21   followed the school's protocol for a proper

22   response for a fire alarm?

1          A     I have no idea.

2          Q     Did you make any effort to determine

3    whether she followed the school's protocol or

4    standard operating procedure for a fire alarm?

5          A     No.

6          Q     And here we are I guess almost four

7    years later and you still haven't reviewed the

8    issue of whether the school has a protocol or

9    standard operating procedure for a fire alarm

10   response?

11         A     I have not reviewed the document, no.

12         Q     But you know that one exists?

13         A     I believe one exists.

14         Q     What makes you think that?

15         A     With discussions with members of either

16   DPS or the physical plant department.

17         Q     And when did they tell you that such a

18   protocol or standard operating procedure exists?

19         A     Sometime since I started working here in

20   2002.

21         Q     If you were in the building on a

22   Saturday and received a fire alarm you're, even

1      Q    And somewhere below the executive

2  director?

3      A    I would assume so, yes.

4      Q    Does he wear a uniform?

5      A    I believe so.

6      Q    Was he in uniform last week when you met

7  him?

8      A    Yes.

9      Q    I think I asked you this earlier, who

10  turned off the water on January 25, 2003,

11  according to your investigation?

12      A    I believe David Ham, the chief -- the

13  engineer for Guest Services, Incorporated did.

14      Q    Is it fair to say he was Guest Services'

15  building engineer for the hotel that day?

16      A    Yes.

17      Q    And he had been in that capacity

18  throughout your entire tenure up until the time

19  that you terminated the contract?

20      A    As far as I know.

21      Q    Who called the fire department, if

22  anyone, on January 25?

132

1        Q    I'm sorry.   I'll refer to it as the

2   January '03 inspection or winter check?

3        A    I had no responsibility or any knowledge

4   of it.

5        Q    You had no knowledge, no involvement?

6        A    That's correct.

7        Q    That was handled directly between Guest

8   Services and my client?

9        A    That's correct.

10       Q    Can you describe for me the access card

11  or suite room access arrangements, particularly

12  whether access to rooms on the fourth and fifth

13  floor was any different than the rooms on the

14  first three flooring which I understand were

15  either public areas on the first floor or spaces

16  dedicated to the university's use on the second

17  through fourth floors?

18       A    Could you repeat the question?

19       Q    I understand that access to the guest

20  rooms on the fourth and fifth floors was through

21  use of a key card of some sort?

22       A    Correct.

133

1    Q    And that was how business was done

2    during your first seven months on the job?

3    A    That's correct.

4    Q    And how did that differ from access to

5    areas on the third and fourth floor, for example,

6    the mental health areas?

7    A    Some on the third floor had some key

8    access, some card access.  The fourth floor had

9    all card access for all guest rooms.

10    Q    How about the fifth floor?

11    A    Fifth floor all guest rooms had card

12    swipe access.

13    Q    Describe for me the process whereby the

14    desk clerk would create a card that would provide

15    someone access to a particular guest room on a

16    given day?

17    A    I'm not intimately involved with that.

18    Q    Do you have a rudimentary understanding?

19    A    I've seen it done before.

20    Q    How do they do it according to your

21    observation?

22    A    According to my observation they put a

1    card in a machine, punch a code in the machine,

2    the card is encoded with the appropriate room and

3    given to the customer.

4         Q    All of this would be done by a Guest

5    Services employee?

6         A    That's correct.

7         Q    So is it fair to say Guest Services

8    employees were responsible for the security of

9    hotel guests, essentially security for the rooms

10   for the hotel and guests during a particular stay?

11        A    That's correct.

12        Q    Can you explain to meet education and

13   training process whereby Guest Services employees

14   were trained as far as when they would create a

15   card and when they would not?

16        A    I had no knowledge of it.

17        Q    That was something handled in-house by

18   Guest Services?

19        A    That's correct.

20        Q    Have you been to suite 5200 since

21   January 25, 2003?

22        A    Correct.

1    Q    Can you describe for me the access to

2    that suite, particularly suites A and B and any

3    anteroom or other space connecting the front door

4    to the suite doors?

