**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY,<br>as Subrogee of Gallaudet University<br><br>  Plaintiff<br>  vs.<br><br>CAPITOL SPRINKLER INSPECTION, INC<br><br>  Defendant<br>  vs.<br><br>GUEST SERVICES, INC.<br><br>  Third-Party Defendant | Case No.: 1:05cv02115(CKK) |

**PLAINTIFF'S RESPONSE TO DEFENDANT CAPITOL SPRINKLER INSPECTION, INC'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS SUMMARY JUDGMENT MOTION**

Pursuant to Rules 7(h) and 56.1 of the Local Rules of the United States District Court for the District of Columbia, plaintiff hereby responds to defendant Capitol Sprinkler Inspection, Inc.'s Statement of Material Facts in Support of Its Motion for Summary Judgment as follows:

1. Admitted.[1]

2. Admitted.

3. Admitted.[2]

4. Admitted.

5. Admitted.

---

[1] Plaintiff notes that the Exhibit A, cited by defendant as the contract for Automatic Sprinkler Equipment Inspection Services, is actually the Gallaudet University Kellogg Conference Center Management Agreement. Page 1 of the contract is actually Exhibit G of Defendant's Motion.
[2] Plaintiff notes that pages 70 & 71 of the Aller Deposition are not contained in Exhibit C of defendant's Motion.

6.   Admitted.

7.   Admitted.

8.   Admitted.

9.   Admitted.

10.  Admitted.

11.  Admitted.

12.  Admitted in part and denied in part. Plaintiff admits the facts herein except for the last sentence. There is no evidence to support the defendant's proposition that there were no "problems with access to perform the work, or freeze related water failures during this time period." Though totally irrelevant to any issues in this case, this proposition is not supported by defendant by any reference to the record in this case. Therefore, plaintiff has no obligation to cite conflicting testimony on this issue and no inferences should be drawn that there were no failures of the sprinkler system during the specified time frame.

13.  Admitted.

14.  Admitted in part and denied in part. Plaintiff admits the factual averments herein except as follows: defendant has only supplied the first page of the Capitol Sprinkler Inspection contract, marked as Exhibit G to defendant's Motion. Plaintiff has attached hereto a complete copy of the contract as Exhibit 1. Also, at the top of the second page, the contract expressly states that Capitol Sprinkler would perform its work in accordance with the requirements of NFPA 13-A, and makes no reference to NFPA 25.

15.  Admitted.

16.  Admitted.

17.	Denied.  Although during the July 2002 inspection Mr. Ham of Guest Services was shown by Capitol Sprinkler's employees the location of the sprinkler system components on its drawings, any suggestion that Guest Services' employees knew how or were trained by Capitol Sprinkler to drain the drum drips is specifically denied.  The testimony of Capitol Sprinkler's own employees clearly establishes that Capitol Sprinkler did not train any Guest Services employees regarding the proper method to drain the drum drips, and there is no evidence that any Guest Services employee had the knowledge, experience, or training to do so.  Vernon Vane of Capitol Sprinkler testified that Capitol Sprinkler did not instruct David Ham about inspections or testing of the sprinkler system and that Mr. Ham had no specialized knowledge of the operation, maintenance, repair, or installation of sprinkler systems.  (See Exhibit 2, excerpts of deposition of Vernon Vane, at p. 71-72).  In addition, there is absolutely no testimony or evidence that Capitol Sprinkler's employees ever had any contact with any Gallaudet employees whatsoever, and certainly no evidence that Capitol Sprinkler ever trained Gallaudet's own employees to properly and safely drain drum drips.  No direct employee of Gallaudet accompanied Vane during the July 2002 inspection.  (Id. at p. 43).  The deposition testimony of Gary Aller, Gallaudet's Director of Business Operations, who was the liaison between Gallaudet and Guest Services, is that Guest Services had total maintenance and fire control responsibility for the conference center, and that Gallaudet had no responsibility for the conference center, and that Gallaudet had no responsibility for facility maintenance at all.  (See Exhibit 3, excerpts of deposition of Gary Aller, at p. 30, 31, 36, 57, 61, 62 & 131).  In addition, Aller testified that the decision to terminate the contract with Guest Services was based on the profitability of the facility and had nothing to do with the water damage.  (Id. at p. 41-42).  Finally, defendant's contention that it is the building engineer's responsibility to keep the drum

