# EXHIBIT 1

DEPOSITION
EXHIBIT
1 Vane
KB 8-14-06
PENGAD 800-631-6989

# Capitol Sprinkler Inspection, Inc.

6550 DOBBIN ROAD
COLUMBIA, MD 21045

Telephone

Maryland: (301) 982-1023
Baltimore: (410) 730-4711
Fax: (410) 740-2428
Emergency: (410) 494-5015

### Contract For Automatic Sprinkler Equipment Inspection Service

AGREEMENT made this ___22___ day of ___April___, 20 _02_ between the Capitol Sprinkler Inspection, Inc., hereinafter called the CONTRACTOR, and _____
Guest Services c/o Galludet Conferenced Center 800 Florida Ave. NE

Washington, D.C.  20002-3695 Attn:  David Ham _____ hereinafter called the SUBSCRIBER, for AUTOMATIC SPRINKLER EQUIPMENT INSPECTION SERVICE.

WITNESSETH, that:

Subscriber owns and or occupies the building(s) located on the premises known as _____
Conference Center _____

wherein there is now installed certain automatic fire extinguishing equipment, to wit:

Perform Annual Trip Test on 2-4" Dry Pipe Valves _____

The contractor shall inspect said installation __Semi-Annually_____.

The Subscriber shall pay to Contractor after first inspection has been made, and annually thereafter, the sum of _Six Hundred Seventy Five Dollars, ($675.00)_____

Such inspection Service shall cover the items specified on the reverse hereof and shall include supplying minor service type adjustments and replacements parts, provided that this shall not include extensions or alteration of the sprinkler system or the furnishing of replacement sprinkler heads or devices or any other major work.

If any equipment shall have been installed in addition to that existing at the date of this contract the annual inspection service charge above provided shall be increased in accordance with prevailing rates effective as of the first inspection of such additional equipment.

Notice of this agreement and copies of all inspection reports will be forwarded by the contractor to the insurance authority having jurisdiction _____

The term of this agreement shall be one year from date hereof and thereafter until the same shall be terminated by either party on at least sixty (60) days advance written notice to the other. Notice of termination or change in number of inspections shall be given to the fire insurance authority by the Contractor.

It is understood that the Contractor by providing such inspection service and by making such adjustments as may be required does not warrant the condition or operation of the system inspected.

SUBSCRIBER:                              CAPITOL SPRINKLER INSPECTION, INC.

By _____                           By _____

Date ___4/30/02___                       Date ___April 22, 2002___

(over)

EF-20

# SCOPE OF SERVICES

- Inspect, test and service the fixed fire protection equipment                    in a workmanlike manner in accordance with this contract, and the requirements of the National Fire Protection Association (NFPA) Care and Maintenance of Sprinkler Systems (No. 13-A) and American Insurance Association publication Recommended Method for Reporting Dry Pipe Valve Tests (No. 13-C). The service shall be performed             and meet the requirements of the Insurance Rating Association. To guide in completing an inspection of the apparatus as installed, the Standard Sprinkler Equipment Report Form, as recommended by the Advisory Engineering Council of the American Insurance Association shall be followed in conjunction with the manufacturer's instructions for testing and servicing the equipment.

## Wet Systems - Alarm Valves

Test alarms by opening the inspector's test connection when available. Otherwise, these may be made through by-pass test connection in conjunction with making a water flow test when facilities and conditions permit.

- Check cold weather valves and exposed piping to assure their proper conditions for winter and summer operation.

Test the solution in anti-freeze systems for satisfactory condition, as required in the Standard for the Installation of Sprinkler Systems (NFPA No. 13).

## Dry Systems - Dry Valves, Accelerators, Exhausters

Test the alarms, both water flow and air if provided, and perform a water flow test through the drain connection when facilities and conditions permit.

Check air pressure, priming water level, latching arrangements, automatic drip connections when provided, and the general condition of the dry pipe valves, accelerators or exhausters, and their environment, including dry pipe valve rooms or enclosures.

- trip test dry pipe valves together with accelerators and exhauster if provided in accordance with standard testing and reporting procedures required by this Association.

- After testing, restore the system and the dry pipe valve to operation according to the manufacturer's instructions.

- Open condensation drains on drum drip connections and drain low points during fall and winter inspection.

### Special Systems - Water Deluge, Foam, CO-2, Dry Powder

Test alarms when facilities and conditions permit according to the procedures suggested by the manufacturer(s) and/or as requested by the insurance authority having jurisdiction.

Test the detection or actuating system and accessory equipment according to the manufacturer's instruction and the requirements of the insurance authority having jurisdiction.

## Replacement Parts and Field Service Adjustments

Provide and replace, when necessary, renewable rubber gaskets, rubber clapper facings, and renewable valve discs for control valves. Perform field service adjustments for all control and alarm devices.

## Reports:

- A report of inspection, test results, services performed, and desirable improvements shall be completed on a Standard National Automatic Sprinkler and Fire Control Association Inspection Report Form, which shall be sent to the Subscriber; a copy shall be sent direct to the office of this Association having jurisdiction.

# EXHIBIT 2

## Capital Reporting Company

Page 1

```
1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - X

3    ST. PAUL MERCURY INSURANCE      :

4    COMPANY, as Subrogee of          :

5    Gallaudet University,            :

6              Plaintiff,             :

7         v.                    : Case No.:

8                               : 1:05-cv-02115

9    CAPITOL SPRINKLER               :

10   INSPECTION, INC.,               :

11             Defendant.            :

12   - - - - - - - - - - - - - - X

13                      Washington, DC
                    Monday, August 14, 2006
14   Deposition of:
                    VERNON VANE
15   called for oral examination by counsel for

16   Plaintiff, pursuant to Notice, at the Law Office

17   of Mesirow and Stravitz, 2000 Massachusetts

18   Avenue, NW, Washington, DC, before Kim Brantley of

19   Capital Reporting, a Notary Public in and for the

20   District of Columbia, beginning at 10:08 a.m.,

21   when were present on behalf of the respective

22   parties:
```

# Capital Reporting Company

Page 18

1    A. Yes.
2    Q. Who was Poplin's helper?
3    A. Rudy.
4    Q. Rudy Cooper was Poplin's helper?
5    A. Well Virgil worked with -- Virgil was
6    with me and actually when we were going then Mike
7    and Rudy were together.
8    Q. I'm sorry, you lost me there for a
9    second. Poplin worked with you as a helper for a
10   while?
11   A. Yes.
12   Q. And Rudy worked with Mike Bowlin?
13   A. Yes.
14   Q. As a helper?
15   A. As a helper, yes.
16   Q. Even though he was more experienced
17   than Mike Bowlin?
18   A. Well, I wouldn't say he was more
19   experienced.
20   Q. On the inspection side?
21   A. On the inspection side, yes, yes. I
22   mean, you say "helper." I mean, I just -- they

Page 19

1    worked together.
2    Q. A team?
3    A. Teamwork, yes.
4    Q. But as of January of 2003, Mike Bowlin
5    was your least experienced inspector?
6    A. No.
7    Q. Who was your least experienced
8    inspector?
9    A. Tim Francis.
10   Q. I thought he was a helper?
11   A. Okay. Inspector. Yes, Mike was the
12   least.
13   Q. And he had only started doing
14   inspections when, Mike Bowlin?
15   A. Maybe a year or two before that.
16   Q. And in terms of his on-the-job training
17   for inspections, not for installing, he had been
18   installing for some years, correct?
19   A. Correct.
20   Q. Who gave him his OJT for inspections?
21   A. I did and -- well, as a team, they went
22   out together and then if they had any problems I

Page 20

1    oversaw whatever they did.
2    Q. Who is "they"?
3    A. If he and Rudy went together, then.
4    Q. But in terms of training, both Mike and
5    Rudy could do this inspection job. That would be
6    one of your functions as supervisor?
7    A. Right.
8    Q. Can you give me a brief description of
9    your educational background, please?
10   A. High school graduate.
11   Q. What year? Well you must go to
12   reunions once in a while?
13   A. No, I don't. '60 I think, somewhere
14   around there.
15   Q. Any formal education after that?
16   A. No, just went in the union. I was in
17   the United Association of Pipe Fitters.
18   Q. Pipe fitters?
19   A. Yes, and sprinkler fitters and did the
20   five years and finished that.
21   Q. Was that right after high school?
22   A. No, it was -- it was after my first

Page 21

1    marriage. So that would have been around '64 I
2    think I started.
3    Q. So you started working for Capitol
4    around 1990?
5    A. No, it was eighty -- I'm trying to
6    think -- my oldest is twenty-five.
7    Q. Oh, you said twenty-three years. I'm
8    sorry.
9    A. I think it was '80, '80 or '81
10   somewhere in there. I'm not real sure.
11   Q. And between the time you finished your
12   apprenticeship in the union and '81, did -- '80,
13   '81 when you went to Capitol, did you have any
14   other jobs in the sprinkler industry?
15   A. No. After I -- well I worked for
16   Grinnel Company. I was there for almost ten
17   years.
18   Q. What did you do for them?
19   A. Same thing, in the field.
20   Q. Inspections?
21   A. No, no, job foreman and installer.
22   Q. Why did you leave there?

6 (Pages 18 to 21)

## Capital Reporting Company

Page 30

1  always told them about drum drips and low point
2  drains and so forth and that they had to be taken
3  care of.
4      Q.  Who is the "they" you're referring to?
5      A.  Okay, any maintenance people or anyone
6  that is in charge in the building.
7      Q.  You were answering my question
8  specifically with regard to this situation at
9  Gallaudet and it was not meant to be for this
10  situation.  I meant in general.  As in general?
11      MR. BROOKS:  Can I have the original
12  question read back, because I thought it did ask
13  about non-employees of Gallaudet University.
14      THE REPORTER:  "Question: As an
15  example, just as an example, did you ever train or
16  instruct any of your inspectors or helpers that it
17  was okay for them to permit or authorize some
18  non-employee of Capitol, I don't care who it is,
19  any non-employee of Capitol to do any part of the
20  work they were supposed to be doing?
21      "Answer:  We always instructed them to,
22  and showed them how to do the draining, which is

Page 31

1  is what they had to do.  I mean we were only there
2  initially and then in a six month frame, so we
3  always told them about drum drips and low point
4  drains and so forth and that they had to be taken
5  care of.
6      "Question: Who is the 'they' you're
7  referring to?
8      "Answer: Okay, any maintenance people
9  or anyone that is in charge in the building.
10      "Question: You were answering my
11  question specifically with regard to this
12  situation at Gallaudet and it was not meant to be
13  for this situation.  I meant in general.  As in
14  general."
15      MR. BROOKS:  A non-employee of Capitol,
16  thank you.
17  BY MR. GROTH:
18      Q.  We're going to go over that question
19  again.  I'll try to rephrase it a little
20  differently.
21      Did you ever train your employees that
22  it was okay for them not to do all the work that

Page 32

1  had to be done to test the system but that they
2  could allow other people who were not employees of
3  Capitol to do some of the work?
4      A.  During the testing?
5      Q.  Yes.  During the testing or inspection
6  of these sprinkler systems.
7      A.  No.
8      Q.  Is there anything in the NFPA 25 that
9  authorizes or permits people who are not familiar
10  with or trained in the -- to do the type of
11  inspections that we just talked about to do the
12  procedures that are outlined in NFPA 25 to test
13  and inspect these systems?
14      A.  I don't know.  I couldn't state -- I
15  don't know what the book says regarding that.
16      Q.  Do you know if there are any provisions
17  in NFPA 25 which talk about experience -- the
18  experience or training that someone should have in
19  order to do this type of work?
20      A.  Not that I'm aware of.
21      Q.  Have you, in your fifteen years as a
22  supervisor of inspections in doing field work

Page 33

1  during that period of time, ever permitted one of
2  your customers or asked one of your customers to
3  do any part of the work that Capitol Sprinkler was
4  contracted to do?
5      A.  Not that I can recall.
6      Q.  Why not?  Why would you not do that?
7      A.  Why would I?  I mean, if I'm there to
8  do a job, we're going to do the job, and that's
9  it, but we do -- we do it while we're there.  I
10  mean --
11      Q.  And when you say "the job," do you mean
12  the whole job, that means --
13      A.  Well, whether it be dry system, wet
14  system, fire pump, whatever.
15      Q.  But I'm talking about the job from
16  beginning to end.  So for example if you have a
17  dry system.
18      A.  Right.
19      Q.  You start out by testing the system,
20  you let the air leak out, you fill the pipes with
21  water and you take your measurements, whatever you
22  have to do, and then you have to drain the system

9 (Pages 30 to 33)

Capital Reporting Company

Page 34

1  completely?
2      A.  Right.
3      Q.  And then you have to set it back up so
4  it can operate again and then you certify that you
5  did the test, correct?
6      A.  Correct.
7      Q.  So you have not ever in your history as
8  a supervisor asked one of your customers or one of
9  their employees to do part of that job for you,
10  any part of that job?
11      A.  No.
12      Q.  And just so we're clear on this,
13  because one of the prior answers you gave I think
14  referred specifically to the Galaudet situation.
15  You were talking about discussions you had with
16  some people about drain points and that kind of
17  stuff?
18      A.  Right.
19      Q.  Let's talk about the Gallaudet
20  situation for a moment and we will get to some of
21  these documents a little bit later, but in
22  general, this was a new account for Capitol in

Page 35

1  terms of the inspections, relatively new?
2      A.  No, we had done it from '96 to '99 and
3  then I think that's when the -- another company
4  took over.
5      Q.  Who was that?
6      A.  I guess it would be David Ham.  What is
7  it?  Whose name --
8      Q.  Are you talking about --
9      A.  Aramark was I believe the first
10  building maintenance people.
11      Q.  And Capitol had a contract with Aramark
12  to do these inspections?
13      A.  Yes, Aramark from -- according to my
14  record '96 to '99.
15      Q.  And then Guest Services after that?
16      A.  And then Guest Services.
17      Q.  And then you had a contract with Guest
18  Services?
19      A.  Right, we signed that in --
20      Q.  I think it was 2002?
21      A.  Right, 2002.
22      Q.  What happened between 1999 and 2002?

Page 36

1      A.  I have no idea.
2      Q.  But you weren't working there?
3      A.  I wasn't there.
4      Q.  Were you actually doing these
5  inspections yourself out in the field between '96
6  and '99?
7      A.  Yes.
8      Q.  So you had some familiarity with the
9  system?
10      A.  Yes.
11      Q.  And then you started up with Guest
12  Services again in 2002, correct?
13      A.  Correct.
14      Q.  And the first inspection that Capitol
15  did after that contract was signed was in July of
16  2002, correct?
17      A.  Correct.
18      Q.  And you participated in that inspection
19  yourself?
20      A.  I was down there, yes.
21      Q.  And who were you with?
22      A.  It was Mike and Tim Francis.

Page 37

1      Q.  And at that inspection, did you
2  basically show Mike Bowlin the lay of the land,
3  where everything was that he had to look at and
4  run it through the procedure through this location
5  since you had been there before?
6      A.  Yes, yes.
7      Q.  How did you know where everything was,
8  and not necessarily in July of 2002, but even in
9  1996, did you have a sketch or a plan or a diagram
10  or something of all this equipment?
11      A.  Yes, there was diagrams, but I know
12  everything is basically in separate locations,
13  specific locations.
14      Q.  Yes, that's what I want to know.  How
15  did you know where the specific locations were?
16      A.  I wasn't looking for them.
17      Q.  Did you have --
18      A.  I mean, the fire pump room is the fire
19  pump room, and the dry pipe valves, in that case,
20  are on the fifth floor, and the inspectors' tests
21  and so forth are here and you know everything is
22  rather obvious.

