UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, as Subrogee of Gallaudet University<br><br>    Plaintiff<br><br>    vs.<br><br>CAPITOL SPRINKLER INSPECTION, INC.<br><br>    Defendant<br><br>    vs.<br><br>GUEST SERVICES, INC.<br><br>    Third-Party Defendant | CASE NUMBER:  1:05CV02115 (CKK) |

**DEFENDANT CAPITOL SPRINKLER INSPECTION, INC.'S
STATEMENT OF GENUINE ISSUES IN OPPOSITION TO
GUEST SERVICES' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rules 7(h) and 56.1 of Local Rules of the United States District Court for the District of Columbia, Defendant Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler") hereby submits the following Statement of Genuine Issues in Opposition to Guest Services' Motion for Summary Judgment:

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied that the contract with Gallaudet University does not require that Guest Services open and drain the sprinkler system. Admitted that the contract with Gallaudet University does not explicitly state that Guest Services is required to open and drain the sprinkler

{DE103784.1}

system; however, the contract does state that Guest Services is to operate and manage the Conference Center "in a commercially reasonable, prudent and professional manner." (Exhibit D, Gallaudet University Kellogg Conference Center Management Agreement §§3.1, 3.1(e)). Denied that the contract with Gallaudet University <u>only</u> required that Guest Services contract with others, and these expenses are passed through to Gallaudet University. Admitted that among its other provisions, the contract with Gallaudet University required Guest Services to exercise "the responsibility and authority, on behalf of [Gallaudet], to . . . (e) Negotiate and enter into service contracts necessary or desirable in the ordinary course of business in operating the [Conference Center]." (Id. at §§3.1, 3.1(e)).

5.  Denied that the Capitol Sprinkler contract was to "maintain and service the sprinkler system." Admitted that on April 22, 2002, Capitol Sprinkler Inspection, Inc. executed a "Contract For Automatic Sprinkler Equipment Inspection Service" under which Capitol Sprinkler agreed to perform semi-annual inspections of the sprinkler system in the subject conference center/hotel. (Exhibit B, Complaint, ¶8; Exhibit C, Answer to Complaint, ¶8; and Exhibit L, Contract for Automatic Sprinkler Equipment Inspection Service). This contract was executed by "Guest Services c/o Galludet Conerenced [sic] Center 800 Florida Ave. NE" (Id.). Capitol Sprinkler thereafter resumed its inspection services at the facility. (Exhibit A, Vane Deposition, P.35 L.15 - P.36 L.17). Mr. Vane signed the contract on behalf of Capitol Sprinkler. (Exhibit A, Vane Deposition, P.48 L.6-8). NFPA 25 is the standard by which Capitol Sprinkler does inspections and routine maintenance. (Exhibit F, Parham Deposition, P.11 L.13 - P.12 L.9; Exhibit G, Affidavit of V. Vane, dated January 17, 2008).

6.  Admitted only as to the first sentence. Denied as to the second sentence. (Exhibit 4 to Guest Services' Motion, Vane Deposition p35). The deposition lines cited by Guest

Services do not state that there is no other contract between Guest Services and Capitol Sprinkler.

7. Admitted.

8. Admitted.

9. Admitted.

10. Denied that Capitol Sprinkler's employees "certified" anything related to the inspection of January 9, 2003. The Capitol Sprinkler contract expressly states "It is understood that the Contractor by providing such inspection service and by making such adjustments as may be required does not warrant the condition or operation of the system inspected." (Exhibit L, Contract for Automatic Sprinkler Equipment Inspection Service). Admitted that the Inspection Report of January 9, 2003 has "Yes" checked off next to "dry valves protected from freezing." (Exhibit 5 to Guest Services' Motion, Inspection Report of January 9, 2003).

11. Admitted.

12. Denied that Capitol Sprinkler's employees "certified" anything related to the inspection of January 9, 2003. (see No. 10 above). Admitted that pipes froze and burst, and caused water damage to the property on January 25, 2003. (Exhibit 4 to Guest Services' Motion, Vane Deposition P.79, 82).

13. Admitted that Michael Bowlin and Tom Scott drained all of the low points except the subject drum drip, which was the only one to which they were not given access. (Exhibit E, Bowlin Deposition at P. 50 L. 10-14). Denied as to the conclusion stated that Bowlin and Scott "were supposed to" drain the subject drum drip.

