# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ST. PAUL MERCURY INSURANCE
COMPANY, as Subrogee of Gallaudet
University,

       Plaintiff,

       v.

CAPITOL SPRINKLER INSPECTION,
INC.

       Defendant/Third-Party Plaintiff,

       v.

GUEST SERVICES, INC.

       Third-Party Defendant.

Civil Action No. 05–2115 (CKK)

## MEMORANDUM OPINION
(September 2, 2008)

On January 25, 2003, a tee fitting froze and burst in the dry sprinkler system at the

Kellogg Conference Center on the campus of Gallaudet University ("Gallaudet") in Washington,

D.C., causing significant water damage. This case is about who is legally responsible for the

damage. Plaintiff St. Paul Mercury Insurance Company ("St. Paul") was Gallaudet's property

insurer, and has been subrogated for Gallaudet in this litigation. St. Paul filed suit against

Defendant Capitol Sprinkler Inspection, Inc. ("Capitol Sprinkler"), the company that was

contracted to perform semi-annual inspections of the sprinkler system. Capitol Sprinkler, in turn,

filed suit against third-party Defendant Guest Services, Inc. ("Guest Services"), the building

management company at the conference center. Currently pending before the Court are four

summary judgment motions: (1) St Paul's [48] Motion for Partial Summary Judgment against Capitol Sprinkler; (2) Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul; (3) Capitol Sprinkler's [58] Motion for Summary Judgment against Guest Services; and (4) Guest Service's [59] Motion for Summary Judgment against Capitol Sprinkler. In addition, there are two motions pending before the Court that relate to the parties' summary judgment briefing: Guest Services's [69] Motion for an Extension of Time to File an Opposition to Capitol Sprinkler's Motion for Summary Judgment (which is actually a motion for leave to file out of time), and Capitol Sprinkler's [73] Motion to Strike Guest Services's Reply filed in support of Guest Services's Motion for Summary Judgment against Capitol Sprinkler.

After thoroughly reviewing all of the parties' pleadings and attachments thereto, applicable case law, statutory authority, and the entire record herein, the Court finds that there are genuine issues of material fact as to whether Capitol Sprinkler was escorted by a Guest Services employee during its January 9, 2003 inspection at the conference center, whether and to what extent Guest Services operated as an agent of Gallaudet, and whether and to what extent National Fire Protection Association standards were incorporated into the Inspection Agreement between Capitol Sprinkler and Guest Services. The Court also finds that Capitol Sprinkler's claims based on frustration of purpose and modification of contract are not cognizable, but it shall order supplemental briefing as to whether Capitol Sprinkler's breach of contract and negligence-based claims are cognizable without Capitol Sprinkler's having provided an expert report or any expert opinion testimony. The Court shall also order supplemental briefing as to whether the escort who accompanied Capitol Sprinkler's inspectors during the January 9, 2003 inspection made statements that constitute inadmissible hearsay.

Accordingly, the Court shall HOLD-IN-ABEYANCE St. Paul's [48] Motion for Partial Summary Judgment, HOLD-IN-ABEYANCE Guest Services's [59] Motion for Summary Judgment against Capitol Sprinkler, and shall HOLD-IN-ABEYANCE-IN-PART Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul to the extent that it claims Gallaudet was negligent based on its own actions (as opposed to those of Guest Services), pending the parties' supplemental briefing. The Court shall also DENY Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul in all other respects and DENY Capitol Sprinkler's [58] Motion for Summary Judgment against Guest Services. Finally, the Court shall DENY Guest Services's [69] Motion for Leave for an Extension of Time to file an Opposition to Capitol Sprinkler's Motion for Summary Judgment, and shall DENY Capitol Sprinkler's [73] Motion to Strike Guest Services's Reply in support of its Motion for Summary Judgment, for the reasons that follow.

## I. BACKGROUND

*A.     Factual Background*

Gallaudet is the owner of the Kellogg Conference Center (the "Conference Center") in Washington, D.C.[1] Pl.'s Stmt. ¶ 1. The Conference Center is a five-story building that houses

---

[1] As the Court has repeatedly advised the parties, *see, e.g.*, [56] Order at 1-2 (Jan. 28, 2008), the Court strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case). Accordingly, the Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. Thus, in most instances the Court shall cite only to Plaintiff's Statement of Material Facts ("Pl.' Stmt."), Defendant's Statement of Material Facts ("Def.'s Stmt."), or Third-Party Defendant's Statement of Material Facts ("Third-Party Def.'s Stmt.") unless a statement is contradicted by the opposing party. The Court shall also cite directly to evidence in the record, where appropriate, to provide additional information not covered or mischaracterized in any the

meeting rooms, 93 guest rooms, and other areas.  Def.'s Stmt. ¶¶ 3, 4.  The building has a

sprinkler system that was installed by Capitol Sprinkler either during its construction between

1996-1998 or thereafter.  *Id.* ¶ 2.  Portions of the building are restricted (such as the guest rooms)

and are accessible only by using specific key cards.  *Id.* ¶ 9.

On February 11, 2002, Gallaudet contracted with Guest Services to provide operational

and management services for the Conference Center.  *Id.* ¶ 13.  The agreement (hereinafter, the

"Management Agreement") authorized Guest Services to contract with third-parties to perform

services related to the maintenance of the property:

> Negotiate and enter into service contracts necessary or desirable in the ordinary
> course of business in operating the Property, including without limitations,
> contracts for provision of telephone and other utility services, cleaning services,
> vermin extermination, trash removal, elevator and boiler maintenance, air
> conditioning maintenance . . . and other services deem[ed] advisable.

Def.'s Mot., Ex. A § 3.1(e) (2/11/00 Management Agreement).  Pursuant to that authority, Guest

Services contracted with Capitol Sprinkler on April 22, 2002, to perform semi-annual inspections

of the sprinkler systems at the Conference Center.  Pl.'s Stmt. ¶ 2.

The agreement between Guest Services and Capitol Sprinkler (hereinafter, the

"Inspection Agreement") obligated Capitol Sprinkler to "open condensation drains on drum drip

connections and drain low points during fall and winter inspection[s]."  *Id.* ¶ 3.  Vernon Vane,

Capitol Sprinkler's supervisor of inspections, confirmed that Capitol Sprinkler's inspectors were

supposed to drain "drum drips" during inspections in accordance with this provision:

> Q: . . . And under that it says "[o]pen compensation drains on drum [drip]
> connections and drain low points during fall and winter inspection."  That right?

---

parties' Statements.

4

A: That's correct.

Q: That is the work that's supposed to be done by Capitol Sprinkler's people when they are at the job site.  Is that correct?

A: That's correct.

Pl.'s Mot., Ex. D at 49:11 - 49:18 (Depo. Tr. of V. Vane); Pl.'s Stmt. ¶ 6 (same).

On January 9, 2003, Capitol Sprinkler employees Michael Bowlin and Tom Scott inspected the sprinkler system at the Conference Center.  Pl.'s Stmt. ¶¶ 7, 8.  Because they needed access to certain areas of the building that were restricted, the inspectors were accompanied by an escort who could provide them with such access.  Def.'s Stmt. ¶¶ 16; 21.  During the inspection, Mr. Bowlin and Mr. Scott drained all of the drum drips except for the one that was located above the building's conference room 5200.  Pl.'s Mot., Ex. F at 50:10 - 50:15 (Depo. Tr. of M. Bowlin) ("Q: Now did you drain, you and Mr. Scott, drain all of the drain points during the January 9, 2003 inspection?  A: All but the one in that room.  Q: The one above conference room 5200?  A: Correct").  The drum drip above conference room 5200 was the last one that needed to be drained during the January 9, 2003 inspection.  Def.'s Stmt. ¶ 28.  Mr. Bowlin testified that he and Scott were supposed to drain that drum drip.  *Id.* at 50:21 - 50:22 ("Q: Were you supposed to drain that drain?  A: Yes").[2]

According to Mr. Bowlin's deposition testimony, and not refuted by contradictory

---

[2] The Court has quoted directly from deposition transcripts in the record to demonstrate that Capitol Sprinkler's objection to the use of the phrase "supposed to" is meritless; the phrase was accepted by two Capitol Sprinkler employees.  *See* Pl.'s Mot., Ex. D at 49:11 - 49:18 (Depo. Tr. of V. Vane) ("Q: That is the work that's *supposed to* be done by Capitol Sprinkler's people when they are at the job site.  Is that correct? A: That's correct.") (emphasis added); Pl.'s Mot., Ex. F at 50:21 - 50:22 (Depo. Tr. of M. Bowlin) ("Q: Were you *supposed to* drain that drain?  A: Yes") (emphasis added).

evidence in the record, Mr. Bowlin and Mr. Scott did not drain the drum drip above conference

room 5200 because their escort did not have immediate possession of the key card necessary to

give them access to the room: "We were going to the room and when we got to the room he [the

escort] says, 'I don't have a card. I have to go down stairs and get the card for the access.'" Pl.'s

Opp'n, Ex. 7 at 51:22 - 52:3 (Depo Tr. of M. Bowlin). Mr. Bowlin's testimony is internally

inconsistent as to whether he asked the escort to retrieve the key card. *Compare id.* at 54:18 -

54:21 ("Q: . . . did you ask him to go get the card? A: No, I didn't ask him to go get the card")

*with id.* at 56:6 - 56:14 ("Q: Why didn't you ask him to go get the card so you could have access

to drain the last drain you had left? A: I asked him to get the card but I don't remember him

going to get the card. Q: So you don't remember him saying, 'I refuse to get the card' or

anything like that? A: He didn't refuse to get the card"). Nevertheless, Bowlin testified that he

asked the escort to drain the drum drip himself instead of retrieving the key card:

> he just kind of looked at us like, you know, he really didn't want to [get the key
> card] – he would take care of it. He said he would take care of the drum drip, and
> I asked him, I said 'Are you going to take care of this' – I said, 'You know what?
> I can't get in the room. Are you going to take care of this drum [drip]?

*Id.* at 54:11 - 54:17. *See also id.* at 56:16 - 56:22 ("Q: . . . Did you ask him, since you don't have

a card, 'Will you take care of the drum drip?' A: I asked him if he would take care of the drum

drip. Q: So you made a request? A: I made a request"). Mr. Bowlin indicated that it would have

taken between five to ten minutes to retrieve the key card, or "[h]owever long it takes [] to get to

the elevator, go downstairs to the front desk, or however fast the elevator runs." Def.'s Opp'n to

Pl.'s Mot., Ex. E at 52:11 - 52:21 (Depo Tr. of M. Bowlin). Mr. Bowlin and Mr. Scott left the

building and completed an inspection report, indicating that all of the "dry valves [were]

6

protected from freezing" and "all areas and valves [were] protected from freezing."  Third-Party

Def.'s Stmt. ¶¶ 10, 11; Def.'s Resp. Third-Party Stmt. ¶ 10.  No "deficiencies" were noted on the

report, and the report does not indicate that a drum drip had not been drained or that the

inspectors had requested that an escort drain a drum drip.  *See* Third-Party Def.'s Mot., Ex. 5 at 2

(7/9/03 Inspection Report).

