**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ST. PAUL MERCURY INSURANCE
COMPANY, as Subrogee of Gallaudet
University,

        Plaintiff,

        v.

CAPITOL SPRINKLER INSPECTION,
INC.

        Defendant/Third-Party Plaintiff,

        v.

GUEST SERVICES, INC.

        Third-Party Defendant.

Civil Action No. 05–2115 (CKK)

**MEMORANDUM OPINION**
(June 15, 2009)

On January 25, 2003, a tee fitting froze and burst in the dry sprinkler system at the

Kellogg Conference Center on the campus of Gallaudet University ("Gallaudet") in Washington,

D.C., causing significant water damage. This case is about who is legally responsible for the

damage. Plaintiff St. Paul Mercury Insurance Company ("St. Paul") was Gallaudet's property

insurer, and has been subrogated for Gallaudet in this litigation. St. Paul filed suit alleging

breach of contract and negligence against Defendant Capitol Sprinkler Inspection, Inc. ("Capitol

Sprinkler"), the company that was contracted to perform semi-annual inspections of the sprinkler

system. Capitol Sprinkler, in turn, filed suit against third-party Defendant Guest Services, Inc.

("Guest Services"), the building management company at the conference center, also for breach

of contract and negligence.

On September 2, 2008, the Court issued an Order and Memorandum Opinion that held in abeyance St. Paul's and Guest Services's Motions for Summary Judgment against Capitol Sprinkler. The Court ordered the parties to file supplemental briefing concerning whether Capitol Sprinkler's breach of contract and negligence arguments were cognizable in the absence of any expert testimony proffered by Capitol Sprinkler.[1] The Court shall fully incorporate its September 2, 2008 Memorandum Opinion by reference herein.

After thoroughly reviewing the parties' original and supplemental submissions to the Court, relevant case law and statutory authority, and the record of the case as a whole, the Court finds that Capitol Sprinkler cannot establish the necessary elements of its breach of contract and negligence arguments in the absence of expert testimony. Accordingly, the Court shall GRANT St. Paul's [48] Motion for Partial Summary Judgment as to its breach of contract claim, and GRANT Guest Services's [59] Motion for Summary Judgment. Guest Services shall be dismissed from further proceedings. By separate Order, the Court shall set a Status Hearing to discuss further proceedings for the two remaining claims in this case – St. Paul's breach of contract claim (as to which liability has been established) and St. Paul's negligence claim (as to which St. Paul did not move for summary judgment).

---

[1] The arguments advanced by Capitol Sprinkler in support of its (1) defenses to St. Paul's breach of contract and negligence claims, (2) claims against Guest Services for breach of contract and negligence, and (3) opposition to Guest Services's Motion for Summary Judgment, are substantially similar. Throughout this Memorandum Opinion, the Court shall refer to Capitol Sprinkler's "arguments," with the understanding that the arguments were made to defend against St. Paul's Motion for Summary Judgment and to support its own Motion for Summary Judgment against Guest Services and St. Paul.

## II.  BACKGROUND

*A.     Factual Background* [2]

Gallaudet is the owner of the Kellogg Conference Center (the "Conference Center") in Washington, D.C.  Pl.'s Stmt. ¶ 1.  The Conference Center is a five-story building that houses meeting rooms, 93 guest rooms, and other areas.  Def.'s Stmt. ¶¶ 3, 4.  The building has a sprinkler system that was installed by Capitol Sprinkler either during its construction between 1996-1998 or thereafter.  *Id.* ¶ 2.  Portions of the building are restricted (such as the guest rooms) and are accessible only by using specific key cards.  *Id.* ¶ 9.

On February 11, 2002, Gallaudet contracted with Guest Services to provide operational and management services for the Conference Center.  *Id.* ¶ 13.  Guest Services, in turn, contracted with Capitol Sprinkler on April 22, 2002, to perform semi-annual inspections of the sprinkler systems at the Conference Center.  Pl.'s Stmt. ¶ 2.

The agreement between Guest Services and Capitol Sprinkler (hereinafter, the "Inspection Agreement") obligated Capitol Sprinkler to "open condensation drains on drum drip connections and drain low points during fall and winter inspection[s]."  *Id.* ¶ 3.  Vernon Vane, Capitol Sprinkler's supervisor of inspections, confirmed that Capitol Sprinkler's inspectors were supposed to drain "drum drips" during inspections in accordance with this provision:

> Q: . . . And under that it says "[o]pen compensation drains on drum [drip] connections and drain low points during fall and winter inspection."  That right?
>
> A: That's correct.
>
> Q: That is the work that's supposed to be done by Capitol Sprinkler's people

---

[2] This section contains facts drawn from the Court's September 2, 2008 Memorandum Opinion, which are necessary to provide context for the motions that were held in abeyance.

when they are at the job site.  Is that correct?

A: That's correct.

Pl.'s Mot., Ex. D at 49:11 - 49:18 (Depo. Tr. of V. Vane); Pl.'s Stmt. ¶ 6 (same).

On January 9, 2003, Capitol Sprinkler employees Michael Bowlin and Tom Scott inspected the sprinkler system at the Conference Center.  Pl.'s Stmt. ¶¶ 7, 8.  Because they needed access to certain areas of the building that were restricted, the inspectors were accompanied by an escort who could provide them with such access.  Def.'s Stmt. ¶¶ 16; 21. During the inspection, Mr. Bowlin and Mr. Scott drained all of the drum drips except for the one that was located above the building's conference room 5200.  Pl.'s Mot., Ex. F at 50:10 - 50:15 (Depo. Tr. of M. Bowlin) ("Q: Now did you drain, you and Mr. Scott, drain all of the drain points during the January 9, 2003 inspection?  A: All but the one in that room.  Q: The one above conference room 5200?  A: Correct").  The drum drip above conference room 5200 was the last one that needed to be drained during the January 9, 2003 inspection.  Def.'s Stmt. ¶ 28.  Mr. Bowlin testified that he and Scott were supposed to drain that drum drip.  *Id.* at 50:21 - 50:22 ("Q: Were you supposed to drain that drain?  A: Yes").