5    A    What I recollect is there is a card

6    swipe on the outer door and there are two rooms in

7    that suite whether or not they have card swipes I

8    don't recall.

9    Q    Why was the hotel configured that way,

10   that is that those two rooms, A and B, would have

11   a common area within an exterior door that was

12   controlled by a card, if you know?

13   A    I don't know.

14   Q    Was the only configuration like that in

15   the hotel?

16   A    I believe there are six suites, whether

17   they're identically configured I don't know.

18   Q    The only aspect of the configuration I'm

19   concerned about is the entry to each suite,

20   whether it would enter directly into the hallway

21   or to a little anteroom like 5200 A and B entered

22   into?

# Exhibit J

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY,: | | |
| as Subrogee of Gallaudet University | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| CAPITOL SPRINKLER INSPECTION, INC | : | CASE NO. 1:05CV02115 (CKK) |
| | : | |
| Defendant | : | |
| | : | |
| vs. | : | |
| | : | |
| GUEST SERVICES, INC. | : | |
| | : | |
| Third-Party Defendant | : | |

**AFFIDAVIT OF VERNON VANE**

STATE OF MARYLAND        :

COUNTY OF HOWARD       :

BE IT REMEMBERED that on this 7th day of February, 2008, personally appeared before me, the Subscriber, a notarial officer authorized to administer oaths in the State and County aforesaid, VERNON VANE, personally known to me as such, and being duly sworn, did depose and attest to the following:

I, *Vernon Vane*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my knowledge and belief:

1.    I am currently employed as the Supervisor of Inspection for Defendant Capitol Sprinkler Inspection, Inc.

2.    I was deposed in this litigation on Monday, August 14, 2006.

3.    Following the incident of January 25, 2003, representatives of Capitol Sprinkler Contracting, Inc. performed certain repairs to the subject fire protection system and restored it to service.  As part of that process, Capitol Sprinkler Contracting replaced four sprinkler heads and one "Tee" fitting.

4.    I then returned the original components to an agent of Guest Services, Inc., at the Kellogg Conference Center.  The components are identified on the receipt/letter of transmittal, attached as Exhibit 1.

5.    When I returned the components to Guest Services, Inc., I met its agent at the Kellogg Conference Center.  He identified himself as Terrance F. Hubbard.

6.    He appeared about 5'10" tall and had a medium build.  He appeared in his 30's or 40's.

7.    The color of his skin was dark for a Caucasian, and light for an African American:  I would describe his race as being mixed.

8.    Mr. Hubbard took possession of the original components, vis., the one "Tee" fitting and 4 sprinkler heads that had been removed from the system.  At that time, I requested Mr. Hubbard to sign the transmittal, attached as Exhibit 1, in an effort to acknowledge receipt, and he complied.

{DE102611.1}

VERNON VANE

SWORN TO and SUBSCRIBED before me the day and year first above written.

Ann Golden, Notary Public

My Commission Expires: _12 - 1 - 08_

{DE102611.1}

# Exhibit J - 1

**CAPITOL SPRINKLER CONTRACTING, INC.**
6550 Dobbin Road
COLUMBIA, MARYLAND 21045

Baltimore (410) 730-4711
Maryland (301) 982-1023

# LETTER OF TRANSMITTAL

TO _Guest Services_
_% Gallaudet Conference Center_
_800 Florida Ave NE, Wash DC 20002_

DATE _January 30/2003_    JOB NO.
ATTENTION _David Ham_
RE: _Return of Fitting & Sprinkler Heads_

WE ARE SENDING YOU  ☐ Attached  ☐ Under separate cover via _____ the following items:

☐ Shop drawings  ☐ Prints  ☐ Plans  ✔ Samples  ☐ Specifications
☐ Copy of letter  ☐ Change order  ☐ _____

| COPIES | DATE | NO. | DESCRIPTION |
|--------|------|-----|-------------|
|  |  | 4 | Viking Mod M 1994 - Glass Bulb 200°F Brass Upright Sprinklers |
|  |  | 1 | 1 x 1 x ½ Blk C.I. Tee |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

THESE ARE TRANSMITTED as checked below:

☐ For approval  ☐ Approved as submitted  ☐ Resubmit _____ copies for approval
☐ For your use  ☐ Approved as noted  ☐ Submit _____ copies for distribution
✔ As requested  ☐ Returned for corrections  ☐ Return _____ corrected prints
☐ For review and comment  ☐ _____
☐ FOR BIDS DUE _____   ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS _____

COPY TO _____

SIGNED: _____
_TERRANCE F HUBBARD_

If enclosures are not as noted, kindly notify us at once.