drips or low points drained is contradicted by NFPA 25, which defendant repeatedly cites in its motion. While NFPA 25 does require a building owner to properly maintain a water based fire protection system, the owner is expressly permitted to pass on that responsibility to a management firm (See Exhibit 4, pertinent sections of NFPA 25 at §1-4.1 & §1-4.2). In turn the management firm or owner is expressly permitted to contract the inspection testing and maintenance of a water based fire protection system to an inspection, testing an maintenance service such as Capitol Sprinkler. (<u>Id.</u> at §A1-4.45.2). Consequently, Gallaudet and Guest Services, as building owner and management company, did exactly what NFPA 25 authorized them to do to ensure that the sprinkler system was properly inspected, tested and maintained by a qualified, experienced service, namely Capitol Sprinkler.

18. Admitted in part and denied in part. It is denied that the July 2002 inspection was performed by only Michael Bowlin and Tim Francis. The July 2002 inspection was performed by Capitol Sprinkler employees Bowlin, Francis, <u>and</u> Vane. (See Exhibit 2 at p. 36). The remaining facts are admitted.

19. Admitted.

20. Admitted.

21. Denied. It is denied that Capitol Sprinkler's employee had any knowledge of the identity and/or employer of their building escort during the January 9, 2003 inspection. In its original Rule 26(a)(1) Initial Disclosures, Capitol Sprinkler identified the Guest Services employee most likely to have discoverable information regarding the circumstances surrounding Capitol Sprinkler's inspections as Terrance Hubbard. (See Exhibit 5, excerpts from Capitol Sprinkler's Rule 26(a)(1) Initial Disclosures). Then, in its interrogatory answers, defendant Capitol Sprinkler, <u>specifically and positively</u> identified Terrance Hubbard as the person who

4

provided Capitol Sprinkler with access to the drum drips, but admitted that it did not know by whom Hubbard was employed, assuming it was either Gallaudet or Guest Services. (See Exhibit 6, excerpts of Capitol Sprinkler's Answers to Interrogatories at #3 & 5). Capitol Sprinkler answered that Mr. Hubbard, personally, was "unwilling to obtain the necessary key "which denied Capitol Sprinkler access to the drum drip which Capitol Sprinkler admits was never drained, even after Mr. Bowlin of Capitol Sprinkler <u>requested</u> Mr. Hubbard to obtain these keys. (<u>Id.</u> at #3, 11 & 12). Capitol Sprinkler's Interrogatory Answers go on to state that on July 2002, David Ham was instructed "on properly draining the drum drips within the system." (<u>Id.</u> at #13). This allegation was subsequently specifically denied by Vernon Vane during his deposition. (See Exhibit 2 at p. 71-72).

The later deposition testimony of Capitol Sprinkler's own employees clearly contradicts its own Initial Disclosures and Interrogatory Answers and proves without any doubt that Capitol Sprinkler has no factual evidence or basis upon which to claim that Terrance Hubbard was its building escort during the January 2003 inspection. Nor does Capitol Sprinkler have any evidence regarding the identity of the actual escort or the escort's employer. The <u>only</u> testimony regarding the alleged agreement by a Guest Services employee to go back and drain the drum drip was provided by Michael Bowlin, the Capitol Sprinkler inspector. (See Exhibit 7, excerpts of deposition of Michael Bowlin). Bowlin was at the Conference Center for inspections in July 2002 and January 2003. (Id. at p. 30-31). He does not know the name of the person who escorted him in January 2003. (Id. at p. 40). He believes it was the same person from the July 2002 inspection. (Id. at p. 41-42). He described the escort as a colored gentlemen who was 5'

10" and approximately thirty years old. (Id. at p. 34).[3] Bowlin did not recall any distinguishing marks or an accent. (Id. at p. 34).