10 (Pages 34 to 37)

## Capital Reporting Company

Page 38

1    Q. Okay. But in any event, over your
2  three years doing inspections you knew where
3  everything was. You really didn't need any sketch
4  or anything?
5    A. Basically.
6    Q. So you took Mike Bowlin around and Tim
7  Francis and you showed them what to do, correct?
8    A. Yes.
9    Q. I'm sorry, we're back to July of 2002?
10   A. Three.
11   Q. 2002.
12   A. Yes, right.
13   Q. At that time, were you aware that Guest
14 Services was a managing agent for the building
15 for Gallaudet University?
16   A. Yes.
17   Q. The contract was signed with Guest
18 Services basically, wasn't it?
19   A. Yes. We -- yes. That's true.
20   Q. And you made your arrangements to
21 inspect the building in terms of scheduling and
22 making sure somebody was there to give you access

Page 39

1  and whatever through Guest Services?
2    A. Through David Ham.
3    Q. Who was he?
4    A. He was the chief, I guess you would
5  call it.
6    Q. Of --
7    A. Head of maintenance.
8    Q. Of? Is he a Guest Services employee?
9    A. Guest Services.
10   Q. I want to know what you thought at that
11 time.
12   A. Guest Services.
13   Q. Did you do this type of work for any
14 other buildings on the Gallaudet campus other than
15 the Kellogg Conference Center?
16   A. No, sir, just that building.
17   Q. And back in July of 2002, did you make
18 arrangements with David Ham of Guest Services to
19 do this inspection?
20   A. Yes.
21   Q. And who if anybody was present for that
22 inspection from Guest Services?

Page 40

1    A. We typically started outside with the
2  pump. Nobody was there for that, and then once we
3  moved inside, then we would go to the desk and
4  tell them that we were ready to do inside, or go
5  down to David's office, either way, and they would
6  be -- send somebody or he would assign somebody to
7  go with us.
8    Q. Ham did not go with you, himself?
9    A. No.
10     MR. BROOKS: Are we talking July?
11     MR. GROTH: Yes, we're talking July
12 '02.
13 BY MR. GROTH:
14   Q. Why did you need somebody from Guest
15 Services to accompany you?
16   A. For access, keys, things of that
17 nature.
18   Q. What were you getting access to that
19 needed a key?
20   A. Well there were locks on the valves
21 that had to be unlocked and rooms, things of that
22 nature.

Page 41

1    Q. Okay. And do you know who Mr. Ham
2  assigned to you to do that?
3    A. No.
4    Q. Can you describe the person physically?
5    A. As I recall.
6    Q. Yes.
7    A. A tall, slender black man.
8    Q. Age, approximately?
9    A. Thirties.
10   Q. Did he wear any kind of uniform, like a
11 shirt with "maintenance" like a name on it or a
12 company name or anything like that?
13   A. I don't recall, I don't recall.
14   Q. Even if he did and he had his name
15 stitched on the shirt, you wouldn't recall that
16 one way or the other?
17   A. No, no.
18   Q. Is this the first time you ever saw
19 this person?
20   A. Yes.
21   Q. In other words he had not been there
22 between 1996 and 1999?

11 (Pages 38 to 41)

## Capital Reporting Company

Page 42

1    A.  No.
2    Q.  Now, is he the only person who
3  accompanied you to unlock these areas that needed
4  to be unlocked in July?
5    A.  As I recall, yes.
6    Q.  And were you given access to all the
7  areas that you needed to be given access to to do
8  the completed testings and inspection?
9    A.  Yes.
10    Q.  And how many of those areas or valves
11  or whatever require a key?
12    A.  Just the ones that are sort of in the
13  public area, like the stairways and things.
14    Q.  By count, can you give me a number
15  approximately how many there are?
16    A.  Two on the fifth floor and one on the
17  fourth floor, I believe it is.
18    Q.  Now does that include those valves that
19  are locked that you need a key for also?
20    A.  I believe the control valves on the
21  drive point valves had a chain on them also.  I
22  believe they did. I don't recall exactly, but.

Page 43

1    Q.  And would need a key for that?
2    A.  And would need a key for that.
3    Q.  So that's a total of about four
4  different keys that have to be used to give you
5  access --
6    A.  More than likely they were all keyed
7  alike.  That's typical.
8    Q.  So you generally used the same key?
9    A.  More or less.
10    Q.  But basically four or five different
11  areas where you have to have access to where you
12  need a key to do your work?
13    A.  Basically.
14    Q.  And this one person who was with you is
15  the one who went around and gave you access to do
16  all that, correct?
17    A.  Yes.
18    Q.  Did any direct employee of Gallaudet
19  accompany you on that inspection of the tour.
20    A.  No.
21    Q.  Now, getting a roundabout way back to
22  that earlier answer about you trying to tell your

Page 44

1  customers certain information about their system,
2  correct?
3    A.  Right.
4    Q.  The person that you told about this
5  system or that you talked to about this system,
6  the only person that you are talking about is this
7  tall, slender black man in his thirties from July
8  of 2002, correct?
9    A.  No.  He just assisted us, I mean,
10  walked with us and unlocked things.  That's all he
11  did.
12    Q.  Let me rephrase the question.  Did you
13  have any discussion with that man concerning how
14  this system operates?
15    A.  None that I can remember.
16    Q.  Did you have any discussion with him
17  about the procedure you need to follow to drain a
18  drum drip?
19    A.  No.
20    Q.  Did you know anything about the history
21  or competency or reliability of the person that
22  accompanied you in July of 2002?

Page 45

1    A.  No.
2    Q.  From your recollection, do you recall
3  if this person did anything to indicate to you
4  that he knew something about sprinkler systems and
5  how to test them and inspect them and do the type
6  of work that Capitol Sprinkler is doing?
7    A.  No.
8    Q.  When Capitol finished doing that work
9  in July of 2002, does it require some sign off by
10  some representative of the building?  In other
11  words, a sheet to be signed or anything like that?
12    A.  No.
13    Q.  Is that customarily the case with all
14  customers?
15    A.  That's basically the way we do.  We
16  have a triple part sheet and once we're finished,
17  you sign it, date it and fill it all in, and we
18  leave one hanging in the folder, one for the pump,
19  one for the dry systems and one for the wet
20  systems, in that case.
21    Q.  And do you send Guest Services or
22  Gallaudet a copy of those?

12 (Pages 42 to 45)

## Capital Reporting Company

Page 50

1    A.  That's correct, yes.

2    Q.  This is what I was asking you about,

3  where these reports go.  It says, "Report of

4  inspection, test results, services performed and

5  so on shall be completed on a standard National

6  Automatic Sprinkler and Fire Control Association

7  inspection report form which shall be sent to the

8  subscriber.  A copy shall be sent direct to the

9  office of this association having jurisdiction."

10        What does that mean?

11    A.  I don't know.

12    Q.  Okay.  And when you say you provided it

13  to the subscriber, are you talking about to Guest

14  Services?

15    A.  Whoever we contract with, yes.

16        MR. GROTH:  I'm going to mark another

17  document as Vane Exhibit 2.

18            (Vane Exhibit 2 was

19              marked for

20              identification.)

21  BY MR. GROTH:

22    Q.  At the top it says Capitol Sprinkler

Page 51

1  inspection, Inc., it has no other identifying

2  information except a date, July 2nd, 2002.

3        What is that document, Mr. Vane?

4    A.  That's the trip test for systems one

5  and two.

6    Q.  What are systems one and two?

7    A.  The two dry systems on the fifth floor.

8    Q.  Do those systems each have their own

9  dry pipe valve --

10    A.  Yes.

11    Q.  And drum drips?

12    A.  Yes.

13    Q.  But you only do one report for both --

14  oh, I see both are listed --

15    A.  System one and system two.

16    Q.  Okay, I got it.  You're familiar with

17  the incident in question, are you not?

18    A.  Yes, I am.

19    Q.  The water leak situation, in January of

20  2003.  Which system was it where the leak

21  occurred?  One or two?

22    A.  I don't know.

Page 52

1    Q.  You can't tell from the document?

2    A.  No.

3    Q.  In the checklist of items here, is

4  there any item of the sixteen that are listed here

5  that refers specifically to draining the drum

6  drips after the test is done?

7    A.  No.

8    Q.  Is there anyone of those sixteen items

9  that would include, even though not referenced by

10  name, include the draining of the drum drips?

11    A.  No.

12    Q.  Isn't that something that has to be

13  done, by the inspector?

14    A.  Drain the drum drips?

15    Q.  Yes?

16    A.  Yes.

17    Q.  Why is there no check line for that?

18  Let me rephrase that.  Why is there no number for

19  that item that has to be done?

20    A.  We just do it and if we have a problem

21  with it, we note it on the problem.

22    Q.  Let's talk about that for a second.

Page 53

1  If for some reason you cannot do the work --

2    A.  Right.

3    Q.  In general, not just Gallaudet, in

4  general if you cannot do the work that you are

5  contracted for to do, some part of the system is

6  inaccessible, maybe there is some construction

7  work or something that would impede you from doing

8  the work, but you did go out and do some of the

9  work, would you generally put some kind of

10  notation in this area of the bottom of the form

11  that says "deficiencies" and says what you did do

12  and what you didn't do and why you wouldn't do it?

13    A.  Yes.

14    Q.  That would be your practice, right?

15    A.  Yes.

16    Q.  Is that what you instruct your helpers

17  to do also?

18    A.  Yes.

19    Q.  And obviously for this visit on July

20  2nd, 2002, on Vane Exhibit 2, there were no

21  deficiencies.  Everything was done as it was

22  supposed to be done.  Is that correct?

14 (Pages 50 to 53)

Capital Reporting Company

Page 66

1    Capitol Sprinkler?
2        A.  Yes.
3        Q.  Is there any type of employee log or
4    daily diary or any other type of paperwork that
5    the employees have to fill out to show where they
6    were on any given day?
7        A.  No.
8        Q.  How about in their time cards?  Does it
9    list places where they went, the jobs that they
10   did, how much time they spent there?
11       A.  No.
12       Q.  Was there anything unusual or unique
13   about the testing and inspection of the dry pipe
14   systems at Gallaudet?
15       A.  No.
16       Q.  Nothing out of the ordinary that
17   presented any particular problem for the
18   inspectors to handle?
19       A.  No.
20           MR. BROOKS:  Are we talking July '02?
21           MR. GROTH:  Yes, in July or January of
22   '02?

Page 67

1           THE WITNESS:  No.
2    BY MR. GROTH:
3        Q.  Does Capitol Sprinkler have any
4    documents, written documents with any type of
5    writing or notation indicating that somebody else
6    at the building agreed to drain one of the drum
7    drips during that January 9th, 2003 inspection?
8        A.  No.
9        Q.  Does Capitol Sprinkler have any
10   documents, any written documents to indicate that
11   it provided any explanations or instructions or
12   training to anybody at the building in July '02 or
13   January of '03 as to how to properly drain a drum
14   drip?
15       A.  No.
16       Q.  Does Capitol Sprinkler have any
17   documents in its business records to indicate that
18   it was not provided access to all drain areas of
19   the Gallaudet dry pipe system during the January
20   9th, 2003 inspection?
21       A.  No.
22       Q.  Who is Ann Golden?

Page 68

1        A.  She's our office manager, accountant.
2        Q.  Does she send out the bills?
3        A.  Yes.
4        Q.  Who is Bill Treece, T-r-e-e-c-e?
5        A.  He's the owner.
6        Q.  Who is Charles Otis?
7        A.  Oh, he's an outside mechanic,
8    installer.
9        Q.  Do you know if he did some of the
10   repairs after the leak?
11       A.  Yes, I believe Craig called him and
12   they have a service truck.
13       Q.  Okay.  With materials on, tools, that
14   kind of stuff?
15       A.  Exactly.
16       Q.  How about Andrew Nichols,
17   N-i-c-h-o-l-s?
18       A.  Andrew Nichols?  Yes, he used to work
19   for us.
20       Q.  What did he do?
21       A.  He was never a volunteer.
22       Q.  What did he do?

Page 69

1        A.  Just a helper.
2        Q.  Did he ever go to Gallaudet for any
3    reason that you know?
4        A.  Well, not that I can recall.
5        Q.  He's listed on Rule 26A disclosures by
6    Capitol as somebody having knowledge about the
7    circumstances surrounding the day of the loss.
8        A.  Andrew Nichols.
9        Q.  I'm sorry, wrong name.  I was looking
10   at Charles Otis. He's listed by Capitol Sprinkler,
11   somebody having information regarding the
12   circumstances surrounding inspections of the
13   subject property.
14       A.  If he does, I mean, it's -- he was
15   just a helper.  He was down there with somebody,
16   maybe me.
17       Q.  In July or January of 2002, 2003, or
18   maybe in 1996 to '99?
19       A.  I'd say prior to all that, yes.
20       Q.  I asked you to sign a contract and you
21   couldn't make out the name.  Does the name Mike
22   Mahoney ring a bell?

18 (Pages 66 to 69)

## Capital Reporting Company

Page 70

1   A. Yes. Mike was the very first -- I
2   think he was with the other Arawana --
3   Q. Aramark?
4   A. Aramark. I think Mike was with them.
5   Because when he left here he went to Boston with
6   them.
7   Q. So you might have had some dealings
8   with him between '96 and '99?
9   A. Initially, yes, when we first came in
10  here. He was the --
11  Q. Was the only reason that there were
12  three people doing the job, the inspection job on
13  July 2nd, 2002, because basically we're showing
14  Mike Bowlin how to do it?
15  A. I just came down to assist. I just
16  sometimes just come along, make sure things are
17  going all right.
18  Q. For the whole day or just for one --
19  A. No, I was just here and David Ham had
20  requested I come down.
21  Q. Why did he request that you come down?
22  A. Well, I think that was the day we all

Page 71

1   went over the system. He had some questions.
2   Q. July?
3   A. July I think it was, yes.
4   Q. And what questions did David Ham about
5   the system?
6   A. Just, you know, what the equipment was
7   all about and how did it work and where
8   everything -- you know more or less everything
9   was, the setups, the fire pump, you know the
10  connections for where we tested from, so forth.
11  Q. But he did not accompany you throughout
12  all of your inspections?
13  A. No, no.
14  Q. And you did not show him how to do
15  every aspect of your inspection?
16  A. No. We just went through it with him
17  with some drawings that he had and we -- as I
18  recall we came to the fire pump room and, you
19  know, this is the main valve and this is the back
20  flow, that kind of thing, and he was -- he made
21  notes on his drawings.
22  Q. From your visit with Mr. Ham, you have

Page 72

1   any reason to believe that he had any specialized
2   knowledge in the operation, maintenance, repair,
3   installation of sprinkler systems?
4   A. No.
5   Q. From what you have described --
6   A. Right, no knowledge.
7   Q. You were telling him about these
8   systems?
9   A. Right, exactly.
10  Q. Who actually prepared that July 2nd,
11  2002 report, Vane Exhibit 2?
12  A. I don't know who wrote it. It kind of
13  looks like my writing.
14  Q. Okay. Whose printing is on the bottom
15  where the names are? Do you know?
16  A. No, I couldn't swear to it.
17  Q. It's not yours?
18  A. It may be. Because I do print like
19  that sometimes.
20  Q. Okay.
21  A. But it could have been Tom, I don't
22  know.