14. Denied that Mr. Bowlin's reasons for not draining the subject drum drip are unsupported. During the January '03 inspection, Mr. Bowlin and Mr. Scott were escorted

throughout the building by an agent of Guest Services, who had an assortment of keys and provided access to the secure areas within the building, including portions of the sprinkler system, but who did not provide access to the subject drum drip located within a guest room on the fifth floor heretofore referred to as conference room 5200. (Exhibit E, Bowlin Deposition at P. 51 L. 5-17; Exhibit M, Affidavit of Thomas Scott). Although Mr. Bowlin does not know the name of the escort, it was not Mr. Ham (Exhibit E, Bowlin Deposition, P.33 L.16-19), but was the very same agent who escorted Mr. Bowlin and Mr. Francis throughout the building during the July '02 inspection. (Exhibit E, Bowlin Deposition, P.41 L.18 - P.42 L.4; P. 51 L. 5-17). Mr. Bowlin described the escort as appearing to be a "colored gentleman," who was "probably" 5'10" in height, and looks "Around I'm guessing like thirty years old or could be younger, could be older, but around that." (Exhibit E, Bowlin Deposition, P.34 L.1-10). Mr. Scott recalls that the escort appeared to be an African American with an average-color complexion, about 5'10" or 5'11" tall, in his 30's or 40's. (Exhibit M, Affidavit of Mr. Scott). During the January '03 inspection, Mr. Bowlin and Mr. Scott drained all of the drum drips except the subject drum drip. (Exhibit E, Bowlin Deposition, P.50 L.10-14). Access to the room wherein the drum drip was located is controlled by card swipe on the outer door. (Exhibit I, Aller Deposition, P.134 L.20 - P.135 L.8). The agent who accompanied Mr. Bowlin and Mr. Scott throughout the building during the January '03 inspection did not have card access to the room. (Exhibit E, Bowlin Deposition, P.51 L.12-17). Mr. Bowlin asked him whether he would take care of that particular drum drip. (Exhibit E, Bowlin Deposition, P.54 L.7-13). The escort said he would "take care of the drum." (Exhibit E, Bowlin Deposition, P.56 L.13-15, P.58 L.3-6; Exhibit M, Affidavit of Mr. Scott). The record is devoid of (1) any evidence that either Plaintiff or Guest Services attempted to notice the depositions of Tim Francis, Tom Scott, or several other individuals

{DE103784.1}

identified by Capitol Sprinkler as having knowledge of the circumstances surrounding Capitol Sprinklers' inspections at the Kellogg Conference Center, the loss itself, or the business relationships of the parties; (2) any evidence that Guest Services attempted to serve discovery requests on any party that addressed this point or any of its defenses to liability set forth in its Answer to Capitol Sprinkler's Third Party Complaint; or (3) any evidence affirmatively contradicting Mr. Bowlin's testimony or Mr. Scott's Affidavit on this point.

15. Admitted only as to the first sentence. Denied as to the second sentence as a conclusion of law.

16. Denied. Mr. Bowlin testified that when he reported to the front desk on January 9, 2003, he identified himself as being from Capitol Sprinkler (Exhibit E, Bowlin Deposition, P.91 L.11-21); he was accompanied by Capitol Sprinkler employee, Thomas Scott, (Exhibit E, Bowlin Deposition, P. 50 L.7-13; and Exhibit M, Affidavit of Mr. Scott); and they were met by a gentleman at the front desk, whose name they can not recall. (Exhibit E, Bowlin Deposition, P.40 L.2-8; and Exhibit M, Affidavit of Thomas Scott). This person escorted them throughout the building during the inspection, had an assortment of keys which provided access to the secure areas within the building and sections of the sprinkler system, but did not have card access to the locked guest room on the fifth floor where the one drum drip that they did not drain was located. (Exhibit E, Bowlin Deposition, P.51 L.8-14; Exhibit M, Affidavit of Thomas Scott). This was the very same agent who escorted Mr. Bowlin and Mr. Francis throughout the building during the July '02 inspection. (Exhibit E, Bowlin Deposition, P.41 L.18 - P.42 L.4; P.51 L.15-17). During the July '02 inspection, Mr. Ham assigned this agent to escort Mr. Bowlin and Mr. Francis throughout the building and to provide access to the sprinkler system. (Exhibit A, Vane Deposition, P.40 L.1 - P.41 L.2 ).