The drum drip above conference room 5200 was never drained.  Pl.'s Stmt. ¶ 13; Def.'s

Resp. Stmt. ¶ 13.  On January 25, 2003, a tee fitting in the sprinkler system froze and burst,

allowing water to discharge.  Pl.'s Stmt. ¶ 11.  It is undisputed that the tee fitting froze and burst

because the drum drip had not been drained during the January 9, 2003 inspection.[3]  Pl.'s Stmt. ¶

13.

Before continuing forward, the Court pauses to address one of the central disputes in this

litigation – the identity of the escort who allegedly agreed to drain the drum drip for Capitol

Sprinkler's inspectors.  Mr. Bowlin testified that the escort was the same individual who

accompanied him during an inspection in July 2002, but whose name he could not recall.  Pl.'s

Opp'n, Ex. 7 at 34:1 - 34:18; 41:18 - 42:6 (Depo. Tr. of M. Bowlin).  Mr. Bowlin described the

---

[3] Craig Parham, the Vice President of Capitol Sprinkler, admitted that the tee fitting froze and burst because the drum drip was not drained during the January 9, 2003 inspection.  Pl.'s Mot., Ex. G at 44:2 - 44:17 (Depo. of C. Parham).  Although St. Paul also suggests that Vernon Vane admitted the same, Capitol Sprinkler correctly points out that his deposition testimony indicated only that the tee fitting froze and burst because the drum drip had not been drained, not because it had not been drained "during the January 9, 2003 inspection."  *See* Def.'s Resp. Stmt.¶ 13.  This distinction, in any event, has no effect on the disposition of the issues related to the instant motions.  Plaintiff's expert, Kenneth McLauchlan, submitted an uncontroverted report that the tee fitting froze and burst because the drum drip was not drained during the inspection. *See* Pl.'s Mot., Ex. H at 8 (Expert Report of K. McLauchlan) ("[t]he water damage incident would not have occurred if Capitol [Sprinkler] had properly drained all of the drum drips during the Winter Service performed on January 9, 2003").

escort as a "colored gentleman" who was 5' 10'' tall, and approximately 30 years old.  *Id.* at 34:1

- 34:14.  Mr. Bowlin conceded that he did not know anything about this individual when he

allegedly asked him to drain the drum drip above conference room 5200:

> Q: . . . did you know at that time anything about his background, experience,
> reliability, competency to do the work that you were requesting that he do?
>
> A: No
>
> Q: Did you ask him for any information that would allow you to [assess] . . .
> whether he was competent, qualified, trained in order to do this job?
>
> A: No.
>
> * * *
>
> Q: Did you have any reason to believe, did you have any facts that told you that
> this guy could do what needed to be done with this drum drip?
>
> A: He was assigned to us by the maintenance, so I assume that he was going – he
> was able to do that.

*Id.* at 57:2 - 57:20.  Mr. Vane, who attended the 2002 inspection but not the 2003 inspection at

the Conference Center, testified that he was unaware of the escort's identity but recalled his

description from 2002.  *See* Pl.'s Opp'n, Ex. 2 at 40:14 - 40:17, 41:1 - 41:3 (Depo. Tr. of V.

Vane) ("Q: Why did you need somebody from Guest Services to accompany you?  A: For access,

keys, things of that nature . . . Q: . . . And do you know who . . . [was] assigned to you to do that?

A: No.").  Mr. Vane recalled the 2002 escort as being a "tall, slender black man" in his thirties,

and confirmed that he knew nothing about this individual:

> A: . . . He just assisted us, I mean, walked with us and unlocked things.  That's all
> he did.
>
> * * *

Q: Did you know anything about the history or competency or reliability of the person that accompanied you in July of 2002?

A: No.

Q: From your recollection, do you recall if this person did anything to indicate to you that he knew something about sprinkler systems and how to test them and inspect them and do the type of work that Capitol Sprinkler is doing?

A: No.

*Id.* at 44:9 - 44:11; 44:20 - 45:7.

Despite the testimony by Capitol Sprinkler's employees that the identity of the escort was unknown to them (except for the descriptions quoted above), Capitol Sprinkler's summary judgment briefs identify the escort as Terrence Hubbard, a former Guest Services employee. *See, e.g.*, Def.'s Opp'n to Pl.'s Mot. at 10. Mr. Vane testified that Capitol Sprinkler's identification of Mr. Hubbard was based only on the fact that Mr. Hubbard signed for a package of sprinkler parts that were delivered by Capitol Sprinkler to Guest Services after the water damage occurred:

A: . . . nobody could come up with a name. I mean, we just didn't know.

Q: Well, eventually somebody came up with a name. Isn't that correct?

A: Yes.

* * *

Q: Where did the name come from?

A: That's the guy that signed off on the – that signed off on the receipt. When I brought – I can't remember we brought it down or sent it down, but anyway the broken fittings in the sprinkler head they wanted.

Q: Yes.

A: Was given to him and he signed off for that.

9

Q: That's Mr. Hubbard?

A: Hubbard, yes, and we're not – we're surmising that possibly he was the gentleman that was–

Q: What's the basis of that surmise?

A: Just somebody that – he seemed to fit the general description that we both – or we all had.

Q: So Mr. Bowlin and Mr. Scott didn't point this guy out to somebody and say he's the guy that was there that day?

A: No.

Pl.'s Opp'n, Ex. 2 at 94:1 - 95:12 (Depo. Tr. of V. Vane).  Mr. Vane was asked a second time to confirm the basis of Capitol Sprinkler's identification of Mr. Hubbard:

Q: And the only reason you assume that this employee is Terrence Hubbard is just because of the fact that he signed the [receipt]?

A: That's correct.

Q: Nobody ever said, 'Hey, that's the guy'?

A: No, nobody specifically.

Q: Have you ever seen Mr. Hubbard personally?

A: No, wouldn't know him if I fell on him.

*Id.* at 153:22 - 154:9.

Terrence Hubbard died on September 10, 2005, prior to the initiation of this lawsuit.

Def.'s Stmt. ¶ 33.   For purposes of its Opposition to Capitol Sprinkler's Motion for Summary

Judgment, St. Paul submitted an affidavit from Mr. Hubbard's father, Edwin Hubbard, who

explained that his son was actually a light complexioned, dirty-blond haired Caucasian of

English/German descent, who would have been 49 years old in 2003, and stood approximately 5'

8'' tall. *Id.*, Ex. 8 at 1-2 (Affidavit of E. Hubbard).

In a transparent attempt to create a factual dispute concerning the identity of the escort,

Capitol Sprinkler submitted a new affidavit from Mr. Vane, wherein he contradicts his previous

deposition testimony concerning the escort:

- Mr. Vane had previously testified that he was unsure whether he personally returned the broken sprinkler parts to Guest Services. *See* Pl.'s Opp'n, Ex. 2 at 152:16 - 153:21 (Depo. Tr. of Vernon Vane) ("Q: Did you personally deliver the pipe back to – A: No, I have no – I don't know. I'm not sure about that, whether I brought it down or I sent it down. I know I had it already in a little plastic bag, but I just don't recall."); *id.* at 94:1 - 95:12 ("Q: Where did the name come from? A: That's the guy that signed off on the – that signed off on the receipt. When I brought – I can't remember we brought it down or sent it down, but anyway the broken fittings in the sprinkler head they wanted."). In his new affidavit, Mr. Vane states that he definitively returned the sprinkler components to Guest Services. *See* Def.'s Opp'n to Pl.'s Mot., Ex. J at 2 ("I then returned the original components to an agent of Guest Services" and "I returned the components to Guest Services, Inc.").

- Mr. Vane previously testified that, in terms of his knowledge of Mr. Hubbard's appearance, he "wouldn't know him if [he] fell on him." Pl.'s Opp'n, Ex. 2 at 153:22 - 154:9. In his new affidavit, Mr. Vane now remembers actually meeting Mr. Hubbard. *See* Def.'s Opp'n to Pl.'s Mot., Ex. J. at 2 ("I met [Guest Services's] agent at the Kellog[g] Conference Center. He identified himself as Terrence F. Hubbard").

- Mr. Vane previously testified that Mr. Hubbard was "black." Pl.'s Opp'n, Ex. 2 at 41:7. In his new affidavit, Mr. Vane now believes Mr. Hubbard was "mixed race" and perhaps "dark for a Caucasian and light for an African American." Def.'s Opp'n to Pl.'s Mot., Ex. J. at 2.

- Mr. Vane previously testified that Mr. Hubbard was tall and slender. Pl.'s Opp'n, Ex. 2 at 41:7. In his new affidavit, Mr. Vane now believes that Mr. Hubbard was "about 5' 10" tall" and of "medium build." Def.'s Opp'n to Pl.'s Mot., Ex. J. at 2.

- Mr. Vane previously testified that Mr. Hubbard appeared to be in his thirties. Pl.'s Opp'n, Ex. 2 at 41:9. In his new affidavit, Mr. Vane now believes he was in his thirties *or forties*. Def.'s Opp'n to Pl.'s Mot., Ex. J.

11

at 2.

St. Paul argues that Mr. Vane's new affidavit is nothing more than a "sham affidavit" that should be disregarded on summary judgment. Pl.'s Opp'n at 5-7. The Court agrees.[4] Under the "sham affidavit" doctrine, "courts will disregard an offsetting affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation and creates only a sham issue of material fact." *Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 929 (D.C. 2003). *See also Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (same). For the doctrine to apply, "the affidavit must clearly contradict prior sworn testimony, rather than clarify confusing or ambiguous testimony, and the contradiction must lack credible explanation, such as new evidence." *Hinch*, 814 A.2d at 930.

In the present case, Capitol Sprinkler argues that the affidavit functions as a "supplement" to Mr. Vane's previous testimony because it relates to his interactions with Mr. Hubbard in January 2003 and not from the inspection that occurred in July 2002. *See* Def.'s Reply to Pl.'s Opp'n at 2. That explanation makes no sense. First, Mr. Vane had previously testified that he did not know whether he had returned the sprinkler parts that gave rise to this alleged meeting with Mr. Hubbard in January 2003. *See* Pl.'s Opp'n, Ex. 2 at 152:16 - 153:21; 94:1 - 95:12. His affidavit now states the opposite. Second, Capitol Sprinkler is alleging that the escort from the 2002 inspection was the same as the 2003 inspection, and that the escort was Mr. Hubbard.