According to Mr. Bowlin's deposition testimony, and not refuted by contradictory evidence in the record, Mr. Bowlin and Mr. Scott did not drain the drum drip above conference room 5200 because their escort did not have immediate possession of the key card necessary to give them access to the room:  "We were going to the room and when we got to the room he [the escort] says, 'I don't have a card.  I have to go down stairs and get the card for the access.'"  Pl.'s Opp'n, Ex. 7 at 51:22 - 52:3 (Depo Tr. of M. Bowlin).  Mr. Bowlin's testimony is internally inconsistent as to whether he asked the escort to retrieve the key card.  *Compare id.* at 54:18 -

4

54:21 ("Q: . . . did you ask him to go get the card? A: No, I didn't ask him to go get the card")

*with id.* at 56:6 - 56:14 ("Q: Why didn't you ask him to go get the card so you could have access

to drain the last drain you had left?  A: I asked him to get the card but I don't remember him

going to get the card.  Q: So you don't remember him saying, 'I refuse to get the card' or

anything like that?  A: He didn't refuse to get the card").  Nevertheless, Bowlin testified that he

asked the escort to drain the drum drip himself instead of retrieving the key card:

> he just kind of looked at us like, you know, he really didn't want to [get the key
> card] – he would take care of it.  He said he would take care of the drum drip, and
> I asked him, I said 'Are you going to take care of this' – I said, 'You know what?
> I can't get in the room.  Are you going to take care of this drum [drip]?

*Id.* at 54:11 - 54:17.  *See also id.* at 56:16 - 56:22 ("Q: . . . Did you ask him, since you don't have

a card, 'Will you take care of the drum drip?'  A: I asked him if he would take care of the drum

drip.  Q: So you made a request?  A: I made a request").  Mr. Bowlin indicated that it would have

taken between five to ten minutes to retrieve the key card, or "[h]owever long it takes [] to get to

the elevator, go downstairs to the front desk, or however fast the elevator runs."  Def.'s Opp'n to

Pl.'s Mot., Ex. E at 52:11 - 52:21 (Depo. Tr. of M. Bowlin).  Mr. Bowlin and Mr. Scott left the

building and completed an inspection report, indicating that all of the "dry valves [were]

protected from freezing" and "all areas and valves [were] protected from freezing."  Third-Party

Def.'s Stmt. ¶¶ 10, 11; Def.'s Resp. Third-Party Stmt. ¶ 10.  No "deficiencies" were noted on the

report, and the report does not indicate that a drum drip had not been drained or that the

inspectors had requested that an escort drain a drum drip.  *See* Third-Party Def.'s Mot., Ex. 5 at 2

(7/9/03 Inspection Report).

The drum drip above conference room 5200 was never drained.  Pl.'s Stmt. ¶ 13; Def.'s

Resp. Stmt. ¶ 13.  On January 25, 2003, a tee fitting in the sprinkler system froze and burst,

allowing water to discharge.  Pl.'s Stmt. ¶ 11.  It is undisputed that the tee fitting froze and burst

because the drum drip had not been drained during the January 9, 2003 inspection.  Pl.'s Stmt. ¶

13.

      B.     *Procedural Background*

      1.     <u>Breach of Contract Claims</u>

St. Paul moved for partial summary judgment on its breach of contract claim based on the

following undisputed facts: (1) Capitol Sprinkler was contractually obligated to drain all drum

drips in the sprinkler system during its January 9, 2003 inspection; (2) Capitol Sprinkler did not

drain one of the drum drips during that inspection; (3) the drum drip that Capitol Sprinkler did

not drain was on the same branch line as the tee fitting which froze and ruptured; and (4) the

rupture of the tee fitting and resulting damage to the Conference Center are the direct result of

Capitol Sprinkler's failure to perform its express contractual obligations.[3]  *See* Pl.'s Mot. at 2.  In

its September 2, 2008 Memorandum Opinion, the Court found that entry of partial summary

judgment in favor of St. Paul was appropriate unless Capitol Sprinkler could raise a defense

pursuant to which a jury could find that Capitol Sprinkler's obligation to perform under the

Inspection Agreement was alleviated.  In this regard, Capitol Sprinkler argued that it was relieved

of its obligations under the Inspection Agreement because Guest Services breached the contract

between Capitol Sprinkler and Guest Services.  According to Capitol Sprinkler, the acts of Guest

Services were attributable to Gallaudet because Guest Services was Gallaudet's agent.  *See*

Def.'s Opp'n to Pl.'s Mot. at 8-10; Def's Reply to Pl.'s Opp'n at 9.

---

[3] St. Paul's Motion for Partial Summary Judgment was supported by the report of its
expert, Kenneth R. McLauchlan.

With respect to this contract-based defense, Capitol Sprinkler argued that the Inspection Agreement incorporated National Fire Protection Association 25 ("NFPA 25"), a set of standards concerning the inspection, testing, and maintenance of water-based fire protection systems. *See* Def.'s Opp'n to Pl.'s Mot. at 12.  Pursuant to NFPA 25, property owners must "provide ready accessibility to components of water-based fire protection systems that require inspection, testing, or maintenance."  Def.'s Opp'n, Ex. G-1 § 4.1.1 (NFPA 25, 2002 Edition).  NFPA 25 provides that this and other obligations may be transferred by a property owner to others where, as here, the owner is not the occupant of the building.  *Id.* §§ 4.1.2.3, 4.1.2.4 ("the property owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual . . . [who] shall comply with the requirements identified for the owner or occupant throughout this standard.").