# Exhibit K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, : as Subrogee of Gallaudet University : | |
| Plaintiff : | |
| vs. : | |
| CAPITOL SPRINKLER INSPECTION, INC : | CASE NO. 1:05CV02115 (CKK) |
| Defendant : | |
| vs. : | |
| GUEST SERVICES, INC. : | |
| Third-Party Defendant : | |

## AFFIDAVIT OF LOUIS R. DEMPSEY

STATE OF DELAWARE :
                                           :
COUNTY OF NEW CASTLE :

BE IT REMEMBERED that on this 17th day of January, 2008, personally appeared before me, the Subscriber, an attorney licensed to practice law in the State and County aforesaid, and authorized to perform notarial acts pursuant to 29 Del. C. §4323(a)(3), LOUIS R. DEMPSEY, a private investigator, licensed by the State of Delaware and personally known to me as such, and being duly sworn according to law, did depose and attest to the following:

I, *Louis R. Dempsey*, hereby give oath and affirm, under the penalties of perjury, that I am over 18 years of age, *sui juris* and competent to testify in court, and that I have personal knowledge of the matters related herein. I am informed of and believe them to be true, and upon that ground, I declare them to be true and correct to the best of my

{DE101080.1}

knowledge and belief:

1.    At the request of Counsel for Defendant Capitol Sprinkler Inspection, Inc., I attempted to locate a subject known only as Terrance Hubbard. I was provided only the name of his employer: Guest Services, Inc. -- 3055 Prosperity Avenue, Fairfax, Virginia 22031.

2.    In October, 2006, I queried five separate data bases for a total of thirteen (13) queries. Computer research revealed four possible subjects located in Virginia. However, I was unable to relate any to Guest Services, Inc., without additional identifying information.

3.    Following the Court's 1/31/07 Status Conference with Counsel, I received additional information from Counsel from Capitol Sprinkler Inspection, vis., 1) the subject's complete name (Terrance Edwin Hubbard); 2) his last known home address (901 6th Street, NW -- Apartment 507 -- Washington, DC  20024); 3) his date of birth (7/27/1954); and his social security number (intentionally blank).

4.    I subsequently performed a Cyber-TRACE. The Cyber-TRACE investigation revealed that an individual identified as Terrance Edwin Hubbard, having the same last known address, date of birth and social security number as those provided to me by counsel and set our in Paragraph 3 above, was listed in the Social Security Administration Death Masterfile as having died in September, 2005.

5.    On January 15, 2008, i.e., following the filing of Plaintiff's Motion for Summary Judgment, I spoke with an individual identified as Edwin Hubbard, of Sodus, New York. He said that Terrence Edwin Hubbard committed suicide in Washington, DC in September, 2005. He directed me to the obituary that appeared in the Newark, New York Courier Gazette on October 5, 2005, a copy of which is attached hereto as Exhibit

{DE101080.1}

1. The obituary identifies the surviving parents of Terrance E. Hubbard as being Beverly & Edwin Hubbard.

6. On January 17, 2008, I spoke with Mr. Hubbard again by telephone.

7. Edwin Hubbard confirmed that his son, Terrance Edwin Hubbard, was at one time employed by Guest Services at the Gallaudet University. Mr. Hubbard specifically recalled on incident wherein his son told him that he was required to work many hours one week to clean up water damage resulting from a sprinkler incident.

LOUIS R. DEMPSEY

SWORN TO and SUBSCRIBED before me the day and year first above written.