According to Bowlin, when they reached the room where the drum drip was located, the escort said "I don't have a card. I have to go down stairs and get the card for the access." (Id. at p. 52). Bowlin estimates it would have taken 5 – 10 minutes to go downstairs and get the card. (Id. at p. 52). The drum drip was the last one that had to be drained that day. (Id. at p. 53). Bowlin testified, "we asked if he was going to get a card and he just kind of looked at us like, you know, he really didn't want to – he would take care of it. He said he would take care of the drum drip, and I asked him, I said 'Are you going to take care of this' – I said, 'You know what? I can't get in the room. Are you going to take care of this drum drip?'" (Id. at p. 54). Bowlin admitted that he did not specifically ask the person to go get the card. (Id. at p. 54, 76). He also admitted that the unknown Guest Services escort <u>never refused</u> or was "unwilling" to get the card. (Id. at p. 56). This testimony directly contradicts Capitol Sprinkler's Interrogatory Answers. Bowlin had no idea about the escort's background, experience, reliability or competency to drain the Drum drip and he did not ask the escort anything about this. (Id. at p. 57). He was never asked by anyone at Capitol Sprinkler to go back to try to identify the escort. (Id. at p. 67-68, 108). Bowlin admitted that Capitol Sprinkler's interrogatory answer stating the escort was "unwilling" to provide access was not accurate. (Id. at p. 76).

Vernon Vane, Capitol Sprinkler's Supervisor of Inspections, also testified regarding the "identification" of Terrance Hubbard and verified the defendant's answers to interrogatories,

---

[3] Based on the information in the Affidavit of Louis R. Dempsey, which was attached as Exhibit K to defendant's Motion, Terrance Hubbard would have been almost 50 years old at the time of the 2003 inspection.

6

even though he was not present during the January 2003 inspection. Vane testified that Bowlin was the least experienced inspector. (See Exhibit 2 at p. 19). Vane admitted that in his 15 years as a supervisor for Capitol Sprinkler, he never permitted a customer to do any aspect of the work that Capitol Sprinkler was contracted to do. (Id. at 32-33). Vane participated in the July 2002 inspection along with Bowlin and testified that someone from Guest Services provided access to the rooms. (Id. at p. 39-40). He does not know the person's name who accompanied them, but described the escort as a tall slender black man in his thirties. (Id. at p. 41). The only thing the escort did was unlock things, he did not drain any drum drips, nor was there any discussion of how to do this. (Id. at p. 44-45). He admitted that if Capitol Sprinkler could not do all of the work it was contracted to do, then there should be a notation under the deficiencies section on the inspection report. (Id. at p. 53). There were no deficiencies listed on the January 9, 2003 inspection report. Vane admitted that Capitol Sprinkler has no records indicating that someone else agreed to drain any drum drips during the January 9, 2003 inspection. (Id. at p. 67). After the incident, Vane discussed with Bowlin the inspection on January 9, 2003 and Bowlin told him for the first time that the escort did not have the key with him and said he would take care of draining the drum drip. (Id. at p 87-88). They did not discuss trying to identify the guy and Vane himself made no attempt to do so. (Id. at 91-92). Vane admitted that they did not know the name of the escort and testified "nobody could come up with a name. I mean, we just didn't know." (Id. at p. 93-94). The only reason that Capitol Sprinkler identified Mr. Hubbard in its interrogatory answers was because he signed the receipt for the return of the evidence by Capitol Sprinkler a week after the incident. (Id. at p. 94). This is the only "evidence" Capitol Sprinkler has that Hubbard was the person who escorted them during the last inspection. (Id. at p. 110-

111).  Vane does not know if the guy who accompanied him on the July 2002 inspection was the person who signed for the evidence. (Id. at p. 143).  He assumed the escort was Hubbard because he signed the evidence receipt and admitted that he "wouldn't know him if he fell on him." (Id at p. 153-154).   Vane also stated, "we're surmising that possibly he was the gentlemen" who accompanied Bowlin during Bowlin's January 2003 inspection." (Id. at p. 94-95).  Based on the above testimony by Capitol Sprinkler's own employees, it is clear that the identification of Hubbard is pure speculation.