Page 73

1   Q. Actually it looks pretty similar to the
2   January 9th form. Do you know?
3   A. Yes, it does. It might even be Mike.
4   He got neat.
5   Q. We're up to the date of loss, January
6   25th, 2003. How were you first informed that
7   there had been a leak of the sprinkler system at
8   the Gallaudet building?
9   A. Craig called me on Sunday.
10  Q. Craig Parham?
11  A. Craig Parham, yes, on a Sunday, the
12  26th.
13  Q. What did he tell you?
14  A. He said they had a breakdown there in
15  the dry system.
16  Q. Did you know a time of day it was when
17  you got the call, approximately?
18  A. I do, because I've got the read out
19  from the answering service. I believe it was
20  around 6:50 something.
21  Q. P.M.?
22  A. P.M., yes.

19 (Pages 70 to 73)

## Capital Reporting Company

Page 86

1 Was it Bowlin or Scott?
2    A.  Probably Mike.
3    Q.  Did he describe the guy?
4    A.  No.
5    Q.  Did he say whether or not it was the
6 same guy that you and he had accompanied you
7 during the July inspection?
8    A.  No.
9    Q.  Did they tell you whether or not they
10 knew the guy's name?
11    A.  No.  Because we all asked that and
12 nobody seemed to recall names.
13    Q.  The drum drip that was not drained, was
14 that one of the drain points that you needed a key
15 to get to to open a door to get in a room to get
16 to the hatch?
17    A.  Yes.
18    Q.  I thought before you said that the guy
19 who had the key generally could open all the locks
20 with one key.  Is that correct?
21    A.  Yes, my understanding is that is in the
22 hotel and it's operated not by a key, but by a

Page 88

1 tell the guy to go get the key to open the door?"
2    A.  Well, they asked him, it's my
3 understanding that they asked and he said he would
4 take care of it later.  That was it.
5    Q.  Well that wasn't my question.  Did you
6 ask or did Mr. Parham ask Mr. Bowlin, "Why didn't
7 you tell the guy to go get the key to open the
8 door?"
9    A.  I didn't ask that question, no.
10    Q.  Did Mr. Bowlin tell you that he knew
11 anything about this guy who apparently made the --
12 or allegedly made the proposition that he would
13 get the key and come back and drain this himself?
14 Did he know anything about the guy?
15    A.  Anything about work history?
16    Q.  No.
17    A.  Anything about his familiarity with the
18 sprinkler system?
19    Q.  No.
20    A.  Anything about his knowledge and
21 ability to manipulate a drum drip and make sure
22 that this process that you described earlier about

Page 87

1 card.
2    Q.  The door?
3    A.  The door.
4    Q.  So was it your understanding from what
5 Mr. Bowlin was saying that this guy didn't have
6 the card on him?
7    A.  Exactly.
8    Q.  In interrogatory answers, which we will
9 get to in a second, I think the terminology used
10 in one of the answers was this person from the
11 building was "unwilling" to get the key.  Do you
12 recall that being in the interrogatory answers?
13    A.  I do recall that, yes.
14    Q.  In what sense did you understand from
15 the information you were getting from Mr. Bowlin
16 why this guy would be unwilling to get them the
17 key to do this work?
18    A.  I don't have a feel for that.  I mean,
19 Mike was there, you know.  I didn't have any -- I
20 don't know what the conversation was exactly.
21    Q.  Okay.  Did you question Bowlin about
22 that, like ask him the question, "Why didn't you

Page 89

1 opening and closing it, making sure all the
2 water's out, any inkling that this guy knew
3 anything about how to do that?
4    A.  Yes -- no, I don't know what Mike knew
5 about the gentleman.
6    Q.  Did Mike Bowlin tell you that he gave
7 this guy any type of instruction on how to do any
8 of this stuff?
9    A.  No.
10    Q.  Did Mike Bowlin tell you whether or not
11 he considered calling back to the office, to you
12 or to somebody else at the office, to see if this
13 procedure would be okay with you guys?
14    A.  No.
15    Q.  Did you suggest he should have done
16 that?
17    A.  No, not that I recall.
18    Q.  Other than telling Mr. Bowlin that he
19 should have noted on the inspection report, under
20 the deficiency section, that they did not drain
21 the one drum drip and that somebody else allegedly
22 volunteered to do that, did you have any other

23 (Pages 86 to 89)

Capital Reporting Company

Page 90

1  criticisms of Mr. Bowlin's or Mr. Scott's
2  performance in that last inspection during that
3  meeting?
4      A.  None.
5      Q.  You told me earlier that in all your
6  years of doing inspections you had never asked a
7  representative of a customer or a building person,
8  whatever, to do any of the job that Capitol was
9  contracted to do.  Do you recall that testimony?
10     A.  Um-hum -- yes.
11     Q.  Did you tell them that it was not
12  appropriate for them to permit anybody, whether
13  they volunteered or didn't volunteer, to do any of
14  the work that Capitol's people were supposed to be
15  doing?
16     A.  No, I didn't tell them that.
17     Q.  Was there any type of disciplinary
18  action taken with regard to Mr. Bowlin or Mr.
19  Scott?
20     A.  No.
21     Q.  Docked a day's work or --
22     A.  No.

Page 91

1      Q.  Any penalty at all?
2      A.  None.
3      Q.  No reduction in hourly wage, that type
4  of thing?
5      A.  No.
6      Q.  What was Mr. Bowlin getting paid back
7  in January of 2003?
8      A.  I don't know.
9      Q.  Can you give me a range?  He was paid
10  by the hour I assume?
11     A.  By the hour, right.  I don't know, I'm
12  going to guess, twenty to twenty-two dollars an
13  hour.
14     Q.  What about Mr. Scott?
15     A.  Fifteen to seventeen, somewhere in that
16  range.
17     Q.  At that meeting with Mr. Parham, was it
18  discussed that somebody would make some attempt to
19  find out who this person was who allegedly said he
20  would drain the remaining drum drip at that
21  January inspection?
22     A.  Well, -- no, no.

Page 92

1      Q.  Did you make any attempt to find out
2  who that person was?
3      A.  No, I didn't.
4      Q.  You didn't call Mr. Ham up?
5      A.  No, I didn't.
6      Q.  You didn't call anybody else up at the
7  building?
8      A.  I don't recall calling anybody, no.
9      Q.  Find out who was on duty that day?
10     A.  Craig said that the fellow that was on
11  duty at that day was -- that he had trouble
12  understanding the gentleman, that he didn't speak
13  English very well.  So I'm just going by what he
14  said.
15     Q.  I forgot about that.  Parham had been
16  out there already, because he was the --
17     A.  Yes, he was the initial responder.
18     Q.  And Parham thinks he actually met the
19  guy that the inspectors say they met with?
20     A.  No.
21     Q.  That was a different guy?
22     A.  Different guy.

Page 93

1      Q.  Okay.  So when Parham -- well when
2  Parham was out there, the two of you had not yet
3  had this conversation with the two inspectors?
4      A.  No.
5      Q.  So you don't think Parham discussed
6  anything at that time when he was doing the
7  repairs out there about that issue, that the issue
8  of some guy saying, "I'll drain this drain for you
9  later"?
10     A.  Oh, no, no.
11     Q.  Was Parham out there after that for any
12  reason, to your knowledge?
13     A.  I don't know.  I think he was here,
14  according to one of those tickets, the 27th.
15     Q.  I'm talking about after your meeting
16  with the two inspectors.
17     A.  Oh, no, I don't know that he ever came
18  back out.
19     Q.  So you didn't do anything to try to
20  find out the name of the guy who supposedly made
21  this offer that he would drain the drains after
22  the September inspection?

24 (Pages 90 to 93)

## Capital Reporting Company

Page 94

1    A.  Well, we discussed that and nobody
2    could come up with a name.  I mean, we just didn't
3    know.
4    Q.  Well, eventually somebody came up with
5    a name.  Isn't that correct?
6    A.  Yes.
7    Q.  In your Answers to Interrogatories,
8    there is a name?
9    A.  Right.
10    Q.  Where did the name come from?
11    A.  That's the guy that signed off on
12    the -- that signed off on the receipt.  When I
13    brought -- I can't remember we brought it down or
14    sent it down, but anyway the broken fittings in
15    the sprinkler head they wanted.
16    Q.  Yes.
17    A.  Was given to him and he signed off for
18    that.
19    Q.  That's Mr. Hubbard?
20    A.  Hubbard, yes, and we're not -- we're
21    surmising that possibly he was the gentleman that
22    was --

Page 95

1    Q.  What's the basis of that surmise?
2    A.  Just somebody that -- he seemed to fit
3    the general description that we both -- or we all
4    had.
5    Q.  So Mr. Bowlin and Mr. Scott didn't
6    point this guy out to somebody and say he's the
7    guy that was there that day?
8    A.  No.
9    Q.  Did they ever go back there for any
10    reason that you know of to the Gallaudet building
11    after the leakage?
12    A.  No.
13    Q.  And as I understand it, at some point
14    after this incident, when the repairs were done,
15    Capitol took with it the ruptured fitting?
16    A.  Yes.  Craig left -- he had brought them
17    with him.
18    Q.  Right.
19    A.  That night, and left them with me.
20    Q.  Right.
21    A.  And just -- I just said, well, we'll
22    hang on to these.

Page 96

1    Q.  Right.
2    A.  And then somebody requested them, so I
3    took them -- I believe I brought them down and
4    dropped them off to them.
5    Q.  But that was some time later?
6    A.  Within the next week or so I think.
7    Q.  Okay.
8    A.  I got a sheet with a date on it, yeah,
9    a transmittal.
10    Q.  Do you have it with you?
11    A.  No, I didn't bring it with me.
12    Q.  Do you know what the approximate date
13    was?
14    A.  No, I don't recall.
15    Q.  This was the end of January.  Was it
16    some time in the beginning of February?
17    A.  I don't recall.
18    Q.  And why did somebody, to your
19    understanding, why did somebody request that you
20    give them the fitting that broke?
21    A.  I assume that their insurance company
22    or someone asked for it.

Page 97

1    Q.  Okay.  Was there any doubt in anybody's
2    mind at Capitol that this fracture took place
3    because of freezing of water in the line that
4    should not have been there?
5    A.  No, it's obvious.
6    Q.  Everybody knew it, right, correct?
7    A.  Correct.
8    Q.  There was no attempt to find out any
9    other cause for this fracture, other than what had
10    appeared just by looking at it, that it froze and
11    broke?
12    A.  Just by looking at it.
13    Q.  You saw other frozen fittings and
14    broke?
15    A.  Oh, yes.
16    Q.  Years as an installer, you know what
17    they look like, right?
18    A.  Exactly.
19    Q.  Are you aware of any facts or
20    information to indicate that Gallaudet University
21    did anything to cause or contribute to cause this
22    pipe rupture?

25 (Pages 94 to 97)

Capital Reporting Company

Page 110

1    Q.  And you only noted one error that you
2  thought existed in the Answers to Interrogatories,
3  number four, where it says "On January 9th Mike
4  Bowlin and Tom Scott performed a trip test," and
5  winter check and as I understand it, the part
6  that's wrong is the trip test part.  There was no
7  trip test done?
8    A.  None.
9    Q.  But there is a winter check?
10    A.  Winter check, correct.
11    Q.  Other than that all the other
12  information as you understand it is correct and
13  accurate?
14    A.  It appears to be, yes.
15    Q.  With regard to Interrogatory Number 3,
16  it states in part, the answer is during the
17  January 2003 inspection, "Gallaudet/Guest Services
18  failed to provide access to the subject drum drip.
19  Terrence Hubbard, a representative of
20  Gallaudet/Guest Services, who was escorting
21  Capitol employees during inspection, did not have
22  the proper key to access a certain conference

Page 111

1  room."
2    I want to make sure I understand this.
3  The only information that you have that Mr.
4  Hubbard was the person who was accompanying
5  Capitol's inspectors on January 9th, 2003 was the
6  fact that Mr. Hubbard signed for the evidence
7  after -- about a week or so after the incident
8  took place.  Is that correct?
9    A.  Right.
10    Q.  That's it?
11    A.  Well, we didn't have a name, and then
12  it was -- yes, that was it.
13    Q.  Would it be fair to say that other than
14  Mr. Ham, knowing Mr. Ham and meeting Mr. Ham, you
15  didn't know the names of any of the building
16  personnel?
17    A.  No.
18    Q.  And would that be true also for Mr.
19  Bowlin and Mr. Scott?
20    A.  I don't know with them.  They were here
21  more than I was.
22    Q.  Well, just one more time than you were?

Page 112

1    A.  Yes, but, no, I didn't know any of
2  the --
3    Q.  And they knew it was not Mr. Ham that
4  accompanied them?
5    A.  Exactly.
6    Q.  Because they had met Mr. Ham in July?
7    A.  Exactly.
8    Q.  Or Mr. Bowlin had met Mr. Ham in July?
9    A.  Right.
10    Q.  Basically that's the only other name
11  that Capitol had, and that's the name that ends up
12  in this answer, correct?
13    A.  Basically, yes.
14    Q.  In your meeting with Mr. Parham and Mr.
15  Bowlin and Mr. Scott a couple of days after this
16  incident took place, did Mr. Bowlin or Mr. Scott
17  tell you whether or not they did anything after
18  leaving the building after that inspection to
19  check with this person at the building to make
20  sure that they had drained the drum drip?
21    A.  No.
22    Q.  That they went back to the building to

Page 113

1  check themselves or they called the guy to ask him
2  or remind him or just to confirm that he had
3  checked -- he had drained the drum drip?
4    A.  No.
5    Q.  Did they say they had done anything
6  like that?
7    A.  No.
8    Q.  Did you ask them?
9    A.  I didn't ask them, no.
10    Q.  Did you ever make a statement to
11  anybody at Capitol Sprinkler after this incident
12  occurred and this meeting with the two inspectors
13  took place that the inspectors were wrong to
14  permit somebody other than a Capitol Sprinkler
15  person to perform or conduct any of the work that
16  Capitol was supposed to be doing?
17    A.  No.
18    Q.  Did anybody else at Capitol make such a
19  statement to you?
20    A.  No.
21    Q.  Did Mr. Parham say, those guys should
22  not have permitted anybody else outside of Capitol

29 (Pages 110 to 113)

## Capital Reporting Company

Page 142

1 alone by themselves?
2    A.  Well I could be downstairs and somebody
3 was outside.  I don't know.
4    Q.  Is it possible, then, that during that
5 inspection period -- you said it was a very early
6 inspection, 7:00 in the morning till about noon --
7 that Mr. Bowlin and Mr. Scott were by themselves
8 on certain valves?
9    A.  That's possible, sure.
10    Q.  Prior to the Gallaudet job in July, how
11 many other jobs had Mr. Bowlin been on as an
12 inspector?
13    A.  I would say a couple of -- at least two
14 hundred.
15    Q.  The size and extent of Gallaudet --
16    A.  Smaller, larger.
17    Q.  Do you know specifically as to dry
18 systems how many he inspected, the size of
19 Gallaudet's?
20    A.  Well they're just -- there are some --
21 most places are all four-inch dry valves.
22    Q.  And all of those inspections that he

Page 143

1 did prior, did he ever have any problems gaining
2 access?
3    A.  To the building?
4    Q.  Um-hum.
5    A.  None that I'm aware of.
6    Q.  Did he ever have any problems gaining
7 access to trip valves?
8    A.  No.
9    Q.  Did he ever call you at any time and
10 say, "I need you to come out here.  I'm not
11 getting access to the valves.  I can't get my job
12 done"?
13    A.  No.
14    Q.  Now you stated on the July inspection,
15 when you and Mr. Bowlin and Mr. Scott were there,
16 you were assisted by a Guest Services employee?
17    A.  I think for the trip test, yes, we did
18 have somebody with us.
19    Q.  Do you know who that was?
20    A.  I don't recall.
21    Q.  Was it the same man that you returned
22 the parts to later on who you now think is Mr.