17. Denied. Mr. Bowlin did not state that Mr. Vane admitted anything. (Exhibit 6 to Guest Services' Motion, Bowlin Deposition P.56). Admitted that the Capitol Sprinkler contract states in the scope of work section: "Open condensation drains on drum drip connections and drain low points during fall and winter inspection." (Exhibit L, Contract for Automatic Sprinkler Equipment Inspection Service). Admitted that the subject low point should have been drained by somebody. (Exhibit E, Bowlin Deposition at P.56 L. 13-15; P.58 L.3-6; Exhibit F, Parham Deposition, P.44 L.13-17).

18. Admitted.

19. Admitted that Mr. Vane and Mr. Parham stated that the tee fitting likely froze and burst because the drum drip was not drained at any time. (Exhibit A, Vane Deposition at P.97 L.1-12; Exhibit F, Parham Deposition at P.43 L.17 - P.44 L.17). Denied that Mr. Vane and Mr. Parham admit that the tee fitting froze and burst "because the drum drip was not drained during the January 9, 2003 inspection."

20. The Kellogg Conference Center was constructed during the period 1996-1998. Capitol installed the sprinkler system. (Exhibit F, Parham Deposition, P.14 L.14-15 & L.19-21). Craig Parham, the current Vice President of Capitol Sprinkler Contracting, was the outside superintendent for Capitol's work on the project. (See Exhibit F, Parham Deposition, P.8 L.8-10, P.14 L.22 - P.15 L.3).

21. Upon installation of the sprinkler system and the owner's acceptance of the building, Capitol Sprinkler performed the maintenance and inspections required by NFPA 25 from the time of acceptance until 1999. Those services were performed for the owner through a contract with Aramark services. (Exhibit A, Vane Deposition, P.34 L.19 - P.36 L.3). The record is devoid of any suggestion of problems with access to perform the work, or freeze-related

failures during this period.

22.     In January, 2003, Gary Aller served as the Director of Business Operations at Gallaudet University.  As such, he had oversight for the Kellogg Conference Center. (Exhibit I, Aller Deposition, P.24 L.7-15).

23.     The Kellogg Conference Center is a five-story building situated on the grounds of Gallaudet University.  It can be fairly described as a hotel, which consists of a standard lobby area as one enters through the front door and a front desk area, which contains a long, front desk having three computer terminals, a "card keying machine" and safety deposit boxes. (Exhibit I, Aller Deposition, P.49 L.15-22, P.63 L.20 - P.64 L.7, P.68 L.11-16).  The fire alarm annunciator panel is located directly across from the front desk. (Exhibit I, Aller Deposition, P.68 L.17 - P.69 L.8).  Guest Services' staff monitored the annunciator panel in January of 2003.  (Exhibit I, Aller Deposition, P.70 L.21 - P.71 L.9).

24.     The Kellogg Conference Center houses meeting rooms, an auditorium, a ballroom and guest rooms, among other things.  (Exhibit I, Aller Deposition, P.49 L.15-22, P.68 L.11-16).  During the relevant period, 2002 & 2003, it contained 93 guest rooms.  (Exhibit I, Aller Deposition, P.55 L.2-7).  The guest rooms are situated on the fourth and fifth floors, the top two floors of the building.  (Exhibit I, Aller Deposition, P.52 L.3-10, P.53 L.9-13).

25.     The facility is open to the general public.  (Exhibit I, Aller Deposition, P.52-53).  Members of the general public, having no affiliation with the school, may stay as guests at the hotel even though they have no business with the school.  (Exhibit I, Aller Deposition, P.52 L.14-17, P.53 L.1-6).

26.     Mr. Aller is well able to describe how access to the various areas throughout the hotel is controlled: Access to the guest rooms on the 4th and 5th floors was through the use of a

key card, described as "card access" or "swipe access."  (Exhibit I, Aller Deposition, P.132 L.18-22, P.133 L. 8-12).  Access to some rooms on the third floor was by key access, while access to others was by card access.  (Exhibit I, Aller Deposition, P.133 L.4-8).

27.	Key cards for access to the guest rooms were controlled by employees of Guest Services as they were responsible for the security of hotel guests.  (Exhibit I, Aller Deposition, P.133 L.22- P. 134 L.12).  Guest Services employees would activate the access card by inserting it into a machine, punching a code and encoding the cards with appropriate information so that the card would open the appropriate room.  The card was then given to a guest.  (Exhibit I, Aller Deposition, P.133 L.22 - P.134 L.6).