---

[4] Capitol Sprinkler submitted a second affidavit by Mr. Vane that covers subjects unrelated to the escort's identity. *See* Def.'s Opp'n to Pl.'s Mot., Ex. G. The Court does not consider this second affidavit to be a "sham affidavit," and shall address the contents of this second affidavit below. *See* Section III.B.i, *infra*.

Capitol Sprinkler offers no credible explanation as to why Mr. Vane's recollection of the *same individual* would differ based on whether it was derived from the alleged interactions occurring in July 2002 or January 2003. Accordingly, the Court finds that Mr. Vane's affidavit is a "sham affidavit," and that it shall be disregarded for purposes of summary judgment.

Based on the foregoing, the Court concludes that there is insufficient evidence in the record from which a jury could find that Capitol Sprinkler's escort during the January 9, 2003 inspection was Terrence Hubbard. While there *is* evidence in the record that Mr. Hubbard worked for Guest Services during this period, *see, e.g.*, Pl.'s Opp'n, Ex. 8 at 1 (Affidavit of E. Hubbard), and that Mr. Hubbard signed a return receipt for sprinkler parts after the water incident at the conference center, *see* Def.'s Mot. against Pl., Ex. J-1 (1/30/03 Transmittal Receipt), those two facts alone are an insufficient basis from which a jury could find that he was the escort during the January 2003 inspection. Contrary to Guest Services's arguments, however, the Court also concludes that there *is* sufficient evidence in the record from which a jury could find that–although unnamed–the escort could have been employed by Guest Services. For example, Mr. Scott stated that he and Mr. Bowlin met a Guest Services employee at the front desk of the conference center who escorted them through the building and provided them with access to secure areas during the January 9, 2003 inspection. *See* Def.'s Mot. as to Pl., Ex. I at 1 (Affidavit of T. Scott). Mr. Bowlin also testified that an employee was "assigned" to them to "open up rooms" and otherwise provide them with access to secure areas. *Id.*, Ex. H at 33:6 - 33:22, 34:21 - 34:22. Accordingly, for purposes of resolving the instant motions, the Court shall consider the person who escorted Capitol Sprinkler during the January 9, 2003 inspection to be "unidentified," but a person whom a jury could nonetheless find was an employee of Guest

Services.

B.    *Procedural Background*

St. Paul filed a two-count Complaint against Capitol Sprinkler on October 31, 2005, alleging negligence and breach of contract. Capitol Sprinkler, in turn, filed a Third-Party Complaint against Guest Services on January 30, 2006, also alleging negligence and breach of contract. The Court held an Initial Scheduling Conference on April 5, 2006, after which the Court issued a Scheduling and Procedures Order requiring the parties to serve their Rule 26(a)(2)(B) expert reports no later than August 15, 2006, and setting December 15, 2006 as the last day for discovery. *See* [18] Order at 6-7 (Apr. 5, 2006). The Court subsequently extended these deadlines, allowing Capitol Sprinkler until November 6, 2006, to serve its Rule 26(a)(2)(B) expert report, and setting January 5, 2007, as the last day for discovery. *See* Min. Order dated Oct. 24, 2006.

As the Court has thoroughly examined in its June 1, 2007 Memorandum Opinion, which the Court shall incorporate herein, Capitol Sprinkler failed to timely take depositions of opposing party witnesses and to serve a compliant Rule 26(a)(2)(B) expert report. *See St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc. v. Guest Svcs., Inc.*, No. 05-2115, 2007 U.S. Dist. LEXIS 39606 *1 (D.D.C. June 1, 2007). To briefly summarize the Court's prior findings in relevant part, on October 9, 2006, Capitol Sprinkler noticed the depositions of two former employees of Guest Services, Terrence Hubbard and David Hamm, along with corporate designees for Gallaudet and Guest Services, for October 16, 2006 (i.e., providing opposing counsel with 5 days notice). *Id.* at * 6. Both St. Paul and Guest Services indicated that they could not produce witnesses in such a short time-frame, *id.*, and counsel for Capitol Sprinkler

14

*retracted* the deposition notices, *id.* at *9.  Capitol Sprinkler did not again notice these depositions or motion the Court to extend the discovery period to take these depositions prior to the expiration of the discovery period.  *Id.* at *6, *22.

On October 16, 2006, Capitol Sprinkler served opposing counsel with a cursory Rule 26(a)(2)(B) expert report of James S. Davidson, Jr., and stated that a "supplementary disclosure" would be forthcoming.  *Id.* at *6-*7.  Capitol Sprinkler failed to offer such a supplement prior to the close of discovery.  *Id.* at *11.  On January 12, 2007, after the close of discovery, after the deposition of Plaintiff's expert, and after mediation with Magistrate Judge Alan Kay, Capitol Sprinkler sent a two-page letter to opposing counsel purporting to supplement its previous disclosure and to indicate that Mr. Davidson was now "available for deposition," even though the discovery period had already closed.  *Id.* at *10-*11.  Defendant subsequently filed a Motion for Leave to Supplement Defendant's Rule 26(a)(2)(B) disclosure on February 5, 2007, which the Court denied because Capitol Sprinkler had failed to demonstrate "good cause" for its failure to abide by the Court's Scheduling Order.  *Id.* at *17-*22.  The Court nevertheless declined to strike Capitol Sprinkler's October 16, 2006 Disclosure, "despite the Court's initial reaction that said filing falls far short of the requirements of a Rule 26(a)(2)(B) expert designation," and instead explained that St. Paul or Guest Services could move to exclude Mr. Davidson's testimony in a Motion in Limine if appropriate.  *Id.* at *28-*29.

St. Paul filed a [48] Motion for Partial Summary Judgment ("Pl.'s Mot.") on January 3, 2008, as to its breach of contract claim.[5]  Capitol Sprinkler filed an Opposition on January 21,

---

[5] St. Paul has not moved for summary judgment as to its negligence claim or proof of damages.

2008, and Guest Services filed a Motion for Summary Judgment on January 24, 2008. The Court held a status hearing on January 28, 2008, where it explained to the parties that the Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1, as it had repeatedly emphasized in its previous orders. *See, e.g.*, [3] Order at 1 (Nov. 15, 2005); [18] Order at 4-5 (Apr. 5, 2006). The Court struck Capitol Sprinkler's Opposition for failing to comply with these local rules. *See* Min. Order dated Jan. 28, 2008. The Court also denied without prejudice Guest Services's Motion for Summary Judgment for the same reason. *Id.* The Court set a schedule for further briefing, which included dates by which these briefs had to be re-filed in compliance with the local rules. *See* [56] Order at 1-3 (Jan. 28, 2008).[6]

Pursuant to the Court's briefing schedule, Capitol Sprinkler filed its Motion for Summary Judgment against St. Paul ("Def.'s Mot. against Pl.") on February 2, 2008, and its Motion for Summary Judgment against Guest Services ("Def.'s Mot. against Third-Party Def.") the same day. Capitol Sprinkler's Motions do not include any reference to Mr. Davidson, nor do they include as exhibits any expert reports or testimony. Guest Services re-filed its Motion for Summary Judgment ("Third-Party Def.'s Mot.") on February 12, 2008, and Capitol Sprinkler re-filed its Opposition to St. Paul's Motion for Partial Summary Judgment ("Def.'s Opp'n to Pl.'s Mot.") on February 15, 2008. St. Paul filed an Opposition to Capitol Sprinkler's Motion for Summary Judgment ("Pl.'s Opp'n") on February 20, 2008, and a Reply to Capitol Sprinkler's Opposition ("Pl.'s Reply") on February 20, 2008. Capitol Sprinkler filed an Opposition to Guest Services's Motion for Summary Judgment ("Def.'s Opp'n to Third-Party Def.'s Mot.") on

---

[6] The Court shall not consider the pleadings on the docket responding to Capitol Sprinkler's Opposition that the Court struck on January 28, 2008, which includes St. Paul's Reply filed on January 24, 2008, and Guest Services's Reply filed on January 24, 2008.

February 29, 2008.  Although Guest Services's Opposition to Capitol Sprinkler's Motion was

due on February 22, 2008, Guest Services failed to file an opposition by that deadline.

Guest Services and Capitol Sprinkler then submitted a flurry of filings in an apparent

attempt to determine who could consume more judicial and party resources.  On February 29,

2008, Capitol Sprinkler filed a Reply to the Opposition that Guest Services failed to file.  On

March 7, 2008, Guest Services filed its dilatory opposition two weeks overdue, along with a

Motion for Leave for an Extension of Time to file it (even though the motion should have been

styled as a motion for leave to file out of time).  Guest Services also filed a timely Reply in

support of its Motion for Summary Judgment ("Third-Party Def.'s Reply").  On March 18, 2008,

Capitol Sprinkler filed an Opposition to Guest Services's Motion for an Extension of Time,

echoing the arguments that it made in its Reply to the Opposition that Guest Services had not

filed at the time.  On March 21, 2008, Guest Services filed a Reply to Capitol Sprinkler's

Opposition to Guest Services's Motion for an Extension of Time.  Not to be outdone, Capitol

Sprinkler then filed a Motion to Strike Guest Services' Reply in support of its Motion for

Summary Judgment.  Guest Services filed an Opposition to the Motion on April 4, 2008, and

Capitol Sprinkler filed a Reply on April 11, 2008.  As a result of the foregoing, the parties' four

Motions for Summary Judgment, Guest Services's Motion for an Extension of Time, and Capitol

Sprinkler's Motion to Strike, are all ripe for decision.

## II.  LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

17

(D.C. Cir. 1994). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C. Cir.1992). Furthermore, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines,* 167 F. Supp. 2d 75, 85 (D.D.C. 2001). Each moving party discharges its burden to support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). In opposing a motion for summary judgment, a party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

## III.  DISCUSSION

The Court shall begin its discussion with St. Paul's Motion for Partial Summary Judgment. The Court shall then proceed to discuss Capitol Sprinkler's Opposition to that Motion and its Opposition to Guest Services's Motion for Summary Judgment, which include nearly identical arguments to those raised by Capitol Sprinkler in support of its Motions for Summary

18

Judgment.[7]  The Court shall also discuss Guest Services's Motion for Summary Judgment in the

context of this section, as appropriate.  Finally, the Court shall discuss Guest Services's Motion

for an Extension of Time and Capitol Sprinkler's Motion to Strike.