According to Capitol Sprinkler, Guest Services breached the Inspection Agreement by "failing to provide Capitol Sprinkler with access to all components of the subject sprinkler system."  Def.'s Opp'n to Pl.'s Mot. at 14.  Assuming a jury would find that NFPA 25 was incorporated as a term in the Inspection Agreement, Capitol Sprinkler argues that Guest Services breached the "ready accessibility" standard set forth in section 4.1.1, *see* Def.'s Opp'n, Ex. G-1 § 4.1.1 (NFPA 25, 2002 Edition), because Capitol Sprinkler could not access the drum drip above conference room 5200.[4]

---

[4] In its Supplemental Brief, Guest Services argues that the Inspection Agreement did not include NFPA 25 as one of its terms because the agreement instead referenced NFPA 13-A.  *See* Third-Party Suppl. Br. at 4-5.  Guest Services's inclusion of this argument in its Supplemental Brief is baffling because the Court already held that "a genuine [and disputed] issue of material fact exists as to whether NFPA 25 was incorporated as a term into the Inspection Agreement despite its reference to NFPA 13-A."  Mem. Op. at 29 (Sept. 2, 2008).

In its September 2, 2008 Memorandum Opinion, the Court explained that Capitol

Sprinkler would have to show what duty was created by the "ready accessibility" standard in

order to show that such a standard had been breached.  The Court also explained that the parties

presented two very different interpretations of what the phrase "ready accessability" required.

According to Capitol Sprinkler, that phrase required a sort of instantaneous access to all sprinkler

components.  *See, e.g.*, Def.'s Reply to Pl.'s Opp'n at 4 ("an inspector must be able to have

access to the component locked behind any such door or panel . . . Guest Services did not unlock

the door to allow the inspector to enter and access the drum drip, and therefore, breached the

contract").  According to St. Paul and Guest Services, that phrase required that an owner not

place immobile objects in front of sprinkler components.  *See* Pl.'s Opp'n at 12-13; Third-Party

Def.'s Reply at 4.  St. Paul and Guest Services both cited to the NFPA 25 Appendix, titled

"Explanatory Material," which appeared to support their interpretation of the "ready

accessibility" language:

> [t]he components are not required to be open or exposed.  Doors, removable
> panels, or valve pits may be permitted to satisfy the need for accessibility.  Such
> equipment should not be obstructed by features such as walls, ducts, columns,
> direct burial, or stock storage.

App'x. A-1-4.1.

The Court found that Capitol Sprinkler would likely require expert testimony to establish

the meaning of the "ready accessibility" standard in NFPA 25, but noted that the parties had

devoted little attention to the absence of an expert opinion in the record.  Because the Court was

unwilling to rule on the dispositive issue of whether Capitol Sprinkler could support its contract-

based claim in the absence of an expert opinion, it ordered supplemental briefing on the

following issue:  "whether Capitol Sprinkler can establish, without an expert opinion, what duty

the 'ready accessibility' standard of NFPA 25 imposed on Guest Services and/or Gallaudet."

Order at 2 (Sept. 2, 2008).

        2.     <u>Negligence Claims</u>

Capitol Sprinkler filed Motions for Summary Judgment against St. Paul and Guest Services arguing that it should be relieved of liability based on the negligent acts of Gallaudet (as the subrogee of St. Paul) and Guest Services.  If Gallaudet were found negligent, St. Paul would be unable to recover as the subrogee.  In this regard, Capitol Sprinkler raised three discernable negligence-based arguments.  First, it argued that Guest Services was Gallaudet's agent, and that Guest Services was negligent when it "thwarted" Capitol Sprinkler's inspection of the sprinkler system:

> the property owner had a duty to maintain the building's sprinkler system; the owner contracted with a property management agent to perform that maintenance; the property management agent hired Capitol Sprinkler to perform inspections and maintenance; the property management agent thwarted Capitol Sprinkler's ability to perform and agreed to reassume the duty to inspect and maintain; and, the property management agent failed in its duty and caused the damages in this case . . . [thus] plaintiff is contributorily negligent.

Def.'s Reply to Pl.'s Opp'n at 8.  Second, Capitol Sprinkler argued that Gallaudet, as the owner of the conference center, had a duty under NFPA 25 to inspect the conference center's sprinkler system, and that this obligation was not transferrable.  *See* Def.'s Reply to Pl.'s Opp'n at 9-10. This argument was grounded in section 1-4.2 of NFPA 25, which provides that

> [the] responsibility for properly maintaining a water-based fire protection system shall be that of the owner(s) of the property . . . [but] [w]here the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm . . . .

Pl.'s Opp'n, Ex. 4 at 1 (NFPA 25 1-4.2 (1998 Ed.)).  According to Capitol Sprinkler, this

provision allowed Gallaudet to transfer the *authority* to maintain the sprinkler system, but not the *responsibility* for its maintenance.  Def.'s Reply to Pl.'s Opp'n at 9-10.  Third, Capitol Sprinkler argued that Guest Services was negligent because NFPA 25 imposes an obligation on the building management agent to either provide the requisite access to the inspectors to maintain the sprinkler system, or to undertake the maintenance itself; because Capitol Sprinkler alleged that it was denied access to the drum drip above conference room 5200, it argued that Guest Services breached its duty to drain the drum drip.  Def.'s Mot. against Third-Party Def. at 17-18.