Norman H. Brooks, Jr., Esquire, Notary Officer
Notarial Officer pursuant to 29 Del.C. §4323(a)(3)
My commission expires: Indefinite

{DE101080.1}

# Death Notices
## July – September 2005

**October 4, 2005**

**Overacre, Thelma** - Thelma Overacre, 76, of Ladue Avenue, Clifton Springs died September 28, 2005 at Strong Memorial Hospital in Rochester. Her loving family was by her side. Thelma was born June 22, 1929 in Canandaigua and was the daughter of the late William and Florence Potter. She had lived in the area all her life and retired from Mobil Chemical in Bushnell's Basin. Thelma was a former member of the Order of Eastern Star. She loved history, especially about World War II. She was a family woman, devoting her time raising her family with love. She was happiest spending time with her children, grandchildren and great-grandson. Thelma will be sadly missed by all her loving family and friends. Arrangement entrusted to R. A. Patrick Funeral Home, 26 W. Main St. Clifton Springs. Funeral services are this morning at the funeral home. Burial will be at the convenience of the family in Pioneer Cemetery. Friends may contribute to Clifton Springs Fire Department. She is survived by her children, Bradley G. Overacre of Lyons and Michelle (Donald) Overacre-Post, Deborah Taylor and Suzanne Giordano, all of Clifton Springs; grandchildren, a great-grandson; sister, Florence Miles of Shortsville; several nieces and nephews. She was predeceased by her husband, Earl Overacre; brothers, George and Kenneth Potter; and sister, Virginia Wiley.

**Hubbard, Terrance E.** - Terrance E. 'Terry' Hubbard, 51, of Sodus/Washington, D.C., died suddenly on September 10, 2005. Terry served 12 years in the U.S. Navy. He is predeceased by his grandfather and grandmother, Fred and Marge Hubbard, and grandfather, Ralph Rawden. Terry is survived by his parents, Beverly and Edwin Hubbard; sister, Debra Cudney and Penny (Steve) Billington; brother, Barry (Laurie) Hubbard; grandmother, Edith Rawden; aunts, uncles, niece, and nephews. Arrangements by Norton Funeral Home. Funeral Services will be held at the convenience of the family.

**Exhibit L**

# Capitol Sprinkler Inspection, Inc.

6550 DOBBIN ROAD
COLUMBIA, MD 21045

Telephone
Maryland: (301) 982-1023
Baltimore: (410) 730-4711
Fax: (410) 740-2428
Emergency: (410) 494-5015

### Contract For Automatic Sprinkler Equipment Inspection Service

AGREEMENT made this __22__ day of __April__ , 20 _02_ between the Capitol Sprinkler Inspection, Inc., hereinafter called the CONTRACTOR, and __Guest Services c/o Galludet Conferenced Center 800 Florida Ave. NE__ __Washington, D.C. 20002-3695 Attn: David Ham__ hereinafter called the SUBSCRIBER, for AUTOMATIC SPRINKLER EQUIPMENT INSPECTION SERVICE.

WITNESSETH, that:

Subscriber owns and or occupies the building(s) located on the premises known as _____
__Conference Center__

wherein there is now installed certain automatic fire extinguishing equipment, to wit: __Perform Annual Trip Test on 2-4" Dry Pipe Valves__

The contractor shall inspect said installation __Semi-Annually__ .

The Subscriber shall pay to Contractor after first inspection has been made, and annually thereafter, the sum of __Six Hundred Seventy Five Dollars, ($675.00)__

Such inspection Service shall cover the items specified on the reverse hereof and shall include supplying minor service type adjustments and replacements parts, provided that this shall not include extensions or alteration of the sprinkler system or the furnishing of replacement sprinkler heads or devices or any other major work.

If any equipment shall have been installed in addition to that existing at the date of this contract the annual inspection service charge above provided shall be increased in accordance with prevailing rates effective as of the first inspection of such additional equipment.

Notice of this agreement and copies of all inspection reports will be forwarded by the contractor to the insurance authority having jurisdiction _____

The term of this agreement shall be one year from date hereof and thereafter until the same shall be terminated by either party on at least sixty (60) days advance written notice to the other. Notice of termination or change in number of inspections shall be given to the fire insurance authority by the Contractor.