The depositions of Capitol Sprinkler's employees, Vane and Bowlin, were taken in August 2006.  Fast forwarding to February of 2008, in support of its Motion for Summary Judgment, Capitol Sprinkler's employees began to change their description of their building escort, Mr. Hubbard.  Now, he is described in Vane's February 7, 2008 Affidavit as "dark for a Caucasian and light for an African American " and "his race as being mixed, about 5'10" tall, of medium build, appearing in his 30's or 40's." (See Exhibit J of Defendant's Motion).[4]  In his deposition in 2006, Mr. Vane identified Hubbard as simply " a tall slender black man" in his 30's.  (See Exhibit 2 at p. 41).  Even more curiously, in his alleged "identification" of Mr. Hubbard, Vane claims in his most recent Affidavit that Mr. Vane, himself, returned the original ruptured sprinkler system components to the conference center, and when he did, he met Mr. Hubbard of Guest Services, who signed the evidence receipt. (See Exhibit J of Defendant's Motion). This is quite astounding given that when testifying about this same issue at his deposition, Vane specifically testified that he did not know how the evidence was returned to the building, and was not "sure about that, whether I brought it down or I sent it down.  I know I had

---

[4] Plaintiff asserts that both of the Affidavits of Vernon Vane are "sham affidavits" and therefore should not be considered by the Court in support of defendant's Motion for Summary Judgment or Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment.  This issue is discussed in Plaintiff's Memorandum of Points and Authorities.

it already in a little plastic bag, but I just don't recall." (See Exhibit 2 at p. 153). Consequently, Mr. Vane's newly enhanced memory directly contradicts his prior deposition testimony.

Most importantly, all of the testimony by defendant Capitol Sprinkler's own employees regarding the now deceased Terrance Hubbard, and his alleged denial of access to the drum drip and offer to drain it himself, can be disproven by the fact that according to Terrance Hubbard's father, Edwin Hubbard, in 2002 his son was a light complexioned, dirty-blond haired Caucasian, 49 years old, of English/German descent, and approximately 5'8" tall. (See Exhibit 8, Affidavit of Edwin Hubbard). One might think this is something that defendant's own private investigator Louis Dempsey, would have found out when he spoke to Edwin Hubbard on January 15 and 17 of 2008, and would have referenced the physical description of Terrance Hubbard in his Affidavit attached to defendant's Motion. (See Exhibit K of Defendant's Motion). Because Terrance Hubbard was not "black," "colored," "African American," or of "mixed race," was not 5'10" tall and was almost 50 years old, not in his 30s, which were the descriptions testified to by Capitol Sprinkler's employees, it is obvious that Terrance Hubbard was not the building escort as alleged by Capitol Sprinkler. It is also obvious that Capitol Sprinkler has absolutely no idea who its building escort was for the January 2003 inspection, nor any knowledge of the identity of the escort's actual employer.

    22.    Admitted.

    23.    Admitted.

    24.    Admitted.

    25.    Admitted.

    26.    Admitted.

27.     Denied.  It is denied that Mr. Bowlin was unable to drain the drum drip in January 2003 because he was not given access to the room.  Mr. Bowlin's testimony cited in the response to paragraph 21 above, establishes that Bowlin, himself, requested the escort to drain the drum drip.  Perhaps Bowlin's most telling testimony is the first statement he made in his deposition testimony on this issue, where he quotes the escort as saying "I don't have a card.  I have to go downstairs and get the card for access."  (See Exhibit 7 at p. 52).  The fact that the escort did not have the key on his person does not establish that the defendant was not given access. Consequently, plaintiff denies that Capitol Sprinkler was not given access to the room where the drum drip was located.