Page 144

1 Hubbard?
2    A.  I don't recall.
3    Q.  Could you describe the man that you saw
4 in July of 2002.
5    A.  Tallish black man.
6    Q.  And this is for the July 2002?
7    A.  As I recall, yes.
8    Q.  Do you remember if David Ham wore a
9 uniform?
10    A.  White shirt and khakis.
11    Q.  Never had any logo or anything?
12    A.  I thought about that.  I don't recall
13 ever seeing a logo on it.
14    Q.  The individual that followed you around
15 in July, did he have on the white shirt and
16 khakis?
17    A.  I don't think so.  I don't recall.
18    Q.  The individual that followed you around
19 in July, did you ever instruct him how to drain a
20 valve, a drip valve.
21    A.  No.
22    Q.  I'd like you to look at what's been

Page 145

1 marked Vane Exhibits 2 and 3, and specifically I'd
2 like to direct your attention to Number 13.  Could
3 you read what Number 13 is for me.
4    A.  "Dry valves protected from freezing."
5    Q.  And what is the applicable check mark
6 for that?
7    A.  Yes.
8    Q.  And is that on Exhibit 2?
9    A.  Yes.
10    Q.  So both Exhibit 2 and 3 state that the
11 dry valves were protected from freezing?
12    A.  That's correct.
13    Q.  You stated before if there was ever any
14 problem with the inspection that there is some
15 lines provided to fill out information?
16    A.  Yes.
17    Q.  Do you recall if any -- Mr. Bowlin had
18 ever returned a report to you previously that had
19 information on those lines?
20    A.  Yes.  He usually has some remarks, on
21 not all of them, but some, yes.
22    Q.  And on the inspections that you

37 (Pages 142 to 145)

## Capital Reporting Company

Page 150

1    A.  One by one half.
2    Q.  Correct, so it's a straight true run of
3  the one-inch and Ts off of a half inch?
4    A.  Yes.
5    Q.  How familiar are you with the type of
6  pipes used in this system?
7    A.  Plain Schedule 40, black iron pipes.
8    Q.  The same as used in gas lines?
9    A.  Yes.
10    Q.  So it's plain Schedule 40?
11    A.  Black iron pipes, standard issue.
12    Q.  Have you ever seen one with a crack in
13  it prior to installation?
14    A.  A pipe, um-hum.
15    Q.  Is that a yes?
16    A.  Yes, I'm sorry.
17    Q.  You have been here a while, I can
18  understand.  How are you able to spot a crack in a
19  pipe?
20    A.  You don't literally -- well, unless
21  it's very obvious, but most of them show up after
22  you hydrostatically test and you have a problem in

Page 151

1  usually --
2    Q.  How do you hydrostatically test the
3  system?
4    A.  You have a hydrostatic pump.  You hook
5  it up, fill it full of water and pump it up to two
6  hundred and twenty-five or two hundred and fifty.
7  Some jurisdictions it's three hundred and
8  twenty-five.
9    Q.  And that's three hundred and
10  twenty-five PSI?
11    A.  Yes.
12    Q.  Pounds per square inch?
13    A.  Yes.
14    Q.  Which is well above the actual air
15  pressure that would be on those lines?
16    A.  Yes.
17    Q.  Did you ever hydrostatically test the
18  Gallaudet system?
19    A.  All the systems there were tested, yes.
20    Q.  When were they tested?
21    A.  I don't know.  You have to -- that's
22  done by the fire marshal, under construction when

Page 152

1  the building is under construction, and witnessed
2  by them.  I'm sure they have the paperwork.
3    Q.  Prior to you beginning your inspections
4  in 2002, or actually back to your inspection there
5  is 1996 when you first started your inspections
6  there, did you ever separately hydrostatically
7  test the line?
8    A.  No, we never hydro'd ever over there.
9    Q.  So you're not actually aware whether
10  there was a problem with that pipe prior to the
11  incident then?
12    A.  No, I'm not.
13    Q.  You never physically inspected the
14  pipes?
15    A.  No.
16    Q.  With regard to the identification of
17  Terrence Hubbard, at what point in time did you
18  return these broken fittings and have Mr. Hubbard
19  sign them off?
20    A.  I don't recall.  Like I said, we'll
21  provide that document.  I don't recall exactly.
22  It wasn't very long after the incident.

Page 153

1    Q.  Would you say it would be within a
2  month?
3    A.  Oh, I'd say, yes.
4    Q.  Within a two-week period?
5    A.  Possibly, yes.
6    Q.  And how long after the incident did you
7  have your conversation with Mr. Bowlin and Mr.
8  Scott?
9    A.  Oh, it was within the next week or so,
10  week and a half, something like that.
11    Q.  Did you ever ask them to accompany you
12  down to Gallaudet to the actual building to see if
13  they could pick out this individual that allegedly
14  told them he would drain the drip drains himself?
15    A.  No.  I never thought of that.
16    Q.  Did you personally deliver the pipe
17  back to --
18    A.  No, I have no -- I don't know.  I'm not
19  sure about that, whether I brought it down or I
20  sent it down.  I know I had it already in a little
21  plastic bag, but I just don't recall.
22    Q.  And the only reason you assume that

39 (Pages 150 to 153)

Capital Reporting Company

Page 154

1  this employee is Terrence Hubbard is just because
2  of the fact that he signed the pager?
3      A.  That's correct.
4      Q.  Nobody ever said, "Hey, that's the
5  guy"?
6      A.  No, nobody specifically.
7      Q.  Have you ever seen Mr. Hubbard
8  personally?
9      A.  No, wouldn't know him if I fell on him.
10     Q.  Did Mike or Tom ever give you a
11 description of the gentleman they say that was the
12 mystery employee that wouldn't let them in?
13     A.  None that I can remember, no.
14        MR. FOSTER:  I have no further
15 questions.
16        MR. BROOKS:  I have none.  We will
17 read.
18        MR. GROTH:  I have just a couple of
19 follow-up questions.
20    EXAMINATION BY COUNSEL FOR PLAINTIFF:
21 BY MR. GROTH:
22     Q.  The folder that has the customer

Page 155

1  information that you maintain at the office and
2  that has the location of the various valves and
3  drum drips and whatever.
4      A.  Yes, the list.
5      Q.  Is that sent out with the inspectors on
6  the job?
7      A.  Yes, they have the job folder and it
8  goes with them when they go.
9      Q.  So Mr. Bowlin should have had that
10 folder and known about all the locations to drain
11 just from looking at the folder?
12     A.  Exactly.
13     Q.  Even if he didn't recall back from July
14 where he had been and what he had done?
15     A.  Right.
16     Q.  And with regard to the issue of
17 condensation in these lines, this last inspection
18 took place on January 9th, 2003 and the loss took
19 place on January 25th, 2003.  There are no weather
20 conditions or any other environmental conditions
21 that should have caused that much condensation in
22 the pipes over a sixteen-day period.  Is that

Page 156

1  correct?
2        MR. BROOKS:  I object.
3        THE WITNESS:  I wouldn't say that.
4  Craig, if you ask him, he can better tell but that
5  system, but in those particular systems, typically
6  the dry pipe valve is here and the sprinkler
7  system is here.  In that particular case, the dry
8  pipe valve is on the fifth floor and we're down on
9  a lower level.  Because of the pitch in the roofs
10 so, it's possible.
11 BY MR. GROTH:
12     Q.  What's possible?
13     A.  Condensation of -- and plus what's
14 left -- like I said, what's left in the pipes
15 after you -- you don't always get it all out.  It
16 drains.
17     Q.  Well if you don't drain it there is
18 obviously water left in the branches, correct?
19     A.  Exactly.  It lays about that deep in
20 the bottom of the pipes (indicating).
21     Q.  And here we know that Capitol did not
22 drain this area that is drained by the drum drip

Page 157

1  that we saw in the photographs, correct?
2      A.  Yes.
3      Q.  That's an admission, your own employees
4  are admitting they didn't do it.
5      A.  Exactly.
6        MR. GROTH:  I don't have any other
7  questions.
8
9        (Whereupon the deposition of Vernon
10 Vane was concluded at 12:54 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22

40 (Pages 154 to 157)

# EXHIBIT 3

1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA
2
    ------------------------------:
3   ST. PAUL MERCURY              :
    INSURANCE COMPANY, as         :
4   Subrogee of Gallaudet ,       :
    University,                   :
5                                 :
          Plaintiff,              :
6                                 :
             v.                   :   Case No.:
7                                 :   1:05-cv-20115
    CAPITAL SPRINKLER             :
8   INSPECTION, INC.,             :
                                  :
9         Defendant               :
                                  :
10             v.                 :
                                  :
11  GUEST SERVICES, INC.,         :
                                  :
12      Third-Party Defendant.    :
    ------------------------------:
13
                              Washington, D.C.
14                            October 26th, 2006
15  Deposition of:
16                  GARY ALLER,
17        Called for oral examination by counsel for
18  Defendant, pursuant to notice, at the Gallaudet
19  University, 800 Florida Avenue, College Hall, Suite
20  318, Washington, D.C., beginning at 10:00 a.m,
21  before Teague Gibson of Esquire Legal Services,
22  Inc., a Notary Public.

1        A       Just by title.

2        Q       When did you first learn that title?

3        A       I'm unsure, I don't remember when.

4        Q       What was your understanding of the

5    building owner's responsibilities concerning fire

6    protection during your first year on the job from

7    July '02 to July '03?

8        A       My understanding was the contract

9    management company had total maintenance and fire

10   control responsibility for the facility.

11       Q       Had total?

12       A       Responsibility for the facility.

13       Q       From where did you get that

14   understanding?

15       A       From the contract.

16       Q       When did you first review the contract

17   between Gallaudet and Guest Services?

18       A       July 2002.

19       Q       Was there a particular passage or

20   provision in the contract that led you to that

21   conclusion?

22       A       It stated it outright.

1    Q    What does the contract state outright in

2  that regard?

3    A    Paraphrasing it that the contract

4  management company has total responsibility for

5  all building maintenance including fire control

6  and maintenance of all systems.

7    Q    What entity owns the Kellog Conference

8  Center?

9    A    Gallaudet University.

10   Q    How do you know that?

11   A    I was told that by my vice-president and

12  we depreciate the building every year, so it's

13  treated as a property of Gallaudet.

14   Q    Can you explain to me the basis of your

15  knowledge that Gallaudet depreciates the building

16  every year?  I take it you have some involvement

17  in the tax returns or long range planning?

18   A    I assist our accounting department with

19  all the businesses under my direct control as far

20  as our end-of-the-year closing of the books for

21  the end of the year.

22   Q    And it's your understanding that

```
 1   with him?

 2         A     No.

 3         Q     And what was his response when you asked

 4   him about that?

 5         A     It was his understanding that the

 6   contract management company had full

 7   responsibility for all maintenance of the

 8   conference center at that time and that the

 9   Gallaudet maintenance department had no

10   responsibility for any maintenance whatsoever on

11   the facility.

12         Q     Why did you look at the contract between

13   Gallaudet and Guest Services during your first

14   month on the job?

15         A     The facility was losing money and part

16   of my job was to find out why and to analyze it

17   and make a recommendation to improve that.

18         Q     When you say the facility was losing

19   money, you mean the conference center in isolation

20   as opposed to the university?

21         A     Correct.

22         Q     In what magnitude was the conference
```

1        Q      And that was in August of '03?

2        A      The last working day of the company was

3   August of '03.

4        Q      When did you give Guest Services notice

5   that you were terminating?

6        A      I believe either late May or early June

7   of '03.

8        Q      Were remediation efforts still ongoing

9   at that point?

10       A      Explain, please.

11       MR. GROTH:  On the water damage?

12       Q      Yes.

13       A      I do not believe so.

14       Q      Everything was essentially returned to

15   normal at that point?

16       A      I believe so, yes.

17       Q      What part, if any, did this particular

18   water event in January of '03 bear on your

19   decision?  Did it play any part or was it the

20   decision going in that direction based on the

21   previous losses?

22       A      The water damage had no bearing on the

1    cancellation of the contract whatsoever.

2         Q    Is it fair to say that the prime basis

3    for canceling the contract was the profit and loss

4    line during the preceding years?

5         A    Yes.

6         Q    To whom was the next contract awarded?

7         A    Flik International, F-L-I-K.

8         Q    That contract began in August or

9    September of '03?

10        A    August of '03.

11        Q    When does that contract end?

12        A    August of '08.

13        Q    The monthly reports that Guest Services

14   generated from the point that you arrived in July

15   of '02 through August of '03 were they kept in the

16   normal course of business?

17        A    Yes.

18        Q    And here we are three years later you

19   would still have a copy of those reports or

20   someone would still have a copy of those reports?

21        A    I believe so.

22        Q    Where would those be kept?

1   that worked in the conference center without

2   regard to their function and I'm understanding you

3   to say now that in July of '02 the school had

4   employees in the mental health center?

5        A    Correct.

6        Q    And their primary function was related

7   to mental health services?

8        A    Correct.

9        Q    And those folks had no responsibilities

10  as far as you were concerned about building

11  maintenance or facilities maintenance?

12       A    Correct.

13       Q    And there was about 25 folks in that

14  group?

15       A    Correct.

16       Q    Other than that group of approximately

17  25 in the mental health function were there any

18  other employees of Gallaudet who primarily

19  performed their function in the Kellog Conference

20  Center?

21       A    If you're asking whether their office

22  space was in Kellog Conference Center, yes.

1     A    They provided food service for the

2  university which included a cafeteria and a

3  marketplace, a bistro type of facility.

4     Q    When did you first meet Mr. Ham?

5     A    I don't have any specific recollection

6  of any date.  I'm assuming the first year I was

7  there.

8     Q    First year?

9     A    First year I was here, yes, in 2002.

10     Q    If your office was in the same building

11  for which he had responsibility for maintenance,

12  do you think you met him during your first month

13  on the job?

14     A    I have no recollection of that.

15     Q    Do you have a recollection of meeting

16  him at all before January of '03?

17     A    I believe so.  I would assume so.

18     Q    Did you make any effort to discuss with

19  him any concerns that you had about the building

20  prior to January 25, 2003?

21     A    No.

22     Q    What did you see his task as being?

1      A    My understanding of his task is that he
2  was responsible for all maintenance of the
3  facility, supervision of all maintenance of the
4  facility.
5      Q    When you had concerns about the
6  profitability of the conference center you did not
7  discuss those with Mr. Ham?
8      A    That's correct.
9      Q    Who was your point of contact on that
10 subject?
11     A    Steve Logue.
12     Q    What was his title or job description?
13     A    General manager.
14     Q    Do you recall having any discussions
15 with Mr. Ham prior to January 25, 2003?
16     A    None specific, no.
17     Q    Do you recall having any correspondence
18 to or from Mr. Ham prior to January 25, 2003?
19     A    No.
20     Q    Are you familiar with the school's
21 academic calendar for the students?
22     A    Generally, yes.

1  maintenance or inspections of the fire protection

2  system?

3       A     No.

4       Q     What involvement did you have, if any,

5  during your first six months on the job about the

6  inspection or maintenance of the fire protection

7  system?

8       A     None.

9       Q     Is it fair to say based upon your

10  reading of the contract between the university and

11  Guest Services that the university had no

12  obligations or responsibilities in connection with

13  maintaining or inspecting the fire protection

14  system?