28.	Prior to January, 2003, Mr. Aller had no formal education or training in facilities maintenance.  (Exhibit I, Aller Deposition, P.28 L.18-20).  Moreover, he had no experience in facilities maintenance, no familiarity with fire sprinkler systems, and no experience with the NFPA.  (Exhibit I, Aller Deposition, P.28 L.21 - P.29 L1, P.29 L.15-21).  Even so, Mr. Aller was responsible for overseeing the activities of the management company that managed the facility, Guest Services, Inc.  (Exhibit I, Aller Deposition, P.29 L.2-14).

29.	Prior to the July '02 inspection, Capitol Sprinkler made arrangements, in terms of scheduling and access, through David Ham, Guest Services, Inc.'s Chief of Maintenance. (Exhibit A, Vane Deposition, P.38 L.20 - P.39 L.9, P.29 L.12, P.39 L.17-20).  The July '02 inspection was performed by Capitol Sprinkler employees, Michael Bowlin and Tim Francis. (Exhibit E, Bowlin Deposition, P.32 L.20 - P.33 L.1).

30.	Mr. Vane was at the July '02 inspection with Mike Bowlin and Tim Francis. Upon being ready to inspect the interior, they identified themselves and Mr. Ham assigned an agent of Guest Services to escort them throughout the building and to provide access to the

{DE103784.1}

sprinkler system. (Exhibit A, Vane Deposition, P.40 L.1 - P.41 L.17; Exhibit E, Bowlin Deposition, P.32 L.20 - P.33 L.15; P.34 L.19 - P.35 L.1). This escort provided Capitol Sprinkler's representatives access to all of the areas necessary to perform their work, including draining the drum drips, so that all of the drum drips were drained that day including the subject drum drip. (Id.). The inspectors encountered no problems while performing the inspection and service work in July, 2002. (Exhibit E, Bowlin Deposition, P. 39 L.6-9).

31. During the July '02 inspection, Mr. Ham asked if they would show him where the drum drips were because he was just taking over the maintenance and so they showed them where the drum drips, inspectors tests and dry valves were. (Exhibit E, Bowlin Deposition, P.31 L.22 - P.32 L.7). It was not unusual for a property management agent to accompany an inspector to see how drum drips were drained, and actually drain some themselves. (Exhibit E, Bowlin Deposition, P.20 L.14-20). Generally, property management maintenance personnel that maintain buildings are supposed to drain drum drips themselves when Capitol Sprinkler is not on site. (Exhibit E, Bowlin Deposition, P.21 L.14 - P.22 L.8). The building engineer's responsibility is to keep the drum drips or low points drained. (Exhibit F, Parham Deposition, P.53 L.16 - P.54 L.3).

32. As of the date of the January 25, 2003 incident alleged in Plaintiff's Complaint, David Ham was Guest Services Inc.'s building engineer for the facility. (Exhibit I, Aller Deposition, P.98 L.10-13). He is the one who actually shut off the water that day. (Exhibit I, Aller Deposition, P.99 L.14-17, P.115 L.9-13).

33. Normally, Mr. Scott and Mr. Bowlin would have split up to perform the January '03 inspection; however, the pair was unable to work separately that day because of the access issue. (Exhibit E, Bowlin Deposition, P.94 L.3-19).

34. Mr. Bowlin was able to drain the subject drum drip during the July '02 inspection. (Exhibit E, Bowlin Deposition, P.51 L.5-6). However, he was unable to drain it in January '03, because he was not given access to the room. (Exhibit E, Bowlin Deposition, P.51 L.8-11). Access to the guest room where the subject drum drip is located is controlled by card swipe on the outer door. (Exhibit I, Aller Deposition, P.134 L.20 - P.135 L.8). This was the only drum drip situated in a guest room requiring card access. (Exhibit E, Bowlin Deposition, P.36 L.15-18). The rest of the drum drips could be accessed by means of physically unlocking a locking mechanism on the component itself, or by means of a building master key that provided access to the mechanical rooms. (Exhibit E, Bowlin Deposition, P.36 L.19 - P.37 L.1).