  A. *St. Paul's Motion for Partial Summary Judgment*

  St. Paul moves for partial summary judgment on its breach of contract claim based on the

following undisputed facts: (1) Capitol Sprinkler was contractually obligated to drain all drum

drips in the sprinkler system during its January 9, 2003 inspection; (2) Capitol Sprinkler did not

drain one of the drum drips during that inspection; (3) the drum drip that Capitol Sprinkler did

not drain was on the same branch line as the tee fitting which froze and ruptured; and (4) the

rupture of the tee fitting and resulting damage to the Conference Center are the direct result of

Capitol Sprinkler's failure to perform its express contractual obligations.  *See* Pl.'s Mot. at 2.

Capitol Sprinkler offers two arguments as to why the above facts are not undisputed, but both

arguments are meritless.

  First, Capitol Sprinkler argues that Craig Parham, Vice President of Capitol Sprinkler,

testified that "*somebody* didn't drain the drum drip that drains this branch of the sprinkler system

back on January 9, 2003."  Def.'s Opp'n to Pl.'s Mot. at 5 (emphasis in original) (quoting Def.'s

Opp'n, Ex. F at 44:13 - 44:17 (Depo. Tr. of C. Parham)).  Capitol Sprinkler appears to be

implying that a question of fact exists as to whether Capitol Sprinkler (as opposed to "somebody"

else) had a contractual obligation to drain the drum drip, but there is no dispute based on the

---

  [7] Because of this overlap, the Court shall include only a single citation to particular
arguments raised by Capitol Sprinkler, even if the arguments are raised in multiple briefs, with
the understanding that Capitol Sprinkler is moving for, and opposing, summary judgment based
on the same arguments.

record evidence.  The Inspection Agreement required Capitol Sprinkler to drain the drum drips at

the conference center.  Pl.'s Stmt. ¶ 3 ("Pursuant to the Scope of Services in the Contract,

defendant Capitol Sprinkler expressly agreed to "open condensation drains on drum drip

connections and drain low points during fall and winter inspection.") (quoting Pl.'s Mot., Ex. A

at 2 (4/22/02 Inspection Agreement)); Def.'s Resp. Stmt. ¶ 3 ("[a]dmitted").  While Capitol

Sprinkler may argue as a defense to liability that its performance under the contract was excused

for one or more reasons, that defense does not alter the undisputed fact that it had a contractual

obligation to drain the drum drip.

Further, Capitol Sprinkler's argument relies on a mischaracterization of Mr. Parham's

deposition testimony.  A review of the deposition transcript reveals that Mr. Parham was *asked*

whether the water damage was the result of someone not draining the drum drip, and he

answered "[y]es . . . [t]hat was the logical conclusion."  Def.'s Opp'n, Ex. F at 44:17.  He did not

testify, as Capitol Sprinkler implies, that somebody other than Capitol Sprinkler was obligated

under the Inspection Agreement to drain the drum drips – he testified that he believed the cause

of the water damage stemmed from the undrained drum drip.  *Id.  See also* Pl.'s Mot., Ex. D. at

49:11 - 49:18 (Depo. Tr. of Vernon Vane) (Q: . . . And under that it says "Open compensation

drains on drum [drip] connections and drain low points during fall and winter inspection . . . That

is the work that's supposed to be done by Capitol Sprinkler's people when they are at the job site.

Is that correct? A: That's correct.").

Second, Capitol Sprinkler argues that "the record is devoid of any evidence of the room's

occupancy [presumably Conference Room 5200] at the time of the inspection."  Def.'s Opp'n to

Pl.'s Mot. at 6.  This is relevant, according to Capitol Sprinkler, because "the fact that this was a

hotel and that the room itself could have been occupied at the time of the inspection" means that "it is not unreasonable that Capitol Sprinkler's inspector would have accepted that the subject drum drip was not accessible at the time of his inspection . . . [n]either Plaintiff nor Guest Services elicited any affirmative evidence on this point of fact." *Id.*  Capitol Sprinkler fails to include a single citation to the record indicating that its inspectors failed to drain the drum drip above conference room 5200 because they perceived the room to be occupied, and the Court is aware of no such support.  Rather, the evidence, considered in the light most favorable to Capitol Sprinkler, establishes that its inspectors failed to drain the drum drip because they believed their unidentified escort would do it for them.  *See* Pl.'s Opp'n, Ex. 7 at 56:16 - 56:22 (Depo. Tr. of M. Bowlin) ("Q: . . . Did you ask him, since you don't have a card, 'Will you take care of the drum drip?'  A: I asked him if he would take care of the drum drip.  Q: So you made a request?  A: I made a request").  Accordingly, Capitol Sprinkler's argument concerning the occupancy of the room is baseless.  The Court also notes that, contrary to Capitol Sprinkler's argument, St. Paul and Guest Services do not have a burden to produce affirmative evidence establishing why Capitol Sprinkler did not complete its obligations under the Inspection Agreement.  *See Celotex Corp.*, 477 U.S. at 324.

Having rejected Capitol Sprinkler's two arguments as to why St. Paul's breach of contract claim has not been established by undisputed facts in the record, the Court finds that entry of partial summary judgment in favor of St. Paul is appropriate unless Capitol Sprinkler raises a defense pursuant to which a jury could find that Capitol Sprinkler's obligation to perform under the Inspection Agreement was alleviated.  In this regard, Capitol Sprinkler argues that it was relieved of its obligations under the Inspection Agreement because Guest Services (1) breached

the contract between Capitol Sprinkler and Guest Services, (2) frustrated the principal purpose of

the contract, and (3) orally modified the Inspection Agreement (hereinafter, Capitol Sprinkler's

"contract-based defenses").  According to Capitol Sprinkler, these acts are also attributable to

Gallaudet because Guest Services was Gallaudet's agent.  Capitol Sprinkler also argues that it

should be relieved of liability based on the negligent acts of Gallaudet and/or Guest Services

(hereinafter, Capitol Sprinkler's "negligence-based defenses").  The Court shall proceed to

discuss these defenses.

> B.    *Capitol Sprinkler's Opposition to Capitol Sprinkler's Motion for Summary
> Judgment and Opposition to Guest Services's Motion for Summary Judgment*

### 1.    Contract-Based Defenses

As an initial matter, the parties dispute whether and to what extent Guest Services

operated as Gallaudet's agent.  Capitol Sprinkler's Motion argues, without any citation to

evidence in the record, that Guest Services was Gallaudet's agent based on the language of the

Management Agreement and their course of dealings.  *See* Def.'s Opp'n to Pl.'s Mot. at 8-10.

Capitol Sprinkler supplements this argument in Reply by citing several portions of the

Management Agreement.  *See* Def's Reply to Pl.'s Opp'n at 9.  Capitol Sprinkler's argument is

vigorously contested by St. Paul, which "disputes that Guest Services was the agent of Gallaudet

for purposes of the conduct in question" and argues instead that "Guest Services was operating as

an independent contractor" such that Gallaudet is not "vicariously liable for Guest Services'[s]

actions."  Pl.'s Reply at 7.

Agency relationships arise "'when one person authorizes another to act on his behalf

subject to his control, and the other consents to do so.'"  *Judah v. Burton, Reiner & Morris*

22

*Mgmt., Inc.*, 744 A.2d 1037, 1040 (D.C. 2000) (quoting *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982)).[8]  The existence of an agency relationship is ordinarily a question of fact, and the "determinative" factor is "'whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.'"  *Id.* (quoting *LeGrad v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968)).  For contractual relationships, courts evaluate both the terms of the contract and the actual course of dealing between the parties.  *Id.*  Where the existence of an agency relationship is established, principals may be held responsible for the acts of their agents.  *Id.* at 1039.

In this case, there is a genuine issue of material fact as to whether Guest Services acted as Gallaudet's agent for purposes of maintaining the sprinkler system.  On the one hand, the agreement between Gallaudet and Guest Services provided Guest Services with a large degree of autonomy:

> [Gallaudet] hereby appoints, authorizes and engages [Guest Services] to act as the operator and manager of the Property during the term of this Agreement, with responsibility, control and discretion in the operation, management and supervision of the Property.

Def.'s Mot, Ex. A § 3.1 (2/11/00 Management Agreement).  This autonomy is reflected in the provisions that authorize Guest Services to contract with outside entities to maintain the building:

> Negotiate and enter into service contracts necessary or desirable in the ordinary course of business in operating the Property, including without limitations,

---

[8] For reasons that are entirely unclear, only Capitol Sprinkler expressly states that D.C. law governs the instant case.  *See* Def.'s Mot. against Pl. at 4-5.  Nevertheless, both St. Paul and Guest Services appear to assume the same conclusion, and the Court has no reason to question the application of D.C. law where, as here, the District appears to be the undisputed location of both of the events giving rise to the litigation and the performance of the contracts at issue.

> contracts for provision of telephone and other utility services, cleaning services,
> vermin extermination, trash removal, elevator and boiler maintenance, air
> conditioning maintenance . . . and other services deem[ed] advisable.
>
> * * *
>
> Perform and supervise (or cause to be performed or supervised) such maintenance
> and repairs to the Property as shall be required by applicable law, or as shall be
> necessary to operate and maintain the Property in a professional manner suitable
> to the character of the Property.

*Id.* §§ 3.1(e), (j).  *See also id.* § 3.3 (expressly limiting Guest Services's authority in certain areas,

implying that its authority was not circumscribed in other areas); *id.* § 12.1 (indemnifying

Gallaudet for the "negligent acts and willful misconduct" of Guest Services's employees, which

St. Paul argues is a recognition that Guest Services was not Gallaudet's agent).  On the other

hand, the Management Agreement expressly provided that Guest Services "shall act as agent for

[Gallaudet] in the performance of its responsibilities under this Agreement," *id.* § 3.4, and

obligated Guest Services  "to consult with [Gallaudet] on a regular basis to assure that the

Property is being marketed and operated in accordance with the policies, goals and objectives of

[Gallaudet]," *id.* § 3.1.  Although the agreement authorized Guest Services to choose its own

employees, Gallaudet specifically retained "the right to approve the hiring of the person [Guest

Services] select[ed] to be the Property's general manager . . . ."  *Id.* § 3.2.  Neither St. Paul nor

Capitol Sprinkler is able to marshal evidence concerning the parties' actual course of conduct

that would clarify, as a matter of law, the parties' relationship.