After reviewing the parties' briefing associated with these arguments, the Court again found that there were questions yet to be resolved concerning whether Capitol Sprinkler could prove these negligence-based arguments without the benefit of expert testimony.  Accordingly, the Court ordered the following supplemental briefing in connection with Capitol Sprinkler's negligence claims:

> whether Capitol Sprinkler can establish, without an expert opinion, that NFPA 25 establishes the requisite standard of care as to these parties, and whether Capitol Sprinkler can prove the following elements corresponding to its three negligence-based defenses:  (1) the standard of care (i.e., what specific duty was required) that was breached when Guest Services allegedly 'thwarted' Capitol Sprinkler's inspection, i.e., whether it was based on a breach of the 'ready accessibility' standard, and the meaning of 'thwarted' in this context, (2) the basis for Gallaudet's allegedly non-transferrable duty to inspect its sprinkler systems (i.e., that NFPA 25 incorporates the distinction between 'authority' and 'responsibility' that Capitol Sprinkler identifies), and that Gallaudet's transfer or attempted transfer of this duty caused, in whole or in part, the damages in this case, and (3) the standard of care (i.e., what specific duty was required) that was breached when Guest Services allegedly denied Capitol Sprinkler access to sprinkler system components, and the standard of care (i.e., what specific duty was required) that was breached by not performing the maintenance itself.

Order at 2 (Sept. 2, 2008).

# III. DISCUSSION

Although the Court's Order requested supplemental briefing that addressed the very specific issues identified above, Capitol Sprinkler decided to ignore the Order and submit a Supplemental Brief consisting largely of various case descriptions where courts found that expert testimony was unnecessary.  The Supplemental Brief makes no attempt to address each of the issues identified in the Order and otherwise fails to provide any guidance as to which issues Capitol Sprinkler intended to address.  Notwithstanding these deficiencies (or perhaps consistent with them), the Court finds it readily apparent that Capitol Sprinkler cannot prevail on its breach of contract and negligence claims against Guest Services in the absence of expert testimony. Similarly, Capitol Sprinkler cannot prevail on its breach of contract and negligence defenses against St. Paul, as presented in Capitol Sprinkler's Motion for Summary Judgment against St. Paul, because without expert testimony, Capitol Sprinkler cannot establish negligence as to Gallaudet (the subrogee of St. Paul).

A.     *Breach of Contract*

It is well established in the District of Columbia that "'[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)).  Conversely, "'no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience.'"  *Briggs v. Wash. Metro. Area Trans. Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *Hill v. Meto. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001)).  As

11

the United States Court of Appeals for the District of Columbia Circuit has observed, "[t]he D.C.

Courts of Appeals has required expert testimony in a number of cases that, on first blush, appear

to be within the realm of common knowledge," such as the maintenance of leaning trees,

application of hair relaxer, or the tightness of handcuffs.  *Id.*

Where the standard of care is "beyond the ken of the average layperson," the law in the

District of Columbia requires an expert to "clearly articulate and [refer to] a standard of care by

which the defendant's action can be measured . . . the expert must clearly relate the standard of

care to the practices in fact generally followed by [similarly situated parties] or to some standard

nationally recognized by such [parties]."  *Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.*, 244 F.3d

153, 154 (D.C. Cir. 2001) (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433

(D.C. 2000)).  The expert's testimony must go beyond establishing the ultimate goal of the

standard and must explain the standard that is generally followed to reach that goal.  *Id.* at 155.

In this case, Capitol Sprinkler asserts that expert testimony is unnecessary because an

average juror would have knowledge about the meaning of "ready accessibility" found in NFPA

25.  Specifically, Capitol Sprinkler argues that "the requirement under NFPA that a fire

protection system be made 'readily accessible' is not highly technical, and does not create any

dispute as to interpretation."  Def.'s Suppl. Br. at 14.  It further argues that "[i]n the context of

this case, the definition of 'ready accessibility' is easily understandable" and that the Court

"should not engage in a lengthy examination of the meaning of a term to somehow produce a

contradictory and illogical conclusion."  *Id.*  Finally, Capitol Sprinkler sets forth its vision for

what it believes the "ready accessibility" standard requires:

> [Capitol Sprinkler] is not suggesting that the 'ready accessibility' standard of
> NFPA 25 requires instantaneous access to the fire protection system.  Rather, they

> [sic] are arguing that the meaning of 'ready accessibility' can be ascertained by the average juror in light of the facts surrounding Capitol Sprinkler's inspection, particularly that the door was locked and that the Guest Services escort stated himself [sic] that he would drain the drip drum himself.

*Id.* at 15.  Capitol Sprinkler's arguments fundamentally misunderstand the law in the District of Columbia pertaining to expert testimony and are otherwise untenable.

First, the relevant inquiry is not, as Capitol Sprinkler suggests, what the words "ready accessibility" mean to "the average juror" in some abstract sense.  Rather, the appropriate inquiry is whether the average juror would have knowledge as to what the words "ready accessibility" mean in the context of the sprinkler inspection standards contained in NFPA 25.  This distinction is critical because expert testimony is required *unless* "everyday experience makes it clear that jurors could not reasonably disagree over the care required."  *Nat'l Tel. Coop. Ass'n*, 244 F.3d at 155.  For example, in *Briggs v. Washington Metropolitan Area Transit Authority*, the D.C. Circuit considered whether expert testimony was necessary in a case involving a murder at a metro station in Washington, D.C.  *See* 481 F.3d at 345.  The victim's mother sued the defendant ("WMATA") for negligence, claiming that the lighting in the area of the murder was too dim.  *Id.* at 349.  The Court concluded that the plaintiff was required to present expert testimony concerning the lighting.  *Id.*  "While lay persons can certainly distinguish between illumination and complete darkness, there is nothing to indicate that common knowledge includes a universal standard of 'adequate' lighting within a temporary construction walkway."  *Id.* at 350.  Because a lighting standard was "not 'within the realm of common knowledge and everyday experience,' . . . [the plaintiff] was required to 'adduce expert testimony . . . to establish the applicable standard of care.'"  *Id.* (quoting *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006)).