It is understood that the Contractor by providing such inspection service and by making such adjustments as may be required does not warrant the condition or operation of the system inspected.

SUBSCRIBER:                                   CAPITOL SPRINKLER INSPECTION, INC.

By _____         By _____
Date _____8/30/02_____                    Date _April 22, 2002_

(over)

EF-20

**Exhibit M**

## AFFIDAVIT OF THOMAS SCOTT

STATE OF MARYLAND                                    :

                                                     :

COUNTY OF ANNE ARUNDEL                               :

BE IT REMEMBERED that on this ‹6ᵗʰ› day of February, 2008, personally appeared

before me, the Subscriber, a notarial officer authorized to administer oaths in the State and

County aforesaid, THOMAS SCOTT, personally known to me as such, and being duly sworn,

did depose and attest to the following:

I, *Thomas Scott*, hereby give oath and affirm, under the penalties of perjury, that I

am over 18 years of age, am competent to testify in court, am not under any legal

disability, and that I have personal knowledge of the matters related herein. I am

informed of and believe them to be true, and upon that ground, I declare them to be true

and correct to the best of my knowledge and belief:

1.     On January 9, 2003, I was employed by Capitol Sprinkler Inspection, Inc.

2.     On that date, I accompanied Michael Bowlin to the Kellogg Conference

Center, located on the campus of Gallaudet University, in order to perform an inspection and

service the automatic sprinkler system.

3.     Upon arrival at the conference center, we were met by an agent of Guest

Services, Inc., who escorted us throughout the building as we performed our work.

4.     I do not recall the name of the gentleman who escorted us, but can describe

him. I am 6'1" tall. He was 2 or 3 inches shorter than me. I was 29 years old at the time.

He was older than me; probably in his 30s or 40s. He had what I would describe as an

average-colored complexion for an African American gentleman.

5.     This same gentleman had in his possession an assortment of keys, which

provided access to secure areas within the building, including portions of the sprinkler

{DE102626.1}

system.  He unlocked the various locking devices on the sprinkler system equipment so as to

enable us to drain all of the drip drums, except the one in the guest room on the fifth floor.

6.     This gentleman was unable to provide us access to that guest room because he

had no metal key or plastic key card for the room.  He indicated that he would return later

and drain that particular drum drip.

THOMAS SCOTT

SWORN TO and SUBSCRIBED before me the day and year first above written.

Notary Public     MARY L ESCALANTE

My Commission Expires:  NOV 1, 2010

MARY L. ESCALANTE
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Nov. 1, 2010

{DE102626.1}

**Exhibit N**

2007-01-31.txt

```
00001
01    UNITED STATES DISTRICT COURT
02    FOR THE DISTRICT OF COLUMBIA
03
04
05    St. Paul Mercury              Docket No. CA 05-2115 CKK
06      Insurance Company
07
08              Plaintiff
09                               Washington, D.C.
10         vs.                   Wednesday, January 31, 2007
11                               9:04 a.m.
12    Capitol Sprinkler Inspection,
13      Inc.
14
15              Defendant
16
17
18    Capitol Sprinkler Inspection,
19      Inc.
20
21              Third-Party Plaintiff
22
23         vs.
24
25    Guest Services, Inc.
26
27              Third-Party Defendant
28
29
30
31
32    Transcript of Status Hearing
33    Before the Honorable Colleen Kollar-Kotelly
34    United States District Judge jury
35
36
37
38
39    APPEARANCES:
40
41    For the Plaintiff:        Eric Stravitz, Esq.
42                              David Groth, Esq.
43
44    For the Defendant:        Norman Brooks, Jr., Esq.
45                              Stephen Horvath, Esq.
46
⊓
00002
01
02    Reporter:                 WILLIAM D. MC ALLISTER, CVR-CM
03                              Court Reporter
04                              (301) 520-1000
05
06
07
08
09    Reported by Voice Writing and transcribed using SpeechCAT
10
11
12
13    Pages 1 through 27
14                               Page 1
```