28.     Admitted.

29.     Admitted in part and denied in part.  Although it is admitted that Bowlin's testimony is properly cited, it is denied that Mr. Bowlin was denied access to the drum drip based on the testimony cited in paragraphs 17 & 27 above.

30.     Admitted.

31.     Denied.  It is denied that Mr. Vane returned the original sprinkler system components to Guest Services.  Mr. Vane's recent sham Affidavit (Exhibit J of Defendant's Motion) is directly contradicted by his own prior deposition testimony, as discussed at length in paragraph 21 above.  In addition, Mr. Vane's description of Terrance Hubbard as a mixed race ("dark for a Caucasian and light for an African American"), 5'10", 30 or 40 year old man, is also directly contradicted by his prior deposition testimony when he described Hubbard as a slender black man in his 30's,  and by Edwin Hubbard's Affidavit confirming that his son was a Caucasian, light complexioned, 5'8" man of English/German descent.  (See response to paragraph 21 above).

32.     Admitted. It is admitted that neither Mr. Hubbard nor Mr. Ham were still employed by third party defendant Guest Services at the time their depositions were noticed.

33.     Admitted.

34.     Denied. It is specifically denied that defendant Capitol Sprinkler made any reasonable efforts to depose or locate Terrance Hubbard and David Ham during the pretrial discovery period. The record in this case is completely devoid of any evidence of such efforts other than serving a deposition notice. Capitol Sprinkler did not do anything to follow up on the deposition notice, including filing a motion to compel depositions of any representatives of Guest Services. Nor did Capitol Sprinkler issue any interrogatories or document requests to Guest Services for time records, personnel files, or other business records to try to identify the person who was the building escort during the January 2003 inspection or to determine if Mr. Hubbard was even working at the conference center on the day of the January 2003 inspection. Nor did Capitol Sprinkler ever file a motion to extend the discovery deadlines past January 2007 in order to try to locate the Guest Services employees.

35.     Denied. It is unknown if Mr. Ham remains unavailable for deposition. There is absolutely nothing in the record to indicate what, if any, attempts were even made by Capitol Sprinkler to locate Mr. Ham.

36.     Plaintiff asserts that defendant Capitol Sprinkler manipulates, mischaracterizes, misstates and, perhaps, even manufactures evidence such as the "sham affidavits," in its Statement of Material Facts. This is consistent with the conduct of defense counsel throughout this litigation. Defense counsel has repeatedly misrepresented facts through the post discovery motion practice in this case. After the January 28, 2008 Status Conference in which the Court struck defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment due to

defendant's failure to comply with the Local Rules, plaintiff's counsel specifically warned Capitol Sprinkler's counsel, Mr. Brooks, about mischaracterizing, misstating, and misciting the testimony of Capitol Sprinkler's own employees, in any subsequent filings.  (See Exhibit 9, email dated 1/28/2008 from David J. Groth to Norman H. Brooks, and responsive email dated 1/29/2008).

37.    In addition, plaintiff incorporates by reference the factual allegations and references to the record set forth in *Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment.*

Respectfully submitted,

COZEN O'CONNOR

BY:  s/ David J. Groth
DAVID J. GROTH, ESQUIRE (phv)
DANIEL J. LUCCARO, ESQUIRE (phv)
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

MESIROW & STRAVITZ, PLLC

BY:  s/Eric N. Stravitz
Eric N. Stravitz, Esquire (D.C. Bar #438093)
1307 New Hampshire Avenue, N.W., Suite 400
Washington, DC 20036
(202) 463-0303

Attorneys for Plaintiff