15       A     That's correct.

16       Q     Did you have any involvement in

17  scheduling or other arrangements that were made

18  for the January 25 inspection that's been

19  described as a winter check?

20       A     What date?

21       Q     January 25, '03?

22       MR. GROTH:  That's the date of loss.

# EXHIBIT 4

provide an adequate supply of water to the hose connections. (See Chapter 3.)

*Wet Standpipe System.* A system that has the supply valve open and the water pressure maintained at all times.

*Dry Standpipe System.* A system that shall be arranged as follows:

(a) Includes devices to admit water to the system automatically by opening a hose valve

(b) Admits water to the system through manual operation of remote control devices located at each hose station

(c) Has no permanent water supply (A filled standpipe having a small water supply connection to keep the piping filled by requiring water to be pumped into the system shall be considered to be a dry standpipe.)

**1-3.3 Combined Standpipe and Sprinkler System.** A system where the water piping services both 2½-in. (63.5-mm) outlets for fire department use and outlets for automatic sprinklers. (See Chapters 2 and 3.)

**1-3.4 Private Fire Service Main.** The pipe and its appurtenances located on private property between a source of water and the base of the riser (i.e., the flange, the flange and spigot piece, or the base tee) for automatic sprinkler systems, open sprinkler systems, water spray fixed systems, standpipe systems, inlets to foam-making systems, or the base elbow of private hydrants or monitor nozzles. Where connected to a public water system, the private service main begins at a point designated by the public water utility, usually at a manually operated valve near the property line. Where connected to fire pumps, the main begins at the fire-protection-system side of the pump discharge valve. Where connected to a gravity or pressure tank, the main begins at the inlet side of the tank's check valve. (See Chapter 4.)

Private fire service mains can include supply and distribution piping installed above ground, in trenches, and inside or outside of buildings. The provisions of this section also apply to pipeline strainers.

**1-3.5 Fire Pump.** A pump supplying water at the flow and pressure required by water-based fire protection systems. (See Chapter 5.)

**1-3.6 Water Tank.** A tank supplying water for water-based fire protection systems. (See Chapter 6.)

**1-3.7 Water Spray Fixed System.** A special fixed pipe system connected to a reliable fire protection water supply and equipped with water spray nozzles for specific water discharge and distribution over the surface or area to be protected. The piping system is connected to the water supply through an automatically or manually actuated valve that initiates the flow of water. An automatic valve is actuated by operation of automatic detection equipment installed in the same areas as the water spray nozzles. (In special cases, the automatic detection system also is located in another area.) (See Chapter 7.)

**1-3.8 Deluge Foam-Water Sprinkler and Foam-Water Spray Systems.**

**1-3.8.1 Foam-Water Spray System.** A special system pipe connected to a source of foam concentrate and to a water supply and equipped with foam-water spray nozzles for fire protection agent discharge (i.e., foam followed by water or in reverse order) and for distribution over the area to be protected.

System operation arrangements parallel those for foam-water sprinkler systems as described in 1-3.8.2.

**1-3.8.2 Foam-Water Sprinkler System.** A special system pipe connected to a source of foam concentrate and to a water supply and equipped with appropriate discharge devices for fire protection agent discharge and for distribution over the area to be protected. The piping system is connected to the water supply through a control valve that usually is actuated by operation of automatic detection equipment installed in the same areas as the sprinklers. When this valve opens, water flows into the piping system and foam concentrate is injected into the water. The resulting foam solution discharging through the discharge devices generates and distributes foam. Upon exhaustion of the foam concentrate supply, water discharge follows and continues until shut off manually. Systems also can be used for discharge of water first, followed by discharge of foam for a specific period, and then followed by water until manually shut off. Existing deluge sprinkler systems that have been converted to the use of aqueous film-forming foam are classed as foam-water sprinkler systems. (See Chapter 8.)

**1-3.9\* Control Valve.** A valve that controls the flow of water to a water-based fire protection system. For procedures concerning control valves, see Chapter 9.

**1-4 Responsibility of the Owner or Occupant.**

**1-4.1\*** The owner or occupant shall provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance.

**1-4.2\*** The responsibility for properly maintaining a water-based fire protection system shall be that of the owner(s) of the property. By means of periodic inspections, tests, and maintenance, the equipment shall be shown to be in good operating condition, or any defects or impairments shall be revealed.

Inspection, testing, and maintenance shall be implemented in accordance with procedures meeting or exceeding those established in this document and in accordance with the manufacturer's instructions. These tasks shall be performed by personnel who have developed competence through training and experience.

*Exception: Where the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract.*

**1-4.3** The owner or occupant shall notify the authority having jurisdiction, the fire department, if required, and the alarm-receiving facility before testing or shutting down a system or its supply. The notification shall include the purpose for the shutdown, the system or component involved, and the estimated time of shutdown. The authority having jurisdiction, the fire department, and the alarm-receiving facility shall be notified when the system, supply, or component is returned to service.

*Exception: Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance in accordance with the Exception to 1-4.2, the occupant, management firm, or managing individual shall comply with 1-4.3.*

**1-4.4** The owner or occupant promptly shall correct or repair deficiencies, damaged parts, or impairments found while per-

NFPA 20, *Standard for the Installation of Centrifugal Fire Pumps,* 1996 edition.

NFPA 22, *Standard for Water Tanks for Private Fire Protection,* 1996 edition.

NFPA 72, *National Fire Alarm Code®,* 1996 edition.

NFPA 110, *Standard for Emergency and Standby Power Systems,* 1996 edition.

NFPA 307, *Standard for the Construction and Fire Protection of Marine Terminals, Piers, and Wharves,* 1995 edition.

NFPA 1962, *Standard for the Care, Use, and Service Testing of Fire Hose Including Couplings and Nozzles,* 1998 edition.

**12-1.2 Other Publications.**

**12-1.2.1 AWWA Publication.** American Water Works Association, 6666 West Quincy Avenue, Denver, CO 80235.

AWWA D100 (AWS D5.2), *Standard for Welded Steel Tanks for Water Storage,* 1984.

## Appendix A   Explanatory Material

*Appendix A is not a part of the requirements of this NFPA document but is included for informational purposes only. This appendix contains explanatory material, numbered to correspond with the applicable text paragraphs.*

**A-1-2** History has shown that the performance reliability of a water-based fire protection system under fire-related conditions increases where comprehensive inspection, testing, and maintenance procedures are enforced. Diligence during an inspection is important. The inspection, testing, and maintenance of some items in the standard might not be practical or possible, depending on existing conditions. The inspector should use good judgment where making inspections.

**A-1-2.1** An entire program of quality control includes, but is not limited to, maintenance of equipment, inspection frequency, testing of equipment, on-site fire brigades, loss control provisions, and personnel training. Personnel training can be used as an alternative even if a specific frequency differs from that specified in this standard.

**A-1-3.1** Systems having not more than 20 sprinklers may be permitted to be installed without a device that activates an alarm.

Hose connections are required by NFPA 231, *Standard for General Storage;* NFPA 231C, *Standard for Rack Storage of Materials;* NFPA 231D, *Standard for Storage of Rubber Tires;* NFPA 231F, *Standard for the Storage of Roll Paper;* NFPA 409, *Standard on Aircraft Hangars,* and others. These hose connections are not considered standpipes.

**A-1-3.9** Experience has shown that closed valves are the primary cause of failure of water-based fire protection systems in protected occupancies.

**A-1-4.1** The components are not required to be open or exposed. Doors, removable panels, or valve pits may be permitted to satisfy the need for accessibility. Such equipment should not be obstructed by features such as walls, ducts, columns, direct burial, or stock storage.

**A-1-4.2** Inspection, testing, and maintenance may be permitted to be contracted with an inspection, testing, and maintenance service.

**A-1-4.5** Fire protection systems should not be removed from service when the building is not in use; however, where a system that has been out of service for a prolonged period (such as in the case of idle or vacant properties) is returned to service, it is recommended that a responsible and experienced contractor be retained to perform all inspections and tests.

**A-1-5 Approved.** The National Fire Protection Association does not approve, inspect, or certify any installations, procedures, equipment, or materials; nor does it approve or evaluate testing laboratories. In determining the acceptability of installations, procedures, equipment, or materials, the authority having jurisdiction may base acceptance on compliance with NFPA or other appropriate standards. In the absence of such standards, said authority may require evidence of proper installation, procedure, or use. The authority having jurisdiction may also refer to the listings or labeling practices of an organization that is concerned with product evaluations and is thus in a position to determine compliance with appropriate standards for the current production of listed items.

**A-1-5 Authority Having Jurisdiction.** The phrase "authority having jurisdiction" is used in NFPA documents in a broad manner, since jurisdictions and approval agencies vary, as do their responsibilities. Where public safety is primary, the authority having jurisdiction may be a federal, state, local, or other regional department or individual such as a fire chief; fire marshal; chief of a fire prevention bureau, labor department, or health department; building official; electrical inspector; or others having statutory authority. For insurance purposes, an insurance inspection department, rating bureau, or other insurance company representative may be the authority having jurisdiction. In many circumstances, the property owner or his or her designated agent assumes the role of the authority having jurisdiction; at government installations, the commanding officer or departmental official may be the authority having jurisdiction.

**A-1-5 Automatic Detection Equipment.** Water spray systems can use fixed temperature, rate-of-rise, rate-compensation fixed temperature, optical devices, flammable gas detectors or products of combustion detectors, and manual means to initiate waterflow.

**A-1-5 Listed.** The means for identifying listed equipment may vary for each organization concerned with product evaluation; some organizations do not recognize equipment as listed unless it is also labeled. The authority having jurisdiction should utilize the system employed by the listing organization to identify a listed product.

**A-1-5 Strainer.** There are two types of strainers. Pipeline strainers are used in water supply connections. These are capable of removing from the water all solids of sufficient size to obstruct the spray nozzles [⅛-in. (3.2-mm) perforations usually are suitable]. Pipeline strainer designs should incorporate a flushout connection or should be capable of flushing through the main drain.

Individual strainers for spray nozzles, where needed, are capable of removing from the water all solids of sufficient size to obstruct the spray nozzle that they serve.

**A-1-5 Water Spray Nozzle.** The selection of the type and size of spray nozzles should be made with proper consideration given to such factors as physical character of the hazard in-

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(Civil Division)

ST. PAUL MERCURY INSURANCE   :
COMPANY, as subrogee of Gallaudet  :
University,          :
              :
    Plaintiff,      :
              :  Case No. 1:05CV02115
   v.          :
              :
CAPITOL SPRINKLER INSPECTION, INC. :
              :
    Defendant/Third-Party Plaintiff, :
              :
   v.          :
              :
GUEST SERVICES, INC.,     :
              :
    Third-Party Defendant.  :

## DEFENDANT/THIRD-PARTY PLAINTIFF'S RULE 26(A) DISCLOSURES

  1.  PURSUANT to Fed. R. Civ. P. 26(a)(1), Defendant, Capitol Sprinkler Inspections, Inc., hereby discloses the following information without a formal discovery request. These disclosures are being made without waiver of and subject to all objections as to attorney-client privilege, work product and relevance.

    (a)  Identities of individuals likely to have knowledge of discoverable information that may be used to support the disclosing parties claims or defenses.

- **Craig Parham:**  **Circumstances surrounding day of loss**
- **Vernon Vane:**  **Circumstances surrounding inspections of subject property; business relationships of parties**
- **Ann Golden:**  **Business relationships of parties**
- **Tim Francis:**  **Circumstances surrounding inspections of subject property**
- **Bill Treece, Jr.:**  **Business relationships of parties**
- **John Wimmer:**  **Circumstances surrounding day of loss**
- **Mike Bowlin:**  **Circumstances surrounding inspections of subject property**
- **Charles Otis:**  **Circumstances surrounding day of loss**

- **Tom Scott:**       **Circumstances surrounding inspections of subject property**
- **Andrew Nichols:**    **Circumstances surrounding inspections of subject property**

**Capitol Sprinkler Inspection**
**6550 Dobbin Road**
**Columbia, MD 21045-4720**

- **Terrence Hubbard:**   **Circumstances surrounding inspections of subject property**
- **David Ham:**       **Circumstances surrounding day of loss and inspections of subject property; Business relationships of parties**
- **Michael Mahoney:**   **Circumstances surrounding inspections of subject property; Business relationships of parties**

**Guest Services, Inc.**
**3055 Prosperity Avenue**
**Fairfax, Virginia 22031**

(b)    Documents and things in the possession of counsel or the party that may be

used to support the disclosing parties' claims or defenses.

1.    **Capitol Sprinkler Inspection, Inc. Contract for Automatic Sprinkler Equipment Inspection Service between Capitol Sprinkler and Guest Services c/o Gallaudet Conference Center dated 4/22/02.**

2.    **Capitol Sprinkler Inspection, Inc. inspection form dated 7/2/02.**

3.    **Capitol Sprinkler Inspection, Inc. inspection form dated 1/9/03.**

4.    **Capitol Sprinkler Inspection, Inc. inspection form dated 7/8/03.**

5.    **Capitol Sprinkler Inspection, Inc. annual fire pump performance test form dated 7/2/02.**

6.    **Capitol Sprinkler Contracting, Inc. invoice dated 1/29/03.**

(c)    Computation of Damages.

**None to date.**

(d)    Insurance agreements in force.

**Insured:**    **Capitol Sprinkler Inspection, Inc.**

DE057447.1

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**
(Civil Division)

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as subrogee of Gallaudet University, | : : : : |
| Plaintiff, | : : |
| v. | : : : |
| CAPITOL SPRINKLER INSPECTION, INC. | : : : : |
| Defendant/Third-Party Plaintiff, | : : : : : |
| v. | : : : |
| GUEST SERVICES, INC. | : : : |
| Third-Party Defendant | : : |

Case No. 1:05CV02115

_____

**DEFENDANT'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

1.    State the name, address and job title of each person providing information for or participating in the answering of these interrogatories.

**ANSWER: Vernon Vane, Supervisor of Capitol Sprinkler Inspections.**

2.    State whether an investigation was made by defendant or on its behalf, relative to the events, occurrences or subject matters involved in this lawsuit. If the answer is yes, please state the name and address of the persons conducting said investigation and whether said investigation was reduced to a written report.

**ANSWER: No.**

{DE061913.1}

DEPOSITION
EXHIBIT
_11 Vane_
KB 8-14-06
PENGAD 800-631-6989

3.    State all facts known to you, your agents, employees or anyone working on your behalf, whether believed by you to be credible or not, relating to the cause of the incident.

**ANSWER:** **Objection. Attorney work product and Attorney-client privilege. Without waiving said objection, representatives of Gallaudet/Guest Services failed to drain a drum drip prior to the onset of freezing temperatures. During the January 2003 inspection, Gallaudet/Guest Services failed to provide access to the subject drum drip. Terrence Hubbard, a representative of Gallaudet/Guest Services, who was escorting Capitol employees during the inspection, did not have the proper key to access a certain conference room. Upon learning that Mr. Hubbard would not provide Mike Bowlin, a Capitol employee, requested that Mr. Hubbard obtain the key and provide access to the drum drip. Mr. Hubbard was unwilling to obtain the necessary key, such that Capitol was denied access to the drum drip. Mr. Hubbard represented that he would return with the necessary key at a later time and drain the drum drip himself. Upon information and belief, he failed to return to drain the drum drip.**

4.    Identify all dates on which you serviced, drained, maintained, inspected and/or tested the Sprinkler System between April 2002 and the February 2003. For each such date, specify the work that was done, identify your employees who performed the work and state whether or not said employees are still employed by you. If the employees are not still employed by you, please provide a last known address.