35. The subject drum drip was the last one to be drained that day. (Exhibit E, Bowlin Deposition, P.53 L.7-15). Upon arriving at the door to the room, the escort said he didn't have a card to the room. (Exhibit E, Bowlin Deposition, P.51 L.22 - P.52 L.3). Mr. Bowlin asked the escort whether he was going to get an access card and the escort responded with a look as if he really did not want to. (Exhibit E, Bowlin Deposition, P.54 L.7-13). The agent never offered to go to the front desk to get an access card. (Exhibit E, Bowlin Deposition, P.53 L.4-6). Mr. Bowlin asked him whether he would take care of that particular drum drip. (Exhibit E, Bowlin Deposition, P.54 L.7-13). And, the escort said he would "take care of the drum". (Exhibit E, Bowlin Deposition, P.56 L.13-15, P.58 L.3-6).

36. Following the incident of January 25, 2003, representatives of Capitol Sprinkler Contracting, Inc. performed certain repairs to the subject fire protection system and restored it to service. As part of that process, they replaced certain components. Vernon Vane returned the original components to an agent of Guest Services, Inc., at the Kellogg Conference Center, who identified himself as Terrance Hubbard. He appeared about 5'10" tall and had a medium build.

{DE103784.1}

He appeared in his 30's or 40's. The color of his skin was dark for a Caucasian, and light for an African American such that Mr. Vane would describe him being of mixed race. (Exhibit J, Affidavit of V. Vane, dated February 7, 2008).

37. The depositions of Mr. Hubbard and Mr. Ham were twice noticed in this litigation; once by counsel for plaintiff, and once by counsel for Capitol Sprinkler. Counsel for Guest Services produced neither witness for either deposition. (Exhibit N, Transcript of Court Status Conference of 1/31/07, PP. 3, 5 & 6).

38. On May 4, 2006, Capitol Sprinkler identified Terrance Hubbard as having knowledge of the "circumstances surrounding inspections of the subject property." (Exhibit P, Defendant/Third Party Plaintiff's Rule 26(a) Disclosures, P.2). On June 6, 2006, Guest Services identified Mr. Hubbard as an "Employee of Guest Services, Inc." (Exhibit Q, Third Party Defendant's Rule 26(a) Disclosures, P.2). Upon information and belief, Terrance Hubbard died on September 10, 2005. (Exhibit K, Affidavit of Lou Dempsey, dated January 17, 2008).

39. Not knowing of Mr. Hubbard's death, Counsel for Capitol Sprinkler made reasonable efforts to depose him and David Ham. Counsel noticed the depositions of both gentleman, as well as Third-Party Defendant's 30(b)(6) witness "concerning access to the conference center provided to Capitol Sprinkler by Third-Party Defendant on January 9, 2003." (Exhibit O, Notice of Deposition).

40. Counsel for Guest Services, Mr. Horvath, was initially in contact with Mr. Ham. However, his office lost contact with him and he was unavailable for deposition. (Exhibit N, Transcript of Court Status Conference of 1/31/07, PP. 3, 5 & 6). As of the close of discovery, Mr. Ham remains unavailable for deposition. (Exhibit N, Transcript of Court

Status Conference of 1/31/07, PP. 3, 5 & 6).

41. Guest Services has never produced Mr. Ham or any Fed. R. Civ. P. 30(B)(6) witness in defense of this litigation. The record is devoid of any evidence that either Plaintiff or Guest Services attempted to notice the depositions of Tim Francis, Tom Scott, or several other individuals identified by Capitol Sprinkler as having knowledge of the circumstances surrounding Capitol Sprinklers' inspections at the Kellogg Conference Center, the loss itself, or the business relationships of the parties. The record is also devoid of any evidence that Guest Services attempted to serve discovery requests on any party that addressed any of its defenses to liability set forth in its Answer to Capitol Sprinkler's Third Party Complaint. The record is also devoid of any evidence affirmatively contradicting the testimony by Capitol Sprinkler's employees as to the acts of Guest Services' employees and agents that affect Guest Services' likely liability in this matter.

    Respectfully submitted,

    **MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.**

    /s/Donald R. Kinsley
    Michael T. Hamilton, Esquire (Bar ID No. 474233)
    Donald R. Kinsley, Esquire (Bar ID No. 432998)
    Norman H. Brooks, Jr., Esquire (PHV)
    913 N. Market Street, Ste. 800
    Wilmington, DE 19801
    *Attorney for Defendant*
    *Capitol Sprinkler Inspection, Inc.*

DATE: February 29, 2008