St. Paul argues the D.C. Court of Appeals decision in *Henderson v. Charles E. Smith*

*Management, Inc.* supports its position, but that case only underscores the conclusion that the

existence of an agency relationship is often a question of fact that cannot be resolved on

summary judgment. 567 A.2d 59 (D.C. 1989). In that case, two maintenance workers at the

Brandywine apartment complex were injured when a valve dislodged from a boiler, causing

scalding water to spew out onto them. *Id*. at 60. The workers brought suit against the

management company, Charles E. Smith Management Company ("CES"), which the workers

alleged had acted as an agent of Brandywine. *Id.* The contract between CES and Brandywine

provided that "everything done by the Agent under [the] terms of this Agreement shall be done as

Agent of the Owner," *id.* at 63, and the trial court held that CES acted as an agent for

Brandywine, *id.* at 60. The D.C. Court of Appeal reversed, holding that "a material question of

fact exists as to whether CES had the right to exercise such control regarding decisions about the

maintenance and repair of the boiler so as to include CES within the definition of 'agent.'" *Id.*

The court held that the relevant inquiry was not whether Brandywine exercised actual control

over CES in decisions regarding the repair of the boiler, but rather "whether Brandywine had the

*right* to exercise such control," which the court found to be a disputed question of fact

inappropriate for resolution on summary judgment. *Id.* at 62 (emphasis in original). *See also*

*Lewis v. Wash. Metro. Area Trans. Auth.*, 463 A.2d 666, 673 (D.C. 1983) ("[w]here the evidence

permits reasonably conflicting inferences . . . the existence of agency, and its nature and extent,

are questions of fact"). The same analysis applies in this case. There is a material question of

fact as to whether Gallaudet, given the provisions in the agreement and the parties' course of

conduct, had the right to control Guest Services's decisions with respect to sprinkler

maintenance, including its relationship with Capitol Sprinkler. Accordingly, the Court finds that

there is sufficient evidence in the record from which a jury could find that the conduct of Guest

Services could be imputed to Gallaudet. The Court shall now proceed to discuss that conduct.

i.    Guest Services's Breach of Contract

Capitol Sprinkler argues that the Inspection Agreement incorporates National Fire

Protection Association 25 ("NFPA 25"), a set of standards concerning the inspection, testing, and

maintenance of water-based fire protection systems.  *See* Def.'s Opp'n to Pl.'s Mot. at 12.

Pursuant to NFPA 25, property owners must "provide ready accessibility to components of

water-based fire protection systems that require inspection, testing, or maintenance."  Def.'s

Opp'n, Ex. G-1 § 4.1.1 (NFPA 25, 2002 Edition).[9]  NFPA 25 provides that this and other

obligations may be transferred by a property owner to others where, as here, the owner is not the

occupant of the building.  *Id.* §§ 4.1.2.3, 4.1.2.4 ("the property owner shall be permitted to pass

on the authority for inspecting, testing, and maintaining the fire protection systems to the

occupant, management firm, or managing individual . . . [who] shall comply with the

requirements identified for the owner or occupant throughout this standard.).  According to

Capitol Sprinkler, Guest Services breached the Inspection Agreement by "failing to provide

Capitol Sprinkler with access to all components of the subject sprinkler system."  Def.'s Opp'n

to Pl.'s Mot. at 14.  Relying on the Restatement (Second) of Contracts, Capitol Sprinkler further

argues that its obligations under the Inspection Agreement were excused by Guest Services's

breach.  *Id.* at 14-15 (citing Restatement (Second) of Contracts § 237 (1981)) ("it is a condition

of each party's remaining duties to render performances to be exchanged under an exchange of

promises that there be no uncured material failure by the other party to render any such

_____

[9] This language is identical to the 1998 edition of NFPA 25 § 1-4.1, *see* Pl.'s Opp'n, Ex.
4, which Capitol Sprinkler also cites.  Capitol Sprinkler fails to explain why it cites to the 1998
version of NFPA 25 if it believes that the 2002 edition applied to the Inspection Agreement.  *See*
Def.'s Opp'n to Pl.'s Mot. at 13 ("[t]he edition that immediately preceded the edition applied in
this instance was the 1998 edition of NFPA 25 . . . .").

performance due at an earlier time").

Both Guest Services and St. Paul dispute Capitol Sprinkler's argument. Guest Services first argues that NFPA 25 was *not* included as a term in the Inspection Agreement. *See* Third-Party Def.'s Reply at 3. Guest Services explains that the Inspection Agreement expressly stated that Capitol Sprinkler's inspections would be conducted in accordance with NFPA 13-A, and nowhere does it reference NFPA 25. *Id.*, Ex. 3 at 2 (4/22/02 Inspection Agreement) (describing the "scope of services" to include "[i]nspect, test and service the fixed fire protection equipment in a workmanlike manner in accordance with [the] contract, and the requirements of the National Fire Protection Association (NFPA) Care and Maintenance of Sprinkler Systems (No. 13-A) . . . ."). Guest Services's perfunctory argument is that "[t]he contract between the parties does not reference NFPA 25, but rather NFPA 13-A . . . As a result[,] NFPA 25 does not apply." *Id.* at 3.

Although Guest Services is correct that the Inspection Agreement does not reference NFPA 25, there is other evidence in the record suggesting that the parties may have believed that NFPA 25 was the appropriate standard incorporated into the Inspection Agreement. For example, St. Paul's expert, Kenneth R. McLauchlan, reported that "[d]ry pipe sprinkler systems are tested at intervals specified in [NFPA] Standard 25." Pl.'s Mot., Ex. H at 4 (Expert Report of K. McLauchlan). Mr. McLauchlan also reported that the provision in the Inspection Agreement that required Capitol Sprinkler to "[o]pen condensation drains on drum drip connections and drain low points during fall and winter inspection[s]" was "consistent with the requirement in NFPA Standard No. 25." *Id.* at 5. If NFPA 25 did not articulate standards that were applicable to the Inspection Agreement, there would have been no reason for Mr. McLauchlan to review the agreement in that context. Further, Craig Parham testified that NFPA 25 is the "standard by

27

which we do – it is the standard that is set up to do sprinkler inspections and routine maintenance." Def.'s Opp'n, Ex. F at 11:13 - 11:18 (Depo. Tr. of C. Parham). Mr. Parham also testified that NFPA 13 is "lumped together" with standards for other systems into NFPA 25 "so there would be one appendix that was basically for inspections only," suggesting that the difference between NFPA 13 and NFPA 25 is a matter of labeling and not substance.[10] *Id.* at 12:1 - 12:9.

Capitol Sprinkler also submits an affidavit from Vernon Vane in support of its argument concerning NFPA 25. *See* Def.'s Mot., Ex. G (Affidavit of V. Vane). Mr. Vane states that the purpose of his affidavit is to "explain the apparent inconsistency presented by the fact that although the subject contract refers to NFPA 13A, the subject inspection was performed under the standards identified as NFPA 25." *Id.* at 2. He states that, based on his personal knowledge, Capitol Sprinkler's form contract referred to NFPA 13A even though those standards evolved into NFPA 25, and even though "the inspection at issue in this litigation was performed pursuant to NFPA 25." *Id.* Mr. Vane goes further, however, and explains that "NFPA 25 controlled the responsibilities of the owner and manager, Gallaudet University and Guest Services, Inc., in performing the subject contract." *Id.* He justifies this conclusion by analyzing the provisions located within NFPA 25. *Id.* The problem with Mr. Vane's affidavit is that he, like Mr. Parham, has not been offered as an expert witness and has not been qualified to provide opinion testimony. While both he and Mr. Parham may testify–to the extent that their personal knowledge allows–that Capitol Sprinkler followed the standards set forth in NFPA 25, *see* Fed.

---

[10] None of the parties include a copy of NFPA 13-A in the record so as to establish that it is substantively similar to NFPA 25 as Mr. Parham suggests.

R. Evid. 602 ("[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"), neither appears competent to testify based on their personal knowledge that NFPA 25 "controlled the responsibilities" of Guest Services, Gallaudet, or any other entity.  Nevertheless, given St. Paul's expert report and the testimony of Mr. Parham and Mr. Vane that Capitol Sprinkler conducted its inspections in accordance with NFPA 25, none of which is refuted (or even addressed) by Guest Services's perfunctory one-sentence argument, the Court finds that a genuine issue of material fact exists as to whether NFPA 25 was incorporated as a term into the Inspection Agreement despite its reference to NFPA 13-A.

Assuming a jury would find that NFPA 25 was incorporated as a term in the Inspection Agreement, Capitol Sprinkler argues that Guest Services breached the "ready accessibility" standard set forth in section 4.1.1, *see* Def.'s Opp'n, Ex. G-1 § 4.1.1 (NFPA 25, 2002 Edition), because Capitol Sprinkler could not access the drum drip above conference room 5200:  "We were going to the room and when we got to the room he [the escort] says, 'I don't have a card.  I have to go down stairs and get the card for the access.'" Pl.'s Opp'n, Ex. 7 at 51:22 - 52:3 (Depo. Tr. of M. Bowlin).  Although Mr. Bowlin's testimony is unclear as to whether he asked the escort to get the key card, he conceded that the escort did not refuse to retrieve it.  *Id.* at 56:6 - 56:14 ("Q: So you don't remember him saying, 'I refuse to get the card' or anything like that?  A: He didn't refuse to get the card").  Mr. Bowlin indicated that it would have taken between five and ten minutes to retrieve the key card, or "[h]owever long it takes [] to get to the elevator, go downstairs to the front desk, or however fast the elevator runs."  Def.'s Opp'n to Pl.'s Mot., Ex. E at 52:11 - 52:21 (Depo Tr. of M. Bowlin).  Rather than wait for the escort to retrieve the key

card, Bowlin testified that he instead asked the escort to drain the drum drip for him:

> he just kind of looked at us like, you know, he really didn't want to – he would take care of it. He said he would take care of the drum drip, and I asked him, I said 'Are you going to take care of this' – I said, 'You know what? I can't get in the room. Are you going to take care of this drum drip?

Pl.'s Opp'n, Ex. 7 at 54:11 - 54:17. *See also* Depo Tr. 56:16 - 56:22 ("Q: . . . Did you ask him, since you don't have a card, 'Will you take care of the drum drip?' A: I asked him if he would take care of the drum drip. Q: So you made a request? A: I made a request").