Here, reasonable jurors undoubtedly would have experience with objects that are readily

accessible, as that phrase may be independently understood by each juror in his or her everyday

life.  It is unlikely, however, that those jurors would have experience with what the phrase "ready

accessibility" means in the context of sprinkler inspections, and specifically, in the context of

NFPA 25.  Just as the jurors in *Briggs* would have an understanding between lightness and

darkness but would nonetheless require expert testimony as to the applicable standard of care

related to the lighting at the metro station, so too the jurors in this case would understand the

concept of accessibility but would nonetheless require testimony as to what standard of care was

required by the "ready accessibility" language in NFPA 25.

None of the cases described by Capitol Sprinkler in its Supplemental Brief support a

different conclusion.  For example, in *National Railroad Passenger Corporation v. McDavitt*, an

employee was injured when a train he was driving derailed in a train yard.  804 A.2d 275 (D.C.

2002).  A jury found that railroad personnel were negligent when they failed to monitor the

unauthorized movement of the employee's train, as they should have been doing.  *Id.* at 280.  The

court found that expert testimony was unnecessary given the plaintiff's theory of liability, which

did not require the assessment of a technical standard:

> we have little doubt that expert testimony on the standard of care would have been
> required to establish [the employee's] theories that Amtrak was negligent in
> selecting and siting [a train signal], in not taking appropriate measures to protect
> against signal malfunctions, and in relying on allegedly outdated technology.
> Each of those matters depends heavily upon technical or specialized knowledge
> that a lay jury would not be expected to possess . . . . On the other hand, . . . [i]n
> the present case, the trial judge who heard and saw what the jury did concluded
> that no special expertise was necessary to evaluate whether [the train] personnel
> had a duty to respond when unauthorized train movements in the Washington
> Terminal coach yard were reported by radio and [other means].  We agree that the
> scope of the duty of railroad traffic controllers to attend to notifications of
> unauthorized train traffic in the confined space of a rail yard is not so esoteric as
> to be beyond the ken of the average layperson.

14

*Id.* at 285.  As is apparent from this discussion, the plaintiff's theory of liability was *not* based on

a technical standard that would have required expert testimony, but rather was based on the

common sense proposition that the traffic controllers had a duty, when alerted to unauthorized

train movements, to respond and not ignore such notifications.  These facts and this theory of

liability bear no resemblance to the present case, where Capitol Sprinkler's theory of liability is

that the actions of Gallaudet and/or Guest Services breached a provision of NFPA 25.

Similarly, in *Transcontinental Insurance Company v. Simplexgrinnell LP*, the plaintiff

alleged that the defendant failed to visually inspect its sprinkler system in an attic space.  2006

U.S. Dist. LEXIS 48654 at *1 (N.D. Ohio Jul. 18, 2006).  The defendant argued that its sprinkler

system inspection met all NFPA requirements because "no inspection is required for sprinklers

and piping installed in concealed spaces" and that the defendant's "inspector testified that the

attic space where the break occurred was inaccessible as there was no flooring."  *Id.* at *18.  The

plaintiff presented expert testimony concerning NFPA 25 and its interpretation, and it is unclear

from the opinion whether Defendant did so as well.  For this reason, and unlike the instant case,

there appears to have been *no* dispute over the applicable standard of care (which was the subject

of testimony by Plaintiff's expert as to what was required by the NFPA), but rather a question of

fact as to whether the attic had flooring.  *Id.* at *19 ("the Court is presented with genuine issues

of fact whether the attic crawl space was accessible under the NFPA").  *Transcontinental*

therefore provides no support for Capitol Sprinkler's argument because the parties in this case *do*

have a dispute concerning the applicable standard of care.  Because the Court finds that the

requirements associated with the "ready accessibility" standard in NFPA 25 are not within the

ken of the average layperson, the Court finds that Capitol Sprinkler must present expert

testimony concerning the applicable standard of care.[5]

Second, contrary to Capitol Sprinkler's assertion that the "ready accessibility" language "does not create any dispute as to interpretation," Def.'s Suppl. Br. at 14, St. Paul and Guest Services have set forth a plausible argument that the standard relates to whether immobile objects may be placed in front of sprinkler components – not whether access has been provided to inspectors within a certain amount of time.  This interpretation is supported by reference to the NFPA 25 explanatory notes for the "ready accessibility" provision:

> The components are not required to be open or exposed.  Doors, removable panels, or valve pits can be permitted to satisfy the need for accessibility.  Such equipment should not be obstructed by features such as walls, ducts, columns, direct burial or stock storage.

NFPA 25 § A.4.1.1.  Without expert testimony "offer[ing] credible evidence sufficient to establish a controlling standard of care," *Briggs*, 481 F.3d at 841, Capitol Sprinkler cannot establish that St. Paul and Guest Services's interpretation is incorrect, and certainly cannot show that the language is not subject to reasonable dispute.

Third, Capitol Sprinkler fundamentally misunderstands the role of the jury by making the following argument:

---

[5] The Court notes that three of the other cases described by Capitol Sprinkler directly undermine its arguments because the parties in those cases did, in fact, present expert testimony supporting their arguments.  *See Graves v. United States,* 517 F. Supp. 95 & n.2 (D.D.C. 1981) ("the Court is persuaded by the testimony of plaintiff's expert witness who stated that because a virtually endless supply of steam flows into the converter, the room is a high hazard area within the meaning of [various] codes" and "Defendant's own expert conceded that for this reason it did not qualify as an exit within the meaning of the building and safety regulations"); *Washington Hosp. Ctr. v. Butler*, 384 F.2d 331, 336-37 (D.C. Cir. 1967) ("[t]he testimony of experts was not indispensable to sagacious resolution of the great bulk of the factual questions, and in the few instances where it was essential it was supplied"); *Kull v. Six Flags over Ga. II*, 592 S.E.2d 143, 144, 146 (Ga. App. 2003) (referring to the plaintiff's expert whose testimony was found unpersuasive).