2007-01-31.txt

```
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
□
00003
01    P R O C E E D I N G S
02           THE CLERK:  Civil Case 05-2115.  St. Paul Mercury
03    Insurance Company versus Capitol Sprinkler Inspection, Inc.,
04    and Guest Service, Inc.
05           Counsel, would you please identify yourselves for the
06    record.
07           MR. GROTH:  David Groth, counsel for the plaintiff,
08    Your Honor.
09           MR. STRAVITZ:  Eric Stravitz, counsel for the
10    plaintiff, Your Honor.
11           MR. BROOKS:  Good morning.  Norman Brooks on behalf
12    of Capitol Sprinkler, Inc., defendant.
13           MR. HORVATH:  Good morning, Your Honor.  Steve
14    Horvath on behalf of Guest Services, third-party defendant.
15           THE COURT:  All right.  We are here for a status.
16    Discovery should be done.  It was extended.  I know you've had
17    some ADR with Magistrate Judge Kay.  I guess we're not able to
18    resolve it.
19           So at this point we're ready for either a motions
20    schedule or to set a pretrial.  I'm unsure where everybody is
21    in all of this.
22           Counsel, if you would come forward to the
23    microphone.  It makes it much easier for the court reporter and
24    for me to hear you.
25           MR. BROOKS:  Thank you, Your Honor.  I believe we
□
00004
01    have a couple of issues that would probably merit some
02    discussion concerning completing discovery which would probably
                              Page 2
```

```
                                  2007-01-31.txt
03   take another 30 days.
04              THE COURT:  Discovery is not done?
05              MR. BROOKS:  No, it's not, Your Honor.
06              THE COURT:  How come?  I mean this thing got pushed
07   off.  You got extra time.  Why isn't it done?
08              MR. BROOKS:  That is correct, Your Honor.  We have
09   had two depositions that we wanted to take on the part of the
10   third-party defendant.  We understand that one witness who is a
11   very critical witness, we think he is deceased.  We are trying
12   to get a copy of the certified death certificate.  But our
13   unofficial research on the Internet suggests he is deceased.
14              The second is a former employee, Mr. Ham.  He is an
15   employee of the third-party defendant.  If the third-party
16   defendant is going to call him as a witness, then we would like
17   to depose him.  The plaintiff noticed his deposition early on
18   in the case and then we noticed the deposition towards the end
19   of the case, and neither one went forward.
20              We understand he is a former employee, and that issue
21   needs to be resolved.  I understand that counsel for third-
22   party defendant early in the case was in contact with this
23   gentleman but is no longer in contact with him.  So we need to
24   have a decision about whether or not this fellow is going to
25   testify at trial or not.
▯
00005
01              The second issue deals with two experts.  One is an
02   expert that I identified on the last day for defendant's
03   experts.  I filed a responsive pleading.  I produced, on the
04   last day I produced a summary of the deposition and trial
05   testimony and a statement of his opinions.  I did not actually
06   have an actual report from him.
07              A little out the time I filed actually, served a
08   handwritten report, not handwritten report, but a report from
09   this particular expert which essentially added nothing to his
10   opinions but it was a signed report as required by the rule.
11              After the discovery I also received a letter from
12   plaintiff's attorney wherein he has provided additional
13   documents relied upon by a new damages expert and I would like
14   30 days to take this new damages expert's testimony.
15              Thank you.
16              THE COURT:  So in other words it is going to take you
17   a year to get all of the discovery in the case.  I mean you
18   were in here back in April of 2006.  Why didn't anybody file
19   extensions or anything before the period was over as opposed to
20   coming in after the time period, although it's pretty close?
21              I think when I extended it -- I didn't bring the
22   docket.  I thought frankly you were done or I would have
23   printed out the docket to take a look at it.  But I thought
24   either yesterday was your last day or it was fairly recently.
25   So let's start.
▯
00006
01              Did you add a new expert or is this a new report?
02              MR. GROTH:  No.  There are no new reports at all.
03              THE COURT:  Then what is the damage expert that
04   they're talking about?
05              MR. GROTH:  There was an adjuster for the plaintiff
06   insurance company who retired, is in ill health and has moved
07   to Florida.  There was another adjuster that worked on the same
08   claim.  His name was substituted for the other adjuster.
09   There's no different reports, no different numbers, nothing
10   else has changed except the name of the witness who we would
11   have testify to that damages at trial.
                                  Page 3
```