**ANSWER:** **Capitol employees Mike Bowlin, Vernon Vane and Tim Francis were present on July 2, 2002. They performed an annual fire pump test, and trip test. On the same day, David Ham, Gallaudet/Guest Services' engineer, was provided an orientation of the subject system. On January 9, 2003, Mike Bowlin and Tom Scott performed a trip test**

and winter check.  Mike Bowlin and Vernon Vane remain employed by Capitol Sprinkler.

The last known addresses of Mr. Francis and Mr. Scott are:

Tim Francis                          Tom Scott
1055 Bulman Harbor                   1273 Pine Hill Drive
Pasadena, MD 21122                   Annapolis, MD 21409

    5.    For each instance of work performed at the Property, please identify the person

who provided you access to the Property and state whether the person was employed by

Gallaudet, Guest Services, or some other entity.

    ANSWER:

- **July 2, 2002 – Unknown.**

- **January 9, 2003 – Terrence Hubbard.  Mr. Hubbard was employed in the
  maintenance/engineering department at the Property.  He did not identify by whom
  he was employed.**

    6.    Did you maintain any written procedures or protocols for servicing, inspecting,

maintaining, draining and/or testing the Sprinkler System? If the answer is yes, please identify

the written materials in detail and provide copies of all such written materials along with your

response.

    **ANSWER: No.**

    7.    Do you provide any type of training and/or education to your employees relative

to the installation, maintenance, testing, inspection and repair of sprinkler systems? If the answer

is yes, please describe any such training and/or education that you provide to your employees.

    **ANSWER: Objection to the extent that this interrogatory pertains to training on**

**installation and repair.  Subject to the foregoing, Capitol does not have a formal training**

**program.  The typical inspector receives his training through on-the-job training as a**

pipefitter or other installer.

8.     In order to properly perform sprinkler system testing/inspection pursuant to NFPA 25 are you required to drain all drum drip connections in a system?

**ANSWER:** **NFPA 25 requires that low points in dry pipe sprinkler systems shall be drained after each operation and before the onset of freezing weather conditions.**

9.     For each drum drip in the Sprinkler System which you were required to drain as part of your inspection please state (a) the location of the drum drip; (b) the manner in which the drum drip needed to be accessed; (c) whether the drum drip was in a locked area; and (d) whether you have any written records of when and how drum drips were drained, and by whom.

**ANSWER:** **One drum drip is located in the 4th floor stairwell. It included a locked cover on the wheel of the valve that could be unlocked only by a Gallaudet/Guest Services' employee with the appropriate key. One drum drip is located in each of the two 5th floor stairwells. Each included a locked cover on the wheel of the valve that could be unlocked only by a Gallaudet/Guest Services' employee with the appropriate key. One drum drip is located in the 5th floor vending room. This drum drip was accessible through an unlocked access panel, which could be opened with a screwdriver. One drum drip is located in the ceiling of conference room #5200. This location could only be accessed by unlocking the door to the conference room with the appropriate key. Once inside the room, the drum drip could be accessed through an unlocked access panel, which could be opened with a screwdriver. Other than those previously produced, Capitol possesses no written records of when and how the drum drips were drained.**

10.     Please state whether you drained all of the drum drip connections on the fifth floor at the Property on January 9, 2003. If the answer is "no", please describe in detail why the

drum drips were not drained and state whether there are any written documents in the defendant's business records which refer to or support your position regarding the failure to drain all of the drum drips.

**ANSWER:**    **Capitol drained all of the drum drip connections on the 5th floor at the property to which they were provided access.  Please see also response to interrogatory #3.**

11.    Please identify the person who you allege failed to provide you access to the drum drip connections on the fifth floor at the Property on January 9, 2003 and state the time, manner and location of any communications, written or verbal, with such individual.

**ANSWER:**    **Terrence Hubbard had a conversation with Mike Bowlin.  The discussion took place in the hallway outside of conference room #5200 after Mike Bowlin had drained the drum drip located in the vending area of the 5th floor.  Tom Scott was also present for this discussion.**

12.    If you contend that some individual at the Property informed employees of the defendant that he or she would drain one or more of the drum drips on the fifth floor on January 9, 2003, state the name of all individuals who participated in the discussion, exactly when it took place, where it took place, and the substance of the conversation.

**ANSWER**    **Although requested Terrence Hubbard, was unwilling to failed to provide access to the drum drip in Room #5200 on the 5th floor at the Property on January 9, 2003.  After Mr. Bowlin drained the drum drip on the 5th floor vending area, Mr. Hubbard realized that he did not have the key necessary to access Room #5200.  The discussion took place in the hallway outside of conference Room #5200.  Mr. Bowlin asked Mr. Hubbard to produce key which would permit him access to the drum drip located in the ceiling of conference room #5200.  Mr. Hubbard was unwilling to get the necessary key,**

{DE061913.1}

but instead, agreed to return to the room after he obtained the key and drum this particular low point at that time.

13.    Please state whether you knew or did anything to determine whether the person identified in the answer to interrogatory #12 knew how to properly drain the drum drip connections.

**ANSWER:  In July 2002, David Ham, Gallaudet/Guest Services' engineer, was provided an orientation of the subject system.  This orientation included instruction on properly draining the drum drips within the system.  Moreover, draining the drum drips is a task which requires no specialized training and can be performed by any maintenance personnel.**

14.    Please state whether you did anything to confirm that the person identified in the answer to interrogatory #12 did, in fact, drain the drum drip connections.

**ANSWER: No.**

15.    Please state whether there are any documents confirming that the person identified in interrogatory #12 was going to drain the drum drip connections.

**ANSWER: Capitol possesses no documents confirming that the person identified in interrogatory #12 was going to drain the drum drip connections.**

16.    Please state whether there are any documents confirming that you were not provided with access to all of the drum drip connections on the fifth floor.

**ANSWER: Capitol possesses no documents confirming that they were not provided with access to all of the drum drip connections on the fifth floor.**

17.    If it is your contention that Gallaudet was in any way responsible or liable for the occurrence described in plaintiff's complaint, or the resulting property damages, describe in full

{DE061913.1}

and complete detail all facts upon which you base your contention; identify all persons with knowledge of those facts and identify any documents which support your contention.

**ANSWER**: Objection.  This Interrogatory is overly broad and unduly burdensome insofar as it may seek information protected by the Attorney-Client Privilege and/or the Work Product Doctrine.  Without waiving and subject to the foregoing objections, Capitol contends that Gallaudet, as the owner or occupant of the Property, failed to drain the drum drips in dry pipe sprinkler systems before the onset of freezing weather conditions. During the January 2003 inspection, Gallaudet failed to provide Capitol access to the subject drum drip.  Furthermore, Gallaudet failed to mitigate damages by allowing the water to flow from the sprinkler system for an excessive amount of time before shutting off the water.

18.    If it is your contention that Guest Services was in any way responsible or liable for the occurrence described in plaintiff's complaint, or the resulting property damage, describe in full and complete detail all facts upon which you base your contention; identify all persons with knowledge of those facts and identify any documents which support your contention.

**ANSWER**: Objection.  This Interrogatory is overly broad and unduly burdensome insofar as it may seek information protected by the Attorney-Client Privilege and/or the Work Product Doctrine.  Without waiving and subject to the foregoing objections, Capitol ontends Guest Services failed to drain the drum drips in dry pipe sprinkler systems before the onset of freezing weather conditions.  During the January 2003 inspection, Guest Services failed to provide Capitol access to the subject drum drip.  Furthermore, Guest Services failed to mitigate damages by allowing the water to flow from the sprinkler system for an excessive amount of time before shutting off the water.

{DE061913.1}

_/s/ W.Frank Johnson, Jr._

**MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.**
Donald R. Kinsley, Esquire
Norman H. Brooks, Jr., Esquire
W. Frank Johnson, Jr., Esquire
913 N. Market Street, Suite 800
Wilmington, DE 19801
302-658-6538

Dated: August 10, 2006

{DE061913.1}

# EXHIBIT 7

Page 1

1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2     - - - - - - - - - - - - - - - X

3     ST. PAUL MERCURY INSURANCE        :

4     COMPANY, as Subrogee of           :

5     Gallaudet University,             :

6                Plaintiff,             :

7          v.                           : Case No.:

8                                       : 1:05-cv-02115

9     CAPITOL SPRINKLER                 :

10    INSPECTION, INC.,                 :

11               Defendant.             :

12    - - - - - - - - - - - - - - - X

13                          Washington, DC
                            Monday, August 14, 2006
14    Deposition of:

15               MICHAEL BOWLIN

16    called for oral examination by counsel for

17    Plaintiff, pursuant to Notice, at the Law Office

18    of Mesirow and Stravitz, 2000 Massachusetts

19    Avenue, NW, Washington, DC, before Kim Brantley of

20    Capital Reporting, a Notary Public in and for the

21    District of Columbia, beginning at 1:45 p.m., when

22    were present on behalf of the respective parties:

## Capital Reporting Company

Page 30

1  there once between '96 and '99?
2      A.  Prior.
3      Q.  Correct?
4      A.  Between what?
5      Q.  '96 and '99, as an inspector.
6      A.  I can't say it was from '99. It might
7  have been '99 and 2000.
8      Q.  Well according to Mr. Vane, they didn't
9  have the account in 2000 --
10         MR. BROOKS:  Don't argue with him.
11  Just wait for the question.
12  BY MR. GROTH:
13     Q.  According to Mr. Vane they didn't have
14  the account in 2000?
15         MR. BROOKS:  That's not a question.
16  BY MR. GROTH:
17     Q.  My question is were you out there
18  before 2000 as an inspector or a helper?
19     A.  No.
20     Q.  So it's likely then that the first time
21  you were out there was in July of 2002, correct?
22     A.  Correct.

Page 31

1      Q.  And the second time that you were out
2  there was January of 2003. Is that correct?
3      A.  Yes.
4      Q.  And were you there in any other
5  capacity, not to do an inspection or testing, but
6  for any other reason other than those two times in
7  2002 or 2003?
8      A.  No.
9      Q.  Were you there for any reason, were you
10  at the building for any reason after the loss
11  incident occurred on January 25th, 2003?
12     A.  No.
13     Q.  Did you have any contact, telephone
14  contact, correspondence contact, any type of
15  contact with any representatives or employees of
16  Gallaudet or Guest Services after the water leak
17  incident took place?
18     A.  No.
19     Q.  You weren't involved in the repairs of
20  the system after the leak occurred?
21     A.  No.
22     Q.  During the July 2002 inspection, what

Page 32

1  was the reason why Mr. Vane was out there?
2      A.  Mr. Ham had asked if we would show him
3  where these -- where things were, because he was
4  just taking over the maintenance and he was there
5  to show him where drum drips were, where the
6  inspector's tests were, where dry valves were and
7  what was involved.
8      Q.  And how did Mr. Vane determine where
9  all these things were?
10     A.  We have a folder that has everything
11  listed on as far as where locations are and then
12  Mr. Ham also had a blueprint of the construction
13  of the building as far as the sprinkler is
14  concerned.
15     Q.  And would it be correct to say that the
16  folder would have been the same folder that
17  Capitol used between '96 and '99 to inspect the
18  same systems?
19     A.  Yes, yes.
20     Q.  So, on that occasion, in July of 2002,
21  you and Mr. Vane and -- there was a third person,
22  Mr. --

Page 33

1      A.  Francis.
2      Q.  Francis, did the trip test and all the
3  other testing that needs to be done for the dry
4  pipe systems, correct?
5      A.  Yes.
6      Q.  Other than Mr. Ham, did any building
7  maintenance people accompany you during that
8  period of work?
9      A.  I don't recall.
10     Q.  Do you know whether or not somebody had
11  to unlock certain locks or doors or whatever to
12  give you access to all of the points that had to
13  be drained and valves that had to be turned, that
14  type of thing?
15     A.  Yes.
16     Q.  Do you know who that person was?
17     A.  I don't recall.
18     Q.  Mr. Ham did not do that?
19     A.  No.
20     Q.  Somebody else was assigned to let you
21  get access to these areas?
22     A.  Yes.

9 (Pages 30 to 33)

## Capital Reporting Company

Page 34

1    Q.   Can you describe the person that gave
2    you access to those areas in July of 2002?
3        A.   He was a colored gentleman, probably my
4    height.
5        Q.   Which is?
6        A.   Five ten.
7        Q.   Okay.
8        A.   Around I'm guessing like thirty years
9    old or could be younger, could be older, but
10   around that.
11       Q.   Did he have any other distinguishing
12   marks? Did he have an accent? Did he have
13   anything else that you can recall?
14       A.   No.
15       Q.   Did he have on a uniform of any type
16   that gave his name or affiliation of the company,
17   anything like that?
18       A.   I can't recall.
19       Q.   And what did that person do during the
20   July inspection?
21       A.   All he did was go and open up rooms
22   that we needed open and took the locks of the drum

Page 36

1    in the room.
2        Q.   There is an access hatch?
3        A.   There is an access hatch.
4        Q.   And what kind of unlocking device do
5    you need to get into that room?
6        A.   The room itself is a card access.
7        Q.   Just like a hotel room?
8        A.   Yes.
9        Q.   Computerized card.
10       A.   Once you get in there, then it's just
11   screwdrivers to open up an access panel.
12       Q.   So it's not a key that allows you to
13   get in?
14       A.   Right.
15       Q.   Were there any other rooms that you
16   needed to get access to that used these types of
17   cards to allow you access, other than that one?
18       A.   No.
19       Q.   All the rest of the devices had some
20   kind of locking mechanism on them instead of a
21   key?
22       A.   Right, or a master key to the building

Page 35

1    drips off and gave us access to all these things.
2        Q.   He was not asked to help physically do
3    any of the work, correct?
4        A.   No.
5        Q.   Nor did you know if he was competent or
6    trained or had knowledge to be able to do this
7    work. Is that correct?
8        A.   No.
9        Q.   For the drum drip that was I think
10   above conference room 5200, do you know what drum
11   drip we're talking about that actually leaked?
12       A.   Yes.
13       Q.   I'm sorry, misstated.
14            The drum drip that drains the lines
15   that actually leak.
16       A.   Right.
17       Q.   Do you know where that is located?
18       A.   Yes.
19       Q.   Is that over and above a conference
20   room?
21       A.   It's a room -- a suite room, and you
22   open the door and it's right, as soon as you walk

Page 37

1    to get inside of the mechanical rooms.
2        Q.   Now do you know whether or not the card
3    that the building person had to allow you access
4    into that suite room was a card that would allow
5    him access into any room in the building, that you
6    needed a card to?
7        A.   I don't know.
8        Q.   On the inspection reports, Exhibit 2
9    and 3, there are -- there is a space at the bottom
10   with some lines, empty lines, blank lines, that
11   has the word "deficiencies" there?
12       A.   Um-hum.
13       Q.   Yes.
14       A.   Yes.
15       Q.   What is that space supposed to be used
16   for according to your training at Capitol?
17       A.   Any problems that I would find in the
18   system or recommendations that I would make to
19   improve the system or to repair the system.
20       Q.   What if there were some conditions in
21   the field that you found that would not permit you
22   to do all of the work that you were needing to do

10 (Pages 34 to 37)

## Capital Reporting Company

Page 38

1  at that location?  For example, if there was
2  construction in an area and you couldn't get to a
3  drain or a valve or something like that, where you
4  couldn't finish all of your work, would you
5  normally note that type of field condition on that
6  report in that section?
7      A.  Sometimes.
8      Q.  Does anybody review those reports back
9  at the office, to your knowledge?
10     A.  Mr. Vane does.
11     Q.  Do you know if he does it on a daily
12  basis?
13     A.  Usually when we the folders back, if
14  there are any deficiencies or any problems that we
15  have, we show him that folder, so he's aware of it
16  so he can contact the customer.
17     Q.  So, if there is nothing written in that
18  deficiency section, is that meant to denote that
19  there were no problems and that all the work that
20  needed to be done was done?
21     A.  Yes.
22     Q.  On those two reports that you have in

Page 39

1  front of you for July of 2002 and January 2003, is
2  that your printing and handwriting?
3      A.  Yes.
4      Q.  On both of them?
5      A.  Yes.
6      Q.  Were there any problems that you recall
7  performing the work, the inspection work and
8  testing work that had to be done in July of 2002?
9      A.  No.
10     Q.  Did Mr. Vane actually assist in doing
11  that work, and by "assist" I mean hands-on that he
12  did some of the work with you and Mr. --
13     A.  Francis.
14     Q.  Francis?
15     A.  Yes.
16     Q.  He wasn't there just saying "You guys
17  do the work.  I'll talk to Mr. Ham or I'll do
18  something else"?
19     A.  No.
20     Q.  And as I understand your testimony, you
21  were not back to the building at all between July
22  of 2002 and January 9th, 2003, correct?