     Neither St. Paul nor Guest Services cites to evidence in the record contradicting Mr. Bowlin's account of what transpired, although that does not end the inquiry concerning Capitol Sprinkler's claim that it was denied "ready accessibility" to the drum drip.[11]  To find that Capitol Sprinkler was denied "ready accessibility," Capitol Sprinkler would first have to establish what duty is owed based on that standard. In the present case, Capitol Sprinkler appears to assume, without citation, that the "ready accessibility" standard requires a sort of instantaneous access to all sprinkler components. *See, e.g.*, Def.'s Reply to Pl.'s Opp'n at 4 ("an inspector must be able to have access to the component locked behind any such door or panel . . . Guest Services did not unlock the door to allow the inspector to enter and access the drum drip, and therefore, breached the contract"). In contrast, St. Paul and Guest Services appear to argue that the "ready

---

     [11] Both parties raise the specter that Mr. Bowlin's testimony concerning statements allegedly made by the escort constitute inadmissible hearsay. Capitol Sprinkler, in response, indicates that such statements are admissible under Federal Rule of Evidence 801(d)(2)(D). *See* Def.'s Reply to Pl.'s Opp'n at 3. The Court requires more specific briefing on this issue, particularly in light of its holding that a jury could not reasonably find that the escort was Mr. Hubbard, but that a jury could find that the unidentified escort was a Guest Services employee. As set forth in the Order accompanying this Memorandum Opinion, Capitol Sprinkler must identify which of the unidentified escort's statements it would seek to admit into evidence at trial, and describe the theory of admissibility as to the same. St. Paul and Guest Services may then respond to the specific arguments raised by Capitol Sprinkler.

accessibility" standard requires that an owner not place immobile objects in front of sprinkler components. *See* Pl.'s Opp'n at 12-13; Third-Party Def.'s Reply at 4. St. Paul and Guest Services both cite to the NFPA 25 Appendix, titled "Explanatory Material," that elucidates the "ready accessibility" language:

> [t]he components are not required to be open or exposed. Doors, removable panels, or valve pits may be permitted to satisfy the need for accessibility. Such equipment should not be obstructed by features such as walls, ducts, columns, direct burial, or stock storage.

Appx. A-1-4.1. Based on this appendix provision, St. Paul argues that "the fact that a door may have initially been locked during the inspection does not violate NFPA 25." Pl.'s Reply at 14.[12]

Capitol Sprinkler's unsupported assertion that the "ready accessibility" standard requires instantaneous access is an insufficient basis from which to find a potential breach of that standard. Capitol Sprinkler must show that the "ready accessibility" standard establishes a duty on the part of the owner (or the building manager to which the duty has been transferred) to provide inspectors with access to sprinkler components within a certain time frame (i.e., instantaneous, reasonable, etc.), and that, based on the facts in the record, that standard was breached. It appears to the Court that an expert opinion would be required to establish this duty, and that Capitol Sprinkler has not provided one. *See Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994) ("[t]he standard of care must be established through expert testimony when the subject matter at issue is so distinctly related to some science, profession,

---

[12] Guest Services's Reply confusingly states that "NFPA does not create a duty that would require Guest Services to get the key to access the room in which the drum drip was located," Third-Party Def.'s Reply at 4, which suggests that Guest Services's argument is that it could comply with the "ready accessibility" standard even if it denied the inspectors access to all sprinkler components entirely. If that is the argument that Guest Services intended to make, it is not explained further nor supported beyond this single assertion.

business, or occupation as to be beyond the ken of the average lay person"). *See also Cosio v. District of Columbia*, 940 A.2d 1009, 1010 (D.C. 2008) ("matters such as appropriate inspection and maintenance schedules for prison facilities . . . require expert testimony"); *Sherman v. Adoption Ctr. of Washington, Inc.*, 741 A.2d 1031, 1036 n.11 (D.C. 1999) (explaining that plaintiff failed to satisfy the breach element of her claims because, in part, plaintiff failed to offer expert testimony regarding the standard of care created by the "best efforts" provision in the parties' contract). Nevertheless, the parties devote only scant attention to the absence of an expert opinion in the record. *See, e.g.*, Pl.'s Opp'n to Def.'s Mot. at 18 (arguing, without citation, that "[d]efendant does not have any expert witnesses in the case. Accordingly, defendant will not be able to establish that Guest Services violated any standard of care in the industry"). The Court is unwilling to rule on the dispositive issue of whether Capitol Sprinkler may support this claim in the absence of an expert opinion without more fulsome briefing by the parties. If such briefing confirms that Capitol Sprinkler cannot meet its burden without an expert opinion, then summary judgment would be appropriately granted for St. Paul and Guest Services as to Capitol Sprinkler's breach of contract claim. Accordingly, the Court shall order supplemental briefing to be filed by the parties as set forth in the Order accompanying this Memorandum Opinion.

2.    Frustration of Purpose

Capitol Sprinkler next argues that "Guest Services'[s] failure to provide Capitol Sprinkler's inspectors appropriate access to the subject drum drip frustrated the principal purpose of the contract between Guest Services and Capitol Sprinkler." Def.'s Opp'n to Pl.'s Mot. at 15. According to Capitol Sprinkler, this frustration rendered Capitol Sprinkler's performance under

32

its agreement discharged.  *Id.*  As St. Paul correctly explains, it appears that Capitol Sprinkler is

confusing the doctrines of "frustration of purpose" with "impossibility of performance."  *See*

Pl.'s Opp'n at 14.  Under either doctrine, Capitol Sprinkler's argument is devoid of merit.

The D.C. Court of Appeals has explained that "[u]nder the frustration [of purpose]

defense, the promissor's performance is excused because changed conditions have rendered the

performance bargained from the promisee worthless, not because the promissor's performance

has become different or impracticable."  *Island Devel. Corp. v. Dist. of Columbia*, 933 A.2d 340,

349 (D.C. 2007).  In the present case, the performance bargained from the promissee, Guest

Services, was payment to the promissor, Capitol Sprinkler, in exchange for inspecting, testing,

and maintaining Gallaudet's sprinkler system.  For Capitol Sprinkler's frustration of purpose

argument to be cognizable, it would have to show that Guest Services's payment for Capitol

Sprinkler's services had become worthless – a showing that Capitol Sprinkler has not even

attempted to make (nor is it clear how receiving payment could be considered worthless).  In any

event, even if Capitol Sprinkler's interpretation of this doctrine were correct (which it is not), the

"frustration" would have to be "so severe that it is not fairly to be regarded as within the risks

that [a party has] assumed under the contract."  *Id.* at 350.  In the present case, Capitol Sprinkler

does not explain how the frustration (having to wait five or ten minutes to gain access to the

drum drip) could be viewed as so severe that "it is not fairly to be regarded as within the risks

that [Capitol Sprinkler] assumed under the contract."

Capitol Sprinkler's argument fares no better under the rubric of an impossibility of

performance defense.  The D.C. Court of Appeals has explained that this doctrine "excuses a

promissor from performance because a supervening event changes the nature of the promissor's

performance so that it has become commercially impracticable." *Id.* at 349. The party asserting this defense bears the burden of establishing that performance is "objectively impossible – that is, the contract is incapable of performance by anyone – rather than instances where the party subjectively claims the inability to perform." *East Capitol View Cmty. Dev. Corp. v. Denean*, 941 A.2d 1036, 1040 (D.C. 2007). In the present case, of course, Capitol Sprinkler does not argue that it was objectively impossible to perform the inspection on the drum drip above conference room 5200, only that access was delayed by the escort's having to retrieve a key card. Moreover, Capitol Sprinkler's argument that the escort allegedly agreed to perform the maintenance, *see* Def.'s Opp'n to Pl.'s Mot. at 15-18, tacitly concedes that the performance could have been performed by someone and was thus not impossible. Further, this doctrine is reserved for a very limited set of circumstances not present in this case. For example, the D.C. Circuit, applying this doctrine, has held that the closure of the Suez Canal did not render performance of a shipping contract impossible because there was an alternative route around the Cape of Good Hope. *See Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 319 (D.C. Cir. 1966). If a party's performance is not excused by having to unexpectedly circumvent a continent, clearly Capitol Sprinkler's performance is not rendered impossible by having to wait five minutes to access a drum drip. Accordingly, the Court finds that Capitol Sprinkler's arguments concerning frustration of purpose or impossibility of performance are not cognizable.

### 3.    Modification of the Inspection Contract

Capitol Sprinkler also argues that the unidentified escort orally modified the Inspection Agreement by assuming the duty to drain the drum drip. Def.'s Opp'n to Pl.'s Mot. at 17. According to Capitol Sprinkler, [t]he individual appointed by Guest Services to control Capitol

34

Sprinkler's access to the subject sprinkler system . . . agreed to undertake the performance of a specific aspect of the Guest Services/Capitol Sprinkler Contract . . . [and] [i]n reliance on that representation, Capitol Sprinkler's inspector left the building under the reasonable impression that his work there was complete . . . ." *Id.* Citing the doctrine of "apparent authority," Capitol Sprinkler argues that despite the lack of knowledge about the escort, Capitol Sprinkler's employees may have believed the escort had apparent authority to modify the Inspection Agreement because the escort was selected to accompany Capitol Sprinkler's inspectors, thereby "impl[ying] general power and permit[ing] reasonable inferences that the employee so designated was invested with the general conduct and control of Guest Services responsibilities with regard to the sprinkler system." Def.'s Reply to Pl.'s Opp'n at 7. Because the drum drip was not drained, Capitol Sprinkler argues that Guest Services breached the modified contract, relieving Capitol Sprinkler from its obligations thereunder. *Id.* at 7-8.

Under the law of the District of Columbia, parties may orally modify a written contract through mutual consent, provided that "the modification [] possess[es] the same elements of consideration as necessary for normal contract formation." *Herson v. Hellaman Co.*, 565 A.2d 282, 283 (D.C. 1989). The burden is on the party arguing that the contract has been modified to establish the elements of contract formation by a preponderance of the evidence. *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C. 1964) ("[w]ritten agreements may be modified by subsequent oral agreement, but the oral modification must be established by a preponderance of the evidence"). These elements must necessarily include a showing that the parties orally modifying the written contract had the authority to do so. *See, e.g.*, *Mgmt. P'ship, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C. 1980) (reversing lower court because the record was devoid of evidence that an

agent had authority to modify or rescind a written contract involving her principal).

Capitol Sprinkler's argument is patently unreasonable in light of the evidence in the record. Capitol Sprinkler's inspectors did not know the identity or the background of the escort at the time of the inspection, and could therefore not have relied on the escort's authority as to which they had no knowledge:

> Q: . . . did you know at that time anything about his background, experience, reliability, competency to do the work that you were requesting that he do?
>
> A: No
>
> Q: Did you ask him for any information that would allow you to [assess] that, whether he was competent, qualified, trained in order to do this job?
>
> A: No.