> Capitol Sprinkler is not suggesting that the 'ready accessibility' standard of NFPA
> 25 requires instantaneous access to the fire protection system.  Rather, they [sic]
> are arguing that the meaning of 'ready accessibility' can be ascertained by the
> average juror in light of the facts surrounding Capitol Sprinkler's inspection . . . .

Def.'s Suppl. Br. at 15.  It is *not* the role of the jury to speculate about what standard of care is

required, but rather, to determine whether or not the required standard of care has been breached

based on the credible evidence submitted by the parties as to what standard of care is required.

*See Tillman v. Wash. Metro. Area Trans. Auth.*, 695 A.2d 94, 97 (D.C. 1997) (rejecting the

plaintiff's negligence claim based on police officers' handcuffing him too tightly because, in the

absence of expert testimony, "[a] jury would have to engage in considerable speculation to find

for [the plaintiff] . . . without any evidence of the applicable standards").  *See also Bammerlin v.

Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) (explaining that the trial judge

made a "serious mistake" by leaving the jury to interpret the meaning of ambiguous motor

vehicle safety standards).  Because Capitol Sprinkler has proffered no credible evidence

concerning the meaning of the applicable standard of care required by NFPA 25, the Court agrees

with St. Paul that "[w]ithout expert testimony, a juror would be left to pure speculation to reach

any conclusion regarding the true meaning of 'ready accessibility' of equipment under NFPA

25."  Pl.'s Suppl. Br. at 5.

Finally, the Court finds the arguments raised in Capitol Sprinkler's Supplemental Brief to

be disingenuous.  As the Court has discussed in its previous opinions, Capitol Sprinkler failed to

timely take depositions of opposing party witnesses in this case and failed to serve a compliant

Rule 26(a)(2)(B) expert report in violation of the Court's Scheduling Order.  *See* Mem. Op. at

10-18 (Jun. 1, 2007).  Although Capitol Sprinkler subsequently filed a Motion for Leave to

Supplement its Rule 26(a)(2)(B) disclosure (which was filed well after the close of discovery),

the Court denied the motion because Capitol Sprinkler failed to demonstrate good cause for its

flagrant disregard of the Court's Scheduling Order. *Id.* In seeking to explain why it sought to

present expert testimony, Capitol Sprinkler made the following representation:

> It is well accepted in this jurisdiction that expert testimony is required . . . when
> the subject matter at issue is so distinctly related to some science, profession,
> business or occupation as to be beyond the ken of the average layman.
>
> In this matter, the care due by Capitol [Sprinkler] and Guest Services under their
> respective contracts is just the kind of issue on which expert testimony is required.

*See* Def.'s Reply in Support of Mot. for Leave ¶¶ 5-6 (Feb. 23, 2007) (internal punctuation and

citations omitted). Capitol Sprinkler's current arguments are therefore in direct conflict with its

previous representations to the Court. Although far from dispositive, the D.C. Court of Appeals

has found similar circumstances to be relevant to the determination of whether expert testimony

was necessary in a given proceeding. *See Lowrey v. Glassman*, 908 A.2d 30, 36 (D.C. 2006)

("the very fact that [the plaintiff] designated expert witnesses on [these] subjects . . . belie his

present assertions that he did not need experts to prove his case. Clearly he believed that the

strength of his case depended largely upon the testimony of these witnesses in their particular

areas of expertise").

Accordingly, the Court finds that Capitol Sprinkler cannot set forth the appropriate

standard of care required by NFPA 25 in the absence of expert testimony, and as a result, cannot

prevail on its arguments that Gallaudet (the subrogee of St. Paul) and/or Guest Services breached

a "ready accessibility" obligation in the Inspection Agreement. The Court shall therefore grant

St. Paul's Motion for Partial Summary Judgment and find that liability has been established as to

St. Paul's breach of contract claim against Capitol Sprinkler, and shall grant Guest Services's

Motion for Summary Judgment as to Capitol Sprinkler's breach of contract claim against Guest

Services.

   *B.     Negligence*

   The Court's analysis in the foregoing section is equally applicable to Capitol Sprinkler's

three negligence arguments:  (1) that Guest Services 'thwarted' Capitol Sprinkler's inspection,

(2) that Gallaudet was subject to a non-transferable duty to inspect its sprinkler systems and that

Gallaudet's transfer or attempted transfer of this duty caused, in whole or in part, the damages in

this case, and (3) that Guest Services negligently denied Capitol Sprinkler access to the sprinkler

system.  Based on Capitol Sprinkler's Supplemental Brief, it appears that all three negligence

arguments rely on NFPA 25 for the applicable standard of care.  *See* Def.'s Suppl. Br. at 11

("[b]ecause NFPA 25 carries the force of law in the District of Columbia, and because any

obligations imposed by NFPA 25 on the Gallaudet University . . . are also imposed upon Guest

Services as property manager, the only remaining question before the Court is whether the

requisite standard of care imposed upon Guest Services is clearly defined by the NFPA 25

without the need of [sic] any expert testimony").  Because the Court finds that expert testimony

is necessary to support Capitol Sprinkler's interpretation of NFPA 25 as asserted in its Motion

for Summary Judgment, Capitol Sprinkler cannot prevail on its negligence defenses to St. Paul's

claims, and cannot prevail on its negligence claim against Guest Services.