2007-01-31.txt
·21 to get his deposition as far as plaintiff is aware until the
22 end of the discovery deadline where apparently some effort was
23 made to find out where he is now.
24          THE COURT:  If I could just ask, in terms of Mr. Ham,
25 had you noticed his deposition at some point and then canceled
 
00009
01 it?  I thought that's what defense counsel said.
02          MR. GROTH:  I noticed his deposition very early on in
03 the case.  I don't have a claim against the third-party
04 defendant.  Plaintiff doesn't have a claim against the third-
05 party defendant.  I noticed his deposition because his name was
06 disclosed by Guest Services, the third-party defendant.
07          I decided shortly thereafter that I did not need his
08 deposition.  I never sought his deposition again.  The
09 information I had was that he was last known to be living in
10 California or something like that; and since I didn't have a
11 claim against Guest Services, I had no intention of taking a
12 deposition.
13          So I initially noticed the depositions of two Guest
14 Services employees neither one of whom plaintiff decided it
15 needed and no attempt was made to get those at any time during
16 the discovery process.
17          So in terms of the status of the discovery, I believe
18 the plaintiff and the third-party defendant are quite content
19 with the status of discovery right now that it's completed.  We
20 completed everything we needed to do and it is the defendant
21 who is seeking to f, or no good reason, to reopen discovery
22 because the defendant did not do what it was supposed to do
23 under the extended discovery deadline entered by the court on
24 October 24, 2006.
25          THE COURT:  Let me hear from the third-party about at
 
00010
01 least, Mr. Ham.
02          MR. HORVATH:  Thank you, Your Honor.  Steve Horvath
03 for Guest Services.  Dealing with issue of Mr. Ham, he was
04 identified early on.
05          THE COURT:  Can you spell his name?
06          MR. HORVATH:  Ham like in the pork.
07          THE COURT:  The meat, okay.
08          MR. HORVATH:  He was identified early on.  My office
09 did have a contact with him early on, and since his move, we've
10 lost contact.  We have no idea where he is.  If we locate him,
11 of course, we will disclose his new address.  But at this time
12 I do not have an address for him.  So I do not know of his
13 whereabouts.
14          An effort was made to take his deposition during the
15 last week of discovery by serving a notice on me.  I advised
16 counsel for the defendant that I don't have access to him.  I
17 don't have control over him.  He's not our employee anymore.
18 So, therefore, I cannot produce him.
19          He agreed.  He tried to serve a subpoena.  He was not
20 able to serve him with a subpoena and, therefore, the
21 deposition was canceled.
22          THE COURT:  So at this point nobody knows his
23 location, is that correct?
24          MR. HORVATH:  That is correct.  Frankly I thought we
25 had a location at one time in the file and I didn't follow up
 