Page 40

1      A.  No.
2      Q.  Other than learning Mr. Ham's name
3  during the July visit, did you learn the name of
4  any other employee at the building during that
5  visit?
6      A.  The gentleman that met us at the desk
7  probably introduced himself, but I can't recall
8  what his name was.
9      Q.  Okay.  And you didn't make a note of
10  that?  It's not written in any record there or
11  anything?
12     A.  No, no.
13     Q.  What about at the time of the January
14  9th inspection?  Did you see Mr. Ham at that
15  inspection?
16     A.  No.
17     Q.  Do you know the name of anybody that
18  accompanied you, anybody employed at the building
19  who accompanied you during that inspection?
20     A.  Like I said that gentleman I met and we
21  shook hands and he probably mentioned his name and
22  it probably went in one ear and out the other.

Page 41

1      Q.  I know it's more than three years after
2  that inspection took place now.  Did you know that
3  person's name two weeks after the inspection took
4  place?
5      A.  No.
6      Q.  So you really never learned his name.
7  He may have said it, but the day after you didn't
8  remember what it was?
9      A.  Exactly.
10     Q.  You're like me.  I'm not good with
11  names, and in and out right away?
12     A.  Exactly.
13     Q.  So basically other than Mr. Ham, based
14  on your two inspection visits to this building,
15  you didn't know of anyone else who worked in the
16  building?
17     A.  Correct.
18     Q.  Can you describe the person that
19  accompanied you and Mr. Scott to give you access
20  to the various areas to do your work during the
21  January 9th visit?
22     A.  It was the same gentleman that

11 (Pages 38 to 41)

## Capital Reporting Company

Page 42

1  accompanied us in July.
2      Q.  So you would give the same description
3  of the gentleman, yes?
4      A.  Yes.
5      Q.  Only six months older?
6      A.  Yes.
7      Q.  In terms of the testing of the system,
8  the dry pipe systems, you didn't do the trip test
9  at that time, correct?
10      A.  In --
11      Q.  January.
12      A.  No.
13      Q.  But you do have to drain the drum drips
14  for other reasons.
15      A.  Correct, correct.
16      Q.  And how many drain areas are there in
17  the system that you had to drain?
18      A.  Approximately seven I think.  There
19  is -- in my folder I had it listed down, but I
20  think the fourth floor there is two -- one in each
21  stairway, and there is another one there, and I
22  can't recall at the time; and then on the fifth

Page 43

1  floor there is stairways there plus the vending
2  area and the room that we didn't have access to.
3      Q.  In Capitol's interrogatory answers to
4  some questions that -- written questions that we
5  gave to Capitol, in answer to number nine they
6  describe the areas where these drains were
7  located.  Have you seen these answers before?
8      A.  Um-hum.
9      Q.  Yes?
10      A.  Yes.
11      Q.  Does that accurately reflect that
12  answer, number nine, and you can just read it to
13  yourself, does that accurately reflect where all
14  the drain areas are to the system?
15      (Brief pause while witness peruses
16  document.)
17      A.  Yes.
18      Q.  A moment ago you gave an answer in
19  which you refer to my folder.  Is the folder that
20  you are referring to the same folder that Mr. Vane
21  was talking about, the customer folder?
22      A.  Yes.

Page 44

1      Q.  You didn't keep your own records or
2  anything for each customer?
3      A.  No, no.
4      Q.  And if we looked at that folder and
5  requested a copy of -- I don't know if I did
6  request a copy, but I'll request it now, a copy of
7  the folder cover, whatever has the information
8  about all these drains and locations are, we would
9  see a listing of these drains as described in this
10  interrogatory answer?
11      A.  Yes.
12      Q.  Did you have out at the scene when you
13  did the January inspection of 2003 any plans,
14  diagrams, sketches of the sprinkler system to look
15  at to tell you where all these things were, or
16  were you strictly going by what was on the folder?
17      A.  Strictly by what was on the folder and
18  my knowledge.
19      Q.  In your memory of what happened six
20  months earlier?
21      A.  Yes.
22      Q.  On the inspection sheet, itself, there

Page 45

1  is no line to check, there is no column to check
2  for, to confirm that you drained all the drain
3  areas, is there?
4      A.  No.
5      Q.  But there are certain things on there
6  that in order to do those items you have to have
7  drained the drum drips.  Is that correct?
8      A.  As far as -- I don't understand what
9  you are saying.
10      Q.  Of any of the sixteen listed items, in
11  order to -- in order to check off that you have
12  actually done that, don't you have to have already
13  drained the drum drips in order to check some of
14  those boxes off?
15      MR. BROOKS:  I'm going to object to the
16  question.  You're assuming facts about a dry out
17  trip test, and you have given him a July '02
18  document in connection with a question of January
19  of '03.
20      MR. GROTH:  I'm sorry.
21  BY MR. GROTH:
22      Q.  Let me show you the January document.

12 (Pages 42 to 45)

**Capital Reporting Company**

Page 50

1  valve, and then close the end valve and drain it
2  so you can maintain air pressure?
3      A.  Yes.
4      Q.  Is that the way you normally did it,
5  the winter check?
6      A.  Yes.
7      Q.  Do you recall doing it that way on
8  January 9th, 2003?
9      A.  Yes.
10     Q.  Now did you drain, you and Mr. Scott,
11 drain all of the drain points during the January
12 9th 2003 inspection?
13     A.  All but the one in that room.
14     Q.  The one above conference room 5200?
15     A.  Correct.
16     Q.  As is listed in this interrogatory
17 answer.  It says "One drum drip is located in the
18 ceiling of conference room 5200."  That's the one
19 that you did not drain.
20     A.  Correct.
21     Q.  Were you supposed to drain that drain?
22     A.  Yes.

Page 51

1      Q.  Why were you supposed to drain that
2  drain?
3      A.  Because it's part of the dry system and
4  has a drum drip above it.
5      Q.  And you drained that drain in July of
6  2002?
7      A.  Yes.
8      Q.  Why didn't you drain the drain in
9  January of 2003?
10     A.  Because I did not have access to the
11 room.
12     Q.  Why did you have access?
13     A.  The gentleman that was with us did not
14 have a card access to let us into the room.
15     Q.  This is the same gentlemen that had the
16 card in July of 2002?
17     A.  Correct.
18     Q.  Describe to me the conversation you had
19 with this gentleman regarding getting access to
20 that room.  Tell me what you said.  Tell me what
21 he said.
22     A.  We were going to the room and when we

Page 52

1  got to the room he says, "I don't have a card.  I
2  have to go down stairs and get the card for the
3  access."
4      Q.  And how far is is downstairs from where
5  you were?
6      A.  We're on the fifth floor.
7      Q.  What did you do?  Take the elevator
8  down?
9      A.  You have to take the elevator down and
10 go to the front desk.
11     Q.  And how long would you suppose it would
12 have taken him to go down, get the elevator and
13 get the card and come back up?
14     A.  Five minutes, ten minutes.
15     Q.  Five, ten minutes?
16     A.  Um-hum.
17     Q.  What kind of distance are we talking
18 about?
19     A.  However long it takes him to get to the
20 elevator, go downstairs to the front desk, or
21 however fast the elevator runs.
22     Q.  Did he say why he didn't have the card

Page 53

1  with him?
2      A.  He hadn't checked out a card -- no, he
3  didn't say why he didn't have a card.
4      Q.  Did he offer to go down and get the
5  key -- get the card?
6      A.  No.
7      Q.  Was this drum drip that had to be
8  drained above this conference room the first, last
9  or one of the middle drains that you were doing?
10     A.  The last.
11     Q.  It was the very last drain?
12     A.  The very last drain.
13     Q.  Was this the last drain that you had to
14 do in order to complete this drum?
15     A.  Right.
16     Q.  Did you have to go back to the control
17 room or turn any other valves or do any other work
18 in order to get the system reset?
19     A.  I would have to go back to the account
20 room to leave my paperwork.
21     Q.  That was it?
22     A.  That was it.

14 (Pages 50 to 53)

**Capital Reporting Company**

Page 54

1  Q. Where is the mechanical room?
2  A. Above the fifth floor, in the middle of
3  the building.
4  Q. How do you get there, by elevator or
5  walking space?
6  A. You have to go up steps.
7  Q. So, you get to the point where he says
8  he doesn't have a card to get in this doorway.
9  What happens next?
10  A. We asked if he was going to get a card
11  and he just kind of looked at us like, you know,
12  he really didn't want to -- he would take care of
13  it. He said he would take care of the drum drip,
14  and I asked him, I said "Are you going to take
15  care of this" -- I said, "You know what? I can't
16  get in the room. Are you going to take care of
17  this drum drip?"
18  Q. Well did you ask him to go get the
19  card?
20  A. No, I didn't ask him to go get the
21  card.
22  Q. Why didn't you ask him to go get the

Page 55

1  card?
2  A. He should have had the card.
3  Q. Why did you not ask him specifically to
4  go get the card, even if he didn't have the card
5  with him at the time?
6  MR. BROOKS: It's been asked and
7  answered. Can I have the last question read back.
8  THE REPORTER: "Question: Why did you
9  not ask him specifically to go get the card, even
10  if he didn't have the card with him at the time?"
11  MR. BROOKS: Asked and answered.
12  MR. GROTH: No, it's not. I asked him
13  before why he didn't ask him to go get the card
14  and he said the guy should have had the card with
15  him. He didn't answer the question the first
16  time. If you want to go back and read that, we
17  can do that, too.
18  MR. BROOKS: You can answer to the best
19  of your recollection. You can answer.
20  THE WITNESS: Can you ask the question
21  again.
22

Page 56

1  BY MR. GROTH:
2  Q. Sure. Why didn't you ask this person,
3  whose name you didn't have and still don't have --
4  correct?
5  A. Yes.
6  Q. Why didn't you ask him to go get the
7  card so you could have access to drain the last
8  drain you had left?
9  A. I asked him to get the card but I don't
10  remember him going to get the card.
11  Q. So you don't remember him saying "I
12  refuse to get the card" or anything like that?
13  A. He didn't refuse to get the card. It
14  wasn't said that he would get the card. It was
15  just he would take care of the drum.
16  Q. Let me ask you about that. Did you ask
17  him, since you don't have a card, "Will you take
18  care of the drum drip?"
19  A. I asked him if he would take care of
20  the drum drip.
21  Q. So you made a request?
22  A. I made a request.

Page 57

1  Q. And when you asked him that question,
2  did you know at that time anything about his
3  background, experience, reliability, competency to
4  do the work that you were requesting that he do?
5  A. No.
6  Q. Did you ask him for any information
7  that would allow you to access that, whether he
8  was competent, qualified, trained in order to do
9  this job?
10  A. No.
11  Q. Did you have any reason to believe that
12  he had those kind of qualifications or training?
13  A. Excuse me?
14  Q. Did you have any reason to believe, did
15  you have any facts that told you that this guy
16  could do what needed to be done with this drum
17  drip?
18  A. He was assigned to us by the
19  maintenance, so I assume that he was going -- he
20  was able to do that.
21  Q. You made an assumption?
22  A. Yes.

15 (Pages 54 to 57)

## Capital Reporting Company

Page 66

1    Q.  Did he tell you that was a bad decision
2    on your part?
3    A.  Yes, he did.
4    Q.  Were you reprimanded in any way?
5    A.  No.
6    Q.  Did Mr. Vane tell you that if this ever
7    happens again where you face a situation where you
8    can't do all the work, that you should note that
9    on your report?
10   A.  That I should note that?
11   Q.  Yes.
12   A.  Yes.
13   Q.  Did he tell you or give you any
14   instructions telling you that you should not allow
15   or permit or authorize any building personnel from
16   doing -- you should not allow any building
17   personnel to do work that you were supposed to be
18   out there doing?
19   A.  No, he didn't say that.
20   Q.  Have you ever had a situation arise
21   since the date of this loss where you've
22   authorized some building person to do some of the

Page 67

1    work that you went out there and were supposed to
2    be doing?
3    A.  No.
4    Q.  Did you ever write down or give a
5    statement to anybody regarding what you did during
6    your inspection on January 9th, 2003?  I mean
7    write out by hand a statement of what you and your
8    partner did out there during that inspection.
9    A.  I don't recall writing any statements
10   other than the questions that have been asked by
11   attorneys.
12   Q.  Okay.  What about giving a taped
13   statement where somebody asks you questions on a
14   tape recorder, taped the conversation?
15   A.  No.
16   Q.  Did Mr. Vane, during that conversation
17   you had with him, the day after the leak took
18   place, did he ask you who this person was that you
19   were going to permit to do this --
20   A.  Yes.
21   Q.  -- work.  What did you tell him?
22   A.  I told him I didn't know the

Page 68

1    gentleman's name.
2    Q.  Did you describe him?
3    A.  Yes, I did.
4    Q.  Did you tell him it was the same person
5    that you had both seen there in July?
6    A.  Yes.
7    Q.  Was there any discussion of contacting
8    Guest Services or Gallaudet, either you or Mr.
9    Vane or somebody else, to contact them to try to
10   find out the name of that person and try and find
11   out who they were?
12   A.  There was no conversation brought to
13   my, no.
14   Q.  Did you ever have a discussion about
15   your inspection in January or this incident with
16   anybody else at Capitol other than Mr. Vane?
17   A.  Yes, with Mr. Parham.
18   Q.  When was that?
19   A.  I can't remember if it was the same day
20   or a day after.  It was within that week.
21   Q.  Who was present for that?
22   A.  Mr. Vane was present and Mr. Parham was

Page 69

1    present.  I don't recall if anybody else was
2    there.
3    Q.  What about Mr. Scott?
4    A.  I don't recall if Mr. Scott was there.
5    Q.  And where was that discussion?
6    A.  In Mr Vane's office.
7    Q.  And what was the purpose of that
8    meeting?
9    A.  To try to find out what happened as far
10   as the circumstances and how not to let it happen
11   again.
12   Q.  Okay.  So basically you were having the
13   same discussion with Mr. Parham that you had with
14   Mr. Vane a day or two before?
15   A.  Yes.
16   Q.  Did you give him any additional
17   information that you had not given Mr. Vane when
18   you talked to him first?
19   A.  No.
20   Q.  And what did Mr. Parham say about the
21   way that you conducted the inspection on January
22   9th?