Pl.'s Opp'n, Ex. 7 at 57:2 - 57:20 (Depo. Tr. of M. Bowlin).

> Q: Did you know anything about the history or competency or reliability of the person that accompanied you in July of 2002?
>
> A: No.
>
> Q: From your recollection, do you recall if this person did anything to indicate to you that he knew something about sprinkler systems and how to test them and inspect them and do the type of work that Capitol Sprinkler is doing?
>
> A: No.

*Id.*, Ex. 3 at 44:9 - 44:11; 44:20 - 45:7 (Depo. Tr. of V. Vane). Further, Mr. Bowlin explained that he believed the escort was assigned to the inspectors by the maintenance department, *see* Pl.'s Opp'n, Ex. 7 at 57:2 - 57:20, and Mr. Vane testified that the escort's role was to "walk[] with [the inspectors] and unlock[] things. . . that's all he did." *Id.*, Ex. 3 at 44:9 - 44:11. This testimony indicates that the escort was a lower level employee whom the inspectors could not reasonably have viewed as someone with the authority to renegotiate contracts on behalf of Guest

36

Services.  *Cf. Nat'l Railroad Passenger Corp. v. Expresstrak, LLC*, No. 02-1773, 2006 WL 2947555 at * 13 (D.D.C. Oct. 16, 2006) (finding an oral modification invalid where various "lower level" employees did not have the authority to agree to oral modifications of a Sublease on behalf of their employers).[13]

Moreover, St. Paul argued in its Opposition to Capitol Sprinkler's Motion for Summary Judgment that Capitol Sprinkler had failed to adduce any evidence that Mr. Bowlin had the authority to renegotiate the agreement on behalf of Capitol Sprinkler.  *See* Pl.'s Opp'n at 12 ("defendant cannot even establish through the record that its own representative, Michael Bowlin, had any authority to modify the contract on behalf of defendant").  Capitol Sprinkler failed to address this argument in Reply, *see* Def.'s Reply to Pl.'s Opp'n 4-8, and the Court is aware of no evidence in the record that would support an argument that Mr. Bowlin had such authority.  Accordingly, the Court finds that neither the unidentified escort nor Mr. Bowlin had the authority to orally modify the Inspection Agreement, and thus Capitol Sprinkler's argument that Guest Services breached a modified Inspection Agreement must fail.

### 2.    Negligence-Based Defenses

Capitol Sprinkler argues that both Guest Services and Gallaudet "are liable" for their own negligence and any damages that resulted from the same.  Def.'s Mot. against Pl. at 19; Def.'s

---

[13] Capitol Sprinkler argues that St. Paul improperly relied on *National Railroad Passenger Corp. v. Expresstrak, LLC* in its briefs because it failed to attach the unpublished opinion as an exhibit.  *See* Def.'s Reply to Pl.'s Opp'n at 5-6.  It would appear that Capitol Services has itself committed the same supposed gaffe.  *See, e.g.*, Def.'s Opp'n to Third-Party Def.'s Motion for an Extension of Time at 5 (quoting *Harrison v. Snow*, 2004 U.S. App. LEXIS 26401 (D.C. Cir. 2004) ("[p]ursuant to D.C. Circuit Rule 36, this disposition will not be published")).  These types of specious arguments absorb party resources but do nothing to resolve the substantive issues meriting judicial attention.

Mot. against Third-Party Def. at 17-18.  Under District of Columbia law, contributory negligence is a cognizable defense to liability.  *See Dennis v. Jones*, 928 A.2d 672 (D.C. 2007).  The burden is on the defendant to establish contributory negligence, which is ordinarily a question for the trier of fact.  *Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997).

Capitol Sprinkler makes three negligence-based claims.  First, it argues that Guest Services was Gallaudet's agent, and that Guest Services was negligent when it "thwarted" Capitol Sprinkler's inspection of the sprinkler system:

> the property owner had a duty to maintain the building's sprinkler system; the owner contracted with a properly management agent to perform that maintenance; the property management agent hired Capitol Sprinkler to perform inspections and maintenance; the property management agent thwarted Capitol Sprinkler's ability to perform and agreed to reassume the duty to inspect and maintain; and, the property management agent failed in its duty and caused the damages in this case . . . [thus] plaintiff is contributorily negligent.

Def.'s Reply to Pl.'s Opp'n at 8.  Second, Capitol Sprinkler argues that Gallaudet, as the owner of the conference center, had a duty under NFPA 25 to inspect the conference center's sprinkler system, and that this obligation was not transferrable.  *See* Def.'s Reply to Pl.'s Opp'n at 9-10.  This argument is grounded in section 1-4.2 of NFPA 25, which provides that the "responsibility for properly maintaining a water-based fire protection system shall be that of the owner(s) of the property" but "[w]here the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm . . . ."  Pl.'s Opp'n, Ex. 4 at 1 (NFPA 25 1-4.2 (1998 Ed.)).  According to Capitol Sprinkler, this provision allowed Gallaudet to transfer the *authority* to maintain the sprinkler system, but not the *responsibility* for its maintenance.  Def.'s Reply to Pl.'s Opp'n at 9-10.  Finally, Capitol Sprinkler argues that Guest Services was negligent because NFPA 25

imposes an obligation on the building management agent to either provide the requisite access to

the inspectors to maintain the sprinkler system, or to undertake the maintenance itself; because

Capitol Sprinkler alleges that it was denied access to the drum drip above conference room 5200,

it argues that Guest Services breached its duty to drain the drum drip. Def.'s Mot. against Third-

Party Def. at 17-18.

　　　　As discussed above, the parties dispute issues of material fact associated with whether

Guest Services was Gallaudet's agent, and whether Guest Services's employee was the

unidentified escort who accompanied Capitol Sprinkler during the January 9, 2003 inspection.

Similar to Capitol Sprinkler's breach of contract claim, however, there are also questions of law

yet to be resolved concerning whether Capitol Sprinkler can establish the requisite standard of

care supporting its negligence claims without the benefit of expert testimony. Capitol Sprinkler

argues that the duties under NFPA 25 arose "independent of any duties under Capitol Sprinkler's

contract," Def.'s Mot. as to Third-Party Def. at 17, because NFPA 25 has been adopted in the

District of Columbia. *See* D.C. Code § 6-1403.01. If so, Capitol Sprinkler must first show that

NFPA 25 establishes the requisite standard of care as to these parties.[14] Capitol Sprinkler must

then show, without the benefit of expert testimony, that it can prove the following elements

corresponding to its three negligence-based defenses: (1) the standard of care (i.e., what specific

duty was required) that was breached when Guest Services allegedly "thwarted" Capitol

Sprinkler's inspection, i.e., whether it was based on a breach of the "ready accessibility"

---

[14] On this point, Guest Services argues that "[t]he purpose of NFPA is to promote public safety and for the benefit of owners and occupiers, not third-party contractors." Third-Party Def.'s Reply at 4. Accordingly, it is unclear whether the standards under the NFPA, even if appropriately presenting the standard of care which had to be followed by Guest Services, create a duty owed to Capitol Sprinkler.

standard, and the meaning of "thwarted" in this context, (2) the basis for Gallaudet's allegedly

non-transferrable duty to inspect its sprinkler systems (i.e., that NFPA 25 incorporates the

distinction between "authority" and "responsibility" that Capitol Sprinkler identifies), and that

Gallaudet's transfer or attempted transfer of this duty caused, in whole or in part, the damages in

this case, and (3) the standard of care (i.e., what specific duty was required) that was breached

when Guest Services allegedly denied Capitol Sprinkler access to sprinkler system components,

and the standard of care (i.e., what specific duty was required) that was breached by not

performing the maintenance itself.  As with Capitol Sprinkler's breach of contract claim above,

the Court is unwilling to rule on the dispositive issue of whether Capitol Sprinkler may support

the elements of its three negligence-based claims in the absence of an expert opinion without

more fulsome briefing by the parties.  If such briefing confirms that Capitol Sprinkler cannot

meet its burden without an expert opinion, then summary judgment would be appropriately

granted for St. Paul and Guest Services as to Capitol Sprinkler's negligence-based claims.

Accordingly, the Court shall order supplemental briefing to be filed by the parties as set forth in

the Order accompanying this Memorandum Opinion.

Finally, Capitol Sprinkler argues that "Guest Services should be required to indemnify

Capitol Sprinkler for any damages that may be assessed against it," Def.'s Opp'n to Third-Party

Def.'s Mot. at 18, and Guest Services "should be required to contribute at least 50% of the value

of any damages that may be assessed against Capitol Sprinkler," *id.* at 19-20.  Both propositions

are disputed by Guest Services.  *See* Third-Party Def.'s Reply at 14-15.  Capitol Sprinkler's

indemnification and contribution arguments raise several threshold questions.  The first is

whether Guest Services and Capitol Sprinkler are joint tortfeasors. Under the law of the District

of Columbia, "an essential prerequisite for entitlement to contribution is that the parties be joint

tortfeasors in the sense that their negligence concurred in causing the harm to the injured party."

*District of Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332, 336 (D.C. 1998) (en banc).  If

they are joint tortfeasors, then indemnification is unavailable.  *Id.* at 340 ("a joint tortfeasor

whose active negligence concurs in causing an injury may be entitled to contribution, but

indemnity is not available") (citing *Early Settlers Ins. Co. v. Schweid*, 221 A.2d 920, 923 (D.C.

1966)).  If parties are not joint tortfeasors, "[a] prerequisite to an equitable indemnity claim is

that the party seeking it [] have discharged the liability for the party against whom it is sought."