   The Court notes that Capitol Sprinkler's second negligence argument also fails because it

is unsupported by any applicable legal authority.  Specifically, Capitol Sprinkler had previously

argued in its summary judgment briefing that Gallaudet (as subrogee for St. Paul) had a non-

transferrable duty to inspect its sprinkler systems based on a distinction found in NFPA 25 that,

according to Capitol Sprinkler, allows a building owner to transfer "authority" to inspect

sprinkler systems but prevents the transfer of the "responsibility" to perform such inspections.

*See* Def.'s Reply to Pl.'s Opp'n at 9-10.  Because Capitol Sprinkler did not proffer any expert

testimony supporting this interpretation, the Court requested briefing as to

> the basis for Gallaudet's allegedly non-transferrable duty to inspect its sprinkler
> systems (i.e., that NFPA 25 incorporates the distinction between 'authority' and
> 'responsibility' that Capitol Sprinkler identifies), and that Gallaudet's transfer or
> attempted transfer of this duty caused, in whole or in part, the damages in this
> case.

Order at 2 (Sept. 2, 2008).

Having reviewed the parties' Supplemental Briefs, it is entirely unclear how Capitol

Sprinkler reaches its conclusion that a building owner cannot delegate its duty to perform

sprinkler inspections.  Capitol Sprinkler makes the naked assertion that "Gallaudet University

has a non-delegable statutory duty under D.C. Code § 6-701.01, *et seq.*, to ensure that the

sprinkler system in the Kellogg Conference Center is properly installed and maintained."  Def.'s

Suppl. Br. at 10.  If such a non-delegation provision exists in the D.C. Code, the Court is unable

to find it in Section 6-701.01 and its related provisions, which are focused on the duties of

building owners to provide fire escapes and other fire protections but make no mention of

sprinkler systems.  Capitol Sprinkler points to no language in this or any related provision even

referencing delegation (or a prohibition on delegation) of an owner's duties, and as St. Paul

correctly observes, non-delegation arguments have been raised and rejected in numerous other

contexts.  *See, e.g.*, Pl.'s Suppl. Br. at 16 (citing *Herbert v. District of Columbia*, 716 A.2d 196

(D.C. 1998)).  Capitol Sprinkler sets forth no reason why application of a non-delegation doctrine

would be appropriate as to the obligations at issue in this case.

In addition to the D.C. Code provision discussed above, Capitol Sprinkler also supports

its argument by reference to two provisions in NFPA 25:

> Where the property owner is not the occupant, the property owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems . . .

> Where an occupant, management firm, or managing individual has received the authority for inspection, testing, and maintenance, the occupant, management firm, or managing individual shall comply with the requirements identified for the owner or occupant throughout this standard.

*See* Def.'s Suppl. Br. at 11 (quoting NFPA 25 §§ 4.1.2.3, 4.1.2.4 (2002)).  Capitol Sprinkler argues that the "plain language" of these provisions means that "the legal duty to ensure that a sprinkler system is properly inspect [sic] and maintained falls on the owner." *Id.*  While it may be true that such a legal duty exists, these provisions do *not* indicate that such a duty cannot be delegated to a third-party.  Accordingly, if non-delegation can somehow be divined from the provisions of NFPA 25 or otherwise, Capitol Sprinkler has failed to set forth any evidence in support of the same.

Finally, all three of Capitol Sprinkler's negligence arguments fail for the additional reason that Capitol Sprinkler cannot establish the non-contractual applicability of NFPA 25 in this case without expert testimony.  Whereas a jury may find that the NFPA 25 was incorporated as a term of the Inspection Agreement (and thereby obligated the parties to comply with its provisions), the same cannot be said about Capitol Sprinkler's negligence arguments, which depend on the applicability of NFPA outside the context of the Inspection Agreement.

In its Supplemental Brief, Capitol Sprinkler argues that NFPA 25 carries the "force of law" in the District of Columbia because "[t]he D.C. Counsel has adopted a Code of D.C. Regulations that expressly adopt the ICC International Fire Code as a uniform standard for fire protection systems" and that, under this code, NFPA 25 is the required standard for inspections.

*Id.* at 10.  Capitol Sprinkler urges the Court to accept NFPA 25 as the applicable standard of care.

*Id.* at 12 ("this Court as well as a jury[] may consider a breach [of NFPA 25] as negligence").

Capitol Sprinkler's arguments fundamentally misunderstand what is required before a regulation

such as NFPA 25 may be submitted to the jury as an applicable standard of care.

In the District of Columbia, courts have "required expert testimony to explain the

applicability of statutes where the statute is relied upon as establishing the standard of care."

*McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567, 583 (D.C. 1996).  For example, in *McNeil*

*Pharmaceutical*, the D.C. Court of Appeals examined whether, in the context of a products

liability claim, the trial court properly submitted various statutes and regulations to the jury

where "the only evidence of a standard of care presented to the jury" were the statutes and

regulations.  *Id.* at 579.  The court held that "complex or technical statutes . . . may not be used

for negligence *per se* purposes without expert testimony or guidance from the court to assist the

jury's understanding."  *Id.*  It was incumbent on the court to determine whether the regulation

"could be reasonably understood by the jury without expert testimony or guidance by the court."

*Id.* at 581.

Similarly, in *Lowrey v. Glassman*, the plaintiff asserted that the reconfiguration of a

hospital's parking lot violated applicable zoning requirements and caused damage to his

property.  908 A.2d 30 (D.C. 2006).  The plaintiff failed to designate a zoning expert, however,

arguing that "expert witnesses were not needed to show the configuration of the parking spaces

or the fact that the spaces violated applicable zoning regulations."  *Id.* at 36.  The D.C. Court of

Appeals summarily rejected that argument because "someone would have to explain to a

factfinder what regulations applied and how they are construed.  These are the things with which

zoning inspectors – and not lay persons – are familiar." *Id.* (internal quotations omitted). Because "[t]hat information was not available," the court found that "there was no 'significant probative evidence' in the record tending to support the claim of a zoning violation 'such that a reasonable [fact-finder] could return a verdict' for [the plaintiff]." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). *See also Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 674 (D.C. 1983) (finding that the trial court erred by admitting into evidence two provisions of a building code as evidence of negligence because the plaintiff failed to "proffer any evidence regarding the purpose and scope of the two building code sections or the meaning of the key terms in them").