00011
01 every month contacting the person to see if he had moved or
02 whatever but he has disappeared.
                              Page 5

```
                                    2007-01-31.txt
·03              I am sure with modern technology someone will be able
04   to locate him at some time but that doesn't require that we
05   extend the discovery in this case to do anything.  If we locate
06   him, the first thing someone can do is give him a call and
07   interview him, and after that, a decision can be made as to
08   whether or not a deposition is necessary.
09              I anticipate that if he's no longer in the area, we
10   can always do a de bene esse type deposition for the trial of
11   this case, if necessary.
12              THE COURT:  So from your perspective, if he is found
13   at some point, you would not object then to doing some sort of
14   telephone interview and potentially a de bene esse deposition,
15   is that correct?
16              MR. HORVATH:  That is right.
17              THE COURT:  That seems to me to resolve that one.
18              Where are we on experts from your prospective?
19              MR. HORVATH:  On experts, the problem I have with
20   expert witnesses is that initial expert disclosure was made by
21   the defendant, Capitol, and was clearly inadequate.  He
22   admitted it was inadequate.  It didn't provide us with the
23   basis for any opinions or anything which would really implicate
24   my client in this case.
25              He made a motion on October 16 to extend the time so
 
00012
01   he could properly designate his experts and no expert was ever
02   designated by him.  So as a result, I never designated any
03   experts on behalf of my client.
04              After the close of discovery, after I was repeatedly
05   told that you have the information for this person, I get a
06   two-page document was purports to implicate my client as being
07   responsible for this event.  I'm not sure if Your Honor recalls
08   what the event was --
09              THE COURT:  Yes.  It was frozen pipes that burst at
10   Gallaudet.
11              MR. HORVATH:  Right.  The implication against my
12   client is that my client should have drained the system even
13   though we hired Capitol to drain the system, that my client
14   should have turned off the water system earlier after it
15   started leaking and water coming down and that caused
16   additional damage.
17              Apparently there is some NFPA 72 regulation that we
18   allegedly violated.  I'm not sure what the basis for that or
19   what the issue is there.  But this is all new to me.  And as a
20   result I did not designate any witnesses.
21              If Capitol is allowed to designate this person and
22   call this person, I am going to need time now to get someone to
23   rebut him because, prior to that time, I was sitting very
24   happy.  I had the plaintiff saying I didn't do anything wrong.
25   I had a contract spelling out the responsibilities and I didn't
 
00013
01   have any experts saying that my client had done anything wrong.
02              I am now in a situation where Capitol is trying to
03   implicate me by saying that an expert in a report that came in
04   after the close of discovery and two months after it was due
05   that implicates my client without an expert.
06              So I'm caught in a terrible bind at this point in
07   time.  So if Capitol is allowed to designate an expert, and we
08   would strenuously object to that, then I'm going to have
09   problems.  I'm going to need to designate someone to come in
10   and rebut him.
11              THE COURT:  All right.  Let me hear back from defense
                                       Page 6
```

**Exhibit O**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ST. PAUL MERCURY INSURANCE COMPANY, :
as Subrogee of Gallaudet University

       Plaintiff

          vs.

CAPITOL SPRINKLER INSPECTION, INC

       Defendant

          vs.

GUEST SERVICES, INC.

       Third-Party Defendant

:
:
:    CASE NUMBER: 1: 05-CV-02115
:
:
:
:
:
:
:
:
:
:
:

---

### NOTICE OF ORAL DEPOSITION

TO:   Stephen Horvath, Esquire
       Trichilo, Bancroft, McGavin , Horvath & Judkins, P.C.
       3920 University Drive, P.O. Box 22
       Fairfax, VA  22030

       David J. Groth, Esquire (phv)
       Daniel J. Luccaro, Esquire (phv)
       1900 Market Street
       Philadelphia, PA 19103
       (215) 665-2000 (p)
       (215) 701-2368 (f)

     PLEASE TAKE NOTICE that plaintiff will take the depositions of the following individuals at the offices of Mesirow & Stravitz, 2000 Massachusetts Avenue, Suite 200, Washington, DC upon oral examination pursuant to the Federal Rules of Civil Procedure, before a Notary Public, or before some other officer authorized by law to administer oaths.

{DE067099.1}

### Monday, October 16, 2006

| Deponent | Time |
|---|---|
| Terrance Hubbard | 10:00 a.m. |
| Plaintiff's 30(b)(6) witness concerning access to the Conference Center provided by Gallaudet University on January 9, 2003. | 11:00 a.m. |
| David Hamm | 1:00 p.m. |
| Third Party Defendant's 30(b)(6) witness concerning access to the Conference Center provided to Defendant by Third Party Defendant on January 9, 2003. | 3:00 p.m. |

      You are asked to notify the deponents to be present at the time and place aforesaid and you are privileged to attend and participate in the examination. Said depositions will continue from day to day until completed.

Michael T. Hamilton, Esquire
Norman H. Brooks, Esquire
Marks, O'Neill, O'Brien & Courtney
913 North Market Street, #800
Wilmington, DE 19805
(302) 658-6538

{DE067099.1}