18 (Pages 66 to 69)

**Capital Reporting Company**

Page 74

1 whether or not that was okay with them?

2    A.  No.

3    Q.  In these interrogatory answers, again

4 these are answers to written questions that were

5 put to Capitol that Capitol answered, they

6 identified the person that accompanied you during

7 the January 9th inspection as Terrence Hubbard,

8 H-u-b-b-a-r-d.  Do you know where Capitol got that

9 name from?

10    A.  No, I don't.

11    Q.  They didn't get it from you?

12    A.  No.

13    Q.  Do you know if they got it from Mr.

14 Scott?

15    A.  I don't think so.

16    Q.  During the January 9th inspection, did

17 you find any other problem with the dry pipe

18 system of the parts that you had access doing work

19 on?

20    A.  No.

21    Q.  No problem with the dry pipe valve?

22    A.  No.

Page 75

1    Q.  No problem with the compressor?

2    A.  No.

3    Q.  No problem draining any of the other

4 drains?

5    A.  No.

6    Q.  In the interrogatory answers from

7 Capitol in response to question number three, it

8 states in part, and I will let you read this whole

9 answer if you like, it states in part, "Upon

10 learning that Mr. Hubbard would not provide Mike

11 Bowling, a Capitol employee" -- actually it's

12 written out wrong, but I'm reading it exactly the

13 way it is, "Upon reading that Mr. Hubbard would

14 not provide Mike Bowling, the Capitol employee," I

15 think it refers to, "with a key to open the door,

16 requested that Mr. Hubbard obtain the key and

17 provide access to the drum drip.  Mr. Hubbard was

18 unwilling to obtain necessary key, such that

19 Capitol was denied access to the drum drip."

20    You can read all of that answer to

21 number three to yourself and then I will ask you a

22 question about it.

Page 76

1    (Brief pause while witness peruses

2 document.)

3    Q.  Okay, have you had a chance to read

4 that?

5    A.  Yes.

6    Q.  Was the individual, whoever it was,

7 that you -- that accompanied you during the

8 January inspection unwilling, which is the term

9 they use in that answer, unwilling to go get the

10 key?

11    A.  He didn't come out and say no.

12    Q.  As I recall your testimony from a

13 couple of minutes ago, I think you said that you

14 never requested that he didn't get the key.  Is

15 that correct?

16    A.  Right.

17    Q.  So to say that in that answer that he

18 is unwilling to go get the key, did he ever refuse

19 to go get the key?

20    A.  No.

21    Q.  You did this inspection on January 9th,

22 2003.  Did you find any freezing of any pipes or

Page 77

1 valves in the system when you did the work that

2 you did do?

3    A.  No.

4    Q.  Even in terms of the draining of the

5 drum drips that you did drain, there was no frozen

6 water or anything in those drains?

7    A.  No.

8    MR. GROTH:  I have no other questions.

9 This other counsel may have some other questions

10 for you also.

11    EXAMINATION BY COUNSEL FOR DEFENDANT:

12 BY MR. FOSTER:

13    Q.  Mr. Bowlin, my name is Matt Foster.

14 I'm here on behalf of Steve Horvath, the lead

15 counsel for Guest Services.  I'm just going to ask

16 you a couple of follow-up questions.  You'll have

17 to forgive me if I duplicate a few things.  I'll

18 try not to, though.

19    What did you do today to prepare for

20 your deposition?

21    MR. BROOKS:  I'm going to object,

22 direct the witness not to answer to the extent it

20 (Pages 74 to 77)

**Capital Reporting Company**

Page 106

1    Q.   How do you know he did that?
2    A.   Because he took us to some of the
3    stairways and I wasn't sure about like the
4    locations, like I was sure of the location at the
5    panel was in the vending room, but he had to show
6    me on the floor where the vending room was.
7    Q.   So how do you know he knew there was a
8    valve located behind this door that would not
9    open?
10    A.   Well I showed him on my list, on my
11    folder that there was an -- inside this room which
12    I had marked as a room number that there was a
13    drum drain.
14    Q.   So you told him, "We need to get access
15    to this door"?
16    A.   Correct.
17    Q.   You stated earlier that Scott was a
18    good assistant.  Did you ever ask Scott to run
19    down to the front office to get a key?
20    A.   It wasn't his responsibility.
21    Q.   That's not what I asked you.  Did you
22    ever ask Scott to run down to the office to get a

Page 107

1    key?
2    A.   No, no.
3    Q.   Did you ever say, "I will go down to
4    the office to get the key"?
5    A.   No.
6    Q.   Did you ever ask him to make contact,
7    when I say "him," the unnamed employee.  Did you
8    ever ask him to make contact with Mr. Hubbard --
9    not Mr. Hubbard -- with Mr. Ham to get access to
10    this room?
11    A.   No.
12    Q.   You stated earlier that you found out
13    about the incident the Monday following, you know,
14    January 25th, 2003?
15    A.   And Mr. Vane told you there was an
16    incident at Gallaudet?
17    A.   Yes.
18    Q.   At that time did you say, "Hey, I told
19    somebody to cover this.  It's not my fault"?
20    A.   No, I didn't say it that way.
21    Q.   What did you say to him?
22    A.   I said that the gentleman that was

Page 108

1    there would take care of it.  He said he would
2    take care of it and we didn't have access.
3    Q.   Did Mr. Vane ever indicate to you that
4    you were going to be in trouble for this?
5    A.   No.
6    Q.   Did Mr. Vane ever indicate to you that
7    Mr. Scott was going to be in trouble for this?
8    A.   No.
9    Q.   Did Mr. Vane ever ask you, "Let's get
10    in my truck right now and go over to Gallaudet and
11    you point to me which employee said that they
12    would release the pressure from the drip drain"?
13    A.   No.
14    Q.   Did you ever suggest to Mr. Vane that
15    we should go to Gallaudet and find out who this
16    mystery employee is?
17    A.   No.
18    Q.   Did Mr. Scott ever ask you, "Hey, let's
19    drive over right now and go find out who this
20    person is"?
21    A.   No.
22    Q.   Did you ever talk to Mr. Scott after

Page 109

1    January 25th, 2003 about the incident?
2    A.   Yes.
3    Q.   How often did you talk to him about it?
4    A.   We talked about it as far as what not
5    to do as far as putting it on our inspections
6    sheet if somebody tells us that, that we need to
7    start logging it down.
8    Q.   I didn't ask you what you talked about.
9    How often do you think you talked about it?
10    A.   I don't know.
11    Q.   Would you say that you talked about it
12    at least two times a week?
13    A.   No.
14    Q.   It was just maybe a one or two time
15    incident that you talked about?
16    A.   Correct.
17    Q.   Did you ever think you were at fault
18    for this?
19    A.   No.
20    Q.   Were you ever afraid of losing your job
21    over this incident?
22    A.   No.

28 (Pages 106 to 109)

# EXHIBIT 8

02/19/2008  16:39    3154834239                    DEVALK & POWER, P.C.

PAGE  02/03

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ST. PAUL MERCURY INSURANCE COMPANY,  :
as Subrogee of Gallaudet University             :        Case No.: 1:05cv02115(CKK)
                                                :
                    Plaintiff                   :
                                                :
          vs.                                   :
                                                :
CAPITOL SPRINKLER INSPECTION, INC               :
                                                :
                    Defendant                   :
                                                :
          vs.                                   :
                                                :
GUEST SERVICES, INC.                            :
                                                :
          Third-Party Defendant                 :

### AFFIDAVIT OF EDWIN HUBBARD

STATE OF NEW YORK         :
COUNTY OF  _WAYNE_         :

    Edwin Hubbard, being duly sworn according to law, and under the penalties of perjury, hereby states that he is over eighteen years of age and competent to testify in court, and that he has personal knowledge of the following facts:

1.  I am the father of Terrance E. Hubbard, a Caucasian male of English/German descent, who was born on July 27, 1954.

2.  In 2003, Terrance E. Hubbard was forty-nine years old, and he told me he was employed by Guest Services, assigned to work at a building on the campus of Gallaudet University in Washington, D.C.

3.  In 2003, Terrance E. Hubbard was approximately five feet eight inches tall, thin, with no accent to his speech.

02/19/2008  16:39    3154834239                    DEVALK & POWER, P.C.

PAGE  03/03

4.  In 2003, Terrance E. Hubbard was light complexioned with dirty blond hair.

EDWIN HUBBARD

Sworn to and subscribed

before me this 19th day

of February , 2008.

Notary Public

SUSAN E. JOSLYN
Notary Public State of New York
Wayne County, NY
My Commission Expires August 31, 2009

PHILADELPHIA\3531430\1  134164.000

2

# EXHIBIT 9

Wilmington, DE  19801
(302) 658-6538
F: (302) 658-6537
nbrooks@mooclaw.com

_____

**From:** Groth, David [mailto:DGroth@cozen.com]
**Sent:** Monday, January 28, 2008 4:07 PM
**To:** Brooks Jr., Norman H.; Kinsley, Donald R.
**Cc:** Eric Stravitz; Luccaro, Daniel J.; Summitt,Gary L; shorvath@tbmhjlaw.com
**Subject:** St. Paul Mercury Ins. Co. v. Capitol Sprinkler,et al

Mr. Brooks:   At the status conference with Judge Kollar-Kotelly today, attended by Mr. Kinsley of your office, the court directed your client, defendant Capitol Sprinkler, to refile its opposition to Plaintiff's Motion for Partial Summary Judgment on procedural grounds.  More specifically, the court stated that Capitol Sprinkler failed to properly cite to the record in this case in its attempt to establish grounds for an alleged genuine issue of material fact and/or defense to plaintiff's contract claim.  Consequently, the court is issuing Orders striking your opposition and giving your client additional time to refile its opposition so as to comply with the court's instructions.

More specifically, among other things, there was a discussion in court concerning Capitol Sprinkler's alleged "identification" of Mr. Hubbard as the Guest Services representative who escorted Mr. Bowlin of Capitol Sprinkler during his inspection on January 9, 2003.  Judge Kollar-Kotelly asked what specific evidence was in the record to establish that Mr. Hubbard was, in fact, the escort, or that he was even in the building on the date of Mr. Bowlin's inspection.  I replied that there is absolutely no evidence in the record to support either one of those contentions, because there is none.  However, in your original, now stricken, opposition, you make repeated allegations about Mr. Hubbard which are either directly contradicted by the testimony of Capitol Sprinkler's own employees, or unsupported by any evidence in the record whatsoever.  See Plaintiff's Reply to Defendant's Opposition.  By my own count, I have found at least eight separate references in Capitol Sprinkler's original opposition where you cited in support of a proposition did not even address the proposition; or where you mischaracterized or misrepresented the actual testimony; or where you cited no testimony or evidence at all for a proposition.

Judge Kollar-Kotelly specifically instructed counsel that they should not put forward any proposition unless it is supported by a specific citation to the record, so that she can determine if there are any triable liability issues with regard to plaintiff's contract claim.  Her meaning was crystal clear.  No general references to the complaint, answer or other pleadings, nor general denials, will suffice.  Nor will any assumptions, speculation, inferences or implications drawn by Capitol Sprinkler, unless fully supported by the existing record.

In plaintiff's original reply, we pointed out to the court many incorrect citations to the record made by Capitol Sprinkler in its original opposition.  The court has graciously given Capitol Sprinkler another opportunity to comply with her instructions regarding the filing of an opposition.  However, plaintiff will be obligated, if necessary, to again point out the many improper, incorrect and misleading citations to the record, especially with regard to the so called identification of Mr. Hubbard, if you persist in submitting them again with your new opposition by the 2/15/08 deadline.  Such conduct would at best be intellectually dishonest and violate the court's specific instructions, and at worst be sanctionable by the court if any misrepresentations of the facts or record by counsel are determined to be intentional or willful.

I forwarded this email to you to ensure that you fully understand the importance of this issue, since your partner, Mr. Kinsley, attended the status conference in your place.

Please let me know if you have any questions about the foregoing.  Thank you.

1/29/2008

David J. Groth
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
Phone:  215/665-2056
Fax:     215/701-2056
Email:  dgroth@cozen.com

---

Notice: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service."

---

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege..

---

## Groth, David

| | |
|---|---|
| **From:** | Groth, David |
| **Sent:** | Tuesday, January 29, 2008 5:29 PM |
| **To:** | 'Brooks Jr., Norman H.'; 'dkinsley@mooclaw.com' |
| **Cc:** | Eric Stravitz; Luccaro, Daniel J.; shorvath@tbmhjlaw.com |
| **Subject:** | RE: St. Paul Mercury Ins. Co. v. Capitol Sprinkler,et al |

Mr. Brooks:   Plaintiff will not voluntarily withdraw anything which it has properly filed for a number of reasons. First, the court took no issue with plaintiff's motion for summary judgment, nor with its reply to defendant's opposition.  The court ordered stricken Capitol Sprinkler's opposition on procedural grounds because it failed to comply with local rules and the court's instructions with regard to a party supporting all of its propositions with accurate and complete citations to the evidence record in the case.  Judge Kollar-Kotelly did not order plaintiff's reply stricken, she simply gave plaintiff another deadline for responding to defendant's revised opposition, depending on what the defendant puts in its revised opposition.

Consequently, it would be procedurally improper, not to mention unnecessary, given the court's explicit orders, for plaintiff to attempt to withdraw its original reply to defendant's original opposition.  Whether the court wishes, for whatever reason, to consider the original filings of the parties is up to the court to decide, not you or me.  I can represent to you that should Capitol Sprinkler's "revised" opposition contradict, abandon or ignore arguments it made in its original, now stricken, opposition, plaintiff will be compelled to deal with that issue accordingly.  It is one thing to fail to properly cite to the record to support a proposition.  It is an entirely different thing to misrepresent and mischaracterize evidence, and mislead the court by a filing, even if that filing is later stricken on procedural grounds.  Just because a filing is stricken does not mean that it never existed.  The court has already dealt with an earlier misrepresentation which you made to the court with regard to your filing of a motion in limine. I would be doing a disservice to the court and to my client if I failed to bring to the court's attention the more recent misrepresentations contained in Capitol Sprinkler's stricken opposition to plaintiff's motion for partial summary judgment, should your "revised" opposition make it necessary to do so.

---

**From:** Brooks Jr., Norman H. [mailto:nbrooks@mooclaw.com]
**Sent:** Tuesday, January 29, 2008 1:38 PM
**To:** Groth, David
**Cc:** Eric Stravitz; Luccaro, Daniel J.; Summitt,Gary L; shorvath@tbmhjlaw.com
**Subject:** RE: St. Paul Mercury Ins. Co. v. Capitol Sprinkler,et al

Mr. Groth:

1.  This will acknowledge receipt.  I understand your position.

2.  Whereas the Court's 28 JAN 08 Scheduling Order provides that defendant's Opposition is now due on 15 FEB, and that plaintiff's Reply shall be filed on 22 FEB,  the Reply that you filed on behalf of plaintiff on 25 JAN can have no practical effect on the existing controversy and therefore, is not entitled to judicial consideration. It appears that leaving that Reply on the docket serves no beneficial purpose.  It can only serve to confuse the record.  For that reason, I respectfully request that you let me know whether you will voluntarily withdraw plaintiff's reply or whether I must file a motion to strike the same.

3.  Thank you for your attention to this.

Norman H. Brooks, Jr., Esq.
913 N. Market Street, Suite 800