*Id.* at 341 (citing *Cokas v. Perkins*, 252 F. Supp. 563, 567 (D.D.C. 1966)).  The Court finds that

an evaluation of these threshold questions is premature prior to any determination as to

negligence or specific findings of liability.  Accordingly, the Court shall decline to address these

arguments at the present time, but shall allow the parties to renew these arguments with Court

authorization if and when it becomes appropriate to consider them.[15]

   C.    *Remaining Motions*

       Two motions remain.  Guest Services failed to comply with the Court's Scheduling and

Procedures Order by filing its Opposition to Capitol Sprinkler's Motion for Summary Judgment

on March 7, 2008, two weeks after the February 22, 2008 deadline set by the Court.  *See* [56]

Order at 3 (Jan. 28, 2008).  Guest Services filed a [69] Motion for an Extension of Time to file

---

       [15] Even though the Court declines to evaluate these arguments at this time, the Court
notes that Capitol Sprinkler fails to cite any evidence in the record to support its argument that
Guest Services "allowed water to continue flowing from the sprinkler system for several hours,
causing the damages suffered," Def.'s Opp'n to Third-Party Def.'s Mot. at 21, and that this was a
conclusion that Capitol Sprinkler intended to support with Mr. Davidson's opinion testimony,
*see St. Paul Mercury Ins. Co.*, 2007 U.S. Dist. LEXIS 39606 at *12.

the Opposition on March 7, 2008.  Eschewing the controlling precedents setting forth the

standard for excusable neglect in this circuit, *see, e.g.*, *Smith v. District of Columbia*, 430 F.3d

450, 457 & n.5 (D.C. Cir. 2005), counsel for Guest Services explained that his failure to file a

timely opposition should be excused because he had asked an associate to prepare it who

"inadvertently" failed to complete or file it.  Third-Party Def.'s Mot. for an Extension at 2.  The

Court finds that counsel's blaming of this associate does not create excusable neglect for a

missed filing deadline.  As counsel of record, Guest Services's counsel has an obligation to

monitor the court's docket, which should have led him to discover that the opposition was never

filed.  *See Fox v. Am. Airlines, Inc.*, 389 F.3d 1291, 1294 (D.C. Cir. 2004) (holding that attorneys

are "obligated to monitor the court's docket").[16]  Moreover, if blaming an associate were

sufficient to establish excusable neglect, counsel would be encouraged to assign briefs to junior

associates, fail to supervise them, and then criticize them in court filings, the result of which

would undermine the Court's ability to effectively and efficiently manage its docket.

Pursuant to the broad discretion vested in the Court by Local Rule of Civil Procedure

7(b), the Court shall strike Guest Services's Opposition to Capitol Sprinkler's Motion for

Summary Judgment.  *See Fed. Deposit Ins. Corp. v. Bender*, 127 F.3d 58, 67 (D.C. Cir. 1997)

(explaining that the D.C. Circuit "has yet to find that a district court's enforcement of [Local

Rule 7(b)] constituted an abuse of discretion").  Nevertheless, the Court shall not treat Capitol

Sprinkler's Motion as conceded.  The arguments made in that Motion are nearly identical to

those made in Capitol Sprinkler's Motion for Summary Judgment against St. Paul, as well as its

---

[16] The parties did not brief (and the Court expresses no view) as to whether counsel for Guest Services also had a duty to supervise the activities of this associate.

Oppositions filed in response to St. Paul's Motion for Summary Judgment and Guest Services's Motion for Summary Judgment. Contrary to Capitol Sprinkler's suggestion that the Court must assume all of the facts asserted in Capitol Sprinkler's Motion for Summary Judgment are true, *see* Def.'s Reply in support of its Mot. for Summ. J. at 3, the Court must scrutinize the record, applicable case law and statutory authority to address Capitol Sprinkler's Motion for Summary Judgment on the merits, which it has done. *Cf. Duffy v. Verizon Communs., Inc.*, No. 05-2005, 2007 U.S. Dist. LEXIS 64347 at *3 (D.D.C. Aug. 27, 2007) (granting motion as conceded under LCvR 7(b) and dismissing case with prejudice only after reviewing the pleadings, relevant case law, and the entire record in the case).[17]

The other motion currently pending is Capitol Sprinkler's [73] Motion to Strike Guest Services's Reply to Capitol Sprinkler's Opposition to Guest Services's Motion for Summary Judgment. Capitol Sprinkler argues that Guest Services's Reply improperly relied on an affidavit from Stephen Logue, Managing Director of the Kellogg Center in 2002 and 2003, to argue that the person who escorted Capitol Sprinkler's inspectors during the January 9, 2003 inspection may not have been Guest Services employees. According to Capitol Sprinkler, this affidavit (and

---

[17] Capitol Sprinkler's Opposition to Guest Services's Motion for an Extension to Time also argues that "Guest Services has no motion for summary judgment presently pending before the Court" because Guest Services failed to accurately denominate its Motion on the Court's docket. Def.'s Opp'n to Third-Party Def.'s Mot. for an Extension at 7-8. Although the Court encourages parties to accurately label their filings on the docket, the Court finds that the failure to do so does not vitiate the operability of an otherwise appropriate motion, particularly where, as here, the motion was filed at the express direction of the Court. *See* [56] Order at 2-3. Capitol Sprinkler's Opposition also argues that Guest Services included an improper affidavit with its Reply in support of Guest Services's Motion for Summary Judgment. Def.'s Opp'n to Third-Party Def.'s Mot. for an Extension at 8-12. Because that argument is not germane to Guest Services's Motion for an Extension, the Court declines to address it in this context, particularly because Guest Services filed duplicative briefing in the context of a Motion to Strike the Reply.

the arguments derived therefrom) "sandbagged" Capitol Sprinkler and are "inconsistent with

[Guest Services's] position during discovery that it had no witness to speak to the issue described

in Capitol Sprinkler's [22] Notice of Deposition pursuant to Fed. R. Civ. P. 30(b)(6)."  Def.'s

Mot. to Strike at 4.

   The Court is unpersuaded by these arguments.  As to Capitol Sprinkler's "sandbagging"

argument, Guest Services has consistently maintained in its briefing that there is no evidence in

the record that the escort was a Guest Services employee.  *See, e.g.*, Third-Party Def.'s Mot. at 15

("Capitol Sprinkler indicated that some unidentified person from Guest Services allegedly told

the inspectors that he would go back and drain the drum drip at a later time . . . Capitol Sprinkler

does not know the name of the person, his position, or that he definitely worked for Guest

Services").  Mr. Logue's affidavit simply lends support for that argument.  *See, e.g.*, Third-Party

Def.'s Reply, Ex. 1 at 2 (Affidavit of S. Logue) (explaining his belief that the escort was unlikely

to have been a building engineer because engineers carried full master keys).  As to Capitol

Sprinkler's argument that Mr. Logue's identity was not disclosed during discovery, this argument

is based on revisionist history.  Guest Services disclosed Mr. Logue's identity in its Rule 26(a)

disclosures.  *See* Third-Party Def.'s Opp'n to Def.'s Mot. to Strike, Ex. 1 at 1 (Rule 26(a)

Disclosures).  In fact, the first person listed in Guest Services's disclosures, under the title

"Individuals That Have Discoverable Information," is "Stephen E. Logue."  *Id.*  The disclosures

indicate that Mr. Logue "will have factual information in regards to the incident," and describe

Mr. Logue's position as "Managing Director of Guest Services at Gallaudet University."  *Id.*

Thus, there is no question that Mr. Logue's identity was disclosed to Capitol Sprinkler.

Nevertheless, as discussed in great detail in the Court's June 1, 2007 Memorandum Opinion,

Capitol Sprinkler chose not depose Mr. Logue, Mr. Hamm, or any 30(b)(6) witness from Capitol Sprinkler. *See St. Paul Mercury Ins. Co.*, 2007 U.S. Dist. LEXIS 39606 at *6 -*9 (explaining that Capitol Sprinkler noticed depositions but retracted the same because they provided opposing counsel with insufficient time to procure the witnesses requested, and did not re-notice the depositions). It was certainly not the responsibility of opposing counsel to ensure that Capitol Sprinkler took the discovery it now deems necessary to support its claims. Accordingly, the Court finds no basis to strike Guest Services's Reply.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that there are genuine issues of material fact as to whether Capitol Sprinkler was escorted by a Guest Services employee during its January 9, 2003 inspection at the conference center, whether and to what extent Guest Services operated as an agent of Gallaudet, and whether and to what extent National Fire Protection Association standards were incorporated into the Inspection Agreement between Capitol Sprinkler and Guest Services. The Court also finds that Capitol Sprinkler's claims based on frustration of purpose and modification of contract are not cognizable, but it shall order supplemental briefing as to whether Capitol Sprinkler's breach of contract and negligence-based claims are cognizable without Capitol Sprinkler's having provided an expert report or any expert opinion testimony. The Court shall order supplemental briefing as to the following: for Capitol Sprinkler's breach of contract claim, whether Capitol Sprinkler can establish what duty the "ready accessibility" standard of NFPA 25 imposed on Guest Services and/or Gallaudet; for Capitol Sprinkler's negligence claims, whether Capitol Sprinkler can establish that NFPA 25 establishes the requisite standard of care as to these parties, and whether Capitol Sprinkler can

prove the following elements corresponding to its three negligence-based defenses:  (1) the standard of care (i.e., what specific duty was required) that was breached when Guest Services allegedly "thwarted" Capitol Sprinkler's inspection, i.e., whether it was based on a breach of the "ready accessibility" standard, and the meaning of "thwarted" in this context, (2) the basis for Gallaudet's allegedly non-transferrable duty to inspect its sprinkler systems (i.e., that NFPA 25 incorporates the distinction between "authority" and "responsibility" that Capitol Sprinkler identifies), and that Gallaudet's transfer or attempted transfer of this duty caused, in whole or in part, the damages in this case, and (3) the standard of care (i.e., what specific duty was required) that was breached when Guest Services allegedly denied Capitol Sprinkler access to sprinkler system components, and the standard of care (i.e., what specific duty was required) that was breached by not performing the maintenance itself.  The Court shall also order further briefing that sets forth which of the unidentified escort's statements Capitol Sprinkler would seek to admit into evidence at trial, with a description of Capitol Sprinkler's corresponding theory of admissibility as to the same.

Accordingly, the Court shall HOLD-IN-ABEYANCE St. Paul's [48] Motion for Partial Summary Judgment, HOLD-IN-ABEYANCE Guest Services's [59] Motion for Summary Judgment against Capitol Sprinkler, and HOLD-IN-ABEYANCE-IN-PART Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul to the extent that it claims Gallaudet was negligent independent of any actions by Guest Services, DENY Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul in all other respects, shall DENY Capitol Sprinkler's [58] Motion for Summary Judgment against Guest Services, based on disputed issues of material fact, including whether Capitol Sprinkler's inspectors were accompanied by a Guest Services

46

employee during the January 9, 2003 inspection, whether and to what extent Guest Services

operates as the agent of Gallaudet, and whether and to what extent NFPA is incorporated as a

term of the Inspection Agreement between Capitol Sprinkler and Guest Services.  Finally, the

Court shall DENY Guest Services's [69] Motion for Leave for an Extension of Time to file an

Opposition to Capitol Sprinkler's Motion for Summary Judgment, and shall DENY Capitol

Sprinkler's [73] Motion to Strike Guest Services's Reply in support of its Motion for Summary

Judgment.  An appropriate Order accompanies this Memorandum Opinion.


Date: September 2, 2008


                                           /s/                          
COLLEEN KOLLAR-KOTELLY
United States District Judge