Based on this guidance, the Court finds that Capitol Sprinkler must present expert testimony concerning both the applicability of NFPA 25 and the meaning of its relevant provisions.[6]  This is particularly necessary in the present case because the parties dispute whether NFPA 25 has, in fact, been adopted as set forth in Capitol Sprinkler's Supplemental Brief.  *See* Pl.'s Suppl. Br. at 13 ("[w]hile plaintiff agrees that NFPA 25 is the standard of care which governs sprinkler system inspections, plaintiff does not agree that NFPA 25, in and of itself, carries the force of law.  Rather it is a national technical standard which is the recognized standard of care in the sprinkler inspection industry").  In the absence of expert testimony, the

_____

[6] The Court notes that there are other issues likely requiring expert testimony.  For example, Capitol Sprinkler would also have to show that the regulation was designed to protect a class of persons or entities of which Capitol Sprinkler is a member, or that the regulation was designed to prevent the type of accident that occurred.  *See McNeil Pharmaceutical*, 686 A.2d at 579 (explaining that a statute or regulation may constitute an appropriate standard of care only if it is "'enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred'") (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (1993)).  Capitol Sprinkler has made no effort to set forth credible evidence relating to this issue.

Court finds that Capitol Sprinkler's negligence arguments are non-cognizable.  Accordingly, the

Court shall grant Guest Services's Motion for Summary Judgment as to Capitol Sprinkler's

negligence claim against Guest Services.[7]

C.      Remaining Issues

Two issues remain.  First, Capitol Sprinkler raised a new theory of liability for the first

time in its Supplemental Brief.  According to this new theory, St. Paul and Guest Services may

be held liable in this case for violating a common law "innkeeper" standard of care.  *See* Def.'s

Suppl. Br. at 7-9.  Capitol Sprinkler argues that, "as the owner of the Kellogg Conference Center,

plaintiff had the same legal duty incumbent upon all inkeepers [sic] by District of Columbia law

i.e., to exercise reasonable care to protect its guests."  *Id.* at 7.  These duties include "tak[ing]

reasonable precautions to protect its guests[] from damages that can be reasonably anticipated."

*Id.* at 8.  Based on this common law standard, Capitol Sprinkler reaches the following

conclusion:

> both plaintiff *and* Guest Services, by virtue of their contractual relationship, each
> had a duty to ensure the safety of the guests of the hotel, which included the duty
> to inspect.  Therefore, in the absence of any inspection of the drum drip in room
> 5200 by Capitol Sprinkler, regardless of the reason, the duty to ensure that the
> drum drip was in proper working order, so as to protect the guests of the Kellogg
> Conference Center, falls to Gallaudet and/or Guest Services.

*Id.* at 9.

---

[7] In its September 2, 2008 Order and Memorandum Opinion, the Court also held in
abeyance Capitol Sprinkler's [57] Motion for Summary Judgment against St. Paul to the extent
that it argued that Gallaudet, as the subrogee for St. Paul, was negligent for conduct that was
unrelated to the conduct of Guest Services.  Consistent with the analysis set forth above, Capitol
Sprinkler cannot prevail on its negligence-based arguments in the absence of expert testimony
and, accordingly, the Court shall deny the portion of Capitol Sprinkler's Motion for Summary
Judgment previously held in abeyance in the Order accompanying this Memorandum Opinion.

The problems with Capitol Sprinkler's new theory of liability are easily identifiable. First, and most obvious, none of the parties in this lawsuit is a former guest of the conference center suing for damages based on a broken sprinkler system. Whatever duty of care is owed by Gallaudet to its guests surely is not implicated by the parties and issues in this case. Second, the undisputed facts in the record demonstrate that Gallaudet (through Guest Services) contractually delegated its duty to Capitol Sprinkler to inspect the dry sprinkler system. Thus, even if Gallaudet had a common law obligation based on its status as an innkeeper, Capitol Sprinkler fails to explain why Gallaudet retained the obligation after Capitol Sprinkler agreed to assume it. Third, Capitol Sprinkler sets forth no credible evidence that the innkeeper common law standard of care would include the obligation to drain a drum drip in a dry sprinkler system.

The second and last issue concerns the possible introduction of hearsay statements by the unidentified escort who accompanied Capitol Sprinkler's inspectors during its inspection of the Kellogg Conference Center. The Court's September 2, 2008 Order required Capitol Sprinkler to set forth a theory of admissibility concerning the escort's statements. *See* Order at 2 (Sept. 2, 2008). Because the Court's foregoing rulings significantly change the posture of this case, the Court shall decline to issue any rulings concerning these statements at this time. The Court shall instead set a schedule for the parties to file pre-trial Motions *in Limine*, which may include a motion by St. Paul to exclude the escort's statements, if deemed appropriate at that time.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT St. Paul's [48] Motion for Partial Summary Judgment as to liability on its breach of contract claim, and GRANT Guest Services's [59] Motion for Summary Judgment, both of which were previously held in abeyance on

September 2, 2008.  The Court shall dismiss Guest Services from further proceedings in this case.  By separate Order, the Court shall set a Status Hearing to discuss further proceedings for the two remaining claims in this case – St. Paul's breach of contract claim (as to which liability has been established) and St. Paul's negligence claim (as to which St. Paul did not move for summary judgment).

Date: June 15, 2009

                                    */s/*                                    
                                    **COLLEEN KOLLAR-KOTELLY**
                                    United States District Judge